1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLARK LANDIS, et al.,

NO.   2:18-cv-01512-BJR

Plaintiff,

**PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

vs.

Filing Date: May 20, 2019

WASHINGTON STATE MAJOR
LEAGUE BASEBALL STADIUM
PUBLIC FACILITIES DISTRICT, et al,

Defendants.

Pursuant to Federal Rule of Civil Procedure 56(a), Plaintiffs Clark Landis, Robert Barker, Kayla Brown, and Grady Thompson (collectively, "Plaintiffs") respectfully move the Court for summary judgment, or in the alternative summary adjudication, on Defendants Washington State Major League Baseball Stadium Public Facilities District, Baseball of Seattle, Inc., Mariners Baseball, LLC, and The Baseball Club of Seattle, LLLP ("Defendants") on the ground that there is no genuine dispute as to a material fact and Plaintiffs are entitled to judgment as a matter of law.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
PAGE 1

2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1

## 1. __INTRODUCTION__

2

Plaintiffs are all long-time Mariners Baseball fans who filed this lawsuit after

3

encountering accessibility barriers at T-Mobile Park, the Mariners' home stadium in Seattle.  The

4

Americans with Disabilities Act ("ADA") has required newly constructed places of public

5

accommodation to follow certain design and architectural standards since 1993.  Despite the fact

6

that construction on the stadium now known as T-Mobile Park first began in 1997 – long after

7

the ADA requirements went into effect – T-Mobile Park fails to meet many of the ADA

8

requirements for accessibility, including requirements for field and scoreboard sightlines, for

9

wheelchair accessible seating dimensions, for slope and changes in level along the path of travel,

10

for comparable choices of wheelchair accessible seats both in price and in physical location, and

11

for wheelchair accessible tables and counters at sales and eating areas.  Thus, fans who with

12

mobility disabilities are offered a significantly lesser experience than fans who can walk around

13

the stadium.

14

In order to bring T-Mobile Park into compliance with the relevant, applicable ADA

15

standards and to provide attendees with mobility disabilities like Plaintiffs a more equal and

16

accessible experience at T-Mobile Park, Plaintiffs respectfully request that the Court grant

17

summary judgment or summary adjudication in favor of Plaintiffs against Defendants.

18

## 2. __LEGAL STANDARDS__

19

### a. __SUMMARY JUDGMENT IS APPROPRIATE IN THE ABSENCE__

20

### __OF A GENUINE DISPUTE OF FACT__

21

Summary judgment is appropriate when "the pleadings, depositions, answers to

22

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

23

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

24

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
PAGE 2
2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1  matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

2  Genuine issues of material fact that preclude summary judgment are "disputes over facts that

3  might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby*, Inc.,

4  477 U.S. 242, 248 (1986). The moving party is entitled to judgment as a matter of law when the

5  nonmoving party fails to make a sufficient showing on an essential element of his case with

6  respect to which he has the burden of proof. *Celotex*, 477 U.S. at 322-23.

7  **b.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON**

8  **THEIR DISABILITY CLAIMS AGAINST THE PFD**

9  To establish a prima facie case of a Title II ADA violation, a plaintiff must show that (1)

10  they are a qualified individual with a disability; (2) they were excluded from participation in or

11  otherwise discriminated against with regard to the public entity's services, programs, or

12  activities; and (3) the exclusion or discrimination was by reason of their disability *Lovell v.*

13  *Chandler*, 303 F. 3d. 1039, 1052 (9th Cir. 2002) (citing *Weinreich v. Los Angeles County Metro.*

14  *Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).

15  **c.   PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON**

16  **THEIR DISABILITY CLAIMS AGAINST THE MARINERS**

17  Title III of the ADA provides that "No individual shall be discriminated against on the

18  basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

19  advantages, or accommodations of any place of public accommodation by any person who owns,

20  leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.

21  To prevail on a discrimination claim under Title III,  a plaintiff must show that: (1) they

22  are disabled within the meaning of the ADA; (2) the defendant is a private entity that owns,

23  leases, or operates a place of public accommodation; and (3) the plaintiff was denied public

24
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PAGE 3

2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1  accommodations by the defendant because of their disability. *Arizona ex rel. Goddard v. Harkins*

2  *Amusement Enters. Inc.*, 603 F.3d 666 (9th Cir., 2010).

3          d.  **T-MOBILE PARK MUST MEET ADA STANDARDS TO AVOID**

4               **VIOLATING THE ADA**

5        Unlike many ADA cases involving complex issues of employment or subjective

6  determinations of "necessary" accessibility alterations to a property, this case revolves around

7  clearly defined and easily measured physical construction standards set forth by the Department

8  of Justice.

9        Discrimination for purposes of the ADA includes a failure to design and construct

10  facilities for first occupancy after January 26, 1993, that are readily accessible to and usable by

11  individuals with disabilities.  28 C.F.R. § 36.401.  "Whether a facility is 'readily accessible' is

12  defined, in part, by the ADA Accessibility Guidelines. . . which "lay out the technical structural

13  requirements of places of public accommodation." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 779

14  F.3d 1001, 1006 (9th Cir. 2015).  T-Mobile Park was constructed after 1993 (per a Seattle Times

15  article available at: https://www.seattletimes.com/sports/mariners/great-moments-at-safeco-

16  field/, groundbreaking on construction for T-Mobile Park was on March 8, 1997 and the first

17  Mariners game took place on July 15, 1999).  Therefore, under a plain reading of the statute, in

18  order to avoid discrimination against persons with disabilities under the ADA, T-Mobile Park

19  must comply with the applicable ADA Accessibility Guidelines (often referred to, as they are in

20  this Motion, as the "ADA Standards").  The Access Board is federal entity charged with

21  developing and maintaining the ADA Accessibility Guidelines (the ADA Standards for

22  Accessible Design) which were adopted as the enforceable ADA requirements by the

23

24

1   Department of Justice and Department of Transportation in 1991 and updated in 2010.  42

2   U.S.C. §§ 12134 and 12186.

3           Defendants have failed to meet the 1991 ADA Standards for Accessible Design ("1991

4   Standards") and the 2010 ADA Standards for Accessible Design ("2010 Standards") in

5   constructing, operating, and maintaining T-Mobile Park, and are unlikely to abide by ADA

6   Standards without an order from the Court.

7           The relevant ADA Standards are laid out below under each category of accessibility

8   barrier Plaintiffs and other baseball game attendees using wheelchairs face at T-Mobile Park.

9           3.   **UNDISPUTED FACTUAL BACKGROUND**

10              a.   **PLAINTIFFS' ARE QUALIFIED INDIVIDUALS WITH**

11                   **DISABILITIES**

12          Plaintiffs each use a wheelchair for mobility and regularly attend Mariners' baseball

13   games at T-Mobile Park. Declaration of Grady Thompson ("Thompson Decl.") at ¶3,

14   Declaration of Robert Barker ("Barker Decl.") at ¶3, Declaration of Clark Landis ("Landis

15   Decl.") at ¶3, Declaration of Kayla Brown ("Brown Decl.") at ¶3.  Plaintiffs have each attended

16   a Mariners' baseball game at T-Mobile Park in the 2018 Season.  Thompson Decl. at ¶4, Barker

17   Decl. at ¶4-5, Landis Decl. at ¶4-5, Brown Decl. at ¶4-5.

18              a.   **THE PUBLIC FACILITIES DISTRICT IS A PUBLIC ENTITY**

19          T-Mobile Park is owned by the defendant Washington State Major League Baseball

20   Stadium Public Facilities District ("PFD").  Under 42 U.S. Code § 12131(1)(b), "any department,

21   agency, special purpose district, or other instrumentality of a State or States or local government"

22   is a public entity within the meaning of Title II of the ADA, and thus the PFD is a public entity.

23

24
WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

### b.  T-MOBILE PARK IS A PLACE OF PUBLIC ACCOMMODATION

Under 42 U.S.C. 12181(7) stadiums are places of public accommodation, and thus under a plain reading of the statute T-Mobile Park, as a baseball stadium, is a place public accommodation.

### c.  DEFENDANTS BASEBALL OF SEATTLE, INC., MARINERS BASEBALL, LLC, AND THE BASEBALL CLUB OF SEATTLE, LLLP ARE PRIVATE ENTITIES

Baseball of Seattle, Inc., Mariners Baseball, LLC, and The Baseball Club of Seattle, LLLP are not public entities and are therefore private entities. 42 U.S.C. § 12181(6).  The Baseball Club of Seattle, LLLP (the "Mariners") leases T-Mobile Park from the PFD, and operates T-Mobile Park as a place of public accommodation.

### d.  WHEELCHAIR SEATING AREAS DO NOT MEET REQUIRED ADA DIMENSIONS

Under the both the 1991 Standards and the 2010 Standards, wheelchair seating spaces must be at least 48 inches deep with a 36 inch wide accessible route directly adjoining the rear of the wheelchair seating space. §§ 4.33.2 – 4.33.3 of the 1991 Standards and §§ 221 and 802 of the 2010 Standards.  Thus, a wheelchair seating location must have 84 inches of depth of clear floor space in order to be ADA compliant.

Wheelchair seating spaces and adjoining accessible route space on the uppermost level of the stadium, the 300 level, is short of 84 inches by about four to five inches due to the placement of the structural supports for the front railing on the wheelchair seating platforms. Declaration of Jim Terry ("Terry Decl.") at ¶6. This deficiency causes many wheelchair users to unacceptably spill into the accessible route behind their chairs.  Thompson Decl. at ¶5, Landis Decl. at ¶6,

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PAGE 6

2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY ADVOCATE

4115 Roosevelt Way NE, Suite B

Seattle, WA 98105

(206) 428-3558

1   Terry Decl. at ¶6.  Due to the design of the facility, many other spectators must also use this

2   accessible route to get to and from their seats.  Terry Decl. at ¶7.

3        Due to the lack of space at the wheelchair seats on the 300 level, some plaintiffs have

4   been crowded against and bumped into by other stadium patrons moving behind them.

5   Thompson Decl. at ¶5, Landis Decl. at ¶6.  If the 300 level seats are sufficiently altered to be

6   deep enough to comply with ADA Standards then plaintiffs Landis and Thompson will sit in

7   accessible seats on the 300 level.  Landis Decl. at ¶7, Thompson Decl. at ¶14.

8          **e.   SIGHTLINES AT WHEELCHAIR SEATING LOCATIONS ARE**

9              **INFERIOR TO SIGHTLINES AT STANDARD SEATING**

10              **LOCATIONS**

11        Both the 1991 Standards and the 2010 Standards require wheelchair accessible seating

12   locations to be constructed and located so spectators in wheelchairs can still see the event when

13   people seated in front of the wheelchair seating locations are standing. Under § 4.33.3 of the

14   1991 Standards lines of sight must be comparable to those for members so the general public.

15   The 2010 Standards further clarified the sightline requirement in § 802.2.2 by specifically

16   requiring both: (a) lines of sight *over the shoulders* of spectators in the row immediately in front

17   of wheelchair seating locations, and (b) lines of sight *over the heads* of spectators in two rows in

18   front of wheelchair seating locations.

19        About half of all wheelchair accessible seating locations at T-Mobile Park are on the

20   lowermost seating level, the 100 level. Terasaki Declaration at ¶5 (345 of 688 seats total).  On

21   the 100 level, spectators in wheelchairs do not have comparable sightlines over the shoulders of

22   the spectators directly in front of them, and do not have comparable sightlines over the heads of

23

24

1   the spectators two rows in front.  Landis Decl. at ¶8, Barker Decl. at ¶6, Brown Decl. at ¶6, and

2   Terry Decl. at ¶11.

3        Plaintiffs expert witness James L. E. Terry, CEO of Evan Terry Associates, LLC ("Mr.

4   Terry") inspected T-Mobile Park on February 5, 2019 to take measurements objectively

5   demonstrating, among other things, the lack of comparable sightlines for spectators in

6   wheelchairs.  Terry Decl. at §§3, 4, 5 and 9. Utilizing the same wheelchair and standing spectator

7   dimensions for shoulder height, head height, and eye level used by the Department of Justice to

8   evaluate sightlines, Mr. Terry measured the amount of baseball field visible from wheelchair

9   accessible seats in 10 different locations throughout the stadium.  Terry Decl. at ¶9.  By taking a

10  photo from the eye height of a spectator in a wheelchair seat and comparing it to a photo taken in

11  an adjacent location at the eye height of a standing spectator, the difference in viewable area can

12  be clearly defined.  Terry Decl. at ¶10. For instance, in section 129, row 41A (the closest

13  wheelchair accessible seat in section 129), only 62% of the entire field and only 65% of the

14  infield is visible above the heads of standing spectators two rows in front.  Terry Decl. at ¶12.

15  By contrast, in section 129, row 40 (the closest row of standard seats to the wheelchair seating

16  row) 97% of the entire field and 100% of the infield is visible over the heads of standing

17  spectators two rows in front.  Terry Decl. at ¶13.  The difference is abundantly clear in the

18  images below, with the left image showing the significantly obscured view of the field at the

19  wheelchair seating and the right image showing clear visibility of the entire infield for standing

20  spectators (from Attachment B3 of Mr. Terry's Expert Report):

21

22

23

24

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1

2

3

4

5

6

7

8



Similar sightline results are found in wheelchair seating locations throughout the 100 level and most of the 200 level (Terry Decl. at ¶14):

| Wheelchair Accessible Seat | Amount of Field Visible | Amount of Field Visible at Comparable Standard Seat | Difference in Viewable Field |
|---|---|---|---|
| Sec 124, Row 41A | 53% | 73% | 20% Less viewable field at wheelchair seat |
| Sec 129, Row 41A | 62% | 97% | 35% Less viewable field at wheelchair seat |
| Sec 135, Row 41A | 36% | 71% | 35% Less viewable field at wheelchair seat |
| Sec 147, Row 41A | 45% | 72% | 27% Less viewable field at wheelchair seat |
| Sec 214, Row 11A | 44% | 81% | 37% Less viewable field at wheelchair seat |
| Sec 224, Row 11A | 38% | 69% | 31% Less viewable field at wheelchair seat |
| Sec 227, Row 11A | 87% | 79% | 16% Better viewable field, because a viewing platform is constructed at this location |
| Sec 237, Row 11A | 36% | 73% | 37% Less viewable field at wheelchair seat |
| Sec 247, Row 11A | 47% | 82% | 35% Less viewable field at wheelchair seat |

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

| Sec 330, Row 5A | 63% | 87% | 24% Less viewable field at wheelchair seat |
|---|---|---|---|

As is obvious from the sightlines at section 227, row 11A, one effective solution may be to raise the wheelchair seating locations on a platform to provide a better view over the shoulders and heads of standing spectators in front.

For all wheelchair seats suffering from inferior sightlines the ideal solution will involve both moving the seats upward in elevation, for instance on a platform, and also moving the seats forward toward the field.

Plaintiffs will sit in wheelchair accessible seats on the 100 level if sightline issues are corrected.  Thompson Decl. at ¶6-7, Landis Decl. at ¶10, Barker Decl. at ¶7, Brown Decl. at ¶7.

###### f.   WHEELCHAIR SEATING LOCATIONS ARE CONCENTRATED IN LESS PREFERABLE SEATING LOCATIONS AND UNEQUALLY DISPERSED IN LOCATION AND PRICE COMPARED TO STANDARD SEATS

The ADA Standards unambiguously require that wheelchair seats be distributed horizontally and vertically throughout the stadium in order to offer a selection of wheelchair seating locations comparable to the selection of standard seating locations.  Wheelchair seats must be dispersed horizontally around the stadium (§ 221.2.3.1 of the 2010 Standards) as well as vertically at varying distances from the playing field (§ 221.2.3.2 of the 2010 Standards).  Under § 4.33.3 of the 1991 Standards, wheelchair seating locations must be in locations that provide wheelchair users with "a choice of admission prices and lines of sight comparable to those for members of the general public." § 221.2.3 of the 2010 Standards requires an even higher bar for compliance and states that "Wheelchair spaces shall provide spectators with choices of seating

WASHINGTON CIVIL & DISABILITY ADVOCATE

4115 Roosevelt Way NE, Suite B

Seattle, WA 98105

(206) 428-3558

1  locations and viewing angles that are substantially equivalent to, or better than, the choices of

2  seating locations and viewing angles available to all other spectators."

3        Seating for spectators in wheelchairs is overwhelmingly concentrated at the rearmost row

4  of the 100 level, with less than 10 wheelchair seats located within the closest fifteen rows of the

5  field.  Terasaki Declaration at ¶6-7.  From wheelchair accessible seats at the rear of the 100 level

6  seating, views of the sun, sky, fly balls, home run fireworks, and the scoreboard are partially or

7  fully obscured due to the overhanging structure from the upper level. Landis Decl. at ¶9, Barker

8  Decl. at ¶8, Thompson Decl. at ¶6, Brown Decl. at ¶8.  Additionally, as a result of the vast

9  distance from the field as well as overhang from the upper level, the chance of catching a fly ball

10  souvenir or of a player tossing a practice ball souvenir to spectators in wheelchair accessible

11  seats is slim to none.  Landis Decl. at ¶11, Thompson Decl. at ¶9, Barker Decl. at ¶9, Brown

12  Decl. at ¶9.

13        By contrast, standard non-accessible seats can be purchased near the field in a wide

14  variety of locations and prices.  For example, according to ticket prices available on the online

15  ticket sales platform for Mariners games through Ticketmaster, a front-row outfield seat next to

16  the field in section 103, row 23, seat 13 was $35, and a wheelchair accessible seat in that same

17  section 103 but in the furthest rear row 39A, seat 7 was also $35 dollars. Terasaki Decl. at ¶8-9.

18  A potential ticket purchaser who requires wheelchair accessible seats would pay the same for a

19  seat 16 rows further back and would have no ability to purchase a ticket anywhere within the

20  first 15 rows of seats aside from the far more expensive seats directly behind home plate as part

21  of either the "Diamond Club" or the "Premier Seats."

22        Since this lawsuit was filed on October 15, 2018 additional wheelchair accessible seating

23  has been added to the Diamond Club and while most Diamond Club wheelchair accessible seats

24

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

remain at the normal Diamond Club price of up to $600 per seat, prices for one wheelchair seat and one companion seat have been dramatically slashed to $100 per seat (Terasaki Decl. at ¶9-10) and categorized as Premium Seats in response to this litigation.  Plaintiffs welcome any and all improvement in accessibility to T-Mobile Park. However, the mere addition of eight wheelchair accessible seats in the front row behind home plate is insufficient. This is a section typically filled with wealthy adults and at a far higher price than a typical front row outfield seat where families on a budget can obtain a casual, close up experience with the players and fly or foul balls. This minor increase in the number of wheelchair accessible and companion seats behind home plate and the repricing of two of these seats does not bring the stadium into compliance with the ADA requirements under either the 1991 or the 2010 Standards.

The seats as identified in the stadium seating manifest provide a broader look at the lack of wheelchair accessible seating near or around the field.  The stadium manifest shows there are 7,820 seats of varying locations and prices within 15 rows of the playing field.  Terasaki Decl. at ¶3.  The total number of wheelchair accessible seats within the first 15 rows of the playing field is 9, and those 9 seats are concentrated only in section 35 near home plate.  Terasaki Decl. at ¶6-7.  There is a stark disparity between standard seating and wheelchair accessible seating within 15 rows of the playing field:

| Wheelchair seats near the field | *only* <u>0.115%</u> (less than one out of every 782 seats) |
|---|---|
| 2010 Standards requirement for seats dispersed horizontally and vertically § 221 | Just over <u>0.5%</u> of seats (36 seats plus 1 for every 200 seats over 5000) |
| 1991 Standards requirement for seats disbursed in a selection comparable to standard seats § 4.1.3(19) | Just over 1% of seats (3 seats plus one for every 100 seats over 500) |

WASHINGTON CIVIL & DISABILITY ADVOCATE

4115 Roosevelt Way NE, Suite B

Seattle, WA 98105

(206) 428-3558

1  Terasaki Decl. at ¶11.  The first 15 rows of seats comprise more than 16% of all seating in the

2  stadium, and in that desirable 16% of the stadium only 9 seats are available to wheelchair users.

3  Terasaki Decl. at ¶12.

4       In order to become even arguably compliant with either the 1991 or the 2010 ADA

5  Standards, T-Mobile Park must offer a dramatically increased number of wheelchair accessible

6  seats closer to the playing field – for instance, by increasing the proportion of wheelchair

7  accessible seating within the first 15 rows of the field from 0.115% to 16%. Additionally,

8  Defendants must resolve issues of pricing to allow attendees in wheelchairs to sit near the

9  playing field without paying a minimum entry fee of $100 to $600 per ticket.

10       Plaintiffs will purchase tickets on the 100 level near the playing field, including in the

11  outfield, if added and priced in line with ADA Standards.  Landis Decl. at ¶12, Thompson Decl.

12  at ¶8, Barker Decl. at ¶ 10, Brown Decl. at ¶10.

13       **g.   THE FLOOR ALONG THE PATH OF TRAVEL IN THE**

14           **CONCOURSES AND THROUGHOUT THE STADIUM HAS**

15           **HAZARDOUS BUMPS, CRACKS, GAPS, AND CHANGES IN**

16           **LEVEL**

17       Accessible dimensions for bumps, cracks, slopes, and changes in level along the path of

18  travel available for people with mobility disabilities are plainly set out in the ADA standards.  §

19  4.3 of the 1991 Standards and § 303 of the 2010 Standards.  While hazardous bumps, cracks, and

20  changes in level are often the result of a failure to sufficiently maintain the wheelchair accessible

21  route of travel, others are the result of design or construction failures. Terry Decl. at ¶17-18.

22       For walking surfaces and the accessible routes, bumps and vertical changes in level ¼

23  inch and less are permitted without edge treatment (like a beveling or smoothing of the top

24  PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
    PAGE 13
    2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

edge), and changes in level up to ½ inch are permitted if sloped no greater than 1:2 (one inch of vertical rise for each two inches of vertical run).  §§ 4.2.4.3, 4.3.8 and 4.5.2 of the 1991 Standards and §§ 206.1, 303, 305.2, and 303 of the 2010 Standards.  All changes in level greater than ½ inch must be altered. *Id.*

Gaps and other long openings in the floor are not permitted to be deeper than ¼ inch or wider than ½ inch, and even within those dimensions the gaps must be oriented perpendicular to the direction of travel to prevent wheels from things like wheelchairs and walkers from becoming stuck.  §§ 4.3.6 and 4.5.4 of the 1991 Standards and §§ 206.1, 302.3, and 403 of the 2010 Standards.

Throughout the concourses of T-Mobile Park and along the wheelchair accessible routes of travel between stadium entry, seating, restrooms, concessions, and other areas of the stadium there are dangerous bumps and cracks.  Landis Decl. at ¶13, Thompson Decl. at ¶10, Barker Decl. at ¶11, Brown Decl. at ¶11.  Mr. Terry identified hundreds, or likely thousands, of linear feet of gaps in the surfaces of the wheelchair travel paths of T-Mobile Park during his extremely brief inspection that are deeper than ¼ inch and more than ½ inch wide, and if Mr. Terry had another day to inspect the stadium he would certainly have found additional gaps. Terry Decl. at ¶16-18.

Mr. Terry additionally identified significant changes in level along the ground surfaces in excess of 1/2 inches.  Terry Decl. at ¶17.  These dangerous changes in level not only include typical issues of maintenance like edges where adjacent sections of concrete or brick meet, but also include serious issues with the covers of expansion joists. Terry Decl. at ¶17.

The expansion joints at T-Mobile Park are architectural assemblies designed to allow different parts of the structure to safely expand and contract with the changes in temperature.

WASHINGTON CIVIL & DISABILITY ADVOCATE

4115 Roosevelt Way NE, Suite B

Seattle, WA 98105

(206) 428-3558

Terry Decl. at ¶19.  To prevent deep and dangerous gaps in the walkway, expansion joints must be covered or filled.  *Id.*  Expansion joints are common and necessary in large buildings like stadiums, and many solutions are commercially available to solve the problems of expansion joint gaps in walkways.  *Id.*  Expansion joint covers at T-Mobile Park are raised metal platforms extending across the width of the expansion joint with edges slanted down toward the ground to provide very short, steep ramps to the concourse floor.  Terry Decl. at ¶20.  While Mr. Terry had limited time to inspect T-Mobile Park, he noted that at least some expansion joint covers the rise in elevation exceeds the ½ inch limit, and for at least some expansion joint covers the rise in elevation is within the ½ inch limit but the beveled edge exceeds the limit for slope.   Terry Decl. at ¶21.

People with mobility disabilities users are forced to cross multiple expansion joints in order to reach their wheelchair accessible seats, and the abrupt jolt wheelchairs receive when crossing expansion joints causes many problems. Landis Decl. at ¶14, Thompson Decl. at ¶11, Barker Decl. at ¶12, Brown Decl. at ¶12.  As a result of encountering expansion joint covers plaintiffs have stopped moving unexpectedly, causing pedestrians to crash into wheelchairs from the rear, spilled food or drink on themselves due to the jolt of hitting the joint cover, and nearly fallen to the ground due to the unexpected bump.  Landis Decl. at ¶14, Barker Decl. at ¶13, Brown Decl. at ¶12.

While we do not know for certain that all expansion joint covers fail to meet the ADA Standards, it is undoubted that many are dangerous due to noncompliance with ADA Standards. A full inspection of the walking paths and accessible routes for problematic expansion joints, bumps, gaps, and changes in level is necessary, and an ADA compliant solution for expansion joint covers must be utilized.

WASHINGTON CIVIL & DISABILITY ADVOCATE

4115 Roosevelt Way NE, Suite B

Seattle, WA 98105

(206) 428-3558

### h. CONCESSIONS SALES COUNTERS EXCEED ADA STANDARDS FOR HEIGHT

Under § 7.2 of the 1991 Standards and § 904.4 of the 2010 Standards, sales and service counters must be no higher than 36 inches or have a portion of the counter no higher than 36 inches, and that portion must be 36 inches in length.

Throughout the concourses there are food and drink concession counters taller than 36 inches with no lowered portion. Terry Decl. at §23, Landis Decl. at ¶16, Thompson Decl. at ¶12. For example, most of the "Shortstop Beer" stands have no lowered counters, and the "Hop Box" beer stand only has a single, tall counter. Landis Decl. at ¶16, Terry Decl. at ¶23-24. In addition to excessively tall counters at food and drink stands, many built-in counters at restaurants, bars, and concession vendors lack a lowered bar portion for wheelchair access. The bar in Edgar's Cantina, a bar and restaurant along the outfield at the playing field level, houses a tall bar from which customers order food and drink, and the entirety of the length of that bar exceeds 36 inches in height. Terry Decl. at ¶25-26.

### i. DINING SURFACES EXCEED ADA STANDARDS FOR HEIGHT

Where dining surfaces are provided at least 5 percent of the seating and standing spaces must have a dining surface between 28 and 34 inches above the floor. §§ 5.1-5.2 of the 1991 Standards and §§ 226 and 902 of the 2010 Standards. Eating is typically an integral part of enjoying baseball game and there are hundreds or thousands of dining surfaces dispersed throughout T-Mobile Park. While a large number of wheelchair accessible seating locations appear to have some sort of dining surface, there many notable and popular areas which are accessible to attendees holding any price-level of ticket which are conspicuously devoid of wheelchair accessible dining surfaces:

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PAGE 16

2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY ADVOCATE

4115 Roosevelt Way NE, Suite B

Seattle, WA 98105

(206) 428-3558

- Edgar's Cantina exclusively features tall, standing height dining tables and dining counters in the lower portion of the restaurant next to the field; Terry Decl. at ¶25-26 Landis Decl. at ¶17.

- "The 'Pen" area of the field level near the bullpens provides and excellent view of pitchers warming up in the bullpen and exclusively features tall, standing height dining counters; Brown Decl. at ¶17.

- The "Edgar's Cantina Home Run Porch" area of the 100 level, near section 150, provides an excellent view of the game from the top of the 100 level and exclusively features tall, standing height dining tables and dining counters; Terry Decl. at ¶27-28.

- Lookout Landing at the top of the 300 level provides excellent city skyline and full stadium views and exclusively features tall, standing height dining tables and dining counters;

### j.   LINES FOR WAITING TO PURCHASE CONCESSIONS ARE SET UP TOO NARROW FOR WHEELCHAIR ACCESS

The wheelchair accessible route must be at least 36 inches wide with 48 inches of clear width at turns, and must connect each accessible element (like a sales or service counter) must be connected via an accessible route. the § 4.3.3 of the 1991 Standards and §§ 206.2 and 403.5 of the 2010 Standards.

Some lines for concession vendors are set up to provide less than 36 inches of width using temporary, retractable line barriers.  Landis Decl. at ¶15, Brown Decl. at ¶13. Concessions

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
PAGE 17

2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1  lines arranged too narrowly prevent wheelchair users from lining up for purchases and excludes

2  patrons in wheelchairs from accessing the goods or services of that concession vendor.

3      **k.  THE WHEELCHAIR LIFT AT EDGAR'S CANTINA IS TOO**

4         **DANGEROUS TO USE**

5       There are several wheelchair elevators or lifts throughout the stadium which are used for

6  traversing small sets of stairs.  One such lift is located in the Edgar's Cantina and is intended to

7  transport wheelchairs diagonally down a set of several stairs from the upper level of the Cantina

8  to the lower level adjacent to the field.

9       The Edgar's Cantina lift is unsafe.  Under the ADA standards a vertical gap may be no

10  larger than ½ inches, and a ramp may be no more than 8.33% slope. §§ 206.1, 303, 305.2, and

11  405 of the 2010 Standards.  When mounting or dismounting the lift at bottom of the stairs, lift

12  users must maneuver their wheelchairs over a short ramp covering 3 ¾ inches of vertical rise at a

13  39% slope.  Terry Declaration at ¶29.  This type of condition is known to cause wheelchair users

14  to flip over backward when ascending or flip out of their chairs forward when descending. Terry

15  Declaration at ¶30.

16       Plaintiffs have been thus far unable to reach Edgar's Cantina but will visit if a safe

17  accessible route is available.  Thompson Decl. at ¶13, Barker Decl. at ¶14, Landis Decl. at ¶18,

18  Brown Decl. at ¶15.

19

20

21

22

23

24
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
PAGE 18
2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

**l.   DRINK RAILS ON THE 200 LEVEL OF THE STADIUM ARE UNNECESSARILY HIGH AND HAVE NO LOWERED SECTION FOR WHEELCHAIR USERS**

Where dining surfaces are provided at least 5 percent of the seating and standing spaces must have a dining surface between 28 and 34 inches above the floor. §§ 226 and 902 of the 2010 Standards.

The guard rails of the 200 level have a wide countertop ledge or "drink rail" similar to a restaurant bar surface for attendees to set food and drink while standing and watching the game from the concourse. Landis Decl. at ¶19. These drink rails are higher than 34 inches and impede the view of the game for wheelchair users. Landis Decl. at ¶21, Terry Decl. at ¶31-32.

**m.   DUGOUT AREAS ARE OFTEN OPEN TO THE GENERAL PUBLIC AND ARE NOT WHEELCHAIR ACCESSIBLE**

While dugouts are usually occupied by baseball players, they are open for a variety of public events like Mariners Fan Fest. Stadium tours, which are offered on an almost daily basis, include the opportunity to enter the dugout, and even take a "selfie" on the dugout benches. Terasaki Decl. at ¶13. As dugouts are open to members of the general public an accessible route must be made available for wheelchair users. § 4.1.3 of the 1991 Standards and § 206.2 of the 2010 Standards.

Unfortunately for attendees using wheelchairs, the dugouts are exclusively accessible via stairs. Terry Decl. at ¶33. Plaintiffs would certainly enter the dugout if offered a wheelchair accessible opportunity to do so. Landis Decl. at ¶20, Brown Decl. at ¶16.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
PAGE 19
2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

### 4. CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request the Court grant summary judgment or summary adjudication in favor of Plaintiffs pertaining to Defendants' failures to comply with the ADA Standards in the following areas and categories:

- Wheelchair accessible seating locations, particularly on the 300 level, do not extend as deep as required by either the 1991 Standards or the 2010 Standards;

- Sightlines over standing spectators for patrons in wheelchairs are unequal to those provided to the general public and do not comply with either §§4.1.3(19) and 4.33 of the 1991 Standards or §§ 221.2 and 802 of the 2010 Standards;

- Wheelchair accessible seating locations are not dispersed vertically throughout the stadium as required by § 221.2.3.2 of the 2010 Standards and not comparably dispersed throughout the stadium when compared to standard non-accessible seating locations as required by §4.33.3 of the 1991 Standards, particularly in the outfield seating sections of 102-114, 116-119, 142-146, and 148-151;

- Pricing for wheelchair accessible tickets is not dispersed so as to provide patrons using wheelchairs with a choice of admission prices comparable to those for members of the general public as required by § 4.33.3 of the 1991 Standards and is not dispersed so as to be substantially equivalent to or better than those for members of the general public as required by the more stringent § 221.2.3 of the 2010 Standards. Further, prices for wheelchair accessible tickets are not appropriately distributed to provide a proportional number of wheelchair accessible seats in each section of the stadium as required by §§ 221.1 and 221.2

WASHINGTON CIVIL & DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

of the 2010 Standards (as further explained by the revised ADA Requirements for Ticketing, page 3, https://www.ada.gov/ticketing_2010.pdf).

- The wheelchair accessible routes throughout the stadium contain hazardous bumps, cracks, gaps and changes in level exceeding allowable dimensions under the §§ 4.3.6 and 4.5.4 of the 1991 Standards and §§ 206.1, 403, and 302.3 of the 2010 Standards;

- Sales of food and drink are provided at standing height counters with no lowered section of counter in violation of § 7.2 of the 1991 Standards and § 904.4 of the 2010 Standards;

- Certain locations at the stadium, including Edgar's Cantina, The 'Pen, Edgar's Cantina Home Run Porch, and Lookout Landing, provide only standing-height tables and counters for dining and do not provide 5 percent of dining surfaces between 28 and 34 inches above the floor as required by §§ 5.1-5.2 of the 1991 Standards and §§ 226 and 902 of the 2010 Standards;

- Lines for purchasing concessions in the concourses of the stadium are set up too narrowly for wheelchair access and do not meet the minimum 36 inch width required by the § 4.3.3 of the 1991 Standards and §§ 206.2 and 403.5 of the 2010 Standards;

- The small wheelchair lift in Edgar's Cantina is dangerous to use due to a slope in excess of 8.33% and vertical rise in excess of 3 inches at the bottom ramp used for mounting in violation of §§ 206.1, 303, 305.2, and 405 of the 2010 Standards.

WASHINGTON CIVIL & DISABILITY ADVOCATE

4115 Roosevelt Way NE, Suite B

Seattle, WA 98105

(206) 428-3558

- Drink rails on the 200 level of the stadium are at standing height and do not include a lowered portion for wheelchair users as required by §§ 5.1-5.2 of the 1991 Standards and §§ 226 and 902 of the 2010 Standards.

- Despite open access to the general public on certain occasions, no accessible route is provided to the dugouts as required by § 4.1.3 of the 1991 Standards and § 206.2 of the 2010 Standards.

Dated this 20th day of May, 2019,

**WASHINGTON CIVIL & DISABILITY ADVOCATE**

*/s/Conrad A. Reynoldson*
Conrad A. Reynoldson, WSBA #48187
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 876-8515
conrad@wacda.com
*Co-Counsel for Plaintiffs*

*/s/Michael Terasaki*
Michael Terasaki, WSBA #51923
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 971-1124
terasaki@wacda.com
*Co-Counsel for Plaintiffs*

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

1

2
<u>CERTIFICATE OF SERVICE</u>

3
      I, Michael Terasaki, hereby certify under penalty of perjury under the laws of the

4
State of Washington, that on the day set forth below, I electronically filed the foregoing with the

5
Clerk of the Court using the CM/ECF system which will send notification of such filing to the

6
attorneys of record for the defendants.

7

8
      Signed at Seattle, Washington this 20th day of May, 2019.

9

10

11
                s/Michael Terasaki_____
                Michael Terasaki

12

13
WASHINGTON CIVIL & DISABILITY ADVOCATE

14
3513 NE 45th Street, Suite G
Seattle, WA 98105

15
(206) 402-5846
terasaki@wacda.com

16

17

18

19

20

21

22

23

24
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PAGE 23

2:18–cv–01512-BJR

WASHINGTON CIVIL & DISABILITY
ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558