Exhibit A

In the matter of:

**Clark Landis, Robert Barker, Grady Thompson, and Kayla Brown v. Washington State Major League Baseball Stadium Public Facilities District and The Baseball Club of Seattle, LLLP**

**United States District Court**
**Western District of Washington**
**At Seattle**

CIV. ACTION NO. 2:18-cv-01512

**By James L. E. Terry, Evan Terry Associates, LLC**
May 3, 2019

# I.   Personal Qualifications and Background

1.      I, James L.E. Terry, am currently the Chief Executive Officer of Evan Terry Associates, LLC, One Perimeter Park So., Suite 200S, Birmingham, Alabama 35243. I have been CEO since 1999, and prior to that, was the President of Evan Terry Associates from 1988 until 1998.  My work experience with Evan M. Terry, Architect, and then Evan Terry Associates dates back to my first summer internship in 1971 which led to my full-time employment in 1978 after obtaining my Master of Architecture Degree.

2.      I graduated from the University of Southern California in 1976 with a Bachelor of Science majoring in Architecture (magna cum laude) and from the University of Michigan in 1977 with a Master of Architecture degree.

3.      I am currently licensed to practice architecture in Alabama, Arizona, California, Colorado, Florida, New York, North Carolina, and Tennessee.  I hold a certificate from the National Council of Architectural Registration Boards (NCARB), which is an objective measure of architectural competence and is the basis for reciprocal architectural registration in all 50 states.  I am certified as an Accessibility Specialist (CASp #119) by the State of California.  I hold a Construction Document Technology (CDT) certificate from the Construction Specifications Institute, indicating my professional competence in the writing and managing of construction documents.

4.      I am a member of the American Institute of Architects and a member of the Board of Directors of the National Association of ADA Coordinators.  I also serve on the Expansion Committee of the national Accessibility Professionals Association.

5.      I have authored, coauthored, or consulted on the writing of the following books, publications, website, and software in the last 28 years:

a)     www.Corada.com, the **CO**mprehensive **R**esource for the **ADA -** Publicly launched in 2015 - Initial Concept, Senior Editor, Development Oversight

b)     The Pocket Guide to the ADA Standards for Accessible Design (multiple versions) - Initial Concept, Senior Editor

c)     The Pocket Guide to the ABA Accessibility Standards for GSA Facilities (multiple versions) - Senior Editor

d)     The Pocket Guide to the California Standards for Accessible Design (multiple versions) - Senior Editor

e)     The Pocket Guide to the Texas Accessibility Standards (multiple versions) -Senior Editor

f)     The Pocket Guide to the Florida Accessibility Code for Building Construction (multiple versions) - Senior Editor

g)     Beautiful Universal Design – Co-authored with Cynthia Leibrock

h)     "ADA Standards Comparison" a free, downloadable 2250-row spreadsheet comparing the 1991 and 2010 ADA Standards. - Concept and Senior Editor

i)     The ADA Design Assistant Software - Initial Concept, Technical Requirements, and Development Oversight

j)     Architectural Graphic Standards Ninth Edition – Lead Accessibility Specialist for AIA Task Force, published in 1994

6.      I have presented hundreds of ADA workshops and seminars nationwide for accessibility specialists, ADA coordinators, architects, engineers, landscape architects, interior designers, contractors, facility managers, advocates, and attorneys, including seminars at five national conventions of the American Institute of Architects and another for the AIA National Board of Directors. I have also co-taught and coordinated a two or three day ADA and Accessibility

Workshop for the Harvard Graduate School of Design Summer Executive Education Series for twenty-five of the last 27 years.  (See resume for additional details.)

7.      I served as the lead outside expert hired by the California Division of the State Architect (DSA) and by the Florida Building Commission (FBC) during their efforts to rewrite their state accessibility standards to bring them into alignment with the 2010 ADA Standards.

8.      As an ADA and program access specialist, I and my ADA team are currently assisting the Congressional Office of Compliance (OOC) and the Architect of the Capitol (AOC) with ADA surveys and consulting for the U.S. Capitol, House and Senate Office Buildings, Supreme Court, Library of Congress, Botanical Gardens, Capitol Police, and grounds.  Our work at the U.S. Capitol started in 1996, shortly after the Congressional Accountability Act was signed into law and has expanded significantly during the last 10 years.

I led our team's efforts in performing pilot facility surveys for the Administrative Office of the U.S. Courts (AO Courts) to project the potential costs of ADA compliance if Congress applied the ADA or ABA to the U.S. Federal Courts.  We have also conducted plan reviews of selected federal courthouse facilities for the General Services Administration (GSA) and AO Courts.

At the federal level, I have also consulted with the Architectural and Transportation Barriers Compliance Board (ATBCB), now known as the Access Board. The Access Board is an independent agency of the federal government that deals with accessibility for persons with disabilities. The Access Board is the agency charged with developing and maintaining accessibility requirements, and Congress gave it the responsibility of developing the ADA Accessibility Guidelines (ADAAG) which are adopted by the Department of Justice (DOJ) and the Department of Transportation (DOT) as the enforceable ADA Standards. My work with the Board has involved serving on its Advisory Committee for Accessibility Standards for Assembly Areas and assisting in the development and illustration of their ADAAG Manual, which explains how to interpret and use the 1991 ADA Accessibility Guidelines.

I am continuing to serve as the court-appointed expert overseeing our teams in surveying all of the poll sites in the City of New York and providing consulting and significant training services to the Board of Elections.  Similarly, I am overseeing our teams in surveying all of the

designated accessible emergency shelters for the City of New York and providing consulting

services to NYC Emergency Management.

9.      Evan Terry Associates, LLC, under my direction and supervision, has provided ADA surveying

and consulting services in every state in the U.S., plus Puerto Rico and the Virgin Islands.  During

the last 28+ years, we have completed meticulous, line-by-line comparisons between the 1991

and 2010 ADA Standards, and other similar standards, including various versions of the

ICC/ANSI A117.1 Standards as promulgated by the International Codes Council and the

American National Standards Institute; the Uniform Federal Accessibility Standards (UFAS), and

every state-specific accessibility standard in the U.S.

10.     Since passage of the ADA in 1990, Evan Terry Associates, under my direction, has consulted

with hundreds of clients, both large and small, both public and private, including facility

owners, facility managers, ADA coordinators, architects and other design professionals,

attorneys, disability rights advocacy organizations, and others. A small sampling of my clients

include Bank of America, Boston Medical Center, Callaway Gardens, Citibank, CVS Caremark,

CVS Health, Darden Restaurants (Red Lobster, Olive Garden, etc.), Delta Airlines, Disability

Rights Advocates, Inc., the Disability Rights Education and Defense Fund, Dunkin Brands

(Togo's, Baskin Robbins, and Dunkin Donuts), the Federal Aviation Administration, The Gap,

HNTB Architects, IBM Corporation, InterContinental Hotels Group, Kaiser Permanente, Kimpton

Hotels, The Limited, Inc. (Victoria's Secret, Bath and Body Works, The Limited, Structure, etc.),

Longhorn Steakhouses for Rare Hospitality, Mobil Oil, The Board of Elections in the City of New

York, New York Emergency Management, the Paralyzed Veterans of America (and three of their

chapters), Partners Healthcare (Massachusetts General Hospital and Brigham and Women's

Hospital in Boston), the Presidio Trust in San Francisco, Ruby Tuesday's Restaurants, Sears

Holding Company and Kmart, Shoney's Restaurants, the Social Security Administration,

Stanford University, the State of Alaska, Sutter Health and Sutter Health Foundations (multiple

hospitals and facilities), the UCLA Medical Center, Wyndham Hotels and Resorts, and many

others nationwide who wish to remain anonymous. We have provided general consulting and

expert witness services, facility surveys, self-evaluations and transition plans, and assistance in

the development and management of ADA compliance programs. I have personally participated

in all of these projects.

11.      I have served as an expert for the US Department of Justice on a number of ADA matters for

over twenty years. I currently have one active case for the main Disability Rights Section in

Washington, D.C. and three active cases for US Attorneys.

12.      I have testified as an expert witness in two cases during the last four years. Erik Twede,

Barry Long, Olivia Williams v. University of Washington No. 2:16-cv-01761-JLR (W.D.Wa) and

Karen Bain vs. B.W. Office Buildings, LLC, et al., Civil Action No. CV-18-900061 (Circuit Court of

Jefferson County, Alabama (Birmingham Division))

13.      I and my staff are being compensated on an hourly plus expenses basis for our time spent in

this case.  The hourly rate for my time during testimony is $325.  My hourly rate for all other

services is $275.  My compensation is not dependent on my opinions.

## II.   <u>Introduction and Scope of My Report</u>

I have been engaged by the plaintiffs in the above case as an expert in accessible buildings

and facilities under the ADA, its regulations, and the ADA Standards for Accessible Design.  I have

been asked to review, and to offer my opinion, if any, regarding the accessibility of T-Mobile Park.

I'm particular, I have been asked to look at the following questions:

1) Do the wheelchair seating positions at T-Mobile Park "provide people with physical
   disabilities… lines of sight comparable to those for members of the general public" when
   spectators stand during events, as required by Sections 4.1.3(19) and 4.33 of the 1991
   ADA Standards, or do they comply with Sections 221.2 and 802 of the 2010 ADA
   Standards "where spectators are expected to stand during events"?

2) Does T-Mobile Park have the required minimum number of wheelchair and companion
   seating locations under the 1991 ADA Standards or the minimum number of required
   wheelchair and companion spaces that meet the 2010 ADA Standards?

3) Do the wheelchair seating positions at T-Mobile Park "provide people with physical
   disabilities a choice of admission prices and lines of sight comparable to those for

members of the general public", as required by Sections 4.1.3(19) and 4.33 of the 1991 ADA Standards, or do they comply with Sections 221.1 and 802 of the 2010 ADA Standards plus 35.138 of the ADA Title II regulations, 36.302(f), and 36.406(f) of the ADA Title III regulations for dispersal of wheelchair and companion seating?

4) Are the seven new wheelchair spaces and their companion seats recently installed in sections 33 and 35 and the accessible routes leading to those spaces compliant with the 2010 ADA Standards?

5) Is there public evidence that the new wheelchair spaces and companion seats recently installed in sections 33 and 35 are actually available for wheelchair users and their companions?  If so, do they eliminate any of the sightline, dispersal, and ticket pricing option problems that have existed in the facility?

6) Are the dimensions of all designated wheelchair spaces and the accessible routes providing access to them, particularly on the 300 Level, compliant with either the 1991 ADA Standards or the 2010 ADA Standards?

7) Do the wheelchair companion seats meet the minimum requirements of Sections 4.1.3(19)(a) and 4.33.3 of the 1991 ADA Standards or Section 221.3 and 802.3.2 of the 2010 ADA Standards and Sections 35.138, 36.302(f), 36.308, and 36.406(f) of the ADA regulations?

8) Is all information provided on the large scoreboard communicated effectively to people with mobility disabilities, particularly those who sit in the back row of the 100 and 200 Level seating sections according to Sections 35.160 and 36.303 of the ADA regulations?

9) Do high drink rails, particularly on the 200 Level, meet the ADA requirements?

10) Do all concession stands have ADA compliant sales and service counters as required by Sections 7.2(1) of the 1991 ADA Standards or Sections 227 and 904 of the 2010 ADA Standards?

11) Are there concession line barriers at the facility caused by the non-compliant placement of queue line stanchions?

12) Are the wheelchair lifts in Edgar's Cantina and the café/patio below it compliant with the ADA Standards and, therefore, safe for wheelchair users to use?

13) Are the accessible routes throughout the facility compliant with the requirements at 4.3.6, 4.5.4 of the 1991 ADA Standards or Sections 206.1, 403, and 302.3 of the 2010

ADA Standards for gaps and openings in the surfaces?

14) Are the accessible routes throughout the facility compliant with the requirements at Sections 4.3.8 and 4.5.2 in the 1991 ADA Standards or Sections 206.1, 403, and 303 of the 2010 ADA Standards for changes in level?

15) Is there an accessible route into the dugouts and bullpens per Section 4.33.5 of the 1991 ADA Standards or 206.2.6 of the 2010 ADA Standards where tours and special events are held?

## III.   <u>Definitions, Terms, Assumptions, and Methods of Measurement</u>

I have assumed that all terms defined in the ADA Standards and regulations have the definitions given to them in those documents.  When a term is not defined there, I have followed the instructions in Section 106.3 of the ADA Standards and used them "as defined by collegiate dictionaries in the sense that the context implies."

I have used the term "**accessible**" to refer to elements and spaces that are required to be accessible under the ADA Standards or regulations.  Use of that term does not imply that they were actually compliant with the Standards as I found them.

I have used the architectural abbreviations, **AFF** and **AFG** to mean "above the finished floor" and "above the finished grade" respectively.

I have used the terms "**compliant**" and "**non-compliant**" to refer to whether a physical condition or element meets the requirements of the 1991 or the 2010 ADA Standards.

I have used the term "**designated accessible**" to refer to any element or space that was somehow marked to indicate that it was the element the facility owners or operators expected would be used to meet their obligation to provide accessibility.

The term "**level**" in the ADA refers to one that slopes no more than 1:48 (2.08%) in any direction.

I have used the term "**threshold**" according to Merriam Webster's definition number 1, which is the way that architects define it.   "1 **:** the plank, stone, or piece of timber that lies under a door **:** sill."  Although this short definition does not mention it, thresholds are also often made of aluminum or another metal.

When I visited the T-Mobile Park on February 5, 2019, I was accompanied by my son, Evan P. Terry, who acted as my assistant for the purpose of taking measurements and holding carpenters rulers with marker tabs showing average spectator top of shoulder and top of head heights for documenting sightlines.  I used a digital camera to document the conditions we found, digital levels for slope measurements, tape measures for distances, and a series of plastic tools we have developed for measuring gaps in walking surfaces, door thresholds, and changes in level.  We calibrated our digital levels upon arrival and as recommended by their manufacturers.  After returning to the office, I reviewed my notes and photographs and developed my opinions based, in part, on those visits.

When surveying for barriers on sloped surfaces, I documented the slope of the steepest section because that is where an accident or limit to independent physical access would most likely occur.


## IV.    <u>Responses and Professional Opinions</u>

In rendering my opinions set forth herein, I am mindful that one question that frequently arises in the use of architects as expert witnesses on ADA cases is whether the testimony of an architect in such a case is a legal interpretation which would be beyond their training, expertise, and licensing, or whether it is truly expert testimony on how members of their profession commonly interpret the ADA Standards and regulations that govern their daily practice.  Architects have professional, contractual, and direct responsibilities for compliance with the ADA in the design of new construction and/or alterations to facilities under the ADA.  They are the most qualified and capable parties in the design and construction process to effectuate initial compliance of the facility with the Standards and regulations because they design the facilities and observe their construction for general compliance with their designs and with applicable codes and standards.

With regard to architects' responsibilities under the ADA and how they are interpreted by architects, the regulations at Sec.36.401 New construction of Subpart D -- New Construction and Alterations state:

> "(a) General. (1) Except as provided in paragraphs (b) and (c) of this section, discrimination for purposes of this part includes a failure to **design and construct** facilities for first occupancy after January 26, 1993, that are readily accessible to and usable by individuals with disabilities." [Emphasis added.]

In further explanation of these responsibilities, the Preamble to the Title III Regulations, at Section 36.401 New Construction, says:

> "Section 36.401 implements the new construction requirements of the ADA. Section 303 (a)(1) of the Act provides that discrimination for purposes of section 302(a) of the Act includes a failure to **design and construct** facilities for first occupancy later than 30 months after the date of enactment (i.e., after January 26, 1993) that are readily accessible to and usable by individuals with disabilities. [Emphasis added.]

> "Paragraph 36.401(a)(1) restates the general requirement for accessible new construction. The proposed rule stated that "any public accommodation or other private entity responsible for design and construction'' must ensure that facilities conform to this requirement. Various commenters suggested that the proposed language was not consistent with the statute because it substituted "private entity responsible for design and construction'' for the statutory language; because it did not address liability on the part of architects, contractors, developers, tenants, owners, and other entities; and because it limited the liability of entities responsible for commercial facilities. In response, the Department has revised this paragraph to repeat the language of section 303(a) of the ADA. **The Department will interpret this section in a manner consistent with the intent of the statute and with the nature of the responsibilities of the various entities for design, for construction, or for both."** [Emphasis added.]

Architects who have read these regulations understand that they have a professional responsibility to possess an independent understanding of the facility related requirements of the ADA if they are to practice their profession.


## V.   <u>Review of Issues</u>

1) Do the wheelchair seating positions at T-Mobile Park "provide people with physical disabilities… lines of sight comparable to those for members of the general public" when spectators stand during events, as required by Sections 4.1.3(19) and 4.33 of the 1991 ADA Standards, or do they comply with Sections 221.2 and 802 of the 2010 ADA Standards "where spectators are expected to stand during events"?

I understand that the defendants in this case contend that the lines of sight (aka sightlines or sight lines) for wheelchair users when spectators stand are comparable to those provided for other "members of the general public" in the same areas.  To assess the T-Mobile stadium's

compliance with this requirement, I used the most publicly available human dimension set available at the time of the design of the stadium for the analysis.  It is the dimensions specified by the U.S. Department of Justice in Exhibit "B" of their Consent Order with Ellerbe Beckett as published in 1998.  Those same dimensions had been quoted in letters to stadium designers by DOJ since 1993 and were also used in their settlements for the 1996 Olympic Games in Atlanta. According to the Ellerbe Beckett Order, the key dimensions are:

> "The average anthropometric dimensions employed shall be:
> (1) average eye height for a person sitting in a wheelchair is 47.45";
> (2) horizontal distance from the eye of an average person sitting in a wheelchair to the edge of the tier on which the wheelchair rests is 30";
> (3) average head height of a standing spectator is 67.65";
> (4) average eye height of a standing spectator is 63.45"; and
> (5) average shoulder height of a standing spectator is 55.65"."

As far as I can tell, these dimensions were based on human dimensions first published in 1974 in Humanscale: A Portfolio of Information.  They were also the basis of the Anthropometric pages entitled "Anthropometric Data" (p.2) and "Handicapped" (p.8) in the Eighth Edition of Architectural Graphic Standards by Ramsey/Sleeper and published by the American Institute of Architects with John Wiley & Sons in 1988.  More recent research conducted for the U.S. Access Board by Ed Steinfeld and others at the IDeA Center, but not available to the designers when T-Mobile Park was designed, has found that the Humanscale-based dimensions above are insufficient to provide comparable lines of sight over standing spectators for even an average wheelchair user when a currently-mandated 48" deep wheelchair clear floor space is provided.  Steinfeld's research has shown that average wheelchair users are several inches shorter than Dreyfuss' numbers.  (See Attachment "D".)  However, since the Humanscale dimensions are what was available when this stadium was designed, my analysis is based on them.

To perform my analysis for lines of sight over standing spectators from wheelchair spaces, I attempted to select and analyze a representative sample of ten wheelchair spaces spread around the stadium.   Attachment "C" is a seating plan of T-Mobile Park where I have shown each location where my line of sight photographs were taken.  I placed my camera the specified 47.45 inches above the floor at the center of the wheelchair clear floor space at a point 30 inches away from the obstruction most likely to stop wheelchair users from rolling further forward.  My son then held a vertical carpenter's ruler in the center of the standing position of a spectator one row forward with

a marker tab showing the average shoulder height of a spectator standing on that row.  He held a second vertical carpenter's ruler in the center of the standing position of a spectator two rows forward with a marker tab showing the average top-of-head height of a spectator standing on that row.  Figure 802.2.2.1 from the 2010 ADA Standards illustrates this requirement.  It is no different from DOJ's official technical assistance about how to apply the 1991 ADA Standards to lines of sight analysis.



**Figure 802.2.2.1 Lines of Sight Over the Heads of Standing Spectators**

I then photographed the baseball field to show which portions of the playing surface would be visible to a wheelchair user in that space when the spectators in front of them stand.  To evaluate the comparable lines of sight available to other members of the general public when spectators stand, I moved one row forward of each surveyed wheelchair space and followed the same process taking the photograph from the specified eye height of a standing spectator instead.  For the comparable positions for the wheelchair user on Row 41A of Section 124, I measured the comparable spectator positions on Rows 11, 25, and 33 of Section 125 to see if there was any significant difference in what spectators standing further in front of Row 40 might see.

When I returned to the office, I had one of our CAD operators project the lines of heads and shoulders on the rows in front of each spectator, outline three areas of the field in each photograph, and calculate what percentage of each of the three areas of the field, and the whole field, would be visible to that spectator.  Attachment "B" shows the detailed results of that analysis.

What I found was that, in every position, both seated and standing members of the general public could see all of the dirt areas of the infield.  Although I did not do a detailed analysis of it, the wheelchair users in Section 308, high above right field, could also see all of the dirt of the infield.

Of the representative ten wheelchair spaces that I did analyze, only the wheelchair users in Section 227 could see all of the infield dirt when spectators stand.  The Section 227 anomaly can be explained because, at some point in time, a raised aluminum platform was installed in that section to give wheelchair users on that platform comparable lines of sight.  I found a similar platform in only one other location.  In six of the ten wheelchair locations, wheelchair users cannot see home plate when spectators stand and in five of the locations, they cannot see any of the circular dirt portion of the infield surrounding home plate.  Similarly, wheelchair users cannot see significant portions of the sidelines and the rest of the field that are visible to other spectators only one row away.  Attachment "D" shows the results of that analysis in spreadsheet form.  Red numbers show where wheelchair users have worse lines of sight that the comparable seats.

It is clear from my analysis that wheelchair users have never had comparable lines of sight from most wheelchair spaces that are "comparable to those for members of the general public" near them under the 1991 ADA Standards and they do not comply with the even more specific language of the 2010 ADA Standards for lines of sight.

2) Does T-Mobile Park have the required minimum number of wheelchair and companion seating locations under the 1991 ADA Standards or the minimum number of required wheelchair and companion spaces that meet the 2010 ADA Standards?

It is important to understand and keep in mind the fact that the Mariners and T-Mobile Park count both their wheelchair spaces and their companion seats as wheelchair accessible seats.  Due to the use of folding chairs for companion seats, in most locations, people can, theoretically, fill any of the locations with a wheelchair or a folding chair.  In the few locations where I measured the total width of the space and divided that total number of inches by 33, that approach would work.  This is a great way to allow groups of wheelchair users to attend games together and sit in whatever pattern they prefer.  However, the ADA Standards have always counted wheelchair seats and companion seats separately.  Therefore, in locations where Ticketmaster and the Mariners' documents refer to wheelchair seats in locations with an odd number of spaces, following the ADA's calculation methods, I have reduced the number for which they get wheelchair space credit to allow only pairs of wheelchairs and companions.  This eliminates non-compliant counting and leaves the extra space for an additional companion.  Other than that difference, I have followed

the Mariners' counting method, showing all seat counts as the combined total of wheelchair spaces and companion seats.

Using the seating manifest provided by the defendants in this case entitled "2019 Seating Manifest DEFS_0000033" and Ticketmaster's interactive online seating chart for the May 28, 2019 Mariners' game, we developed a spreadsheet comparing the two.  It is attached as Attachment "E".

Ticketmaster shows a total of 45,846 seats in the ballpark that are available for sale including 628 effective wheelchair spaces and companion seats.  Based on those numbers, the 1991 ADA Standards would have required a total of 918 wheelchair and companion seats.  The 2010 ADA Standards require a total of 482 wheelchair and companion seats.  The Seating Manifest shows a total of 45,807 seats in the ballpark including 620 effective wheelchair spaces and companion seats.  Based on those numbers, the 1991 ADA Standards would have required a total of 918 wheelchair and companion seats.   The 2010 ADA Standards require a total of 482 wheelchair and companion seats.  Therefore, the facility does not have enough wheelchair and companion seats under the 1991 Standards and it does not appear that they have ever had sufficient wheelchair and companion seats to comply with the 1991 ADA Standards.

Since the facility does not appear to have ever had sufficient numbers of wheelchair and companion seats to meet the 1991 ADA Standards under either count, eligibility for safe harbor under any of the wheelchair seating requirements is limited.  My client has asked for detailed information about the post-3/15/2012 dates of modifications affecting wheelchair spaces and companion seating as well as the numbers and locations of spaces and seats affected.  Until that information is available, I cannot determine which wheelchair spaces and companion seats, if any, might be covered by the safe harbor exception.

3) Do the wheelchair seating positions at T-Mobile Park "provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public", as required by Sections 4.1.3(19) and 4.33 of the 1991 ADA Standards, or do they comply with Sections 221.1 and 802 of the 2010 ADA Standards plus 35.138 of the ADA Title II regulations, 36.302(f), and 36.406(f) of the ADA Title III regulations for dispersal of wheelchair and companion seating?

Based on the seating Manifest provided by the defendants and ticketing information provided

by Ticketmaster, the official ticketing agency of T-Mobile Park, we created Attachment "F" "Mariners T-Mobile Park Seating Comparison" to analyze this issue.  There are some differences between the seating manifest and the spaces that are available for sale in about ten of the sections, so there are still some minor questions remaining, however, there are some obvious problems.  Attachment "G" Wheelchair Seating Positions by Section illustrates some of them.

a)  There do not appear to be any wheelchair spaces or companion seats in the Hit It Here Café.  This is a half-inside and half-outside, tiered dining facility where anyone can go well before a game to eat a meal overlooking the field.  Then HIHC ticketholders can sit at their tables and eat during the game.  These tickets are available for sale on Ticketmaster for many games (it appears to be closed on low-traffic dates) but no wheelchair seating opportunities were available for any game we could find.  We tried to get into the space during my site visit to see if there were barriers for wheelchair users.  We even waited in the lobby of the executive offices for thirty minutes to get "permission" to open the door and go in.  However, we were prevented from seeing the space.  This lack of wheelchair spaces and companion seating opportunities clearly violates the dispersal requirements in both the 1991 and the 2010 ADA Standards and segregates based on disability under several sections of the Title II and Title III regulations, too.

b)  Similarly, the All Star Club has tickets available on Ticketmaster but none are listed as available for wheelchair users and their companions.

c)  The seating sections "Above the Pen" have no wheelchair seating options available on Ticketmaster either.

d)  Perhaps the most frustrating dispersal problem for most wheelchair users is their inability to get any closer to the infield than the 41st row without paying the ticket prices required to sit behind the plate, even when there are no other options.  Ticketmaster does show three wheelchair spaces and three companion seats that are close to the field in Edgar's Cantina which is just past the left field foul pole and above the wall.  Of the dozen or more games I checked going well into September, none of those seats were ever available.  In fact, every ticket in Edgar's Cantina for every game I checked was unavailable and I looked at weekday and weekend games.  So those positions clearly don't effectively create any opportunities for wheelchair users to go to Mariners' games if they want to get close to the field without planning months ahead.  For comparison, there are four sections on the

sides of the field with multiple seats on the second row for the game May 13th and one seat is available on the first row.

The other option for getting close to the field as a wheelchair user or their companion, is the expensive one. Ticketmaster shows only one wheelchair and one companion space available for any game of the dozens we checked during this baseball season that are available in front of the 41st row and between the foul poles where most spectators seem to want to sit. Those seats are in the "Diamond Club" and they cost $75-$100 per seat when they're available. I just checked every one of the 13 games that will be played during the next month at T-Mobile Park. The wheelchair seat next to the field was only available for the games on Monday, May 27th and Tuesday, May 28th. There were other seats available for ambulatory spectators on the first to fifth row next to the sidelines (as opposed to the outfield) during every one of those games. The wheelchair and companions seats for May 28th were $75 each but there were second-row seats available in sections 116 and 143 for only $60 each. Seats on Row 20 were $39. Wheelchair seats on row 41A (21 more rows back) were also $39.

This lack of vertical dispersal for wheelchair users and their companions failed the 1991 ADA Standards when the stadium was designed and built and it fails the 2010 ADA Standards, too. Under the 1991 ADA Standards, the requirement was to "provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." The 1991 ADA Standards was a performance standard describing only what was to be achieved by the design. It was up to the architects to create a layout that provided comparable lines of sight. Lines of sight did not just require designers to allow wheelchair users to see over other spectators when they stand, but also to provide similar viewing opportunities. The Access Board, who wrote the language of the requirements in 4.33, explained viewing angles in their <u>ADAAG Manual</u> as follows:

"Sight Lines

"Both the horizontal and vertical viewing angles must be considered in the design of assembly areas. A variety of factors determine the quality of "vertical" sight lines, such as the distance from performance areas, row spacing, staggering of seats, and floor slope."

Note the reference to "distance from the performance areas".  As you can see in the photographs below, there is a significant difference between the viewing angles experienced from a row near the front of a section at T-Mobile Park and the viewing angles experienced from the back row of the 100 level sections. From the back, it's hard to even read the players' numbers but you can see the expressions on their faces and how hard they're sweating from the front few rows.



Due to highly limiting constraints placed on my time in the stadium by the defendants, I could not look for alternative accessible routes that might serve seating areas closer to the field than the 41st row in the infield.  I was also unable to attempt to determine specifically how the other violations of the ADA listed above could be solved.  But I also did not see any obvious reasons that they could not be solved.  I have been involved in solving these same types of problems in many other large stadiums and arenas all over the country for over 20 years.  They are not nearly as difficult to fix as many people might think.

   e) We reviewed season ticket availability on Ticketmaster for the ten sections we surveyed for lines of sight.  As of the date of that sample review, season ticket availability was

present in standard seating areas in Plans A, B, C, D, & Full Season ticket packages in every one of the sample sections where tickets were offered for that season ticket plan.  Season tickets were only available for wheelchair users and their companions in two of eleven sections offered in Plan A, two of nine sections offered in Plan B, three of ten sections in Plan C, two of ten sections in plan D, and two of seven sections for The Full Season ticket plan.   This means that the vast majority of season ticket packages available for wheelchair users and their companions have sold out but not for other members of the general public.  This sell-out has occurred before the end of the first month of the season.  This is an indicator that the Mariners need to reconsider their ticketing policies, practices, and procedures because the impact of those appears to discriminate against people with disabilities.

4) Are the seven new wheelchair spaces and their companion seats recently installed in sections 33 and 35 and the accessible routes leading to those spaces compliant with the 2010 ADA Standards?

When I visited the site, the new wheelchair spaces and companion seats were not yet in place.  The construction workers were in the process of setting and stripping the concrete forms.  I received a set of construction plans last week to review to attempt to answer this question.  In reviewing those drawings and photographs, but without seeing what was actually built, I have three concerns.

a) Sheets A2 & A3 seem to show a foot rail in front of two of the wheelchair spaces that will reduce the depth of those spaces to less than the minimum 48".

b) The distance between the spectator side of the field wall and the first step up to the row behind the wheelchair spaces is shown as 7'-3".  The companion seats are shown aligned with the back of the 48" deep wheelchair spaces.  Those seats appear to tilt backward at an angle which appears to reduce the minimum width of the accessible route leading to the wheelchair spaces to less than 36" wide.

c) One of the photographs appears to show that the handrails coming up the ramped accessible routes leading to these spaces do not all have the appropriate extensions that were shown in the drawings.  The photograph is not clear but I would want to verify that it was built

according to the plans and ADA Standards.  Due to time constraints, I was not able to trace the accessible routes through the facility that lead to this area so I cannot comment on those.

5) Is there public evidence that the new wheelchair spaces and companion seats recently installed in sections 33 and 35 are actually available for wheelchair users and their companions?  If so, do they eliminate any of the sightline, dispersal, and ticket pricing option problems that have existed in the facility?

The Mariners have added seven more wheelchair spaces plus companion seats in the area behind home plate but they are not yet available on Ticketmaster and we could find no mention of them on the website.  When they become available, those seats may help alleviate some of the frustration of wheelchair-using spectators who pay full price for the seats with the worst lines of sight on the 100 level and the 100 level contains well over half of all seats in the stadium.  If offered and operated correctly, these new spaces can provide an improved vertical dispersal option for 3.6% of the wheelchair spaces currently provided on the 100 level.  Since they are not yet available on Ticketmaster and are not listed in any of the documents we have received from the defendants, I cannot yet comment on the ticket pricing portion of this question.

6) Are the dimensions of all designated wheelchair spaces and the accessible routes providing access to them, particularly on the 300 Level, compliant with either the 1991 ADA Standards or the 2010 ADA Standards?

During my visit to the stadium, we measured the wheelchair platforms on the 300 level to determine if they met the minimum size requirements of the 1991 ADA Standards or the 2010 ADA Standards.  For rear-approach wheelchair spaces, both standards require a 36" wide accessible route behind a 33" or 36" wide (depending on configuration) by 48" deep wheelchair space.  The wheelchair spaces on level 300 were all less than that by about four to five inches due to the placement of the structural supports for the front railing on the platforms.  This deficiency causes many wheelchair users to unacceptably overhang the accessible route behind their chairs.  Due to the design of the facility, many other spectators must also use this accessible route to get to and from their seats.  (See photos below.)  It appears that face-attaching the guard to the front of the

platform (instead of using the top-attachment method currently in place) and reconfiguring the guard itself may allow the design to become compliant without any loss of seats.



7) Do the wheelchair companion seats meet the minimum requirements of Sections 4.1.3(19)(a) and 4.33.3 of the 1991 ADA Standards or Section 221.3 and 802.3.2 of the 2010 ADA Standards and Sections 35.138, 36.302(f), 36.308, and 36.406(f) of the ADA regulations?

Section 4.33.3 required a fixed companion seat.  Section 803.3.2 modified and expanded on that requirement.  It says:

> "802.3.2 Type.
> "Companion seats shall be equivalent in size, quality, comfort, and amenities to the seating in the immediate area. Companion seats shall be permitted to be movable."

The Access Board approved and published their ADA Guidelines in 2004.  Those Guidelines became the basis for the ADA Standards when they were adopted by the DOJ.  In the Preamble to their 2004 Guidelines, the Access Board said the following about companion seats:

"…the Board has added a requirement that companion seats be "equivalent in quality, size, and comfort and amenities" to seating in the immediate area (802.3.2). Amenities include, but are not limited to, cup holders, arm rests, and storage pockets."

The Department of Justice and most accessibility specialists add seat padding to that list when other seats in the same area have padded seats.  Although most companion seats were not in place during my site visit, I understand that they are not all comparable to the other seats in the nearby areas.

8) Is all information provided on the large scoreboard communicated effectively to people with mobility disabilities, particularly those who sit in the back row of the 100 and 200 Level seating sections according to Sections 35.160 and 36.303 of the ADA regulations?

While I was photographing the lines of sight to the field from the ten representative wheelchair spaces and comparable seats during my site visit, I also photographed the scoreboard from the viewpoint of wheelchair users and their comparable seats.  We then took those photographs and analyzed the relative visibility of the screen by wheelchair users and by the comparable spectators.  The resulting image comparisons are attached as Attachment  "H" – Graphic Analysis of the Lines of Sight to the Scoreboard at T-Mobile Park.  The results also appear in spreadsheet form in Attachment "D".  In three of the locations I checked (Sections 135, 147, and 214), the scoreboard was partially or mostly blocked by the overhang above while the comparable spectators only one row away had full view or substantially better views of the scoreboard.

Due to this problem, the Mariners have installed relatively small TV screens hanging under the overhang to attempt to improve the problem.  Under the sections of the ADA regulations cited in the question above, public entities and places of public accommodation both have the obligation to communicate effectively with people with disabilities.  These small TV monitors do not communicate effectively because they do not provide equally large viewing areas from the perspective of wheelchair users and their companions and because they do not contain all of the same information that is shown on the scoreboard.  There are many ways to solve this problem so the defendants have a wide range of choices, but they have not yet met their obligations under the ADA regulations to communicate effectively.

9) Do high drink rails, particularly on the 200 Level, meet the ADA requirements?

The Appendix to the 1991 ADA Standards used Figure A3 below to show the expected eye heights of wheelchair users to be somewhere between 43" and 51" AFF.



**Fig. A3 Dimensions of Adult-Sized Wheelchairs**

This was based on rounding the numbers for small females and large males from the Dreyfuss Humanscale book.  However, in a discussion I had in 1992 with one of Dreyfuss's employees who worked on that book, I learned that the numbers in the book were developed by measuring able-bodied young adults who sat in standard hospital wheelchairs for the study.  Therefore, the numbers were likely higher than what would be expected if an average population of people with real disabilities had been measured.

Ed Steinfeld's more recent research for The Anthropometry of Wheeled Mobility Project conducted for the U.S. Access Board and published in 2010 took just such a population and measured 495 actual wheelchair users.  That project showed that the real average height for wheelchair users was about 3.15 inches lower than the Dreyfuss number.  I have attached my correspondence with Mr Steinfeld including a scatter diagram of his actual measurements in Attachment "E".  What it shows is that the standard drink rail height of 42" used at T-Mobile Park will block the views of a large percentage of wheelchair users, particularly when those drink rails are located on upper levels where the wheelchair users are looking down on a wide rail and attempting to see the field beyond it.

The ADA Standards include the following requirements:

> Under the 1991 ADA Standards:
>
> "5.2 Counters and Bars.
> "Where food or drink is served at counters exceeding 34 in (865 mm) in height for consumption by customers seated on stools or standing at the counter, a portion of the main counter which is 60 in (1525 mm) in length minimum shall be provided in compliance with 4.32 or service shall be available at accessible tables within the same area."
>
> Under the 2010 ADA Standards:
>
> "226.1 General.
> "Where dining surfaces are provided for the consumption of food or drink, at least 5 percent of the seating *spaces* and standing *spaces* at the dining surfaces shall comply with 902."
>
> "902.3 Height.
> "The tops of dining surfaces and work surfaces shall be 28 inches (710 mm) minimum and 34 inches (865 mm) maximum above the finish floor or ground."

If fixed drink rails were installed before 3-15-2012 and none of them have been modified since that time, they would be safe harbored under the Section 35.150(b)(2)(i) of the ADA regulations but only if there were, and still are, dining surfaces "within the same area" that meet the height requirements of 5.2. If they exist, I did not see those low rails during my site visit. If they do not exist, low rails equal to 5% of the rail length are required by the language of 226.1 and 902.3 and must be installed.

10) Do all concession stands have ADA compliant sales and service counters as required by Sections 7.2(1) of the 1991 ADA Standards or Sections 227 and 904 of the 2010 ADA Standards?

We did not measure any movable concession stands during my site visit as they were not available. We did not have time to look at every concession stand, but we found that the lowest sales counter surface at the Hop Box was only 34.5 inches wide and 42.5 inches AFF. The minimum width is 36 inches and the maximum height is 36 inches AFF. Similarly, the Poquitos Taco Bar sales counter was set entirely at the height of 45.5 inches AFF. The minimum widths and maximum heights did not change between the 1991 and 2010 ADA Standards.

11) Are there concession line barriers at the facility caused by the non-compliant placement of queue line stanchions?

None of the queue line stanchions were in place during my visit but it is obvious from the photographs taken by Brenda Cummings and from my discussions with her that many of these queue lines were set up too close to each other and to other obstructions nearby (less than 36 inches apart when in set up in straight lines and according to the turns around obstructions requirements when turning 180 degrees).  Therefore, they blocked required accessible routes.  (See photos below.)



12) Are the wheelchair lifts in Edgar's Cantina and the café/patio below it compliant with the ADA Standards and, therefore, safe for wheelchair users to use?

Due to time constraints on site and no lift mechanic to test all aspects of the lifts, I am not able to say whether the lifts are fully compliant with the ADA Standards for wheelchair lifts.  I can say that the stair lift serving the café below Edgars (called "Bullpen Storage" on the posted Annual Operating Certificate which expired  4/1/2016) is very unsafe.  There were tables set up in the area and the bar on the level above looked operational so, despite the name on the old certificate, it appears that this café is still used during games.

The transition ramp on the top level of that lift has an open vertical gap exceeding ¼ inch in height with a total transition height before reaching the ramp surface of ¾ inch.  The vertical gap is

limited to ¼ inch in height by the ADA Standards and the total change in level is not allowed to exceed ½ inch.  However, the worst problems occur at the transition ramp used to exit the lift on the lower level.  This short ramp rises a total of 3 ¾ inches and slopes between 39.0% and 85.0%. The maximum slope allowed by the ADA Standards at any point is 8.33%.  This kind of condition is known to cause many wheelchair users to flip over backward if trying to go up the ramp or flip out of their chairs forward when going down the ramp.  The vertical gap on one side of the bottom transition ramp is ½ inch high.  (See photos below.)



13) Are the accessible routes throughout the facility compliant with the requirements of Sections 4.3.6 and 4.5.4 of the 1991 ADA Standards or Sections 206.1, 403, and 302.3 of the 2010 ADA Standards for gaps and openings in the surfaces?

During my site visit, I saw hundreds or thousands of linear feet of non-compliant gaps in the walking surfaces of the stadium.  The standards allow gaps in the walking surface of an accessible route that are deeper than ¼ inch to be no more than ½ inch wide and must be oriented perpendicular to the direction of travel.  This requirement is in the ADA Standards to keep the front wheels of wheelchairs and walkers and also crutch tips from being trapped in the gap resulting in a fall.  Although under normal circumstances, wheelchair users can be expected to find the accessible route across an open plaza and avoid problem areas, in a space like this one with large crowds, it would be very time-consuming and difficult to do safely.  In many places at this facility there did not even appear to be a compliant accessible route reasonably available to get around the gaps.  These gaps are also covered under Sections 35.133 and 36.211 of the regulations entitled Maintenance of Accessible Features.  (See photos below.)









14) Are the accessible routes and required clear floor spaces throughout the facility compliant with the requirements of Sections 4.2.4.3, 4.3.8, and 4.5.2 in the 1991 ADA Standards or Sections 206.1, 303, 305.2, and 403 of the 2010 ADA Standards for changes in level?

There were significant numbers of places in the facility where there were non-compliant changes in level crossing required accessible routes and required clear floor spaces.  (See photos below.)





Many of these non-compliant changes in level are significant enough that we have seen conditions very similar to them that have resulted in trip and fall injury lawsuits. People with disabilities are disproportionately affected by these conditions and can be seriously injured or killed by tripping over them or by being thrown from their mobility assistance devices.  Like the gaps, they are also covered by the maintenance of accessible features requirements in the ADA regulations.

15) Is there an accessible route into the dugouts and bullpens where tours and special events are held per Section 4.33.5 of the 1991 ADA Standards or 206.2.6 of the 2010 ADA Standards?

There is no accessible route into either of the dugouts despite the fact that the tour brochure shows only three photos of the stadium and one of them is of tour participants sitting on the bench in a dugout.  The website also features tour participants in a dugout.  This is a violation of both the 1991 and the 2010 ADA Standards.

During my site visit, I was shown a ramp leading to the bullpens and told that, despite the complaint that there was no accessible route into the bullpens, this one was actually provided. Unfortunately, due to the extreme time constraints on my site visit, I did not follow the ramp all the

way down into either of the bullpens.  I understand now that, if I had, I would have found steps at both entrances.  This, too, is a violation of the same sections of the ADA Standards.

## VI.  Summary

Based on the site visit by Brenda Cummings during a game on August 5, 2018, my own detailed survey of existing conditions at the T-Mobile Park, and the documents listed below, it is clear to me that there have been and continue to be significant physical barriers to people with disabilities at the facility.  I would expect that the result of these barriers is that many people with disabilities would find that safe and independent access to the stadium and its many features and services is difficult, burdensome, or impossible.

## VII.  Reservations

I have only been allowed to spend a total of 6 ½ hours identifying and documenting the barriers to people with disabilities in the facility.  That is a wholly insufficient time to find and document all of the problems that thousands of people with disabilities who attend games would likely encounter.  Due to the time limitations placed on my survey by the defendants, I spent my time identifying and documenting the barrier types listed in the questions above.  I am certain that there is additional information relevant to this case that I was unable to study.  Some physical changes, such as the new wheelchair spaces behind home plate, have been made since I visited the site and I have not had the opportunity to return and inspect them personally and in detail.  Also, numerous important documents that might have a bearing on my opinions in this case have not yet been produced by the facility owners, operators, or tenants.  Therefore, I reserve the right to supplement my report after any of that information becomes available for my review.

## VIII. Basis for Opinions

In developing my opinions for this report, I have considered or relied upon the following:

1.      The Complaint filed 10/15/2018 in this case;

2.      Defendants' Answer to the Complaint;

3.      Defendants' responses to interrogatories in this case including Ex A from D's responses regarding WC Ticket Pricing;

4.  2019 Seating Manifest DEFS_0000033;

5.  Diamond Club Drawings numbered as DEFS_000313 through 000319 and dated 11/12/18 with revisions through 1/14/19;

6.  Photographs of the Diamond Club renovations numbered DEFS_000320 through 000327;

7.  Defendants' Responses and Objections to Plaintiffs' Interrogatories and Request for Production of Documents – Set Two;

8.  Photographs taken by Brenda Cummings during her attendance at a game on August 5, 2018 and my discussions about what she saw and experienced during that time in the facility;

9.  The observations, notes, and photographs, made during my own on-site inspections of the facility on February 5, 2019;

10. My formal architectural training at the University of Southern California and the University of Michigan as well as numerous continuing education courses in ADA compliance and accessibility every year since the ADA passed;

11. My 47+ years of working experience in the design and construction professions first as a student, then as an intern, as a registered architect, Project Manager, President, and finally as CEO of Evan M. Terry, Architect which became Evan Terry Associates, P.C. and then Evan Terry Associates, LLC;

12. My experience surveying and overseeing the surveys of tens of thousands of buildings and facilities for ADA compliance throughout the United States over the last 28+ years and my other experience as noted in my resume and the sections above;

13. Thousands of conversations over the last 28+ years with ADA specialists, architects and other design professionals, ATBCB/Access Board members and staff, US DOJ attorneys and staff, plaintiffs, defendants, and their counsel, people with disabilities, and others who work in facility research, design, construction, operation, and use of facilities on the language of the ADA and Rehabilitation Act Regulations, Standards, and Guidelines;

14. Detailed ADA surveys, plan reviews, barrier removal projects, consulting, and expert witness work on accessibility cases and projects for our clients on dozens of large assembly facilities nationwide;

15. The 1991 ADA Title II and Title III regulations and their associated preambles;

16. The 1991 ADA Standards and Preambles to those Standards and associated Guidelines;

**Expert Report of James L.E. Terry**                                     Re: CIV. ACTION NO. 2:18-cv-01512

17. The 2010 ADA Title II and Title III regulations and the 2010 Preamble with the 2016 amendments;

18. The 2010 ADA Standards and the 2004 Preamble to the ADA Guidelines;

19. Guidance on the 2010 ADA Standards for Accessible Design by the U.S. Department of Justice, published 2010;

20. ADAAG Manual: A Guide to the Americans with Disabilities Act Accessibility Guidelines by the US Architectural and Transportation Barriers Compliance Board (now the US Access Board), published 1998;

21. "Title II Technical Assistance Manual" by U.S. Department of Justice - published 1993;

22. "Title II Technical Assistance Manual - 1994 Supplement" by U.S. Department of Justice - published 1994;

23. "Title III Technical Assistance Manual" by U.S. Department of Justice - published 1993;

24. "Title III Technical Assistance Manual - 1994 Supplement" by U.S. Department of Justice - published 1994;

25. "Accessible Stadiums" by the U.S. Department of Justice, published 1996;

26. "ADA 2010 Revised Requirements: Ticket Sales" by U.S. Department of Justice - published 07/07/2011;

27. Information and Technical Assistance on the Americans with Disabilities Act at https://www.ADA.gov;

28. United States Access Board's web site at https://www.access-board.gov;

29. The Comprehensive Resource for the ADA at https://www.Corada.com;

30. The Official MLB website for the Mariners at https://www.mlb.com/mariners and its associated web sites;

31. The official ticket sales provider for the Mariners at https://www.Ticketmaster.com;

32. Emails with Ed Steinfeld and his "Draft memo on Eye locations and eye sight lines" by Clive D'Souza and Ed Steinfeld with the IDeA Center, dated 1/14/2012 which was based on research for The Anthropometry of Wheeled Mobility Project conducted for the U.S. Access Board;

33. The Measure of Man: Human Factors in Design, by Henry Dreyfuss, published in 1960;

34. The Measure of Man: Human Factors in Design, Revised and Expanded 2nd Edition, by Henry Dreyfuss, published in 1967;

**Expert Report of James L.E. Terry**                    Re: CIV. ACTION NO. 2:18-cv-01512

35.  <u>Humanscale: A Portfolio of Information</u>, by Niels Diffrient, Alvin R. Tilley, and Joan Bardagjy, originally published in 1974 and reissued by IA Collaborative in 2017;

36.  <u>The Measure of Man and Woman: Human Factors in Design</u>, by Alvin R.Tilley and Henry Dreyfuss Associates, published in 1993;

37.  <u>The Measure of Man and Woman: Revised Edition; Human Factors in Design</u>, by Alvin R. Tilley and Henry Dreyfuss Associates, published in 2002;

38.  <u>Architectural Graphic Standards: Eighth Edition,</u> by Ramsey/Sleeper, published by the American Institute of Architects with John Wiley & Sons in 1988;

39.  Plans, spreadsheets, photographs, reports, publications, websites, and other documents attached herein.

I anticipate using at trial selected Attachments from this report, documents reviewed in connection with their preparation, enhanced graphic versions of information above and selected Attachments included in this report (e.g., redrafted and/or printed at large scale to improve their presentation quality), graphic presentations of all or selected portions of the data included in this report, and additional graphics illustrating concepts described in this report.

Respectfully submitted,

James Leslie Evan Terry
May 3, 2019

---

## Attachments:

**"A"** –James L.E. Terry – Resume

**"B"** –Graphic Analysis of Lines of Sight to the Field at T-Mobile Park

**"C"** –Seating Plan of T-Mobile Park Showing Locations Where Line of Sight Photos Were Taken

**"D"** –Analysis of Lines of Sight at T-Mobile Park

**"E"** – 4/14 through 4/17/19 Emails with Ed Steinfeld and "Draft memo on eye locations and eye sight lines"

**Expert Report of James L.E. Terry**                    Re: CIV. ACTION NO. 2:18-cv-01512

**"G"** – Wheelchair Seating Positions by Section

**"H"** – Graphic Analysis of Lines of Sight to the Scoreboard at T-Mobile Park

**"I"** – Season Ticket Prices and Availability as of April 28, 2019

Exhibit B

**Attachment "A"**

**James L. E. Terry, AIA, CASp, NCARB**
Qualifications and Experience

---

**SUMMARY OF PROFESSIONAL QUALIFICATIONS**

Mr. Terry, CEO of Evan Terry Associates, LLC (ETA), and COO of Corada, LLC, joined ETA after receiving his B.S. in Architecture from the University of Southern California and his Master of Architecture degree from the University of Michigan.  He has served on a variety of levels at ETA including project architect, project manager, energy specialist, project designer, contract administrator, and accessible design specialist.   Mr. Terry's architectural project experience includes corporate facilities, municipal facilities, healthcare, schools and universities, libraries, recreational facilities, large assembly facilities, shopping centers, multi-family housing, churches and light industrial facilities.  For twenty eight years, he has concentrated his efforts in the area of accessible design and in particular with the Americans with Disabilities Act and various state accessibility standards' requirements.

**EXAMPLES OF SIGNIFICANT PROJECTS AND CLIENTS**

1) Assisting the Congressional Office of Compliance and the Architect of the Capitol with ADA surveys of the U.S. Capitol, House and Senate Office Buildings, Supreme Court, Library of Congress, Botanical Gardens, Capitol Police, and grounds;.
2) Providing expert witness consulting to the U.S. Department of Justice on multiple projects nationwide.
3) Providing expert witness services and consulting on assembly and sports facilities for the US DOJ such as the Ellerbe Becket case for the Disability Rights Section plus Madison Square Garden, Radio City Music Hall, the Metropolitan Opera House, 25 Broadway Theaters and Yankee Stadium for the US Attorney's Office in New York City.
4) Coordinating and performing pilot facility surveys for the Administrative Office of the U.S. Courts to project the potential costs of ADA compliance if applied to the U.S. Federal Courts.
5) Serving as primary Architectural Access Consultant to CVS Caremark including surveying facilities throughout the United States, providing access plan reviews, training, and consulting.
6) Serving as the court-appointed architectural access specialists surveying all polling places in the City of New York.  Also surveying all designated accessible emergency shelters for the New York Emergency Management Department.
7) Serving as the lead outside expert hired by the California Division of the State Architect and by the Florida Building Commission during their efforts to rewrite their state accessibility standards to bring them into alignment with the 2010 ADA Standards.
8) Serving as the primary outside architectural access specialist for the Los Angeles Unified School District.
9) Serving as primary Architectural Access Consultant to Kaiser Permanente including overseeing the surveying of over 30,000,000 GSF of their hospital and medical facilities throughout the state of California, providing access plan reviews, training, and consulting.
10) Serving as primary Architectural Access Consultant to Sutter Health for surveying over 300 hospital and medical office facilities throughout northern California, providing access plan reviews, training, and consulting.
11) Serving as a joint expert for plaintiffs & defense on the Kmart national class action settlement agreement resulting in ongoing training, surveying, consulting, and database management work for Sears Holding Corp.
12) Providing ADA surveys, plan reviews and consulting services for numerous theaters, concert halls, arenas, stadiums, universities, national restaurant, lodging, healthcare, and retail chains.
13) Providing expert witness consulting and compliance verification services to Disability Rights Educational Defense Fund on their nationwide Shell and Chevron class action lawsuits and access compliance and universal design plan reviews and consulting services for the Ed Roberts Center.

---

14) Coordinating ADA compliance consulting and surveys of 1800 Bank of America retail branches and other selected facilities;
15) Assisting the Access Board in developing the ADAAG Technical Assistance Manual and serving on its Advisory Committee for Accessibility Standards for Assembly Areas;
16) Served on a 10-person panel for the Access Board's workshop, "Access- An International Comparison".
17) Serves on the Board of Directors of the National Association of ADA Coordinators.
18) Serving on the Global Universal Design Commission's Commercial Building Consensus Committee to develop the first Global Universal Design Standard.
19) Creating the concepts, developing the detailed functionality, and overseeing the development of www.Corada.com, the **CO**mprehensive **R**esource for the **ADA**, powered by Evan Terry Associates.

**TRAINING EXPERIENCE**

Mr. Terry has presented hundreds of ADA and accessible design training programs to ADA Coordinators, access specialists, building owners, managers, and designers and has worked with numerous federal agencies, public entities, and private corporations nationwide including at least half of the twenty largest companies in the US.

1) ADA National Symposium sponsored by the ADA National Network of technical assistance centers (who are funded by the US Department of Education and the National Institute on Disability and Rehabilitation Research) – co-taught four sessions on self-evaluations and transition planning with Robin Jones, Director of the Great Lakes ADA and Accessible IT Center in 2014 and 2015, then taught courses solo in 2016. Scheduled to teach three courses in 2019.
2) ADA Audio Online Webinars www.ada-audio.org for the ADA National Network – three-part session on developing ADA self evaluations and transition plans in 2014
3) National Association of ADA Coordinators – has served as an instructor for three to four days in the twice-annual conferences and as a member of the board of directors since 2006
4) Certified Access Specialists Institute – Presented all-day seminars in Sacramento and in Southern California in 2014 and two half-day seminars in 2017.  Presented additional seminars at the Statewide CASI ADA Symposiums in 2017 and 2018.
5) Accessibility Professionals Association – Former co-chair of Education Committee.  Taught 26 Seminars from 2014 through 2019 Annual Conference.
6) Harvard Graduate School of Design – Continuing to coordinate and co-teach with Bill Hecker a multi-day seminar on access held annually at the GSD since 1994.  Other current instructors include Marsha Mazz, John Wodatch, Irene Bowen, Mark J. Mazz, and Kaylan Dunlap.  This session was co-taught with Cynthia Leibrock in earlier years.
7) The United States Congressional Office of Compliance and the Architect of the Capitol - access compliance requirements for the U.S. Capitol, House and Senate Office Buildings, Supreme Court, Library of Congress, Capitol Police, Botanical Gardens, Central Utility Plant, and grounds – continuing
8) U.S. Social Security Administration Headquarters (and USDA Graduate School) – GSA/ABA compliance requirements for SSA facilities nationwide – continuing
9) Administrative Office of the U.S. Courts – GSA/ABA compliance requirements for AOC facilities nationwide
10) American Institute of Architects, National Conventions in 2014-Denver, 2009-San Francisco, 2003-San Diego, 2000-Philadelphia, 1999-Dallas

**Attachment "A"**                                    James L. E. Terry, AIA, CASp, NCARB
                                                                 Qualifications and Experience

---

11) American Institute of Architects, National Board of Directors meeting, Santa Fe, NM in 2012
12) CVS Health – access requirements for CVS facilities nationwide - multiple training sessions, live and web-based for consulting architects, engineers, contractors, and construction managers
13) Kaiser Permanente, CA – access requirements for over 30,000,000 GSF of KP facilities in California - multiple live training sessions for KP project managers, consulting architects, engineers, contractors, and construction managers including design and construction teams for 13 new hospital campuses
14) Sutter Health, CA – access requirements for over 300 Sutter facilities in California - multiple live training sessions for Sutter project managers, architects, engineers, contractors, and construction managers.
15) Served on a 10-person panel for the Access Board's workshop, "Access- An International Comparison".
16) And many more…

## EDUCATION

University of Southern California, B.S. Architecture, Magna Cum Laude, 1976
University of Michigan, Master of Architecture, 1977
Extensive Continuing Education Courses

## ARCHITECTURAL AND ACCESS REGISTRATIONS

| | | | |
|---|---|---|---|
| Alabama - 1984 | Arizona – 1985 | California – 1986 | Colorado - 2019 |
| Florida - 1985 | New York – 1999 | North Carolina – 1985 | Tennessee - 2013 |
| NCARB File Holder | | | |

## PROFESSIONAL, CIVIC AND OTHER ACTIVITIES

National Association of ADA Coordinators – Current Member of Board of Directors
Accessibility Professionals Association – Chapter Expansion Committee, former Co-chair of Education Committee
Harvard University Graduate School of Design - Executive Education Program – Co-taught 2 and 3-day ADA & Universal Design Seminars for 25 of last 27 years.  Scheduled for year #26 on June 10-12, 2019.
American Institute of Architects - Accessible Design Specialist on Architectural Graphic Standards 9th Edition, National Task Force, Presented ADA Seminars, Workshops, Webinars, and Podcast at four National AIA Conventions to over 1000 participants, 2014 "Tolerances" panel was one of AIA's top 10 online webinars of 2015 and 2016
American Institute of Architects – Past Continuing Education Committee for Birmingham Chapter, Past Alabama Council Representative, Past Secretary Birmingham Chapter, Past Energy Committee, Alabama Council
Global Universal Design Commission – Commercial Buildings Consensus Committee – member, Definitions Subcommittee - member
Alabama Governor's Committee on the Employment of People with Disabilities – past member
Alabama Solar Coalition - Past Executive Director
Alabama Solar Association - member
American Solar Energy Society - member

---

Attachment "A"

**James L. E. Terry, AIA, CASp, NCARB**
**Qualifications and Experience**

**PUBLICATIONS, SOFTWARE, AND WEBSITES**

www.Corada.com powered by Evan Terry Associates – Initial concept, features development, oversight
www.EvanTerry.DigitalChalk.com – online, on-demand access compliance training – webinars oversight
The Pocket Guide to the 2010 ADA Standards (multiple versions) - Initial Concept, Senior Editor
The Pocket Guide to the 2010 ABA Standards – GSA Version  - Initial Concept, Senior Editor
The Pocket Guide to the California Standards for Accessible Design (multiple versions) - Senior Editor
The Pocket Guide to the Texas Accessibility Standards (multiple versions) - Senior Editor
The Pocket Guide to the Florida Accessibility Code for Building Construction (multiple versions) - Senior Editor
The Pocket Guide to the ADA Standards (1991 Standards - multiple versions) - Initial Concept, Senior Editor
ADA Facilities Compliance Workbook - Initial Concept, Senior Editor
ADA Facilities Compliance Workbook Supplements for 1993, 1994, 1995, and 1996 - Senior Editor
ADA Facilities Compliance - A Practical Guide - Senior Editor
The ADA Design Assistant software - Initial Concept, Program Specifications, Senior Editor
Architectural Graphic Standards, 9th Edition - Lead Consultant for ADA Revisions
Beautiful Universal Design, (sequel to Beautiful Barrier Free) – Co-author with Cynthia Leibrock, ASID
Socially Sustainable Design (in progress) – Co-author with Cynthia Leibrock, ASID
Avoiding the 100 Most Common ADA Design Errors PowerPoint for Web-based CEU training for architects (in
      progress w/RL Mace Institute for Universal Design) – Initial Concept, Senior Editor
ADA/Proposed ADA Standards – Line-by-Line Comparison Spreadsheet – Initial Concept, Senior Editor
1991 vs 2010 ADA Standards vs CBC 2010 Standards  – Line-by-Line Comparison Spreadsheet – Initial Concept,
      Senior Editor
Dozens of articles in national magazines

**REPRESENTATIVE CLIENTS, PROJECTS, AND TRAINING**

Access Board, Washington, DC
Accessibility Professionals Association
Accessology
Administrative Office of U.S. Courts, Washington, DC
Alabama Association of Municipal Attorneys, Panama City, FL
Alabama Bar Institute for Continuing Legal Education, Birmingham, AL & Orange Beach, AL
Alabama Council American Institute of Architects, Montgomery, AL
Alabama Council of Community Mental Health Boards, Birmingham, AL
Alabama Governor's Health and Safety Conference, Gulf Shores, AL
Alabama Hospital Association Members, Birmingham, AL and Montgomery, AL
Alabama Hospital Association Board of Governors, Mobile, AL
Alabama Society of Hospital Engineers, Panama City, FL
Alaska Department of Transportation and Public Facilities, Juneau, Anchorage, & Fairbanks, AK
Alaska Governor's Committee, Anchorage, AK
Alaska, State ADA Coordinators, Juneau, AK
Allied Domecq, Randolph, MA—nationwide locations (Dunkin Donuts, Baskin Robbins, Togos)
America's Best / National Vision, Lawrenceville, GA - Nationwide
American Association of Airport Executives, Orlando, FL
American Hotel & Motel Association, Internal Audits Committee, Atlanta, GA
American Institute of Architects Architectural Graphic Standards Task Force, Washington, DC
American Institute of Architects, Alabama Council Continuing Education

**Attachment "A"**

**James L. E. Terry, AIA, CASp, NCARB**
**Qualifications and Experience**

---

**REPRESENTATIVE CLIENTS, PROJECTS, AND TRAINING - *continued***

American Institute of Architects, Numerous State Councils and Local Chapters Nationwide
American Management Association, Leawood, KS
American Society of Landscape Architects, Birmingham, AL
Architect of the U.S. Capitol, Washington, DC
Architectural and Transportation Barriers Compliance Board, Washington, DC
Ark Encounter for Troyer Group, Hebron, KY
Arizona Center for Disability Law on Tucson Electric Park, Tucson, AZ
Association of County Commissions of Alabama, Florence, AL
Auburn University, AL
Auburn University, Civil Engineering Department, Auburn, AL
Baldwin County Schools, Bay Minette, Alabama
Bank of America, San Francisco, CA – 1800 CA and Western States Retail Branches & Corporate Facilities
Baptist Hospitals, Birmingham, AL
Barber Companies, Birmingham, AL
Barrett Deacon Attorneys, Little Rock, AR
Beard-Eaves Memorial Coliseum, Auburn University, AL
Belk Stores, Charlotte, NC
Bessemer, City of, AL
Birmingham Bar Association, Birmingham, AL
Birmingham-Jefferson Civic Center, Birmingham, AL
Birmingham Race Course, Birmingham, AL
Birmingham Realty, Birmingham, AL
Booker T. Washington Office Building for Kenneth Owens, Architect, Birmingham, AL
Boston Medical Center, Boston, MA
Brigham and Women's Hospital for Partners Healthcare, Cambridge, MA
Broadway Theatres: Ambassador; Barrymore; Belasco; Booth; Broadhurst; Broadway; Brooks Atkinson; Cort;
     Gershwin; Golden; Imperial; Longacre; Lunt-Fontanne; Lyceum; Marquis; Minskoff; Music Box; Nederlander; Neil
     Simon; Palace; Plymouth; Richard Rodgers; Royale; Shubert; and Winter Garden, for US Atty. New York, NY
Brookwood Medical Center, Birmingham, AL
Bryan Cave, New York City, Multiple Clients Nationwide
Building Owners and Managers Association, Birmingham, AL
Business Council of Alabama, Birmingham, AL
California Division of State Architect, Sacramento, CA
California Construction Authority – State Fairs ADA & Title 24 Surveys & Consulting w/Interactive Resources, Inc. -
     Statewide
Callaway Gardens, Pine Mountain, GA
Certified Access Specialists Institute
CheckFree Facilities throughout Northern CA
Chick-fil-A, Inc., Atlanta, GA
Citibank, New York, NY
City of Charlotte, NC
City of Birmingham, AL, Project Civic Access settlement agreement w/ US DOJ
City of Huntsville, AL
City of Las Vegas, NV
City of Miami, FL

**Attachment "A"**

**James L. E. Terry, AIA, CASp, NCARB**
**Qualifications and Experience**

<u>**REPRESENTATIVE CLIENTS, PROJECTS, AND TRAINING –** *continued*</u>

City of Phoenix/Arizona State University, Phoenix, AZ
City of San Diego – Parks and Rec. & Port Authority with Jeff Katz Architecture, San Diego, CA
City of Tuscaloosa, AL
CLARB (Council of Landscape Architectural Regulatory Board), Washington, DC - training
Clark, Scott & Sullivan, Attorneys, Mobile, AL
Colbert County, Tuscumbia, AL
College and University Facilities Management Association, Albany, NY
Colonial Properties, Inc., Birmingham, AL
Colonnade Office Buildings and Shopping Center, Birmingham, AL
Colorado Cross Disability Coalition, Denver, CO
Coors Field for Colorado Cross-Disability Coalition & Fox Robertson, Attys., Denver, CO
Coosa Valley Medical Center, Sylacauga, AL
Costa's Restaurant, Birmingham, AL
Culpepper, McAuliffe, & Meaders, Inc. Architects, Atlanta, GA
Cumberland School of Law Continuing Education, Birmingham, AL
CVS Caremark – facilities nationwide
Darden (formerly General Mills) Restaurants, Orlando, FL (Red Lobster, Bahama Breeze, China Coast, & Olive Garden)
Davenport's Pizza, Mountain Brook, AL
DCH Regional Medical Center, Tuscaloosa, AL
Delta Air Lines, Atlanta, GA
Denver Broncos Stadium for HNTB Architects, Denver, CO
Denver Opera House (Ellie Calkins Center) for Colorado Cross-Disability Coalition, & Fox Robertson, Attorneys,
    Denver, CO
Disability Rights Advocates – Macy's East and U-Haul, nationwide
Disability Rights, Education, and Defense Fund on Shell and Chevron National Class Action Lawsuits
Dunkin Brands, nationwide
Dutchess County, NY
Eastwood Mall, Birmingham, AL
Ed Roberts Campus with LMS Architects, Berkeley, CA
Emmett O'Neal Library, Mountain Brook, AL
Entenmann's Bakery, Bay Shore, NY
Enterprise Rent-A-Car, FL
EPVA (Eastern Paralyzed Veterans of America) and PVA-FL (Paralyzed Veterans of America –
    Florida) on American Airlines / Miami Heat Arena, Miami, FL
EPVA (Eastern Paralyzed Veterans of America) and PVA-FL (Paralyzed Veterans of America –
    Florida) on Florida Panthers / Broward County Civic Arena, Ft. Lauderdale, FL
EPVA (Eastern Paralyzed Veterans of America) and the Public Interest Law Center of Philadelphia on CoreStates
    Center Arena (now Wachovia Center)
Equal Rights Center, Washington, D.C.
Escambia County School District, Pensacola, FL
FAA Miami ARTCC, Miami, FL
Federated Department Stores/Macy's, Long Island, NY
Flagstar Bank, MI
Frist Center for Visual Arts, Nashville, TN
Florida Building Commission and the University of Florida - FACBC Review, Gainesville, FL

**Attachment "A"**      **James L. E. Terry, AIA, CASp, NCARB**
**Qualifications and Experience**

___

<u>**REPRESENTATIVE CLIENTS, PROJECTS, AND TRAINING** – *continued*</u>

Florida HRS Annual Seminar - Keynote Speaker, Orlando, FL
Fox-Robertson Attorneys, Denver, CO
Fox Theatre, for Sutherland, Asbill, & Brennan Attorneys, Atlanta, GA
Ft. Lauderdale/Hollywood International Airport, Ft. Lauderdale, FL
Georgia Division of Rehabilitation Services, Atlanta, GA
Goldstein, Borgen, Dardarian & Ho, Oakland, CA
Goodyear Tire & Rubber Co., Nationwide
Graham & Company, Birmingham, AL
Grand Ole Opry, Nashville, TN
Gulf States Paper Corporation, Tuscaloosa, AL
Hafele/HEWI Products, New York, NY
Hancock Fabrics, Birmingham, AL
Hard Rock Cafe, Nashville, TN
Harvard Graduate School of Design Exec. Education Program, 1993-2001, 2003-2009, 2011-2017 - Cambridge, MA
Hayden Ferry Lakeside, Phoenix, AZ
Healthsouth, Birmingham, AL
Holiday Inn, Birmingham, AL, Auburn Hills, MI and Gaithersburg, MD
Honda Arena, Anaheim, CA
HNTB Architects – Multiple offices nationwide
Huntsville International Airport, For KPS Group Architects, Huntsville, AL
Huntsville Hospital, Huntsville, AL
IBM Corporation, Stamford, CT
Independent Living Resources & Stephen L. Brischetto, Atty. on Rose Garden Arena, Portland, OR
Industry Labor Council, National Center for Disability Services, New York City
Institute of Real Estate Management, Chicago, IL
Interstate Hotels & Resorts, Sanibel, FL
J. Paul Getty Museums, Westwood and Malibu, CA
Jackson, Lewis, Schnitzler, & Krupman, Multiple Clients Nationwide
Jeff Katz Architecture, San Diego, CA
Jeffer, Mangels, Butler & Marmaro, San Francisco, CA Multiple Clients Nationwide
Jefferson County, AL
Kaiser Permanente Center for Total Health, Washington, DC
Kaiser Permanente Medical Facilities (throughout CA)
Kansas International Speedway, Kansas City, MO
KFC, Miami, FL locations
Kmart and Fox Robertson, Joint Expert on National Class Action Lawsuit
Knoxville, TN Airport
Kodak Theatre for Western Law Center for Disability Law, Los Angeles, CA
Lakeshore Foundation, Homewood, AL
Lanier Ford Attorneys, Huntsville, AL
Lee County, Opelika, AL

**Attachment "A"**                                      **James L. E. Terry, AIA, CASp, NCARB**
                                                        **Qualifications and Experience**

---

<u>**REPRESENTATIVE CLIENTS, PROJECTS, AND TRAINING** – *continued*</u>

Limited Brands, Columbus, OH
    Bath & Body Works
    Express
    Henri Bendel
    The Limited
    The White Barn Candle, Co.
    Victoria's Secret
Little - Diversified Architectural Consulting, Charlotte, NC
Lloyd's Restaurant, Birmingham, AL
Los Angeles Unified School District with PBWS Architects, Los Angeles, CA
Mac's One Stop, Birmingham, AL
Madison Square Garden, For U.S. Attorney, SDNY, New York, NY
Marshall's Department Store, Mobile, AL
Massachusetts General Hospital for Partners Healthcare, Boston, MA
McCall Design Group for The Gap, Nationwide
Mercedes Benz Louisiana Superdome for the Bizer Law Firm, New Orleans, LA
Metropolitan Area Regional Transit Authority, Atlanta, GA
Metropolitan Opera House, For U.S. Attorney, SDNY, New York, NY
Miller Canfield, Attys., Detroit, MI
Mobil Oil, Washington, DC, & Miami, FL
Mockingbird Station, Dallas, TX
Muse Hotel for Kimpton Hotels, New York, NY
National Association of ADA Coordinators
National Association of Protection and Advocacy Systems on Bridgestone/Firestone National Lawsuit
National Association of Convenience Stores
National Restaurant Association's Multi-Unit Architects, Engineers, and Building Construction Officers, Atlanta, GA
NEPVA (New England Paralyzed Veterans of America) for Fleet Center Arena, Boston, MA
Nevada Governor's Committee on the Employment of People with Disabilities, Las Vegas, NV
New Jersey Society of Professional Engineers, Trenton, NJ
New York City Board of Elections, NY
New York City Emergency Management Department, NY
New York Lawyers for the Public Interested (NYLP), New York, NY
New York Times on Multiple Affiliated Facilities Nationwide
Nike Retail Store, Folsum, CA
Nimrod Long Associates, Birmingham, AL
North Broward Hospital District, Ft. Lauderdale, FL
Oakland Alameda County Civic Arena, Oakland, CA
Opelika, City of, AL
Orange Bowl Stadium Renovations with HNTB, Architects, Miami, FL
Organization Resources Counselors, Inc., New York City
Oxmoor Rotary Club, Birmingham, AL
Pacific Gas & Electric Facilities, CA
Partner's Healthcare, Boston MA
Paul Hastings, Washington DC, Atlanta, GA – for Multiple Clients Nationwide
Pell City School Board, Pell City, AL
Pentacore/Stantec on New York-New York Hotel and Casino, Las Vegas, NV

---

**Attachment "A"**                              **James L. E. Terry, AIA, CASp, NCARB**
                                                    **Qualifications and Experience**

---

**REPRESENTATIVE CLIENTS, PROJECTS, AND TRAINING – *continued***

Pepsi Center Arena, for Colorado Cross-Disability Coalition, & Fox Robertson, Attorneys,
    Denver, CO
Pima Community College, Tucson, AZ
Pizza Hut, Childersburg, AL
Potbelly Restaurants, Chicago, IL
Premier Cruise Lines, Cape Canaveral, FL
Presidio Trust, San Francisco, CA
Public Seminars sponsored by Evan Terry Associates Nationwide
PVA (Paralyzed Veterans of America) on the MCI Center Arena, Washington, DC
QuikTrip Stores, Nationwide
Radio City Music Hall, for US Attorney, New York, NY
Radio Shack, Washington D.C.
RaceTrac Stores, Atlanta, GA
Rainbow Room, for US Attorney, New York, NY
Riverside Galleria, Hoover, AL
Riverside Hospitals, Columbus, OH
Rose Garden Arena, Portland, OR
Ruby Tuesdays, Inc., Knoxville, TN
Sacramento Regional Transit Authority, Sacramento, CA
Saint Bernards Medical Center, Jonesboro, AR
Saul Ewing, Washington, DC for Multiple Clients Nationwide
Schermerhorn Symphony Center, Nashville, TN for Earl Swensson Associates, Inc. Architects
Sears, Roebuck & Co., Sears Holding Company, Chicago & Hoffman Estates, IL
Shake Shack, New York, NY
Shands Hospital, University of Florida, Gainesville, FL
Sheppard Mullin, San Diego, CA, Costa Mesa, CA, & New York City for Multiple Clients Nationwide
Sirote, Permutt Attorneys' Client Seminar, Birmingham, AL
Six Continents (formerly Bass and Intercontinental Hotels and Resorts, Atlanta, GA (nationwide)
Social Security Administration and USDA Graduate School, Baltimore, MD and Nationwide via IVT Satellite
Softdesk, Henniker, NH
South Central Educational Risk Management Program, 10 Florida County School Districts
Southern Progress Corporation, Birmingham, AL
Stanford University, Palo Alto, CA (with Interactive Resources, Inc.)
Starnes & Atchison, Birmingham, AL
State University of New York at Stony Brook, Long Island, NY
Stockham, Stockham & Carroll, Attorneys
SunCor Development, Inc., Phoenix, AZ
Sutter Health, Northern, CA
T.W. Services, Inc. (now Flagstar Restaurants), Spartanburg, SC
Tenet Healthcare, Multiple Hospitals in Alabama, Arkansas, Georgia, Missouri, & Texas
Texaco, Inc., White Plains, NY
The Gap, Denver, CO
Thomas Hospital, Fairhope, AL
Thacher, Proffitt & Wood, World Trade Center, New York City
Toys R Us, Inc., Nationwide

---

**Attachment "A"**

**James L. E. Terry, AIA, CASp, NCARB**
**Qualifications and Experience**

## REPRESENTATIVE CLIENTS, PROJECTS, AND TRAINING – *continued*

Tricon, Inc., Louisville, KY
Troy City Schools, Troy, AL
UAB/UCP/DOJ/EEOC Seminar, Birmingham, AL
UCLA Hospitals, CA
U-Haul Facilities for Disability Rights Advocates, nationwide
University of California System, Irvine, CA
University of Alabama Continuing Legal Education, Tuscaloosa, AL
University of Alabama, Tuscaloosa, AL
University of Alabama at Birmingham
University of Miami Diabetes Hospital, Miami, FL
University of Miami School of Medicine, Miami, FL
University of Wisconsin, Madison, WI
Urology Associates, Homewood, AL
U.S. Attorneys, Locations Confidential (multiple projects)
U.S. Congressional Office of Compliance, Washington, DC
U.S. Department of Justice, Washington, DC (multiple projects)
USAA, San Antonio, TX
Vestavia Hills, City of, AL
Vinson & Elkins LLP, Washington, D.C.
Von Braun Civic Center, Huntsville, AL
Washington Lawyer's Committee for Civil Rights and Urban Affairs – Disability Rights Project, Washington, D.C.
Waste Management, Inc., Chicago, IL
Wawa Convenience Stores, Wawa, PA
WCEO Radio, Birmingham, AL
Welch's Foods, Birmingham, AL
Wells Fargo Bank, San Francisco, CA
West Michigan Baseball Stadium, Grand Rapids, MI
Westin Beach Resort, Key Largo, FL
Westville Historic Handicrafts, Inc., Lumpkin, GA
Willis Corroon, Birmingham, AL
Winter Park Hospital, Winter Park, FL
Women's Sports Complex, Auburn University, Auburn, AL
Woolpert, Charlotte, NC
Wyndham Resort Hotels, Orlando, FL, Nashville, TN, St. Croix
Wynfrey Hotel, Hoover, AL
Yankee Stadium (1923 facility) for US Attorney, New York, NY

**And Other Clients who wish to remain anonymous**

# Attachment "B₁" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



# Attachment "B₂" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



## Attachment "B₃" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



# Attachment "B₄" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



## Attachment "B₅" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



# Attachment "B$_6$" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



## Attachment "B₇" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



# Attachment "B₈" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



# Attachment "B₉" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



# Attachment "B₁₀" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



# Attachment "B₁₁" – Graphic Analysis of Lines of Sight to the Field at T-Mobile Park



# Attachment "C"  -  Seating Plan of T-Mobile Park
# Showing Locations Where Line of Sight Photos Were Taken



## Attachment "D"  -  Analysis of Lines of Sight at T-Mobile Park, Seattle, WA (Representative Sampling)

| Side Seating Sections | Sec. | Row | Seat | Scoreboard Visibility | | | Photo # | 1 Row Fwd (Shoulders) | | | | 2 Rows Fwd (Top of Heads) | | | | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Photo # | Sit | Stand | | Side | Infield | Outfield | Field | Side | Infield | Outfield | Field | |
| **Wheelchair Location** | 124 | 41A | 1 | | | - | 6011 | 100% | 100% | 100% | 100% | 15% | 83% | 80% | 53% | |
| Comparable Mid-Section | 125 | 33 | 8 | | | | 6278 | 100% | 100% | 100% | 100% | 45% | 100% | 100% | 73% | |
| Comparable Mid-Section | 125 | 25 | 8 | | | | 6270 | 100% | 100% | 100% | 100% | 38% | 100% | 100% | 65% | |
| Comparable Mid-Section | 125 | 11 | 8 | | | | 6263 | 100% | 100% | 100% | 100% | 20% | 100% | 100% | 42% | |
| **Wheelchair Location** | 129 | 41A | 16 | 6017 | 93% | - | 6017 | 100% | 100% | 100% | 100% | 0% | 65% | 99% | 62% | Speaker partly blocks scoreboard |
| Comparable Location | 129 | 40 | 18 | 6019 | 100% | 100% | 6018 | 100% | 100% | 100% | 100% | 91% | 100% | 100% | 97% | |
| **Wheelchair Location** | 135 | 41A | 1 | 6022 | 62% | - | 6022 | 100% | 100% | 100% | 100% | 8% | 31% | 66% | 36% | Overhang blocks scoreboard |
| Comparable Location | 135 | 40 | 1 | 6040,27 | 100% | 100% | 6027 | 100% | 100% | 100% | 100% | 41% | 100% | 86% | 71% | |
| **Wheelchair Location** | 147 | 41A | 6 | 6031 | 9% | - | 6030 | 100% | 100% | 100% | 100% | 26% | 72% | 43% | 45% | Overhang blocks scoreboard |
| Comparable Location | 147 | 40 | 5 | 6032 | 68% | 41% | 6032 | 100% | 100% | 100% | 100% | 56% | 100% | 69% | 72% | |
| **Wheelchair Location** | 214 | 11A | 9 | 6101 | 78% | - | 6100 | 92% | 100% | 73% | 79% | 26% | 77% | 40% | 44% | Overhead for WC plus part of Section |
| Comparable Location | 214 | 10 | ~16 | 6107 | 87% | 87% | 6106 | 100% | 100% | 73% | 81% | 92% | 100% | 73% | 81% | 306 blocks scoreboard for both |
| **Wheelchair Location** | 224 | 11A | 7 | | | | 6083 | 49% | 100% | 82% | 74% | 11% | 40% | 62% | 38% | No platform |
| Comparable Location | 224 | 10 | 12 | | | | 6087 | 100% | 100% | 100% | 100% | 41% | 100% | 81% | 69% | |
| **Wheelchair Location** | 227 | 11A | 1 | | | | 6072 | 100% | 100% | 100% | 100% | 70% | 100% | 95% | 87% | **Raised Platform** |
| Comparable Location | 227 | 10 | 1 | | | | 6079 | 100% | 100% | 100% | 100% | 51% | 100% | 93% | 79% | |
| **Wheelchair Location** | 237 | 11A | 7 | | | | 6054 | 45% | 100% | 87% | 75% | 7% | 31% | 82% | 36% | |
| Comparable Location | 237 | 10 | 12 | | | | 6063 | 100% | 100% | 100% | 100% | 40% | 100% | 88% | 73% | |
| **Wheelchair Location** | 247 | 11A | 2 | | | | 6043 | 100% | 100% | 100% | 100% | 30% | 83% | 42% | 47% | |
| Comparable Location | 247 | 10 | 2 | | | | 6048 | 100% | 100% | 100% | 100% | 96% | 100% | 78% | 82% | |
| **Wheelchair Location** | 330 | 5A | 2 | | | | 6125 | 38% | 93% | 100% | 73% | 18% | 82% | 100% | 63% | |
| Comparable Location | 330 | 4 | 2 | | | | 6128 | 100% | 100% | 100% | 100% | 67% | 100% | 100% | 87% | |

# Attachment "E1"

**Jim Terry**

| | |
|---|---|
| **From:** | Steinfeld, Edward <arced@buffalo.edu> |
| **Sent:** | Wednesday, April 17, 2019 10:50 AM |
| **To:** | Jim Terry |
| **Subject:** | Re: Urgent - research data needed |
| **Attachments:** | IDEACenter_LineofSight_Prelim_Jan142013.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| | |
| **Categories:** | Red Category |

You are in luck…We actually investigated this as part of the Ellerbe case. See attached. I don't think it every went any further to a final, however.

Let me know if this helps…

Edward Steinfeld, Arch. D., AIA
SUNY Distinguished Professor of Architecture
Director, IDeA Center
School of Architecture and Planning
University at Buffalo, SUNY

arced@buffalo.edu
http://idea.ap.buffalo.edu/

+1 716 829 5899

---

**From:** Jim Terry <jterry@evanterry.com>
**Date:** Monday, April 15, 2019 at 9:38 PM
**To:** Edward Steinfeld <arced@buffalo.edu>
**Cc:** Jordana Maisel <jlmaisel@buffalo.edu>
**Subject:** RE: Urgent - research data needed

Ed,

Thanks for such a quick response.  I passed it along to my clients.  At the mediation today, both sides decided they wanted to have their experts produce formal reports by next Friday.  So, I need to get any data you can share that relate to the calculation of sightlines for wheelchair users.

I'm not sure where DOJ found the horizontal dimension from the toes to the eye point.  I can't find any other decent sources for that dimension, possibly because it is so varied because of the significant differences in devices.

I knew that our assumed heights for wheelchair users were inaccurate based on personal experience.  Most people who use mobility assistance devices are much shorter than it assumes.  But I haven't found any other good research to show what numbers we should be using.  DOJ based their Ellerbe Beckett Consent Order in 1998 on the numbers that I shared with you Sunday.  I believe that they were the same numbers they used in their settlement with the Atlanta Committee on the Olympic Games in 1996 but I have not been able to find those dimensions online.  The eye height number came

1

from Architectural Graphic Standards - Eighth Edition which, I believe, came from the research of Dreyfuss.  About 25 years ago I was told by one of his employees that it was not based on real people with disabilities but on studies using ambulatory people sitting in wheelchairs.  So they're not as helpful as I'd like but it's all that I've been able to find that might be defensible in court.  DOJ's precedents do carry some weight.

Because the Dreyfuss/AGS numbers are not as accommodating as real dimensions would be, DOJ and I have guessed they would be easier to defend than anything based on no research.  Now that you have carefully collected hard numbers on a lot of people, I believe that yours should be used for this purpose.

The following table is from your Appendix 2.  It does not show the dimensions for manual chair users' eyes and I'm not sure how to read the dimensions it reports.  They appear to be too short to mean what I'd expect.

**Table 2. Research findings on Eye Height, measured on the right eye**

| Type of WhMD user | Sample Size | Mean (SD) | Min | 5%ile | 10%ile | Median | 90%ile | 95%ile | Max |
|---|---|---|---|---|---|---|---|---|---|
| Power chair users | 189 | 1167 (75) | 932 | 1032 | 1068 | 1168 | 1261 | 1281 | 1365 |
| Scooter users | 30 | 1210 (68) | 1093 | 1110 | 1129 | 1195 | 1324 | 1364 | 1387 |
| All Device Users | 495 | 1152 (77) | 898 | 1021 | 1049 | 1155 | 1248 | 1269 | 1387 |

Can you share any of the numbers you found for:
1. The heights of the eyes of users in each of the various types of wheeled mobility devices
2. The distance from the forward most protruding part of people using wheeled mobility devices (toes, scooter front wheels, etc.) where they might be stopped by contact with a fixed panel or rail

If you need to talk about this request, I'd be glad to set up a call.

Jim

**James L.E. Terry, AIA, CEO**
**Evan Terry Associates, LLC**
One Perimeter Park South - Suite 200S
Birmingham, AL 35243-3246

**w. (205) 972-9100**
fx.(205) 972-9110
**c. (205) 807-0372**
jterry@evanterry.com
www.evanterry.com
www.Corada.com



**CONFIDENTIALITY NOTICE**
The information contained in this e-mail message may be privileged, confidential and/or protected from disclosure.  If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited.  If you think that you have received this e-mail message in error, please e-mail the sender at jterry@evanterry.com and delete it permanently from your computer files.  Thank you.

🌍 Please consider the environment before printing this email.

**From:** Steinfeld, Edward [mailto:arced@buffalo.edu]
**Sent:** Sunday, April 14, 2019 11:27 AM
**To:** Jim Terry
**Cc:** Maisel, Jordana
**Subject:** Re: Urgent - research data needed

Hello Jim,

I don't know where you got your data but our data shows that the mean eye height is much lower than 48.5. Our results are that the mean and median for all device types are 1152 and 1155 mm. (about 45.35). The mean or median heights, however, are not really what you should be using since half the population would below the median. You want to work with some percentile value below. Further, eye height is not the only part of the story since the horizontal distance between the eyes and the heads in the row in front is a critical factor as well.

Here is our report…see Appendix 2.

https://www.udeworld.com/documents/anthropometry/pdfs/AnthropometryofWheeledMobilityProject_FinalReport.pdf

The definitive peer reviewed publication is this one but I don't remember if we addressed eye height and head height in it because it had to fit into a journal:

Steinfeld, E., Maisel, J., Feathers, D. and D'Souza, C. Anthropometry and standards for wheeled mobility: an international comparison, Assistive Technology, 22: 1, 51 — 67, 2010.

We have talked about developing a visualization tool for using our data to evaluate site lines…a visual model that designers and code types could test out different conditions. But, we don't have funding for it yet. Maybe DoJ would like to fund its development?

Edward Steinfeld, Arch. D., AIA
SUNY Distinguished Professor of Architecture
Director, IDeA Center
School of Architecture and Planning
University at Buffalo, SUNY

arced@buffalo.edu
http://idea.ap.buffalo.edu/

+1 716 829 5899

---

**From:** Jim Terry <jterry@evanterry.com>
**Date:** Sunday, April 14, 2019 at 11:23 AM
**To:** Edward Steinfeld <arced@buffalo.edu>, Jordana Maisel <jlmaisel@buffalo.edu>
**Subject:** Urgent - research data needed

Ed and Jordana,

I have a client who is going into mediation on an ADA case tomorrow that concerns sight lines over standing spectators. The defendants are arguing that they believe they have comparable sight lines for wheelchair users. We argue that they do not. I've been using the anthropometric dimensions from Exhibit B to the Ellerbe Becket case (https://www.corada.com/documents/USvsEllerbe/whole-document) that DOJ settled in 1998. They have not been willing to tell us what dimensions they have been using.

In your Anthropometry of Wheeled Mobility Final Report, you mention than you collected the dimensions we need to settle our disagreement. Have you published any additional data that you collected beyond what was in that report? If so, where can I find it? If not, is there any way we could see the key dimensions we need?

Jim

James L E Terry
205-807-0372

---

This email has been scanned for spam & viruses. If you believe this email should have been stopped by our filters, click here to report it.

# Attachment "E2"

Dated: 1/14/2012

To:  Ed Roether, Gina Hilberry

From: Clive D'Souza, Ed Steinfeld, IDeA Center

RE: <u>Draft memo on Eye locations and eye sight lines</u>


The following memo is a summary of our preliminary analysis to determine suitable eye locations of when constructing lines of sights for wheeled mobility users in assembly areas.

<u>The rear-edge of the wheelchair seat was used as the reference point, and was aligned with the rear-edge of the companion seat</u>, in contrast to a "shoulder alignment" which is desirable but does not provide a reliable and consistent reference for analysis purposes. Shoulder locations would vary considerable among people seated in wheelchairs, and among people seated in the companion seat. The rear edge of the seat, however, would not have so much variability.

Three dimensions were used for our preliminary analysis:

(i)     Horizontal distance from the rear-edge of the wheelchair seat to the anterior-most point on the occupied device e.g., toe, leading edge of the footrest

(ii)    Eye depth defined as the horizontal distance from the rear-edge of the wheelchair seat to the eye

(iii)   Eye height defined as the vertical distance from the floor to the eye

Figure 1 depicts the results from the analysis as a scatter-plot with eye height on the vertical axis and horizontal distance from the reference point. The reference point (and the rear edge of the companion seat) was set 1015 mm (40 in) from the tier edge.

The horizontal distance from the rear-edge of the wheelchair seat to the anterior-most point exceeded 1015 mm (40 in.) for 24 manual wheelchair users  (9% MWU), 11 power chair users (6% PWU), and 15 scooter users (44% SU). These users were set further back from reference point (i.e., they were located behind the companion seat) such that the anterior-edge aligned with the tier edge. Note that changing the distance to the tier edge (for example from 40 in. to 36 in.) would result in different eye locations.

Figure 1 also includes sample eye locations recommended by the agreement between the Department of Justice and Ellerbe-Becket. This agreement requires the average eye location for a wheelchair user to be located 1205 mm (47.45 in.) high and 762 mm (30 in.) back from the tier edge. We show the eye location when using a clear floor length of 52 in. (i.e., 40 in. from reference point to tier-edge), and 48 in. (i.e., 36 in. from reference point to tier-edge) respectively. We note that a majority of the wheelchair users (viz., 88% MWU, 66% PWU, 62% SU) in our sample had eye locations below and further back from the current guidelines for eye locations, and would not likely be accommodated by corresponding lines

of sight.  The dimensions from the settlement are not comparable with average dimensions in standard anthropometric data tables. We are trying to find out their source.



Figure 1: Scatter-plot depicting Eye Height (mm) from the floor and Eye Depth (mm) referenced from the rear-edge of the wheelchair seat, when the tier edge barrier is 1015 mm (40in.) from the reference point (i.e. rear-edge of the wheelchair seat and companion seat). The eye locations are stratified by mobility device type, viz., manual wheelchair users (blue, n=277), power wheelchair users (green, n=189) and scooter users (red, n=34). The points below the horizontal axis show the locations of the anterior-most point in relation of the reference point.

Rather, we suggest lowering and setting further back the recommended eye location, with the assumption that alignment between the rear-edge of the wheelchair seat and the companion seat is an important priority.  Table 1 provides some sample combinations of the eye heights and eye depths when the reference point is located 40 in. from the tier edge. The table depicts the percent of the sample with eye heights less than the "height from floor" in column 1, and distance from the reference point in row 1.

The cells in 'red' depict the combination of eye height and depth represented by the DoJ-Ellerbe Becket agreement. The cells in 'green' represented a recommended value for eye locations, viz. an eye height

of 1105 mm (43.5 in.) from the floor, and a depth of 900 mm (35.5 in.) from the tier edge. Using this combination, approximately 20% of MWU, 10% of PWU, and 3% of SU would likely be excluded, i.e., they would not be accommodated by corresponding lines of sight. Additional details on the construction of the lines of sight are needed to compute a more accurate estimate of the number of the persons likely to be excluded.

**Table 1: Percent of wheeled mobility device users (manual, power and scooter) with eye height less than "Height from floor" and depth less than "Distance from Reference Point"**

| Height from floor mm (in.) | Distance From Anterior CFS edge, mm(in.) = 1015 (40 in) minus Dist. From reference point | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 915 (36) | 900 (35.5) | 890 (35) | 875 (34.5) | 865 (34) | 850 (33.5) | 840 (33) | 825 (32.5) | 815 (32) | 800 (31.5) | 790 (31) | 775 (30.5) | 762 (30) |
| | Distance from Reference Point | | | | | | | | | | | | |
| | 100 (4) | 115 (4.5) | 125 (5) | 140 (5.5) | 150 (6) | 165 (6.5) | 175 (7) | 190 (7.5) | 200 (8) | 215 (8.5) | 230 (9) | 240 (9.5) | 253 (10) |
| **Manual Wheelchair Users (n=277)** | | | | | | | | | | | | | |
| 1205 (47.5) | 31 | 41 | 45 | 51 | 57 | 62 | 67 | 73 | 77 | 83 | 86 | 87 | 88 |
| 1180 (46.5) | 25 | 34 | 38 | 43 | 49 | 53 | 58 | 64 | 67 | 43 | 74 | 75 | 76 |
| 1155 (45.5) | 22 | 30 | 33 | 39 | 44 | 48 | 52 | 57 | 59 | 64 | 66 | 67 | 68 |
| 1130 (44.5) | 17 | 25 | 28 | 32 | 36 | 40 | 43 | 47 | 47 | 51 | 52 | 52 | 53 |
| 1105 (43.5) | 14 | 20 | 22 | 26 | 28 | 31 | 34 | 36 | 37 | 39 | 40 | 40 | 40 |
| 1080 (42.5) | 9 | 13 | 16 | 18 | 20 | 22 | 25 | 26 | 26 | 27 | 28 | 28 | 29 |
| **Power Wheelchair Users (n=189)** | | | | | | | | | | | | | |
| 1205 (47.5) | 21 | 26 | 29 | 32 | 35 | 42 | 46 | 52 | 55 | 58 | 62 | 65 | 66 |
| 1180 (46.5) | 19 | 23 | 26 | 29 | 32 | 37 | 40 | 46 | 48 | 51 | 54 | 57 | 57 |
| 1155 (45.5) | 14 | 18 | 21 | 23 | 26 | 31 | 32 | 38 | 38 | 40 | 42 | 44 | 44 |
| 1130 (44.5) | 11 | 13 | 14 | 17 | 19 | 22 | 23 | 23 | 26 | 29 | 30 | 31 | 31 |
| 1105 (43.5) | 7 | 10 | 10 | 12 | 13 | 15 | 16 | 19 | 19 | 20 | 21 | 22 | 22 |
| 1080 (42.5) | 5 | 6 | 6 | 7 | 8 | 10 | 11 | 12 | 13 | 13 | 14 | 15 | 15 |
| **Scooter Users (n=34)** | | | | | | | | | | | | | |
| 1205 (47.5) | 29 | 35 | 35 | 41 | 41 | 41 | 44 | 50 | 53 | 59 | 59 | 59 | 62 |
| 1180 (46.5) | 21 | 26 | 26 | 32 | 32 | 32 | 35 | 38 | 41 | 47 | 47 | 47 | 47 |
| 1155 (45.5) | 9 | 15 | 15 | 18 | 18 | 18 | 18 | 21 | 21 | 24 | 24 | 24 | 24 |
| 1130 (44.5) | 3 | 6 | 6 | 6 | 6 | 6 | 6 | 9 | 9 | 12 | 12 | 12 | 12 |
| 1105 (43.5) | 0 | 3 | 3 | 3 | 3 | 3 | 3 | 6 | 6 | 6 | 6 | 6 | 6 |
| | 0 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |

**Attachment "F"**     Mariners T-Mobile Park Seating Comparison - Ticketmaster vs Defendant-Provided     -     Counts from Ticketmaster as of 4/16/2019 for 5/28/2019 Game and Seating Manifest from T-Mobile Park as DEFS_0000033

| Section # / Name | Ticketmaster Std Seating | WC/Comp anion Seating | Total | Pricing Std Seating | WC/Comp ion Seating | Seating Manifest Std Seating | WC/Comp anion Seating | Total |
|---|---|---|---|---|---|---|---|---|
| 25 | 65 | 0 | 65 | $450 | N/A | 65 | 0 | 65 |
| 27 | 144 | 0 | 144 | ? | N/A | 144 | 0 | 144 |
| 33 | 132 | 0 | 132 | ? | N/A | 132 | 0 | 132 |
| 35 | 99 | 2 | 99 | ? | $75 | 84 | ? | ? |
| 102 | 112 | 4 | 116 | $35 | $35 | 127 | 4 | 131 |
| 103 | 288 | 10 | 298 | $35 | $35 | 298 | 10 | 298 |
| NA104 | 127 | 4 | 131 | $35 | $35 | 127 | 4 | 131 |
| 105 | 178 | 0 | 178 | $35 | $35 | 178 | 0 | 178 |
| 106 | 432 | 11 | 443 | $35 | $35 | 432 | 11 | 443 |
| 107 | 432 | 12 | 444 | $35 | $35 | 432 | 12 | 444 |
| 108 | 432 | 11 | 443 | $35 | $35 | 432 | 11 | 443 |
| 109 | 355 | 8 | 363 | $35 | ? | 355 | 8 | 363 |
| 110 | 211 | 9 | 220 | $39 | $39 | 211 | 9 | 220 |
| 111 | 402 | 11 | 413 | $39 | $39 | 402 | 11 | 413 |
| 112 | 575 | 7 | 582 | $39 | $39 | 575 | 7 | 582 |
| 114 | 568 | 11 | 579 | $39-$60 | $39 | 568 | 11 | 579 |
| 115 | 510 | 11 | 521 | $39 | $39 | 510 | 11 | 521 |
| 116 | 640 | 8 | 648 | $39-$60 | $39 | 640 | 8 | 648 |
| 117 | 632 | 8 | 640 | $39-$60 | $39 | 632 | 8 | 640 |
| 118 | 543 | 9 | 552 | $39-$60 | $39 | 543 | 9 | 552 |
| 119 | 687 | 10 | 697 | $55-$75 | $55 | 687 | 10 | 697 |
| 120 | 480 | 6 | 486 | $55-$75 | $55 | 480 | 6 | 486 |
| 121 | 442 | 5 | 447 | $55-$100 | $55 | 442 | 5 | 447 |
| 122 | 432 | 6 | 438 | $55-$75 | ? | 432 | 6 | 438 |
| 123 | 432 | 5 | 437 | $55-$75 | ? | 432 | 5 | 437 |
| 124 | 432 | 6 | 438 | $55-$75 | $55 | 432 | 6 | 438 |
| 125 | 437 | 6 | 443 | $55-$75 | $55 | 437 | 6 | 443 |
| 126 | 316 | 8 | 324 | $55-$75 | $55 | 316 | 8 | 324 |
| 127 | 425 | 9 | 434 | $55-$75 | ? | 425 | 9 | 434 |
| 128 | 346 | 4 | 350 | $55-$75 | ? | 346 | 4 | 350 |
| 129 | 516 | 5 | 521 | $55-$75 | $55 | 516 | 5 | 521 |
| 131 | 356 | 5 | 361 | $55-$75 | ? | 356 | 5 | 361 |
| 132 | 491 | 4 | 495 | $55-$75 | ? | 491 | 4 | 495 |
| 133 | 284 | 8 | 292 | $55-$75 | ? | 284 | 8 | 292 |
| 134 | 355 | 8 | 363 | $55-$75 | $55 | 355 | 8 | 363 |
| 135 | 358 | 7 | 365 | $55-$75 | $55 | 358 | 7 | 365 |
| 136 | 396 | 7 | 403 | $55-$75 | $55 | 396 | 7 | 403 |
| 137 | 432 | 5 | 437 | $55-$75 | $55 | 432 | 5 | 437 |
| 138 | 432 | 7 | 439 | $55-$75 | $55 | 432 | 7 | 439 |
| 139 | 442 | 4 | 446 | $55-$75 | $55 | 442 | 4 | 446 |
| 140 | 480 | 7 | 487 | $55-$100 | $55 | 480 | 7 | 487 |
| 141 | 694 | 10 | 704 | $55-$75 | $55 | 694 | 10 | 704 |
| 142 | 543 | 9 | 552 | $39-$60 | $39 | 543 | 9 | 552 |
| 143 | 640 | 9 | 649 | $39-$60 | $39 | 640 | 9 | 649 |
| 144 | 640 | 8 | 648 | $39-$60 | ? | 640 | 8 | 648 |
| 146 | 644 | 10 | 654 | $39-$60 | $39 | 644 | 10 | 654 |
| 147 | 427 | 11 | 438 | $39 | $39 | 427 | 11 | 438 |
| 148 | 572 | 8 | 580 | $39-$60 | $39 | 572 | 8 | 580 |
| 149 | 315 | 10 | 325 | $39-$60 | $39 | 315 | 10 | 325 |
| 150 | 322 | 11 | 333 | ? | ? | 322 | 11 | 333 |
| 151 | 39 | 0 | 39 | $39 | N/A | 39 | 0 | 39 |
| Edgar's | 30 | 6 | 36 | ? | ? | ? | ? | 100 |
| 180 | 131 | 9 | 140 | $20 | $20 | 131 | 9 | 140 |
| 181 | 239 | 6 | 245 | $20 | ? | 239 | 6 | 245 |
| 182 | 275 | 0 | 275 | $20 | N/A | 265 | 0 | 265 |
| 183 | 256 | 0 | 256 | $20 | ? | 256 | 0 | 256 |
| 184 | 256 | 0 | 256 | $20 | ? | 256 | 0 | 256 |
| 185 | 256 | 0 | 256 | $20 | ? | 256 | 0 | 256 |
| 186 | 303 | 0 | 303 | $20 | ? | 303 | 0 | 303 |
| 187 | 159 | 0 | 159 | $20 | N/A | 159 | 0 | 159 |
| 190 | 174 | 0 | 174 | $17 | N/A | 174 | 0 | 174 |
| 191 | 354 | 7 | 361 | $17 | $17 | 354 | 7 | 361 |
| 192 | 386 | 6 | 392 | $17 | $17 | 386 | 6 | 392 |
| 193 | 354 | 11 | 365 | $17 | $17 | 354 | 11 | 365 |
| 195 | 164 | 5 | 169 | $17 | $17 | 164 | 5 | 169 |
| **Subtotals:** | **24393** | **416** | **24807** | | | **24363** | **408** | **24777** |

Mariner Counting Method:  Effective: **388**  1991 Stds: **498**  2010 Stds: **261**

# Diamond Sections not included in Manifest
? = Seats in this section sold out - prices not available

| Section # / Name | Ticketmaster Std Seating | WC/Comp anion Seating | Total | Pricing Std Seating | WC/Comp ion Seating | Seating Manifest Std Seating | WC/Comp anion Seating | Total |
|---|---|---|---|---|---|---|---|---|
| 211 | 73 | 0 | 73 | $55 | N/A | 73 | 0 | 73 |
| 212 | 151 | 0 | 151 | $55 | N/A | 151 | 0 | 151 |
| 213 | 207 | 0 | 207 | $55 | N/A | 207 | 0 | 207 |
| 214 | 142 | 10 | 152 | $55 | $55 | 142 | 10 | 152 |
| 215 | 120 | 7 | 127 | $55 | $55 | 120 | 7 | 127 |
| 216 | 120 | 6 | 126 | $55 | $55 | 120 | 7 | 127 |
| 217 | 120 | 7 | 127 | $60 | $55 | 120 | 7 | 127 |
| 218 | 140 | 0 | 140 | $60 | N/A | 140 | 0 | 140 |
| 219 | 175 | 0 | 175 | $60 | N/A | 175 | 0 | 175 |
| 220 | 140 | 0 | 140 | $60 | N/A | 140 | 0 | 140 |
| 221 | 142 | 0 | 142 | $60 | N/A | 142 | 0 | 142 |
| 222 | 141 | 0 | 141 | $60 | N/A | 141 | 0 | 141 |
| 223 | 142 | 0 | 142 | $60 | N/A | 142 | 0 | 142 |
| 224 | 120 | 7 | 127 | $60 | $60 | 120 | 7 | 127 |
| 226 | 138 | 2 | 140 | $60 | $60 | 138 | 2 | 140 |
| 227 | 145 | 5 | 150 | $60 | $60 | 145 | 5 | 150 |
| 233 | 181 | 0 | 181 | $60 | N/A | 181 | 0 | 181 |
| 234 | 171 | 0 | 171 | $60 | N/A | 171 | 0 | 171 |
| 236 | 151 | 0 | 151 | $60 | N/A | 151 | 0 | 151 |
| 237 | 120 | 7 | 127 | $60 | $60 | 120 | 7 | 127 |
| 238 | 147 | 0 | 147 | $60 | N/A | 147 | 0 | 147 |
| 239 | 120 | 7 | 127 | $60 | $60 | 120 | 7 | 127 |
| 240 | 148 | 0 | 148 | $60 | N/A | 148 | 0 | 148 |
| 241 | 185 | 0 | 185 | $60 | $55 | 182 | 0 | 182 |
| 242 | 141 | 0 | 141 | $60 | N/A | 141 | 0 | 141 |
| 243 | 142 | 0 | 142 | $60 | N/A | 142 | 0 | 142 |
| 244 | 140 | 0 | 140 | $60 | N/A | 140 | 0 | 140 |
| 245 | 142 | 0 | 142 | $60 | N/A | 142 | 0 | 142 |
| 246 | 135 | 9 | 144 | $55 | $55 | 135 | 9 | 144 |
| 247 | 163 | 4 | 167 | $55 | $55 | 163 | 4 | 167 |
| 248 | 144 | 0 | 144 | $55 | N/A | 144 | 0 | 144 |
| 249 | 71 | 0 | 71 | $55 | N/A | 71 | 0 | 71 |
| **Subtotals:** | **4517** | **71** | **4588** | | | **4514** | **72** | **4586** |

Mariner Counting Method:  Effective: **4517**  1991 Stds: **252**  2010 Stds: **132**

**August 23, 2019, 7:10 pm**

| Section # / Name | Ticketmaster Std Seating | WC/Comp anion Seating | Total | Pricing Std Seating | WC/Comp ion Seating | Seating Manifest Std Seating | WC/Comp anion Seating | Total |
|---|---|---|---|---|---|---|---|---|
| 314 | 411 | 0 | 411 | $26-$30 | N/A | 411 | 0 | 411 |
| 315 | 455 | 12 | 467 | $26-$30 | $26 | 455 | 12 | 467 |
| 316 | 586 | 0 | 586 | $26-$30 | N/A | 586 | 0 | 586 |
| 318 | 497 | 13 | 510 | $26-$30 | $30 | 497 | 13 | 510 |
| 319 | 291 | 0 | 291 | $26-$30 | N/A | 291 | 0 | 291 |
| 320 | 455 | 12 | 467 | $26-$35 | ? | 455 | 12 | 467 |
| 321 | 585 | 0 | 585 | $26-$35 | N/A | 585 | 0 | 585 |
| 323 | 496 | 13 | 509 | $26-$35 | $26 | 496 | 13 | 509 |
| 325 | 392 | 0 | 392 | $26-$35 | N/A | 392 | 0 | 392 |
| 326 | 321 | 7 | 328 | $26-$30 | ? | 321 | 7 | 328 |
| 327 | 524 | 0 | 524 | $26-$35 | N/A | 524 | 0 | 524 |
| 328 | 355 | 7 | 362 | $26-$35 | $35 | 350 | 7 | 357 |
| 329 | 524 | 0 | 524 | $26-$35 | N/A | 524 | 0 | 524 |
| 330 | 355 | 7 | 362 | $26-$35 | $35 | 350 | 7 | 357 |
| 331 | 522 | 0 | 522 | $26-$35 | N/A | 522 | 0 | 522 |
| 332 | 350 | 7 | 357 | $26-$35 | $35 | 350 | 7 | 357 |
| 333 | 522 | 0 | 522 | $26-$35 | N/A | 522 | 0 | 522 |
| 334 | 333 | 7 | 340 | $26-$35 | $26 | 333 | 7 | 340 |
| 335 | 393 | 0 | 393 | $26-$35 | N/A | 393 | 0 | 393 |
| 339 | 561 | 0 | 561 | $26-$35 | N/A | 561 | 0 | 561 |
| 340 | 455 | 12 | 467 | $26-$35 | ? | 455 | 12 | 467 |
| 341 | 299 | 0 | 299 | $26-$30 | N/A | 299 | 0 | 299 |
| 342 | 497 | 13 | 510 | $26-$30 | $30 | 497 | 13 | 510 |
| 344 | 586 | 0 | 586 | $26-$30 | N/A | 586 | 0 | 586 |
| 345 | 454 | 12 | 466 | $26-$30 | N/A | 380 | 0 | 380 |
| 346 | 380 | 0 | 380 | $26-$30 | N/A | 380 | 0 | 380 |
| 347 | 231 | 13 | 244 | $26 | $26 | 231 | 13 | 244 |
| 349 | 47 | 0 | 47 | $35** | N/A | 47 | 0 | 47 |
| **Subtotals:** | **12375** | **148** | **12523** | | | **12365** | **148** | **12513** |

Mariner Counting Method:  Effective: ___

**Sections not advertised** (No Pricing Available)

| Section # / Name | Ticketmaster Std Seating | WC/Comp anion Seating | Total | Seating Manifest Std Seating | WC/Comp anion Seating | Total |
|---|---|---|---|---|---|---|
| 306 | 244 | 6 | 250 | 244 | 6 | 250 |
| 307 | 536 | 0 | 536 | 536 | 0 | 536 |
| 308 | 498 | 13 | 511 | 498 | 13 | 511 |
| 309 | 597 | 0 | 597 | 597 | 0 | 597 |
| 310 | 431 | 9 | 440 | 431 | 9 | 440 |
| 311 | 201 | 0 | 201 | 201 | 0 | 201 |
| 312 | 396 | 0 | 396 | 396 | 0 | 396 |
| 313 | 497 | 13 | 510 | 497 | 13 | 510 |
| **Subtotals:** | **3400** | **41** | **3441** | **3400** | **41** | **3441** |

Mariner Counting Method:  Effective: **38**  1991 Stds: **36**

**Hit It Here Café Seating**

| Section | Ticketmaster Std Seating | WC/Comp anion Seating | Total | Pricing* | Hit It Here Café Seating Std Seating | WC/Comp anion Seating | Total |
|---|---|---|---|---|---|---|---|
| ICAFLO | 24 | 0 | 24 | $52 | 24 | 0 | 24 |
| ICAFMI | 25 | 0 | 25 | $52 | 25 | 0 | 25 |
| ICAFUP | 25 | 0 | 25 | $52 | 24 | 0 | 24 |
| ICAF1-18 | 72 | 0 | 72 | $52 | 72 | 0 | 72 |
| CAFLO | 34 | 0 | 34 | $52 | 34 | 0 | 34 |
| CAFMI | 34 | 0 | 34 | $52 | 34 | 0 | 34 |
| CAFUP | 25 | 0 | 25 | $52 | 24 | 0 | 24 |
| CAF1-22 | 88 | 0 | 88 | $52 | 88 | 0 | 88 |
| **Subtotals:** | **327** | | **327** | | **325** | | **325** |

**All Star Club Seating**

| Section | Ticketmaster Std Seating | WC/Comp anion Seating | Total | Pricing* | All Star Club Seating Std Seating | WC/Comp anion Seating | Total |
|---|---|---|---|---|---|---|---|
| 8 | 15 | 0 | 15 | $205 | 20 | 0 | 20 |
| 9 | 21 | 0 | 21 | $205 | 21 | 0 | 21 |
| 10 | 21 | 0 | 21 | $205 | 21 | 0 | 21 |
| 11 | 20 | 0 | 20 | $205 | 21 | 0 | 21 |
| 12 | 21 | 0 | 21 | $205 | 21 | 0 | 21 |
| 13 | 21 | 0 | 21 | $205 | 21 | 0 | 21 |
| 14 | 20 | 0 | 20 | $205 | 21 | 0 | 21 |
| 15 | 21 | 0 | 21 | $205 | 21 | 0 | 21 |
| **Subtotals:** | **160** | **0** | **160** | | **165** | | **165** |

*May 23, 2019, 7:10 pm game

**Key to Colors**

| | | |
|---|---|---|
| (yellow) | Disparity between Ticketmaster & Manifest | |
| (orange) | Additional seats do not count towards total | |

**Special Sections**

| | Std Seating | WC/Comp | Total |
|---|---|---|---|
| S35 | ? | ? | ? |
| PRESS8 | 28 | ? | ? |

**Private Suites (1-69)**
| (69 Boxes) | 1616 | ? | ? |

**Private Suites (A-H)**
| (8 Suites) | 320 | ? | ? |

**Lower Level Edgar's** | ? | ? | ? |

**Restaurants**

**Ticketmaster Totals / Manifest Totals**

| | Ticketmaster Totals | Manifest Totals |
|---|---|---|
| 100 | 24,807 | 24,777 |
| 200 | 4,588 | 4,586 |
| 300 | 12,523 | 12,513 |
| Other | 3,928 | 3,931 |
| **Total:** | **45,846** | **45,807** |

Effective WC & Comp:   **628**     Mariner Counting Total

**ADA Requirements**

| | |
|---|---|
| 1991 WCs: | **459** |
| 1991 Companions: | **459** |
| Mariner Counting: | **918** |
| 2010 WCs: | **241** |
| 2010 Companions: | **241** |
| Mariner Counting Tot: | **482** |   1.051345810%

**Event Spaces and Hospitality Seating at T-Mobile Park**

**First Base Terrace Club:** "The First Base Terrace Club provides fabulous views looking out onto the field and the Seattle skyline" (https://www.mlb.com/mariners/ballpark/events/spaces); Capacity: Existing seating: 156;

**Keybank Diamond Club:** "The Diamond Club is a spacious, upscale bistro featuring a circular bar, big screen TV's and comfortable furnishings." (https://www.mlb.com/mariners/ballpark/events/spaces); Capacity: Existing seating: 171; Reception: 250; Rounds: 100; Classroom: 50; Theatre: 175

**The 'Pen:** "This indoor/outdoor space is the perfect spot for your next Happy Hour!" Capacity: Existing seating: 60; Reception: 2,000; Rounds: 350; Theatre: 175 (https://www.mlb.com/mariners/ballpark/events/spaces);

**Third Base Terrace Club:** "The Third Base Terrace Club provides fabulous views looking out onto the field and the Seattle skyline." (https://www.mlb.com/mariners/ballpark/events/spaces); Capacity: Existing seating: 130; Reception: 350; Rounds: 100; Classroom: 70; Theatre: 100

**Lookout Landing:** "This outdoor terrace provides both city and field views!" Capacity (75-150 guests): Existing seating: 0; Reception: 150; Rounds: 80; Theatre: 100; (https://www.mlb.com/mariners/ballpark/events/spaces);

**Outside Corner:** "Enjoy majestic Puget Sound and stunning Seattle city views atop T-Mobile Park at the Outside Corner located above the Home Plate Rotunda. Perfect for a summer picnic or warm evening gala at the ballpark." (https://www.mlb.com/mariners/tickets/group-tickets/hospitality-areas); Capacity (100-600 guests): Existing seating: 80; Reception: 400; Rounds: 300; Theatre: 200

**Edgar's Home Run Porch:** "Located above Edgar's Cantina in the left field corner, host a private party throughout the game with a private bartender and food and beverage package." Capacity: 55-75 guests; (https://www.mlb.com/mariners/tickets/group-tickets/hospitality-areas)

**Power Alley at The 'Pen:** "Extend your party in The 'Pen throughout the game with a VIP experience including a private bartender and food and beverage package." Capacity: 75-100 guests; (https://www.mlb.com/mariners/tickets/group-tickets/hospitality-areas);

**Hit It Here Terrace (Outdoor Patio of the Hit It Here Café & Bar):** "This private event space can be reserved for groups of 170+, includes outdoor terrace seating throughout the game and food and beverage package." Capacity: 170; (https://www.mlb.com/mariners/tickets/hit-it-here-cafe)

**Hit It Here Café & Bar:** "Hit it Here Café & Bar provides a terrific setting to enjoy a restaurant-style meal prior to or during the game". Capacity: Existing seating 188; Reception 225; \ (https://www.mlb.com/mariners/tickets/hit-it-here-cafe)

**Terrace Club Group Package:** "Access to the exclusive Terrace Club Level, a block of wide, padded seats for the game and a buffet including food and beverage. The perfect way to upgrade your group outing at the ballpark! Patio areas may be shared with other groups." Capacity: 40-400 guests; (https://www.mlb.com/mariners/tickets/group-tickets/hospitality-areas)

**Group Suites:** "Located in Right Field above the Hit It Here Cafe host an event for as low as $105 per person that includes a ticket, catering credit and parking." Capacity [30-400 guests (30-49 tickets per suite, which can be interconnected)]: Access to Club Level lounges and Mariners Game Room featuring a pool table, foosball and shuffleboard;

**Edgar's Cantina:** "Edgar's Cantina provides patrons with exceptional views of the ballpark". Capacity: Existing seating: 30; Reception: 30; Rounds: 15; Theatre: 20; (https://www.mlb.com/mariners/ballpark/events/spaces/edgars-cantina)

# Attachment "G"  -  Wheelchair Seating Positions by Section



# Attachment "H₁" – Graphic Analysis of Lines of Sight to the Scoreboard at T-Mobile Park

**Wheelchair User View**



SECTION: 129     ROW: 41A     SEAT: 16   PHOTO: 6017

**Comparable Spectator View**



SECTION: 129     ROW: 40     SEAT: 18   PHOTO: 6019

SCOREBOARD
% VISIBLE:
SIDE:          93%

SCOREBOARD
% VISIBLE:
100%

# Attachment "H₂" – Graphic Analysis of Lines of Sight to the Scoreboard at T-Mobile Park

Wheelchair User View



SECTION: 135     ROW: 41A     SEAT: 1   PHOTO: 6022

Comparable Spectator View Seated



SECTION: 135     ROW: 40     SEAT: 1   PHOTO: 6040

SCOREBOARD
% VISIBLE:
62%

SCOREBOARD
% VISIBLE:
100%

# Attachment "H₃" – Graphic Analysis of Lines of Sight to the Scoreboard at T-Mobile Park



**Wheelchair User View**

SECTION: 135      ROW: 41A      SEAT: 1      PHOTO: 6022

**Comparable Spectator View Standing**

SECTION: 135      ROW: 40      SEAT: 1      PHOTO: 6027

SCOREBOARD
% VISIBLE:
62%

SCOREBOARD
% VISIBLE:
100%

# Attachment "H₄" – Graphic Analysis of Lines of Sight to the Scoreboard at T-Mobile Park

Wheelchair User View



SECTION: 147    ROW: 41A    SEAT: 6    PHOTO: 6031

Comparable Spectator View Seated



SECTION: 147    ROW: 40    SEAT: 5    PHOTO: 6034

SCOREBOARD
% VISIBLE:
9%

SCOREBOARD
% VISIBLE:
68%

# Attachment "H₅" – Graphic Analysis of Lines of Sight to the Scoreboard at T-Mobile Park

Wheelchair User View



SECTION: 147      ROW: 41A      SEAT: 6      PHOTO: 6031

Comparable Spectator View Standing



SECTION: 147      ROW: 40      SEAT: 5      PHOTO: 6033

SCOREBOARD
% VISIBLE:
9%

SCOREBOARD
% VISIBLE:
41%

# Attachment "H$_6$" – Graphic Analysis of Lines of Sight to the Scoreboard at T-Mobile Park

Wheelchair User View



SIDE

SECTION: 214     ROW: 11A    SEAT: 9    PHOTO: 6101

Comparable Spectator View



SIDE

SECTION: 214     ROW: 10    SEAT: ~16    PHOTO: 6107

SCOREBOARD
% VISIBLE:
78%

SCOREBOARD
% VISIBLE:
87%

## Attachment "I"  -  Season Ticket Prices and Availability as of April 28, 2019

| Section | Plan A (20 Game Plan) | | Plan B (16 Game Plan) | | Plan C (15 Game Plan) | | Plan D (16 Game Plan) | | Full Season (63 Games) | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Std Seating | WC/Comp | Std Seating | WC/Comp | Std Seating | WC/Comp | Std Seating | WC/Comp | Std Seating | WC/Comp |
| | Price/Row | Price/Row | Price/Row | Price/Row | Price/Row | Price/Row | Price/Row | Price/Row | Price/Row | Price/Row |
| 124 | $918/33 | WC not avail | $932/6 | WC not avail | $868/36 | WC not avail | $936/33 | WC not avail | $3024/30* | $3024/41A |
| 125 | $1000/33 | WC not avail | $932/33 | WC not avail | $868/36 | WC not avail | $936/34 | WC not avail | $3024/30** | WC not avail |
| 129 | $918/24 | WC not avail | $932/30 | WC not avail | $868/30 | WC not avail | $936/29 | WC not avail | Not offered | Not offered |
| 135 | $918/33 | WC not avail | $932/30 | WC not avail | $868/30 | WC not avail | $936/30 | WC not avail | $3024/30*** | WC not avail |
| 147 | $634/12 | WC not avail | $664/12 | WC not avail | $606/12 | WC not avail | $678/12 | WC not avail | Not offered | Not offered |
| 247 | Std not avail | WC not avail | Not offered | Not offered | Not offered | Not offered | Not offered | Not offered | Not offered | Not offered |
| 237 | $964/7 | WC not avail | Not offered | Not offered | $914/7 | WC not avail | $982/7 | WC not avail | $3336/4 | WC not avail |
| 227 | $964/8 | WC not avail | $980/8 | WC not avail | $914/8 | $914/11A | $982/8 | WC not avail | $3336/10 | $3336/11A |
| 224 | $964/10 | $964/11A | $980/10 | $980/11A | $914/10 | $914/11A | $982/10 | $982/11A | $3336/8 | WC not avail |
| 214 | $768/1 | WC not avail | $782/1 | WC not avail | $727/2 | WC not avail | $786/1 | WC not avail | Not offered | Not offered |
| 330 | $510/3 | $510/5A | $516/3 | $516/5A | $482/4 | $482/5A | $516/3 | $516/5A | $1772/4**** | WC not avail |
| 308 | Not offered | Not offered | Not offered | Not offered | Not offered | Not offered | Not offered | Not offered | Not offered | Not offered |

*Also available: $3614/20
**Also available: $3614/21
***Also available: $3614/21
****Also available: $1178/14

Evan Terry Associates, LLC

# Exhibit C



DSC06168



DSC06169



DSC06170



DSC06281



DSC06282



DSC06283



DSC06284



DSC06285

# Exhibit D



DSC06200

# Exhibit E



DSC06163

Exhibit F



DSC06092



DSC06093



DSC06094



DSC06095