1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

CLARK LANDIS, ROBERT BARKER,
GRADY THOMPSON, and KAYLA BROWN,

    Plaintiffs,

    v.

WASHINGTON STATE MAJOR LEAGUE
BASEBALL STADIUM PUBLIC
FACILITIES DISTRICT; and BASEBALL OF
SEATTLE, INC., a duly licensed Washington
corporation, d.b.a. Mariners Baseball, LLC, a
duly licensed Washington limited liability
company, d.b.a. The Baseball Club of Seattle,
LLLP, a duly licensed Washington limited
liability limited partnership,

    Defendants.

NO.    2:18-cv-01512-BJR

**DEFENDANTS' OPPOSITION TO
MOTION FOR SUMMARY
JUDGMENT**

NOTE ON MOTION CALENDAR:
June 14, 2019

*ORAL ARGUMENT REQUESTED*

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF FACTS ..................................................................................... 2

    A.      The Stadium. ............................................................................................... 2

    B.      Accessible Seating. ..................................................................................... 2

    C.      Ticket Pricing. ............................................................................................ 4

    D.      Operations, Maintenance and Improvements. ............................................ 4

    E.      Concessions. ............................................................................................... 6

III.    ARGUMENT AND AUTHORITY ....................................................................... 6

    A.      The ADA. .................................................................................................... 6

    B.      Applicable ADA Standards. ....................................................................... 6

    C.      Summary Judgment Standard. .................................................................... 7

    D.      The Lines of Sight For Accessible Seating at the Stadium are Comparable
        to those For General Seating and Comply with the ADA. ............................... 7

        1.      The evolving regulatory view of "lines of sight." .................................. 8

        2.      The Stadium complies with Section 4.33.3. ....................................... 10

        3.      Accessible seating at the Stadium has comparable lines of sight
           under the subsequent *Ellerbe Becket* framework. ............................... 14

    E.      Accessible Seating is Dispersed Throughout the Stadium and Provides a
        Choice of Admission Prices and Lines of Sight Comparable to those for
        General Seating. ............................................................................................. 15

    F.      Plaintiffs' Height and Width Complaints Are Unfounded. ............................. 18

        1.      Concession counter heights are compliant. ........................................ 18

        2.      Accessible tables and seating are distributed throughout non-
           ticketed areas. ....................................................................................... 19

        3.      Concession lines are width compliant. ................................................ 19

        4.      The drink rails on Level 200 do not violate the ADA. ........................ 20

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - i
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue, Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

G.     The Expansion Joints at T-Mobile Park are Scheduled for Replacement. ....... 20

H.     The Mariners Have A Robust Maintenance Program, Including for Flooring. ........................................................................................................... 21

I.     Some 300 Level Seating Requires Modification. ............................................... 22

J.     The Mariners Will Correct The Edgar's Cantina Lift. ...................................... 22

K.     The Dugouts Should Be Accessible or Not Open to the General Public. ........ 23

IV.     CONCLUSION ............................................................................................................. 23

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT  - ii
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Access Now, Inc. v. S. Florida Stadium Corp.*,
    161 F. Supp. 2d 1357 (S.D. Fla. 2001)....................................................................... 22

4

*Anderson v. Liberty Lobby, Inc.*,

5

    477 U.S. 242 (1986) .................................................................................................... 7

6

*Auer v. Robbins*,
    519 U.S. 452 (1997) .................................................................................................. 13

7

*Berry v. Baca*,

8

    379 F.3d 764 (9th Cir. 2004) ...................................................................................... 7

9

*Bragdon v. Abbott*,
    524 U.S. 624 (1998) .................................................................................................. 13

10

*Caruso v. Blockbuster-Sony Music Entertainment Centre*,
    968 F.Supp. 210 (D.N.J. 1997) ............................................................................ 7, 10

11

*Caruso v. Blockbuster-Sony Music Entertainment Centre*,

12

    193 F.3d 730 (Third Cir. 1999) ....................................................................... 8, 10, 11

13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................................... 7

14

*Christopher v. SmithKline Beecham Corp.*,
    567 U.S. 142 (2012). ................................................................................................. 13

15

*Independent Living Resources v. Oregon Arena Corporation*,

16

    982 F.Supp. 698 (D. Ore. 1997) ..................................................... 8, 10, 11, 15, 16, 17

17

*Johnson v. Poway Unified School Dist.*,
    658 F.3d 954 (9th Cir. 2011) ...................................................................................... 7

18

*Lara v. Cinemark USA Inc.*,

19

    207 F.3d 783 (5th Cir. 2000) ..................................................................................... 13

20

*Paralyzed Veterans of America v. D.C. Arena L.P.*,
    117 F.3d 579 (D.C. Cir. 1997) .................................................................................. 10

21

*Paralyzed Veterans of America v. Ellerbe Becket Architects and Engineers P.C., et al.*,

22

    950 F.Supp. 389 (D.D.C. 1996) ............................................................................... 10

23

*Paralyzed Veterans of America v. Ellerbe Becket Architects and Engineers P.C., et al.*,
    950 F.Supp. 393 (D.D.C. 1996) .......................................................................... 11, 16

24

*Rodriguez v. Barrita, Inc.*,
    2012 WL 3538014 (N.D. Cal. Mar. 1, 2012) ........................................................... 22

25

*Soremekun v. Thrifty Payless, Inc.*,

26

    509 F.3d 978 (9th Cir. 2007).....................................................................................  7

27

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - i
(No. 2:18-cv-01512-BJR)

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue, Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

*Thomas Jefferson Univ. v. Shalala*,
  512 U.S. 504 (1994) ................................................................................ 13

*United States v. AMC Entertainment*,
  549 F.3d 760 (9th Cir. 2008) ............................................................... 13

*United States v. Ellerbe Becket, Inc.*,
  976 F.Supp. 1262 (D. Minn. 1997) ....................................... 10, 12, 13, 14

**Statutes**

42 U.S.C. § 12101 ................................................................................... 6

42 U.S.C. § 12181(9) ............................................................................. 22

42 U.S.C. § 12182(a) ............................................................................. 13

42 U.S.C. § 12182(b)(2)(A)(iv) ............................................................. 22

42 U.S.C. § 12188(b)(1)(B) ................................................................... 13

**Other Authorities**

*Down In Front: Entertainment Facilities and Disabled Access under the Americans with Disabilities Act*,
  20 Hastings Comm. & Ent. L.J. 897 (1998) .......................................... 11

*Standing in Front of the Disabled: Judicial Uncertainty over Enhanced Sightlines in Sports Arenas*,
  8 Jeffery S. Moorad Sports L.J. 161 (2001) .......................................... 11

*Wheeling Through Rough Terrain – The Legal Roadblocks of Disabled Access in Sports Arenas*,
  8 Marq. Sports L.J 263 (1998) ............................................................... 11

**Rules**

Fed. R. Civ. P. 56(a) ............................................................................... 7

**Regulations**

*1991 ADA Standards for Accessible Design.*
  [Washington, D.C.]: Dept. of Justice, 1991. ...................................... 6, 8

*2010 ADA Standards for Accessible Design.*
  [Washington, D.C.]: Dept. of Justice, 2010. ......................................... 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT  - ii
(No. 2:18-cv-01512-BJR)

1

## I.   INTRODUCTION

2

Defendants Washington State Major League Baseball Stadium Public Facilities District

3

(the "PFD"); and Baseball of Seattle, Inc.; Mariners Baseball, LLC; and The Baseball Club of

4

Seattle, LLLP (collectively, "the Mariners") oppose Plaintiffs' Motion for Summary Judgment.

5

This case concerns claims under the Americans with Disabilities Act, 42 U.S.C. §

6

12101, *et seq.* (the "ADA") regarding accessibility at T-Mobile Park (f/k/a Safeco Field), home

7

of the Seattle Mariners.  The Mariners are proud of T-Mobile Park's record and reputation as a

8

welcoming and accommodating community gathering spot for everyone, including guests with

9

accessibility needs.  To this end, the Mariners are continually updating and bettering their

10

accommodation offerings, including based on feedback from guests, to ensure a welcoming

11

experience for all fans.  Consistent with this practice, the Mariners and Plaintiffs' counsel had

12

pre-litigation dialogue in which the Mariners agreed to promptly address immediately solvable

13

issues and to investigate in good-faith the more complicated issues raised.  Instead, Plaintiffs

14

elected to file this case.

15

Contrary to Plaintiffs' suggestion, this case does not "revolve[] around clearly defined

16

and easily measured physical construction standards set forth by the Department of Justice."

17

Mtn. at 4:6-8.  Some of the issues presented (*e.g.*, counter height for concessions) do concern

18

straight-forward physical measurements with clear parameters, which the Mariners agreed to

19

correct before the filing of this case.  But the central issues that Plaintiffs seek to litigate—

20

sightlines and seating distribution—are complex accessibility matters that have evolved and

21

have had varying and inconsistent interpretations over time.

22

The ADA is salutary legislation, which has been amended since its enactment in 1990,

23

and the related regulations have also evolved.  This is a beneficial process for improving

24

accessibility.  But the statute's aspirational goals do not permit the law to be stretched so as to

25

retrospectively create material new design and construction requirements for a 20-year old

26

facility like T-Mobile Park.  In short, foundational fairness and due process prohibit imposing

27

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 1
(No. 2:18-cv-01512-BJR)

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

liability on Defendants for regulatory iterations and interpretations that did not exist when T-Mobile Park was designed and constructed.  Plaintiffs' Motion should be denied.

## II.   STATEMENT OF FACTS

### A.   The Stadium.

T-Mobile Park (the "Stadium"), which opened in mid-1999, is the fifteenth oldest ballpark in Major League Baseball (out of 30) and is consistently ranked as one of the best baseball venues in the country.[1]

The Stadium is owned by the PFD, which is a municipal corporation created by the Washington State Legislature and the King County Council.  *See* http://www.ballpark.org/. The Stadium was constructed over a twenty-seven month period between March 1997 and July 1999.[2]  NBBJ was the project architect and Hunt-Kiewet was the general contractor.[3]  The Mariners' first baseball game at the Stadium was July 15, 1999 against the San Diego Padres.[4]

Although the Mariners were not involved in the construction or design of the Stadium, which they lease from the PFD, the designs and plans for a building of this size and complexity began in 1996, well before breaking ground in March 1997.[5]

### B.   Accessible Seating.

The Stadium is composed of four tiers of seating, which are vertically-stacked: the 100 Level, the 200 or "Club" Level, the Suite level, and the 300 Level.  Declaration of Malcolm

---

[1] *See, e.g.*, https://www.washingtonpost.com/news/sports/wp/2017/07/11/how-thomas-boswell-ranked-all-30-mlb-ballparks-and-grouped-them-in-four-tiers/?utm_term=.13b0448231f7.

[2] *See generally* https://www.mlb.com/mariners/ballpark/information/history; http://www.ballpark.org/construction.aspx.

[3] *See* https://www.mlb.com/mariners/ballpark/information/history

[4] *Id.*

[5] *See* https://www.mlb.com/mariners/ballpark/information/history.  The current lease dated December 10, 2018, runs through December 31, 2043.  A copy of the lease is publicly-available at the PFD's website.  *See* http://www.ballpark.org/pdfs/Ballpark%20Operations%20and%20Lease%20Agreement%20-%20PFD-Mariners.pdf.  Under the lease, the Mariners are responsible for all ongoing operation, management, and maintenance of the Stadium.  *Id.*

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 2
(No. 2:18-cv-01512-BJR)

Rogel, ¶ 4.  To afford fans with the best views possible, each level is sloped.  *Id.*  Within each level, seating is divided vertically and horizontally into "Sections."[6]  *Id.*

On the 100, 200, and Suite Levels, a concourse is located at the rear of each Section.  A concourse is also located on the 300 Level, but guests access their seats from the concourse through vomitories that are located in approximately the middle of the 300 Level.  Rogel Decl., ¶ 6.  All ADA seating is located adjacent to concourses.  *Id.*, ¶ 7 and Ex. A.  This to ensure that guests have a wheelchair-accessible means of egress to their seats, as well as proximate access to concourse amenities.  *Id.*  Within the concourses, fans can visit concessions (both built-in and mobile), restaurants and bars, restrooms, elevators, gift shops and guest services.  *Id.*  The proximity of ADA seating to the concourse also ensures that in the event of emergency, ADA guests are closest to escape routes, Mariners' personnel, and first responders.  *Id.*

Aside from the concourse access points described above, the only other points of access to seating are on the 100 Level and clustered behind home plate.  Rogel Decl., ¶ 8.  There are four tunnels that provide access to the front of the 100 Level Sections.  These are located in between the Visitors' Dugout and Section 35, in between Section 35 and 33, in between Section 33 and 27, and in between Section 27 and 25.  *Id.* and Ex. A.  The first two tunnels are ADA accessible.  *Id.*  There are sixteen ADA spaces  located in the front row of Section 35, between the two ADA accessible tunnels located on either side of Section 35.  *Id.* and Ex. A.  The total number of accessible seats at the Stadium exceeds the number required by the ADA.

ADA seating has been placed along every accessible path of egress within the Stadium.  Rogel Decl., ¶ 9; *see also* Declaration of William Endelman, ¶ 17. ADA seating is distributed vertically on every level, and it is also dispersed and distributed horizontally, all around the perimeter of the field.  Rogel Decl., ¶ 11 and Ex. A.  This ensures that fans requiring accessible seats are able to select seating from a wide variety of perspectives and sightlines, as well as at different ticket price points.

---

[6] **Appendix 1** is a map showing the four tiers of the Stadium and the various seating Sections.  The four tiers are demarcated by different shades of gray; red circles with white wheelchair icons indicate the general locations of wheelchair accessible and companion spaces ("ADA seating").  *See also* Rogel Declaration, ¶ 5 and Ex. A.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 3
(No. 2:18-cv-01512-BJR)

**SAVITT BRUCE & WILLEY** LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

**C.      Ticket Pricing.**

Tickets to Mariners games are offered in three different groupings or buckets:  season tickets, group tickets, and individual tickets.  Rogel Decl., ¶ 12.  Depending on the time of year, a ticket may be offered in one or more of these three buckets.  *Id.*  Season tickets are sold first, with sales beginning in November prior to a season (*e.g.*, season tickets for the current 2019 season went on sale in November 2018), and group tickets and individual game tickets are offered for sale subsequently.  *Id.*  Season ticket prices are set and do not vary, but the pricing for group tickets and individual game tickets is dynamic and may be affected by a number of factors, including availability of inventory, demand, weather, day of week, opponent, and team standing.  *Id.*

Seats are grouped into different price levels.  Rogel Decl., ¶ 13.  The price level a seat is assigned varies depending on the amenities associated with the seat, as well as the location of the seat (*e.g.* proximity to home plate and to the field).  *Id.*  These price levels are also impacted by the dynamic factors discussed above.  *Id.*  Regardless of location, however, ADA seating is always priced at or below the non-accessible seats that are adjacent to them.[7]  *Id.*, ¶ 14.

**D.      Operations, Maintenance and Improvements.**

The Stadium is one of the premier baseball venues in the country and the Mariners are committed to maintaining this status, which includes ensuring that the Stadium is accessible and compliant with applicable ADA Standards.  Declaration of Fred Rivera, ¶ 2.  This is an ongoing process, which includes maintenance, regular inspection by both team employees and third-parties, responding to guest comments, and planning for the future.  *Id.*, ¶ 3.

---

[7] Certain seats are identified as "premium" because they are considered to be among the best seats at the Stadium. Rogel Decl., ¶ 15.  While the exact locations and offerings can vary by season, for the 2019 season, Premium Seats are located in the Diamond Club (Sections 35, 33, 27 and 25), Premier Seats (certain rows nearer to the field in Sections 112-148), at Level 200 ("Club Level"), and on the Suite Level/All-Star Club.  *Id.; see also* https://www.mlb.com/mariners/tickets/premium.  ADA seating is available in each of the Premium Seating areas. Rogel Decl., ¶ 15.  The Mariners implemented an ADA Seating Expansion project over the past off-season.  Rogel Decl., ¶ 16.  As a result, sixteen (16) additional accessible seating spaces have been added to the 100 Level in Section 35.  *Id.*  These are seats that are in the first row next to the field.  Four are Diamond Club and twelve are Premier seats.  *Id.*

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 4
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

The Mariners are constantly engaged in work to maintain and improve the Stadium. Declaration of Trevor Gooby, ¶ 3.  Some of the projects in recent years have included repairs to the retractable roof system (an ongoing multi-year project to refurbish faulty axles), the installation of LED lights, the installation of a new scoreboard in centerfield, and improving accessible seating by removing fixed seats and creating flexible ADA seating spaces.  *Id.*[8]

Over the course of the past two years, the Mariners have undertaken a wide-range of ADA accessibility improvements.[9]  Gooby Decl., ¶ 4.  These include improvements in the following areas: (a) ticketing policies, practices and procedures for accessible seating; (b) modified seating dimensions for some wheelchair spaces; (c) general accessibility in suites; (d) slope mitigation in common areas and ramp corridors; (e) restrooms; and (f) parking.  *Id.* These improvements alone have incurred costs in excess of $2.3 million.  *Id.*

Following the 2018 season, the Mariners embarked on an ADA Seating Expansion project, to provide for additional accessible seating within the 100 Level of the Stadium. Gooby Decl., ¶ 5.  Given the construction of the 100 Level bowl and the lack of mid-level vomitories, Section 35 was identified as a viable location because it has accessible tunnels on either side.  *Id.*  Also, the new seating is located in the front row, closest to the field, and so does not require additional elevation that might block the view of those seated behind them.  *Id.* Construction was completed in early 2019 and these accessible seats are now offered as Premier and Diamond Club seats.  *Id.*

While the Stadium is generally in excellent condition, it was built some twenty plus years ago and a building of its vintage requires continuous maintenance.  Gooby Decl., ¶ 10. To ensure the Stadium remains in good and safe condition, the Mariners have developed a preventative maintenance plan.  *Id.*  As part of that plan, the Mariners have a member of their maintenance team whose responsibility is to repair joints, bumps, and cracks in the floors of the

---

[8] ADA seating spaces are demarcated and a given space may be used by someone with a wheelchair need; there are also folding chairs that may be used for companion seating and drink rails in front.  Gooby Decl., ¶ 3, n.1.

[9] Plaintiffs' assertion that Defendants "are unlikely to abide by ADA standards without an order from the Court" (Mtn. at 5:5-6) is demonstrably wrong.  Rivera Decl., ¶¶ 4, 5; *see also id.*, ¶¶ 6-13 and Exs. 1-3.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 5
(No. 2:18-cv-01512-BJR)

**SAVITT BRUCE & WILLEY** LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Stadium. *Id.* This employee identifies and ensures that any cracks, bumps, or gaps are promptly repaired. *Id.* Repairs that are identified as being most urgent are prioritized. *Id.*

As is common in large stadiums, the Stadium is comprised of eight separate building segments constructed largely of concrete. Gooby Decl., ¶ 11. For structural integrity, the joints where the segments meet need to be able to expand and contract depending on conditions. *Id.* Protective covers have been placed over these expansion joints to ensure safe egress and passage. *Id.* The maintenance team regularly inspects the condition of the joints and covers as part of the Mariners' preventative maintenance plan. *Id.*

**E.      Concessions.**

Service America Corporation d/b/a Centerplate is the primary concessionaire at the Stadium. Rogel Decl., ¶ 3. The Mariners' contract with Centerplate obligates it to operate in compliance with all applicable law. *Id.*, ¶ 20. The contract also includes a nondiscrimination provision, which requires Centerplate, and its contractors and subcontractors, to comply with all applicable law pertaining to nondiscrimination, in both the provision of services and in employment, with specific reference to compliance with the ADA. *Id.*

## III.      ARGUMENT AND AUTHORITY

**A.      The ADA.**

The Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (the "ADA") prohibits discrimination against individuals with disabilities. The ADA is divided into various titles (or sections) that relate to different areas of public life. In this suit, Plaintiffs have alleged claims under Title II (applicable to public entities such as the PFD) and Title III (applicable to entities providing public accommodation and services such as the Mariners).

**B.      Applicable ADA Standards.**

The construction of the stadium known as T-Mobile Park began in 1997 and was completed in 1999.[10] Accordingly, the 1991 ADA Standards for Accessible Design (with its

---

[10] *See also* Mtn. at 4:114-16.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 6
(No. 2:18-cv-01512-BJR)

**SAVITT BRUCE & WILLEY** LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

ADA Accessibility Guidelines Appendix section revision dated July 1, 1994) (the "1991 Standards") are the applicable standards to evaluate Plaintiffs' claims.[11]  *See generally* https://www.ada.gov/1991standards/adastd94-archive.pdf.  Structural elements that meet the 1991 Standards can remain in place indefinitely until such time as they are altered.   For new construction or alterations undertaken after March 15, 2012, the 2010 Standards are applicable.

**C.      Summary Judgment Standard.**

Summary judgment is only appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  In deciding a summary judgment motion, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.  *Johnson v. Poway Unified School Dist.*, 658 F.3d 954, 960 (9th Cir. 2011).  "'[C]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004), *quoting Anderson,* 477 U.S. at 255.

**D.      The Lines of Sight For Accessible Seating at the Stadium are Comparable to those For General Seating and Comply with the ADA.**

*Constructing a stadium is an expensive, complex affair.  If the law is to impose certain requirements to assist those with disabilities and to impose an obligation to make expensive retrofits if that law is violated, it is essential that those requirements be clearly articulated in the regulations.*[12]

---

[11] The ADA was amended in 2010.  The 2010 Standards, under 28 CFR Part 36, were adopted September 15, 2010 to replace the 1991 Standards.  *See*  https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf. From September 15, 2010, to March 15, 2012, a Title II or Title III entity undertaking new construction or alteration could either the 1991 Standards or the 2010 Standards.   On March 15, 2012, the 2010 Standards became the enforceable standards under Titles II and III for new construction, alterations, program accessibility, and barrier removal.  *See generally* https://www.ada.gov/revised_effective_dates-2010.htm.

[12] *Caruso v. Blockbuster-Sony Music Entertainment Centre*, 968 F.Supp. 210, 216 (D.N.J. 1997) ("*Caruso I*").

Plaintiffs assert that "[o]n the 100 level, spectators in wheelchairs do not have comparable sightlines[.]" over standing spectators in front of them.  Mtn. at 7:21-22.  They are wrong.  This conclusory argument is presented almost entirely without context or reference, and with no citation to any case law.  Plaintiffs fail to meet their moving burden under Rule 56.  Moreover, Plaintiffs' expert opines without reference to or any explanation of the chronological evolution of sightline requirements under the ADA.

Given the factual record here, and under the applicable law, the sightlines for accessible seating in T-Mobile Park comply with the 1991 ADA Standards.

### 1.     The evolving regulatory view of "lines of sight."

The 1991 Standards address accessible seating locations and provide as follows:

> ***Placement of Wheelchair Locations***.  <u>Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public</u>.  They shall adjoin an accessible route that also serves as a means of egress in case of emergency.  At least one companion fixed seat shall be provided next to each wheelchair seating area.  When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location.  Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.
>
> EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent.  Equivalent accessible viewing positions may be located on levels having accessible egress.

Section 4.33.3 (emphasis supplied).[13]  The 1991 Standards make no mention of sightlines over standing spectators and offer no details or guidance as to what comprises compliant "lines of sight."

---

[13] The term "lines of sight" in Section 4.33.3 is not defined and there is no stated presumption that all members of the general public have unobstructed sightlines.  Some courts have found this language ambiguous.  *Caruso v. Blockbuster-Sony Music Entertainment Centre*, 193 F.3d 730, 733 (Third Cir. 1999) ("*Caruso II*").  Other courts have concluded that "lines of sight" is a reference to the distribution of seats within a stadium or arena—"*e.g.*, views from behind the plate, or first and third base, or the fifty-yard line."  *Independent Living Resources v. Oregon Arena Corporation*, 982 F.Supp. 698, 543 (D. Ore. 1997).

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

In late 1993, the Department of Justice published a Technical Assistance Manual (the "TAM").[14]  The TAM does not refer to lines of sight other than, for assembly areas, seating for individuals who use wheelchairs should be "dispersed throughout the seating area" and should "provide[] lines of sight and choices of admission prices comparable to those offered to the general public."  *Id.*

In November 1994, the DOJ issued a TAM Supplement, which stated that "in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand."[15]  The TAM Supplement did not provide any guidance as to what its directive meant, or how it might be accomplished, other than that this new directive "can be accomplished in many ways," including clustering wheelchair locations at the front of a seating section or in the rear with "additional elevation."  *Id.*

Subsequently, in May 1996, the Department of Justice issued a document entitled *Accessible Stadiums*.[16]  It addresses "lines of sight" as follows:

> In stadiums where spectators can be expected to stand during the show or event (for example, football, baseball, basketball games, or rock concerts), all, or substantially all of the wheelchair seating locations must provide line of sight over standing spectators.  *Id.*

In the DOJ's articulation at the time,

> [a] comparable line of sight . . . allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front.  *Id.*

*Accessible Stadiums* is the first DOJ publication that offers any detail regarding what a "line of sight over standing spectators" might mean in practice, but it fails to provide anthropometric data for use in determining a "comparable" line of sight.  For example, there is

---

[14] Endelman Decl., ¶ 10; *see also* https://www.ada.gov/taman3.html.

[15] Endelman Decl., ¶ 11; *see also* https://www.ada.gov/taman3up.html.

[16] Endelman Decl., Ex.1 (at Ex. A); *see also* https://www.ada.gov/stadium.pdf.  *Accessible Stadiums* was published by the Disability Rights Section of the Civil Rights Division of the DOJ, but it was not issued as a revision to the 1991 Standards using a Federal Register review process or otherwise.

no data for eye height of persons seated in wheelchairs, nor average head height, eye height or shoulder height of standing spectators.[17]  Similarly, there is no information provided regarding a spectator's focal point on the playing surface or the horizontal range of view or perspective.

### 2.      The Stadium complies with Section 4.33.3.

There is a limited body of case law that addresses sightlines under the 1991 Standards and—given the absence of apposite statutory language and the lack of clear guidance from the DOJ—it is no surprise that there are conflicting and inconsistent decisions, both as to outcome and analytic framework.  Of the cases that are <u>contemporaneous with the time period during which the Stadium was designed and constructed</u>, two (including the only case from a court within the Ninth Circuit) found that the 1991 Standards did *not* require sightlines over standing spectators and two found that the 1991 Standards did require sightlines over standing spectators.[18]

The common thread among these cases is the courts' observations and concerns regarding the DOJ's failure to clearly state a sightline requirement, much less how one might comply:[19]

---

[17] This matters because different variables will yield different results.  Endelman Decl., ¶ 5.  There were no commonly-accepted or regularized anthropometric dimensions for such analysis at the time that T-Mobile Park was designed.  *Id.*  To this day, there are no anthropometric dimensions provided for by the 2010 ADA Standards or the 2015 International Building Code.  *Id.*

[18] *See* (i) *Caruso I*, 968 F.Supp. at 219 (concerning a multi-purpose music and entertainment facility, granting summary judgment in favor of facility and holding that Section 4.33.3 of the 1991 Standards "does not require enhanced lines of sight for wheelchair users") and *Caruso II*, 193 F.3d at 733 (affirming *Caruso I* regarding summary judgment in defendant's favor regarding lines of sight); (ii) *Independent Living Resources,* 982 F.Supp. at 758 (concerning the Rose Garden arena in Portland; in relevant part, granting defendant's motion for summary judgment: "Section 4.33.1 does not presently require that wheelchair users be given lines of sight over standing spectators."); (iii) *Paralyzed Veterans of America v. Ellerbe Becket Architects and Engineers P.C.*, *et al.,* 950 F.Supp. 389, 392-93 (D.D.C. 1996) ("*PVA I*") (concerning MCI Center, a multi-purpose arena being constructed in Washington D.C.; denying defendants' motion for summary judgment and holding that Section 4.33.3 requires defendants to "construct an arena in which substantially all wheelchair locations have an enhanced line of sight over standing spectators.") and *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997) ("*PVA III*") (affirming *PVA I* regarding line of sight obligation; denying plaintiff's cross-appeal and holding that substantial compliance, not complete compliance, satisfies the obligation; "we think the district judge was more than justified in concluding that there was a good deal of wiggle room in the degree of compliance contemplated by the regulation and the manual[.]"); and (iv) *United States v. Ellerbe Becket, Inc.*, 976 F.Supp. 1262, 1268-69 (D. Minn. 1997) (denying defendant's motion to dismiss and holding that architects are not excluded from liability under the ADA as a matter of law; concurring with *PVA III* regarding line of sight requirement).

[19] Numerous commentators have also noted the uncertain state of law, both in and after this time period.  *See, e.g.*, James Kurack, *Standing in Front of the Disabled: Judicial Uncertainty over Enhanced Sightlines in Sports Arenas*,

- [T]he Justice Department has not established a clear record of exactly what its interpretation [of Section 4.33.3] requires.  With the exception of a single, general diagram in the 1996 "Accessible Stadiums" release, the Department has not defined or documented the technical specifications for compliance . . . . The application of the theoretical issues of sightlines to the design of an actual arena is a complex problem; this problem has been exacerbated by the lack of concrete, technical standards for architects to follow.[20]

- [Section] 4.33.3, when viewed in light of the regulatory history recounted above, does not reach the issue of sightlines over standing spectators.[21]

- Although the ADA clearly would support a requirement to provide wheelchair users with sightlines over standing spectators in certain situations, the more difficult question is whether such a requirement does, in fact, exist . . . . [Section] 4.33.3 does not purport to decide whether lines of sight over standing spectators are—or are not—necessary in order to comply with the ADA.[22]

Simply put, when T-Mobile Park was being designed and constructed, there was no statutory requirement or applicable regulation that made clear any sightline requirement for standing spectators.  There was no specific requirement, much less implementation guidelines, for architects and engineers to follow, and even informed lawyers would have been unable to offer concrete advice but only speculation.  *See, e.g.*, *Independent Living Resources*, 982 F.Supp. at 743 ("If the Access Board had addressed the sightlines in a subsequent rulemaking—as it had pledged to do in 1991—we might not be having this debate today.

---

8 Jeffery S. Moorad Sports L.J. 161, 183 (2001) ("Under current case law … the issue of enhanced sightlines for disabled patrons is in a confused state."); Katherine C. Carlson, *Down In Front: Entertainment Facilities and Disabled Access under the Americans with Disabilities Act*, 20 Hastings Comm. & Ent. L.J. 897, 912-15 (1998) ("No one - not the Department of Justice, not the courts, not architects, not business owners - seems to know exactly what the ADA requires" and "[t]he DOJ's failure to provide "concrete guidelines for architects and builders" has resulted in a "near complete failure to provide adequate guidance[.]"); Mark A. Conrad, *Wheeling Through Rough Terrain – The Legal Roadblocks of Disabled Access in Sports Arenas*, 8 Marq. Sports L.J 263, 286 (1998) ("The issue of proper access by the disabled to sports arenas is in a confused state …. the fault is not as much in the architects, engineers, and owners, as in the government's methods of promulgating a regulation.").

[20] *Paralyzed Veterans of America v. Ellerbe Becket Architects and Engineers P.C., et al.,* 950 F.Supp. 393, 399-400 (D.D.C. 1996) ("*PVA II*") (also noting that the DOJ has not insisted on full compliance with enhanced sightlines, has never maintained an enforcement action against an arena or stadium under construction, and "even declined to enforce its standards against the MCI center in this litigation")

[21] *Caruso II*, 193 F.3d at 731-36 (assessing inconsistent interpretation of Section 4.33.3, noting that "[a]n agency is not allowed to change a legislative rule retroactively through the process of disingenuous interpretation of the rule to mean something other than its original meaning" and "[t]he DOJ could, of course, adopt a new substantive regulation to require that wheelchair users be given lines of sight equivalent to standing patrons—and such a rule certainly has much to recommend it—but to do this it must proceed with notice-and-comment rulemaking.").

[22] *Independent Living Resources*, 982 F.Supp. at 734-743.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 11
(No. 2:18-cv-01512-BJR)

Instead the years have slipped by while the Access Board has 'continued to study this matter.'") This stands in contrast to the circumstances of stadiums being designed and constructed today.

As a result, courts—and the DOJ—have struggled with this issue and how to implement the goals of the ADA and promote accessibility and, at the same time, comport with fairness and due process (and the requirements of the Administrative Procedure Act). This is illustrated by the Consent Order in *Ellerbe Becket*.

As noted above, the court in *Ellerbe Becket* denied the defendant's motion to dismiss. 976 F.Supp. at 1268. A few months later, on March 24, 1998, the court entered an agreed Consent Order.[23] In relevant part, the Consent Order provided as follows:

> The terms of this order shall apply to assembly area projects in the United States … for which Ellerbe provides design services <u>after the date of this order</u>, if the facility is being designed is one at which spectators can be expected to stand for some or all of the event to be held in the facility. This includes, but is not limited to, sports stadiums and arenas. Ellerbe shall design these facilities such that all or substantially all of the wheelchair seating locations … provide persons with physical disabilities with lines of sight that are comparable to those for members of the general public. For purposes of this order, Ellerbe shall calculate sight lines for wheelchair seating locations as described in the Department of Justice publication entitled "Accessible Stadiums." [] In making these calculations, Ellerbe shall employ the average anthropometric dimensions set forth in … this order, <u>on designs commenced after the date of this order</u>.

Consent Order, § B.5 (emphasis supplied).

The Consent Order is notable for two related reasons. It is the first instance of the DOJ's providing some degree of detail regarding both measurement of sightlines and the anthropometric data  (*e.g.*, seating and standing heights and eye levels of spectators) to use to calculate those sightlines. And the design and implementation mandate of the Consent Order is prospective, applicable only to projects designed subsequent to March 28, 1998. Consent Order, § B.5.

Additionally, the DOJ expressly agreed that it would "not commence any enforcement action" against Ellerbe Becket regarding lines of sight for any "projects designed by Ellerbe as

---

[23] *See* Endelman Decl., Ex. 1 (at Ex. B); (*United States v. Ellerbe Becket, Inc.*, D. Minn., No. 4-96-995, (March 24, 1998 Consent Order); *see also* https://www.ada.gov/ellerbe.htm.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 12
(No. 2:18-cv-01512-BJR)

1    of the date of this Agreement" and there was no requirement that facilities designed by Ellerbe

2    Becket prior to March 24, 1998 be remediated to meet the newly-stated sightline requirement.

3    Consent Order, § B.7. *Ellerbe Becket* reflects the DOJ's articulation of a requirement and its

4    concurrent recognition that any design compliance mandate could only be prospective. *Cf.*

5    *Lara v. Cinemark USA Inc.*, 207 F.3d 783, 789 (5th Cir. 2000) (reversing summary judgment in

6    favor of plaintiffs; holding that "in the absence of specific regulatory guidance, we must hold

7    that section 4.33.3 does not require movie theatres to provide disabled patrons with the same

8    viewing angles available to the majority of non-disabled patrons); *United States v. AMC*

9    *Entertainment*, 549 F.3d 760, 770 (9th Cir. 2008) (reversing district court's entry of injunction

10   requiring retrofitting of theatre seating for determination as to when defendant theatre "could

11   have fairly discerned the settled meaning of § 4.33.3.").

12        Given that the DOJ is the entity charged by Congress with enforcing and interpreting

13   Title III of the ADA and promulgating design standards,[24] the Court should defer to the DOJ's

14   litigation position as evidenced by *Ellerbe Beckett*.[25]

15        In this case, which concerns a facility designed and constructed more than twenty years

16   ago, there is no basis to find that accessible seating design requirements in effect at the time the

17   Stadium was designed and built required a sightline over standing spectators as a matter of law.

18   For the reasons set forth above, Plaintiffs' motion with respect to sightlines should be denied.

---

[24] *See, e.g.*, 42 U.S.C. § 12182(a);   42 U.S.C. § 12188(b)(1)(B).

[25] A court must give controlling weight to an agency's interpretation of its own ambiguous regulation—when expressed as a litigation position or otherwise—unless it is "'plainly erroneous or inconsistent with the regulation,'" or there is "reason to suspect that the agency's interpretation 'does not reflect the agency's fair and considered judgment on the matter in question.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155, 132 S. Ct. 2156, 183 L. Ed. 2d 153 (2012).  *See also Bragdon v. Abbott*, 524 U.S. 624, 646, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998) (deferring to agency's interpretation of a regulation when agency has responsibility to issue regulations under statute in question); *Auer v. Robbins*, 519 U.S. 452, 462–63, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (deferring to agency's interpretation of its own regulations as presented in a legal brief).  On the other hand, an agency's judgement may be called into doubt when an interpretation it promotes conflicts with one it advanced earlier. *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994).

**3.      Accessible seating at the Stadium has comparable lines of sight under the subsequent *Ellerbe Becket* framework.**

In response to Plaintiffs' Complaint, Defendants' expert performed a sightline study at T-Mobile Park using Section 112 and Section 224 as illustrative examples.[26]  Endelman Decl., Ex. 1.  The accessible seating in these sections provides for a <u>comparable line of sight</u> to see the playing surface or field between the heads and over the shoulders of persons standing immediately in front and over the heads of the persons standing two rows in front.[27]  *Id.*, ¶ 4.



**SIGHTLINE STUDY - SECTION 112**



**SIGHTLINE STUDY - SECTION 224**

---

[26] These Sections are called out in Plaintiffs' Complaint at ¶¶ 4.15 & 4.16.

[27] Although there were no commonly-accepted anthropometric dimensions for such analysis at the time that the Stadium was designed, Defendants' expert utilized the data in the March 1998 Ellerbe Becket Consent Order. Endelman Decl., ¶¶ 5. 6.  As of March 1998, the Stadium had been under construction for a year.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 14
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1   The sightlines at T-Mobile Park comply with Section 4.33.3 of the 1991 Standards and

2   are also consistent with the later guidance in *Accessible Stadiums*.  Endelman Decl., ¶ 7.

3   Substantially all of the wheelchair seating locations at T-Mobile Park provide lines of sight

4   over seated and standing spectators comparable to the general public.[28]  *Id.,* ¶¶ 4-15.

**E.   Accessible Seating is Dispersed Throughout the Stadium and Provides a Choice of Admission Prices and Lines of Sight Comparable to those for General Seating.**

7        Plaintiffs assert that wheelchair seating locations at T-Mobile Park are "concentrated in

8   less preferable locations" and "unequally dispersed in location and price compared to standard

9   seats."  Mtn. at 10:11-14.  Plaintiffs again fail to meet their moving burden.  They do not

10  present a detailed consideration of the applicable standard (Plaintiffs refer variously to both the

11  1991 Standards and the 2010 Standards), and they offer no citation to legal authority in support

12  of their argument.[29]

13       Section 4.33.3 of the 1991 Standards provides that "[w]heelchair areas shall be an

14  integral part of any fixed seating plan and shall be provided so as to provide people with

15  physical disabilities <u>a choice of admission prices and lines of sight comparable to those for

16  members of the general public</u>."[30]  Additionally, accessible seating must "adjoin an accessible

17  route that also serves as a means of egress in case of emergency" and, for facilities with more

18  than 300 seats, the seating "shall be provided in more than one location."  There is also an

19  exception that permits clustered seating where there are slopes greater than five (5) percent.

---

[28] Where accessible seating is fixed, "staggered" seating row-to-row may improve lines of sight for accessible seating locations.  Endelman Decl., ¶ 7, n.2.  The accessible seating at T-Mobile Park is flex (non-fixed) seating, which permits wheelchair users greater horizontal flexibility; lines of sight are not static and fans have the ability to individually stagger their line of sight with respect to spectators in the rows in front of them.  *Id.*

[29] Plaintiffs' primary complaint appears to be a desire for "a dramatically increased number of wheelchair accessible seats closer to the playing field" and with lower ticket prices.  Mtn. at 13:4-9  Certainly, many sports fans would like cheap seats next to the field.  But Plaintiffs do not offer any legal authority to support their desire as a purported statutory requirement, nor do they make any factual showing as to whether creating additional accessible seats within the 100 Level is "readily achievable."  *But see* Rogel Decl., ¶ 8; Endelman Decl., ¶ 8; *see also Independent Living Resources*, 982 F.Supp. at 717 (noting that "physical constraints preclude mathematical homogeneity in the distribution of wheelchair seating" and "it may not always be feasible to provide front row wheelchair seats for every single event as plaintiffs have demanded").

[30] As noted above, *Independent Living Resources* held that "lines of sight" in Section 4.33.3 refers to the distribution of seats—"*e.g.*, views from behind the plate, or first and third base, or the fifty-yard line."  982 F.Supp. at 543.

1    The contemporaneous case law on seating dispersal (horizontal and vertical

2    distribution) is sparse.  Courts recognize that accessible seating distribution encompasses "a

3    choice of various seating areas, good and bad, expensive and inexpensive."  *PVA II*, 950

4    F.Supp. at 404.  And, "[b]ecause wheelchair patrons make up only a small percentage of all

5    spectators, there need not be accessible seating in every section of the arena, but there must be

6    a sufficiently representative number of sections in the seating bowl to provide comparable

7    choices."  *Id.*  "Absolute proportionality in the number of wheelchair spaces <u>on each level</u> is

8    not required; some leeway must be permitted for design purposes."[31]  *Independent Living*, 982

9    F.Supp. at 716 (emphasis supplied).

10   In *PVA II*, the court found that the planned accessible seating at the MCI Center in the

11   lower seating bowl and club level was not adequately dispersed because "almost every one of

12   these seats is in the end zone sections" and "[t]here are almost no spaces in the center court

13   sections."[32]  950 F.Supp. at 404.  The court in *Independent Living Resources* was faced with

14   similar accessible seating concentrations where a "disproportionate amount—82% of the

15   wheelchair seating is clustered in the corners of the end zone or high up on Level 7."  982

16   F.Supp. at 717.

17   Here, in contrast, the Stadium offers accessible seating within each of its four tiers (100

18   Level, 200 Level, Suite Level, and 300 Level).  Rogel Decl., ¶¶ 4, 5 and Ex. A; *see also*

19   Appendix 1.  <u>ADA-accessible seating has been placed along **every** accessible path of egress

20   within the Stadium</u>.[33]  *Id.*, ¶ 9.  And, rather than bunching accessible seating at the highest tier

21

22   [31] "The court also acknowledges that in designing and operating the arena, defendant had to balance many
     concerns only one of which was meeting the needs of wheelchair users.  Defendant also had to … meet the needs

23   of those spectators not in wheelchairs—including some with disabilities such as vision and hearing impairments.
     Defendant had to comply with fire and building codes and to control costs so it was feasible to build the arena at
     all."  *Independent Living*, 982 F.Supp. at 717.

24   [32] To address this issue, the court ordered that the MCI Center facility be designed and constructed to provide

25   "wheelchair spaces that provide lines of sight throughout the seating bowl, including locations at each level of the
     bowl."  950 F.Supp. at 405.  The Court previously noted that "defendants have on several occasions represented to
     the Court that they could, even at this late date, implement changes in the seating bowl to comply with ADA

26   regulations."  *Id.* at 396-97.

27   [33] "Modern arenas are primarily vertical in orientation, a place where spectators often must ascend stairs to reach
     their seats.  To some degree, these obstacles can be surmounted by providing elevators and by locating wheelchair
     spaces on accessible routes.  Nonetheless, these physical constraints preclude mathematical homogeneity in the

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

of the Stadium (300 Level) or in an undesirable "end-zone location," accessible seating at T-Mobile Park is located in greater numbers on the 100 Level, which is closest to the playing field.[34]  *Id.*, ¶ 10.  Accessible seating at T-Mobile Park is dispersed vertically on every level, and it is also dispersed and distributed horizontally, all around the perimeter of the field.  *Id.*, Ex. A; *see also* Appendix 1.  This enables fans with accessibility needs to find seats with a wide variety of perspectives and sightlines, as well as different ticket pricing.

Accessible seating at T-Mobile Park spans the same range of price points as tickets that are offered to non-ADA guests.  Rogel Decl., ¶ 17.  Similarly, accessible seating is made available and offered for sale in the same manner and under the same conditions as all other ticket sales, including (a) during the same hours, (b) through the same methods of purchase (*e.g.*, by telephone, on site, online through Ticketmaster), and (c) during the same stages of sale (*e.g.*, season tickets, followed by group tickets and single-game tickets).[35]  *Id.*

By way of example, an illustrative search for accessible seat tickets for the Mariners game against the Cincinnati Reds on September 10, 2019 indicates seats available in a wide range of prices and locations.  Rogel Decl., ¶ 18.  For the September 10 game, a variety of accessible seats are available, including at the following price points and locations:

- $17, Section 192, Seat 17A [centerfield bleacher]

- $20, Section 181, Seat 8A [leftfield bleacher]

---

[34] distribution of wheelchair seating." *Independent Living Resources*, 982 F.Supp. at 717.  *See also* Gooby Decl., ¶ 5 (adding additional ADA seats to 100 level constrained by engineering of the seating bowl and the lack of mid-level vomitories); Endelman Decl., ¶ 18 (no viable engineering would permit accessible seats throughout the bowl within Section 100, and there is no means of accessible egress to the 100 Level except behind home plate in the Diamond Club area).

[34] *Cf.*, *Independent Living Resources*, 982 F.Supp. at 715 (noting concentration of accessible seating in "nosebleed section" on Level 7).

[35] Tickets to Mariners games are generally offered in three different groupings or buckets:  season tickets, group tickets, and individual tickets.  Rogel Decl., ¶ 12.  Depending on the time of year, a ticket may be offered in any one of these three ways.  *Id.*  Season tickets are sold first, with sales beginning in November prior to a season (*i.e.*, season tickets for the current 2019 season went on sale in November 2018), and group tickets and individual game tickets are offered for sale subsequently.  *Id.*  Season ticket prices are set and do not vary, but the pricing for group tickets and individual game tickets is dynamic and may be affected by a number of factors, including availability of inventory, demand, weather, day of week, opponent, and team standing.  *Id.*  As a result, the price for a particular seat during a Wednesday night game against the Royals may be lower than for a Saturday afternoon game in July against the Red Sox.  Regardless of location or time, ADA seating is always priced at or below the non-accessible seats that are adjacent to them.  *Id.*, ¶ 14.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 17
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1          • $26, Section 315, Seat 5A [1B side]

2          • $30, Section 318, Seat 5A [1B side]

3          • $35, Section 328, Seat 5A [behind Homeplate]

4          • $39, Section 142, Seat 41A [3B side]

5          • $55, Section 214, Seat 11A [1B side]

6          • $60, Section 239, Seat 11A [3B side]

7          • $75, Section 35, Seat 1A [behind Homeplate]

8  *Id.*, ¶ 18 and Ex. B.[36]  This range of ticket prices (and seating locations) is comparable to the

9  prices and locations for general seating.

10        For all the reasons detailed above, Plaintiffs' argument regarding unequal distribution

11  and less preferable locations is legally unsupported and factually inaccurate.  At a minimum,

12  Plaintiffs' factual contentions alone raise genuine issues of fact, and their motion should be

13  denied.   *See also* Endelman Decl., ¶¶ 16-19.

14  **F.**    **Plaintiffs' Height and Width Complaints Are Unfounded.**

15      **1.**    **Concession counter heights are compliant.**

16        Plaintiffs argue that food and drink concession counters "throughout the concourses"

17  are excessively high with no ADA-complaint lowered portion.  Mtn. at 16:1-4.  Plaintiffs,

18  however, identify only two concessions: (i) the "Shortstop Beer" stands, and (ii) the "Hop Box"

19  beer stand.  *Id.* at 16:8-9.  Plaintiffs offer no evidence regarding the current season.[37]

20        There are two Hop Box concessions, which are located on the concourse of the 100

21  Level, and each has a lowered section of the service counter that is ADA-compliant.  Gooby

22  Decl., ¶ 14.  The "Shortstop" beer concessions are portable concessions and the Mariners have

23  added lowered-height tables to each of these concessions in order to ensure accessibility.  *Id.*

24

25

26  [36] Additionally, the Mariners also take steps to ensure that accessible seating is used only by fans with accessible needs and their companions.  Rogel Decl., ¶ 19.  For example, when one purchases tickets on-line, a pop-window appears that requires the purchaser to affirmatively agree that she or he is (or a member of his/her party) has a disability that requires accessible features provided by the seating locations being purchased.  *Id.* and Ex. B.

27  [37] Prior to this lawsuit, the Mariners agreed to ensure accessible concessions.  Rivera Decl,, ¶ 8-12 and Exs. 2, 3.

**2.      Accessible tables and seating are distributed throughout non-ticketed areas.**

Plaintiffs argue that there are "many notable and popular areas [at the Stadium] which are accessible to attendees holding any price-level of ticket which are conspicuously devoid of wheelchair accessible dining surfaces." Mtn. at 16:21-23.  Again, however, Plaintiffs offer no evidentiary support regarding the current season.[38]

Each of the four locations that Plaintiffs identify—Edgar's Cantina, The Pen, Edgar's Cantina Home Run Porch, and Lookout Landing—is a non-ticketed area where fans may gather to socialize and watch the game.[39]  Gooby Decl., ¶ 16.  These spaces do not have permanent seating, but rather have a variety of temporary/mobile dining spaces and tables, some of which include accessible seating.  *Id.*  In setting up the temporary tables and seating in these non-ticketed areas before each game, Mariner personnel distribute accessible tables and seating among all of the various non-ticketed gathering areas.  *Id.*  Because tables and seating in these areas are not reserved and are utilized on a first-come/first-served basis, accessible seating may not always be available at all times in every location.  *Id.*  Additionally, Edgar's Cantina has an accessible lowered counter section within the interior space across from the bar.  *Id.*, Ex. B.

**3.      Concession lines are width compliant.**

Plaintiffs argue that "[s]ome lines for concession vendors are set up to provide less than 36 inches of width using temporary, retractable line barriers."  Mtn. at 17:21-22.

Certain concession areas, especially in the Pen—which is a popular and well-used space and is often crowded—utilize portable stanchions to mark access lines.[40]  Gooby Decl., ¶ 18.  All concessions are advised on ADA-compliant line width and accessibility, and Mariners

---

[38] Further, the evidence offered does not support Plaintiffs' Motion.  For example, Plaintiffs' assert that "[t]he 'Pen' area of the field level near the bullpens provides and [sic] excellent view of pitchers warming up in the bullpen and exclusively features tall, standing height dining counters."  Mtn. at 17:4-6 (citing Brown Decl. at ¶ 17).  Paragraph 17 of Plaintiff Brown's Declaration states as follows in full: "I like to watch the game from the bullpen area and am unable to see over or use the guardrail counters by the bullpen."  There are no dining counters by the bullpen; there are, however, various temporary/mobile dining spaces and tables, including accessible seating, in the Pen.  Gooby Decl., ¶ 14.

[39] *See, e.g.*, https://www.mlb.com/mariners/tickets/the-pen; https://www.mlb.com/mariners/ballpark/events/spaces/lookout-landing.

[40] Permanent stanchions are not permitted because of fire code requirements.  Gooby Decl., ¶ 18.

personnel regularly monitor stanchion placement to ensure appropriate dimension. *Id.* Nevertheless, portable stanchions are sometimes inadvertently moved by fans during games. *Id.* As a result, the Mariners are exploring demarcating stanchion locations with permanent markings to promote consisting spacing. *Id.* But it is simply not true that concession lines are "set up" at insufficient width.[41]

### 4.     The drink rails on Level 200 do not violate the ADA.

Plaintiffs argue that the drink rails on Level 200 do not comply with the 2010 ADA Standards.[42] Mtn. at 19:2-10. This argument applies the wrong standard and misconstrues it. Endelman Decl., ¶ 20.

There are drink railings (*i.e.* a space to rest a beverage) located along certain windows of the 200 Level, but there is no food or drink service at these locations. Gooby Decl., ¶ 17. Instead, tables are also provided nearby so that guests can have a space to eat food. *Id.* These tables have ADA-compliant height between 28 and 34 inches above the floor. *Id.*

## G.     The Expansion Joints at T-Mobile Park are Scheduled for Replacement.

As is common in large stadiums, T-Mobile Park is comprised of eight separate building segments constructed largely of concrete. Gooby Decl., ¶ 11  For structural integrity, the joints where the segments meet need to be able to expand and contract depending on conditions. *Id.* Protective covers have been placed over these expansion joints to ensure safe egress and passage. *Id.* The Mariners' maintenance team regularly inspects the condition of the joints and covers as part of a preventative maintenance plan. *Id.*

Although many of the expansion joints were refurbished in the 2006-2010 time period, the majority of them are original to the Stadium. Gooby Decl., ¶ 12. The expected life expectancy for expansion joints like these is 20-25 years, which places them near the end of their service life. *Id.* As a result, a phased replacement of all expansion joints has already been

---

[41] The Mariners' contract with Centerplate, the primary concessionaire at the Stadium, expressly requires it to comply with the ADA. Rogel Decl., ¶ 20. As part of Centerplate's efforts to ensure ADA compliance, Centerplate ensures that stanchions are placed to ensure minimum width requirements for wheelchair users. Gooby Decl., ¶ 19.

[42] Plaintiffs do not explain why the 2010 Standards would be applicable.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 20
(No. 2:18-cv-01512-BJR)

**SAVITT BRUCE & WILLEY LLP**
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

planned and is expressly provided for in a comprehensive Long-Term Capital Needs Assessment (the "LTCNA") that has been performed and is in the process of being implemented.[43]  *Id.*

The LTCNA is a nearly 200 page document that informs the Mariners' planning and budgeting for maintenance, improvements and potential modifications to the Stadium.  The LTCNA provides for investment in all aspects of the Stadium, including architectural, the retractable roof, the garage, spectator requirements, major building systems, technology and infrastructure.[44]  Gooby Decl., ¶ 13.

**H.     The Mariners Have A Robust Maintenance Program, Including for Flooring.**

While the Stadium is generally in excellent condition, it was built some twenty plus years ago and a building of its vintage requires continuous maintenance.  Gooby Decl., ¶ 10. To ensure the Stadium remains in good and safe condition, the Mariners have developed a preventative maintenance plan.  *Id.*  As part of that plan, the Mariners have a member of their maintenance team whose responsibility is to repair joints, bumps, and cracks in the floors of the Stadium.  *Id.*  This employee identifies and ensures that any cracks, bumps, or gaps are promptly repaired.  *Id.*  He prioritizes those repairs that are identified as being most urgent. *Id.*

At any given time, there may be multiple flooring-related repairs that are needed and ongoing at the Stadium.  Gooby ¶ 10.  But Plaintiffs' general assertions (Mtn. at 14:10-21) that there are "hundreds, or likely, thousands of linear feet of gaps in the surfaces of the wheelchair paths of T-Mobile Park" and "dangerous changes in level" are not accurate.  *Id.*  Regardless, each such area of non-conformance raises a deeply factual issue about whether it is "readily

---

[43] The LTCNA and the related 2018 update are Exhibit A to the Gooby Declaration.  These documents are also publicly-available on the PFD's website.  *See* http://douglas-sma.com/wp-content/uploads/2018/05/Safeco_LTCNA_Revised_Draft_III.pdf; and http://www.ballpark.org/pdfs/2018%20Update%20to%20the%20LTCNA.pdf.

[44] As noted above, the Mariners entered into a new 25-year lease for the Stadium.  Among other things, the Mariners are required to operate, maintain, repair, re-equip and improve the Stadium in a first class manner, as measured against the operation, maintenance, repair, re-equipping and improvement of the top one-third of all Major League Baseball ballparks, taken as a whole.  This obligation is consistent with the Mariners' continuing commitment to a first-class Stadium in all respects and the LTCNA is a concrete example of the planning to accomplish this.  Rivera Decl., ¶ 15.

Savitt Bruce & Willey llp
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

achievable" for the Mariners to do better than they have already done in identifying and remediating these barriers.  42 U.S.C. § 12182(b)(2)(A)(iv); 42 U.S.C. § 12181(9) (listing four fact-based "factors" to consider in making the "readily achievable" determination).[45]  Plaintiffs have made no showing that the removal of any of these putative non-conforming features, let alone all of them, is "readily achievable."[46]

## I.       Some 300 Level Seating Requires Modification.

Plaintiffs are correct that some of the accessible seats on the 300 Level are short in front-to-back dimension by approximately 3-4 inches. Mtn. at 6:12- 7:7; Gooby Decl., ¶ 8. This appears to the result of protective railing that is mounted on the floor of the seating area as opposed to the front of the seating area riser.  Gooby Decl., ¶ 8.  That is, the accessible seating spaces as designed appear to be compliant in dimension, but the installation of protective railing was implemented in a manner that slightly reduced seat spacing.[47]  *Id.*  The Mariners are in the process of determining how best to remedy this issue, in a manner that complies with the ADA and applicable building code—and does not result in a net loss of accessible seating.  *Id.*

## J.       The Mariners Will Correct The Edgar's Cantina Lift.

Plaintiffs' Complaint does not assert any claim regarding the Edgar's Cantina lift and Plaintiffs' present Motion is the first time the issue has been raised in this litigation.[48]  Nevertheless, consistent with the Mariners' demonstrated practice, the issue has now been investigated and the Mariners agree that the lift requires improvement and they will do so.

---

[45] *See also Rodriguez v. Barrita, Inc.*, C 09-04057 RS, 2012 WL 3538014, at *8 (N.D. Cal. Mar. 1, 2012) ("readily achievable" is a "fact-intensive inquiry that will rarely be decided on summary judgment"); *Access Now, Inc. v. S. Florida Stadium Corp.*, 161 F. Supp. 2d 1357, 1371 (S.D. Fla. 2001) ("readily achievable" is a fact-intensive inquiry; granting summary judgment in favor of stadium).

[46] Indeed, Plaintiffs have failed to make any factual showing on "readily achievable" as to <u>any</u> of their alleged contentions for which such analysis is necessary.

[47] During games, hosts (or ushers) monitor the path of egress behind the ADA seating spaces on the 300 Level to ensure that these paths are kept clear and that fans are not able to gather in back of the ADA seating spaces. Gooby Decl., ¶ 9.

[48] Plaintiffs' Complaint alleged that the Edgars' Cantina lift was not independently operable. *See* Sub No. 1 at ¶¶ 4.39 – 4.42.  This issue was resolved prior to the 2019 season.

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 22
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

**K.      The Dugouts Should Be Accessible or Not Open to the General Public.**

There is presently no accessible route into the player dugouts, which are not open to the general public during games.  In order to ensure consistent accessibility, the Mariners will provide for an accessible lift into one or more of the dugouts, or preclude general public access to these player areas.

### IV.      CONCLUSION

Under the applicable law, and given the multitude of disputed issues of material fact, Plaintiffs' Motion should be denied.

DATED: June 10, 2019

S AVITT  B RUCE  &  W ILLEY LLP

By      */s/ Stephen C. Willey*
  Stephen C. Willey, WSBA #24499
  Sarah Gohmann Bigelow, WSBA #43634
  1425 Fourth Avenue, Suite 800
  Seattle, WA  98101-2272
  Telephone: 206.749.0500
  Facsimile:  206.749.0600
  Email: swilley@sbwllp.com
  Email: sgohmannbigelow@sbwllp.com

  *Attorneys for Defendants*

DEFENDANTS' OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT - 23
(No. 2:18-cv-01512-BJR)

S AVITT  B RUCE  &  W ILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

# **APPENDIX 1**



THE 'PEN
EDGAR'S
VISITORS
MARINERS
PRESS BOX
PB SUITE
All-Star Club
Hit it Here Cafe
A B C D E F G H
25 27 33 35
101 102 103 104 105 106 107 108 109 110 111 112 114 115 116 117 118 119 120 121 122 123 124 125 126 127 128 129 131 132 133 134 135 136 137 138 139 140 141 142 143 144 146 147 148 149 150 151
180 181 182 183 184 185 186 187 190 191 192 193 194 195
211 212 213 214 215 216 217 218 219 220 221 222 223 224 226 227 233 234 236 237 238 239 240 241 242 243 244 245 246 247 248 249
306 307 308 309 310 311 312 313 314 315 316 318 319 320 321 323 325 326 327 328 329 330 331 332 333 334 335 337 339 340 341 342 344 345 346 347 349
s1 s2 s3 s4 s5 s6 s7 s16 s17 s18 s19 s20 s21 s22 s23 s24 s25 s26 s27 s28 s29 s30 s31 s32 s33 s34 s35 s36 s37 s38 s39 s40 s41 s42 s43 s44 s45 s46 s47 s48 s49 s50 s51 s52 s53 s54 s55 s56 s57 s58 s59 s60 s61 s62 s63 s64 s65 s66 s67 s68 s69

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that, on June 10, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 10th day of June, 2019 at Seattle, Washington.

Rondi A. Greer

CERTIFICATE OF SERVICE
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500