The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CLARK LANDIS, ROBERT BARKER, GRADY THOMPSON, and KAYLA BROWN, | NO.   2:18-cv-01512-BJR |
| Plaintiffs, | **DECLARATION OF WILLIAM E. ENDELMAN IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| WASHINGTON STATE MAJOR LEAGUE BASEBALL STADIUM PUBLIC FACILITIES DISTRICT; and BASEBALL OF SEATTLE, INC., a duly licensed Washington corporation, d.b.a. Mariners Baseball, LLC, a duly licensed Washington limited liability company, d.b.a. The Baseball Club of Seattle, LLLP, a duly licensed Washington limited liability limited partnership, | NOTE ON MOTION CALENDAR: June 14, 2019 |
| Defendants. | |

I, WILLIAM E. ENDELMAN, hereby state and declare as follows:

1.     I am a licensed Architect and am licensed in Washington, California, Arizona and Nevada.  I founded and was Principal of Endelman & Associates PLLC ("E&A"), a firm specializing in accessibility consulting and ADA/FHA compliance until my retirement December 31, 2018.  I am competent to testify and make this declaration based on personal knowledge.

DECLARATION OF WILLIAM E. ENDELMAN - 1
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

2.      I have over more than 30 years' experience in facility accessibility, architectural business operations, project management, and architecture in high level management positions for architectural, real estate and other design-related companies.  I have consulted for major banking, institutional, educational, residential developer, legal, real estate asset management clients, and enforcing agencies in dozens of states.  I founded E&A in 1995 and grew the firm from one person to a nationally recognized 12-person accessibility consulting firm, with work in over 30 states, and more than 1,000 clients.  I have been engaged as a consultant and expert witness in multiple jurisdictions, including engagements by the United States Department of Justice, state enforcement agencies, and private parties.

3.      I have been engaged by the Defendants in this matter to evaluate alleged ADA deficiencies at T-Mobile Park, and I have prepared an expert report, a copy of which is attached hereto as *Exhibit 1*.

4.      E&A performed a sightline study at T-Mobile Park using Section 112 and Section 224 as illustrative examples.  (*See* Complaint ¶¶ 4.15 & 4.16.)  We determined that accessible seating in these sections provides for a comparable line of sight to see the playing surface or field between the heads and over the shoulders of persons standing immediately in front and over the heads of the persons standing two rows in front.  This is consistent with the Department of Justice's "Accessible Stadiums" publication, a copy of which is Exhibit A to my report.

5.      In measuring sightlines some of the variables include the eye height of the wheelchair user, the height of standing spectators, the depth within the tread row of the spectator and the wheelchair user, and the focal point on the floor from which measurements are calculated.  Different variables will yield different results.  There were no commonly-accepted or regularized anthropometric dimensions for such analysis at the time that T-Mobile Park was designed.  In fact, to this day, there are no anthropometric dimensions provided for by the 2010 ADA Standards or the 2015 International Building Code.

DECLARATION OF WILLIAM E. ENDELMAN - 2
(No. 2:18-cv-01512-BJR)

6.      Nevertheless, for the study done here, E&A utilized the data set forth in a March 24, 1998 Consent Order from *United States v. Ellerbe Becket, Inc.* (D. Minn., No. 4-96-995).[1]



**SIGHTLINE STUDY - SECTION 112**



**SIGHTLINE STUDY - SECTION 224**

---

[1] A copy of the Consent Order is Exhibit B to my report.  Under the Consent Order, the DOJ agreed that it would "not commence any enforcement action" against Ellerbe Becket, an architectural firm, regarding lines of sight for any "projects designed by Ellerbe as of the date of this Agreement."  There was no requirement that any facilities designed by Ellerbe Becket <u>prior</u> to March 24, 1998 be remediated to meet the newly stated sightline requirement. The line of sight requirement applicable to Ellerbe Becket under the Consent Order was not issued as a revision to the 1991 ADA Standards using a Federal Register review process or otherwise.  Accordingly, architects and engineers were not on notice of any generally applicable new regulation.

DECLARATION OF WILLIAM E. ENDELMAN - 3
 (No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

7.      The dimensions shown above reflect actual field conditions of Sections 112 and 224.  In my opinion, the sightlines as designed by the stadium architect comply with Section 4.33.3 of the 1991 Standards and are also consistent with the subsequent guidance provided by the DOJ in "Accessible Stadiums.  In my view, substantially all of the wheelchair seating locations at T-Mobile Park provide lines of sight over seated and standing spectators comparable to the general public.[2]

8.      I am aware of the sight-line analysis done by Plaintiff's expert (Jim Terry), but do not agree that it is relevant.  For purposes of determining what design standards were applicable and required when T-Mobile Park was designed and constructed, one has to look to the then available guidance from the DOJ.  In this respect, Mr. Terry's analysis, which includes a broad-range perspective beyond a view to the playing surface, may be useful in terms of future stadium design.[3]  It does not, however, establish that T-Mobile Park fails to comply with the 1991 ADA Standards, which are the relevant standards.

9.      The 1991 Standards make no mention of sightlines over standing spectators and offer no details at all as to what comprises compliant sightlines.

10.      In late 1993, the DOJ published a Technical Assistance Manual (the "TAM").  The TAM made no mention of lines of sight other than the statement that, for assembly areas, seating for individuals who use wheelchairs should be "dispersed throughout the seating area" and should "provide[] lines of sight and choices of admission prices comparable to those offered to the general public."

11.      Subsequently, in November 1994, the DOJ published a TAM Supplement, which stated that "in assembly areas where spectators can be expected to stand during the event

---

[2] As a related matter, where accessible seating is fixed, "staggered" seating may improve lines of sight for accessible seating locations.  Because the accessible seating at T-Mobile Park is now flex seating, which permits wheelchair users greater horizontal flexibility within a seating area, lines of sight are not static and fans have the ability to individually stagger their line of sight with respect to spectators in the rows in front of them.

[3] Among the flaws of Mr. Terry's analysis for present purposes is that he assumes non-disabled spectators have unlimited and unobstructed sightlines to the playing surface.  This is manifestly not true given the wide range of human height dimensions.  At root, Mr. Terry's analysis is in service of an idealized world.  That may be a worthwhile goal, but it is not, in my view, the correct viewpoint for a retrospective analysis regarding compliance with a statute that has had evolving and not always consistent interpretations and related requirements over time.

DECLARATION OF WILLIAM E. ENDELMAN - 4
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

1  or show being viewed, the wheelchair locations must provide lines of sight over spectators who

2  stand."  The TAM Supplement did not, however, provide any guidance as to what its directive

3  meant, or how it might be accomplished, other than that this new directive "can be

4  accomplished in many ways," including clustering wheelchair locations at the front of a seating

5  section or in the rear with "additional elevation.

6      12.    Later, in May 1996, the Department of Justice issued the document entitled

7  "Accessible Stadiums."[4]  It addresses "lines of sight" as follows:  "In stadiums where

8  spectators can be expected to stand during the show or event (for example, football, baseball,

9  basketball games, or rock concerts), all, or substantially all of the wheelchair seating locations

10  must provide line of sight over standing spectators." *Id.* (emphasis supplied.)  In the DOJ's

11  view at the time, "[a] comparable line of sight . . . allows a person using a wheelchair to see the

12  playing surface between the heads and over the shoulders of the persons standing in the row

13  immediately in front and over the heads of the persons standing two rows in front."

14      13.    Although the "Accessible Stadiums" is the first DOJ publication that offers

15  some detail regarding what a "line of sight over standing spectators" might mean in practice, it

16  does not provide any anthropometric data for use in calculating a "comparable" line of sight.

17  For example, there is no data for eye height of persons seated in wheelchairs, nor average head

18  height, eye height or shoulder height of standing spectators.[5]  Similarly, there is no information

19  provided regarding a spectator's focal point on the playing surface or the horizontal range of

20  view or perspective.

21      14.    Further, when the DOJ entered into the Consent Order with Ellerbe Becket in

22  1998, the design and implementation mandate for sightlines was forward-looking only—*i.e.*, it

23  only applied to "designs commenced after the date of this order."  As of March 1998, T-Mobile

24  Park was designed, permitted, and had been  under construction for a year.

25  ---

[4] "Accessible Stadiums" was published by the Disability Rights Section of the Civil Rights Division of the DOJ,
26  but it was not issued as a revision to the 1991 Standards using a Federal Register review process or otherwise.

[5] As noted, the current 2010 ADA Standards also lack this data, although the 2010 Standards are more stringent in
27  that they require spectators seated in wheelchair spaces to be provided sightlines over the heads of persons
standing in the first row in front of the wheelchair spaces.

DECLARATION OF WILLIAM E. ENDELMAN - 5
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

15.     In short, the analysis that Mr. Terry promotes is useful and well-worth considering if one were designing a stadium today.  As a tool for assessing what was required for a stadium being constructed in the 1997-1999 time period, I believe it is inapplicable.

16.     Plaintiffs allege that the only field-level wheelchair accessible seating on the 100 Level is in the Diamond Club section and that this arrangement does not satisfy the ADA because "patrons who use wheelchairs" are not offered "a choice of admission prices and lines of sight comparable to the front rows, or other rows near the infield, of the 100 Level." (Complaint ¶¶ 4.19–4.20, 4.26–4.28.)  And in their Motion for Summary Judgment, Plaintiffs assert that "[i]n order to become even arguably compliant with either the 1991 or the 2010 ADA Standards, T-Mobile Park must offer a dramatically increased number of wheelchair seats closer to the playing field."  I do not agree with this argument and do not understand its basis.

17.     At T-Mobile Park, there are wheelchair seating spaces equally distributed around the field of play at the back of the 100 Level, the 200 Level, and the 300 Level, each connecting to an accessible route and means of egress path.  The accessible seats have varying prices and, in each instance, are priced at the lowest price point as adjacent general seating.

18.     Further, there is a there is a slope-based exception in the 1991 Standards.  No viable engineering would permit accessible seats throughout the bowl within Section 100, and there is no means of accessible egress to the 100 Level except behind home plate in the Diamond Club area.  Accordingly—and consistent with Section 4.33.3 of the 1991 Standards, the bulk of accessible seats within Section 100 are clustered, in varying horizontal locations, along the main concourse, which enables readily-accessible egress.  Additionally, I am aware of an ADA Seating Expansion project that the Mariners completed over the past off-season.  As a result, sixteen (16) wheelchair spaces have been added to the 100 Level in Section 35.  Four are Diamond Club and twelve are Premier seats.

DECLARATION OF WILLIAM E. ENDELMAN - 6
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

19.     In my opinion, the accessible seating at T-Mobile Park is distributed both horizontally and vertically throughout the stadium, with a choice of ticket prices, in compliance with Section 4.33.3 of the 1991 Standards.[6]

20.     Plaintiffs allege that the drink rails on the 200 Level are not compliant with the ADA because they are an excessively high dining surface with no lowered section.  I do not agree.  Because neither food nor drink is being served at the drink rails, Section 5.2 of the 1991 Standards cited in the Complaint is inapplicable.[7]  (Similarly, Sections 226 and 902 of the 2010 Standards, alleged in Plaintiff's Motion for Summary Judgment are inapplicable.)

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed this 9 day of June, 2019 at Seattle, Washington.

_____
William E. Endelman

---

[6] As a related point, the Mariners utilize dynamic pricing, such that single-game ticket prices for a given seat will vary during the course of the season depending on various factors such as weather, fan demand, day of week, opponent, etc.  As a result, the price for a particular seat during a Tuesday night game against the Orioles in April may be lower than for a Saturday afternoon game in July against the Yankees.  My understanding is that pricing changes are implemented across a section or subsection and that accessible seating prices vary consistently with all other similarly-situated seats within a section or subsection, both accessible and non-accessible, with the accessible seats priced at the lowest amount within that section or subsection.

[7] If food was consumed on the drink rails but no service was provided, then they would be considered a dining surface per Section 5.1 of the 1991 Standards.  If this were the case, then an alteration would be required and would need to comply with 2010 ADAS Sections 226 and 902.  These sections require 5% of the seated and standing spaces to provide maximum 34" high surface with 30" minimum wide x 17" minimum deep x 30" minimum wide knee and toe space.

DECLARATION OF WILLIAM E. ENDELMAN - 7
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

# **<u>Exhibit 1</u>**

ENDELMAN
&ASSOCIATES PLLC

Accessibility Consulting   |   ADA-FHA Compliance

# Report of William E. Endelman

### *Landis, et al v. PFD, et al.* **(W.D.Wash. No. 2:18-cv-01512-BJR)**

## I.   INTRODUCTION

William E. Endelman of Endelman & Associates PLLC ("E&A") has been retained as a testifying expert in the above-referenced litigation.  This report reflects my professional opinions, and is inclusive of work performed by Bart Sanderson, E&A Associate, Technical Director, CASp, under my Principal level supervision.

E&A was retained to evaluate alleged ADA deficiencies at T-Mobile Park, as set forth in and limited by Plaintiffs' Complaint in the above-referenced litigation (the "Complaint").  As part of its analysis, E&A conducted a physical inspection of T-Mobile Park.  As explained in greater detail below, E&A has applied the 1991 ADA Standards for Accessible Design (with its ADA Accessibility Guidelines Appendix section revision dated July 1, 1994) (the "1991 Standards"), to evaluate Plaintiffs' ADA claims.  Additionally, where E&A has proposed alterations that would address an issue identified in the Complaint, E&A has relied on the 2010 ADA Standards for Accessible Design (the "2010 Standards") as the set of guidelines that would apply if the Defendants were to make remediation alterations.[1]

## II.   APPLICABLE ADA STANDARDS

### a.   Applicable standards for assessing issues identified in Plaintiffs' Complaint

The construction of the stadium known as T-Mobile Park (f/k/a Safeco Field) began in 1997 and was completed in 1999.[2]  Accordingly, the 1991 Standards are the applicable standards to evaluate the issues identified in Plaintiffs' Complaint.  Structural elements that meet the 1991 Standards can remain in place indefinitely until such time as they are altered.  Put another way, the 2010 Standards are not an appropriate lens for evaluating existing construction where the document did not exist at the time of design or construction.

### b.   Applicable standards for alterations and barrier removal

For any existing structural element that is identified and confirmed as not satisfying the 1991 Standards, any remediating alterations would be subject to the 2010 ADA Standards. For this reason, to the extent E&A proposes potential alterations to remediate particular issues, it has identified alterations that comply with the 2010 Standards.  Section 36.402 of the 2010 Standards requires that alterations by private entities to their facilities comply with the applicable accessibility standards to the maximum extent feasible.

With respect to barrier removal, per Section 36.304, a public accommodation shall remove architectural barriers in existing facilities where such removal is readily achievable, *i.e.*, easily accomplishable and able to be carried out without much difficulty or expense.  Any measures taken to comply with the barrier removal requirements of this section shall comply

---

[1] The 2010 Standards under 28 CFR Part 36, were adopted on September 15, 2010 to replace the 1991 ADA Standards for Accessible Design and ADAAG.

[2] Leading firms in stadium design and construction were used. NBBJ was the project architect and Hunt-Kiewit was the general contractor.

ENDELMAN
&ASSOCIATES
Accessibility Consulting  |  ADA-FHA Compliance

with the applicable requirements for alterations in Section 36.402 and Sections 36.404 through 36.406 for the element being altered. If, as a result of compliance with the alterations requirements of aforementioned sections, the measures required to remove a barrier would not be readily achievable, a public accommodation may take other readily achievable measures to remove the barrier that do not fully comply with the specified requirements.  When implementing solutions to barrier removal, where a public accommodation can demonstrate that barrier removal is not readily achievable to comply with requirements for alterations in Section 36.402 and Sections 36.404 through 36.406, the ADA allows for an "equivalent facilitation" to accomplish barrier removal.  This is acceptable to the extent that such action provides greater or equal access.  Section 36.404(d)(2) also created a "safe harbor" from the "readily achievable" barrier removal obligation for features and elements that may not comply with the newer 2010 ADA Standards, provided that they conformed to the 1991 ADAAG that were applicable when they were constructed.

Any potential alterations would also be subject to current Seattle Building Code requirements, City approval, and other feasibility considerations.

## III.   STATEMENTS OF OPINIONS

### a.  Summary of Plaintiffs' Allegations and E&A's Finding and Conclusions:

Plaintiffs' Complaint identifies issues in the following categories:

- Accessible routes into the bullpen and dugouts
- Inadequate field-level accessible seats
- Sight lines
- Expansion joints
- Changes in level in concourse areas
- Concessions and seating in the Pen
- Lift in Edgar's Cantina
- Wheelchair space seat depth
- Drink rails on the 200 Level

In Section III(b) below, E&A identifies Plaintiffs' allegations which, in my professional opinion, do not constitute violations. In Section III(c), E&A addresses issues identified by Plaintiffs but that have been or are easily remedied. In Section III(d), E&A discusses potential solutions for other issues that need to be addressed.

### b.  Issues that do not constitute ADA violations

E&A has determined that the following issues identified in the Complaint do not constitute violations under the 1991 Standards.

#### i.   Shaded Seating

Plaintiff Barker complains that when he sat in Section 112 on May 27, 2018, he experienced "cold shade." (Complaint ¶ 4.16).  Sitting in the shade or in the sun is a personal preference, and Section 112, like other surrounding general seating sections, may not offer sun or warmth depending on the time of year, weather and relative sun paths.  For those preferring greater exposure to the weather, accessible wheelchair seating can be found in the 300 level sections and at the field-level.  As noted in greater detail below, the only seat dispersal requirements in the 1991 Standards concerns providing "lines of sight comparable to those for members of the general public."  Section 4.33.3 ("Placement of Wheelchair Locations";

ENDELMAN
&
ASSOCIATES
PLLC

Accessibility Consulting   |   ADA-FHA Compliance

emphasis supplied).  Nothing in the 1991 Standards requires or even addresses the amount of shade, sun or other environmental elements.[3]

ii.  <u>Sight lines over standing spectators</u>

Plaintiffs allege that they do not have adequate sightlines over standing spectators when seated in the wheelchair accessible seating on the 100 or 200 levels.  (Complaint ¶¶ 4.29–4.32.)

Although the 1991 Standards vaguely required assembly areas to provide accessible seating with "lines of sight comparable" to  those for general seating, there was no specific guidance on what was meant by "comparable" until 1996.  At the time construction of T-Mobile started in March 1997, the design for sight lines fully conformed with the sparse guidance then available on what was meant by "comparable" sight lines.

As a starting point, the 1991 Standards have no details on compliant sightlines and do not mention sightlines over standing spectators.  Section 4.33.3 ("Placement of Wheelchair Locations") simply states that "[w]heelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and <u>lines of sight comparable to those for members of the general public</u>." (Emphasis supplied.)  The term "lines of sight comparable" is not otherwise defined and there is no stated presumption that all members of the general public have unobstructed sightlines.  This is true both with respect to structural orientation and seating location, as well as a function of varying heights of individuals, both seated and standing, which often compromise sight lines in any assembly space.

In May 1996, the Department of Justice issued a document entitled "Accessible Stadiums."[4]  *See* <u>Exhibit A</u>.  It addresses "lines of sight" as follows:  "In stadiums where spectators can be expected to stand during the show or event (for example, football, baseball, basketball games, or rock concerts), <u>all, or substantially all</u> of the wheelchair seating locations must provide line of sight over standing spectators." *Id.* (emphasis supplied.)  In the DOJ's view at the time, "[a] comparable line of sight . . . allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front."

---

[3] The 2010 Standards also do not address such environmental factors in seat dispersal requirements.  *See* Section 221.2.3 ("Lines of Sight and Dispersion").  Likewise, the Department of Justice regulation on Assembly Area accessible seating also fails to address these environmental factors.  28 C.F.R. § 36.406(f).

[4] "Accessible Stadiums" was published by the Disability Rights Section of the Civil Rights Division of the DOJ, but it was not issued as a revision to the 1991 Standards using a Federal Register review process or otherwise. Previously, in November 1993, the DOJ published a Technical Assistance Manual (the "TAM").  The TAM made no mention of lines of sight other than the statement that, for assembly areas, seating for individuals who use wheelchairs should be "dispersed throughout the seating area" and should "provide[] lines of sight and choices of admission prices comparable to those offered to the general public."  Subsequently, in November 1994, the DOJ published a TAM Supplement, which stated that, "in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand."  The TAM Supplement did not, however, provide any guidance other than that this new direction "can be accomplished in many ways," including clustering wheelchair locations at the front of a seating section or in the rear with "additional elevation."

ENDELMAN
&ASSOCIATES PLLC

Accessibility Consulting   |   ADA-FHA Compliance

Although the "Accessible Stadiums" is the first DOJ publication that offers some detail regarding what a "line of sight over standing spectators" might mean in practice, it does not provide any anthropometric data for use in calculating a "comparable" line of sight.  For example, there is no data for eye height of persons seated in wheelchairs, nor average head height, eye height or shoulder height of standing spectators.[5]



*Figure Showing Comparable Line of Sight for Wheelchair Seating Location*

Subsequently, in March 1998, the DOJ entered into a Consent Decree with the architectural firm Ellerbe Becket, Inc.  *See* Exhibit B.[6]  The Consent Decree required Ellerbe Becket, when designing facilities that might have standing spectators, to provide for accessible seating "such that all or substantially all of the wheelchair seating locations in the facility provide persons with physical disabilities lines of sight that are comparable to those of the general public."  *Id.*  The Consent Decree provided that Ellerbe "shall calculate sight lines … as described in the Department of Justice Publication entitled 'Accessible Stadiums.'"  *Id.*  And for purposes of "making these calculations," the Consent Decree identified "the average anthropometric dimensions" to be used for "designs commenced after the date of this order."  *Id.*

Under the Consent Decree, the DOJ agreed that it would "not commence any enforcement action" against Ellerbe Becket regarding lines of sight for any "projects designed by Ellerbe as of the date of this Agreement."  *See* Ex. B.  There was no requirement that any facilities designed by Ellerbe Becket prior to March 24, 1998 be remediated to meet the newly stated sightline requirement.

The Ellerbe Becket Consent Decree resolved a single lawsuit against one company.  The line of sight requirement applicable to Ellerbe Becket under the Consent Decree was not issued as a revision to the 1991 ADA Standards using a Federal Register review process or otherwise.  Accordingly, architects and engineers were not on notice of any generally applicable new regulation.  As noted above, design documents had been completed, building permits approved

---

[5] The current 2010 ADA Standards also lack this data, although the 2010 Standards are more stringent in that they require spectators seated in wheelchair spaces to be provided sightlines over the heads of persons standing in the first row in front of the wheelchair spaces.  The current 2015 International Building Code / ANSI A117.1-2009 do not require this.

[6] March 24, 1998 Consent Order from *United States v. Ellerbe Becket, Inc.* (D. Minn., No. 4-96-995).

ENDELMAN
&
ASSOCIATES PLLC

Accessibility Consulting  |  ADA-FHA Compliance

and issued, and construction on T-Mobile Park had been underway for a year when the Ellerbe Becket Consent Decree was entered.

E&A performed a sightline study at T-Mobile Park using Section 112 and Section 224 as illustrative examples.  (Complaint ¶¶ 4.15 & 4.16.)  E&A determined that accessible seating in these sections do provide for a <u>comparable line of sight</u> between the heads and over the shoulders of the persons standing immediately in front and over the heads of the persons standing two rows in front.  This is consistent with the DOJ's "Accessible Stadiums" publication.  For anthropometric dimensions, E&A utilized the data set forth in the Ellerbe Becket Consent Decree, as indicated below.

The dimensions shown reflect actual field conditions of Sections 112 and 224.  E&A's conclusion is that the sightlines as designed by the stadium architect comply with Section 4.33.3 of the 1991 Standards and are also consistent with the subsequent guidance provided by the DOJ in "Accessible Stadiums.

In summary, E&A believes that that substantially all of the wheelchair seating locations at T-Mobile Park provide lines of sight over seated and standing spectators comparable to the general public.[7]

Anthropometric Data Excerpt from Exhibit B       **EXHIBIT B**

The average anthropometric dimensions employed shall be: (1) average eye height for a person sitting in a wheelchair is 47.45"; (2) horizontal distance from the eye of an average person sitting in a wheelchair to the edge of the tier on which the wheelchair rests is 30"; (3) average head height of a standing spectator is 67.65"; (4) average eye height of a standing spectator is 63.45"; and (5) average shoulder height of a standing spectator is 55.65".

---

[7] Where accessible seating is fixed, "staggered" seating may improve lines of sight for accessible seating locations. Because the accessible seating at T-Mobile Park is now flex seating, which permits wheelchair users greater horizontal flexibility within a seating area, lines of sight are not static and fans have the ability to individually stagger their line of sight with respect to spectators in the rows in front of them.

ENDELMAN & ASSOCIATES PLLC

Accessibility Consulting | ADA-FHA Compliance



# SIGHTLINE STUDY - SECTION 112



# SIGHTLINE STUDY - SECTION 224

**ENDELMAN**
**& ASSOCIATES** 2016

Accessibility Consulting  |  ADA-FHA Compliance

---

   iii.   _Accessible seats—comparable lines of sight and comparable ticket prices_

Plaintiffs allege that the only field-level wheelchair accessible seating on the 100 Level is in the Diamond Club section and that this arrangement does not satisfy the ADA because "patrons who use wheelchairs" are not offered "a choice of admission prices and lines of sight comparable to the front rows, or other rows near the infield, of the 100 Level."  (Complaint ¶¶ 4.19–4.20, 4.26–4.28.)

Per 28 CFR Part 36, Appendix A (7-1-94 Edition) for which the Stadium was built, Assembly Areas are to provide the following:

   4.33.3 - Placement of Wheelchair Locations.  Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public.  They shall adjoin an accessible route that also serves as a means of egress in case of emergency.  At least one companion fixed seat shall be provided next to each wheelchair seating area.  When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location.  Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.

   EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent.  Equivalent accessible viewing positions may be located on levels having accessible egress.

There are wheelchair seating spaces equally distributed around the field of play at the back of the 100 Level, the 200 Level, and the 300 Level, each connecting to an accessible route and means of egress path.  The accessible seats have varying prices and, in each instance, are priced at the lowest price point within a given section or subsection.[8]

As noted above, there is a slope-based exception in the 1991 Standards.  No viable engineering would permit accessible seats throughout the bowl within Section 100, and there is no means of accessible egress to the 100 Level except behind home plate in the Diamond Club area.  Accordingly, the bulk of accessible seats within Section 100 are clustered, in varying horizontal locations, along the concourse, which enables readily-accessible egress.[9]  Additionally, I am aware of an ADA Seating Expansion project that was completed over the past off-season.  As a result, 16 wheelchair spaces have been added to the 100 Level in Sections 33 and 35.  Four are Diamond Club and twelve are Premier seats.

---

[8] I am aware that the Ball Club utilizes dynamic pricing, such that single-game ticket prices for a given seat will vary during the course of the season depending on various factors such as weather, fan demand, day of week, opponent, etc.  As a result, the price for a particular seat during a Tuesday night game against the Orioles in April may be lower than for a Saturday afternoon game in July against the Yankees.  My understanding is that pricing changes are implemented across a section or subsection and that accessible seating prices vary consistently with all other similarly-situated seats within a section or subsection, both accessible and non-accessible, with the accessible seats priced at the lowest amount within that section or subsection.

[9] The TAM also notes that "wheelchair seating must adjoin an accessible route that serves a means of egress from the assembly area," and the TAM Supplement added the comment regarding a line of sight requirement and the note that this might be accomplished by clustering wheelchair locations at the front of a seating section or in the rear with "additional elevation."

---

In E&A's opinion, the accessible seating at T-Mobile Park is distributed both horizontally and vertically throughout the stadium, with a choice of ticket prices, in compliance with Section 4.33.3 of the 1991 Standards.

### iv. Excessive Counter Height for Fixed and Portable Concession Counters in the Pen, such as the Jack Daniels Bar and the Silver Bullet Bar

The Complaint alleges that "both fixed and portable concession counters in the Pen, such as the Jack Daniels Bar and the Silver Bullet Bar, have excessive counter height." (Complaint ¶¶ 4.43, 4.45–4.46.) Both the Silver Bullet Bar and Jack Daniels bars are service bars only and thus Section 5.2 of the 1991 Standards, addressing counters where food or drink is served for consumption by customers seated on stools or standing at the counter, does not apply. I understand that no seating or standing spaces are provided at either bar.[10] Therefore, only a lowered service counter 36" high maximum x 36" wide minimum is required. Both service bars provide this lowered section and, as a result, they both dimensionally comply. Jack Daniels' lowered counter measures 34.75" high x 36" wide and Silver Bullet's counter measures 35.75" - 36" high x 60" wide.

For portable concessions, a minimum 36" wide x maximum 36" high service counter should be provided.

### v. Drink rails on the 200 Level

Plaintiff Landis alleges that he experienced drink rails on the 200 level that were too high. (Complaint ¶ 4.53.) Because neither food nor drink is being served at the drink rails, however, Section 5.2 of the 1991 Standards cited in the Complaint is inapplicable.[11]

### vi. Drink rails along the windows of the 200 Level

Plaintiffs allege—"on information and belief"—that all of the drink rails along the windows of the 200 Level exceed height requirements and do not have any lowered segments. (Complaint ¶ 4.57.)

E&A does not agree that there is any violation here. The movable seating and drink rails in the circulation corridor of the 200 level are not required to provide comparable lines of sight as required places of assembly with fixed seating, *i.e.*, purchased seats, because these seats are not separately served. Additionally, the drink rails would only be considered a dining surface where food is consumed (Section 5.1 of the 1991 Standards).[12]

---

[10] Section 5.2 reads in full: "**5.2 Counters and Bars.** Where food or drink is served at counters exceeding 34 in (865 mm) in height for consumption by customers seated on stools or standing at the counter, a portion of the main counter which is 60 in (1525 mm) in length minimum shall be provided in compliance with 4.32 or service shall be available at accessible tables within the same area." If seating were provided at the Jack Daniels Bar or Silver Bullet Bar, then 5% of seating at each location should be accessible, including a lowered section 34" maximum high with knee and toe space as required.

[11] If food was consumed on the drink rails but no service was provided, then they would be considered a dining surface per Section 5.1 of the 1991 Standards. If this were the case, then an alteration would be required and would need to comply with 2010 ADAS Sections 226 and 902. These sections require 5% of the seated and standing spaces to provide maximum 34" high surface with 30" minimum wide x 17" minimum deep x 30" minimum wide knee and toe space.

[12] *See* n.11 above.

ENDELMAN
& ASSOCIATES

Accessibility Consulting  |  ADA-FHA Compliance

c.  **Issues identified by Plaintiffs that have already been remedied for the 2019 Season or are easily remedied**

i.  Gaps in the floor on the 100 Level

Plaintiffs allege that there are "gaps in the floor on the 100 Level" that "have excessive vertical changes in level." (Complaint ¶ 4.56.)  These gaps could be addressed by filling them with an appropriate product.

ii.  Expansion joints

Plaintiffs allege that metal expansion joints on the 100 and 300 Levels "have excessive vertical changes in level." (Complaint ¶¶ 4.38 & 4.54–4.55.)  Subject to further feasibility assessment, one option might be to replace these expansion joints with a flush mount system.  It is important to understand that expansion joints exist because enabling movement of expanses of concrete is structurally necessary.  Additionally, based on the Long-Term Capital Needs Assessment for the stadium, E&A is aware that (a) the majority of expansion joints are original to the 20+ year-old facility, though many were refurbished from 2006 – 2010; (b) the life expectancy for these joints is in the 20-25 year range, which places them near the end of their service life; and (c) a phased replacement has already been planned.[13]  As a result, it is premature to opine or assess whether it is "readily achievable" today to eliminate any excessive vertical changes in level at the expansion joints.

iii.  Edgar's Cantina platform lift

Plaintiffs allege that the Edgar's Cantina lift requires a key for operation "and is thus not 'automatic.'" (Complaint ¶¶ 4.39–4.42.)  In prior seasons, a guest services employee operated the lift for spectators with a need.  E&A understands that an operational key is now maintained in the lift at all times during games and public events to enable unassisted operational access.  This fully addresses the issue identified in Plaintiffs' Complaint.

iv.  Concessions in "The Pen"

The Complaint states that food service lines for concessions in the Pen, such as Jack's BBQ and Dynamite Chicken, lack minimum clear width.[14]  (Complaint ¶¶ 4.44, 4.47–4.48.)

Our understanding is that the stanchions are set up and taken down for each game or for each other event at the stadium for which they are used.  This is consistent with our observation that not all the stanchions were set up during our visit and observation.  Thus, the clear width of the food service lines may vary on a daily basis, rendering it difficult to make any assessment of the conformance of these food service lines to applicable standards.  We are also aware that team personnel monitor stanchion placement, in the Pen and throughout the Stadium, to ensure accessibility.

At the time of E&A's observation, only Jack Daniels Bar had stanchions set up.  One area had less than 48" at the turn around an obstruction (end stanchion) measuring 39".  The remaining route through the stanchions was greater than 42" wide at 44" - 64".  For existing and

---

[13] *See* http://douglas-sma.com/wp-content/uploads/2018/05/Safeco_LTCNA_Revised_Draft_III.pdf.

[14] Per Section 5.5 of the 1991 Standards, "Food service lines shall have a minimum clear width of 36 in (915 mm), with a preferred clear width of 42 in (1065 mm) to allow passage around a person using a wheelchair."  The 2010 Standards are consistent in terms of accessibility dimensions.

future stanchion setup, a 42" minimum wide aisle width is preferred, with 48" minimum at the 180 degree turns.

### d.  Outstanding Issues

#### i.   Depth of seats in 300 Level

Plaintiffs claim that the depth of accessible seating area in the 300 Level does not comply with ADA requirements.  (Complaint ¶¶ 4.33–4.37.)  Using Section 342 as an example, for some of the wheelchair spaces provided, there is less than a 36" route behind the 48" deep wheelchair seating area due to the stairs behind the wheelchair seating.  These affected wheelchair spaces measure 78.5" deep from edge of wheelchair seating platform to concrete stair end wall due to maintenance of required egress width.  This is less than the 84" combined minimum depth of wheelchair space and 36" egress width.

Further feasibility assessment and consultation with the City is necessary to determine if the wheelchair spaces opposing the stairs behind the wheelchair spaces could be removed to create a total of four complying wheelchair spaces. Verification would also be needed to ensure that if the wheelchair seats are removed, the four remaining wheelchair spaces would be sufficient to meet the 2010 Standards and current Building Code for total number of wheelchair seating areas.

Subject to further design study to determine if it is readily achievable, an alternate solution, may be to remove some of the general seating below the wheelchair seats opposing the stairs so that the wheelchair seat platform can be extended to provide additional depth.  As a result, it is premature to opine or assess whether it is "readily achievable" today to eliminate the barrier alleged while maintaining this accessible seating.[15]

#### ii.   Depth of seats in Sections 180-181

Plaintiffs claim that the depth of accessible seating area in Sections 180 and 181 do not comply with ADA requirements.  (Complaint ¶¶ 4.33–4.37.)  Sections 180-181 measures 74" and 76" deep from edge of wheelchair seating platform to the pre-fabricated stair affecting four of the wheelchair spaces due to maintenance of required egress width. This is less than the 84" combined minimum depth of wheelchair space and 36" egress width.

Further feasibility assessment and consultation with the City is necessary to determine if the four wheelchair spaces opposing the opposing the stairs behind the wheelchair spaces could be removed.  Verification would also be needed to ensure that if the wheelchair seats are removed, the number of wheelchair seats meets the 2010 Standards and current Building Code for total number of wheelchair seating areas.

Subject to further design study to determine if readily achievable, an alternate solution may be to revise the temporary bleachers to allow the required depth or remove some of the general seating below the wheelchair seats opposing the stairs so that the platform can be extended to provide additional depth.  As a result, it is premature to opine or assess whether it is

---

[15] T-Mobile has more accessible seating than required.  As a result, one way to achieve compliance might be to remove these wheelchair seats, despite the fact that these seats are regularly used for accessible seating without known complaint.

ENDELMAN
&ASSOCIATES LLC

Accessibility Consulting  |  ADA-FHA Compliance

"readily achievable" today to eliminate the barrier alleged while maintaining this accessible seating.[16]

### iii.   Access to dugouts and bullpen

Plaintiff Brown alleges that her stepfather is a police officer who has assisted with security and that, "[d]ue to her stepfather's position, [she] would have been able to go into the bullpen but for the step that must be traversed to enter.  (Complaint ¶ 4.18.)  Plaintiff Brown also complains that access to the dugouts requires traversing a step.  (*See generally id.* ¶¶ 4.59–4.62.)

There is a wheelchair stair lift in the home dugout that was not operational during our visit to, and observation of, the dugout area.  If public access to the dugout is to be maintained, then one option would be to ensure that the existing wheelchair stair lift in the home dugout is operational.

Contrary to Plaintiff Brown's allegations, the bullpen does not require a step to enter; it is accessible from the concourse directly adjacent to the bullpen.

### iv.   100 Level view of high definition scoreboard

The Complaint alleges that "many of the accessible seats on the 100 Level" cannot see the HD Scoreboard.  (Complaint ¶¶ 4.21–4.25.)

As an initial observation, and depending upon the section, there are many non-accessible general seats on the 100 Level, within the same seating sections as accessible seats, that do not have an unobstructed view of the HD Scoreboard.  As a result, the lines of sight of these 100 Level accessible seats are comparable to the lines of sight of many general seats in conformance with Section 4.33.3 of the 1991 Standards.

Due to the angle of the accessible (and many general) seats on the 100 level, the view of the full HD Scoreboard is obstructed at some of these seats.  For similar reasons, this is also true for certain seats in the center field and right field bleacher sections, which have variously obstructed views of the HD Scoreboard.

E&A is also aware that there is a wide variety of communication means and options available for all spectators for conveying the same information available on the HD Scoreboard:

- Television screens are mounted above the seats and face the guests seated in the back of the 100 level.  These screens show live footage of the baseball game and feed from the scoreboard when the game is not actively in play, such as between innings or batters, or during mound visits or pitching changes.

- Public announcements are provided to guests throughout the stadium.  These announcements provide continuous information including information about the game such as upcoming batters and pitching changes.  Announcements are also made about events, such as on-field activities between innings, services, and amenities available to guests at the stadium.  The PA system is also used to broadcast the audio portion of entertainment that is provided to guests on the scoreboard.

- Guests are able to download applications for their smart devices such as Ballpark (https://www.mlb.com/mariners/apps/ballpark) and MLB At Bat (https://www.mlb.com/mariners/apps/atbat), that provide voluminous information about

---

[16] *See* n. 15 above.

# ENDELMAN
## & ASSOCIATES 2016
Accessibility Consulting | ADA-FHA Compliance

the baseball game and stadium.  Guests are made aware of these applications through promotional materials that are provided at the ballpark, on the Mariners' website and through Major League Baseball advertising and marketing..

- There is a hand-operated scoreboard adjacent to the left field foul pole.

- There is an out-of-town scoreboard above the bullpen in left-center field.

- Electronic screens run around the perimeter of the stadium at the base of the 200 level. These screens display sponsorship signage, in-game entertainment, baseball scores from out-of-town games, statistics and features from the game, and some sections display closed captioning.

Finally, to the extent there is some particular communication that only appears on the HD Scoreboard, some existing TV monitors, or additional TV monitors, could potentially be programmed to reflect the same information that is on the HD scoreboard.

## IV.    FACTS AND DATA CONSIDERED

- 1991 ADA Standards for Accessible Design (with its ADA Accessibility Guidelines [ADAAG] Appendix section revision dated July 1, 1994) under 28 CFR Part 36
- 2010 ADA Standards under 28 CFR part 36 subpart D
- Title III Technical Assistance Manual
- Title III Technical Assistance Manual 1994 Supplement
- "Accessible Stadiums," issued by U.S. Department of Justice, Civil Rights Division, Disability Rights Section (May 1996)
- Consent Order (March 24, 1998), *United States v. Ellerbe Becket, Inc.* (D. Minn., No. 4-96-995)
- Architectural PDF Drawings of Safeco Field
- Visual field inspections of each complaint item by Bart Sanderson E&A Associate, Technical Director, CASp, under my Principal level supervision
- 2015 Seattle Building Code with 2009 ICC A117.1 Technical Standards
- 1994 Uniform Building Code with WAC 51-40 Amendments
- Seattle Mariners ADA Audit dated 3-10-17
- Architectural and Transportation Barriers Compliance Board (now Access Board) July 1998 published ADAAG Manual, A Guide to the Americans with Disabilities Act Accessibility Guidelines
- Safeco Field Long-Term Capital Needs Assessment
- Defendants' Responses and Objections to Plaintiffs' First Interrogatories and Requests for Production
- Defendants' Supplemental Response to Plaintiff's Interrogatory No. 9
- Defendants' Responses and Objections to Plaintiffs' Second Interrogatories and Requests for Production

## V.     EXHIBITS

Exhibit A – "Accessible Stadiums"

Exhibit B – Ellerbe Becket Consent Order

# ENDELMAN & ASSOCIATES

Accessibility Consulting | ADA-FHA Compliance

---

## VI.  WITNESS QUALIFICATIONS

William E. Endelman, AIA, is a licensed Architect.  He founded and was Principal of Endelman & Associates PLLC (E&A) until his retirement December 31, 2018.  With over 30 years' experience in facility accessibility, architectural business operations, project management, and architecture in high level management positions for architectural, real estate and other design-related companies, Mr. Endelman consulted for major banking, institutional, educational, residential developer, legal, real estate asset management clients, and enforcing agencies in dozens of states.  Since 1995, Mr. Endelman has grown E&A from one person to a nationally recognized 12-person accessibility consulting firm, with work in over 30 states, and more than 1,000 clients.  Mr. Endelman has been hired as a Consultant and Expert Witness in Accessibility for several jurisdictions, consulting for the U.S. Attorney's Offices, the U.S. Department of Justice, State enforcing agencies, and attorneys for building owners and developers.

### Education, Licenses, Boards, & Affiliations

- Licensed Architect since 1977; CA #C9203; WA #5376; AZ #45387; NV #7358
- The Management Program, University of Washington, Graduate School of Business Administration, May 1991
- Master of Architecture, University of Pennsylvania, 1973
- BA in Architecture Honors Program, University of Pennsylvania, 1970
- Member American Institute of Architects (AIA); Code Committee Member
- National Council of Architectural Registration Boards (NCARB) #39334
- Guest Juror & Presenter for Univ. of Washington Architecture School, Universal Design Class 1998 and 2003, and Presenter - Accessibility Thematic Workshop (2004, 2006, 2008)
- Washington State Building Code Council – Appointed to Technical Advisory Group 2012 – present during new code cycles)

### Published Articles

- Published in "Corporate Real Estate Executive" by NACORE – "Making Buildings Disability Friendly May Be Easier Than You Think"
- Published in "Corporate Real Estate Executive" by NACORE – "Five Common Mistakes in Providing Accessibility"
- Published in "Cadence" – "Reflections on the Realities of CADD" – 1986

## VII.  CASE LIST

Mr. Endelman has been an expert witness and litigation consultant in the following accessibility cases.  There are other complaints which are confidential.

| Case | Client |
|---|---|
| U.S. v. Rose, at al. | U.S. Department of Justice – HCE Section |
| U.S. v. Cedar Builders, et al. | Perkins Coie, Attorneys for Cedar Builders |
| U.S. v. Hallmark, et al. | U.S. Department of Justice – HCE Section |
| U.S. v. Horsley, et al. | U.S. Department of Justice – HCE Section |

# ENDELMAN & ASSOCIATES
Accessibility Consulting | ADA-FHA Compliance

| | |
|---|---|
| U.S. v. Canal St. Apartments | U.S. Attorney Idaho – Marc Haws |
| U.S. v. Taigen and Sons, Inc. | U.S. Department of Justice – HCE Section |
| U.S. v. Pacific Northwest Electric, et al. | U.S. Department of Justice – HCE Section |
| Lincoln Property Company N.C., Inc. v. Wagner Architectural Team, Ltd. et al. | Manly & Stewart, Attorneys for Lincoln Property Company |
| U.S. v. Penn's Landing Partners, Brennan Beer Gorman, and Hyatt Hotels Corporation | U. S. Attorney Eastern Pennsylvania |
| State of Arizona v. Kolasa | State of Arizona - Office of the Attorney General |
| Dana Marshall and Access Now, Inc. v. The Kroger Company | Reeve Shima P.C., Attorneys for Defendant |
| Dana Marshall and Access Now, Inc. v. Taco Grande Northwest Inc. | Stoel Rives, Attorneys for Defendant |
| Jeffrey and Renee Broxon v. Lakewest Condominium Association | Robert M. Zoffel, Attorney for Plaintiff |
| Joann Tolentino and Joseph Tolentino v. Wenatchee Valley Hospital | Kornfeld Trudell Bowen and Lingenbrink PLLC, Attorneys for Plaintiff |

## VIII.    STATEMENT OF COMPENSATION

| | |
|---|---|
| Principal – Special Litigation Consulting – Preparation of Testimony in support of Legal issues; Negotiation Sessions and Mediations. – William E. Endelman Founder | $440 / hr. |
| Principal - Testifying Expert Services – Testimony and Depositions. – William E. Endelman Founder | $530 / hr. |

Respectfully submitted,

*William E. Endelman*

William E. Endelman, AIA, Founder and Previous Owner

Endelman & Associates PLLC

June 3, 2019

1

## **CERTIFICATE OF SERVICE**

2      The undersigned hereby certifies that, on June 10, 2019, I electronically filed the

3   foregoing document with the Clerk of the Court using the CM/ECF system which will send

4   notification of such filing to all counsel of record.

5

6

7   _____
    Rondi A. Greer

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CERTIFICATE OF SERVICE
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500