The Honorable Barbara J. Rothstein

1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT
8           WESTERN DISTRICT OF WASHINGTON AT SEATTLE
9

10   CLARK LANDIS, ROBERT BARKER,          NO.    2:18-cv-01512-BJR
     GRADY THOMPSON, and KAYLA BROWN,
11                                          **DECLARATION OF STEPHEN C.
             Plaintiffs,                    WILLEY IN SUPPORT OF
12                                          DEFENDANTS' OPPOSITION TO
        v.                                  MOTION FOR SUMMARY
13                                          JUDGMENT**
     WASHINGTON STATE MAJOR LEAGUE
14   BASEBALL STADIUM PUBLIC                NOTE ON MOTION CALENDAR:
     FACILITIES DISTRICT; and BASEBALL OF   June 14, 2019
15   SEATTLE, INC., a duly licensed Washington
     corporation, d.b.a. Mariners Baseball, LLC, a
16   duly licensed Washington limited liability
     company, d.b.a. The Baseball Club of Seattle,
17   LLLP, a duly licensed Washington limited
     liability limited partnership,
18
             Defendants.
19

20
21       I, STEPHEN C. WILLEY, declare as follows:
22       1.      I am a partner in the law firm Savitt Bruce & Willey LLP, counsel to Defendants

23   in this matter.  I am competent to testify and make this declaration based on personal

24   knowledge.

25       2.      I deposed James Terry, Plaintiffs' expert, on June 14, 2019.  Mr. Terry

26   previously submitted a declaration in support of Plaintiffs' Motion for Summary Judgment (*see*

27   ECF-20) and his deposition testimony is pertinent to several of the issues in dispute.

DECLARATION OF STEPHEN C. WILLEY - 1          **SAVITT BRUCE & WILLEY LLP**
(No. 2:18-cv-01512-BJR)                         1425 Fourth Avenue Suite 800
                                              Seattle, Washington  98101-2272
                                                     (206) 749-0500

3.      A true and correct copy of the transcript of Mr. Terry's deposition is attached hereto as ***Exhibit A***.

4.      As a general matter, Mr. Terry testified that he has not visited T-Mobile Park during the current 2019 baseball season and has not been at the stadium during a baseball game.  Ex. A at 18:17-23.

5.      With respect to **<u>sightlines</u>**:

- Mr. Terry testified that Section 4.33.3 of the 1991 ADA Standards requires a sightline over standing spectators.  Ex. A. at 42:16-19.  Mr. Terry acknowledges that those words do not appear in Section 4.33.3.  *Id.* at 42:23 – 43:6.

- Mr. Terry testified that Section 4.33.3 contains no detail or guidance as to what comprises compliant sightlines.  *Id.* at 43:7-23.

- Mr. Terry could not identify any statutory requirement, regulation or DOJ guidance in effect at the time T-Mobile Park was designed and built other than: (a) the 1991 Standards, (b) the 1993 Technical Assistance Manual, (c) the 1994 Supplement to the Technical Assistance Manual, and (d) the 1996 Accessible Stadiums document issued by the DOJ.  *Id.* at 58:13 – 63:6.[1]

- Mr. Terry testified that he had previously provided the same testimony (*i.e.*, that Section 4.33.3 requires sightlines over standing spectators) in the case *Independent Living Resources v. Oregon Arena Corporation*, 982 F.Supp. 698 (D. Ore. 1997) and that the Court disagreed with him.[2]  *Id.* at 63:9 – 64:18.

- Mr. Terry further testified that "Yes, that is was the Judge's opinion in that case. And so in that Circuit for the period of time, you know, my understanding is that is the way it was interpreted until it was relitigated."  *Id.* at 65:5-8; *see also id.* at 65:9 – 66:12.

---

[1] *See also* Defendants' Opposition to Motion for Summary Judgment (ECF-21) at 8:9 – 10:3.

[2] 982 F.Supp. at 758 ("Standard 4.33.3 does not presently require that wheelchair users be given lines of sight over standing spectators.")

DECLARATION OF STEPHEN C. WILLEY - 2
  (No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

- Regarding his sightline analysis, Mr. Terry testified that his analysis would differ and measured sightlines would improve if the measuring point for the wheelchair spectator varied (*e.g.*, the wheelchair user moved forward within the seating area) or the position of the putative standing spectator varied (*e.g.*, the standing spectator moved forward). *Id.* at 75:13 – 83:10.  Mr. Terry testified that he did not assess sightline analysis with any lateral movement for the spectator because "there would have been no point in doing that."  *Id.* at 79:5-9. Mr. Terry acknowledged, however, that accessible seating at T-Mobile Park is flex seating (*i.e.*, non-fixed) and that moving a wheelchair user laterally would make a difference in sightline.  *Id.* at 80:16 – 83:23.

- Mr. Terry has not identified any remedy—"no specific design solutions"—to address sightlines.  *Id.* at 66:13 – 68:23.

6.    With respect to **accessible seating distribution**:

- Mr. Terry testified that his opinions were premised on a "hybrid kind of analysis" that mixed the 1991 Standards and the 2010 Standards.  Ex. A at 130:3-19.  Mr. Terry further testified that the 2010 standards require vertical dispersal to all levels that are served by an accessible route, whereas the 1991 standards were "performance standards" that did not provide any such directive or guidance.[3]  *Id.* at 130:20 – 132:2.

- Mr. Terry testified that "[w]ith limited exceptions, I would say that it [T-Mobile Park] has good horizontal distribution."  *Id.* at 94:16 – 95:4.

- Mr. Terry testified that the 200 Level and the 300 Level at T-Mobile Park meet the standards for vertical dispersal of accessible seating.  *Id.* at 126:9 – 128:1.

- Mr. Terry testified that, in his opinion, the 100 Level seats do not have sufficient vertical dispersal, but he did not have a proposed remedy and has not done any sort of feasibility study.  *Id.* at 121:14 – 122:22; 128:11-13.

[3] *See also* Declaration of Malcolm Rogel (ECF-22) at ¶¶ 4-11.

DECLARATION OF STEPHEN C. WILLEY - 3
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

- Plaintiffs' Motion for Summary Judgment argues that "to become even arguably compliant with either the 1991 or 2010 ADA Standards, T-Mobile Park must offer a dramatically increased number of wheelchair accessible seats closer to the playing field – for instance by increasing the proportion of wheelchair accessible seating within the first 15 rows of the field from 0.115% to 16%." ECF-10 at 13:4-7.  In his deposition, Mr. Terry testified that he had not done this calculation, "so I can't say whether I agree with it or not."  Ex. A at 132:3-16.  Mr. Terry testified that the Plaintiffs' assertion "sounds like it is probably right for the 2010 Standards for vertical dispersal for new construction" but "I don't have an opinion, I haven't studied it."  *Id.* at 132:17 – 133:9.

7. With respect to **ticket pricing for accessible seating**:

   - Mr. Terry testified that his opinion was based on the "preamble" to the 2010 regulations and having read "thousands and thousands of pages on this topic over the last 29 years."  Ex. A at 102:5-15; 106:11-16; 110:12 – 112:6.

   - Mr. Terry testified that the factual predicate for the opinion in his report was a search he did on Ticketmaster on April 16, 2019 for a single game on May 28, 2019.  *Id.* at 99:2 – 100:15; 112:20 – 114:18.

8. In his declaration submitted to the Court, Mr. Terry opined regarding a "Shortstop Beer" stand at T-Mobile Park.  ECF-20 at ¶ 20.  In his deposition, however, Mr. Terry testified that (a) his expert report made no mention of a "Shortstop Beer" stand; (b) he was not sure if he had measured a "Shortstop Beer" stand; and (c) he did not have knowledge as to whether the "Shortstop Beer" stand was compliant with the ADA.  Ex. A at 34:14 – 38:3.[4]

9. In his declaration submitted to the Court, Mr. Terry opined regarding Edgar's Cantina and Edgar's Home Run Porch.  ECF-20 at ¶¶ 25-28.  In his deposition, however, Mr. Terry testified that (a) his expert report did not state any opinion regarding table heights or counter heights for Edgar's Cantina or Edgar's Home Run Porch; and (b) these cafes were not

---

[4] *See also* Declaration of Trevor Gooby (ECF-25) at ¶ 14.

DECLARATION OF STEPHEN C. WILLEY - 4
(No. 2:18-cv-01512-BJR)

set up and operational on the day he visited T-Mobile Park (February 5, 2019).  Ex. A at 26:15 – 32:21.[5]

10.     In his declaration submitted to the Court, Mr. Terry opined regarding 200 level drink rails.  ECF-20 at ¶ 31.  In his deposition, however, Mr. Terry testified that he had erroneously assumed that there was wait service at the rails and, as a result, Section 5.2 of the 1991 Standards was inapplicable.  Ex. A at 158:12 – 160:20.[6]

11.     In his expert report, Mr. Terry opined that queue line stanchions created a concession line barrier.  ECF-20 at Ex. A (at p.23); *see also* Plaintiff's Motion for Summary Judgment (ECF-19) at 17:15 – 18:2.  In his deposition, however, Mr. Terry testified that he had no personal knowledge of the stanchion placement for queue lines at T-Mobile Park, had never measured any stanchion placement, and that his opinion was based on looking at two photographs taken by someone else at one game in August 2018.  Ex. A at 160:21 – 162:21.[7]

**I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed this 21st day of June, 2019 at Seattle, Washington.

_____*/s/ Stephen C. Willey*_____
Stephen C. Willey

---

[5] *See also* Gooby Declaration at ¶¶ 15, 16.
[6] *See also* Gooby Declaration at ¶ 17.
[7] *See also* Gooby Declaration at ¶ 18.

DECLARATION OF STEPHEN C. WILLEY - 5
(No. 2:18-cv-01512-BJR)

# EXHIBIT A

## Page 1

1       UNITED STATES DISTRICT COURT

2       WESTERN DISTRICT OF WASHINGTON

3              AT SEATTLE

4

5   CIVIL ACTION NO: 2:18-CV-01512

6

7   CLARK LANDIS, ROBERT BARKER, GRADY THOMPSON, AND

8   KAYLA BROWN,

9        Plaintiff,

10  vs.

11  WASHINGTON STATE MAJOR LEAGUE BASEBALL STADIUM

12  PUBLIC FACILITIES DISTRICT AND THE BASEBALL CLUB OF

13  SEATTLE, LLP,

14       Defendants.

15

16          DEPOSITION

17             OF

18          JAMES TERRY

19      BIRMINGHAM, ALABAMA

20        JUNE 14, 2019

21

22  REPORTED BY: Caila Bonds

23        Court Reporter

## Page 2

1           S T I P U L A T I O N S

2

3        IT IS STIPULATED AND AGREED by and

4   between the parties through their respective counsel

5   that said deposition may be taken before Caila

6   Bonds, Court Reporter;

7        That the signature to and the reading

8   of the deposition by the witness is waived, the

9   deposition to have the same force and effect as if

10  full compliance had been had with all laws and rules

11  of Court relating to the taking of depositions:

12       That it shall not be necessary for any

13  objections to be made by counsel to any questions,

14  except as to form or leading questions, and that

15  counsel for the parties may make objections and

16  assign grounds at the time of trial, or at the time

17  said deposition is offered in evidence or prior

18  thereto.

19

20

21

22

23

## Page 3

1          A P P E A R A N C E S

2   FOR THE PLAINTIFF:

3       MR. CONRAD REYNOLDSON

4       Washington Civil & Disability Advocate

5       4115 Roosevelt Way NE

6       Suite B

7       Seattle, Washington 98105

8

9   FOR THE DEFENDANT:

10      MR. STEVE WILLEY

11      Savitt, Bruce & Willey, LLP

12      Joshua Green Building

13      1425 Fourth Avenue

14      Suite 800

15      Seattle, Washington 98101

16

17

18

19

20

21

22

23

## Page 4

1          EXAMINATION INDEX

2

JAMES TERRY

3       DIRECT BY MR. WILLEY . . . . . . . . . . 5

4

5

6          EXHIBIT INDEX

7

Defendant's

8   3   Plaintiff's Motion for Summary Judgement 10

9   2   Declaration              11

10  1   Expert Report              14

11  4   Diagram of the field            95

12  5   Diagram of the field            95

13

14

15

16

17

18

19

20

21

22

23

**James Terry**                                                    **6/14/2019**

Pages 5 to 8

---

Page 5

1      I, Caila M. Bonds, a Court Reporter of

2   Birmingham, Alabama, and a Notary Public for the

3   State of Alabama, acting as Commissioner, certify

4   that on this date, pursuant to Rule 30 of the

5   Alabama Rules of Civil Procedure and the foregoing

6   stipulation of counsel, there came before me at

7   Office of Birmingham Reporting Services, 600 20th

8   Street North, Birmingham, Alabama, on the 14th day

9   of June, 2019, commencing at around 2:30 p.m., JAMES

10  TERRY, witness in the above cause, for oral

11  examination, whereupon the following proceedings

12  were had:

13

14            JAMES TERRY,

15   being first duly sworn, was examined and testified

16            as follows:

17

18         DIRECT EXAMINATION

19  BY MR. WILLEY:

20      Q.   Good afternoon, Mr. Terry, my name is

21  Steve Willey and I represent the Defendant's in this

22  matter. Could you please state your full name for

23  the record?

---

Page 6

1      A.   It is James Leslie Evan Terry.

2      Q.   And you are employed by Evan Terry

3   Associates, LLC?

4      A.   Yes.

5      Q.   And you are the CEO of that entity?

6      A.   That is correct.

7      Q.   Who are the members of the LLC?

8      A.   Neal H. King Jr., Jeffrey Fowler and Todd

9   Hollingsworth, and I can't remember their middle

10  initials.

11     Q.   That is okay. Are you also a member?

12     A.   I am, uh-huh.

13     Q.   Have you been deposed before?

14     A.   Yes.

15     Q.   How many times, roughly?

16     A.   Roughly fifteen, could be ten, could be

17  twenty, but I think it is around fifteen.

18     Q.   Fair enough. When were you most recently

19  deposed?

20     A.   Good question, I think that is in my

21  report. It was possibly -- yeah, I need to look at

22  my report to tell you. It has been within the last

23  six months or so.

---

Page 7

1      Q.   Okay. Fair enough.  You probably know the

2   drill here, but for record and to make sure we are

3   on the same page we walk through it, this is an

4   opportunity for me to ask questions and for you to

5   answer them. If you do not understand a question,

6   please let me know. I will do my best to rephrase

7   or --

8      A.   Let me turn the volume down.

9      Q.   You recognize that the oath you have

10  taken is the same as in the Court of law, felony of

11  perjury?

12     A.   Yes, I do.

13     Q.   And if you will do this, let me finish my

14  question and I will do my best to let you finish

15  your answer, okay?

16     A.   Okay.

17     Q.   That makes it easier for the Court

18  Reporter who is doing her best to transcribe this in

19  a clear fashion.

20     A.   Yes.

21     Q.   It is possible there may be objections by

22  Mr. Reynoldson, and if so, you still need to answer

23  the question unless Mr. Reynoldson advises you not

---

Page 8

1   to.

2      A.   Okay.

3      Q.   All right. How did you prepare for

4   today's deposition?

5      A.   Kind of briefly glanced back through my

6   report, and looked at just some of the other

7   documents that I have been collecting in going

8   through this, and talked, yesterday, to Conrad and

9   to Steve Conner to find out, you know, how they

10  wanted me to approach the deposition, because

11  sometimes different attorneys have different

12  approaches, you know, short answer versus long and

13  detailed, teaching sessions, basically was the

14  question.

15     Q.   Fair enough. I don't want to know about

16  your communication with Conrad or Steve.

17     A.   Okay. All right.

18     Q.   Did you meet or communicate with anyone

19  else to prepare for today's deposition?

20     A.   I don't recall anything where I -- I

21  certainly didn't meet with anybody, but as to -- I

22  don't think I talked to anybody in preparation for

23  this. I talked to some people in preparation for my

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**James Terry**                                    **6/14/2019**

---

Page 9

1    report, but not in preparation for the deposition.

2        Q.   A couple of answers ago you mentioned

3    looking at other documents, what are the other

4    documents you looked at beyond your report?

5        A.   Documents that were referenced in my

6    report, as well as some other documents that were in

7    response to things that Mr. Endelman had said where

8    I had a different recollection and I was trying to

9    check source documents.

10        Q.   Okay. Do you recall in particular

11    anything you looked at?

12        A.   Looking at documents, for example, AIA

13    memo talking about complaints in stadiums related to

14    lack of sightline over standing spectators, looked

15    at -- I guess, graphic standards and human scale

16    were both in the -- in my report. Looked at some

17    articles and newspapers related to Department of

18    Justice positions in relation to line of sight over

19    standing spectators in the early 90's.

20        Q.   Okay. Did you review any legal papers?

21        A.   Legal papers meaning what?

22        Q.   A motion, a declaration, anything of that

23    sort, legal papers within this case?

---

Page 10

1        A.   Within this case? No.

2        Q.   Yes. Did you review the plaintiff's

3    motion for summary judgment?

4        A.   No, I don't think so, unless it has been

5    a long time ago. I haven't reviewed anything lately.

6        Q.   Did you review it before it was filed?

7        A.   I don't know -- how long ago would the

8    document you are talking about have been filed?  I

9    mean, there are lots of legal papers that go back.

10    I don't know what you are talking about. If you have

11    a copy of it, I can maybe look at it and see if I

12    know what you are talking about.

13        Q.   Sure. That would be Exhibit 3.

14            (Defendant's Exhibit 3 was marked

15            for identification.)

16        Q.   This document, Mr. Terry, was filed on

17    May 20 of this year, 2019.

18        A.   Okay. I see that date on it.

19        Q.   And the question is only did you review

20    this before it was filed?

21        A.   And I am trying to look through it to see

22    if anything looks familiar.

23        Q.   Well, let me do this, if the Court

---

Page 11

1    Reporter would also hand Mr. Terry Exhibit 2.

2            (Defendant's Exhibit 2 was marked

3            for identification.)

4        Q.   Exhibit 2, Mr. Terry, is a declaration

5    that is in your name and was filed in support for

6    the motion for summary judgment that is Exhibit 3.

7    Is that your signature on page five?

8        A.   Yes, it is, and I did review this

9    document.

10        Q.   Okay. So you did review the declaration,

11    it was correct and accurate when filed?

12        A.   Yes, as -- when I signed it it was. I

13    haven't read through it to make sure that everything

14    is exactly the same as what I signed, but yeah, we

15    worked on this one together to make sure that it

16    was -- that it was, you know, accurate and expressed

17    opinions.

18        Q.   Okay. And so my question then goes back

19    to the prior document, did you review that motion

20    before it was filed?

21        A.   I don't recognize it. I am looking to try

22    to see -- yeah, this looks like it is all legal

23    stuff and I am not a lawyer, so I don't --

---

Page 12

1        Q.   My question --

2        A.   I don't retain the legal -- I don't

3    retain the legal pleadings and references and all

4    those kind of things that are in the front. Let me

5    see the other things in here. I don't recall

6    reviewing this, at least not in this form.  There

7    may have been things that we talked about in it, but

8    I am still only on page fifteen of twenty-three, so.

9        Q.   I am really not asking you to read it

10    all, all though you are welcome to.  What I am

11    interested in is whether you reviewed it and what I

12    understand is you are not sure?

13        A.   I am not sure.

14        Q.   Fair enough. So you don't have an opinion

15    about whether or not there is anything in that that

16    you disagree with?

17        A.   Unless I read it, no, I -- I have not had

18    a circumstance where I disagreed with something and

19    they disagreed with that without explaining, so I

20    mean, I don't -- I haven't had a circumstance where

21    we -- I disagreed with something that they were

22    writing that they showed me. That was -- that they

23    didn't change, so, but again, we have mainly been

---

**James Terry**                                                    **6/14/2019**

Page 13

1   dealing with, like, this declaration and so, but I
2   don't know. I can't -- unless I read this and use my
3   reference materials to see exactly what they are
4   referring to in the things that they put here, but I
5   don't recall reviewing this document as it stands in
6   front of me now.
7       Q.  Fair enough. Did you review any of the
8   declarations that were filed by the Defendant's in
9   their response to that motion?
10      A.  To this motion?
11      Q.  Yes. For example, did you review Malcolm
12  Rogel's declaration?
13      A.  I don't remember it. If you can put it in
14  front of me, it might refresh my memory.
15      Q.  Did you review Trevor Gooby's
16  declaration?
17      A.  I don't recognize that name and I don't
18  believe so, but I would have to see it to know if
19  there was something in there that I was supposed to
20  have learned that I don't know yet or didn't know. I
21  don't --
22      Q.  Fair enough.
23      A.  -- recall.

Page 14

1       Q.  If the Court Reporter would provide the
2   witness with Exhibit 1.
3           (Defendant's Exhibit 1 was marked
4           for identification.)
5       A.  Okay. I have it.
6       Q.  Exhibit 1, Mr. Terry, is labeled as the
7   expert report of James L. E. Terry, is that your
8   expert report?
9       A.  It is, at least the first page is.
10      Q.  Well, you are welcome to flip through it
11  to make sure it is complete.
12      A.  You know, it is funny, I had a deposition
13  some years back where I was asked to, you know,
14  testify that something was mine and it was not. Most
15  of it was, but not all of it, so I try to be
16  cautious about an answer like that. This appears to
17  be the document. I am still going through, but this
18  appears be my report.
19      Q.  It should have thirty-two pages of text
20  and then it has attachments?
21      A.  This document does have thirty-two pages
22  of text -- I am checking to see if they are all
23  here -- text and images, and then there are

Page 15

1   attachments to it, I am looking to see if all of
2   those are here. The thirty-two pages are there.
3   Somebody has gone to some trouble to print some of
4   the attachments in 8 and a half by 11 to make it
5   easier to copy, I am sure. Looks like it is all
6   here.
7       Q.  Very good. If you would turn to section
8   two of your report, which begins on page five.
9       A.  Okay. I am there.
10      Q.  Is section two accurate and complete
11  regarding scope of your assignment?
12      A.  It is the scope of what the questions
13  that I was asked to answer in my report.
14      Q.  Got it. And does the report contain all
15  of your opinions?
16      A.  Oh no. No, I mean, if somebody asked me a
17  question in, you know, in trial or wherever else, I
18  will do my best to answer it, and if that involves
19  an opinion, I will give that. I mean, I have had a
20  number of cases where a judge would ask me a
21  question and I answer it. And if that opinion isn't
22  one that was in my report, I -- I still feel like I
23  need to be able to answer it. Or if --

Page 16

1       Q.  Have you developed to date any opinions
2   about this matter that are not in your report?
3       A.  Yes.
4       Q.  What are they?
5       A.  I had some opinions about things that
6   Mr. Endelman said in his report that were different
7   from his opinions.
8       Q.  Let me put it this way, are there
9   opinions that you plan to offer to the Court that
10  you have developed to date that are not in your
11  report?
12      A.  You know, that is a legal question and I
13  am not sure exactly what it means. Like I said, if
14  the judge asks me a question, I will do that. I am
15  not preparing any kind of documents right now and
16  haven't prepared any documents that I am going to
17  submit. I mean, one question I always ask is, hey,
18  do I need to do rebuttals, do I need to do anything
19  else, and I don't know of anything like that that --
20  that I am being asked to report as additional
21  opinions beyond what is in here.
22      Q.  Let me put it this way, if we were to
23  have a trial tomorrow and you were to go on the

**James Terry**                                                          **6/14/2019**

---

Page 17

1    stand and I were to ask you to please give your
2    opinions about this case that you are prepared to
3    offer as an expert witness, are they all in your
4    report or are there some that I don't know about?
5        A.  You know, I am not sure what you mean if
6    I were being asked to give my opinions in this
7    report.  I mean, the opinions that are written here
8    are the only opinions that I have written, they are
9    the only ones that I have been asked to write, and I
10   don't know schedule wise what might happen, what new
11   information might come up, but if we went to trial
12   tomorrow, I don't have anything else that is not
13   here, but if I am asked a question, my job as an
14   expert is to answer the question. And if that
15   question is an opinion or a fact or whatever, my
16   understanding is that I am supposed to answer it. So
17   --
18       Q.  But I am not asking you right or wrong, I
19   am only asking about the facts and what I understand
20   you to say is you don't know what will happen in the
21   future, but as of today your opinions are as in your
22   report?
23       A.  Other than what we have already talked

---

Page 18

1    about in relation to other opinions that I have not
2    put under my report because they were in response to
3    documents that came after my report, other than
4    those kinds of things, then I have no other opinions
5    that I am planning to present.
6        Q.  Okay. You are not preparing a
7    supplemental report?
8        A.  I am not.
9        Q.  Okay. Thank you. Your report mentions
10   that you visited T Mobile Park on February 5, 2019;
11   is that right?
12       A.  Yes.
13       Q.  It was a brisk winter day, as I recall?
14       A.  Ahh, yes.
15       Q.  That visit was not during a game, was it?
16       A.  It was not.
17       Q.  Have you ever visited T Mobile Park
18   during a game?
19       A.  I don't believe so.
20       Q.  And you have not visited the park during
21   a game during the 2019 season, correct?
22       A.  I have not.
23       Q.  Okay. So you don't have any knowledge,

---

Page 19

1    personal knowledge, of what is occurring within the
2    stadium during the current season, correct?
3        A.  When you say what is occurring, what do
4    you mean?
5        Q.  For example, you don't know how tables
6    are set up or where mobile concessions are stationed
7    or what is being shown on the TV screens, any of
8    those things, in 2019, you do not have personal
9    knowledge of?
10       A.  Those things I do not.
11       Q.  Okay. Who is Brenda Cummings?
12       A.  Brenda is a consultant that we used to
13   accessibility consulting work, survey work with us
14   primarily. She was formerly an employee at Evan
15   Terry Associates before she moved and now lives in
16   the Seattle area.
17       Q.  Got it. There is a reference in the
18   report to her visiting a game on August 5, 2018; is
19   that correct?
20       A.  That is correct.
21       Q.  Was Ms. Cummings working for you at the
22   time?
23       A.  She was, as a consultant.

---

Page 20

1        Q.  Okay.  Got it. So did she visit T Mobile
2    Park at your direction?
3        A.  Yes.
4        Q.  Okay. And how did you obtain information
5    from Ms. Cummings?
6        A.  A discussion with her and then she
7    uploaded her photographs so that I could see those,
8    and there may have been more than one discussion
9    with her actually.
10       Q.  Okay. Did she provide you information
11   other than a discussion and the uploaded
12   photographs?
13       A.  I don't recall any kind of written
14   report. Again, that has been a year almost and --
15   but I don't recall any kind of written report.
16       Q.  How many cases or matters are you
17   currently working on, Mr. Terry?
18       A.  Depends on how you define that. There are
19   active cases that I am working on, cases, matters,
20   investigations, clients that I would have, for
21   example, time charged to in a given two month
22   period, probably, I don't know, fifteen, twenty in
23   say for the last two months, just -- that is a

---

**James Terry**                                              **6/14/2019**

Page 21

1   guess.  The office would have more than that, many
2   of those that I wouldn't be involved in directly.
3       Q.  No, I am interested just in yours for the
4   moment.
5       A.  Uh-huh.
6       Q.  What portion of your practice, Mr. Terry,
7   is functioning as an expert witness?
8       A.  Over the last 25 years, probably in the
9   two to three percent range. In the last six months,
10  my personal time has been much more than that for
11  some reason. I don't know why.
12      Q.  Well, when you say much more, what do you
13  mean?
14      A.  Maybe five times that much, maybe six or
15  eight times that much. Well, excuse me, times that
16  much, no, I would have to look at my time sheet to
17  see, but a significantly higher percentage of my
18  time just recently than has normally been the case.
19      Q.  What other components of your practice
20  are not acting as an expert witness?  I am looking
21  for categories here.
22      A.  Plan reviews, ADA plan reviews, where we
23  are looking at proposed construction, surveying of

Page 22

1   existing facilities to help clients identify various
2   people with disabilities and help them figure out
3   how to keep track of those, remove those, and just
4   kind of manage the whole process, figure out what
5   the best way to do it is. That is the majority of
6   the work that we do. We are doing some work with a
7   company that we started called Corada that is
8   producing -- is coming up with software to help ADA
9   coordinators do their job with certification of
10  products as compliant with accessibility standards
11  and also with just providing information about
12  accessibility standards and the ADA to the general
13  public. And so I have spent more time than normal
14  with that, because of -- we are launching some of
15  those features on Sunday at the National Symposium.
16  Other things, some internal consulting, a good bit
17  of training.  So I do training at most of the
18  National Associations Conferences and some web based
19  training. And then just a fair amount of just
20  consulting where people have questions they need
21  answers to -- related to accessibility.  But all of
22  my work is now accessibility related. I am not doing
23  regular practice of architecture anymore.

Page 23

1       Q.  Thank you. If I could direct your
2   attention to section four of your report that is on
3   pages eight and nine.
4       A.  Yes.
5       Q.  You have some quotations here, several
6   quotations within this section four, what are you
7   quoting?
8       A.  The section that is listed above it.
9       Q.  And section 36.401 you are quoting there?
10      A.  Yes.
11      Q.  And is that the 2010 standards or the
12  1991 standards?
13      A.  You know, I can't recall which it is and
14  I don't recall any changes to those paragraphs in
15  the 2010 standards. But I would have to -- I would
16  have to look that up to see.  I mean, I drafted this
17  some time back for an expert report when somebody
18  questions, well, you know, why is an architect
19  somebody who should be able to opine about the ADA.
20      Q.  And I understand, all I was asking you
21  was what standard you were quoting from and you are
22  telling me you are not sure, you would have to look
23  it up?

Page 24

1       A.  It is either the -- well, they are not
2   standards, this is from the regulations, and so it
3   is either the '91 section from the regulations or
4   the preamble from that or it is the 2010 and I don't
5   recall which of those it is. That is easy to find
6   out though.
7       Q.  Okay. And as I understand, you are not a
8   lawyer; is that correct?
9       A.  That is correct.
10      Q.  Okay. And so none of your opinions are
11  legal opinions, correct?
12      A.  I try to stay away from legal opinions
13  and I am telling you the opinions of an expert under
14  the ADA and other accessibility standards.
15      Q.  I am just clarifying, you are not
16  offering legal opinions, that is all.
17      A.  I am not.
18      Q.  Okay. You have a quotation here at the
19  bottom of that section four, right, that talks about
20  architects having a quote, professional
21  responsibility to possess independent understanding
22  of the facility related requirements of the ADA if
23  they are to practice their profession; do you see

**James Terry**                                                    **6/14/2019**

Page 25

1  that?

2    A.  I do.

3    Q.  What does that mean?

4    A.  There is a lot of information that an

5  architect is responsible for understanding and

6  applying in the buildings that they are designing or

7  the facilities they are designing, if they are not

8  buildings.  And the architect is expected to know

9  those, to understand those in order to be able to do

10  their job.  Just like you have to know the building

11  code, you have to understand that in order to be

12  able to design a building that complies with it. The

13  ADA isn't a building code, but it is in a similar

14  way there is information both in the standards and

15  in the regulations that an architect has got to

16  know. A lot of the things that people would think

17  would be in the standards are actually not there,

18  but they are in the regulations.  And so it is my

19  opinion that to perform professional services, you

20  have got to be aware of those kind of things.  And

21  in fact, most contracts now require the architect to

22  agree that they are designing in compliance with

23  these.

Page 26

1    Q.  There is a phrase here I am trying to

2  understand, it is independent understanding, and you

3  mean independent as in the individual or independent

4  of something, like independent of standards; what

5  does independent mean?

6    A.  Independent understanding, meaning as a

7  professional you are personally responsible for

8  understanding it without having to ask your client's

9  attorney or your own attorney at every turn what

10  this means from a legal standpoint in order to be

11  able to practice. You have got to get a familiarity

12  with these regulations and standards so that you can

13  do that without burdening the client to interpret

14  every single piece of it.

15    Q.  Okay. If you could look at your

16  declaration please, it is Exhibit 2.

17    A.  I am there.

18    Q.  Okay. In Paragraph twenty-five.

19    A.  Yes.

20    Q.  And in paragraph twenty-six and twenty-

21  seven and twenty-eight, you talk about what the

22  tables are in Edgar's Cantina and Edgar's Cantina

23  Home Run Porch; is that correct?

Page 27

1    A.  Yes.

2    Q.  Do you opine on the seating in those

3  facilities in your report?

4    A.  Opine about the seating?

5    Q.  In those -- in your report.

6    A.  I don't recall. I can look that up if

7  you'd like.

8    Q.  You are welcome to look at it. I am not

9  trying to make this a trick or a memory game.

10    A.  Okay. I mention the tables on the bottom

11  of page twenty-three.

12    Q.  Yes, you do.  But I don't believe you are

13  opining about their height or not.

14    A.  Not in that case, no.

15    Q.  Right. And you are not opining about the

16  tables in Edgar's Cantina Homerun Porch in your

17  report either, are you?

18    A.  I don't believe so.

19    Q.  So what would be the basis of your

20  opinion that the Edgar's Cantina Homerun Porch

21  exclusively features tall standing height tables and

22  dining counters?

23    A.  You know, I have to look back at my

Page 28

1  photographs of it. It -- those were the only ones

2  that I saw set up while we were there, and as I

3  said, they were the tables, I don't recall seeing

4  chairs set up.  There were chairs stacked in a

5  number of places around the stadium, I don't recall

6  what the status of them was in that location, but I

7  didn't see anything lower, but there were a lot of

8  tables down in that area. Now there were two -- two

9  areas that -- there were to kind of stacked Edgar's

10  places and there was a difference in the way that

11  they were set up, but I don't recall seeing any low

12  tables in that area.

13    Q.  So the day that you were there, February

14  5th, was not a day anything was happening at the

15  stadium, correct?

16    A.  They were doing construction on the

17  seating --

18    Q.  Let me make it clear, there were no

19  events going on?

20    A.  No, there was no event.

21    Q.  And so Edgar's Cantina Homerun Porch was

22  not set up for operation and patronage that day,

23  correct?



Page 29

1  A.  That is correct.
2  Q.  And so on the day you saw it, you saw it
3  in an un-setup state with chairs stacked and tables,
4  but it wasn't operational?
5  A.  I would say it was partially set up, but
6  not operational.
7  Q.  Okay. And so it would not be then
8  factually accurate to say that that Homerun Porch
9  exclusively features tall standing height dining
10  tables, right?
11  MR. REYNOLDSON:  Object to the form.
12  A.  Yeah, I wouldn't say that it is not
13  factually accurate, because I have no evidence to
14  contradict that. What I am saying is that it
15  reflects what I saw when I was there.
16  Q.  Well, it would be then accurate to say,
17  on the day I was there, Edgar's Cantina had only
18  tall standing height tables, but it was not
19  operational, would that be accurate?
20  A.  It would be.
21  Q.  Right. But to say it exclusively features
22  tall standing height tables, there is no factual
23  support for that?

Page 30

1  MR. REYNOLDSON:  Object to the form.
2  A.  Yeah, my understanding of the reports
3  that I write, particularly when I tell you that this
4  is the day that I visited, are, in my understanding,
5  that means that is what I saw when I was there, this
6  is what I have been able to tell from my other
7  research, for example, Internet, et cetera, and from
8  photographs that I have seen, from all the
9  information that I have been able to collect, this
10  is what I believe the case is. Now, immediately
11  before my report is done or some time shortly before
12  my report, those kind of things could be changed,
13  things could be changed from what I see on the
14  Internet, things can be changed, I may have missed
15  something on the Internet, it is a big place, or
16  something could have been changed after my report
17  was done. My report reflects what I know about it,
18  what I could see and what I have been able to tell
19  from my research. I can't say that there is no other
20  information that is different from my report, this
21  is just what I know from what I have seen.
22  Q.  I understand and I appreciate that. I
23  just want to be clear that when we are looking at

Page 31

1  paragraph twenty-seven of your declaration, that is
2  Exhibit 2, that paragraph is not qualified in any
3  way; is that correct?
4  A.  It is not qualified in a way that you
5  would like to have it qualified, and which I have
6  agreed it could be qualified and still be accurate.
7  Q.  I am not actually debating with you about
8  what you might have looked at or might have seen, I
9  actually am only looking at what is said in this
10  declaration. So if one reads paragraph twenty-seven,
11  paragraph twenty-seven says, that the Edgar's
12  Cantina Homerun Porch exclusively features tall
13  standing height tables and dining counters. It does
14  not say as seen on February 5, as set forth in my
15  report, based on the research I have looked up on
16  the Internet, it doesn't say any of those things,
17  does it?
18  A.  I am sorry, maybe there is a legal
19  distinction here, and I am not a lawyer.
20  Q.  I am just asking you to answer my
21  question.
22  A.  Right. If you are asking -- if you are
23  asking that if I could have chosen a more precise --

Page 32

1  more precise language here that would reflect and
2  limit it only to what I actually saw and what my
3  research showed me and what the photographs I have
4  seen show, then I could have changed this wording to
5  say something else. I don't -- I mean, I am not
6  arguing that, but I don't have any evidence to say
7  that this is wrong. And I haven't, you know, I --
8  yeah, like I said, I am not a registered architect
9  in Washington, I am registered in a bunch of other
10  states. I am writing as an architect, not as a
11  lawyer. And if there is a legal distinction between
12  what this says and what you are saying, I don't hear
13  anything wrong with what you are saying, I am just
14  saying, you know, this is what I chose to say here
15  and say, yeah, for all the evidence that I have,
16  this is what I can see. Now, I have photographs that
17  I took while I was there that didn't give me any
18  indication that there was anything different from
19  what I have said in this. You know, I would be glad
20  to entertain, you know, information that might
21  change that opinion, but I haven't seen anything.
22  Q.  I am interested in paragraph twenty-
23  three.

Page 33

1    A.  Okay.

2    Q.  This is now paragraph twenty-three within

3  your declaration that is Exhibit 2?

4    A.  Yes.

5    Q.  It says that the Shortstop Beer Stand had

6  no lower counter; do you see that?

7    A.  Yes.

8    Q.  Is that something that you observed?

9    A.  It was.

10    Q.  Okay. I was under the impression that the

11  Shortstop Beer Stands were mobile concessions,

12  portable concessions, is that rue?

13    A.  I don't know. There were lots of portable

14  concessions that were set up, some of them had names

15  on them, some of them did not have names on them. I

16  was only allowed to spend six and a half hours in

17  the facility, so I had to choose what I measured and

18  what I didn't and I did not attempt to measure, you

19  know, all of the low counters. The one that -- the

20  one that I measured, this one, I believe was a --

21  was actually a built in one. And looks like I did

22  not put that photograph in my report. I would have

23  to look and -- it might take me a minute to look and

Page 34

1  see where I --

2    Q.  I don't recall there being --

3    A.  Right, I did not put that photograph in

4  my report that I can right right now, and so -- but

5  the ones that I called out were actually -- now I

6  call them fixed.  If you wanted to move them, you

7  can probably move them, but you probably have to

8  have a crew and some heavy mechanical lifting

9  equipment for the ones that I looked at. Like I

10  said, I don't know if they were attached to the

11  building or not, but they were very large where

12  somebody was -- would stand behind the counter

13  inside of a structure.

14    Q.  Let me direct you to page twenty-two of

15  your report, which is Exhibit 1.

16    A.  Okay. All right.

17    Q.  This refers -- I believe this is number

18  ten there at the bottom of the page, it is talking

19  about concession stands; is that right?

20    A.  Yes.

21    Q.  It does not mention the Shortstop Beer

22  Stand, is there a reason you didn't mention it here?

23    A.  Now that is a question. I don't remember

Page 35

1  why I didn't put it in here. And it is possible --

2  it is possible that in writing my report I did not

3  reflect all of the things that I saw and measured.

4  In fact, I know it doesn't, and that the -- the two

5  photographs that I was thinking about were the Hot

6  Box and the Paquitos Taco Bar Sales.

7    Q.  Which are mentioned in section ten here

8  on page twenty-two, correct?

9    A.  Yes.

10    Q.  But the Shortstop Beer, right, which you

11  are opining about in your declaration isn't

12  mentioned in your report, right?

13    A.  I don't see it in the report.  So it is

14  possible that the Shortstop Beer one was one of

15  those that was -- that was a short one, that was a

16  movable one and was not one of the built-ins and I

17  put a tape measure on that one, I just don't recall

18  at this point.

19    Q.  Okay. Your report says that the -- you

20  did not measure any movable concession stands; is

21  that correct?

22    A.  Okay. Defining measure, normally when I

23  measure something, I put a tape measure on it, I

Page 36

1  take a picture of it, I know exactly what that

2  dimension is. There are a lot of times when I am

3  walking around a facility where I look at an element

4  and I can just tell you, with usually -- for the

5  height of an element, within an inch or two or a few

6  inches, what that height is.  And in this particular

7  case we did not attempt to document those kind of

8  things. So I didn't measure, photograph and document

9  in my report as to whether, you know, we looked at

10  them and -- or whether we photographed them or not,

11  I just don't recall that. We did see -- we did see

12  movable elements around the facility and they were

13  not all compliant.

14    Q.  Let me just ask you very simply, is the

15  first sentence under section ten on page twenty-two

16  of your report accurate?

17    A.  Again, I think from a wording standpoint,

18  I could have been clearer.

19    Q.  I think it is a yes or no question. Is it

20  accurate or not?

21    A.  Again, as I explained, how you measure

22  something varies. So when I say -- when I say

23  measure, I normally am saying, I am putting a tape

**James Terry**                                                        **6/14/2019**

Page 37

1   measure on it, I am photo documenting it and I am
2   preparing it in that way.
3       Q.  Are you telling me that you measured some
4   movable concessions but did not say so here?
5       A.  I noticed that there were accessible
6   concessions that were not -- I mean that there were
7   movable concessions that were not in the height
8   ranges that they were supposed to be or don't appear
9   to have all of the elements. Again, I didn't see all
10  of those elements when I was onsite because
11  sometimes they are partnered together and so there
12  may have been a lower section that was with it when
13  I saw it and said, ehhh, that is not compliant, and
14  I just don't recall on that one. I would have to go
15  back through and look at my photographs to see what
16  the -- you know, what the -- what that comment was
17  based on.
18      Q.  Fair to say that you don't actually have
19  the knowledge as you sit here today about whether
20  the Shortstop Beer Stand is compliant?
21      A.  I don't have definitive knowledge of the
22  dimension on that particular type as we sit here
23  today. Again, it would be in my records, but I don't

Page 38

1   have that with me.
2       Q.  You just don't know?
3       A.  You could say that.
4       Q.  I would like to turn your attention to
5   page nine of your report, please.
6       A.  Okay. Got it.
7       Q.  Within section five, the number one, is
8   your discussion of lines of sight and I believe it
9   continues onto page twelve; is that correct?
10      A.  Yes.
11      Q.  Okay. And as I understand it, your
12  opinion is that T Mobile Park does not have
13  compliant lines of sight under 1991 standards or
14  2010 standards; is that correct?
15      A.  That is an over generalization.
16      Q.  Okay. Why don't you rephrase it
17  accurately for me?
18      A.  Of the locations that I studied, only one
19  of those had compliant lines of sight over standing
20  spectators.
21      Q.  So I believe you looked at ten locations;
22  is that correct?
23      A.  There were ten of them that I studied,

Page 39

1   yes.
2       Q.  You looked at and studied ten locations
3   and your opinion is that nine of those do not have
4   compliant sightlines and one does?
5       A.  That is correct.
6       Q.  Okay. So if we look at the last paragraph
7   on -- in section one on page twelve.
8       A.  Yes.
9       Q.  Are you there?
10      A.  Yes.
11      Q.  It is the paragraph that begins, it is
12  clear, right?
13      A.  Yes.
14      Q.  That is an over generalization, isn't it?
15      A.  No.
16          MR. REYNOLDSON: Object to the form.
17      A.  I don't believe it is.
18      Q.  Well, it doesn't say based upon the ten
19  locations I studied, does it?
20      A.  Oh, okay. Again, as I mentioned, I was
21  given six and a half hours to study this stadium.
22  And so everything that I have done has been
23  qualified by explaining exactly what I did and

Page 40

1   recognizing the fact that I did not measure
2   everything. I didn't measure two locations, I
3   measured ten. And so my opinion is based on what I
4   was allowed to find out by looking at this, now, by
5   looking at it, by studying everything I could study
6   in the six and a half hours I was allowed to be
7   there. And so if you are asking if I should have
8   made this thirty-two page report 200 pages in order
9   to add all the qualifications in every sentence and
10  paragraph, that would repeat that kind of
11  limitation, I didn't do that. I didn't choose to do
12  that. I stated exactly what I was basing my opinions
13  on. I stated the limitations on it. And
14  everything -- all of the opinions that I have put in
15  here are based on those limited things that I was
16  allowed to see. And so you can look at lots of
17  sentences in the report and take the same kind of
18  "well, you don't have enough information to make
19  that judgment," you can take that to as far as you
20  want to take it. But I think it is -- it is not
21  going to be supported by the process that I
22  followed, by the information that I listed, the
23  details that I gave, and what we found, and then by

**James Terry**                                              **6/14/2019**

---

Page 41

1   the evidence on the ground. I tried to get a very
2   representative sample of the spaces where most
3   wheelchair users would want to go and I based this
4   on what I saw from those. Now, I have done dozens
5   and dozens of stadium facilities and so when I --
6   when I chose these spots to take these, I did that
7   in a way that would be what I felt like was
8   representative, based on my experience as a stadium
9   accessibility expert.
10      Q.  Mr. Terry, I was not asking you questions
11  about your statistical sampling. What I was
12  interested in and that I started this line of
13  questioning was by asking whether or not your
14  opinion is that T Mobile Park does not have proper
15  lines of sight for accessible seating under either
16  the 1991 or 2010 standard.  And your response was
17  telling me that was an over generalization. You then
18  qualified it and said that if you were to rephrase
19  it you would say, based upon the ten locations I
20  looked at, nine of them, I believe, were not
21  compliant. Then I asked you why you didn't have the
22  same language in your report. That is all. So you're
23  familiar with section 4.33.391 standards, correct?

---

Page 42

1       A.  Yes.
2       Q.  And that requires that wheelchair areas
3   shall be an integral part of any fixed seating plan
4   and shall be provided so as to provide people with
5   physical disabilities a choice of admission prices
6   and lines of sight comparable to those for members
7   of the general public, end quote; right?
8       A.  I didn't -- I don't have a copy of the
9   standards in front of me to know if that is the
10  exact quote, but that is generally what it says.
11      Q.  Okay. And the seating for -- accessible
12  seating also means to adjoin an accessible route as
13  a means for egress in case of emergency; is that
14  correct?
15      A.  Yes.
16      Q.  Do the '91 standards in section 4.33.3
17  provide a requirement of sightline over standing
18  spectators?
19      A.  Yes.
20      Q.  Does it say that anywhere in the section
21  4.33.3?
22      A.  Yes.
23      Q.  Where does it say that?

---

Page 43

1       A.  Lines of sight comparable to those for
2   members of the general public.
3       Q.  Fair enough. I understand, but the phrase
4   or the words sightlines over standing spectators are
5   not there, are they?
6       A.  The words are not there.
7       Q.  Okay. Is there any detail or specific
8   guidance in 4.33.3 as to what comprises compliant
9   lines of sight?
10      A.  It is a performance standard and so it
11  requires the designers and the contractors and the
12  owners to achieve the level of performance specified
13  so it does not do prescriptive requirements. It is
14  not a prescriptive section of the standard.
15      Q.  My question is is there any details or
16  guidance as to what comprises compliant lines of
17  sight in section 4.33.3?
18      A.  Details are prescriptive standards. This
19  is not a prescriptive standard.
20      Q.  So the answer is no?
21      A.  It is not a prescriptive standard, so it
22  does not have the details that a prescriptive
23  standard would have.

---

Page 44

1       Q.  Okay. Are you familiar with the Technical
2   Assistance Manual that came out in November 1993
3   regarding Title 3?
4       A.  Was it '93?
5       Q.  There is a Technical Assistance Manual in
6   November 1993, are you familiar with it?
7       A.  I know that one came out then and it was
8   amended maybe the next year. It was added to.
9       Q.  That is correct. There was a '94
10  supplement.
11      A.  Yes.
12      Q.  Okay. Are you familiar with the Technical
13  Assistance Manual that came out in November 1993?
14      A.  Yes.
15      Q.  Does it make any mention of sightlines
16  over standing spectators?
17      A.  I don't recall. If I have a copy of it, I
18  can look at it.  I know that your expert testified
19  that it did not, but I haven't gone back to look at
20  it since then.
21      Q.  Okay. You just don't recall. That is
22  fair. Do you know if the Technical Assistance Manual
23  for 1993 provided any detail or guidance as to what

---

**James Terry**                                      **6/14/2019**

Page 45

1  comprises compliant lines of sight?
2      A.  I haven't gone back to look at it, so I
3  don't recall.
4      Q.  There was a Technical Assistance Manual
5  supplement in November 1994; do you recall that?
6      A.  I do.
7      Q.  Did that make any mention of lines of
8  sight over spectators in the stands?
9      A.  I have not gone back to look at it, so I
10 don't recall, but I know your expert testified that
11 it did, in his expert report.
12     Q.  You just don't know it?
13     A.  I didn't go back to look at it.
14     Q.  Fair enough. You don't know as you sit
15 here today?
16     A.  As I sit here today, I am not going to
17 quote from a document that I haven't reviewed enough
18 to know what it said.
19     Q.  Fair enough. That is all I am asking.
20     A.  Okay.
21     Q.  Do you know if the supplement provided
22 any anthropometric data regarding how one goes about
23 measuring standing spectator eyesight?

Page 46

1      A.  I don't believe it did.
2      Q.  Are you familiar with the Accessible
3  Stadium Document DOJ issued in 1996?
4      A.  Yes.
5      Q.  Are you familiar with what it says about
6  lines of sight?
7      A.  Yes, generally.
8      Q.  It says that in stadiums where spectators
9  can be expected to stand during the show or event,
10 paren, for example, football, baseball, basketball
11 games or rock concerts, end paren, all or
12 substantially all of the wheelchair seating
13 locations must provide a line of sight over standing
14 spectators; right?
15     A.  I don't know if that is a quote or not,
16 but that is the idea, yes.
17     Q.  Okay. It talks about a, quote, comparable
18 line of sight, end quote, being one that, quote,
19 allows a person using a wheelchair to see the
20 playing surface between the heads and over the
21 shoulders of the persons standing in the row
22 immediately in front, and over the heads of the
23 persons standing two rows in front, end quote.  Is

Page 47

1  that consistent with your understanding of the
2  Accessible Stadium document?
3      A.  Yes.
4      Q.  Did it provide any anthropometric data in
5  terms of figuring out whether or not there were
6  lines of sight that were compliant with that
7  direction?
8      A.  It did not.
9      Q.  Is that a prescriptive document?
10     A.  It is -- it is not a prescriptive
11 standard. It is a performance -- it is a performance
12 standard with more information in it than the
13 original 1991 paragraph 4.33.3. It is still a
14 performance standard.
15     Q.  And more than the supplement in 1994?
16     A.  Okay.
17     Q.  Do you disagree?
18     A.  I don't disagree.
19     Q.  Okay. Is there any mention in the
20 Accessible Stadium document of what part of the
21 playing surface one has to have a line of sight to?
22     A.  It is comparable lines of sight, so it
23 would be whatever the people in comparable seats

Page 48

1  would have.
2      Q.  Has the DOJ ever indicated anthropometric
3  data in regulations with respect to sight line?
4      A.  In a regulation have they specified the
5  actual anthropometric data?
6      Q.  Yep.
7      A.  Not to my knowledge.
8      Q.  If you were to look for guidance from the
9  DOJ as to what anthropometric data one might use,
10 what would you look to?
11     A.  I think it would depend on the
12 circumstance, so because it was a -- it would depend
13 on when that was given to me and it would depend
14 on what the circumstances were. So if I were being
15 asked by a stadium designer what would you do versus
16 being asked by a plaintiff or by the Department of
17 Justice, what is the absolute minimum that they
18 should have done, then I would give both of those
19 answers, and in fact do that now. Now meaning in my
20 current practice I will tell people that
21 information.
22     Q.  Fair enough. And I recognize there may be
23 a range of guidance you might give. If one were to

Page 49

1   look to the DOJ for specific guidance with respect
2   to anthropometric data to use in measuring
3   sightlines, what would you look to?
4       A.  I would look at the settlement agreements
5   that they have reached with stadium designers, with
6   stadium owners and say what kind of numbers have
7   they agreed to in their settlement agreements,
8   consent decrees, whatever type of action they have
9   had, what have you agreed to as the minimum that you
10  would be willing to accept to in order to drop the
11  investigation, drop the suit, settle the suit or
12  whatever. And those numbers are the Ellerbe Becket
13  numbers that were the best available at the time
14  that these -- that these cases were going and that
15  most of these facilities were being designed. That
16  was the best anthropometric data that anybody had in
17  the design profession.
18      Q.  Are you talking about the consent order
19  in the Ellerbe Becket case that was issued in late
20  1998?
21      A.  Yes, and other cases that were before
22  that.
23      Q.  Okay. What are the other cases before

Page 50

1   that that you are referring to?
2       A.  Well, certainly the Olympic facilities
3   that else Becket designed in Atlanta that were in
4   operation in mid '96, so they were designed, you
5   know, years before that, year to two years before
6   that, and they were using them in the same -- I am
7   sorry.
8       Q.  Did the anthropometric data, whatever it
9   was, if it was in the settlement regarding the
10  Olympic stadium in Atlanta, is that public?
11      A.  You know, I haven't seen that in the
12  Department of Justice's web site. I can tell you
13  that it is in my files from as early as '95 that
14  Justice was telling people that.  We worked as their
15  expert on the aquatic center for the Olympics and
16  those were the numbers that we were using then. So I
17  have records going back to then and Ellerbe Becket
18  was getting that.
19      Q.  And --
20      A.  And before that.  Those same numbers have
21  been floating around for a long time.
22      Q.  Is there any publicly available
23  information from the DOJ as to anthropometric data

Page 51

1   to use prior to Ellerbe Becket?
2       A.  I don't know how public that information
3   was. I know that they were telling architects that
4   as early as '93, but I don't know -- I don't know if
5   they published any of those things for general
6   publication. You remember that was before the
7   Internet, so it wasn't like you could put it on the
8   Internet and everybody could find it really easily,
9   you had to do searches for it. I know it was an
10  attachment to the Olympic settlement agreement in
11  '96. I don't know --
12      Q.  You are aware the exhibits to the
13  settlement agreement in '96 were sealed, right?
14      A.  I am not.
15      Q.  That is not publicly available, is it?
16      A.  I don't know.  That is a legal question.
17  I didn't know they were sealed.  You are the first
18  person to tell me that.
19      Q.  You didn't know that?
20      A.  I didn't know that. I was involved in the
21  process then and -- but again, at the time we
22  weren't -- we were under non disclosure agreements
23  not to discuss those cases because they were active

Page 52

1   and there were people -- you know, millions of
2   people are getting ready to show up and so they
3   didn't want us disclosing what we knew about the
4   whole thing.
5       Q.  Okay. So if you are advising someone
6   designing a stadium in 1996, '97, what are the DOJ
7   regs that you would say apply to the line of sight
8   with respect to standing spectators?
9       A.  I would be advising them that the
10  standards are a performance standard, that you have
11  to achieve comparability with members of the public,
12  you need to -- members of the general public, which
13  means people who can stand, you need to achieve
14  comparability, you need to do the best efforts that
15  you can do to meet that, so whatever information is
16  available in terms of anthropometrics, you need to
17  look for that and use it. And at the time, the best
18  information was human scale by Dreyfuss and
19  architectural graphic standards was available from,
20  you know, the 70's, mid 70's on, with those kind of
21  dimensions in it.  And so absent specific numbers
22  from the Department of Justice for what was clearly
23  a performance standard, you would use your best

**James Terry**                                                    **6/14/2019**

Page 53

1  professional knowledge, your best professional
2  information sources to design that.
3      Q.  Is there any statutory guideline or DOJ
4  promulgated regulation that specifies what line of
5  sight over standing spectator is required in 1996 or
6  1997?
7      A.  Yes.
8      Q.  What is it?
9      A.  Comparability.
10      Q.  Okay. So it is comparability and is there
11  anything that you can point to from the DOJ that
12  tells you what comparability means in this context
13  in 1996 or 1997?
14      A.  Technical Assistance Documents that they
15  put together.
16      Q.  Are you referring to something other than
17  the 1993 TAM and the 1994 TAM supplement?
18      A.  You know, I would have to go back through
19  and look at my notes. There were -- there was
20  information in -- there was information in letters
21  that they wrote in other cases that they were
22  investigating, letters to architects, there were --
23      Q.  Mr. Terry, I asked you -- I have asked

Page 54

1  you about statutory guidelines or DOJ promulgated
2  regulations, that is what I am asking about.
3      A.  Yeah, I am sorry, as a lawyer you may not
4  understand performance codes, that is something that
5  architects work with all the time. There are lots
6  and lots of performance codes. In a performance code
7  you are not given specific details about how to
8  accomplish, in your building, the requirement of
9  that code. And so what I am telling you is, you are
10  trying to turn a performance standard into a
11  prescriptive standard, and you can't do that unless
12  you rewrite it as a prescriptive standard, which
13  they did.  The Access Board wrote it as a
14  prescriptive standard in their 2004 guidelines and
15  the Department of Justice adopted it with
16  modifications in their 2010 standard, but prior to
17  that it was a performance standard, and you just
18  can't twist it to mean anything else.
19      Q.  But I am actually -- I understand your
20  distinction and I appreciate that.
21      A.  Okay.
22      Q.  I am not trying -- I am actually just
23  asking a question.

Page 55

1      A.  Okay.
2      Q.  What you are telling me is that the 1991
3  standard is a performance standard and the 2010
4  standard is prescriptive; is that right?
5      A.  Yes.
6      Q.  Okay. What is the specific anthropometric
7  data that the 2010 standard requires?
8      A.  The -- it requires the same kind of
9  information, it does not specify the anthropometric
10  data. At the time that standard was written, at the
11  time the guidelines were written by the Access
12  Board, the best studies were research that were, at
13  the time, still underway. And so they didn't have
14  dimensions for that when they wrote the 2004 ADA
15  guidelines. When Justice wrote it as 2010
16  standards, it still hadn't come out.  It wasn't
17  released until the end of 2010 and so they did not
18  choose to give you actual dimensions, but it is --
19  that is not unusual in the -- in the ADA standards
20  or in anything else. The architect still has an
21  obligation to meet broader requirements than purely
22  all the dimensions that are listed.  Where
23  dimensions are listed, clearly you have to meet

Page 56

1  those, but where they are not listed, you have to
2  use your professional judgment.  And based on
3  reasonable assumptions about who your users are and
4  the buildings intended uses and those kind of
5  things, and they did not -- they have still not come
6  out with definitive spectator anthropometrics to use
7  in the standard. It is a prescriptive standard, a
8  more prescriptive standard.  But, again, if you
9  tried to detail every single piece out of the ADA
10  standard or even a building code, the -- they would
11  balloon tremendously.
12      Q.  Would you agree that the Ellerbe Becket
13  consent order is prescriptive?
14      A.  In more ways than the -- than the '91
15  standards are, it is more prescriptive. It defines
16  the performance objective that they will accomplish
17  in their designs, it defines those with greater
18  specificity than the performance objectives that
19  were in the '91 standard, but it is not as
20  prescriptive as, for example, the 2010 standards
21  are.
22      Q.  Well, so is it fair to say that you see
23  performance standards and prescriptive standards as

**James Terry**  **6/14/2019**

Page 57

1   being a continuum?
2       A.  They are.
3       Q.  Okay. And you would say the consent order
4   is prescriptive or performance or both?
5       A.  That is a legal question.
6       Q.  No, I --
7       A.  As an architect it looks to me like it is
8   still a performance standard, because it says, you
9   shall provide all or substantially all, but it gives
10  you some more prescriptive guidance on what
11  dimensions to use for wheelchair users.
12      Q.  So I think you testified a few minutes
13  ago that other more developed anthropometric data
14  was available in late 2010; is that correct?
15      A.  Yes.
16      Q.  Is there some reason why that data has
17  not been incorporated in the 2010 standards or any
18  update since in the nine years?
19      A.  The regulatory process in Washington
20  moves at an incredibly slow pace. And has just
21  stopped, essentially, in the last few years. So,
22  yeah, I don't expect all of those results to be
23  imbedded in the ADA standards any time soon.

Page 58

1       Q.  Fair enough. I understand you to say it
2   in your view is sort of bureaucratic slowness?
3       A.  Yes.
4       Q.  Okay. Let's do this, I am not trying to
5   make this a marathon.
6       A.  Okay.
7       Q.  So why don't we take a three minute break
8   so that everybody can use the restroom or get a
9   glass of water or whatever and then we will come
10  back and start up; is that fair?
11      A.  Sure.
12          (Short break.)
13      Q.  I want to go back and make sure I am
14  clear about the applicable guidance and the DOJ that
15  is in the form of a statutory requirement or a
16  regulation that was available in '96/97. What we
17  have, I think, is the '91 standard, the TAM of '93,
18  the TAM supplement of '94, and then the Accessible
19  Stadium documents; is that correct?
20      A.  You are asking me a legal question,
21  because you have imbedded the question of
22  statutorily something or other.
23      Q.  No, it is not a legal question. It is not

Page 59

1   a legal question, Mr. Terry.  I am asking about
2   whether you are aware of some sort of statutory
3   requirement or regulation from the DOJ, something
4   official from the government, right, that you can
5   rely upon that is public, that addresses the issue
6   of sightlines and standing spectators in any way as
7   of 96/97 and I identified four things.  If there is
8   something else out there that you think that one
9   would have been looking at, there was a statutory
10  requirement or regulation, then please identify it,
11  I want to be complete.
12      A.  All right. Define -- I am not sure --
13  when you qualify it by saying statutorily or
14  regulation, when you use that, you are limiting what
15  you are willing to accept of documents from the
16  Department of Justice. And I don't understand your
17  limitation in that, because I don't understand -- as
18  a non lawyer, I don't understand, if I get a letter
19  from the Department of Justice that says here is
20  what I want you to do, knowing that the Department
21  of Justice is the entity that wrote that regulation,
22  that adopted it, and that enforces it and interprets
23  it, their interpretation is supposed to be, as an

Page 60

1   architect, I know, it is supposed to be entitled to
2   deference.  So if I get a letter from the Department
3   of Justice that says, here is what you are supposed
4   to do, I am going to treat that like, you know,
5   something else. Now, the Technical Assistance Manual
6   doesn't go through the same process that the
7   regulations themselves go through, but they go
8   through a little more detailed process than a letter
9   from the Department of Justice. And so I don't know
10  where to draw the line between what you want me to
11  list in the list you are asking for and the letters
12  from the Department of Justice that were going out
13  in 1993 to architects and the Department of Justice
14  discussions with people about what their
15  expectations were, and '93, '94, '95 and the time
16  these things came out.  So I am not sure how to draw
17  the line there when you are saying you want me to
18  list these documents for you, I don't have a
19  complete list of them. There are lots of them.
20      Q.  What I am looking for is I am looking for
21  things that would have been available to the general
22  public.
23      A.  Well, the letters that the Department of

**James Terry**  **6/14/2019**
Pages 61 to 64

---

Page 61

1  Justice wrote --
2      Q.  Let me finish, please.
3      A.  Yes, okay.
4      Q.  You referred, for example, to the Olympic
5  stadium settlement, right?  That settlement document
6  is public but all the exhibits are sealed, that is
7  an example.
8      A.  Okay.
9      Q.  I don't believe then that you can say
10  whatever is in those Exhibits is something that the
11  public was aware of.
12      A.  Oh, wait a minute.
13      Q.  Similarly, if I sent a letter to you,
14  Evan Terry Associates, LLC, Architect, that is
15  certainly communication provided to you, but it is
16  not necessarily communication that the general
17  public is aware of or that a practitioner in North
18  Dakota knows, okay?  So what I am looking for is
19  your understanding of what kind of official
20  publication, guidance, regulation, the DOJ was
21  publishing in this time frame that one could look
22  to.  And I have identified the 1991 standard section
23  4.33.3, and I have identified the two Technical

---

Page 62

1  Assistance Manuals, and I have identified the
2  Accessible Stadium document.  I am happy to
3  entertain and would like to know if there is
4  something else out there that is official, published
5  by the DOJ that was available to the general public
6  at the time.
7      A.  Yes, there were.
8      Q.  What?
9      A.  For example, the letters that the
10  Department of Justice was writing, the Technical
11  Assistance letters that they were writing, many of
12  them to congress people on behalf of their
13  constituents, those letters were publicly available.
14  We got hundreds of those and did summaries from
15  those in our -- in one of the supplements to our ADA
16  facilities compliance workbook from that time frame.
17  Those were publicly available. You could ask them
18  and they would send them to you. There were -- I am
19  sorry.
20      Q.  I said okay.
21      A.  There were other documents that Justice
22  was putting out that would have been publicly
23  available.  There were newspaper articles that were

---

Page 63

1  coming out about the Department of Justice saying
2  particular things. And so that was -- there were
3  lots of other things coming out then, prior to '96.
4  Like I said, I could trace back '93, '94, '95, '96,
5  '97 with those kinds of expectations in those
6  documents.
7      Q.  This issue has been litigated, right?
8      A.  It has.
9      Q.  Did you testify in the Independent Living
10  Resources case?
11      A.  Is that the one that was the Rose Garden
12  Arena?
13      Q.  Yes, it is.
14      A.  Yes.
15      Q.  Did you testify about this issue?
16      A.  I am sorry.
17      Q.  Did you testify about this issue?
18      A.  In deposition, yes, it didn't go to
19  trial.
20      Q.  I understand. What was your opinion in
21  that case with respect to sightlines over standing
22  spectators?
23      A.  Same one.

---

Page 64

1      Q.  Same as today?
2      A.  Yes.
3      Q.  Okay. And the Court issued a ruling in
4  that case, didn't it?
5      A.  Yes.
6      Q.  Did they agree with you?
7      A.  I am sorry?
8      Q.  Did the Court agree with you?
9      A.  Partially.
10      Q.  Well, actually the Court said this, Court
11  said section 4.33.3 does not presently require that
12  wheelchair users be given lines of sight over
13  standing spectators, that is what the Court said?
14      A.  In that part, yes.
15      Q.  Okay. And they disagreed with you about
16  the requirement for there to be sightlines over
17  standing spectators, right?
18      A.  In that part, yes.
19      Q.  What do you mean in that part?  That was
20  the ruling in the case.
21      A.  Didn't the Judge actually write a much
22  longer opinion than that or a ruling that was much
23  longer than that?  Weren't there other things that

---

Page 65

the Judge agreed with us on?
Q. The Judge may have agreed with you on things, I am asking about the sightline over standing spectators issues.
A. Yes, that is was the Judge's opinion in that case. And so in that Circuit for that period of time, you know, my understanding is that is the way it was interpreted until it was relitigated.
Q. Got it. So you were in the Ninth Circuit in 1997, that is what you would have understood?
A. I would have understood that that Judge said that.
Q. Right. That a Court had addressed the issue that you had testified and the Court had ruled differently than what you testified, right?
A. Yes.
Q. Was there any case in the Ninth Circuit if that time frame that went a different direction --
A. I don't know, that is --
Q. -- on this issue?
A. That is a legal question and I don't know.

Page 66

Q. It is a factual question.
A. It is, but I would have to have access to Lexus Nexus or some other legal resource in order to be able to look at it, and then I would have to be able to study the facts of the case and render a legal opinion and I can't do that.
Q. But you just don't know, though -- in your words, for example, you don't know if there was any other case on that issue at that time in the Ninth Circuit?
A. I do not know of anything else that would contradict that.
Q. Okay. So if for today's deposition we assume that you are correct and that there is a non compliance with respect to the sightlines over standing spectators, what is the remedy?
A. You know, I didn't have enough time to study remedies while I was there. There are -- I teach seminars on different ways to remedy sightline over standing spectators in existing facilities or facilities that are already built under the 2010 definition of existing, and there are lots and lots of solutions that I have seen for this kind of

Page 67

problem. I haven't studied them specifically at the Mariners stadium, but I have seen them in other large stadiums, and it is my opinion that there are probably solutions there that will work to fix them. I just haven't studied them enough to go on record, you know, to a Court that tells you, oh, this will work, because I haven't studied enough to do that. I like to be very careful with what I claim about something.
Q. I appreciate that. Is it fair to say then that you do not have an opinion as to what would be a remedy for T Mobile Park if you are correct?
A. I have an opinion that there are options that would have a very high likelihood of working, but I can't tell you which ones of those would work, and specifically any of the specific locations that are there.
Q. Right. So you have a conceptual idea about what remedies might be, but you have no opinion as to the remedy here?
A. Well, it wouldn't be remedy, there would be lots of different remedies depending on which section of the pit you are trying to correct.

Page 68

Q. Fair enough. You don't have an opinion as to the specific remedies here?
MR. REYNOLDSON: Object to the form.
A. I have opinions about specific remedies, I have not compared those specific opinions and those specific solution types to this facility on a dimensional basis to know which ones of them will work in which locations, and which ones won't, because some of them you just have to compare them to the specific conditions. And there may be something that is not one of my typical ones that would work even better than the -- in that location. And I just haven't had a chance to study that.
Q. I understand. And all I am trying to make clear is that you have ideas, certainly things that might work, different ideas, but you do not have an opinion about any specific remedy here in this ballpark today?
A. I do not have specific design solutions to solve the problems in this ballpark. I have generic solution that I would have to analyze in relation to the specifics of each section that needed to be fixed.

Page 69

1    Q.  Could you identify for me, say, five of
2  your generic solutions?
3      A.  Sure. Raised platforms.  When you have
4  got wheelchair seating in the back of a seating
5  bank, like you do in the one hundred section around
6  T Mobile, you can add raised platforms like you did
7  in section 227. Those kind of -- you have a lot more
8  room in the one hundreds than you did in the two
9  hundreds. Those were kind of shoe horned into small
10  spaces.  But you can add raised platforms.  That
11  will give the wheelchair users just that extra
12  height that you need to be able to see, and in this
13  case particularly the infield, to be able to see the
14  same things that other people can see. That is one
15  solution type. Another one you can add wheelchair
16  users behind vomitories.  I don't remember the
17  specific lay out of the vomitories in this one to
18  see if it works. You can add at the suite levels,
19  sometimes you can add wheelchair seats in those
20  because the suites are typically designed where
21  spectators don't block the suite seated people.
22  Sometimes you can provide front row seating.  In
23  fact you have got that opportunity easily at the

Page 70

1  Mariners stadium. Front row seating for more
2  wheelchair users so that spectators don't stand in
3  front of them and they still don't block the people
4  behind them, because they are seated. And so those
5  are -- how many did I give you?
6      Q.  I think you gave me four.
7      A.  Okay. All right.  So we are going for one
8  more. Another one is to put them in places where
9  they are on corners where the aisle is the only
10  thing separating them and the -- what you need to be
11  able to see. So there are sometimes places where a
12  wheelchair user can be -- they are looking over an
13  aisle rather than looking over a bank of standing
14  spectators. And like I said, there is, you know,
15  easily fifteen or twenty of those types of solutions
16  that you just bring there and say, you know, would
17  any of these work in this specific location you are
18  looking at and try to solve.
19      Q.  If I could get you to look at pages
20  eleven and twelve of your report.
21      A.  Yes.
22      Q.  So as I understand your description of
23  the mechanics that you went through to do your

Page 71

1  analysis are setout at the bottom of page ten on
2  through into page eleven, is that fair?  I am
3  looking at mechanics, not the conclusions.
4      A.  That sounds about right, I am just trying
5  to see if there are any other mechanical things on
6  prior pages or later pages. That is where certainly
7  most everything is, if not everything.
8      Q.  Okay. And the figure that is shown on
9  page eleven.
10      A.  Yes.
11      Q.  That is a mistake, right?
12      A.  I don't know why you think it is a
13  mistake, it is not a mistake.
14      Q.  Okay. That figure is 802.2.2.1, lines of
15  sight over the heads of standing spectators?
16      A.  Yes.
17      Q.  You sure that is not 802.2.2.2?
18      A.  I am not sure now that you raise the
19  question, I would have to look at it and see.
20      Q.  So it is possible you put the wrong
21  diagram in?
22      A.  The diagram is the correct diagram. The
23  diagram itself -- you know, I would have to look

Page 72

1  this up to see. I mean, I can't -- I can't remember
2  the numbers of particular sections so I would have
3  to look at it and go back and look at it and see. It
4  could be 802.2.2.2. One of those is -- I think the
5  first one, you may be right, I think the first one
6  is line of sight over the heads one row in front of
7  you and the second one is two rows in front of you.
8  And the figure that is shown here is two rows in
9  front of you, which is the one that applies to the
10  Mariners stadium, at least as I did the analysis.
11  And, wow, if I made that error, I apologize for
12  doing it, but the figure is correct and the concept
13  on it is correct. I am sorry?
14      Q.  In figure -- above the diagram you refer
15  to figure 802.2.2.1, to illustrate the requirement,
16  right?
17      A.  Yes.
18      Q.  And that reference is also wrong, right?
19      A.  It would be if I picked the wrong
20  figure -- if I picked the wrong section number and
21  figure number -- did I quote the section number
22  anywhere in here?  Let me go back to my question.
23  This is 802. Yeah. It is possible that I quoted the

**James Terry**

Page 73

1    wrong figure number in here because I was quoting --
2    I was intending to quote the figure number that goes
3    with the figure that is displayed that goes with the
4    over the top of the head two rows forward, over the
5    shoulders and between the heads one row forward,
6    that was what I was intending to plug in.  So it is
7    possible that I typoed that and then just repeated
8    it below.
9        Q.  Okay. So let me understand the kind of
10   mechanics of what you did. I am looking now at the
11   bottom of page ten, the paragraph beginning to
12   perform my analysis.
13       A.  Yes.
14       Q.  So you chose what you believe to be a
15   representative sample of ten different wheelchair
16   spaces, right?
17       A.  Yes.
18       Q.  Then for each of the spaces you placed
19   your camera 47.45 inches above the floor at the
20   center of the wheelchair clear floor space at a
21   point 3 inches away from the obstruction, most
22   likely to stop wheelchair users from rolling further
23   forward; is that right?

Page 74

1        A.  That is correct.
2        Q.  Okay. So in this analysis the camera is a
3    proxy for a head and eye, correct?
4        A.  It is a proxy for the eye.
5        Q.  Okay. So what you are doing is you are
6    putting it at a height above the floor, a specified
7    height, right, 47.45 inches?
8        A.  Yes.
9        Q.  And then you are situating it in the
10   center of the wheelchair clear floor space.  So if
11   it is 40 inches across, you are doing it in a 20
12   inch space, right?
13       A.  Well, it is 33 inches across and so it is
14   in the center of that 33 inch space. Now,
15   recognizing that T Mobile stadium does not have
16   rectangles drawn on the floor in all the sections so
17   that you say, okay, you have got to stay right here
18   and you have got to stay right here and you have to
19   be between these lines, so you are approximating
20   where you are thinking a wheelchair user might sit.
21   It turns out not to be that critical because the
22   people on the rows in front, both one and two rows
23   in front of you are still going to be -- have the

Page 75

1    same kind of relationship to wherever the eyes are
2    horizontally in that plain.  It is the distance from
3    the toe stop to the eyes that is the critical
4    dimension there in terms of its impact on the line
5    of sight.
6        Q.  So the toe stop, is that what you are
7    referring to there when you talk about the
8    obstruction most likely to stop wheelchair users
9    from rolling further forward?
10       A.  Yes.
11       Q.  Is that a consistent distance from the
12   center spot or within the front to back spacing?
13       A.  It is a -- yes.  The place that -- as I
14   looked at it and said, you know, most wheelchair
15   users, you are going to look at a point somewhere
16   around maybe 4 inches above the surface on which
17   their wheels rest. And so at that, what is going to
18   block it, so it is blocked by different things in
19   different places.  Sometimes it is the back of the
20   seat in front of you, sometimes it is a rail,
21   sometimes it is a fabric that has been stretched
22   across the front of it, sometimes it is, you know,
23   any kind of obstruction there that would keep the

Page 76

1    wheelchair user from rolling further forward.
2        Q.  Yep. So, and then your son held a
3    carpenter's ruler in the center of the standing
4    position of the spectator one row forward; is that
5    right?
6        A.  One row forward and two rows forward.
7        Q.  Understood. I was going to get there. I
8    was walking us through it.
9        A.  Yes.
10       Q.  And then he did the same thing in the
11   standing position -- in the center of the standing
12   position of the spectator two rows forward, right?
13       A.  At the same time, yes.
14       Q.  Okay. And the standing position, where in
15   the space in front is it?
16       A.  How far from the -- from what point?
17       Q.  I am trying to understand it within the
18   spacing dimensions it is in front of the seat.
19       A.  Okay. So in the lower level -- in the
20   lower level stands it is typically going to be where
21   the spectator in front is standing -- is just
22   standing up and standing right in the center of that
23   space. If they are on a upper level, which I don't

Page 77

1  think we had that kind of situation in this, but
2  they might step back.  If they are worried about
3  falling over the edge, they might actually step back
4  when the seat folds up. But in these cases it was
5  very close to the front edge, so it is going to be
6  maybe -- depending on whether the seats fold up or
7  whether they don't fold up, somewhere in the range
8  of six inches from the front tier of the platform on
9  which the standing spectator is standing.
10      Q.  So the foot -- you are saying that the --
11  the height of the foot was six inches from the front
12  of the platform?
13      A.  No, it is the top of their head is six
14  inches or so from the back -- six, could be eight
15  back, just depends on, like I said, what the level
16  of concern the spectators have got. We tried to
17  measure that the same distance whether we are
18  measuring the comparable location or measuring the
19  wheelchair user, we put it in the same relationship
20  to the seat in front in both cases.
21      Q.  So and you did the same thing in all
22  sections?
23      A.  Yes.

Page 78

1      Q.  And so the space for the spectator
2  standing was the same, in terms of being in the
3  center, and the front and back dimension was the
4  same with respect to all sections?
5      A.  Within an inch or two.
6      Q.  So do you get a different measurement if
7  the person standing in front is further forward?
8      A.  If the standing spectator steps further
9  forward, yes, you would get a different measurement.
10      Q.  Got it. And if they step back you would
11  get a different measurement too, right?
12      A.  Yes, slightly.
13      Q.  And what if they stepped to the side?
14      A.  Generally not going to affect anything.
15      Q.  Okay. And when you were -- and so if they
16  stepped to the left or the right, that doesn't
17  change anything, in your view?
18      A.  It generally doesn't.  And the reason is
19  that you have got -- you are looking over the
20  shoulders of the people one row in front of you and
21  you are looking over the top of their heads, and so
22  when you are trying to draw that line, you are
23  looking at the top of those heads and the top of

Page 79

1  their heads is a line. And that is the way -- that
2  is the way stadium designers have designed
3  sightlines.  And so where you stand in that lateral
4  plain is not -- doesn't affect the design.
5      Q.  Did you do any analysis here about
6  whether there was any change in the perspective from
7  moving the spectators laterally?
8      A.  That is not the design criteria, so there
9  would have been no point in doing that.  No, we did
10  not attempt to say, well, what if this guy stands on
11  his left leg instead of his right leg or what if he
12  shifts over to lean against his companion or
13  whatever, we didn't attempt to do that because that
14  doesn't affect the way you design the stadium.
15      Q.  And you didn't also do an analysis to say
16  what if the person was standing three inches
17  forward, right?
18      A.  We did not.
19      Q.  Okay. When you were doing your analysis,
20  did you engage in any variability with respect to
21  the placement of the wheelchair proxy?  So in other
22  words, did you do any changes in variation in
23  lateral movement for the wheelchair proxy, the

Page 80

1  camera?
2      A.  I selected the location to put the camera
3  based on the ability to document the sightlines at
4  that location. So, for example, if a wheelchair user
5  was sitting right next to the aisle and looking down
6  the aisle I did not attempt to photograph it from
7  there because I would have had to have put the
8  standing spectator in the aisle. So I moved it to
9  the wheelchair user down to the -- if I am on the
10  third baseline, I moved it to the side that would
11  allow you to have a spectator standing in front of
12  them, directly in front of them, so that I could
13  document what the majority of the wheelchair users
14  in that section would be seeing in terms of line of
15  sight over standing spectators.
16      Q.  So as I understand it, there are not
17  fixed places for the wheelchair users to sit in most
18  of the spaces; is that correct?
19      A.  Some of the locations had numbers that
20  indicated what -- where your generally -- generally
21  where your ticket space was supposed to go, but I
22  don't recall seeing lines painted on the floor that
23  would say, you know, this is the 33 inch wide, 48

**James Terry**

Page 81

1    inch long wheelchair space that the person who holds
2    ticket number three or seat number three is supposed
3    to be. There may have been some of those, I don't
4    recall those. But so there were some numbers, but
5    there weren't specifically designated locations to
6    measure that 3 -- the center of that 33 inch space
7    from.
8        Q.  Got it. Well, let me ask you this, if you
9    were to do your analysis, take your camera, move it
10   back two inches and two inches to the left, that
11   would give you different data, right?
12       A.  The moving back would give you different
13   data, moving it to the left or right would not give
14   you different data.
15       Q.  That wouldn't give you different
16   sightline between spectators?
17       A.  Between spectators?
18       Q.  Right. So if you were offset as opposed
19   to directly behind, you would have a different
20   sightline, right?
21       A.  Directly behind who?
22       Q.  If you, the viewer in the wheelchair,
23   were offset vis-a-vis the person in front of you,

Page 82

1    you would have a different sightline than if you
2    were directly behind them, right?
3        A.  No.
4        Q.  No?
5        A.  No, the calculations are still the same.
6        Q.  Got it. So they would still have, you are
7    saying, a different potentially blocked view of the
8    infield even if they were in staggered seating?
9        A.  When you are looking between the heads of
10   the people one row in front of you, you see certain
11   portions of the field blocked by those heads. The --
12       Q.  And if you move -- I am sorry.
13       A.  The analysis of those, the design
14   analysis of those that you would design when you are
15   trying to figure out how high does this platform
16   need to be, that design analysis is not reflected by
17   who is sitting in which location -- in which
18   lateral shifting, that doesn't affect the design
19   analysis.
20       Q.  So to go back to my question, if you had
21   moved your camera back two inches and you moved your
22   sight -- your spectator in front forward two inches,
23   that would give you different data, right?

Page 83

1        A.  Yes, it would.
2        Q.  It would give you better sightline,
3    right?
4        A.  No, it would give you worse. You said
5    move the wheelchair user back and the standing
6    spectator forward?
7        Q.  How about if you move the wheelchair user
8    forward?
9        A.  If you move the wheelchair user forward,
10   they get better sightlines.
11       Q.  Okay. And you say moving them laterally
12   makes no difference?
13       A.  It would to the person moving, it does
14   not to -- it does not make a difference in the
15   design of the facility or in the compliance
16   analysis, it doesn't make a difference.
17       Q.  Well, but the person who is actually
18   trying to see the playing surface would see a
19   different view of the playing surface if they moved
20   laterally, right?
21       A.  They might. It depends on where the
22   person in front of them or the people in front of
23   them moved.

Page 84

1        Q.  That is correct. All I am getting at is
2    there are differences here that you did not address,
3    including this, right?
4        A.  There are dynamic differences during a
5    game that are not addressed by the design standards.
6    The design standards tell you how to design it so
7    that you give people comparability as much as that
8    can be handled from a design standpoint.
9        Q.  Right. And it is challenging when you do
10   not have prescriptive standards, right?
11       A.  I don't think so.
12       Q.  Got it. In your report on page twelve and
13   thirteen, you have a section regarding number of
14   wheelchair and companion seating locations.
15       A.  Yes.
16       Q.  Do you have a firm opinion or is this
17   opinion still contingent, it wasn't clear to me?
18       A.  Yes. You want me to give you that
19   opinion?
20       Q.  Yes, I just want to know what the opinion
21   is.
22       A.  Yes, the opinion is that the
23   compliance with the 1991 standards in terms of the

Page 85

1  minimum number of wheelchair and companion seating
2  locations is that because the seating -- the
3  wheelchair seating did not comply with the standards
4  by March 15 of 2012, it did not comply with the '91
5  standards, then you did not have the minimum number
6  of seats required under the 1991 standards.
7  Because --
8      Q.  So do you know how -- I am sorry, do you
9  know how many seats there were in 1999 when they
10 opened?
11     A.  I don't.
12     Q.  Do you know how many accessible seats
13 there were in 1999 when the stadium opened?
14     A.  I don't have evidence of but three.
15     Q.  I am sorry?
16     A.  I only see three that looked like they
17 would have had line of sight compliance when it
18 opened. And those were the three behind home plate.
19     Q.  I am asking about your opinion as set
20 forth in the section numbered two.
21     A.  Yes.
22     Q.  On pages twelve and thirteen. I have read
23 that and understood that to be something different

Page 86

1  than a sightline opinion.
2      A.  It is a layered opinion.  So a wheelchair
3  position that doesn't have line of sight that is
4  sold as a ticketed seat is not actually a wheelchair
5  seat, it is a ticketed location. If it is not
6  compliant with the standards, then you can call it
7  accessible, you can count it as accessible, and for
8  the purposes of this I have counted them that way
9  and then qualified that to say, but, just for the
10 purpose of doing the analysis, if it is not a
11 wheelchair -- if it is not a compliant wheelchair
12 position, you can't really count it. So I have tried
13 to look at it both ways so you can get a chance to
14 understand how many there would have been if they
15 had been made compliant in terms of sightlines.  But
16 the numbers under the '91 standards did not, as far
17 as I can tell, based on the information that we
18 received related to the stadium for this case,
19 related to those numbers, there weren't enough
20 numbers to have met the '91 standards if they all
21 had proper sightlines or if all or substantially had
22 proper sightlines, there weren't enough of them to
23 meet that. Now I saw something that there had been

Page 87

1  some changes, but I don't know what those changes
2  were.
3      Q.  Right. Could you point to me in section
4  two where you are talking about sightline?
5      A.  For the purpose of the expert report I
6  split these up between one and two.
7      Q.  I understand. Section two makes no
8  mention of sightlines, correct?
9      A.  I will have to look back through and see
10 if it does or not.  It may not.
11     Q.  It is page twelve and thirteen and I am
12 trying to understand, you were talking about
13 sightline, there is no mention of it in there.
14     A.  Okay. Yes, so I. --
15     Q.  As I understand it, then, section two,
16 your opinion of whatever it is in section two, is
17 not related to sightlines because you are not even
18 mentioning them, right?
19         MR. REYNOLDSON:  Object to the form.
20     A.  Right, okay. Now I understand what you
21 are doing and I remember how I split this opinion
22 up. So I analyzed those two obligations separately
23 for the purpose of this, and just looking at numbers

Page 88

1  and saying, did you have enough numbers, ignoring
2  sightline problems, did you have enough numbers?
3  The answer was no, from the information that I have,
4  you did not have enough numbers to meet -- you don't
5  have enough numbers now to meet the 1991 standards.
6  Excuse me, you don't have enough to meet the '91,
7  you have more than enough to meet the 2010 standards
8  if you are just looking at numbers.
9      Q.  You don't know how many accessible seats
10 there were in 1999, right?
11     A.  Not specifically, not thoroughly, I do
12 not know what was there in '99.
13     Q.  Right. And you do not have any
14 information about how many accessible seats there
15 were in 2012?
16     A.  All I have is the documents that were
17 furnished to us and I don't -- to my knowledge they
18 are not 2012 numbers.
19     Q.  Right. And they are not 2015 numbers
20 either, are they?
21     A.  I don't believe so. I don't know if there
22 were changes. I don't know when changes were made. I
23 know that changes were made. I asked for the changes

**James Terry**                                    **6/14/2019**

Page 89

1  and my client has been unable to get those from the
2  stadium authority. And so absent that information, I
3  am making my analysis based on what I was able to
4  obtain.
5      Q.  I understand. And I want to be very clear
6  that all I am trying to understand is what you
7  looked at. You did not look at any seating
8  information that predated 2017, right?
9      A.  No, that is not correct.
10     Q.  Okay. Tell me what you looked at with
11 respect to the number of accessible seats at T
12 Mobile park for dates prior to 2017?
13     A.  All right. I am looking back through the
14 documents here, because I received some documents
15 right before my expert report was turned in, and
16 I -- I am trying to see which ones came in before
17 and which ones came in after. All right. We have the
18 2019 seating manifest, so those were seating numbers
19 from that. We got those from the Diamond Club
20 with revisions through January 2019, and those were
21 under construction when we were there, we couldn't
22 tell anything about it from there, so we were
23 relying on those drawings. And so I believe it is

Page 90

1  possible that some of these Defendant's responses to
2  interrogatories include, for example, the seating
3  plan that we saw from Hussey that I believe had a
4  date of 1998 on it, and that document showed some
5  wheelchair positions both in what is now the Diamond
6  Club area and it seems like it may have had
7  wheelchair seating positions in the back. That
8  drawing was not a complete series of seating
9  drawings for the whole stadium, so we didn't have
10 enough information to calculate anything else about
11 the total number of wheelchair seats in the stadium.
12     Q.  Fair enough. And what I am getting at
13 here, I am looking at the basis for your opinions
14 that is on twenty-eight and twenty-nine into thirty.
15 I do not see anything in here that refers to seating
16 information that predates 2019, if I am incorrect,
17 please let me know.
18     A.  You -- and again, I can't remember when
19 that Hussey drawing came in, but that was a 1998
20 seating drawing. And it may have been one of the
21 Defendant's answers to the complaint, Defendant's
22 responses to interrogatories, I am looking at two
23 and three, or Defendant's responses and objectives

Page 91

1  to Plaintiff's interrogatories and request for
2  production of documents set two, number seven, so it
3  may have been in one of those. I can't recall where
4  it was, but if it was -- if that came in before my
5  report was in, then that is where it is.
6      Q.  All right. And when you refer to the
7  Hussey drawing, what are you referring to?
8      A.  There was a series of documents that we
9  got, one of which the last page in that particular
10 set, the last page was what looked to me like a shop
11 drawing from Hussey. They apparently were the
12 seating supplier for the original stadium. And so
13 any time you design a large arena or stadium, you --
14 the actual dimensions are provided to the seating
15 provider, then come back and say, this seat
16 right here will be twenty-two, this will be a
17 twenty-three, this will be a twenty-four, this will
18 be a twenty-two, and they do that for every single
19 fixed seat that they are selling. And that shows
20 exactly how the contractor that is assembling those
21 seats, that shows exactly what to put in each place.
22 So that is the drawing that showed that area for the
23 Diamond Club and a lot of or maybe all of the

Page 92

1  section behind it.
2      Q.  The Hussey drawing you are referring to
3  was not the complete stadium drawing, right?
4      A.  It was not.
5      Q.  And it was -- you said it was 1998?
6      A.  I believe that was the last revision date
7  on it.
8      Q.  Okay. You don't know if that is, in fact,
9  what was implemented in the stadium when it was
10 opened in 1999, do you?
11     A.  I do not.
12     Q.  Okay. So other than the Hussey drawing,
13 this incomplete 1998 document, and the 2019 seating
14 manifest, the Diamond Club drawings that are
15 referred to in pages four and five of your opinion,
16 you are not able to identify any seating information
17 that predates 2019, correct?
18     A.  Any seating information, I wouldn't say
19 that, because there are pictures in the -- yeah,
20 there are pictures that Brenda took and things like
21 that, but I can't do a seating analysis. I don't
22 have sufficient information to do a seating analysis
23 of accounts prior to the dates of the documents that

**James Terry**                                                                    **6/14/2019**

Page 93

1  we were furnished.

2      Q.  Got it. So you don't know then whether or

3  not, setting aside sightlines, there were a

4  sufficient number of accessible seats in '99 or 2005

5  or 2010 or today?

6      A.  What do you mean or today?

7      Q.  Well --

8      A.  You mean post writing my report?  So it

9  is possible that they came back and changed things

10  since I was there February 5, yes, anything could

11  have been changed.

12      Q.  You don't know, though, if there was

13  sufficient numbers of seats in 1999 to satisfy the

14  '91 standard, do you?

15      A.  I do not have information about that.

16      Q.  Okay. That is really what I wanted to

17  know. So when your report says on page thirteen, the

18  facility does not have enough wheelchair companion

19  seats under the 1991 standards, you are not talking

20  about whether it complied in 1999, right?

21      A.  I am in the second half of that sentence.

22      Q.  Right, but you don't know that?

23      A.  I don't have specific knowledge of that.

Page 94

1  I just don't know where you would have put all the

2  extra wheelchair seats that you would have had to

3  have in order to meet the '91 standards. That is why

4  I said it didn't appear that you had enough to meet

5  the '91 standards. There just aren't -- there don't

6  appear to be enough places to put them.

7      Q.  Fair enough. But you are speculating,

8  right?

9      A.  I am. That is why I said appear rather

10  than quoting as a fact.

11      Q.  Got it. Let's turn to number three on the

12  same page, thirteen.  I think this sort of deals

13  with the distribution of seating issues; is that

14  correct?

15      A.  Generally.

16      Q.  Do you believe that the accessible

17  seating at T Mobile park has sufficient horizontal

18  distribution?

19      A.  Let me look at my drawing that shows

20  where all of the seats are.

21      Q.  Yeah, if you like, Exhibit Number 4, the

22  Court Reporter can show that to you, you are welcome

23  to look at that as well.

Page 95

1          (Defendant's Exhibit 4 was marked

2          for identification.)

3      A.  Okay. With limited exceptions, I would

4  say that it has good horizontal distribution.

5      Q.  Your report does not comment on

6  horizontal distribution, that is why I was asking

7  the question.

8      A.  It doesn't do it under that category. It

9  just says that there are certain sections that have

10  no wheelchair seating in them.

11      Q.  Certain sections?

12      A.  Yes.  So for example, between center

13  field and the third base foul line, there are no

14  wheelchair seating options available.

15      Q.  Got it. There are wheelchair seating

16  options surrounding the entire field but for that

17  piece of left field, right?

18      A.  Well, at the -- at that level, that is

19  the one that is limited, but you have also got the

20  Hit It Here Cafe area on that level that is -- that

21  has no -- no wheelchair seats between whatever that

22  section number is, 214, there is nothing on that

23  level between 214 and under the scoreboard. And

Page 96

1  under the scoreboard I am not really sure what is

2  going on there, because my drawing showed a

3  different dispersal than what the Exhibit 4 shows

4  under the scoreboard. So there is a band in there

5  where at that level you don't have sufficient

6  horizontal -- or we don't know. They wouldn't let us

7  into the Hit It Here Cafe, so I don't really know

8  what is in there, other than the fact that

9  Ticketmaster doesn't have any wheelchair seating

10  positions available for any of the dozens of games

11  that I tried to see if there were wheelchair

12  positions in Hit It Here, I couldn't find any

13  tickets available for wheelchair users in there, and

14  since we weren't allowed in, you know, I hate to

15  think the worst, but I just don't have evidence that

16  there are any chairs in there.  And I don't see them

17  in Exhibit 4 either.

18      Q.  You don't have an opinion one way or the

19  other, you just don't know, right?

20      A.  No, I have an opinion that I can't find

21  any evidence that there are wheelchair positions

22  there. It is not in Exhibit 4 that you just handed

23  me, it is not on Ticketmaster, and I wasn't allowed

**James Terry**                                              **6/14/2019**

Page 97

1   to see whether it was there or not.  So I have no
2   evidence that there is any wheelchair positions in
3   there and all the evidence points to the fact that
4   there isn't.
5        Q.  But you don't know?
6        A.  With absolute certainty, have I put my
7   own eyes on it to know, no.  But I have no evidence
8   that it is and I have looked for that evidence.  And
9   you just handed me evidence that doesn't indicate
10  where it is.  There is a little wheelchair shown in
11  one corner of it, but I have -- I don't know what
12  that means and it is -- it is -- so I can't --
13       Q.  Is it your understanding, Mr. Terry, that
14  the seats in Hit It Here are ticketed seats?
15       A.  It is, therefore there should be
16  wheelchair positions in there.
17       Q.  Okay.  Do you know if there are wheelchair
18  positions, have you looked at it?
19       A.  I have tried to find hem. I was not
20  allowed into the space, I couldn't control that. We
21  were not allowed.  We waited 30 minutes to go in and
22  we were not allowed to go in.  And I looked on
23  Ticketmaster --

Page 98

1        Q.  It is really just a yes or no question.
2   You haven't seen it, you don't know, right?
3             MR. REYNOLDSON:  Object to the form.
4        A.  I know what I have seen and I have seen
5   that Ticketmaster had no wheelchair seats available
6   in there, but there were lots of other -- there were
7   lots of other seats in there, but no wheelchair
8   seats available in any of the games I tried to get
9   them or find out if they were available.
10       Q.  Which games were those?
11       A.  I don't know.
12       Q.  Okay. So you can't tell us today which
13  game days you looked at?
14       A.  I can tell you --
15       Q.  For wheelchair tickets?
16       A.  I can tell you some of the days I looked
17  at, because they were the same days that we based
18  some of our reports on. The rest of them -- yeah,
19  counts from Ticketmaster for the 5/28 game and
20  seating manifest.
21       Q.  Are you referring to something in your
22  report?
23       A.  Attachment F.

Page 99

1        Q.  Yep. Thank you.
2        A.  So on April 16th we looked at all of the
3   seats available in the -- in the stadium.  And that
4   was the basis for our counts for attachment F and
5   those -- as of the May 16, we were looking at the May
6   28th game to do our count.  And then we compared
7   that to the manifest that was provided to us in this
8   case. So I know we looked at that one. We looked at
9   -- I personally looked at probably at least a couple
10  of dozen other dates trying to find where they were
11  in there and I couldn't find them at all.
12       Q.  Your report refers to attachment F, an
13  analysis that you derived from looking at
14  Ticketmaster on April 16 for a particular game on
15  May 28, right?
16       A.  Yes.
17       Q.  And you do not have information and it is
18  not in your report regarding that same search for
19  any other dates, right?
20       A.  It is not in my report.
21       Q.  And you don't have an opinion about, for
22  example, what seating was available on June 2?
23       A.  I don't recall looking at June 2. I don't

Page 100

1   remember if that was one of the dates that I looked,
2   so I don't have -- right now, I don't have an
3   opinion about whether it was -- whether there was a
4   wheelchair seat or any wheelchaired seats in there
5   on June 2.
6        Q.  How about on July 17?
7        A.  I could not tell you any specific date.
8        Q.  And you don't have an opinion about it,
9   right?
10       A.  I don't have an -- I don't have an expert
11  opinion and I don't have the facts in front of me to
12  state something on the record right now.
13       Q.  Got it. And you don't -- September 10,
14  same question?
15       A.  Same answer.
16       Q.  Okay. Fair enough. And so as I read your
17  report on page 15, you are, I think, opining that
18  there is a lack of vertical dispersal; is that
19  right?
20       A.  Yes.
21       Q.  And the vertical dispersal, what is your
22  opinion here as to what that should be?
23       A.  It is the opinion that is listed in my

**James Terry**                                                    **6/14/2019**

Page 101

1    report, that the -- that you don't have enough
2    vertical dispersal to give wheelchair users
3    comparable ticket prices and sightlines.
4         Q.   Okay. Did you look at or ever seen
5    Malcolm Rogel's declaration?
6         A.   I don't recall it. What did that
7    deposition talk about?  If you can give me some
8    details, I may be able to remember.
9         Q.   Yeah, it is a declaration, not a
10   deposition. Mr. Rogel went out and did a search for
11   tickets at a particular game and he found tickets in
12   basically every horizontal position around the field
13   and in all of the levels in prices ranging from 17
14   dollars to 75 dollars. Were you aware of that?
15        A.   I don't recall seeing that. I may have,
16   but I don't recall seeing that. That would not have
17   changed my opinions.
18        Q.   Okay. Just wondering. Because there was a
19   range of tickets from 17 dollars, 20 dollars, 26
20   dollars, 30 dollars, 35, 39, 55, 60 and 75 dollars,
21   and the 75 was for the Diamond Club front row seats.
22   All right. So based on that, is there some other
23   range of pricing that you believe should be

Page 102

1    available?
2         A.   I believe that you should take the
3    guidance that the Department of Justice has given as
4    to how to interpret that.
5         Q.   Okay. What is that guidance, what are you
6    referring to?
7         A.   There  is guidance that the Department of
8    Justice gave in the -- in the 2010 standards and
9    regulations.  And I believe it is in the preamble to
10   that, maybe in the guidance document that they
11   listed -- that they published with the 2010
12   standards, but I believe it may have been in the
13   preamble, the discussion of what they intended where
14   they describe what your -- what their expectation is
15   for -- for ticket price dispersal.
16        Q.   And what would be the guidance -- do you
17   recall what that guidance is with any specificity?
18        A.   Generally that you need to give people
19   pricing options, that -- people with disabilities
20   pricing options that are comparable to those
21   provided for other people. And that you not -- that
22   you -- if people have the opportunity to get a -- if
23   the general public has an opportunity to get seats

Page 103

1    that have, you know, that are 125 dollar seats or
2    450 dollar seats, and there are benefits to doing
3    that, either because you are closer to the action,
4    because you have a better chance of getting tossed a
5    foul ball when it comes off the sideline, or you are
6    in some other advantageous position, that you have
7    the opportunity to get that because of your -- you
8    are paying more for your ticket. And if there is not
9    a way to get that ticket because there is a
10   wheelchair seat in that particularly desirable
11   location, that you can provide that same ticket
12   price in a more desirable location that gives you as
13   close to that experience as you can get. And that
14   experience is my word. But you got something that
15   you can go to a better place for that same ticket
16   price and that is -- that is giving you the kind of
17   comparability that was intended by the regulations.
18        Q.   Well, let me ask you this, is there some
19   sort of guidance that you would point to that
20   predates the 2010 standards on this issue?
21        A.   On the issue of ticket price
22   comparability?
23        Q.   Yep.

Page 104

1         A.   Yes, there was -- there were other
2    documents that have been, you know, over the years
3    have come out that explain that to greater and
4    greater and greater specificity.  And one of the --
5    one of the things that has changed drastically, as
6    you know, in the last 25, 30 years, is that ticket
7    pricing has become more and more differentiated so
8    that rather than having, you know, lower bowl price
9    and mid bowl price and nose bleed price and maybe
10   different in the bleachers, now you have got maybe
11   20 or 30 or 75 prices.  And now with dynamic
12   pricing, one seat price might change depending on
13   what time of day you log in and what your ZIP code
14   is. And so that kind of difficulty, as ticket
15   pricing policies changed, Justice adjusted that --
16   adjusted their guidance to reflect the new
17   expectations based on the new policies.  So those
18   have changed over time.
19        Q.   Could you read back the question to him,
20   please, Court Reporter?
21             (The desired portion of the
22             transcript was read back.)
23        A.   Some sort of guidance to me is a very

**James Terry**                                                **6/14/2019**

Page 105

1  broad question. I answered a very broad question
2  with a truthful, accurate answer. I do not have in
3  front of me a list of all of those guidance
4  documents and I cannot tell you exactly what they
5  are. I can tell you that they exist. I can come back
6  and find them for you if you need me to do that, but
7  I can't -- I can't tell you what they all were. I
8  have stated that there are dozens of those kinds of
9  documents that have been out there the whole time, I
10  just don't have them in front of me.
11  Q. I just want to be clear, you have
12  identified for me the 2010 standards providing
13  guidance from DOJ, and are you able, as you sit
14  here, to provide me with any guidance from the DOJ
15  that predates that 2010 standard?
16  MR. REYNOLDSON: Objection, asked and
17  answered.
18  Q. It is a yes or no question.
19  A. Are you asking me if I can give you a
20  document -- any guidance from DOJ? Are you looking
21  for a specific document that you want me to put in
22  front of you or do you want me to tell you a
23  specific document date and authorship and -- what do

Page 106

1  you want in that?
2  Q. Well, I want anything that is similar to
3  what you've articulated previously. You identified
4  2010 standards as providing guidance on pricing with
5  respect to DOJ's perspective. And I am just saying
6  to you, please tell me, if you are aware, of
7  anything else that predates that that is similar in
8  the since of providing DOJ guidance on pricing. And
9  if the answer is you can't identify something here
10  today, that is fine, I just want to know.
11  A. The answer is I did. First of all, the
12  standards don't talk about pricing in the level of
13  specificity that the preamble to the regulations
14  does or that the regulations issued in 2010 provide.
15  So those two documents provide more pricing
16  information than the standards themselves provide.
17  Department of Justice published a guidance document
18  that went with the standards and that document may
19  have it, I don't recall if that has pricing
20  information in it or not. And you want something
21  predating that, so I just want to make sure we
22  are -- I didn't just say it was the standards, I
23  said those other documents as well. Predating that,

Page 107

1  there were lots of documents, I do not have any of
2  those documents with me, I do not remember the dates
3  or the specifics of those documents, other than the
4  ones we have already discussed, other than the
5  Department of Justice's many documents that they've
6  weighed in on in terms of their opinions about the
7  Olympics -- the unsealed documents on the Olympics
8  say that it was all or substantially all the spaces.
9  Only the anthropometrics in that, you are telling me
10  now -- or today you are telling me that those
11  anthropometrics were sealed. That is the only
12  thing -- I mean, the fact that sightline over
13  standing spectators was all or substantially all,
14  that was in the news. That was in the news all over
15  the place. Justice issued press releases in it. It
16  was in the document that is available on their web
17  site. So that was something in '96. The Ellerbe
18  Becket case was out there, Justice's stance on that.
19  So like I said, lots of those kind of documents, I
20  don't have any of them with me.
21  Q. Mr. Terry, I am asking about pricing. In
22  section three of your report, starting on page
23  thirteen, you are talking about, in part, about

Page 108

1  pricing.
2  A. Yes.
3  Q. And you identified -- in this section
4  here you identify certain sections of the 1991
5  standards and you identify certain sections of the
6  2010 standards, correct?
7  A. Yes.
8  Q. Is there anything else that you were
9  relying upon for your analysis in section three?
10  A. 36.302 F of the title two regulations,
11  36.406 F of the title three regulations.
12  Q. These are things all cited in that
13  paragraph, everything is in that paragraph. Is
14  there something else?
15  A. That I relied on in what? In developing
16  my opinion?
17  Q. To render this opinion. Is there some
18  guidance, other than the document section that you
19  were citing there, that you are relying upon, that
20  is what I am trying to figure out?
21  A. Okay. My history of doing this for all of
22  these years. I've tried to lay out the basis of
23  those things in the answers to this same question

**James Terry**                                                    **6/14/2019**

Page 109

1   already, and -- so those particular ones did not
2   completely -- I can't remember which of those
3   discussed pricing and which ones didn't, I can go
4   look that up.  But in all of those kinds of
5   documents, Justice was trying to attempt this same
6   thing.  And I would have to look at which of all of
7   those Technical Assistance documents, guidance
8   materials, letters, other briefs that they issued,
9   settlement agreements, all of those kind of things
10  where they were trying to explain it and do so
11  publicly, I would have to go back and look at which
12  ones specifically address the issue of ticket price
13  dispersal. But all of those have had a bearing on my
14  development of the opinion that I have rendered.
15      Q.  Other than the specific things referred
16  to in the first paragraph in section three on page
17  thirteen, is there something that you can identify
18  for me that you relied upon for this opinion?
19      A.  For this particular opinion?
20      Q.  Yes.
21      A.  Number twenty-six, 2010 revised
22  requirements of ticket sales by the U.S. Department
23  of Justice published 7/7/2011.

Page 110

1       Q.  Where?
2       A.  I am sorry?
3       Q.  What are you referring to, is it in
4   your --
5       A.  Page thirty, basis for opinions.
6       Q.  Yep.
7       A.  Obviously I am now limiting what I am
8   saying to those things that were from the Department
9   of Justice, so I am not looking at, you know, all
10  the places where I got information about ticket
11  prices on MLB, et cetera.
12      Q.  Here is what I am trying to understand,
13  and I am really not trying to play a game, I just
14  want to know the things that are official that you
15  relied upon for purposed of your opinion in that
16  section three. And if there is something that you
17  haven't listed there that you are relying upon, then
18  tell me, and if there isn't anything, that is fine
19  too.  I just want to know it.
20      A.  I get it. I get it. Yeah, and my
21  difficulty is sitting here right now, after reading
22  thousands and thousands of pages on this topic over
23  the last 29 years, trying to come up with a specific

Page 111

1   document that mentioned this specific requirement
2   and how I have interpreted this requirement, I have
3   taken what I have read in all of those documents, I
4   have internalized them, I have tried to understand
5   them and now I am trying to spit out to you, as
6   though I had a photographic memory, which of those
7   documents specifically addressed this issue, is
8   beyond my memory.
9       Q.  Well --
10      A.  And so I've tried to give you a sense of
11  where they came from, but specific document lists, I
12  can't tell you right now what they are beyond the
13  ones I have already given you.
14      Q.  Okay. Just so you understand, this is not
15  me trying to harass you.
16      A.  No, I get that.
17      Q.  When we take a deposition of an expert,
18  we are entitled to know the full basis of the
19  expert's opinion.  One of the things that I like to
20  try and understand is what is the stuff you are
21  looking at to rely upon. And what I hear you telling
22  me is other than the things you have identified, you
23  don't have something in particular in mind other

Page 112

1   than your experience in the past?
2       A.  I would say experience in the past is
3   different from understanding of the documents that I
4   have read and the cases that I have worked on, I
5   would say that is different from experience in the
6   past.
7       Q.  Okay. I don't want to argue with you. You
8   can't tell me a document.  You told me you've read a
9   lot of things and you have digested it.  I will let
10  that go. That is fine.
11      A.  Okay. I wish I could give you the
12  specific details, I just don't have a photographic
13  memory.
14      Q.  What you can't do is tell me what you
15  relied on other than what you cited?
16      A.  That is a legal question, I won't argue
17  it, I don't know.
18      Q.  It is a factual question, sir.
19      A.  Okay.
20      Q.  Would you look at your attachment F,
21  please?
22      A.  Okay. I am there.
23      Q.  Is your analysis of pricing,

Page 113

1   distribution, variability, comparability based on
2   data about T Mobile park other than what is in
3   attachment F?
4       A.   Attachment F reflects what I knew at the
5   time, which was sufficient to develop the opinion
6   that is in my report. I have learned more since
7   then, but it was sufficient, and nothing that I have
8   learned has contradicted or counteracted or even
9   reduced the opinions that I have listed in my
10  report.
11      Q.   All I am asking is this, when you wrote
12  the report and articulated the opinions in that sub
13  section three about ticket pricing, I understand
14  that the factual information upon which you were
15  doing that analysis is what is set forth in
16  attachment F; is that correct?
17      A.   Not solely what is set forth in
18  attachment F.
19      Q.   Okay. Please identify for me what else
20  that opinion is based on with respect to factual
21  information of T Mobile park that is not in
22  attachment F?
23      A.   Okay. The item number thirty on page

Page 114

1   thirty, the official web site for the Mariners,
2   thirty-one, the information from Ticketmaster.
3       Q.   Wait a second, information from
4   Ticketmaster is listed in attachment F, right?
5       A.   That is part of what -- that is part of
6   the basis for what is in attachment F.
7       Q.   Okay. Let me put it another way, is there
8   ticket pricing that you analyzed and that you've
9   relied upon for purposes of your opinions here that
10  reflects a day other than the May 28, 2019 game?
11      A.   Yes.
12      Q.   Where is that information?
13      A.   In my files.
14      Q.   And is it referenced here?
15      A.   It is not referenced here because it was
16  additional information that didn't add anything to
17  what we found here that was significant enough to
18  report on. It just backed up what we found here.
19      Q.   I am just trying to figure out where in
20  your opinion it says we did analysis of something
21  other than that game?
22      A.   Item thirty and thirty-one.
23      Q.   Where does it say it in the opinion?

Page 115

1       A.   I don't know if it did. I would have to
2   look at it. Which section of the opinion are you
3   wanting me to check?
4       Q.   In section three beginning on page
5   thirteen and continuing onto page seventeen.
6       A.   All right. If you read on page fourteen,
7   sub A, it says, these tickets are available for sale
8   on Ticketmaster for many games.  It appears to be
9   closed on low traffic dates, but no wheelchair
10  seating opportunities were available for any game we
11  could find. Before I wrote that I actually did what
12  I said I was doing.  So there is -- I am not saying
13  that everything was in attachment F, I am saying
14  that there are other things that we've looked at. So
15  there we did that. All Star Club has tickets
16  available on Ticketmaster but none are listed
17  available for wheelchair users and their companions.
18  Again, that was as a result of reviewing many, many
19  days on Ticketmaster to see if I could find those. I
20  didn't repeat that in that same kind of language
21  that I had in A.  In C, again, same thing, looked at
22  dozens of games and could not find seats in the All
23  Star Club or above the pen. For every game I

Page 116

1   checked, when talking about Edwards Cantina, so I
2   did not, in my report, attempt to list every game
3   that I looked at on Ticketmaster -- although I have
4   a lot of that information in my files, I didn't
5   attempt to show that here.
6       Q.   Got it. So when I am looking at sub A,
7   sub B, sub C, and sub D on page fourteen, I don't know
8   the date you are talking about, right?
9       A.   That is correct. Now, on page fifteen --
10  on page fifteen you can see some dates.
11      Q.   I understand. I am clarifying, the ones
12  A, B, C, D, there is no dates, right?  We don't know
13  what dates we are talking about?
14      A.   Well, D is what continues on fifteen that
15  has dates.
16      Q.   Let me ask you this, in D you say so
17  those positions clearly don't effectively create any
18  opportunities for wheelchair users to go to
19  Mariners' games if they want to get close to the
20  field without planning months ahead, period, right?
21      A.   Yes.
22      Q.   Are you saying that there is an
23  obligation to not sell those seats to people who

**James Terry**                                                    **6/14/2019**

Page 117

1   want them and therefore to preserve them?

2       A.  That is a long answer. That is a long

3   answer. Justice has given lots and lots of guidance

4   on ticket sales and how to protect ticket sales and

5   make them available for wheelchair users. And that

6   is a -- we don't have enough time today to go

7   through that analysis.

8       Q.  But my point, you don't actually have any

9   factual information about who has bought those seats

10  you are referring to in sub section D, right?

11      A.  That is correct.

12      Q.  So you don't know, for example, if those

13  seats were bought by somebody, a group of friends,

14  whatever, who bought a whole slew of tickets; you

15  don't know that?

16      A.  Like you said, I can't tell from

17  Ticketmaster who bought a seat. I can guess all

18  kinds of things, but I can't tell.

19      Q.  Right. And so if those seats were

20  purchased by people using wheelchairs and wanting

21  access to accessible seating, that is okay, right?

22      A.  It is.

23      Q.  And the fact that someone else can't buy

Page 118

1   that seat doesn't mean that there is a problem, it

2   means that someone else bought it first, right?

3       A.  That is correct. If that someone else is

4   a wheelchair user, beyond that it is a whole bigger

5   question.

6       Q.  Fair enough. Fair enough. We just don't

7   know, right?

8       A.  I don't have information about who bought

9   any tickets at the stadium.

10      Q.  Got it. Right. Okay. Let's talk about the

11  vertical dispersal issue.

12      A.  Okay.

13      Q.  What is your opinion as to what vertical

14  dispersal should be?

15      A.  What the regulations and standards say it

16  should be.

17      Q.  Okay. Please tell me what that means.

18      A.  Okay. Vertical dispersal. We are talking

19  about '91 standards, it was sufficient to provide

20  comparable lines of sight and choice of ticket

21  prices to those available to the general public.

22  Under the 2010 standards it is distributed according

23  to a very long series of sections and Technical

Page 119

1   Assistance back up material that tells you how you

2   disperse that in a stadium.

3       Q.  Okay. So in -- do you have an opinion as

4   to which of those standards is applicable here?

5       A.  Where vertical dispersal was sufficient

6   under the '91 standards to provide comparability

7   where the elements were compliant, they would be

8   safe harbored. They are not -- they weren't

9   compliant with the line of sight requirements, so

10  they failed that. So the element would have failed

11  under the '91 standards because it didn't meet the

12  line of sight over standing spectators requirement.

13  The 2010 -- so if it didn't comply, and it still

14  doesn't, if it didn't comply by March 15, 2012, then

15  it is not fully safe harbored. So you would now look

16  to the vertical dispersal of those elements

17  according to the 2010 standards. Now if there were

18  wheelchair seating positions, spaces, and their

19  companions that complied with the '91 standards,

20  then those would be safe harbored and could be

21  factored out of the equation. So, for example, if

22  the platforms in section 227 were compliant with

23  the -- with the '91 standards for comparable

Page 120

1   sightlines by March 15, 2012, then those would be

2   safe harbored in and you would ignore that section

3   for vertical dispersal. I have not -- I don't have

4   enough information to be able to tell what is safe

5   harbored to know how you would calculate that.  So

6   the opinion that I am going to give you is not based

7   on having sufficient information to tell what would

8   be safe harbored, so I what I would say is look at

9   the 2010 standards, see how they handle the vertical

10  dispersal and then see if there is evidence to

11  indicate that any of the -- those requirements would

12  have been met by the safe harbor by the '91

13  standards.

14      Q.  So are you telling me you believe that it

15  is the 2010 standards, unless there is something

16  safe harbored and they are 1991?

17      A.  Yes.

18      Q.  Okay. And when you were looking at the

19  analysis here, are you applying both standards or

20  one?

21      A.  I am attempting to analyze it according

22  to the 2010 standards and then say where it looks

23  like there might have been safe harboring to say,

**James Terry**                                                **6/14/2019**

Page 121

1    hey, I am not saying that I know what would have
2    been entitled a safe harbor.  I can look at some
3    things and say, yeah, I don't think this is because
4    there is no evidence that it was ever compliant. But
5    there is some areas where I can't tell that. So I
6    tried to make it clear that I am open to the safe
7    harbor information, if that information is
8    available, but otherwise, it is analyzed based on
9    2010.
10       Q.  So just so I am clear, you are leaving
11   the door open for a 1991 safe harbor basis, but you
12   are saying your analysis here is based upon 2010?
13       A.  That is correct.
14       Q.  Okay. And what do you think should be
15   done with respect to the vertical distribution of
16   dispersal?
17       A.  Wheelchair spaces should be provided
18   where they are required.
19       Q.  Where are they required here, do you have
20   a proposed remedy?
21       A.  I don't. Wasn't given enough time to look
22   for proposed remedies.
23       Q.  You don't have an opinion as to proposed

Page 122

1    remedy, right?
2        A.  I am sorry, I don't have what?
3        Q.  An opinion as to any proposed remedy?
4        A.  I have opinions.
5        Q.  Have you done a feasibility study?
6        A.  I have not.
7        Q.  Okay. Do you know anything about the
8    engineering of the stadium with respect to vomitory
9    locations?
10       A.  Engineering of the locations?
11       Q.  Do you know where the vomitories are?
12       A.  I can see those in the photographs, I can
13   see them in the drawings that I have been given.
14       Q.  Do you know where the vomitories are, if
15   any, in the 100 level?
16       A.  Yes. We have that information.
17       Q.  Where are they?
18       A.  They come out in the -- into the area
19   behind the home plate.
20       Q.  And do you know if those accessible --
21   those vomitory pathways are accessible?
22       A.  I do not.
23       Q.  Have you ever testified in a case

Page 123

1    regarding vertical distribution?
2        A.  Yes.
3        Q.  Could you identify the case?
4        A.  Sure, it is more than one.
5        Q.  Just even one would be great.
6        A.  Coors Field.
7        Q.  Any other?
8        A.  I believe the MCI arena included vertical
9    dispersal and horizontal dispersal in it. Yankee
10   stadium did.
11       Q.  How about the Rose Garden case?
12       A.  You know, it has been a long time. I
13   don't remember if dispersal was in there.  My guess
14   would be it was because we tried to look at a broad
15   range of issues in that one, but I can't testify
16   that I know that for sure. I can go back and pull my
17   file.
18       Q.  No, I am just really wondering if you
19   know. I am not asking you to guess.
20       A.  Yeah, I don't remember if it was in there
21   or not.
22       Q.  So as I understand it, I want to close
23   this out, your opinion is that there is a lack of

Page 124

1    vertical dispersal under the 2010 standards, leaving
2    the door open for possible safe harbor, and you
3    don't have an opinion as to how that would be
4    remedied?
5        A.  No, I didn't say that.
6        Q.  Okay. Tell me what is wrong.
7        A.  The assuming because, again, based on the
8    fact that there were wheelchair positions designed
9    behind home plate to start with that there is an
10   accessible route, at least one, to get to that area,
11   the number of wheelchair positions in that area
12   could be increased beyond what is available now.
13   And those spaces could be used to meet the
14   obligations described in the Department of Justice's
15   preamble analysis of what their -- I say preamble
16   analysis, their analysis of the -- what they
17   intended with ticket price dispersals in the 2010
18   regulations.  That those -- that that number could
19   be increased to improve dispersal there. Dispersal
20   could be improved by adding wheelchair positions in
21   the other places where they should be and where I
22   have no evidence that they exist. And those would --
23   those would improve it.  I have not had a chance to

**James Terry**                                                    **6/14/2019**

Page 125

1   develop detailed opinions on how the other dispersal
2   things can be handled, just because of lack of time
3   available in the field.
4       Q.  Let's be specific, okay?
5       A.  All right.
6       Q.  Let's look at Exhibit 4.
7       A.  Okay.
8       Q.  Where do you believe there should be more
9   accessible seating put in?
10      A.  Closer to the field, between the foul
11  poles on the --
12      Q.  Where?
13      A.  Where?
14      Q.  Yes.  I mean, you've got a map in front
15  of you, I am trying to figure out what you are
16  recommending.
17      A.  Additional seats between the dug-outs.
18  We know that there is an accessible route that leads
19  to that. Additional seats in that area, wheelchair
20  seats, would improve vertical access for the ten
21  thousand plus people that are between the foul poles
22  on the 41st row.
23      Q.  Other than taking out seats in sections

Page 126

1   thirty-five, thirty-three, whatever they are, and
2   adding in more accessible seats, do you have any
3   other recommendations with respect to level 100?
4       A.  I have not had a chance to study it and I
5   do not have specific opinions or solutions until I
6   have a chance to study it.
7       Q.  Okay. Do you have any recommendation with
8   respect to level 200?
9       A.  In terms of vertical dispersal in 200, I
10  am not as concerned about vertical dispersal in 200
11  because they are such shorter sections.
12      Q.  Okay. So 200 you believe is okay?
13      A.  Let me -- hang on just a second.
14      Q.  Yes.
15      A.  Yeah, I don't have a problem with the 200
16  section just because it is so short.
17      Q.  Okay. How about 300?
18      A.  300 meets the standards for vertical
19  dispersal. For vertical dispersal only.  I mean,
20  they fail other parts of the standard, but vertical
21  dispersal, they are close enough at this point where
22  I wouldn't spend a lot of effort working on them.
23      Q.  Got it. And just so I am clear here, the

Page 127

1   level 300 you believe the vertical dispersal is
2   okay, the same is true for level 200, it is level
3   100 that you are articulating is the problem?
4       A.  Level 100 is where the biggest problems
5   are.
6       Q.  Right. I understand. I am really just
7   trying to get focused so I can ask some questions
8   about that.
9       A.  Sure.
10      Q.  Don't let me put words in your mouth,
11  your view is level 200 and level 300 are okay with
12  respect to vertical dispersal, but level 100 you
13  think is not?
14      A.  Just making sure I am not forgetting
15  anything here.
16      Q.  No, that is fine. Please take your time.
17      A.  Yeah, you know, I would have to look at
18  ticket pricing to see about the 200 level and the
19  300 level.
20      Q.  We can put that aside for a moment.
21  Setting aside the issue of pricing, the vertical
22  dispersal with respect to location for 300 and 200
23  you are okay with, setting aside pricing?

Page 128

1       A.  Yes.
2       Q.  Okay. So with respect to location, your
3   complaint is about level 100?
4       A.  That is the primary complaint, yes.
5       Q.  Is there some other complaint?
6       A.  Well, horizontal dispersal we talked
7   about a little earlier.
8       Q.  I am actually trying to keep ourselves
9   focused on vertical dispersal.
10      A.  Okay. All right.
11      Q.  Is there something, other than level 100
12  vertical dispersal, that you have a complaint about?
13      A.  No.
14      Q.  Okay. So then if we look at level 100, in
15  terms of trying to figure out if there is a remedy,
16  your view is add more seats in thirty-five, section
17  thirty-five, section thirty-three and so on, right?
18      A.  If you are looking for an opinion that is
19  almost certain about something that could be done
20  but without the opportunity to look at other things
21  that could be done, that one looks to me to be an
22  easy fix. I am not ruling out other solutions, that
23  given an opportunity to go there and look at it,

**James Terry**                                    **6/14/2019**

Page 129

1  that other solutions couldn't be come up with as
2  well, I just don't --
3      Q.  I am not --
4      A.  They are not obvious.
5      Q.  I am not trying to -- I am just saying as
6  you sit here today, there is nothing else that you
7  have to say on that topic?
8      A.  I don't have an opinion about something
9  that appears to be a great solution right now.
10     Q.  That appears to be what?
11     A.  A great solution right now.
12     Q.  We have been going more than an hour, why
13  don't we take a three minute break and let you go to
14  the restroom or get a glass of water, whatever.
15         (Short break.)
16     Q.  Mr. Terry, thank you for your willingness
17  to do this on a Friday afternoon. I know it is not a
18  lot of fun.
19     A.  It doesn't bother me at all.
20     Q.  I appreciate it. I want to close out a
21  couple of things. So when we were talking about
22  vertical distribution, I understand that your
23  analysis is kind of section by section within the

Page 130

1  stadium as opposed to viewing the stadium as a
2  whole; is that right?
3      A.  That probably is a little over
4  simplification. The rules regarding vertical
5  dispersal under the 2010 standards are -- they are
6  complicated because they were written to deal with a
7  lot of different types of assembly spaces,
8  everything from, you know, a small lecture room to a
9  theater to a cinema theater to a stadium, and so my
10  analysis of this is kind of a hybrid analysis of
11  those details, my opinions about this. And the --
12  and what was required in '91.  And so it is kind of
13  a hybrid analysis. It is it not necessarily a
14  section by section, because the fact that one
15  section has wheelchair seats in it and the other one
16  doesn't, doesn't mean that the one that doesn't have
17  them failed because the count may not have been
18  required, horizontal dispersal didn't require
19  something, so it is a hybrid kind of analysis.
20     Q.  Is it fair to say that your analysis with
21  respect to T Mobile park is section by section?  In
22  other words, you are saying that level 100 is a
23  problem, in your view, but that level 200 is not and

Page 131

1  level 300 is not?
2      A.  Are you calling the level a section?
3  Because I call the sections the ones that have
4  separate numbers to them.  So I would think 321 and
5  322 are different sections.
6      Q.  I agree. And so is your analysis --
7      A.  Actually there is no 322, sorry.
8      Q.  Well, is your analysis, then, that the
9  level 100 is viewed discretely from level 200 and
10  level 300?
11     A.  Yes, under the 2010 standards, you are
12  required to provide vertical dispersal to all levels
13  that are served by an accessible route.
14     Q.  How about the '91 standards?
15     A.  '91 standards were performance standards.
16  They didn't give you nearly as much guidance on how
17  to do.  You just had to provide lines of sight that
18  were comparable and you had to provide ticket
19  pricing options that were comparable.  And so that
20  gave you a lot more latitude in how you design the
21  stadium to achieve that performance requirement.
22     Q.  There is nothing in the '91 standard that
23  talks about a level by level or a section by section

Page 132

1  analysis, right?
2      A.  I don't recall one.
3      Q.  Okay. In the motion that the plaintiff's
4  filed, and you can look at Exhibit 3, they say this,
5  in order to become even arguably compliant with
6  either the 1991 or the 2010 ADA standards, T Mobile
7  park must offer a dramatically increased number of
8  wheelchair accessible seats closer to the playing
9  field, for instance by increasing the proportion of
10  wheelchair accessible seating within the first
11  fifteen rows of the field from 0.115 percent to
12  16percent. Do you agree that 16 percent of the
13  seating within the first fifteen rows of the field
14  should be accessible seating?
15     A.  I have never done that calculation, so I
16  can't say whether I agree with it or not.
17     Q.  Do you believe that that is required by
18  the 1991 or the 2010 ADA standards for T Mobile
19  park?
20     A.  That sounds like it is probably right for
21  the 2010 standards for vertical dispersal for new
22  construction. And so --
23     Q.  Do you believe that the 2010 ADA

**James Terry**                                                    **6/14/2019**

Page 133

1    standards, if applicable, would require 16 percent
2    of the seating in the first fifteen rows to be
3    accessible?
4         A.   I don't have an opinion about that
5    specific number.
6         Q.   You just don't know?
7              MR. REYNOLDSON:  Object to the form.
8         A.   I don't have an opinion, I haven't
9    studied it.
10        Q.   Fair enough. I want to talk a little bit
11   about season ticket availability.
12        A.   Okay.
13        Q.   You have a chart.  I believe it is
14   attachment I.
15        A.   Yes.
16        Q.   Your opinion at section E on page sixteen
17   to the top of page seventeen talks about season
18   tickets.
19        A.   All right. I am on page seventeen.
20        Q.   Sixteen -- starts at the bottom of
21   sixteen and continues to the top of seventeen.
22        A.   Yes, all right.
23        Q.   Okay. Is there an opinion you have about

Page 134

1    the availability of accessible seats in season
2    tickets?
3              MR. REYNOLDSON:  Can you clarify the
4    question?
5         A.   Yeah, is there an opinion -- you are
6    asking me if I have additional opinions beyond what
7    are in the report?
8         Q.   I don't know, actually, what the report
9    says exactly and I am trying to understand it. Are
10   you making an opinion that there is something not
11   compliant with the ADA, whether it is the 1991
12   standards or 2010 standards, with respect to the
13   season ticket availability of accessible seating?
14        A.   Yes, what I am indicating is I don't have
15   enough information yet to be able to form a defined
16   opinion, but the indicators are because of the fact
17   that wheelchair seats are just not available for
18   purchase while all the other -- you know, there are
19   lots and lots of season tickets available, but very
20   few to wheelchair users, comparatively speaking,
21   very few to wheelchair users.  That is an indicator
22   that there is something wrong with either the number
23   of seats that are made available to wheelchair users

Page 135

1    or that are -- that are being bought maybe by non
2    wheelchair users or something -- I am telling you
3    that there are indicators here that say that
4    something is wrong.  And I don't have enough
5    information about it to be able to tell definitively
6    what is wrong.
7         Q.   Or even if there is anything wrong, you
8    just don't know?
9              MR. REYNOLDSON:  Objection. Object to the
10   form.
11        A.   Yeah, I have -- I just told you what I
12   know. What I know is what I see and it is a red
13   flag.
14        Q.   What I understand you to be doing, tell
15   me if I am wrong, is that you are seeing something
16   and you are making a inference, you just don't know?
17             MR. REYNOLDSON:  Object to the form.
18        A.   I am looking for the opportunities
19   available to wheelchair users when compared to the
20   opportunities available to other people, and I am
21   raising a flag to say, this looks funny, somebody
22   needs to look at this.
23        Q.   Okay. But you have not looked at it to

Page 136

1    date?
2         A.   Not in anymore detail than what I have
3    explained and what shows up in attachment I.
4         Q.   Right. And so in attachment I you are
5    providing information regarding a -- some searching
6    you did on -- as of April 28, 2019; is that right?
7         A.   Yes.
8         Q.   Did you look at the ticket availability
9    for any dates -- sorry, on any other dates than
10   April 28th?
11        A.   No.
12        Q.   So do you know when ticket -- excuse me,
13   do you know when season tickets go on sale?
14        A.   I do not.
15        Q.   They go on sale in November. So you don't
16   know what the availability was here for any of these
17   seats in November, do you?
18        A.   I do not.
19        Q.   Or January or February or March, right?
20        A.   I have testified that I know only what
21   was available on April 28th.
22        Q.   Got it. And you also don't know if, for
23   example, on May 1, if you had done the same search

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**James Terry**  6/14/2019

Page 137

1  there may have been more inventory put in those
2  sections, right?
3      A.  I have already testified I only know what
4  was there on April 28th.
5      Q.  Got it. So the indicator, the red flag
6  that you referred to, is only based upon searching
7  you did on April 28th; is that right?
8      A.  That is correct.
9      Q.  In your report, in section four, you are
10  talking about the new seats in the Diamond Club
11  area?
12      A.  Yes.
13      Q.  It is on page seventeen onto the top of
14  eighteen.
15      A.  Yes.
16      Q.  And the question -- I guess the question
17  you are addressing is whether or not those seats and
18  the routes leading to them are compliant with the
19  2010 ADA standards, that is the question you are
20  asking, right?
21      A.  That is one of questions.  Oh, yes, are
22  the seats and the routes accessible, that is all
23  that is in that one.

Page 138

1      Q.  Yeah, I am not trying to mislead you, I
2  am trying to get you --
3      A.  Yes, sure.
4      Q.  So the answer is you don't know?
5      A.  I am sorry?
6      Q.  The answer is you don't know, is that
7  right?
8      A.  I don't know what?
9      Q.  You don't know whether they comply or
10  not, you don't have an opinion?
11      A.  I don't have enough information to know
12  definitively whether they comply or not.  Again,
13  there are red flags that I pointed out in my report,
14  there are red flags that came from the photographs
15  of those seats and from the drawings of those seats
16  that indicate that there may be problems.  I don't
17  know specifically, personally, that those problems
18  are there, but they are indicated as being problems
19  in the photographs in the drawings.
20      Q.  Fair enough. And again, you are saying
21  that there are indicators that come to your
22  attention, but you don't have enough information to
23  render an informed opinion; is that right?

Page 139

1      A.  No, I didn't say it is not an informed
2  opinion. I said it is not a definitive opinion. I
3  have not measured them personally myself in the
4  field to know whether they were built like the
5  drawings show them, or like the photographs show
6  them, or if they have been modified since then, or
7  whether they were -- the drawings were, you know,
8  modified later. All I know is what I have seen and
9  what I have seen indicates that there is the
10  potential for some problems there. Dimensions are
11  closer than I would have designed them if I had done
12  it myself.
13      Q.  But again --
14      A.  So I can't tell.
15      Q.  -- you haven't measured anything, right?
16      A.  I have not measured these, no.
17      Q.  You have not been there, you have not sat
18  in them?
19      A.  No.
20      Q.  And you haven't done anything to see what
21  they are doing in the operation, right?
22      A.  No, I have testified I haven't been to
23  the field this year, since that visit.

Page 140

1      Q.  Okay. So as we sit here, you don't have
2  the ability to render a firm opinion because you
3  don't have the information, that is all, right?
4      A.  That is correct.
5      Q.  Okay. Number five of your opinion here
6  asks the question about whether there is, quote,
7  public evidence that the new seating is available;
8  is that right?
9      A.  Yes.
10      Q.  And the answer is you did not know based
11  upon whatever you did at the time, right?
12      A.  I wouldn't have phrased it that way.
13      Q.  Well, I mean, the answer is you don't
14  know, right?
15      A.  The answer is that I could not -- I mean
16  the question was, is there public evidence, and the
17  answer is no, there is no public evidence that I
18  could find.
19      Q.  That you could find for purposes -- so if
20  I said to you, go on Ticketmaster tonight and you
21  can find those seats available, you wouldn't have
22  any reason to rebut that, would you?
23      A.  I would be totally surprised. I looked at

**James Terry**                                                    **6/14/2019**

Page 141

1  them this week and I couldn't find them.
2      Q.  So you haven't read Malcolm Rogel's
3  declaration, have you, or looked at the Exhibit
4  which shows the seats available?
5      A.  I have not.  I've looked at Ticketmaster
6  and that is what is publicly available.
7      Q.  Right.  And in Mr. Rogel's declaration
8  attached an Exhibit which is a screen shot of
9  Ticketmaster purchasing those seats, you have not
10  seen that, have you?
11      A.  I have not.
12      Q.  I want to ask you about number six, this
13  says the dimensions of seating placement on the 300
14  level.
15      A.  Yes.
16      Q.  The bottom of eighteen.  And I see you
17  make an analysis about the dimensions, sizing and
18  that what you believe or think to be the problem
19  which is the placement of structural supports; is
20  that right?
21      A.  It is placement of the structural
22  supports for the guard that goes across the front of
23  the platform, yes.

Page 142

1      Q.  Right.  And I think you are correct, you
2  are saying it is mounted on the floor as opposed to
3  the front of the platform; is that right?
4      A.  It is mounted on the top rather than the
5  front of the platform, yes.
6      Q.  Fair enough.  Fair enough.  And is that
7  true for all seats in the 300 level or certain ones?
8      A.  The ones that I saw, it looked like a
9  standard detail.
10      Q.  Do you know?
11      A.  I did not have time to look at every
12  section and document that kind of specificity.  No, I
13  don't know that every section is that way.
14      Q.  Got it.  Do you know which ones you looked
15  at?
16      A.  I looked at a whole series of them from
17  section 306 back.  We walked all the way -- I think
18  we walked all the way around the section, I can't
19  recall for sure that we did them all, but we walked
20  all the way around them and said, hey, are there
21  other things that we need to be looking at here,
22  but, again, we only had six and a half hours, so
23  that was not a real high priority.  Once we saw what

Page 143

1  was causing the complaint --
2      Q.  Do you know the numbers?  If you know the
3  numbers, tell me, if you don't know, tell me you
4  don't know.
5      A.  I don't know the specific numbers.
6      Q.  Okay.  That is fine.
7      A.  As I sit here.
8      Q.  That is fine.  And they are not listed in
9  your report, are they?
10      A.  I don't recall.
11      Q.  I didn't see them.  That is why I am
12  asking.  If you think they are, just tell me where.
13      A.  I don't think -- I don't think they are
14  listed in the report.  It was a typical condition and
15  so I mean, I have photographs of them that have
16  section numbers in the photographs, but I don't have
17  those with me.
18      Q.  Okay.  What I am getting at, there is
19  nothing in your report that says which section,
20  right?
21      A.  No, I don't think so.
22      Q.  Okay.  You also have this thing here,
23  number seven, about companions.

Page 144

1      A.  Yes.
2      Q.  As I understand it, you don't actually
3  know -- have an opinion about the companion seats,
4  you are just not sure, you don't have the
5  information; is that right?
6      A.  There were a few companion seats that I
7  saw in the stadium, kind of surprised me to see a
8  few fixed companion seats around, but the vast
9  majority of the companion seats were not in place
10  and so I don't know for sure what kind of companion
11  seats are in use this season.
12      Q.  Fair enough.  You do not know and you
13  don't have an opinion about whether the companion
14  seats are or are not complaint in any which way?
15      A.  I do not have an opinion about companion
16  seats in use this season at the stadium, because I
17  haven't seen them.
18      Q.  Fair enough.  And similarly, you don't
19  have an opinion about --
20      A.  About the what?
21      Q.  You don't have an opinion with respect to
22  the compliance or non compliance with companion
23  seats as used last season?

**James Terry**                                                      **6/14/2019**

Page 145

1    A.  I believe that there were -- some of the
2  companion seats visible in the photographs that
3  Brenda Basher took, and I would have to go back and
4  look at those.  But, again, it is a question that I
5  would have to go back and look and see what all was
6  in there for those. I did ask somebody and I can't
7  recall when I asked that and so I felt like it was
8  something that should go in here.
9    Q.  Let me ask you this, I don't see an
10  opinion one way or the other in this sub section
11  seven on nineteen and twenty of your report, am I
12  missing something?
13    A.  Okay. Maybe the question here is an
14  opinion. When I say, I understand that they are not
15  all comparable to the other seats in the nearby
16  area, are you disqualifying an opinion based on an
17  understanding?  If this understanding is correct,
18  then my opinion is that it is in violation, that is
19  what I am saying. Do I have specifics about what is
20  actually in place right now?  No. So I don't have an
21  opinion about what is actually in place right now. I
22  have an opinion that says that if, as I understand,
23  they don't meet the obligations defined in my report

Page 146

1  and defined by the standards and the Technical
2  Assistance Materials, then my opinion is that they
3  are out of compliance.
4    Q.  And if the seating does comply with the
5  standards, then they are in compliance, right?
6    A.  Provided they are operating correctly and
7  all the other things, then, yes, they would be
8  compliant.
9    Q.  Okay. Your report does not say they lack
10  compliance in 2019; does it?
11    A.  It does not.
12    Q.  It does not say that there was a lack of
13  compliance in 2018; does it?
14    A.  It says that my understanding is that
15  they did not comply. From the facts that I have been
16  given, that I understand they do not comply, and
17  here are the reasons that I am told that they don't
18  comply.  So that would be my opinion. If my
19  understanding of the facts -- again, I have spent
20  six and a half hours in a stadium, I was not allowed
21  to be there otherwise, and so based on what I could
22  see and what I understand, that is a problem. And
23  that is my opinion.

Page 147

1    Q.  So, Mr. Terry, wait a second, you know,
2  and you said here, when you visited most companion
3  seats were not in place, right?
4    A.  That is correct.
5    Q.  So you could have been at the stadium for
6  three days and you wouldn't have seen any, right?
7    A.  During that time, if it continued
8  snowing, I probably wouldn't have seen anything.
9    Q.  Right. Okay. Now secondly, you don't have
10  an opinion stated here about 2018, you have some
11  understanding about I don't know what, so let's talk
12  about that. What is your understanding based on?
13    A.  Is that the seats were not comparable for
14  wheelchair users companions --
15    Q.  No, what is your understanding, what is
16  the information that is the premise and basis of
17  your understanding.
18    A.  My understanding was that the companion
19  seats did not -- were not comparable to the seats
20  provided for other spectators in the same area, that
21  they lacked -- either in some areas they lacked cup
22  holders, in some areas they lacked armrests, in some
23  areas they lacked padding where there was padding

Page 148

1  available to other people, that the kinds of things
2  that would make them comparable were not provided.
3    Q.  Okay. I am going to back up here, so
4  number one, you do not say anywhere here that the
5  comparability issues are cup holders, armrests or
6  padding, why is that?
7    A.  Why do you say I don't say that?
8    Q.  Well, you don't say that your
9  understanding is that there are non comparable seats
10  because they lack X, Y or Z, you don't tell us that,
11  right?
12    A.  All right. So you are saying that my
13  quoting --
14    Q.  My question is just a yes or no?
15    A.  Okay. I am reading my report. Amenities
16  include but are not limited to cup holders, armrests
17  and storage pockets.  Later, the next sentence, I
18  don't say they are missing armrests, cup holders and
19  storage pockets, I don't repeat what was in the
20  standards, I just said as a matter of grammatical,
21  you know, the way I am doing it is I understand they
22  are not all comparable. Two sentences later I tell
23  you that I understand this is not the case. I could

James Terry                                                    6/14/2019

Page 149

1    have repeated that list. I didn't. But I could have.
2        Q.   Here is the deal, if, for example, the
3    complaint was that these seats were not comparable
4    because they lacked cup holders then I would expect
5    you, even if you quoted the entire regulation, you
6    would then say here the seats were not comparable in
7    the 2018 season because they lacked cup holders or
8    whatever, but you are not telling us that. So now
9    what I am hearing you say is that your, quote
10   unquote, understanding is that there are in some
11   places cup holder issues, other places armrest
12   issues, other places padding issues, but you don't
13   actually have personal knowledge of any of those?
14       A.   No more personal knowledge than what I
15   have seen in the photographs and been told.
16       Q.   Okay. So when you are understanding is
17   based on being told, who told you this?
18       A.   Brenda Basher and my client's.
19       Q.   Your client's --
20       A.   People who have been there to the stadium
21   more than any of the rest of us.
22       Q.   The plaintiff's in this case?
23       A.   Plaintiff's attorneys in this case and I

Page 150

1    don't think I have talked to the plaintiff's about
2    this.
3        Q.   All right. So your understanding is based
4    upon the communication Mr. Reynoldson had with you?
5        A.   Partially.
6        Q.   And the communications Mr. Conner had
7    with you?
8        A.   Partially.
9        Q.   Got it. And what else?
10       A.   Conversations with Brenda Basher, what I
11   saw in photographs.
12       Q.   Who is Brenda Basher?
13       A.   The surveyor who went there during the
14   game in 2018.
15       Q.   I don't see that -- is that and Brenda
16   Cummings the same person?
17       A.   Oh, yes, sorry. Her maiden name was
18   Basher or her prior name was Basher. It is Cummings
19   now, sorry.
20       Q.   So Ms. Basher-Cummings, she didn't
21   actually do an analysis of a companion seat, did
22   she?
23       A.   I did not do an analysis of it.

Page 151

1        Q.   She didn't in fact -- she did not
2    document whether or not they were compliant or not,
3    did she?
4        A.   She has photographs that I looked at, I
5    would have to look back through those photographs to
6    see if part of what I was basing this opinion was on
7    her photographs.
8        Q.   But you don't know today?
9        A.   Today I can't tell you what the specifics
10   were.
11       Q.   Got it.
12       A.   I --
13       Q.   So apart from Mr. Reynoldson's input and
14   Mr. Conner's input and potentially looking at the
15   pictures that Brenda Basher took, that covers the
16   basis of your understanding as a factual matter?
17       A.   Not completely. Like I said, there were
18   some companion seats in place when I was there.
19       Q.   Okay. Were the companion seats in place
20   when you were there non compliant, because it
21   doesn't say that and I want to know if they were?
22       A.   You know, I need to look back at any
23   photograph of the companion seat in the 200 level,

Page 152

1    the fixed companion seat that was there. My
2    recollection is that it was non compliant.
3        Q.   It doesn't say that in this opinion, does
4    it?
5        A.   No.  Now, I understand would not be
6    contradicted by the fact that I saw something that
7    was compliant or non compliant. So I used a more
8    general term than I would have if I had stopped and
9    said, okay, that seat was not, I -- I didn't do
10   that.
11       Q.   Right. You actually, as you sit here
12   today, do not have personal knowledge about this,
13   you are relying upon input from the attorney's and
14   maybe even some pictures you saw and some
15   recollection you have, but maybe you didn't measure
16   it, right?
17       A.   I do not have personal recollection of
18   that particular seat to tell you specifically what
19   it failed. My recollection is that it was non
20   compliant, but I don't have that in front of me so I
21   can't tell you specifically what was wrong with it,
22   otherwise I am relying on photographs, discussions
23   with other people.

**James Terry**                                                    **6/14/2019**

---

Page 153

1    Q.  Right. And to the extent that you
2    believe, sitting here today, maybe this 200 level
3    seat was non compliant, you did not say that in your
4    opinion, did you?
5        A.  I did not put it in my report.
6        Q.  Got it. Let's talk about the large
7    scoreboard which is section eight of your report on
8    page twenty.
9        A.  I am sorry, which page are we on now?
10       Q.  On page twenty.
11       A.  Okay.
12       Q.  Section number eight.
13       A.  Yes.
14       Q.  So do you have an opinion -- are you
15   giving an opinion that there is a violation of the
16   ADA with respect to the large scoreboard?
17       A.  Yes.
18       Q.  And that is because you are basing it
19   upon the idea that there is some sort of lack of
20   effective communication; is that right?
21       A.  Yes.
22       Q.  Okay. And so when you were there, you
23   didn't actually see any scoreboard in operation,

---

Page 154

1    right?
2        A.  I did not.
3        Q.  And in fact, you didn't see the large
4    scoreboard in operation, did you?
5        A.  I did not.
6        Q.  So you didn't see whether the television
7    monitors were in action, you didn't see those
8    either, right?
9        A.  That is correct.
10       Q.  Got it. And you didn't hear the PA with
11   respect to any kind of game commentary, right?
12       A.  That is correct.
13       Q.  And you didn't look at any apps to show
14   other information that was being provided, right?
15       A.  That is correct.
16       Q.  So you don't -- when you rendered the
17   opinion, you are not taking into account any of
18   those things, right?
19       A.  No, not true.
20       Q.  Oh, really?  I am trying to understand,
21   because you don't mention how information is
22   communicated other ways and other means, other
23   venues?

---

Page 155

1        A.  That is correct.
2        Q.  So what is it that you believe -- what is
3    the remedy that you believe should be occurring
4    here?
5        A.  The Mariners should do an analysis of the
6    information that is being provided through the
7    scoreboard that is disproportionally blocked because
8    of the location of the wheelchair positions, and
9    they should analyze and make sure that that same
10   information is available in a similar kind of way to
11   people who can find no better place to sit and that
12   is where -- that is where they have to sit, so that
13   everybody is communicated effectively to, the same
14   kinds of information that are being provided to
15   everybody else.
16       Q.  Right. And do you know what information
17   is provided on the large scoreboard?
18       A.  Yes.
19       Q.  What?
20       A.  Depending on the instance during the
21   game, I have looked at photographs of that
22   scoreboard on the Internet and there is replays,
23   there are all kinds of statistics about players,

---

Page 156

1    there are player line ups, there are all kinds of
2    details that baseball players seem to really get
3    into analysis of what is going on, there is pitcher
4    information, there is pitch information, there is
5    batter information, lots of things like that on that
6    scoreboard that I don't believe were actually being
7    communicated effectively on the TVs.
8        Q.  Do you know?
9        A.  I can look at them and tell based on the
10   amount of information that shows up on the Internet
11   views of that large scoreboard, and I can look at
12   the distance to the televisions from the wheelchair
13   positions, and the relative size, and if they put
14   the same information on the HD TVs, if those are
15   really HD TVs, and I don't know, but if they put HD
16   TVs there, you couldn't read the statistics as
17   sparsely -- as sparsely located as those television
18   screens are, you couldn't read those statistics if
19   they were on them.
20       Q.  Is that your speculation, correct?  You
21   haven't actually sat in any of those seats and
22   looked at those monitors during a game, right?
23       A.  I have not looked at those monitors

---

**BIRMINGHAM REPORTING SERVICE**
**(205) 326-4444**

**James Terry**            **6/14/2019**

## Page 157

1 during a game. They were not on in the six and a
2 half hours I was allowed to spend there.
3     Q.   And there was no game going on when you
4 were there, right?
5     A.   There was no game going on. But I looked
6 at the relative size of these compared to the
7 relative size of the scoreboard, and then I looked
8 at the images of the scoreboard and said, well, if
9 they put that information on that little tiny screen
10 that is sitting X-ty feet away, you couldn't read
11 it, unless you have super human eyesight.
12     Q.   How far is the screen from the accessible
13 seating?
14     A.   Depends on which seat you are in.
15     Q.   Did you measure it from any seat?
16     A.   Did not measure it.
17     Q.   Got it. And do you know how large the
18 screen is?
19     A.   No.
20     Q.   Didn't measure that?
21     A.   Did not measure it.
22     Q.   And have not ever seen what is on the
23 screen during a game, so you don't know what is on

## Page 158

1 it?
2     A.   I don't recall if I have seen any
3 photographs of what is on it. And I am sure that it
4 changes throughout the game.
5     Q.   Again, I am just trying to pen down what
6 you know and what you don't know.
7     A.   Sure.
8     Q.   I believe you don't know what is on the
9 screen during the game, do you?
10     A.   I don't know what all is on that screen
11 during the game.
12     Q.   Okay. Let's talk about the drink rails on
13 the 200 level. So as I understand it, your opinion
14 is what is on twenty-two in the last paragraph, is
15 that right?  It is the paragraph that begins, if
16 fixed drink rails were installed, et cetera, that
17 paragraph?
18     A.   That is -- that was my opinion as of the
19 time I wrote this report.
20     Q.   Okay. And do you have any different
21 opinion today?
22     A.   Based on additional information about
23 operation, I understand that those counters are not

## Page 159

1 served for consumption at that location. So rather
2 than having waitresses coming by and bringing your
3 drinks for you to consume it right there where you
4 are sitting, you may have to go somewhere else. So
5 they may not be required to meet 5.2, they may be
6 required to meet 5.1.
7     Q.   Right. And you don't know, though?
8     A.   I don't know because I haven't watched to
9 see if anybody actually goes around and serves
10 people at those drink rails. If they don't, they
11 have to comply with 5.1, if they do, they have to
12 comply with 5.2. Either way they don't comply with
13 either of those two sections.
14     Q.   But they may be safe harbored?
15     A.   I am sorry?
16     Q.   I believe your opinion is that they may
17 be safe harbored?
18     A.   5.1 and 5.2 are both safe harbor
19 sections. Those don't apply unless they are safe
20 harbored. Those are the safe harbored sections. It
21 if it didn't comply with 5.2 under '91, then it had
22 to comply with 5.1 under '91. When I was writing my
23 report, prior to reading Mr. Endelman's report, I

## Page 160

1 believed that this, like so many other bars, had
2 waitresses that came around and brought your drinks
3 to you so they were served for consumption at the
4 drink rail, but from what he said, no, they are
5 never served there, then that means rather than 5.2
6 it has to go to 5.1, which has slightly different
7 requirement, but it still has a low section
8 requirement and those low sections were not there.
9     Q.   I see. So when you wrote your report you
10 were assuming there was bartender service or service
11 at those rails?
12     A.   I was.
13     Q.   Right. And then you didn't say anything
14 about 5.1 in here, right?
15     A.   Right, because of my understanding of
16 what was going on. I mean, it was a bar. I mean,
17 if you are going to make money, you drink -- bring
18 the drinks to the people. I assumed it worked like
19 most bars do. But your expert said that doesn't ever
20 happen, so then it is 5.1.
21     Q.   On the question of concession lines, you
22 said that none of the queue lines stands were in
23 place during your visit?

**James Terry**                                                   **6/14/2019**

Page 161

1    A.  That is correct.
2    Q.  And so you don't actually have any
3    personal knowledge of whether or not the queue lines
4    and stanchion placements in operation are
5    satisfactory or not, right?
6    A.  Define personal knowledge.
7    Q.  You didn't measure it, you never saw it,
8    right?
9    A.  I am looking at two photographs in my
10   report.
11   Q.  Yep. And did you measure anything out of
12   those photographs?
13   A.  I don't need to measure those. Those are
14   clearly non compliant widths.
15   Q.  Got it. So you don't know, for example,
16   if those widths were corrected after the picture was
17   taken or if they exist today, right?
18   A.  I don't know that they exist today. I
19   don't know if they have been corrected. What I see
20   is a problem that I reported on in my report, that
21   they are not all always set up to be compliant.
22   Q.  Or that they don't always remain set up,
23   right?

Page 162

1    A.  That is correct.
2    Q.  They are mobile stanchions, correct?
3    A.  That is correct, they could be moved.
4    Q.  Got it. So what we know is, based upon
5    your report, you did not observe any stanchions
6    during your visit, and you believe that based upon
7    your eyeing pictures taken by Ms. Cummings at a
8    single game last August, that those were non
9    compliant as shown in those pictures, that is your
10   opinion?
11   A.  Not just by looking at the photographs,
12   but by talking to Ms. Cummings and her reporting
13   that there were instances like this that she photo
14   documented when she saw them.
15   Q.  And we have documentation of two places
16   within the stadium on a day in August last summer,
17   correct?
18   A.  That is correct.
19   Q.  Is there some listing of some other
20   locations other dates?
21   A.  I don't have one.
22   Q.  Okay. Do you know if -- do you know if
23   the Mariners have a policy with respect to the

Page 163

1    placement of the stanchions?
2    A.  I saw from Mr. Endelman's report that
3    they have a procedure to set those up correctly.
4    Q.  Okay. And you don't have any reason to
5    doubt that, do you?
6    A.  I don't have a reason to doubt the fact
7    that they have a policy and that they have trained
8    some people to do it. I have serious doubts that
9    they are actually succeeding at a level required for
10   compliance.
11   Q.  And let me ask you this, how would you
12   remedy that?
13   A.  Lot of different ways you could remedy
14   it.
15   Q.  Give me an example, that would be
16   sufficient.
17   A.  Okay. You could create a device that is
18   the right width and you could put a diagram on it
19   that shows people how to set things up, how to
20   measure it. You could train them on how to use that
21   device and then just have them go through the park
22   throughout the games and say, here, just go through
23   and check. You know, run this thing that is 36

Page 164

1    inches wide or 48 inches wide or however you are
2    setting up the stanchions, run this thing through
3    the opening and if it touches, if the ends of it
4    touch the end of the counter and the stanchion
5    support, then it is too small, move it.
6    Q.  Okay. Do you know if that is done?
7    A.  I know that that was required by the
8    Judge in the Macy's West case where they had aisles,
9    retail aisles done that way.
10   Q.  Sir, I am asking you if you know if it is
11   done at the stadium?
12   A.  I don't know if it is done at this
13   stadium, nobody said it was.
14   Q.  I just asked if you knew. That is all.
15   A.  No, sorry, I don't know.
16   Q.  And you don't know what is going on this
17   season either, right?
18   A.  I don't.
19   Q.  Okay. You have a section in your report
20   about accessible routes to the stadium, it is like
21   section thirteen, I believe, on page twenty-five.
22   A.  Yes.
23   Q.  And you refer to hundreds or thousands of

James Terry                                                          6/14/2019

---

Page 165

1  linear feet of non compliant gaps, end quote; do you
2  see that?
3      A.  Yes.
4      Q.  I mean, there is a difference, is it
5  hundreds or thousands?
6      A.  In six and a half hours I couldn't
7  measure.
8      Q.  Got it. So you don't know?
9      A.  It is at least hundreds.  My guess would
10  be it is thousands, but again, I didn't have time to
11  try to do a calculation on it.
12      Q.  Understood. So the answer is you are just
13  not sure, you don't know?
14      A.  I don't know which of those it is.
15      Q.  Okay. Does your report identify where
16  these areas are?
17      A.  Let's see, if you look at the photographs
18  you can see some places where the surfaces, where
19  you will get clues from the counters that are there,
20  I did not list all the places where I found it.  I
21  really -- it would have taken many, many more pages
22  to do that.  These problems --
23      Q.  I am not interested in the reasoning, I

---

Page 166

1  want to know whether you did.
2      A.  I did not, other than what you can tell
3  from the photographs.
4      Q.  Right. But there is no listing anywhere
5  of where this -- these gaps exist?
6      A.  Not in my report.
7      Q.  Okay. And you don't have a record of
8  that?
9      A.  I didn't say that.
10      Q.  Well, do you?
11      A.  I do. I have photographic records of lots
12  of places where I took pictures of these.
13      Q.  I understand. But apart from photographic
14  records, and there are some in here, do you have
15  listings, for example, where I could say to you, you
16  know what, I would like to go out there tomorrow and
17  make sure that everything you have identified has
18  been fixed or will be fixed, please give me the list
19  of sites, could you do that?
20      A.  I could put together a list of the places
21  that I photographed and look at those places, but I
22  would have to take my photographs and match them up
23  to be able to do that though.

---

Page 167

1      Q.  Right. Right. You would try and use clues
2  from the photographs to figure out where they were?
3      A.  They are pretty good clues if you can see
4  where the photograph is taken.
5      Q.  All I am saying is what you are doing --
6      A.  Yes, yes, in the tiny amount of time I
7  had in the facility, I did not list all of the
8  locations they were found.
9      Q.  All right. And in fact, you didn't list
10  any of the locations they were found?
11      A.  In my report, I did not.
12      Q.  Okay. Do you know whether or not any of
13  those gaps have been repaired?
14      A.  I have not been there, I don't know.
15      Q.  Okay. So you did not look at the bullpen
16  when you were there?
17      A.  I did not go into the bullpen when I was
18  there.
19      Q.  Right. You didn't assess it, right?
20      A.  I did not look at the last step into the
21  bullpen.
22      Q.  You don't know even if there is a step
23  into the bullpen?

---

Page 168

1      A.  I was told that there was a step into the
2  bullpen.  I was led to believe while I was there
3  that there was not. I did not go all the way.
4      Q.  So you didn't look?
5      A.  I am sorry?
6      Q.  You did not look?
7      A.  I did not go all the way to look at the
8  last step into the bullpen. Is there --
9      Q.  You don't know if there is a step though,
10  right?
11      A.  I have been told there is a step, I did
12  not look at it myself.
13      Q.  Got it. So you did not go to see whether
14  the thing you were told is true or not?
15      A.  I did not go all the way there to see it.
16      Q.  Okay. So the dugouts do not presently
17  have a lift from the field surface into the dugouts,
18  correct?
19      A.  That is correct, as of the day of my
20  survey.
21      Q.  Understood. Understood. And the
22  complaint, as I understand it, is that because there
23  are stadium tours that permit access to the general

---

**James Terry**                                             **6/14/2019**

---

Page 169

1  public there should be a lift; is that correct?

2      A.  There should be a -- an accessible route

3  is required into the dugout if that is a part of a

4  tour or if it is part of the area that is used by

5  the performers, in this case. So yes, an accessible

6  route is required. Doesn't have to be a lift. It can

7  be done many ways.

8      Q.  Understood. And would that be true even

9  if no members of the general public ever used that

10  area?

11      A.  Yes.

12      Q.  And if there were only professional

13  baseball players in that area?

14      A.  Yes.

15      Q.  Got it. When you were in the stadium, did

16  look at Lookout Landing?

17      A.  Remind me what Lookout Landing is.

18      Q.  It is a space that is -- I believe it is

19  upper level N out past center field.

20      A.  I see that. It is surrounded by section

21  347.

22      Q.  Did you go there?

23      A.  I don't recall. Is there a -- did I say

---

Page 170

1  anything about it in my report?

2      Q.  No, I didn't see it in there, that is why

3  I was wondering.

4      A.  I don't recall if I went there or not.

5      Q.  Did you observe or make any opinions

6  about seating accessibility in Lookout Landing?

7      A.  Like I said, I don't recall.

8      Q.  If it is not in your report, you didn't

9  do it, right?

10      A.  No, there are things that I looked at

11  that I didn't put in my report.

12      Q.  Do you have an opinion about the

13  availability of seating in Lookout Landing?

14      A.  I see that it is indicated on your

15  exhibit -- Defendant's Exhibit or Terry deposition

16  Exhibit 4, I see it as a wheelchair at the back of

17  section 347. I don't know what that refers to. Let

18  me see if it shows up in ours -- in my report. I

19  don't have any information. It looks like the

20  wheelchair symbol shown on Exhibit 4 for section 347

21  is actually part of the seating in 347, so it is not

22  indicated on my attachment G as being wheelchair

23  accessibility in the Lookout Landing. I -- so, you

---

Page 171

1  know, my opinion is that I don't see anything

2  related to wheelchairs in that area, but I -- that

3  wasn't one of the questions I was asked to resolve.

4      Q.  If you didn't look at it and don't know,

5  that is fine. Do you know if there is ticketed

6  seating in Lookout Landing?

7      A.  I don't know. There was nothing that we

8  found for Lookout Landing -- let me check and make

9  sure I am not talking -- our notes said that the

10  existing seating was zero, reception set up was 150,

11  rounds 80, theater set up 100, and that was based on

12  the MLB Mariners Ballpark Event Spaces. So

13  apparently it is temporary seating that is there and

14  not -- now I don't know whether you -- whether those

15  kinds of set up become ticketed through some process

16  that is not a Ticketmaster process that we could

17  easily see, whether that is some other ticketing

18  process, I don't know about that.

19      Q.  Yeah, again, I am not asking you to

20  speculate, you just don't know?

21      A.  I don't know anymore than what my report

22  shows.

23      Q.  Okay. Does your report have -- offer any

---

Page 172

1  opinion about whether or not there is appropriate

2  accessible seating in Lookout Landing?

3      A.  It does not.

4      Q.  Does your report offer any opinion on

5  whether there is accessible seating in the pen?

6      A.  The pen?

7      Q.  That is the area that is on the first

8  level ground floor right behind and around the

9  bullpen.

10      So it is also called Patio at the Pen?

11      Q.  I think Patio at the Pen is actually part

12  of it.

13      A.  Okay. I did have some -- I did have

14  photographs that I took there and I think there

15  were -- there were seats that were stacked there

16  when I was -- when I was there.

17      Q.  Understood. And all I am trying to

18  understand is do you have an opinion about it? I

19  don't think you do because it is not mentioned, but

20  I want to clarify.

21      A.  I will have to go through and see. You

22  know, if you can point me to the section where that

23  comes up we might speed the process up a little bit,

---

**James Terry**                                    **6/14/2019**

---

Page 173

1  but --
2      Q.  I don't believe there is any section in
3  which it comes up, that is why I am asking the
4  question.
5      A.  There were sections where we talked about
6  rails blocking the views of people. It seems to me
7  like that might have been one of the problems there,
8  but I can't recall if -- without going back and
9  looking at it specifically.
10     Q.  Well, section nine of your report on page
11  twenty-one.
12     A.  Okay.
13     Q.  Right, refers to drink rails, I do not
14  see any reference there to the pen, is there some
15  reference I am missing?
16     A.  Yes, do high drink rails, particularly on
17  the 200 level, particularly is not an exclusive
18  term.
19     Q.  I know it is not.
20     A.  Okay.
21     Q.  I know it is not.  Do you have an opinion
22  about whether or not there is accessible seating in
23  the pen?

---

Page 174

1      A.  I don't have any information that showed
2  that there was fixed seating in the pen. I don't
3  know whether there was movable seating in the pen,
4  other than if that is the place that we went through
5  very quickly and identified as having movable
6  seating, and I am now looking at my report. Existing
7  seating 60, reception 2000, rounds 80, theater 200,
8  I think that was one of those areas where we just
9  didn't have time to thoroughly analyze it. So I
10  don't have an opinion, other than those opinions
11  that are general in my report, that refer to general
12  opinions that may have applied to that section.
13     Q.  Can you identify for me any opinion in
14  your report that applies to the pen?
15     A.  I would say this section does.
16     Q.  How do you know that?  It doesn't mention
17  the pen, are you aware of there being high drink
18  rails in the pen?
19     A.  Yes, there are high drink rails in the
20  pen.
21     Q.  Where is that in your report?
22     A.  The pen's location has rails separating
23  it from the areas where the pitchers go to warm up,

---

Page 175

1  the pen, and the field, and those rails, by
2  definition, are going to be high -- high guards
3  for -- to keep people from going off the edges.  So,
4  yes, I have an opinion that there are high rails
5  there.
6      Q.  Are there high drink rails there?
7      A.  If I remember correctly, they were set up
8  as -- some of them were set up as places that you
9  could put your drink, some of them were not set up
10  for drinks.  For instance, seems like there is some
11  sort of a scoreboard in front of that, I may be
12  thinking about -- no, I think that is where it
13  was -- some sort of scoreboard below it and that, if
14  I recall correctly, did not have a drink rail on top
15  of it, I assumed because they didn't want people
16  putting their drinks there and spilling them on the
17  face of the scoreboard, but there were other places
18  where there were rails set up in that area. I would
19  have to look at my photographs for more details.
20     Q.  Are there any pictures in your report of
21  this?
22     A.  I don't believe so.
23     Q.  And there is no mention of that in your

---

Page 176

1  report, right?
2      A.  Specific mention, I would have to go back
3  through and look.
4      Q.  You are not aware of one, are you?
5      A.  I would have to go back through and look
6  to see if it was there.  I don't recall a specific
7  reference to the pen, other than the one that I just
8  read to you --
9      Q.  Which --
10     A.  I am sorry?
11     Q.  It makes no reference to the pen, does
12  it?
13     A.  Exhibit or Attachment F?
14     Q.  Right.
15     A.  Right-hand side, bottom, event spaces and
16  hospitality seating at T Mobile park, third bolded
17  item, the pen.
18     Q.  I am sorry, you are looking at Attachment
19  F?
20     A.  Attachment F.
21     Q.  This is the ticket pricing.
22     A.  It is multiple things.  It is multiple
23  things, including seat counts, ticket prices, and

---

**James Terry**                                                **6/14/2019**

Page 177

1    event spaces and hospitality seating.
2        Q.  Right. And I understand that you have
3    some information on the bottom right side about the
4    pen?
5        A.  That is correct.
6        Q.  Right. Is there anything else other than
7    that in the report about the pen?
8        A.  I don't recall it, not anything else
9    specifically calling out the pen as being a location
10   where a particular violation occurred.
11       Q.  Right. So if you were reading this
12   report, you would not have an idea of there being
13   any violation of the pen, because nothing is
14   mentioned, right?
15       A.  I wouldn't say that.
16       Q.  Got it. So you would just infer, take
17   your language and apply it anywhere, right, there is
18   no record here that I can see of you identifying a
19   problem in the pen, and if there is, let me know, I
20   just want to know where it is?
21           MR. REYNOLDSON:  Objection.
22   Mischaracterizes earlier testimony.
23       Q.  You have shown me Attachment F where it

Page 178

1    contains the word the pen, but there is no other
2    mention in the report, is there?
3        A.  There is no other specific mention of
4    specific barrier types in the pen in the report,
5    that I can recall. The report has many, many
6    references to things that are barrier types found
7    throughout the facility. I would say you need to
8    look at those barrier types, wherever they occur.  I
9    would not exclude the pen just because it wasn't
10   simply listed in the report.
11       Q.  All I am asking is whether or not you
12   identified any particular barriers in the pen and
13   the answer is, I understand it, you did not,
14   although you think maybe it is possible?
15       A.  I didn't identify any others, that I
16   recall, in my report, specifically by name.
17       Q.  Got it. And you didn't identify any
18   violations regarding the pen, right?
19       A.  Not by name, that I recall, in my report.
20       Q.  Right. And you have not otherwise
21   identified a particular violation with respect to
22   the pen?
23       A.  I don't recall any reference -- specific

Page 179

1    references to violations of the standards in the
2    pen.
3        Q.  Thank you. Let's do this, let's take
4    a three minute break and I may be done. I want
5    to check my notes, but I am cautiously hopeful
6    we will conclude it.
7            (Short break.)
8        Q.  Mr. Terry, did you observe whether or
9    not there was -- was Edgar's Cantina a set up
10   for operation when you were there?
11       A.  First of all, there was some question
12   about what is actually called Edgar's Cantina.
13   There were two levels, both of which seemed to
14   be labeled as Edgar's, one of them I think was
15   Cantina, one of them may be Homerun Porch, and
16   so I can't recall exactly which one was the
17   upper level and which one was the bottom level.
18       Q.  The one on the bottom level is the
19   Cantina and the one on the upper level is
20   Homerun Porch.
21       A.  Okay. All right. There were tables
22   set up. There were things, you know, I have
23   photographs of tables being set up, there were

Page 180

1    displays on top of the bar counter, displays,
2    equipment, looked maybe things for pretzels or
3    something like that that were wrapped up.  So it
4    looked like some of the pieces of the set up
5    were there, some of them still wrapped, some of
6    them clearly missing.
7        Q.  Is there a lower drink rail in the
8    Cantina?
9        A.  I did not see one.
10       Q.  Do you know if there are -- if there
11   is accessible seating setup on the porch area of
12   the Cantina outside?
13       A.  I did not see what appeared to be
14   compliant -- evidence of compliant seating while
15   I was there.
16       Q.  On February 5, do you know if when
17   the Cantina is in operation if there is
18   accessible seating on that porch area?
19       A.  I do not.
20       Q.  Do you know if there is accessible
21   seating and tables on the Homerun Porch?
22       A.  I do not.
23           MR. WILLEY:  Okay. Mr. Terry, I

**James Terry**                                                          **6/14/2019**

Page 181

1  think that concludes the deposition for today. I
2  thank you for your time and willingness to do
3  this by video on a Friday. Much appreciate your
4  input.
5          THE WITNESS:  Okay.
6
7          (The deposition concluded at
8  6:45 p.m.)
9
10
11
12
13
14
15
16
17
18
19      C E R T I F I C A T E
20
       STATE OF ALABAMA     )
21
       COUNTY OF JEFFERSON   )
22
23

Page 182

1  foregoing deposition was taken down by me in
2  stenotype and the questions and answers thereto
3  were reduced to typewriting under my
4  supervision; that the foregoing represents a
5  true and correct transcript of the deposition
6  given by said witness upon hearing.
7          I further certify that I am neither of
8  counsel nor of kin to the parties to the action,
9  nor am I in anywise interested in the result of
10  said cause.
11  _____
12          /s/Caila M. Bonds
13          Caila M. Bonds, CCR
14          CCR # 250, Expires 09/30/2019
15          Commissioner for the State of
16          Alabama at Large
17          My Commission Expires: 3/29/2022
18
19
20
21
22
23

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on June 21, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

_____

Rondi A. Greer

CERTIFICATE OF SERVICE
2:18-cv-01512-BJR

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500