EXHIBIT F



EXHIBIT G



EXHIBIT H







# EXHIBIT 1

# Deposition of William Endelman

# Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

## June 12, 2019



**206.287.9066 | 800.846.6989**
1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
**www.buellrealtime.com**
email: info@buellrealtime.com



## Page 5

```
 1   for the deposition today?
 2       A.  I, basically, reviewed my own documents that I
 3   created and took a quick look at a couple of the
 4   sections of the '91 standards and other documents that
 5   are listed in my report.
 6       Q.  Did you speak with anybody about your
 7   testimony today?
 8       A.  No.
 9
10       Q.  I'll have the court reporter mark for us your
11   report to begin with.
12       (Exhibit 1 was marked.)
13       Q.  Mr. Endelman, you've been handed what's been
14   marked as Exhibit 1.  Is that the report that you
15   prepared for this litigation?
16       A.  Yes, it is.
17       Q.  Have you prepared any subsequent reports or
18   any additions to this report?
19       A.  Not an addition to this report.  I did prepare
20   a declaration for the rebuttal to summary judgment.
21       Q.  Okay.  Why don't we go ahead and mark that now
22   just so we have it in front of us.
23       (Exhibit 2 was marked.)
24       Q.  And, Mr. Endelman, you've been handed
25   Exhibit 2.  Is that the declaration that you were just
     referring to?
```

## Page 6

```
 1       A.  Yes, it is.
 2       MR. WILLEY:  Just for the record, the
 3   declaration doesn't include the exhibit.
 4       Q.  Sans exhibits, this is the declaration?
 5       A.  Correct.
 6       Q.  Mr. Endelman, let's talk about your experience
 7   and qualifications for a little bit.  Your report
 8   includes, starting on page 13, some witness
 9   qualifications, correct?
10       A.  Correct.
11       Q.  Let me ask you:  Are you presently an
12   employee or an owner of Endelman & Associates?
13       A.  Well, let me differentiate that.
14       Q.  Okay.
15       A.  As of December 31, I am no longer an owner of
16   Endelman & Associates.  I was the founder.  I was the
17   principal.  I was the owner.  I am not an owner
18   anymore.  I am technically a part-time employee of
19   Endelman & Associates, and I do a little bit of ad hoc
20   work in support of the firm.
21       Q.  Just out of curiosity, other than this case,
22   are you doing any other work for Endelman & Associates
23   currently?
24       A.  Currently, no.
25       Q.  Have you since December of this year?
```

## Page 7

```
 1       A.  Yes, but different kind of work.  I've helped
 2   with some proposals.  I meet with Michael Schneider
 3   who is the current principal sometimes just to discuss
 4   various business aspects of the firm, things like
 5   that.
 6       Q.  Okay.  The education, licenses, boards, and
 7   affiliations that you list here, those are all
 8   correct?
 9       A.  That's correct.
10       Q.  Are you presently a licensed architect?
11       A.  Yes.
12       Q.  You have listed publications here.  I want to
13   ask you, if I could, about those.  I may have given
14   you my copy.  Did I give you a highlighted copy?  No.
15   I've got it here.
16       Q.  Can you tell me -- I understand some of these
17   have been a while.  Can you tell me generally --
18       A.  It's quite some time.  Let me find that.
19       Q.  It's on page 13.
20       A.  Page 13.
21       MR. WILLEY:  Next page.  There you go.
22       A.  I have macular degeneration in my left eye, so
23   it's quite a magnifying glass to read.
24       Q.  Don't let me rush you today.  If you need to
25   take time, just let me know.
```

## Page 8

```
 1       A.  Most of these articles were really interviews
 2   by magazines when they wanted my professional opinion
 3   as part of an article, and they also interviewed and
 4   spoke to other people as well.  They were not -- the
 5   first two, as I recall, were not solely authored by
 6   me, if I remember correctly.  It's been a long time.
 7       Q.  Any idea when those first two were --
 8       A.  Oh, gosh.  It's got to be at least a dozen
 9   years ago.
10       Q.  Do you know whether they were before or after
11   the 1991 act?
12       A.  Oh, it was after 1991 for sure, yes.
13       Q.  It looks like the latter -- the third article
14   is before, correct?
15       A.  Yes.
16       Q.  Have you ever actually published any scholarly
17   articles yourself?
18       A.  No.
19       Q.  Did any of these -- well, do you have any
20   recollection of the substance of the articles that are
21   listed here?
22       A.  I think these were really pretty rudimentary
23   highlights of some of the requirements of the ADA
24   standards.  And for most of these magazines, for their
25   audiences it's usually to encourage them to use an
```

2 (Pages 5 to 8)

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

William Endelman

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

William Endelman
Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

Page 9

1 accessibility consultant, to use knowledgeable
2 architects, and things like that so that they do
3 comply.
4 Q. And the title of the first article would
5 appear or suggest that you were commenting on how it
6 might be easier to comply with the law than owners
7 might think?
8 A. Right. There are certain things that are very
9 simple to take care of.
10 Q. In terms of your involvement in litigation,
11 you have a case list that begins on page 13 and
12 continues through page 14. I'm wondering whether any
13 of these cases involved any sort of sports facility?
14 A. I don't believe so. Let me just take a quick
15 look and refresh my memory. No.
16 Q. Putting aside your role as a witness in
17 litigation, have you ever been involved in the design
18 of a sports facility?
19 A. I do not design sports facilities. We -- as
20 Endelman & Associates, our bread and butter work is
21 reviewing architects' plans to make sure they conform
22 with the '91 standards or today would be the 2010
23 applicable building code in force at
24 that time, or when it applies to multiunit housing,
25 Fair Housing Act.

Page 10

1 And so we've done a lot of assembly spaces.
2 One big group of them is in Las Vegas. We have a lot
3 of clients in Las Vegas, and they have all these
4 performance venues of one sort or another. People in
5 my firm have done surveys of stadiums like Jack Murphy
6 Stadium in San Diego, the original one before they
7 built a new stadium, lots and lots of school surveys,
8 high school stadiums, things of that sort.
9 Q. Do the standards for high school stadiums, for
10 example, differ from the standards for the large
11 facilities like the T-Mobile stadium?
12 A. Not really other than schools would be covered
13 under Title II of the ADA rather than Title III.
14 Q. Have you yourself been involved personally in
15 the review of your clients' compliance with standards
16 in stadiums?
17 A. Yes.
18 Q. Can you tell me what stadiums you've been
19 personally involved with?
20 A. For the schools, they were mostly ADA surveys,
21 so surveys in the field.
22 Q. Can I interrupt? Let me stop and ask you what
23 you mean by that?
24 A. ADA surveys is assessing existing conditions
25 as opposed to reviewing architects' plans for things

Page 11

1 that are just under design.
2 Q. I'm sorry to interrupt you.
3 A. Yes. So for the schools, we probably worked
4 on, I don't know, 160 schools or something, you know.
5 And so we did lots of surveys of that stuff. For the
6 plan reviews, so many facilities in Las Vegas. One of
7 them is the Cosmopolitan Hotel. They have venues for
8 entertainment. The Echelon hotel, which never got
9 constructed. It stopped work when it came out of the
10 ground when the recession hit. Those are two huge
11 facilities and lots of others. There's a lot of
12 facilities in Las Vegas.
13 Q. Well, let me ask you: Were any of those
14 sports facilities?
15 A. Yes. One of them we didn't review. We were a
16 consultant. I'm trying to think of the name of it.
17 University of UC Las Vegas has an existing basketball
18 arena, and they had hired a sports architect to help
19 bring it into compliance. And I was as an ad hoc
20 consultant for them, not an in-depth scope of work,
21 but I was involved in that.
22 Q. What do you recollect being involved with?
23 A. Pardon me?
24 Q. What do you recollect doing with respect to
25 that facility?

Page 12

1 A. Well, I mean, some of the same discussions
2 here is, you know, it's an older facility. It doesn't
3 have sight lines above standing people, and it doesn't
4 have distribution of seats, you know, around the
5 arena. It was really a very substandard facility.
6 Q. Did you case personally -- were you
7 personally involved within that line-of-sight
8 analysis?
9 A. I would review what the sports architect
10 proposed as alterations, proposed alterations to the
11 facility, that were both readily achievable and
12 technically feasible to do.
13 Q. And I don't know if I'm putting too fine of
14 point on it, but I am wondering whether you yourself
15 have done -- in that occasion first -- I'll ask you
16 first about that. Did you yourself do an analysis as
17 to whether the sight lines were appropriate in
18 compliance with ADA requirements?
19 A. No.
20 Q. Have you ever done that?
21 A. No.
22 Q. So the first time you've done sight line
23 analysis is what you've done in the context of this
24 litigation; is that fair to say?
25 A. Correct. Our job generally is to point out to

**4 (Pages 13 to 16)**

**Page 13**

1  our clients who may be owners or they may be
2  architects here's what the requirements have. I'm
3  looking at your drawings. I can see you clearly don't
4  have that. You guys are responsible for the detailed
5  dimensions to make it work, because they're the
6  architects of record, and that's what we do.
7  Q  So have you ever, prior to this litigation,
8  been involved in trying to assess or measure the lines
9  of sight in a facility?
10  A  No.
11  Q  Let me take a step back and ask you what it
12  was that you've been asked to do in this litigation?
13  A  Really very simply I was asked by the owner if
14  I would be an expert witness on this project, and I
15  wrote these reports.  When I was still at Endelman &
16  Associates as a principal, my role was supervising
17  Bart Sanderson who was our technical director who was
18  the one who actually did the assessments in the field.
19  And these assessments were strictly limited to
20  what we see in the complaint, and we had periodic
21  meetings and discussions, you know, as to what he was
22  doing, what he was recommending.  And so it was with
23  my full knowledge.
24  Q  Okay.  Can you tell me what it was that
25  Mr. Sanderson did in the field?

**Page 14**

1  A  He went in the field and took a lot of
2  measurements at the sections that are indicated in the
3  exhibits in my report, and what he did when he came
4  back is took the Department of Justice conceptual
5  diagram, I'll call it, from the accessibility
6  standards guidance document, undated, that they issued
7  and put their template, if you will, on top of what is
8  the real cross section of the stadium, put it into
9  CAD, and did those drawings to validate the sight
10  lines.
11  Q  Okay.  You said that Mr. Sanderson took
12  measurements in the two sections identified in your
13  report; correct?
14  A  Yes.
15  Q  And those are Sections 112 and 224?
16  A  Correct.
17  Q  Was there a reason he chose those sections?
18  A  Yes.  Those are the sections that were
19  originally cited in the complaint.
20  Q  What's your basis for saying that, do you
21  remember?
22  A  I'm sorry?
23  Q  Well, did you understand -- I don't have the
24  complaint in front of me.  Did he make any
25  measurements in any other sections of the stadium?

**Page 15**

1  A  No.
2  Q  Can you tell me what you understand
3  Mr. Sanderson did in terms of taking the measurements?
4  How did he go about doing that?
5  A  He was measuring the dimensions of the
6  wheelchair footprint on these platforms.  He was
7  measuring the heights of the platforms.  He was
8  measuring the heights of the stepping of the rows in
9  front of these sections and the depth of the rows in
10  sections so we would have accurate data to generate
11  those drawings.
12  Q  Okay.  You have read Mr. Terry's report;
13  correct?
14  A  I have.
15  Q  Do you know whether Mr. Sanderson did anything
16  like Mr. Terry in terms of taking pictures to
17  ascertain the views?
18  A  He didn't go through the methodology that Jim
19  Terry used.
20  Q  Okay.  Do you know how much time Mr. Sanderson
21  spent taking those measurements?
22  A  I believe he was out in the field for the
23  better part of two days.
24  Q  Do you know whether he took measurements other
25  than those which would be reflected on page 6 of your

**Page 16**

1  report, which are the two drawings?
2  A  He may have taken more measurements than are
3  there, yes, but I can't tell you exactly.
4  Q  Mr. Endelman, I'll have you turn to page 6 of
5  your report, and it's kind of a detailed thing.  You
6  may find on your magnifying glass.  On this these
7  are drawings that were apparently prepared by you in
8  conjunction with Mr. Sanderson; is that correct?
9  A  I did not prepare the drawings.  Mr. Sanderson
10  prepared the drawings.
11  Q  Did you review these drawings before you
12  submitted your report?
13  A  I did.
14  Q  Can you tell me on the first drawing there are
15  some distances reflected there, 2 feet, 5 inches;
16  2 feet, 9 inches, 2 feet, 6 inches.  Do you see those
17  on the upper drawing?
18  A  Yes.
19  Q  There appears to be a space between the
20  2-foot-9 and the 2-foot, 6-inch notation.  Do you see
21  that?
22  A  Yes, I do.
23  Q  Do you have any idea how deep that space is?
24  A  I don't know.  It's not on the drawings, so I
25  can't tell you right now.  I would say based upon the

Page 21

```
 1   the figures reflected in your report in terms of
 2   distances, were those from the drawings, or were those
 3   from field measurements?
 4        A   Field measurements.
 5        Q   Do you know if the field measurements differed
 6   from the drawings?
 7        A   They probably did to some degree because
 8   there's always some construction deviations.
 9        Q   But you don't have as you sit here --
10        A   I don't know.
11        Q   -- whether they did?
12        THE REPORTER:  Try to speak one at a
13   time.  You're talking over each other.
14        And I should have said that at the start.  I
15   tend to mumble and trail off on my questions, so it's
16   easy for people to start talking.
17        THE WITNESS:  Is there something you
18   need for me to repeat?
19        THE REPORTER:  No.
20        Q   Did you review documents regarding changes
21   to the seating in the first level that had been
22   effectuated?
23        A   I have not reviewed those documents, no.  It
24   was reported that some alterations were made in the
25   first level.
```

Page 22

```
 1        Q   Do you know whether Mr. Sanderson took any
 2   measurements down there?
 3        A   I don't know that.
 4        MR. WILLEY:  Are you referring to the
 5   expansion project over the past season, or are you
 6   referring to something else?
 7        MR. CONNOR:  I'm referring to the
 8   expansion project for the last season.
 9        MR. WILLEY:  The Diamond Club/Premier
10   Seating?
11        MR. CONNOR:  Yes.
12        THE WITNESS:  I don't know if he
13   measured the changed situation.
14   BY MR. CONNOR:
15        Q   Let me ask you just generally and then get
16   into some details as we go through the report.  Your
17   report addresses those changes to some extent;
18   correct?
19        A   Yes.
20        Q   I'm wondering how did you come to learn what
21   you say in your report about those areas?
22        A   In discussions with Fred Rivera and also from
23   Bart Sanderson who had discussions with Fred Rivera as
24   well.
25        Q   Your report in that respect, with regard to
```

Page 23

```
 1   seating changes in the front rows of the first level,
 2   comes from discussions with Mr. Rivera?
 3        A   Correct.
 4        Q   Not from review of actual construction
 5   documents or as-built diagrams; correct?
 6        A   Correct.
 7        Q   Have you ever yourself personally visited the
 8   Safeco Field?
 9        A   I have not and for good reason.  I have some
10   physical limitations that make it not desirable for me
11   to spend a lot of time climbing up and down lots of
12   steps and things and moving all around the stadium, so
13   I did not.
14        Q   Did you perceive that it would be a challenge
15   for you to do that at the stadium?
16        A   Well, for all day, yes.  I made a decision, I
17   want to say, about six years ago not to go to any
18   construction sites because it would not really be safe
19   for me to be walking around these sites.
20        Q   Aside from your conversations with Mr. Rivera
21   and Mr. Willey and Mr. Sanderson, have you talked with
22   anybody else as part of your preparation of this
23   report?
24        A   No.
25        Q   We've discussed that the report addresses two
```

Page 24

```
 1   sections of the stadium with regard to sight lines;
 2   correct?
 3        A   Correct.
 4        Q   Did you make any effort to ascertain whether
 5   there were any differences between those sections and
 6   other sections in the stadium?
 7        A   I did not.  When we had a complaint,
 8   typically, we limit what we're looking at to what's
 9   specifically in the complaint.
10        Q   So the scope of your expert opinion in this
11   case with regard to sight lines is going to be limited
12   to Sections 112 and 224; correct?
13        A   Yes, that's correct.
14        Q   You have no opinion at the present time
15   concerning any other sections with regard to sight
16   line compliance or standards; correct?
17        A   In terms of cross section, you're correct.  In
18   terms of distribution of seats, yes, I have opinions.
19   I don't need to be in the field to see what's on the
20   drawings.
21        Q   Let me make sure I understand what you just
22   said.
23        A   I will definitely opine that the seats are
24   provided, essentially, around all the seating sections
25   behind Section, you know, 100, 200, and 300 around the
```

6 (Pages 21 to 24)

William Endelman

Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

## Page 37

1   other than what's in the report?
2       Q. I'm asking — well, let me ask it this way:
3   What distinction is there between the items identified
4   in Subsection C of your report and the items
5   identified in Subsection D? It appears to me you've
6   drawn some conceptual distinction between the two.
7       A. I guess it's not a big distinction. We've
8   really gone through all the issues item by item and
9   opined on them.
10      Q. Are the items in -- in your opinion, are the
11   items in Section D resolved, or is there any specific
12   easily achievable means of resolving them?
13      A. These are items for which our opinion is
14   there's not really an issue or which are easily fixed.
15   Frankly, these issues are much smaller issues than the
16   overarching sight line issue that appears to be the
17   main issue at hand.
18      Q. And I don't disagree with that. I'm sorry.
19   You mean with respect to outstanding issues, do you
20   believe that there are issues associated with these
21   items identified in Subsection D?
22       MR. WILLEY: Are you asking for
23   something other than what's in this report?
24       MR. CONNOR: Yes.
25       MR. WILLEY: Why don't you ask him a

## Page 38

1   question about --
2       MR. CONNOR: I did. I asked him a
3   question.
4      Q. Mr. Endelman, you wrote this report; correct?
5      A. Yes.
6      Q. And you put different subsections in the
7   report; correct?
8      A. Yes.
9      Q. One of the subsections identifies items that
10   you said have already been remedied or easily
11   remedied; correct?
12      A. Right.
13      Q. There's a different section, and it's titled
14   "Outstanding Issues." And I'm --
15      A. They've not been fixed yet.
16      Q. Okay. And is there a reason those were put in
17   a different section than the ones that you said
18   were -- had been fixed or were easily remedied?
19      A. Here we're agreeing that there's a technical
20   noncompliance issue. We are not agreeing that there's
21   a sight line issue.
22      Q. Okay. So with respect to the items in
23   Sections C and D, you agree that there's a technical
24   noncompliance issue; correct?
25      A. Actually, that's not quite true. With respect

## Page 39

1   to the high-definition scoreboard, we're not agreeing
2   that it's not compliant. I think the important thing
3   is to look at the content of each section, and I'm
4   perfectly willing to discuss what our observations are
5   and what our beliefs are. In terms of the
6   organization of the report, if I might have organized
7   it a little bit better or differently, maybe.
8      Q. Okay. And I don't mean to be belligerent
9   about that. It appears to me that you've drawn a
10   distinction between the items addressed in those two
11   sections. That's what I was trying to understand.
12      A. I understand.
13      Q. Why don't we talk about the items in
14   Subsection C and D first before we get to the sight
15   line issue. All right?
16      A. Okay.
17      Q. On page 9, I'm looking at, there's a Sub 1,
18   "Gaps in floor on the 100 Level." Do you see that?
19      A. Yes.
20      Q. You yourself did not make any observations of
21   the 100 level obviously. You've told me that;
22   correct?
23      A. No.
24      Q. Do you know whether Mr. Sanderson did anything
25   to evaluate the gaps in the floor in the 100 level by

## Page 40

1   personal observation?
2      A. I don't know.
3      Q. Did he report to you that he had done so?
4      A. We didn't spend time talking about this
5   because this wasn't a substantive issue that we wanted
6   to talk about.
7      Q. What do you mean this isn't a substantive
8   issue?
9      A. There are things that are -- smaller issues
10   that are relatively easy to fix, and there are things
11   that are big issues that are not relatively easy to
12   fix. And we spent our time focusing on the bigger
13   issues.
14      Q. I take it, then, that you don't dispute that
15   there are gaps in the floor that might be not
16   noncompliant with the ADA?
17      A. No, I don't.
18      Q. Did you discuss with the Mariners why those
19   gaps had not been filled or fixed?
20      A. My understanding, from conversations with Fred
21   Rivera, is they have a program of repairing these
22   cracks and gaps as part of routine maintenance at the
23   stadium.
24      Q. If there's routine maintenance at the stadium,
25   do you understand why these cracks have not been

William Endelman

Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

William Endelman

**Page 41**

```
 1   fixed?
 2      A   I don't know when they appeared.  They could
 3   be new cracks.  There could be a phased program to
 4   repair these things.  I don't have the answer to that.
 5      Q   Do you have any understanding as to -- strike
 6   that.
 7      Do you have an understanding as to the last
 8   time that the gaps in the stadium were actually fixed
 9   by filling?
10      A   I do not.
11      Q   Do you know whether any monies were budgeted
12   to address this type of concern, the gaps and the
13   cracks in the building?
14      A   I don't know anything about the Mariners's
15   finances.
16      Q   Were you provided any sort of budget by the
17   Mariners in terms of their facility?
18      A   I have not reviewed any budgets.
19      Q   Let's look at little Roman numeral ii,
20   "Expansion joints."
21      A   Yes.
22      Q   Do you have any basis to dispute that the --
23   there are excessive vertical changes in level related
24   to expansion joints?
25      A   No.
```

**Page 42**

```
 1      Q   And what you say in your report here is that
 2   there are options to fix those vertical changes, if
 3   necessary; correct?
 4      A   Yes.  And what I understand is that they have
 5   a program occurring because expansion joints have a
 6   certain life expectancy in the building, and they're
 7   nearing the end of their useful life.  And that's
 8   probably also why some of them become problematic is
 9   because they're at the end of their useful life.
10      And I want to add, of course, that expansion
11   joints are a huge requirement because buildings move.
12   Laypeople don't often understand the concept that
13   buildings move but buildings move.  And that's why
14   there's the need for these expansion joints just from
15   day to day and, certainly, if there's an earthquake
16   kind of event to occur.
17      Q   Nobody is going to dispute that there's a need
18   for expansion joints.  What we're interested here in
19   this lawsuit is whether the expansion joints have been
20   adequately dealt with such that they don't provide a
21   barrier to people with disabilities; correct?
22      A   Understood.
23      Q   Is there any specific plan in terms of
24   removing these vertical distances on these -- related
25   to these expansion joints?
```

**Page 43**

```
 1      A   I don't know the details of the Mariners's
 2   plans other than I was informed that they have a
 3   program to replace them.
 4      Q   Have you ever been involved in reviewing or
 5   designing or suggesting modifications or actions that
 6   could be taken such that expansion joints do not
 7   present a barrier to people in wheelchairs in any
 8   facility?
 9      A   No.
10      Q   Have you read any literature about possible
11   solutions to barrier impediments caused by expansion
12   joints?
13      A   I do not.
14      Q   As you sit here today, can you think of any
15   possible solutions to something like that?
16      A   I think there are all kinds of expansion
17   joints, and I think some study needs to occur as to
18   which the appropriate solution to remedy the
19   situation.
20      Q   The Mariners didn't ask you to do that;
21   correct?
22      A   No.  And that would not be my expertise.
23      Q   When you say that, why would that not be your
24   expertise?
25      A   I'm not an expert in designing expansion
```

**Page 44**

```
 1   joints.  I mean, I have not done design in my practice
 2   at all for 24 years.
 3      Q   Are you an expert in remediation efforts to
 4   ensure ADA compliance?
 5      A   I mentioned that what we normally do is tell
 6   people in the approach we recommend you take, and
 7   sometimes our reports will say things like "further
 8   design study required," which would mean you need an
 9   architect, you need a civil engineer, you need someone
10   appropriate to do that.
11      Q   The Edgar's Cantina platform lift, you didn't
12   personally observe that lift; correct?
13      A   I did not.
14      Q   And do you know if Mr. Sanderson did?
15      A   He did.
16      Q   You don't have personal knowledge whether
17   there is an operational key at the lift presently;
18   correct?
19      A   I do not.
20      Q   What you know about this is what you've been
21   told by whom?
22      A   By Fred Rivera.
23      Q   The "Concessions in 'The Pen,'" do you see
24   that section?
25      A   Uh-huh.
```

William Endelman | Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

**Page 45**

```
 1   Q  What did you do to come up with your opinions
 2   that are set forth in that section of your report?
 3   A  So for food service concessions, there are
 4   stanchions they set up for the game, so they're not
 5   permanently set up.  Of course, these are all
 6   subtenants of the stadium.  They have contracts with
 7   the Mariners, and they set up these stanchions.  And
 8   it's their responsibility, as the subtenant, to set
 9   them up correctly.
10         Obviously, the Mariners are interested in them
11   being set up correctly.  So we did not observe these
12   being -- this particular location set up, but we said
13   here's the criteria, here are the dimensions you need
14   when you set them up.
15   Q  Have you previously been involved with
16   any sort of design or review or recommendations with
17   respect to assuring that movable stanchions for
18   concession lines are properly maintained?
19   A  Yes.  This is a problem in lots and lots of
20   facilities.
21   Q  And what solutions have there been to make
22   sure that happens properly?
23   A  Well, if it's temporary, obviously, it's got
24   to be an owner -- it has to have a program to ensure
25   these things get set up properly, and, you know, it's
```

**Page 46**

```
 1   their facility.  If they're permanent -- and sometimes
 2   they are -- then we say you're going to have to alter
 3   the permanent queuing lines to comply.
 4   Q  Do you have an understanding as to what
 5   program the Mariners have, if any, with respect to
 6   maintaining the appropriate stanchion widths?
 7   A  I do not.
 8   Q  The last paragraph of page 9 you say "At the
 9   time of E&A's observation, only Jack Daniels Bar had
10   stanchions set up."
11         I take it that was something your colleague
12   observed himself; correct?
13   A  Correct.
14   Q  Am I understanding your report correct that as
15   it was set up the stanchions were not in compliance
16   with ADA requirements?
17   A  It was not compliant at the time.
18   Q  Let's move to Section D.
19         MR. WILLEY:  Could we take a break when
20   you get a minute?
21         MR. CONNOR:  Yeah.  That would be fine.
22         (A break was taken from 11:03 a.m. to
23   11:15 a.m.)
24   BY MR. CONNOR:
25   Q  I think we were going through the items in
```

**Page 47**

```
 1   Section C, and I guess we were done with those.  Let's
 2   talk about what you've identified as outstanding
 3   issues in Section D, if we could.
 4         MR. WILLEY:  You're on page 10?
 5         MR. CONNOR:  Yes, I am.
 6   Q  The first is depths of seats in the 300 level.
 7   Let me ask you:  Do you disagree that the seats in the
 8   300 level are not compliant with ADA requirements?
 9   A  This is one specific section, Section 342, for
10   example.  The issue is there's an encroachment of a
11   stair, and it's very possible that those spaces should
12   be taken out as accessible spaces and perhaps
13   relocated somewhere else.
14   Q  Okay.  And just to make a shorter bite,
15   you don't disagree with respect to the seating in
16   Section 342?  It's not compliant presently; correct?
17   A  And any other similar conditions at those
18   stairs that it would apply to.
19   Q  Okay.  Did Mr. Sanderson make a review of any
20   other sections, do you know?
21   A  No.  I mean, what we believe is that the
22   sections that we have are representative sections in
23   the stadium, and our expectation is that as you go
24   around the curve of the bowl you're going to find the
25   same section, same structural sections, supporting it.
```

**Page 48**

```
 1   And, therefore, we would expect the same conditions.
 2   Q  Okay.  In other words, with respect to this
 3   issue, you would expect in the other sections there's
 4   a similar deficiency with respect to compliance;
 5   correct?
 6   A  Yes.
 7   Q  The depth of the seats in Sections 180 and
 8   181, do you agree with respect to the seats in
 9   those sections they are not ADA compliant presently?
10   A  Let me just refresh my memory.
11         This is little Roman numeral ii on the second
12   half.
13   A  Yes, same thing, prefabricated stairs
14   encroaching four spaces.
15   Q  So you agree that those -- the chairs in those
16   sections are not compliant; correct?
17   A  Correct.
18   Q  And you would expect the same thing would be
19   true in the other sections that are similarly constructed
20   in that level?
21   A  Where that stair condition exists.
22         MR. WILLEY:  I'm not sure there are
23   other sections.  Let's be careful about that.
24   Q  And I didn't mean to be asking a trick
25   question.  I wasn't sure whether there were or not.
```

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

13 (Pages 49 to 52)

**Page 49**

```
 1   Do you know whether there are other sections
 2   like this?
 3       A   Not off the top of my head.
 4       Q   Okay.  But you would -- I guess what
 5   you said earlier was that you make an assumption that
 6   around the bowl there's similar conditions with
 7   respect to similar seats; correct?
 8       A   Yes.  But, however, we did not measure these
 9   other sections, and, you know, there could be some
10   differences in as-built conditions where it doesn't
11   encroach.
12       Q   And, Mr. Willey, for the record, is obviously
13   acting frustrated with me.  I was simply trying to
14   follow up on what I understood you to express, which
15   was that you had interpolated -- you made some sort of
16   interpolation from your examination of some of the
17   seats in the 300 level.  The same would be true
18   elsewhere; right?
19           MR. WILLEY:  There is a difference
20   between the representations of the 300 level and the
21   representations about Section 181.  Those are
22   different things.
23           MR. CONNOR:  Okay.
24           MR. WILLEY:  And if you look at a map,
25   they're different things.  Let's not push him places
```

**Page 50**

```
 1   he's not saying.
 2       Q   I don't mean to be doing that.  Like I said,
 3   I'm simply trying to follow up on what he said, and I
 4   was apparently extending it beyond what I should have.
 5   So I apologize for that.
 6       Why don't we look at little Roman numeral iii
 7   on the next page, 11, "Access to dugouts and bullpen."
 8   Can you tell me whether you have an opinion about
 9   whether the stadium is in compliance with the ADA
10   accessibility requirements with respect to the
11   dugouts?
12       A   Well, we saw that there was a platform lift
13   that was not operational in the dugout, so that's a
14   Q   Okay.  And do you know if -- do you have any
15   understanding as to whether that lift has ever been
16   operational?
17       A   I do not know.
18       Q   Did you talk with anybody from the Mariners
19   about that?
20       A   I did not.
21       Q   Did the Mariners tell you whether they had any
22   plan with respect to what's going to be done about or
23   with that lift?
24       A   I don't recall any.
25
```

**Page 51**

```
 1       By the way, you know, the idea of having a
 2   lift in a dugout really primarily is for players.
 3   It's not meant that the audience go into dugouts.  Do
 4   you know what I'm saying?  And, you know, the law is
 5   written for all kinds of conditions, like -- let's
 6   take a park stadium.  All kinds of different teams use
 7   that stadium.  You could have a wheelchair softball
 8   team using the stadium, and they would want to be able
 9   to use the dugout.  I think that's what lifts enable
10   process was in terms of access to the dugout.
11       Q   Let me clarify.  Do you believe that the
12   dugout is ADA compliant or not?
13       A   No.
14           MR. WILLEY:  Do you mean as currently
15   used?
16           MR. CONNOR:  Yes, as currently
17   configured.
18       A   It's a prescriptive requirement.
19           MR. WILLEY:  Because just to be clear,
20   your allegation in the general public are accessing it
21   on tours, and that's what your motion is about as
22   well.
23           MR. CONNOR:  Yes, it is.
24       Q   Let me ask you this:  Do you have any
25   understanding as to whether the general public
```

**Page 52**

```
 1   accesses the dugout?
 2       A   I was not aware that there were tours of the
 3   dugout.  But, again, tours cannot be had for anybody.
 4   They could discontinue tours of the dugout.
 5       Q   Do you know whether that -- you said you don't
 6   know whether they've been conducting tours?
 7       A   I don't know.
 8       Q   Let me ask you in that regard:  Did you review
 9   any deposition transcripts that were provided by
10   personnel for the Mariners in this case?
11       A   No.
12       Q   So let me ask you this:  To the extent that
13   the Mariners were providing tours or have been
14   providing tours to the public, is it your opinion that
15   the dugout would not be compliant with ADA
16   requirements?
17       A   I would agree.
18       Q   Let's move on and talk about the
19   high-definition scoreboard, if we could.  Okay?
20       A   Yes.
21       Q   As you note, the complaint alleges that many
22   of the accessible seats on the 100 level cannot see
23   the high-definition scoreboard.  Do you disagree with
24   that assertion in the complaint?
25       A   I disagree that it's discriminatory.
```

**Page 105**

1 if you looked at this exhibit?
2     A   I did.
3     Q   And do you have an understanding as to what
4 this depicts?
5     A   I do.
6     Q   And what do you understand it depicts?
7     A   I think it's Jim Terry's opinion that based
8 upon his measuring system that this yellow band in the
9 drawings would be areas that the spectator could not
10 see on the field.
11     Q   Okay.  And do you have any reason to disagree
12 with his measurements?
13     A   Yes.
14     Q   Or measuring techniques?
15     A   I am not clear on his methodologies in a
16 couple respects.
17     Q   Please tell me what you're unclear about.
18     A   No. 1, as I recall, he indicated that he was
19 using the pole that represented a standing person, and
20 he said he, you know, put it in the center of the
21 space, as I recall the language.
22         And what you will see when you look at this
23 kind of stuff here, you move a person 1 inch this way,
24 1 inch that way, whatever, it's going to change this,
25 and that's how fussy this methodology gets.

**Page 106**

1 The second thing is we -- I don't know if he
2 said he measured in the center of the wheelchair space
3 as striped on the ground, and we already acknowledged
4 those spaces are flex spaces.  If he did it where
5 there was a stripe on the ground, chances are it's not
6 staggered seating.  So you're basically looking
7 directly behind the head of the person in front of
8 you, not between two heads or over someone's shoulder.
9 So I'm not sure that his diagrams reflect that or not.
10     Q   With those limitations, do you have any other
11 bases for disagreeing with what Mr. Terry has done in
12 terms of this analysis?
13     A   No.
14     Q   Did you do any -- well, you provided in your
15 report, page 6, the sight lines section studies.  Did
16 you make any effort to ascertain what the actual
17 effect -- what the actual observable portion of the
18 field was for somebody sitting in these sections?
19     A   No, because there's no standards that describe
20 how much of the field you have to see.
21     Q   I didn't ask that.  You've done a diagram that
22 projects out where somebody sitting in Section 112 in
23 an accessible seat would supposedly be viewing;
24 correct?
25     A   Correct.

**Page 107**

1     Q   And that would have allowed you to ascertain
2 how much of the field they could have seen; correct?
3     A   We did not do that.
4     Q   You could have done that; correct?
5     A   If we had a drawing that was 5 feet long or
6 something like that and all to scale, maybe.
7     Q   Do you know how much of the field a patron
8 sitting in an accessible seat in Section 112 can see?
9     A   I do not.
10     Q   Do you know how much of the field a patron
11 sitting in the first row of the nonaccessible seat can
12 see?
13     A   I do not.
14     Q   Are you able without knowing that to determine
15 whether the sight lines are comparable?
16     A   Comparable to what?  I'm sorry.
17     Q   What the difference is between
18 what somebody sitting in the accessible seat can see
19 versus somebody sitting in the nonaccessible seat?
20     A   It depends on all the people are.
21     Q   You think it should be determined on a
22 game-by-game, spectator-by-spectator basis?
23     A   I think it's the DOJ ought to put a
24 couple of dimensions on a drawing and say this is how
25 high we want the platform to be because we deem that

**Page 108**

1 this would be a compliant height that would meet the
2 standards.
3     Q   Do you know how much of the field somebody
4 could see sitting in an accessible seat with the
5 assumptions that you made in terms of their eyesight?
6     MR. WILLEY:  Objection.  Asked and answered.
7     A   No.
8     Q   Do you know how much of the field somebody
9 using the assumptions you made in terms of the height
10 of somebody in nonaccessible seating or a standing
11 patron would be able to see?
12     A   No, sir.
13     Q   So you don't know the difference between the
14 views of the patron in the accessible seating and the
15 patron in the nonaccessible seating; correct?
16     MR. WILLEY:  Objection,
17 mischaracterizes the testimony.
18     A   I already stated that this is all based upon
19 everybody being the same exact height in the general
20 public and they're not.
21     Q   Let's make the assumption that they were.
22     A   It's not a valid assumption.
23     Q   I'm asking you to make this assumption.  I
24 think, unlike you, that there have to be standards.
25 And it's --

William Endelman
Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

29 (Pages 113 to 116)

**Page 113**

1   MR. WILLEY: He's not offering an
2   opinion of remediation.
3   MR. CONNOR: Yeah, I'm not. I'm asking
4   measurement. I'm asking how you ascertain whether
5   this is in compliance with the law. He's testified if
6   is, so I'm trying to ascertain how he thinks he would
7   determine what portion of the field could be viewed.
8   A   And I told you that I was using the DOJ's
9   guidance to ascertain whether it complies with the
10  law.
11  Q   If you are going to take the stand and tell
12  the judge in this trial how much of the field could be
13  seen by a disabled person if there were spectators
14  standing in front of them, how would you go about
15  figuring that out and then communicating that to the
16  judge?
17  A   I would say to the judge the standards do not
18  address that.
19  Q   So you -- and so you wouldn't have any
20  recommendations in accessible seating would
21  actually -- what somebody in accessible seating would
22  be able to see over standing spectators?
23  MR. WILLEY: Are you asking him that as
24  a legal question or as a consulting question?
25  MR. CONNOR: He keeps saying that there

**Page 114**

1   aren't standards, that they aren't defined.
2   Q   What I want to know in the real world, as best
3   as we can construct it, is what the effect of the
4   seating arrangements in the T-Mobile stadium are now
5   on accessible -- patrons in the nonaccessible seating when
6   somebody stands. And I would like to know how you
7   would compare those to what could be viewed by
8   somebody in the nonaccessible seating; right?
9   A   And what Jim did is perfectly valid for what
10  it is. What I come back to is that there's no
11  standards that say you need to see 100 percent of
12  everything, and don't forget the standard is
13  comparable -- substantially comparable to what the
14  general public gets. In these standards, you're
15  always weighing what does a disabled person get to do
16  versus somebody who is not disabled.
17  Q   Let me ask you this: Do you think that the
18  views reflected on these two diagrams depicted on
19  Exhibit 6 are comparable views?
20  MR. WILLEY: Objection to the extent
21  you're seeking a legal conclusion.
22  A   I mean, if I agree with his methodology,
23  that's what you see, that's what I'm not
24  going to challenge --
25  Q   Do you think those are comparable views within

**Page 115**

1   the ADA?
2   A   No.
3   MR. WILLEY: Objection to the extent
4   you're seeking a legal conclusion.
5   MR. CONNOR: Pardon me?
6   MR. WILLEY: Objection to the extent
7   you're seeking a legal conclusion.
8   MR. CONNOR: Steve, you can make all
9   those objections you want. His report is a legal
10  conclusion.
11  MR. WILLEY: No, it's not.
12  MR. CONNOR: He has no personal
13  experience having done any of this. He's reading
14  regulations. He's setting forth what he says the
15  regulations say, so I'm going to ask him that.
16  MR. WILLEY: You can ask him about the
17  regulations.
18  MR. CONNOR: No, I'm not even asking
19  him that. I'm asking him whether he thinks applying
20  the facts of this case to the regulations -- he has
21  submitted a declaration to the court saying that the
22  Mariners stadium is -- provides comparable sight
23  lines.
24  And now I want to -- what I'm trying to find
25  out is whether he would agree with me that making the

**Page 116**

1   assumptions that Mr. Terry made these are not
2   comparable sight lines.
3   THE WITNESS: And should this analysis
4   be done for all, whatever it is, 45,000 seats?
5   BY MR. CONNOR:
6   Q   You would agree with me that with respect to
7   these two views they're not comparable views; correct?
8   A   Correct.
9   MR. WILLEY: Objection to the extent
10  you're seeking a legal conclusion.
11  Q   Did you review the other diagrams that
12  Mr. Terry had prepared for the other sections of the
13  stadium?
14  A   I looked at them, and I didn't look at them in
15  the hyper detail because I could understand what he
16  was saying in the broad idea.
17  Q   Okay. And do you have any reason -- with the
18  caveats that you already gave me as to Attachment B7,
19  do you have any other objections of the other views of
20  attachments that Mr. Terry had made showing what would
21  be visible to people in the different seats?
22  A   Based upon his methodology, I have no reason
23  to say anything about it.
24  Q   And just for the record, not to drag this on,
25  but do you have a methodology that you think should be

Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

William Endelman

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

EXHIBIT J

# Deposition of 30(b)(6) Trevor Gooby

## Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

## May 16, 2019



206.287.9066 | 800.846.6989

1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101
www.buellrealtime.com
email: info@buellrealtime.com



**Page 57**

1  A  I don't know that answer.
2  Q  Let's look at 10, Topic 10. What can you tell
3     me about what tables and seating there are in the
4     'Pen?
5  A  So in the 'Pen, it's a nonticketed area. So
6     fans that have a ticket for anywhere in the ballpark
7     can come down. There's no set location for anybody.
8     There's tables, chairs, drink rail, countertops at
9     accessible heights, accessible seating throughout the
10    'Pen.
11  Q  Okay. And I'm sorry I skipped over Section 9.
12    I'll ask you with respect to the 'Pen and other areas.
13    Let's talk about gaps and cracks in the flooring in
14    expansion joints. Have you done anything in
15    preparation for this deposition today to talk about
16    that issue as it pertains to the compliance of the
17    ballpark with the ADA?
18  A  We have a general preventive maintenance plan
19    in the ballpark that addresses maintenance issues
20    throughout.
21  Q  Has that plan included any specific plans or
22    work tasks to make sure there are not cracks and gaps
23    and height changes in the part that are not in
24    compliance with the ADA?
25  A  We have a plan in place that we've had for

**Page 58**

1  five or six years now where we are maintaining any
2  crack, joint, expansion joint, any change in
3  elevation. We've hired an employee actually to
4  repair -- his sole responsibility is to repair all
5  joints and cracking throughout the ballpark. And he's
6  been on staff now for five or six years. It's an
7  ongoing issue that we have.
8  Q  As we sit here today, are there cracks in the
9     joints --
10  A  Yes.
11  Q  -- that have not been repaired?
12  A  It's an ongoing preventive maintenance issue
13    that we have.
14  Q  Okay. As you sit here today, do you think if
15    you and I went down to the ballpark there would be
16    cracks or gaps that would not be in compliance with
17    ADA requirements?
18  A  I don't know the exact compliance code, but I
19    know that there's cracking concrete that we are
20    ongoing constantly working on repairing.
21  Q  When was the last time there was a repair
22    made?
23  A  Less than a week ago.
24  Q  Where was that made?
25  A  We have joints that were repaired on the

**Page 59**

1  100 level.
2  Q  Where in the 100 level?
3  A  I believe the section was 105.
4  Q  And what was the nature of the joint or repair
5     that was done?
6  A  The caulking has failed in the joint, and it
7     needed to be repaired.
8  Q  What other repairs of that nature have been
9     made this year, to your knowledge?
10  A  Again, it's an ongoing daily task that I have
11    one of our engineering and maintenance employee that
12    is going from one side of the building to the other
13    side of the building repairing joints and concrete.
14    And like I mentioned, he's been tasked with this for
15    over five-plus years and still hasn't got back to the
16    starting point.
17  Q  Is he literally working his way around the
18    stadium?
19  A  Yes.
20  Q  How far has he progressed if we look at the
21    map?
22  A  It depends. Because if something -- if an
23    area becomes a bigger issue, we'll move him to other
24    areas of the ballpark. So I can't say exactly where
25    he started and stops because he moves when we have

**Page 60**

1  larger issues.
2  Q  It sounds like aside from the larger issues,
3     though, he's on a program of working his way around
4     the stadium?
5  A  I wish it was like that, but there's issues
6     that pop up pretty regularly on concrete and joint
7     failure.
8  Q  I just got this idea from something you said.
9     I don't have any idea that there was this fellow or
10    anything. It sounded as if you said he hadn't made
11    his way around the stadium from start to finish?
12  A  That's correct.
13  Q  Where did he start, and where is he supposed
14    to finish?
15  A  Sure. Again, I don't know the exact starting
16    point and ending point, but if we were to look at --
17    pick one section. He hasn't gone from that one
18    section throughout the entire ballpark and then back
19    to that section.
20  Q  And he's been at it, you said, for five or six
21    years?
22  A  Yes.
23  Q  And is anybody else responsible for
24    maintaining these gaps and cracks besides this
25    individual?

BUELL REALTIME REPORTING, LLC
206.287.9066 | 800.846.6989

Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.
30(b)(6) Trevor Gooby

Landis, et al. v. Washington State MLB Stadium Public Facilities District, et al.

30(b)(6) Trevor Gooby

**Page 61**

1  A  We have 15 engineering and maintenance of all
2  skill and trades. We have one assigned for the
3  caulking and joints of the ballpark, and we have
4  another tech who handles our concrete repairs.
5  However, they get pulled to do a lot of different
6  projects throughout the ballpark.
7  Q  Is there any expected date for this individual
8  to complete his circle around the park?
9  A  There's not an expected date of completion.
10  Q  Is there any -- do you know whether the
11  expansion joints that are in the park are ADA
12  compliant?
13  MR. WILLEY: Objection, seeks a legal
14  conclusion from a lay witness.
15  Q  You can go ahead and answer.
16  A  I do not know.
17  Q  Is there any plan to change or correct the
18  expansion joints that are in the park?
19  A  We are looking at expansion joint replacement,
20  and this is due to some of the expansion joints
21  failing as being 20-plus years old.
22  Q  Is that the only type of joint that you're
23  looking at fixing or changing, expansion joint?
24  A  Those are massive joints in the building. The
25  building is built in eight pieces, and so those are

**Page 62**

1  the massive pieces that need to be repaired due to
2  failing.
3  Q  Are there any repairs anticipated with regard
4  to ADA compliance?
5  A  I don't know.
6  Q  But your understanding is the only thing
7  that's going to be done with regard to the expansion
8  joints has to do with failures?
9  A  The life of the expansion joint, correct.
10  Q  I think you said in your job description
11  you're responsible for fan experience or something
12  like that?
13  A  Yes, sir.
14  Q  Have you ever gone around the stadium with
15  somebody in a wheelchair?
16  A  No, I have not.
17  Q  Have you talked with people who have visited
18  the stadium who have been in wheelchairs?
19  A  I talk to many fans.
20  Q  I know. I'm asking a particular question.
21  Have you talked to any fans who have been in
22  wheelchairs?
23  A  Yes.
24  Q  Have you had any discussions with them about
25  their fan experience from the standpoint of being in a

**Page 63**

1  wheelchair?
2  A  Yes.
3  Q  Have any of those individuals identified for
4  you any problems that they've had at the stadium?
5  A  Not to me.
6  Q  Let's talk more broadly. I think this is one
7  of the topics I think. Thirteen on the list here asks
8  somebody be made available to talk to us about policy
9  and procedure about making complaints of disability
10  access or accommodations. Can you tell me what
11  policies or procedures the Mariners have in place for
12  fans to make complaints about difficulties that
13  they're having?
14  A  Sure.
15  Q  Okay.
16  A  We have a variety of ways for fans to
17  communicate with us, positive and negative. We
18  receive comments and complaints on a variety of topics
19  throughout the year and off-season. Many different
20  ways. In game and nongame days, some of those ways
21  are talking to hosts and myself or my full-time staff
22  that are at the games. Another way is communicate --
23  Q  I'm sorry. I don't mean to interrupt you, but
24  just so I don't lose track, when you say "hosts," who
25  are you referring to?

**Page 64**

1  A  So our hosts are our day-o-game staff that
2  work every single section. We have a host that's
3  assigned to every section throughout the ballpark.
4  Q  And is that what would formally be called an
5  usher or are they different?
6  A  We call them hosts, but other teams do call
7  them ushers.
8  Q  I don't mean anything disparaging by either
9  designation. I was just wondering if --
10  A  Yeah, similar job responsibility.
11  Q  Okay.
12  A  So one way would be to communicate with a
13  Mariner employee, be it a host or a full-time staff
14  member, and to issue that comment, compliment,
15  complaint regardless of what that is. That usher or
16  team member would then fill out a comment card, and we
17  would report that comment card to our guest experience
18  department where it's logged.
19  A  second way would be --
20  Q  Let's stop on that, if I can. Are the hosts
21  trained in terms of filling out cards like that?
22  A  Yes. We have a training program called
23  Mariners Way training, which our mission for our hosts
24  is that all our fans are treated to exceptional
25  experiences in a clean, safe, and friendly

EXHIBIT K

