1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLARK LANDIS, ROBERT BARKER, )
GRADY THOMPSON, and )
KAYLA BROWN, )
                   )
          *Plaintiffs*, )
                   )
        v. )
                   )
WASHINGTON STATE MAJOR LEAGUE )
BASEBALL STADIUM PUBLIC )
FACILITIES DISTRICT, BASEBALL OF )
SEATTLE, INC., a Washington )
Corporation, MARINERS BASEBALL, )
LLC, a Washington limited liability )
Company, and THE BASEBALL CLUB )
OF SEATTLE, LLLP, a Washington limited )
liability limited partnership, )
                   )
         *Defendants*. )
                   )

CASE NO. 2:18-cv-01512-BJR

ORDER GRANTING IN PART
AND DENYING IN PART
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

## I.      INTRODUCTION

This matter involves a challenge to the accessibility of T-Mobile Field,[1] home of Major

League Baseball's Seattle Mariners.   Plaintiffs Landis, Barker, Thompson, and Brown

(collectively "Plaintiffs") are lifelong baseball fans who, because of mobility disabilities, are

---

[1] For the first twenty years of its life T-Mobile Field was known as "Safeco Field."  In 2018 the Mariners signed a
twenty-five year naming rights agreement with the telecommunications company to rename the stadium.  *See* Ryan
Divish, *Goodbye, Safeco Field. The Mariners' stadium is now called T-Mobile Park*, THE SEATTLE TIMES (Dec. 19,
2018), https://www.seattletimes.com/sports/mariners/mariners-reach-a-stadium-naming-rights-agreement-with-t-
mobile/.  Often, though, old habits prove hard to shake and the Field is sometimes referred to by its old name.  *See,
e.g.*, Dkt. No. 1 at ¶ 41.

1

confined to wheelchairs.  They bring the current action seeking (1) declaratory relief that T-Mobile Field does not comply with the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and its subsequently promulgated regulations and standards, and (2) injunctive relief ordering that T-Mobile Field be brought into compliance.  Their grievances include a list of noncompliant elements, from insufficient sightline to the playing field to wheelchair spaces that do not comply with depth requirements, all of which will be outlined below.

Before the Court is Plaintiffs' motion for summary judgment.  Dkt. No. 19.  Defendants Washington State Major League Baseball Stadium Public Facilities District, Baseball of Seattle, Inc., Mariners Baseball, LLC, and The Baseball Club of Seattle, LLLP (collectively "Defendants"), all of which own or operate the stadium in some capacity, oppose the motion.[2] Dkt. No. 21.  Having reviewed the motion, the oppositions thereto, the record of the case, and the relevant legal authorities, the Court will grant the motion as to some of Plaintiffs' grievances but deny as to others.  The reasoning for the Court's decision follows.

## II.   BACKGROUND

### A.  The Parties

As mentioned previously, Plaintiffs are all baseball fans who visit T-Mobile Field regularly to watch their favorite team take the field.  Dkt. No. 1 at ¶¶ 3.1–3.4.  Because of mobility disabilities, all are confined to wheelchairs.  *Id.*  In the course of enjoying a day of America's

---

[2] Defendants have requested oral arguments to address the pending motion.  Dkt. No. 21.  The Court, however, deems this matter appropriate to resolve without oral arguments and will therefore deny the request.  *See Murcia v. Godfrey*, No. 19-0587, 2019 WL 3504124, at *1 (W.D. Wash. Aug. 1, 2019) (denying oral argument where "[t]he parties have thoroughly briefed the issues and oral argument would not be of assistance to the court" (citing *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998))).

favorite pastime, however, all have encountered various obstacles specific to wheelchair users. *See, e.g.*, *id.* at ¶¶ 4.15–4.18.

Defendants comprise four separate entities. Washington State Major League Baseball Stadium Public Facilities District ("PFD") is a Washington state municipal corporation, created by the Washington State Legislature and the King County Council, that owns T-Mobile Field. Dkt. No. 21 at 7. PFD, in turn, leases the Field to the other privately-owned entities, Baseball of Seattle, Inc., Mariners Baseball, LLC, and The Baseball Club of Seattle, LLLP (collectively "the Mariners"), who manage operations and maintenance of T-Mobile Field. Dkt. No. 1 at ¶ 3.5, 3.6, 5.20; Dkt. No. 19 at 6; Dkt. No. 21 at 7, 7 n.5 (stating that under the current lease between PFD and the Mariners, "the Mariners are responsible for all ongoing operation, management, and maintenance of the Stadium").

**B.  T-Mobile Field**

Construction of T-Mobile Field began on March 8, 1997, with legendary Mariner Ken Griffey, Jr. helping to break first dirt. *See* Seattle Mariners, *T-Mobile Park History*, https://www.mlb.com/mariners/ballpark/information/history (last visited Aug. 8, 2019).[3]  But, as Defendants point out, planning for the Field's design dates back to 1996. Dkt. No. 21 at 7.

T-Mobile Field boasts a retractable roof and is also composed of four separate seating tiers, which are "vertically-stacked." *Id.* Closest to the field is the 100 Level and, extending upward,

---

[3] An excellent picture of the Mariner great digging in to the future site of T-Mobile Field is available at Seattle Times sports staff, *From dirt to diamond: How Safeco Field has matured since its groundbreaking 20 years ago*, THE SEATTLE TIMES (Mar. 8, 2017), https://www.seattletimes.com/sports/mariners/seattle-mariners-safeco-field-20-years-groundbreaking-photos/.

are the 200 or "Club" Level, the Suite Level, and the 300 Level.  *Id.*; *see also* Dkt. No. 1 at ¶ 4.9. The tiers are then divided horizontally into sections.

Each level is connected to a concourse that contains concessions and which guests use to access their seats.  In the 100, 200 and Suite Levels, the concourse is located at the rear of each section.  Dkt. No. 21 at 8.  In the 300 Level, guests access their seats from the concourse through passages located in the middle of the sections.  *Id.*  At field-level, the 100 Level also includes the "Diamond Club," which is a premium seating location directly behind home plate.  *Id.* at 9 n.7. Guests access the Diamond Club through four tunnels from the 100 Level concourse.  *Id.* at 8. These tunnels are the only points of access to seating on the 100 Level, apart from the access provided directly from the concourse.  *Id.*  A diagram of the Field, provided by Defendants, is appended as Exhibit A.

Addressing T-Mobile Field's architecture, the structure itself is actually composed of eight separate building segments made largely of concrete.  Dkt. No. 19 at 14–15; Dkt. No. 21 at 11, 25. These segments are connected by architectural assemblies called "expansion joints" designed to allow the structure to safely expand and contract with changes in temperature.  Expansion joints are common in large stadiums and, as with T-Mobile Field, are usually covered with protective covers.

Wheelchair accessible seating is provided throughout T-Mobile Field.  On the 100, 200, and Suite Levels, ADA-compliant seating is located adjacent to the concourses.  Dkt. No. 21 at 8. In the 300 Level, compliant seating is located in the middle of each section, where the passages provide access from the concourse.  *Id.*  Field-level accessible seating is located in Section 35, as only two of the four tunnels providing access to the Diamond Club are ADA-accessible.  *Id.* at 8,

4

9 n.7.  The Section 35 seating is the only field-level wheelchair accessible seating available.  Dkt. No. 1 at ¶ 4.19.  Accessible seating is labeled on the diagram provided in Exhibit A.

### C.  Plaintiffs' List of Grievances

Plaintiffs' complaint and motion for summary judgment provide a long list of alleged noncompliant elements.  *See* Dkt. No. 1 at 1.5; Dkt. No. 19 at 20–22.  This list is also dynamic, as discussed below, because the Mariners have conducted some remedial measures since the initiation of the instant action.  *See infra* at 7–8.  As best the Court can ascertain, the following is a list of Plaintiffs' outstanding grievances:

- *Seating Dimensions*- Plaintiffs claim that the accessible seating in the 300 Level fails to meet the minimum depth requirements set by the ADA.  Dkt. No. 1 at ¶¶ 4.33–4.38; Dkt. No. 19 at 6–7.  Because the seat depth is insufficient, Plaintiffs claim their wheelchairs "unacceptably spill into the accessible route behind the chairs" causing other spectators to bump into Plaintiffs while the they attempt to pass behind the seats.  Dkt. No. 19 at 6.

- *Edgar's Cantina Elevator/Lift*- Plaintiffs complain about the elevator or lift leading to Edgar's Cantina,[4] which is "a bar and restaurant along the outfield at the playing field level," Dkt. No. 19 at 16, is not ADA-compliant.  Dkt. No. 1 at ¶ 4.39–4.42; Dkt. No. 19 at 18.  The Court is unclear as Plaintiffs' exact concern with the elevator/lift.  In Plaintiffs' complaint they claim the lift is noncompliant because it requires a key to operate and is not automatic.  Dkt. No. 1 at ¶ 4.40–4.41.  While, in their motion for summary judgment, the complaint appears to be that it is too dangerous because there is a vertical gap which may cause wheelchair users to flip over backwards while attempting to mount the lift.  Dkt. No. 19 at 18.

- *Bullpen and Dugout Access*- Plaintiffs allege that during stadium tours or when the Field is open for public events, the Mariners allow guests to tour the bullpen and dugout.  Dkt. No. 1 at ¶¶ 4.59–4.62; Dkt. No. 19 at 19.  According to Plaintiffs, these areas are only accessible by stairs preventing Plaintiffs from visiting the areas.

---

[4] *See* Seattle Mariners, *Edgar's Cantina*, https://www.mlb.com/mariners/ballpark/events/spaces/edgars-cantina (Last Visited Aug. 8, 2019).

- *Gaps, Cracks, and Expansion Joints*- Plaintiffs allege that there are hundreds, if not thousands, of bumps, cracks, slopes, and changes in level along paths of travel and walking surfaces around the stadium that present hazards for wheelchair users. Dkt. No. 1 at ¶¶ 4.54–4.56; Dkt. No. 19 at 13–15. Some of these obstacles result from maintenance issues where adjacent sections of concrete or brick meet or from expansion joint covers with excessive rises in elevation. Dkt. No. 19 at 14–15. These excessive cracks cause wheelchair users to become stuck or excessively jostled while attempting to traverse causing "pedestrians to crash into wheelchairs from the rear, spilling food or drinks on themselves" or "nearly fall[ing] to the ground due to the unexpected bump." *Id.* at 15.

- *Eating and Drinking Surfaces*- Plaintiffs claim there are numerous eating and drinking surfaces around the park that do not comply with ADA standards. Dkt. No. 1 at ¶¶ 4.53, 4.57; Dkt. No. 19 at 16–17, 19. For example, Plaintiffs list the following: (1) drink rails that are too high on the 200 Level, Dkt. No. 1 at ¶ 4.53; and excessively tall dining tables and counters in (2) Edgar's Cantina; (3) "The Pen";[5] (4) Edgar's Cantina Home Run Porch;[6] and (5) Lookout Landing,[7] Dkt. No. 19 at 17.

- *Concession Counters*- In addition to noncompliant eating and drinking surfaces, Plaintiffs claim that several of the sales counters at concession stands around T-Mobile Field are also noncompliant. Dkt. No. 1 at ¶¶ 4.43–4.46; Dkt. No. 19 at 16. For example, Plaintiffs list the following: counters in The Pen, including (1) Jack Daniels Bar; (2) Silver Bullet Bar, Dkt. No. 1 at ¶ 4.45; (3) most of the "Shortstop Beer" stands; (4) the "Hop Box" beer stand; and (5) the bar at Edgar's Cantina, Dkt. No. 19 at 16.

- *Concession Lines*- Plaintiffs claim that many of the lines leading up to concession counters also fail to meet the ADA's width requirements preventing wheelchair users from navigating to sales counters. Dkt. No. 1 at ¶¶ 4.47–4.52; Dkt. No. 19 at 17–18.

- *Distribution*- Plaintiffs charge Defendants with failing to provide sufficient distribution of ADA-compliant seating throughout T-Mobile Field. *See* Dkt. No. 1 at ¶¶ 4.9–4.28; Dkt. No. 19 at 10–13, 20. This includes the allegation that the current arrangement fails to provide both sufficient choice of admission prices and locations throughout the Field.

---

[5] Seattle Mariners, *The T-Mobile Pen at T-Mobile Park*, https://www.mlb.com/mariners/tickets/the-pen (Last Visited Aug. 8, 2019).

[6] Seattle Mariners, *Hospitality Areas*, https://www.mlb.com/mariners/tickets/group-tickets/hospitality-areas (Last Visited Aug. 8, 2019)

[7] *See supra* at 6 n.6.

6

- *Sightlines*- Plaintiffs allege that guests seated in ADA-compliant seats on the 100 Level do not have comparable sightlines to both the field of play and scoreboards. Dkt. No. 1 at ¶¶ 4.21–4.25, 4.29–4.32; Dkt. No. 19 at 7–10.  This failure is exacerbated when fans seated in front of wheelchair accessible seats stand up in excitement during particularly exhilarating moments in the game.

**D. Procedural History and Subsequent Improvements**

The instant action commenced on October 15, 2018 when Plaintiffs filed their complaint. Dkt. No. 1.  In it, they allege three causes of action for violations of Titles II and III of the ADA, as well as Washington state law.  They then moved for summary judgment on May 20. 2019.[8] Dkt. No. 19.  Defendants opposed the motion.  Dkt. No. 21.

Plaintiffs and Defendants, however, have long been in contact with each other regarding Plaintiff's grievances.  *See* Dkt. No. 21 at 6 ("Consistent with [the] practice [of continually updating and bettering their accommodation offerings], the Mariners and Plaintiffs' counsel had pre-litigation dialogue in which the Mariners agreed to promptly address immediately solvable issues and to investigate in good-faith the more complicated issues raised.").  In fact, it is clear from the parties' pleadings that significant accessibility changes have occurred since the initiation of this action, but it is unclear to the Court just how much has changed in the intervening time.

One example that is evident from the pleadings, for example, is that the number of field-side ADA-compliant seats has increased.  Plaintiffs complaint states that the "only field level wheelchair accessible seating on the 100 Level of the stadium is currently in the Diamond Club"

---

[8] Plaintiff's motion for summary judgment makes no mention of their cause of action under Washington state law, namely discrimination in violation of Washington Law Against Discrimination, Wash. Rev. Code § 49.60.010 *et seq.*  Dkt. No. 1 at ¶¶ 5.26–5.34.  As such, the Court concludes Plaintiffs have not sought summary judgment on this claim and will therefore not address it.

7

and that "there is one wheelchair accessible seat in the Diamond Club which costs $500, and it does not comply with 2010 ADA standards." Dkt. No. 1 at ¶ 4.20.  By the time Defendants filed their response, however, they informed the Court that "[f]ollowing the 2018 season, the Mariners embarked on an ADA Seating Expansion project, to provide for additional accessible seating within the 100 Level of the Stadium." Dkt. No. 19 at 10.  Now, according to Defendants, "[t]here are sixteen ADA spaces located in the front row of Section 35." Dkt. No. 21 at 8; *see also id.* at 9 n.7 ("The Mariners implemented an ADA Seating Expansion project over the past off-season.  As a result, sixteen (16) additional accessible seating spaces have been added to the 100 Level in Section 35.  These are seats that are in the first row next to the field.  Four are Diamond Club and twelve are Premier seats."  (Internal citations removed)).  These sixteen seats include eight wheelchair accessible spaces and eight companion seats.  Malcolm Rogel Decl., Dkt. No. 22 at ¶ 8.

## III.   LEGAL STANDARD

Rule 56 provides that a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Fed. Home Loan Mortg. Corp. v. SFR Investments Pool 1, LLC*, 893 F.3d 1136, 1144 (9th Cir. 2018), *cert. denied*, 139 S. Ct. 1618 (2019).  "Materiality" is based on the substantive law, making disputes over facts material only where they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "genuine dispute of material facts," occurs where the "evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Id.*

During the course of a motion for summary judgment, the moving party bears the "initial

8

responsibility of informing the district court of the basis for its motion," including "identifying those portions of the pleadings . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal citations and quotations removed).  Further, "[w]here the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where the nonmovant bears the burden of proof, however, "the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Macareno v. Thomas*, 378 F. Supp. 3d 933, 940 (W.D. Wash. 2019) (citing *Celotex Corp.*, 477 U.S. at 325).

Where the moving burden has met its initial burden, the nonmovant must respond showing that there is a genuine issue for trial.  *Anderson*, 477 U.S. at 250.  "If the nonmoving party fails to establish the existence of a genuine issue of material fact, 'the moving party is entitled to judgment as a matter of law.'"  *Perfect Co. v. Adaptics Ltd.*, 374 F. Supp. 3d 1039, 1041 (W.D. Wash. 2019) (quoting *Celotex*, 477 U.S. at 323–24).  In conducting its evaluation of the merits of a motion for summary judgment, "the court does not make credibility determinations or weigh conflicting evidence."  *Soremekun*, 509 F.3d at 984.  Instead, the Court must "view 'the evidence in the light most favorable to the nonmoving party.'"  *Universal Cable Prods., LLC v. Atl. Specialty Ins. Co.*, 929 F.3d 1143 (9th Cir. 2019) (quoting *Pension Tr. Fund for Operating Eng'rs v. Fed. Ins. Co.*, 307 F.3d 944, 949 (9th Cir. 2002)).

# IV.   DISCUSSION

## A.  The ADA

Broadly, the ADA prohibits discrimination against individuals, like Plaintiffs, who live with various forms of disability.  Its enactment in 1990 was intended by Congress "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(2).  The ADA is divided into several titles, two of which are relevant to the instant action.

First, Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Both parties in this matter agree that PFD qualifies as a public entity subject to Title II.  *See* Dkt. No. 19 at 5; Dkt. No. 21 at 11.

Title III, on the other hand, addresses "Public Accommodations and Services Operated by Private Entities" and provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Both parties agree that the Mariners are private entities and that T-Mobile Field is a public accommodation regulated under Title III.  *See* Dkt. No. 19 at 6; Dkt. No. 21 at 11.

Both provisions of the ADA are supported by a structure of code, regulations, and guidance materials that help define and explain its provisions.  Because the parties focus almost exclusively on Title III of the ADA, as outlined in Section IV.B. of this order, the Court will focus on its

provisions.  *See infra* at 14–15.

Under Title III,[9] discrimination includes "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable.'" 42 U.S.C. § 12182(b)(2)(A)(iv). It also provides that newly constructed facilities like T-Mobile Field—*i.e.*, those designed and constructed for occupancy after January 26, 1993—must be "readily accessible to and usable by individuals with disabilities."  *Id.* at § 12183(a)(1).  Title III also directs the Attorney General to "issue regulations . . . that include standards applicable to" public accommodations, *id.* at 12186(b), and to provide "appropriate technical assistance manuals to individuals or entities with rights or duties under this chapter."  *Id.* at § 12206(c)(3).

The promulgation process, however, includes an "unusual twist."  *Miller v. California Speedway Corp.*, 536 F.3d 1020, 1024 (9th Cir. 2008).  Congress mandated that the Attorney General's regulations must "be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board," 42 U.S.C. § 12186(c), which is "commonly referred to as the 'Access Board.'"  *Miller*, 536 F.3d at 1024.[10]  Thus, the Access Board establishes the "'minimum guidelines' for Title III, but the DOJ promulgates its own regulations, which must be consistent with—but not necessarily identical to—the Board's

---

[9] In mapping the requirements of Title III, the Court will mostly cite to the applicable code, regulations, and guidance materials.  But it would like to note that *Miller*, 536 F.3d at 1024–27, provides an excellent in-depth recitation of the applicable regulatory scheme including the process of notice, comment, and adoption.

[10] The Access Board is "an independent federal agency comprised of twenty-five persons—thirteen presidentially-appointed individuals and representatives from twelve federal agencies, including the DOJ."  *Miller*, 536 F.3d at 1024 (citing 29 U.S.C. § 792(a)(1)).  It is directed to establish "minimum guidelines and requirements for the standards issued" under Title III, 29 U.S.C. § 792(b)(3)(B), as well as "develop advisory information for, and provide appropriate technical assistance to, individuals or entities with rights or duties under" Title III, *Miller*, 536 F.3d at 1024–25.

guidelines." *Id*. at 1025.

As relevant to the standards for several of Plaintiffs' grievances discussed below, the Access Board published its first ADA Accessibility Guidelines in January 1991. *See* Access Board, *ADA Standards for Accessible Design* (1994), https://www.ada.gov/1991standards/adastd94-archive.pdf ("1991 ADAAG").[11]   The DOJ promptly "adopt[ed] the [1991] ADAAG as the accessibility standard applicable under this rule." 56 Fed. Reg. 35,544, 35,585 (1991); *see also Miller*, 536 F.3d at 1026.   Both parties agree that the 1991 ADAAG is the applicable standard under which to evaluate T-Mobile Field's compliance with the ADA as to existing architectural deficiencies.   *See* Dkt. No. 1 at ¶ 4.7; Dkt. No. 21 at 11–12.   In 2004, the Access Board completed an update of the ADAAG, which the Department of Justice adopted in 2010, and went into effect on March 15, 2012.   Access Board, *2010 ADA Standards for Accessible Design* (2010), https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf ("2010 ADAAG"); *see Rush v. Hyun Suk Kim*, 908 F. Supp. 2d 1117, 1119 n.2 (C.D. Cal. 2012).   The 2010 ADAAG is applicable to all covered entities which start new construction or alterations on or after March 15, 2012.   *See* Department of Justice, *Effective Date/Compliance Date* (2011), https://www.ada.gov/revised_effective_dates-2010.htm.   Therefore, where alterations have occurred in T-Mobile Field, the 2010 ADAAG will apply.

In addition to adopting the two ADAAGs, the DOJ also published two technical assistance

---

[11] The version provided online includes revisions to the 1991 ADAAG as of July 1, 1994.

manuals under the ADA's direction to provide such guidance; the first in 1993, Department of Justice, *ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities* (1993), https://www.ada.gov/taman3.html ("TAM"), and the second in 1994 which supplemented the TAM, Department of Justice, *Title III Technical Assistance Manual 1994 Supplement* (1994), https://www.ada.gov/taman3up.html ("1994 Supplement to the TAM"). Finally, in 1996 the DOJ published guidance in the form of the *Accessible Stadiums* document, on which Defendants heavily rely.   Department of Justice, *Accessible Stadiums* (1994), https://www.ada.gov/stadium.pdf ("Accessible Stadiums").[12]

        The Ninth Circuit has held that, as an agency interpretation of its own regulations, the TAM is to be accorded deference where it does not conflict with the underlying regulations. *Miller*, 536 F.3d at 1028 (citing *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 875–76 (9th Cir. 2004) ("DRAC"); *Botosan v. Paul McNally Realty*, 216 F.3d 827, 834 (9th Cir. 2000); *Bay Area Addiction Research v. City of Antioch*, 179 F.3d 725, 732 n.11 (9th Cir. 1999)).  As it explained, the ADAAG's guidelines are only a "launching point," and the Attorney General is "free to interpret the regulations in a manner that [is] more strict than contemplated by the Access Board." *Miller*, 536 F.3d at 1032.  Thus, as applicable to this matter, the minimum standard that T-Mobile must meet is established by the ADAAG.  But more stringent requirements may be applicable where provided for by the TAM or 1994 Supplement to the TAM.  The Ninth Circuit, however, has not spoken to *Accessible Stadiums*.

_____

[12] Both parties agree that the *Accessible Stadiums* guidance applies to T-Mobile Field.  *See, e.g.*, Dkt. No. 27 at 14 ("[h]ere, both parties' experts used the same "Accessible Stadiums" publication in conducting their analysis").

**B. Summary Judgment Against PFD**

Before proceeding to Plaintiffs' list of grievances, it is first necessary to address a deficiency in their motion for summary judgment.

Plaintiffs bring a claim against PFD under Title II of the ADA, which prohibits discrimination on the basis of disability by a public entity in relation to its services, programs, or activities. Dkt. No. 1 at ¶¶ 5.1–5.17; Dkt. No. 19 at 3. In order to establish a prima facie case under Title II, Plaintiffs must show that "(1) [they are] qualified individual[s] with a disability; (2) [they were] excluded from participation in or otherwise discriminated against with regard to a public entity's services, programs, or activities, and (3) such exclusion or discrimination was by reason of [their] disability." *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002) (citing *Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).

The parties, however, largely do not consider PFD's liability under Title II separate and apart from the private entities under Title III. For example, Title II is only addressed twice in Plaintiff's motion for summary judgment and then only to establish the prima facie standard under Title II and assert that PFD is a public entity, Dkt. No. 19 at 3, 5, and once in Defendant's response for the proposition that it is "applicable to public entities such as the PFD," Dkt. No. 21 at 11.

In *DRAC*, the Ninth Circuit held that a private entity could be held responsible for assuring compliance with Title III's requirements for public accommodations where the stadium in question was owned by a public entity. 375 F.3d at 878. At the same time, it held joinder as a necessary party of the public entity was inappropriate where meaningful relief could be provided by remedies not requiring the public entities' cooperation. *Id.* at 879–880 ("[m]eaningful relief could thus be granted by enjoining [the private entities] from making certain kinds of operational decisions

1

2    regarding conditions over which they have control").

3        Here, the current lease for the stadium runs through 2043 and the Mariners "are responsible

4    for all ongoing operation, management and maintenance of the Stadium."   Dkt. No. 21 at 7 n.5.

5    Thus, Plaintiffs have not shown how an injunction against the private entities would fail to

6    thoroughly address their complaints and offer no more than a recitation of the necessary elements

7    of a Title II claim against PFD in their motion for summary judgment, which fails to satisfy as a

8    "a formulaic recitation of a cause of action's elements will not do." *Bell Atlantic Corp. v.*

9    *Twombly*, 550 U.S. 544, 555 (2007); *see also Wynn v. Turner*, 631 F. App'x 483, 484 (9th Cir.

10   2016) (applying "formulaic recitation" standard in summary judgment context).   The Court

11   therefore will deny Plaintiff's motion as it pertains to PFD.

12   **C. Summary Judgment against the Mariners**

13       Next, the Court moves to Plaintiffs' case against the private entities.   In order to establish

14   a claim under Title III of the ADA, Plaintiffs must show that "(1) [they are] disabled within the

15   meaning of the ADA; (2) the defendant[s are] private entit[ies] that own[], lease[], or operate[] a

16   place of public accommodation; and (3) the plaintiff[s were] denied public accommodations by

17   the defendant[s] because of [their] disability." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th

18   Cir. 2007).   There is no debate as to the first two elements, so the only question left for the Court

19   to answer is whether Plaintiffs' enumerated grievances constitute discrimination on account of

20   disability by failing to meet the applicable statutory or regulatory requirements.

21       The Court finds several of the Plaintiffs' claims have sufficient merit to justify summary

22   judgment, while a genuine dispute of material facts exists over most of the others.   As such, the

23   Court will address each of the Plaintiffs' claims in turn, starting with the easiest—the conceded

24

25

15

deficiencies—before moving to the heart of the lineup.  Finally, the Court will address the "heavy hitters" of distribution and sightline.

### 1.  Noncontested Claims

There are a number of Plaintiffs' grievances which the Mariners concede noncompliance. First, as it regards _seating dimensions_, Defendants respond that "Plaintiffs are correct that some of the accessible seats on the 300 Level are short [of the applicable] front-to-back dimension by approximately 3-4 inches."  Dkt. No. 21 at 27.  Second, regarding _Edgar's Cantina elevator/lift_, Defendants respond that "the Mariners agree that the lift requires improvement and they will do so."  _Id._  Finally, as to _bullpen and dugout access_, Defendants respond that "[t]here is presently no accessible route into the player dugouts" but that "the Mariners will provide for an accessible lift into one or more of the dugouts, or preclude general public access to these player areas."  _Id._ at 28.

Thus, the Court finds there is no genuine dispute of material facts as to these grievances and will grant summary judgment as it pertains to them.

### 2.  Contested Claims

#### a.  Gaps, Cracks and Expansion Joints

Moving on to Plaintiffs' more involved claims, as it relates to the numerous gaps, cracks, and expansion joints located throughout the Field, Defendants respond that "the Mariners' maintenance team regularly inspects the conditions of the joints and covers as part of a preventative maintenance plan."  Dkt. No. 21 at 25.  Thus, in essence, Defendants admit that there may be noncompliant gaps, cracks, and expansion joints, but that they (1) have an established plan to replace deficient expansion joints accounted for in their Long-Term Capital Needs Assessment, _id._, and (2) have an employee on staff whose job it is to "identify and ensure that any cracks,

bumps, or gaps are promptly repaired," *id.* at 26.  They claim, however, that each potentially noncompliant gap, crack, or expansion joint "raises a deeply factual issue about whether it is 'readily achievable' for the Mariners to do better than they have already done in identifying and remediating these barriers." *Id.* at 26–27.

To this Plaintiffs in essence reply that the Mariners are not doing a good enough job.  As they point out, Defendants own witness, Senior Vice President of Ballpark Operations Trevor Gooby, has stated that the single employee tasked with "going from one side of the building to the other" repairing the gaps and expansion joints has been at it for "five-plus years and still hasn't got back to the starting point."  Trevor Gooby Dep., Dkt. No. 28-1 at 23, 59:8–59:19, May 16, 2019.

Title III's regulations provide that they "do[] not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs."  28 C.F.R. § 36.211(b).  Further, the TAM elaborates that "[i]solated or temporary interruptions in access due to maintenance and repair of accessible features are not prohibited" but that "the obligation to ensure that facilities are readily accessible to and usable by individuals with disabilities would be violated, *if repairs are not made promptly*." *TAM*, at § III-3.7000 (emphasis added).

For example, in *Chapman v. Pier 1 Imports (U.S.) Inc.*, a wheelchair user brought a Title III action against the home furnishings and décor retailer[13] claiming that the store's aisles were often obstructed by merchandise and other items which "denied him full and equal access."  779

---

[13] Retail stores are public accommodations under Title III, similar to baseball stadiums.  *Chapman*, 779 F.3d at 1005 (citing 42 U.S.C. § 12181(7)(E)).

F.3d 1001,1003–04 (9th Cir. 2015) (internal quotations removed).   Pier 1 replied that these obstructions were "temporary," and that it employed policies instructing employees on properly maintaining aisle widths.   In response, the Ninth Circuit stated that "[t]he existence of policies designed to limit obstructions does not establish that the obstructions that [the plaintiff] encountered were 'temporary.'" *Id.* at 1008.  "Instead," the Ninth Circuit concluded, the plaintiff's evidence of repeated obstructions despite the preventative policies, "demonstrates that these policies and procedures were either ineffective in preventing" the obstructions or "honored in the breach." *Id.*

The same logic applies here, but the evidence compels a different conclusion.  *Chapman* stands for the proposition that repeated failures of a maintenance plan can constitute a violation of the ADA because the maintenance problems become no longer temporary or isolated.  But, the effectiveness of Defendants' maintenance plan is a deeply factual question, involving an assessment of such factors as the number of noncompliant gaps, cracks, and expansion joints, the average speed at which they are repaired, the amount of resources the Mariners have committed to the problem, the amount of resources potentially available to commit to the problem, and the reasonableness of the Mariners doing better than they already have.  The dispute between the parties over the gaps, cracks, and expansion joints boils down to an argument over whether Defendants' maintenance policy is adequate, and Plaintiffs have not presented sufficient evidence for the Court to conclude whether it is or not.  Such a determination is better resolved at a trial on the facts and, thus, summary judgment is not appropriate.

> b.  *Eating and Drinking Surfaces*

In response to Plaintiffs' argument that it has met its initial summary judgment burden of

showing noncompliant eating and drinking surfaces, Defendants respond that "[e]ach of the four locations that Plaintiffs identify—Edgar's Cantina, The Pen, Edgar's Cantina Home Run Porch, and Lookout Landing—. . . do not have permanent seating, but rather have a variety of temporary/mobile dining spaces and tables, some of which include accessible seating."  Dkt. No. 21 at 24.  Defendants add that Edgar's Cantina includes an accessible lowered counter.  Addressing the drink rails on the 200 Level, Defendants claim that Plaintiffs "appl[y] the wrong standard and misconstrue it" because "there is no food or drink service at these locations," but instead, ADA-compliant "tables are also provided nearby so that guests can have a space to eat food."  *Id.* at 25.

Plaintiffs reply in support of their claims on the issue with photographic evidence taken June 19, 2019 showing "only standing height tables and counters for eating and drinking at Edgar's Home Run Porch" and "no sign of [] accessible tables" at The Pen.  Dkt. No. 27 at 12 (referencing Dkt. No. 28-1 at 4, 6–8).  Further, they claim that since "Defendants [in their response] have not identified any portion of the drink rails that are low enough to meet ADA Standards" and have only justified noncompliance with adjacent compliant seating that is not evident in the photographs, summary judgment is appropriate.

This is a dispute made difficult by the dynamic nature of changes taking place as litigation proceeds.  Many of the areas in the photographs provided by Plaintiffs show only temporary eating and drinking surfaces, which are subject to being readily changed.  Thus, in the lifetime of this motion's pendency, Plaintiffs have claimed noncompliance and Defendants have rebuffed with claims of compliance.  Given that the seating at issue is temporary and may be readily changed, there is a genuine dispute of material facts as to the conditions present at the time of trial thus, this claim is not appropriate for summary judgment.

1

2

3       c.   *Concession Sales Counters*

4           To Plaintiffs' claims of noncompliant concession sales counters, Defendants respond, in

5   essence, that Plaintiffs are wrong.   As they state, "Plaintiffs, however, identify only two

6   concessions: (i) the 'Shortstop Beer' stands, and (ii) the 'Hop Box' beer stand." Dkt. No. 21 at 23.

7   As to those, (1) "[t]here are two Hop Box concessions . . . and each has a lowered section of the

8   service counter that is ADA-compliant" and (2) "[t]he 'Shortstop' beer concessions are portable

9   concessions and the Mariners have added lowered-height tables to each of these concessions in

10  order to ensure accessibility." *Id.*  Plaintiffs again reply with photographic evidence take on June

11  19, 2019 of noncompliant counters at the "Hop Box" concession.  Dkt. No. 27 at 11; Dkt. No. 28-

1 at 2, 26.

12          Similar to eating and drinking surfaces, summary judgment is not appropriate here.

13  Plaintiffs have claimed noncompliance and Defendants have countered that they are compliant.

14  Given the dynamic nature of changes occurring at the stadium, the Court cannot determine whether

15  or not the concession sales counters are currently compliant.  Thus, a genuine dispute of material

16  fact still exists, and the Court will deny summary judgment as to this claim.

17          d.   *Concession Lines*

18          Defendants largely do not contest that concession lines are sometimes noncompliant.

19  Instead, they state that "popular and well-used space[s] [that are] often crowded," like the Pen,

20  "utilize portable stanchions to mark access lines" and that, despite regular monitoring by Mariners'

21  personnel, "portable stanchions are sometimes inadvertently moved by fans during games." Dkt.

22  No. 21 at 25.  Defendants claim, however, that they are "exploring demarcating stanchion locations

23  with permanent markings" but that "it is simply not true that concession lines are 'set up' at

24

25

insufficient width[s]." *Id.*

As previously stated, Title III's regulations do "not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs." 28 C.F.R. § 36.211(b). Again, *Chapman v. Pier 1 Imports (U.S.)* is on-point. 779 F.3d 1001. Part of Pier 1's argument claiming compliance with the ADA was that since, "customers commonly move merchandise around the Store" Pier 1 had adopted policies to ensure aisles remained accessible, for example, "directing that employees regularly walk around the Store with a yard stick to measure the width of Store aisles." *Id.* at 1004. Plaintiff countered, however, that "on each of his eleven visits to the Store in 2011 and 2012, aisles were obstructed by merchandise or other items" and, therefore, the policies were clearly systemically ineffective. *Id.*

In determining whether the temporary obstructions ran afoul of Title III, the Ninth Circuit turned to the TAM, and specifically to the "Maintenance of accessible features" section which states that "[w]here a public accommodation must provide an accessible route, the route must remain accessible and not blocked by obstacles such as furniture, filing cabinets, or potted plants." *TAM*, at § III-3.7000. But the TAM also explains that "[a]n isolated instance of placement of an object on an accessible route would not be a violation, if the object is promptly removed." *Id.* Thus, the question for the Ninth Circuit was whether the aisle obstructions were sufficiently temporary to constitute isolated instances, or whether their recurrence ran afoul of 28 U.S.C. § 36.211(b).

The Circuit held they were not merely isolated instances. The plaintiff, after all, "encountered several obstructed and blocked aisles on *each* of eleven separate visits." *Chapman*, 779 F.3d at 1007 (emphasis in original). Further, the Circuit concluded that "[t]he DOJ interpretive

21

authorities make clear that the presence of items in aisles is not 'temporary' for the purposes of § 36.211(b) just because the obstructing items in the aisles were placed there by customers and would have been moved on request or eventually." *Id.* at 1008.

The conundrum of fan-moved line stanchions in this case is a more difficult call. In support of their contentions regarding the concession lines, Plaintiffs rely on two of their own declarations. Dkt. No. 27 at 9. These two declarations rather vaguely assert that "some lines for concession vendors throughout T-Mobile Park are set up to be too narrow for me to access the vendor in my wheelchair, including on the 200 level where I have had to move the line barriers to get through," Clark Landis Decl., Dkt. No. 20-3 at ¶ 15, and "[s]ome lines for concession vendors are set up to be too narrow for me to access the vendor in my wheelchair," Kayla Brown Decl., Dkt. No. 20-1 at ¶ 14. None of the repetitiveness and detail alleged by Plaintiff Chapman on which the Ninth Circuit so heavily relied is present. *See Chapman*, 779 F.3d at 1008.[14] Even as the Ninth Circuit stated in *Chapman*, "[t]o be sure, the 'regulations implementing the ADA do not contemplate perfect service.'" *Id.* (quoting *Midget v. Tri–County Metro. Transp. Dist. Of Or.*, 254 F.3d 846, 849 (9th Cir. 2001)). On the record before it, this Court is unable to conclude how often Defendants' policies fail to ensure proper line width. In other words, vague allegations of "some lines" not conforming with ADA standards is not enough to show that Defendants' policies

_____

[14] "We note in this connection that given its frequency, the aisle access problem must be viewed systemically, not as a series of individual barriers to access. Removing one obstructing object does not assure accessible aisles where it is likely that soon thereafter another item will be moved and create a blockage. Thus, the evidence that Chapman encountered 'repeated and persistent failures' in accessing the aisles, Manual § III–3.7000, confirms that the Store failed to remedy the problem 'promptly,'—that is, within a 'reasonable period of time,' 56 Fed. Reg. at 35,562— rendering its maintenance 'improper or inadequate.' Manual § III–3.7000."

systemically fail to promptly remedy temporary obstructions within a reasonable period of time. The Court, therefor, will deny summary judgment as to this grievance.

### 3. Heavy hitters

Both of the Plaintiffs' final two grievances involve a question of whether T-Mobile Field's placement of accessible seating complies with the ADAAG, as adopted by the DOJ.

ADAAG Section 4.44.3 provides:

> **Placement of Wheelchair Locations.** Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. . . . When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

*1991 ADAAG* at § 4.33.3.[15]

Based on this provision, Plaintiffs assert two grievances, including that T-Mobile Field does not provide adequate (1) distribution of accessible seating, both as it relates to admissions pricing or locations around the stadium, and (2) lines of sight comparable to the general public. *See supra* at 6–7.

### a. Distribution

First, as it relates to the distribution of wheelchair accessible seats, Plaintiffs claim that "[s]eating for spectators in wheelchairs is overwhelming concentrated at the rearmost row of the 100 [L]evel." Dkt. No. 19 at 11.  As noted earlier, when Plaintiffs' filed their complaint, only one

---

[15] The updated requirements are found in Section 221.2.3 of the 2010 ADAAG.  *See 2010 ADAAG* § 221.2.3.1 (Horizontal Dispersion); *id.* at § 221.2.3.2 (Vertical Dispersion).

wheelchair accessible seat was located at field-level but, during the interim between the filing of the complaint and the motion for summary judgment, Defendants embarked on an ADA Seating Expansion project. *Supra* at 7–8. Still, according to Plaintiffs, the concentration at the rear of the 100 Level prohibits wheelchair bound spectators from enjoying the game to the same extent as non-wheelchair bound spectators as they are farther from the field, less likely to catch fly balls because of the overhang from the upper level bleachers, and do not have the same pricing or seating options. Dkt. No. 19 at 11. And, addressing the expansion program, Plaintiffs reply "the mere addition of eight wheelchair accessible seats in the front row behind home plate is insufficient." *Id.* at 12.

In response, Defendants in essence claim that Plaintiffs are long on desires but short on legal authority. *See* Dkt. 21 at 20–23. They claim that while Plaintiffs, like "many sports fans would like cheap seats next to the field," they simultaneously have failed to provide "any legal authority to support their desire as a purported statutory requirement, nor do they make any factual showing as to whether creating additional accessible seats within the 100 Level is 'readily achievable.'" *Id.* at 20 n.29. T-Mobile Field, according to Defendants, "offers accessible seating within each of its four tiers" and "ADA-accessible seating has been placed along *every* accessible path of egress." *Id.* at 21 (emphasis in original). Thus, allege Defendants, "[a]ccessible seating at T-Mobile Park is dispersed vertically on every level, and it is also dispersed and distributed horizontally, all around the perimeter of the field." *Id.* at 22. Further, they provide a representative example of accessible seating prices for a game against the Cincinnati Reds on September 10, 2019 in which prices range from $17 to $75 and vary from the center field bleacher in Section 192 at the cheapest end to Section 35, Seat 1A behind home plate. *Id.* at 22–23.

Thus, the Court is left with a situation similar to the one it found in the case of the eating and drinking surfaces and concession sales counters: Plaintiffs initially claim that distribution is inadequate, Defendants respond that seats and prices are dispersed across the Field and price points, and Plaintiffs reply that the distribution is not good enough.  Neither side, however, points the Court to a clear standard to determine whether the distribution that exists is sufficient to meet the ADA's standards.  In fact, neither party can find, nor can the Court locate, a definitive standard under the ADA apart from Section 4.33.3's requirement that a distribution exist.

For example, the U.S. District Court for the District of Columbia in *Paralyzed Veterans* stated that Section 4.33.3 meant merely that "[d]ispersal requires a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators."  *Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Engineers, P.C.*, 950 F. Supp. 393, 404 (D.D.C. 1996).  While the Court in *Paralyzed Veterans* held that the MCI Center's distribution was inadequate where the "upper bowl [did] not have spaces with enhanced lines of sight, and spaces in the lower and club levels are ghettoized in the end zone areas," T-Mobile Field differs from the MCI Center's design in significant ways.  *Paralyzed Veterans of Am.*, 950 F. Supp. at 404.

Seating in the "upper bowl," or 300 Level, is located in the middle of the bleachers and parties do not discuss the lines of sight from those locations.  In fact, Plaintiffs do not appear to take issue with the seating disbursement in the 300 Level.  Moving to the lower level, seating in the 100 Level is spread throughout the Field horizontally and not ghettoized in that respect.  Vertically in the 100 Level, seats are located at the two locations where they may be accessed by wheelchair users: at top of the bleachers along the concourse and at the bottom of the bleachers

25

where they may be accessed from the ADA-accessible tunnels.  Further, Plaintiffs have nowhere alleged that the number of ADA-accessible seats is deficient or in someway does not meet the ADA's requirements.  In fact, neither party in their briefs even informs the Court as to how many ADA-accessible seats exist in the Field and whether that number is sufficient under the ADA.

Thus, a deeply factual question exists as to whether the current arrangement offers wheelchair users a choice "comparable to those for members of the general public," *1991 ADAAG* at § 4.33.3, and whether supplying a preferred ratio is "readily achievable," 42 U.S.C. § 12182(b)(2)(A)(iv).  The Court finds, therefore, that a genuine dispute of material facts exists as to whether accessible seats are sufficiently distributed throughout T-Mobile Field.  *Accord Colorado Cross-Disability Coal. v. Colorado Rockies Baseball Club, Ltd.*, 336 F. Supp. 2d 1141, 1143 (D. Colo. 2004) (declining to grant summary judgment on distribution where only identified standard was that stadium could not "'ghettoize' wheelchair spaces or designate a few token wheelchair spaces in the luxury seating areas"); *Berry v. City of Lowell*, No. 01-10694, 2003 WL 22050772, at *3 (D. Mass. May 30, 2003) (declining to grant summary judgment where the "issue of whether people in wheelchairs are truly deprived of a viewing experience comparable to that of ambulatory stadium-goers remains a disputed issue of fact").  The Court will therefore deny Plaintiffs' motion for summary judgment as to this grievance.

   *b.  Sightlines*

Plaintiffs' final grievance surfaces a controversy that has gained renewed attention thanks to the Supreme Court's recent decision in *Kisor v. Wilkie*, 139 S. Ct. 2400, 2410 (2019) (upholding

judicial deference to agencies' reasonable readings of genuinely ambiguous regulations).[16]  Before this Court is a classic instance of an ambiguous regulation.  Section 4.33.3 of the 1991 ADAAG requires wheelchair accessible seats to have "lines of sight comparable to those for members of the general public."  *1991 ADAAG* at § 4.33.3.[17]  As Defendants point out in their response to the motion for summary judgment, several circuits have struggled to interpret what exactly comparable lines of sight entail.  *See* Dkt. No. 21 at 13–18; *see, e.g.*, *Miller*, 536 F.3d 1020; *United States v. Hoyts Cinemas Corp.*, 380 F.3d 558 (1st Cir. 2004); *United States v. Cinemark USA, Inc.*, 348 F.3d 569 (6th Cir. 2003); *Oregon Paralyzed Veterans of Am. v. Regal Cinemas, Inc.*, 339 F.3d 1126 (9th Cir. 2003); *Lara v. Cinemark USA, Inc.*, 207 F.3d 783 (5th Cir. 2000); *Caruso v. Blockbuster-Sony Music Entm't Ctr. at Waterfront*, 193 F.3d 730 (3d Cir. 1999)*; Paralyzed Veterans of Am. v. D. C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997).

Plaintiffs, for example, assert that "[b]oth the 1991 Standards and the 2010 Standards

---

[16] As an example of "real uncertainties about a regulation's meaning" under which it may be appropriate to defer to an agency's interpretation of its own regulations, the Supreme Court listed:

> In a rule issued to implement the Americans with Disabilities Act (ADA), the Department of Justice requires theaters and stadiums to provide people with disabilities 'lines of sight comparable to those for members of the general public.' 28 C.F.R. pt. 36, App. A, p. 563 (1996). Must the Washington Wizards construct wheelchair seating to offer lines of sight over spectators when they rise to their feet? Or is it enough that the facility offers comparable views so long as everyone remains seated? *See Paralyzed Veterans of Am. v. D. C. Arena L.P.*, 117 F.3d 579, 581–582 (CADC 1997).

*Kisor*, 139 S. Ct. at 2410.

[17] The comparable requirement in the 2010 ADAAG can be found in Section 802.2.2, which requires (1) "[w]here standing spectators are provided lines of sight over the heads of spectators standing in the first row in front of their seats, spectators seated in wheelchair spaces shall be afforded lines of sight over the heads of standing spectators in the first row in front of wheelchair spaces" and (2) "[w]here standing spectators are provided lines of sight over the shoulders and between the heads of spectators standing in the first row in front of their seats, spectators seated in wheelchair spaces shall be afforded lines of sight over the shoulders and between the heads of standing spectators in the first row in front of wheelchair spaces."

require wheelchair accessible seating locations to be constructed and located so spectators in wheelchairs can still see the event *when people seated in front of the wheelchair seating locations are standing*." Dkt. No. 19 at 7 (emphasis added).  Plaintiffs' expert has conducted comparative visibility testing, contrasting the eye height of a wheelchair accessible seat against the eye height of a standing spectator in adjacent standard seating and noted a marked difference in percentage of the field which can be seen.  *See* Dkt. No. 19 at 8–10; James Terry Decl., Dkt. No. 20 at ¶¶ 12–15.  An effective solution is available, claims Plaintiffs, and is already in use at T-Mobile Field as accessible seating in the 200 Level is placed on platforms, increasing the seats' sightline.  Dkt. No. 19 at 10; Dkt. No. 27 at 17.

Defendants respond that the evolution of the sightline requirements under the ADA is more complicated and that "given the absence of apposite statutory language and the lack of clear guidance from the DOJ—it is no surprise that there are conflicting and inconsistent decisions." Dkt. No. 21 at 15.  As they conclude, "[s]imply put, when T-Mobile Park was being designed and constructed, there was no statutory requirement or applicable regulation that made clear <u>any</u> sightline requirement for standing spectators."  *Id.* at 16 (emphasis in original).

This assertion by Defendants, however, is not wholly on-point.  While guidance and anthropometric dimensions were scarce, one standard which was in place was that sightlines needed to be over the heads of spectators in front of wheelchair seating.  Conspicuously absent from Defendants recitation of the statutory and caselaw history of the sightline requirement is discussion of *Miller v. California Speedway Corp.*, 536 F.3d 1020, which spoke directly to this issue for the Ninth Circuit.

As discussed previously, Section 4.33.3 requires "lines of sight comparable to those for

28

members of the general public." *1991 ADAAG* at § 4.33.3.  The TAM does not elaborate, but the

1994 Supplement to the TAM does.  It provides:

> In addition to requiring companion seating and dispersion of wheelchair locations,
> ADAAG requires that wheelchair locations provide people with disabilities lines of
> sight comparable to those for members of the general public. Thus, in assembly
> areas where spectators can be expected to stand during the event or show being
> viewed, the wheelchair locations must provide lines of sight *over spectators who
> stand*. This can be accomplished in many ways, including placing wheelchair
> locations at the front of a seating section, or by providing sufficient additional
> elevation for wheelchair locations placed at the rear of seating sections to allow
> those spectators to see over the spectators who stand in front of them.

*1994 Supplement to the TAM*, at III-7.5180 (emphasis added).

In *Miller*, the Ninth Circuit was presented with a NASCAR stadium in which, according

to the plaintiff in that case, "when the fans immediately in front of Miller stand during the most

exciting parts of the race, they block his view of the action."  536 F.3d at 1023.  After proceeding

through a lengthy history of the ADA, as well as the promulgation and development of the sightline

regulations, the Ninth Circuit determined that it was appropriate to defer to the construction

provided in the 1994 Supplement to the TAM, which established the applicable standard at the

time to be "over spectators who stand." *Id.* at 1029–30 ("[b]ecause the DOJ's interpretation is a

reasonable, practical construction in light of the ambiguity of the regulation, it is entitled to

substantial deference").   At the time planning and construction of T-Mobile Field were

beginning—recall in 1996—the 1994 Supplement to the TAM was already in place, requiring lines

of sight *over* standing spectators.

Defendants, however, point to a second standard to assert that they have met the ADA's

requirements.  *See* Dkt. No. 21 at 19 ("[t]he accessible seating in [] sections [112 and 224]

provide[] for a comparable line of sight to see the playing surface or field *between the heads and*

*over the shoulders* of persons standing immediately in front and over the heads of the persons standing two rows in front") (emphasis added).

The "between the heads and over the shoulders" standard originates from the *Accessible Stadiums* guidance, on which Defendants heavily rely.  *See id.* at 14–17, 20.  Released in May 1996, this guidance provides that

> **Wheelchair seating locations must provide lines of sight comparable to those provided to other spectators.** In stadiums where spectators can be expected to stand during the show or event (for example, football, baseball, basketball games, or rock concerts), all or substantially all of the wheelchair seating locations must provide a line of sight over standing spectators. A comparable line of sight, as illustrated in the figure below, allows a person using a wheelchair to see the playing surface *between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front*.

*Accessible Stadiums*, at 2 (emphasis added).

Thus, this Court is left with a deeply factual dispute to resolve.  The parties present the Court with dueling standards presented by the same government agency.  Further, this standard does not provide anthropometric dimensions with which to determine the comparability of sightlines.  Plaintiffs and Defendants' experts used the same standards to review T-Mobile Field's sightlines and came to different conclusions about whether they comply with the ADA.  *See* Dkt. No. 19 at 8; Dkt. No. 27 at 2.  The need for further exploration by the parties is apparent, establishing that summary judgment is not appropriate.

## V.    CONCLUSION

For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part Plaintiffs' motion for summary judgement as follows:

1.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to <u>*Seating Dimensions*</u> is

GRANTED;

2.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to *Edgar's Cantina Elevator/Lift* is GRANTED;

3.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to *Bullpen and Dugout Access* is GRANTED;

4.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to *Gaps, Cracks, and Expansion Joints* is DENIED;

5.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to *Eating and Drinking Surfaces* is DENIED;

6.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to *Concession Counters* is DENIED;

7.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to *Concession Lines* is DENIED;

8.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to *Distribution* is DENIED; and

9.  Plaintiffs' motion for summary judgment, Dkt. No. 19, as to *Sightlines* is DENIED.


DATED this 19th day of August, 2019.

*Barbara J. Rothstein*

BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

EXHIBIT A

*Provided by Defendants. Dkt. No. 21, App. 1, at 30.