UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

CLARK LANDIS, ROBERT BARKER,      )
GRADY THOMPSON, and KAYLA BROWN,  ) CASE NO. C18-01512-BJR
                                  )
              Plaintiffs,         ) SEATTLE, WASHINGTON
                                  )
v.                                ) October 15, 2019
                                  ) 10:00 a.m.
WASHINGTON STATE MAJOR LEAGUE     )
BASEBALL STADIUM PUBLIC           ) BENCH TRIAL, Day 1 of 4
FACILITIES DISTRICT, BASEBALL     )
OF SEATTLE, INC., a Washington    )
corporation, MARINERS             )
BASEBALL, LLC, a Washington       )
limited liability company, and    )
THE BASEBALLCLUB OF SEATTLE,      )
LLLP, a Washington limited        )
liability partnership,            )
                                  )
              Defendants.         )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

  For the Plaintiffs:      CONRAD A. REYNOLDSON
                           MICHAEL TERASAKI
                           Washington Civil & Disability Advocate
                           4115 Roosevelt Way NE, Suite B
                           Seattle, WA 98105

                           STEPHEN P. CONNOR
                           DERIK R. CAMPOS
                           Connor & Sargent, PLLS
                           1000 Second Avenue, Suite 3670
                           Seattle, WA 98104

  For the Defendants:      STEPHEN C. WILLEY
                           SARAH GOHMANN BIGELOW
                           Savitt Bruce & Willey LLP
                           1425 Fourth Avenue, Suite 800
                           Seattle, WA 98101-2271

EXAMINATION INDEX

EXAMINATION OF                                              PAGE

MALCOM ROGEL          DIRECT EXAMINATION               22
                     BY MR. CONNOR

                     CROSS-EXAMINATION                 96
                     BY MR. WILLEY

                     REDIRECT EXAMINATION             130
                     BY MR. CONNOR

TREVOR GOOBY         DIRECT EXAMINATION               140
                     BY MR. CONNOR

                     CROSS-EXAMINATION                150
                     BY MR. WILLEY

                     REDIRECT EXAMINATION             164
                     BY MR. CONNOR

JAMES TERRY          DIRECT EXAMINATION               172
                     BY MR. CONNOR


PLAINTIFFS' OPENING STATEMENT                           6

DEFENDANTS' OPENING STATEMENT                          14

EXHIBIT INDEX

EXHIBITS ADMITTED                                        PAGE

ADMITTED OFF THE RECORD

PROCEEDINGS

1

2

3          THE CLERK:  This is the matter of Clark Landis,

4    et al. v. Washington State Major League Baseball Public

5    Facilities District, Cause No. C18-1512-BJR.

6       Counsel, please make your appearances for the record.

7          MR. REYNOLDSON:  Good morning, Your Honor.  Conrad

8    Reynoldson for the plaintiffs.

9          THE COURT:  Good morning, Mr. Reynoldson.

10         MR. CONNOR:  Your Honor, Steve Connor on behalf of

11   the plaintiffs.

12         THE COURT:  Good morning.

13         MR. CAMPOS:  Derik Campos on behalf of the

14   plaintiffs.

15         THE COURT:  You need to speak into the microphone, or

16   I won't hear you.

17         MR. CAMPOS:  Derik Campos on behalf of the

18   plaintiffs.

19         MR. TERISAKI:  Michael Terisaki for the plaintiffs.

20         MR. WILLEY:  Hello, Your Honor.  Steve Willey on

21   behalf of the defendants.

22         MS. GOHMANN BIGELOW:  Good morning, Your Honor.

23   Sarah Gohmann Bigelow on behalf of the defendants.

24         MS. GREER:  Good morning, Your Honor.  Rondi Greer,

25   paralegal, Savitt Bruce & Willey.

 1          THE COURT:  I understand plaintiff wanted 20 minutes

 2    for opening statement.

 3       Did defendants want to make an opening statement also?

 4          MR. WILLEY:  Yes, please, Your Honor.

 5          THE COURT:  Okay.  We'll begin, then.

 6          MR. CONNOR:  Your Honor, I was wondering if we could

 7    address a couple of preliminary matters before the opening

 8    statements?

 9          THE COURT:  Sure.

10          MR. CONNOR:  And I'll step up to the podium mike.

11          THE COURT:  Please.

12          MR. CONNOR:  I suppose before doing that, I'd like to

13    just introduce two of our clients.  Mr. Clark Landis and

14    Mr. Robert Barker are both here.

15       Your Honor, I wanted to address two things.  One is, we

16    informed the court we were able to resolve some of the

17    matters in this case.  As a consequence of that, I have to

18    admit that I think Mr. Willey's estimation on the length of

19    the trial is probably on point.

20          THE COURT:  Slow down, slow down, and speak slowly so

21    the court reporter could get what you're saying.

22       You said you resolved certain matters?

23          MR. CONNOR:  Yes.  And one of the consequences of

24    that is, I do think that the length of trial will be closer

25    to what Mr. Willey was estimating, rather than what I was

 1   estimating.  So we'll probably be done by Thursday.

 2            THE COURT:  That's very good news.

 3            MR. CONNOR:  Also related to that, Your Honor, with

 4   regard to the matters that were settled, there was an

 5   agreement that the parties will ask the court, if necessary,

 6   to resolve the fee issues related to both the settlement of

 7   those claims.

 8      Mr. Willey and I spoke this morning.  It is not our

 9   intention to put on any evidence, in the course of this week,

10   relating to those fee claims.  I just want to make sure the

11   court understood that.  Is that acceptable to you?

12            THE COURT:  Fine.  I guess you'll put in a fee

13   request in due course, the way we usually do, mostly on

14   papers.

15            MR. CONNOR:  Mostly on the paper.  My only concern

16   was that Mariners had identified a witness who -- it appears

17   the intended witness might be testifying about issues related

18   to fees, and so it seems conceivable -- and I'm hopeful we

19   won't need to get involved in that matter, but it does seem

20   conceivable there might be an occasion with testimony taken

21   regarding that.

22            THE COURT:  I would be very surprised if we end up

23   having live testimony on attorney's fees.

24            MR. CONNOR:  Okay.

25            THE COURT:  I don't think it's going to happen.

 1    Okay?  So don't worry about it yet.

 2              MR. CONNOR:  All right.  All right.  Thank you, Your

 3    Honor.

 4        Mr. Reynoldson will be giving our opening statement.

 5              THE COURT:  Okay.

 6                    PLAINTIFFS' OPENING STATEMENT

 7              MR. REYNOLDSON:  Good morning, Your Honor.  My name

 8    is Conrad Reynoldson, and I represent the plaintiffs in this

 9    case, Clark Landis, Robert Barker, Kayla Brown, and Grady

10    Thompson.

11        All plaintiffs in this case require the use of wheelchairs

12    for mobility, due to mobility disabilities.  All plaintiffs

13    are also all avid Mariners fans who enjoy going to T-Mobile

14    Park.

15        This case was filed because they are unable to enjoy the

16    facilities at the stadium at a comparable level because of

17    accessible barriers that have been present since the day the

18    stadium opened.

19        These barriers are the result of the stadium's

20    non-compliant design, construction, and accessibility

21    policies and practices.  We believe the evidence we'll

22    present to you today and the rest of the trial will

23    demonstrate that these barriers violate the requirements of

24    the ADA and the Washington Law Against Discrimination.

25        This court is familiar with many of the facts in this

1    case, and the parties have now reached a settlement, as we

2    just mentioned, on the majority of the issues in the case.  I

3    will keep my remarks brief and limit them to the overview of

4    the testimony and the evidence we will be presenting to

5    address the two issues currently remaining in this case.

6        The first is other patrons who use wheelchairs are

7    discriminated against, in violation of the ADA, by not being

8    provided sight lines over standing spectators comparable to

9    members of the general public.

10       The second is whether patrons who use wheelchairs are

11   discriminated against, in violation of the ADA and the

12   Washington Law Against Discrimination because they're not

13   afforded a choice of seating options, with respect to ticket

14   price and seat location, comparable to that afforded to the

15   general public.

16       Prior to addressing the particular evidence of those

17   issues, I want to note that, as the Mariners have stipulated

18   in the pretrial statement that is now known as T-Mobile Park,

19   did not begin construction until March of 1997, and the first

20   game was played on July 15th, 1999, years after the ADA's new

21   construction requirements were fully implemented in January

22   of 1993.

23       The stadium is not an existing facility under the ADA, and

24   thus must fully comply with the new construction requirements

25   of the ADA.

1      We will address the topic further, but we'll not be

2   presenting evidence about whether something is readily

3   achievable or not.  That is neither relevant to T-Mobile Park

4   nor part of our prima facie case.

5      The defendants had an obligation to build this new stadium

6   in strict compliance with the requirements of the ADA, and we

7   believe the evidence will establish that they did not.

8      The evidence we'll present regarding sight lines will not

9   be complicated.  We'll have a representative of the Mariners,

10   Mr. Malcom Rogel, the vice president of ticket and event

11   services, briefly explain where accessible seating is located

12   throughout T-Mobile Park.

13      As the court knows from the summary judgment motion, the

14   vast majority of the accessible seats on the first level, and

15   all the accessible seats on the second level, are located in

16   the back row of those levels.  In fact, prior to the filing

17   of this lawsuit, there was only one seat designated as ADA

18   accessible in the front row of the entire stadium.

19      Our expert, Mr. Jim Terry of Evan Terry Associates, a

20   licensed architect and a nationally recognized authority on

21   ADA facilities like this stadium.  Mr. Terry has extensive

22   experience assisting both owner and patron interests with

23   regard to large assemblies, including the original Yankee

24   Stadium, Coors Field, Rose Garden Arena, MCI Center Arena,

25   Pepsi Center Arena, the Orange Bowl, Oakland Alameda County

1    Civic Arena, the Mercedes-Benz Louisiana Superdome, Denver

2    Broncos Stadium, and Madison Square Garden, among others.

3    Mr. Terry is a certified access specialist and has presented

4    hundreds of ADA and accessibility programs to ADA

5    coordinators, access specialists, building owners, managers,

6    and designers, and has worked with numerous federal agencies

7    and public entities and private corporations nationwide,

8    including at least half of the 20 largest companies in the

9    United States.

10        Mr. Terry will testify regarding his observations and

11   analysis of the sight lines at T-Mobile Park.  He will focus

12   on the difference in sight lines between wheelchair users and

13   members of the general public when people in front of them

14   are standing.  This is something that often happens at

15   precisely the most exciting and important parts of a baseball

16   game, and can ruin a person's enjoyment of the game when it's

17   not properly addressed.

18        Mr. Terry will explain how, based on anthropometric

19   assumptions regarding the average height of members of the

20   general public and the average eye location of wheelchair

21   users, patrons who use wheelchairs do not have comparable

22   sight lines of the field as compared to the general public.

23        Mr. Terry will testify that, for many sections of T-Mobile

24   Park that he surveyed, patrons who use wheelchairs can be

25   expected to have substantially less favorable views than the

1   views of members of the general public located in the seats

2   in front of them when people stand up during the game.

3        Mr. Terry will present exhibits that are made following

4   the methodology of the Department of Justice in its

5   *Accessible Stadiums* Technical Assistance Manual document.

6   The exhibits will demonstrate why the sight lines at T-Mobile

7   Park present accessibility barriers, in violation of the

8   requirements of the ADA.  Mr. Terry will also explain why

9   these exhibits understate the detrimental impact of such

10  sight line violations.

11       Mr. Terry will testify about how the anthropometric

12  assumptions regarding wheelchair users, which were utilized

13  in an earlier consent decree by the Department of Justice,

14  are not in line with the more recent and accurate data on the

15  average height of wheelchair users versus the general public.

16       Mr. Terry will explain the details of the more recent data

17  and why it is what should be used to accurately assess what

18  is required to give wheelchair users views over standing

19  spectators that are comparable to the views of Mariner fans

20  who do not use wheelchairs.

21       At the end of the case, we will ask you to enter a decree

22  requiring defendants to take all measures necessary to

23  provide all wheelchair users lines of sight over standing

24  spectators that are comparable to patrons who do not use

25  wheelchairs.

1       We will utilize the assumptions and methodologies

2   testified to by Mr. Terry, which is in line with the

3   standards set forth by the Department of Justice.

4       The second issue is that the stadium does not offer a

5   comparable distribution of accessible seating.  For this

6   issue, we will depend on the testimony of Mr. Rogel and

7   Mr. Trevor Gooby, the Mariners' senior vice president of

8   ballpark operations, to explain to this court the

9   distribution of accessible seating in T-Mobile Park,

10  including seating pricing.

11      That evidence will show that, with the exception of seven

12  seats added by the Mariners this last off-season after this

13  lawsuit was filed, all accessible seating in the lower bowl

14  of T-Mobile Park is located in the back row.

15      Mr. Terry will then testify and opine regarding his

16  observation/analysis of the distribution of accessible

17  seating at T-Mobile Park.

18      With the exception of eight seats, wheelchair users are

19  unable to sit any closer to the infield than the 41st row,

20  without paying significantly greater prices than the general

21  prices.  The difference of the experience between sitting in

22  the 41st row at a baseball and the front row is substantial.

23  From the 41st row, it's difficult to even read the numbers on

24  the players' jerseys, which is not comparable to the

25  experiences in the lower rows, where fans see the expressions

 1   in the players' faces, and even how hard they're sweating.

 2       The facts regarding pricing and seating distributions

 3   testified to by the Mariners representatives will be

 4   addressed by Mr. Terry.  He will explain that while the

 5   general public has a range and price options in infield

 6   between the back row and the front row, wheelchair users do

 7   not have the same range of price points and locations to

 8   choose from.

 9       As noted earlier, last off-season, the Mariners added

10   seven accessible seats located in the Diamond Club.

11   Mr. Rogel has testified that they are typically $450 to $600

12   a game when sold as single-game tickets.  However, by

13   comparison and review, the general public can access seating

14   in some field-level front row areas of the stadium for as low

15   as $39.

16       Mr. Terry will also testify that his review of ticket

17   availability on the Mariners' TicketMaster website

18   establishes that ticket packages available to the general

19   public are often not available to wheelchair users seeking

20   accessible seats.

21       We intend to argue and prove that this arrangement does

22   not comply with the applicable standards, as it does not meet

23   the requirements of people with physical disabilities with

24   admission prices and lines of sight comparable to the general

25   public.

1          Finally, the plaintiffs will testify about their own

2    personal experiences at the stadium as wheelchair users, and

3    how those experiences failed to live up to the ADA and

4    Washington Law Against Discrimination regarding promises of

5    equality.

6          In sum, the remaining issues of this case are about

7    providing a comparable experience for anyone who wants to

8    attend a game at T-Mobile Park, and centered on two issues.

9          First, are wheelchair users afforded a comparable view of

10   the field of play, particularly when the most exciting

11   moments of the game are happening?  Second, are wheelchair

12   users provided a choice of seating location and prices that

13   are equal to or better than those afforded to the general

14   public?

15         We believe that the facts and evidence that we'll present

16   will demonstrate the answer to both those questions as no,

17   and that the defendants are, thus, liable under the Americans

18   with Disabilities Act, as well as the Washington Law Against

19   Discrimination, and, thus, modify the stadium accordingly.

20         As discussed during our pretrial conference, at the end of

21   the case we'll be asking the court to grant declaratory

22   relief requiring the Mariners to do what they should have

23   done 20 years ago:  Provide the fans who use wheelchairs the

24   ability to enjoy their games in the same way as the general

25   public.

1    Thank you.

2         THE COURT:  Thank you very much.

3    Opening statement on behalf of the defendants?

4              DEFENDANTS' OPENING STATEMENT

5         MR. WILLEY:  Good morning, Your Honor.  Steve Willey

6    representing the defendants.

7    The two remaining issues in this case, sight lines for

8    accessible seating and dispersal of accessible seating in the

9    stadium are interesting, important, and vexing.

10   Since its enactment, the ADA has been amended and the

11   implemented regs have, likewise, evolved over time, and, in

12   theory, this process should lead us to approved accessibility

13   and greater clarity.

14   In reality, in particular with respect to the two issues

15   before the court here, the result is more like regulatory

16   mush.

17   And, importantly, the ADA's good and aspirational goals

18   don't prevent the law from being stretched, so as the

19   retrospect to create new designs and construction allocation

20   for a 20-year-old facility like T-Mobile, that's what the

21   plaintiffs seek here.

22   At the outset, I'd like to focus our attention on a couple

23   of important data points, and these are undisputed factual

24   issues that evoke the contemporaneous issues on the pertinent

25   issues, and these necessarily frame the evidence here.

1        So, first, I want to look at the central and foundational

2   regulation, which is Section 4.33.3 of the standards.

3        Rondi, if you could show that on the screen and go to the

4   second page there.

5        Here is the standard, Your Honor.  It talks about

6   wheelchair areas being an integral part of the fixed seating

7   plan and shall be provided so to provide people with physical

8   disabilities a choice of admission prices and lines of sight

9   comparable to those for members of the general public.  And

10  they shall adjoin an accessible route that also serves as a

11  means of egress in case of an emergency.  And there's also

12  information at the bottom, and the exception to that,

13  positions being clustered with slopes of greater than five

14  percent.

15       So the pivotal language here, "a choice of admission

16  prices and lines of sight comparable to those of the general

17  public."  A couple comments:  One, numerous courts have found

18  that language right there to be ambiguous.  Some courts have

19  found that the line-of-sight language refers to different

20  viewing perspectives; for example, views from behind the

21  plate or first or third base.  There is no reference in this

22  regulation -- none -- to views with respect to standing

23  spectators.

24       Next we have, in 1994, the Technical Assistance Manual

25  issued by the DOJ.  In relevant part, it doesn't put any meat

1    on the bones at all.  It reiterates the '93 language --

2    excuse me -- the '91 language.

3         Section 3/4.4600, this is the TAM, it requires that, in

4    No. 2 here, lines of sight and choices of admission prices

5    comparable to those offered to the general public, and it has

6    the same obligation regarding the accessible route for

7    emergency egress.  But there's no language in here that

8    addresses standing spectators.  There's no language in here

9    that's materially different from the '91.  This language, by

10   the way, appears in a section of the TAM [inaudible]

11   requirements, not in the section related to new construction

12   and not in the section labeled ADAAG.

13        In 1994, the DOJ published a TAM supplement.  For the

14   first time, that made mention of standing spectators.  And

15   what the supplement did was simply insert a sentence or two

16   to the prior TAM language.

17        If you could call that up, Rondi.

18        The relevant language in the TAM supplement is as follows:

19   It says, "In addition to requiring companion seating and

20   dispersion of wheelchairs, ADAAG requires that wheelchair

21   locations provide people with disabilities lines of sight

22   comparable to those of the general public.  Thus, in assembly

23   areas where spectators can be expected to stand during the

24   event, the wheelchair locations must provide lines of sight

25   over spectators who stand."  It doesn't tell us whether it's

1    the row in front or two rows in front or over the heads or

2    exactly, but that's what it says.

3        It also then says this can be accomplished in many ways,

4    including placing the wheelchair locations at the front of

5    the seating location, or by providing sufficient elevation

6    for wheelchair users at the rear of the viewing locations to

7    allow viewing over the spectators standing.  That's the

8    language added by the TAM supplement in 1994.

9        As I mentioned, there's no clarity as to spectators rows

10   in front, three rows in front, no clarity.  No specifications

11   or details about how you do this, which is really odd,

12   because by 1991, they contained a host of detailed design

13   specifications for other topics:  How high the handrails had

14   to be, detailed spec on a whole host of issues, and yet

15   nothing here.

16       Finally, in 1996, the DOJ published *Accessible Stadiums*.

17   That document addressed the issue.  It has language, again,

18   about dispersion.  Wheelchair seating locations should be

19   provided in more than one location.  This is dispersed

20   seating.  It had the same language about choices of admission

21   prices and views to those for the general public.  It goes on

22   to clarify what the DOJ means by "comparable to those of the

23   general public."

24       Can you pull up that language, Rondi?

25       If we go to page 2 of this document, the language the DOJ

1    uses gives some clarity to what the phrase "comparable line

2    of sight" means, and what it says is, "In stadiums where

3    spectators can be expected to stand during a show or event,

4    all or substantially all the wheelchair seating locations

5    must provide a line of sight over standing spectators."  It

6    is the second paragraph on the screen before you.  If you can

7    blow that up a little bit.

8         "A comparable line of sight, as illustrated in the figure

9    below, allows a person using a wheelchair to see the playing

10   surface between the heads and over the shoulders of the

11   persons standing in the row immediately in front and over the

12   heads of persons standing two rows in front."

13        Okay.  So now we have some clarity a little bit.

14        What's important here, again -- well, first of all, that's

15   it.  That's the sum total of the regulatory guidance you've

16   got contemporaneous to T-Mobile.

17        Secondly, and importantly, the DOJ here, in its document

18   entitled "*Accessible Stadiums*," does not provide design

19   specs.  Rather, the DOJ defines the term.  Just like in a

20   contract, if you have a term that's capitalized and there's a

21   definition for it, the DOJ says that "comparable line of

22   sight" means a person using the wheelchair can see the

23   playing surface between the heads and shoulders, and so on.

24   That's what they're doing.  They're not giving you design or

25   anything else except that definition.

1        And there's one more relevant data point.  In 1998, the

2    DOJ agreed to a consent order in an enforcement action that

3    it brought against the architectural term Ellerbe Becket.

4    It's Defendants' Exhibit 23.  Here's the order that got

5    entered.

6        The DOJ alleged that Ellerbe Becket had violated the ADA

7    by participating in the design and construction of several

8    sports stadiums and arenas where wheelchair seating locations

9    failed to provide a line of sight.  In other words, they

10   weren't complying with 4.33 of the ADA standards.  That's the

11   allegation.

12       So in the consent order, the DOJ required Ellerbe Becket,

13   going forward, after the date of this order, March 25th,

14   1998, to design facilities such that all or substantially all

15   of the wheelchair locations in the facility provide persons

16   with physical disabilities lines of sight comparable to those

17   of the general public.  Comply with the law.

18       And then it said, "For purposes of this order, Ellerbe

19   shall calculate sight lines" -- this is the last sentence in

20   the highlighted section.  "For purposes of this order,

21   Ellerbe shall calculate sight lines for wheelchair seating

22   locations as described in the Department of Justice

23   publication entitled '*Accessible Stadiums*.'"

24       "In making these calculations, Ellerbe shall employ the

25   average anthropometric dimensions set forth in Exhibit B to

1   this order on designs commenced after the date of this

2   order."  And Exhibit B provides anthropometric dimensions.

3       There is a provision by which the Department of Justice

4   warrants that it will not commence any action, any

5   enforcement action against Ellerbe with respect to stadiums

6   and sight lines for any design predating the order.

7       So something to think about.  If Ellerbe designed it, it

8   would have been exempt from the order.  It's not.  But it

9   tells us something, and it's a good indicator of the DOJ --

10          MR. CONNOR:  Excuse me.  I don't mean to be rude and

11  interrupt, but I must have a misunderstanding of the opening

12  statement.  It sounds like closing argument to me.

13          THE COURT:  It's getting close to that, but I assume

14  you're wrapping up anyway.

15          MR. WILLEY:  It's very close, Your Honor.

16          THE COURT:  Okay.

17          MR. WILLEY:  So we have a context and a framework,

18  the factual record that's out there, and the DOJ's regulatory

19  guidance.  Against that context, the evidence here in front

20  of you will show that the plaintiffs' case is premised almost

21  entirely on their expert's substantive advocacy, as expressed

22  in a post-hoc forensic analysis that is divorced from the

23  regulations.  Now, there's nothing wrong with such advocacy

24  in the legislative rule-making context, but foundational

25  fairness cuts against finding the defendants liable for a

1   regulatory interpretation that didn't exist when T-Mobile was

2   constructed.

3        They want to talk to you about new anthropometric data,

4   something different than what is in the *Ellerbe Becket*

5   consent order, and which is not in any DOJ guidance or

6   regulation anywhere.

7        The evidence is going to show, Your Honor, that just like

8   the *Accessible Stadiums*, and consistent with that, T-Mobile

9   Park complies with the comparable sight-line requirement

10  articulated by the DOJ in *Accessible Stadiums* and in the

11  *Ellerbe Becket* consent orders.

12       The evidence is also going to show that T-Mobile Park

13  complies with the ADA's accessible seating dispersal

14  requirement, because the accessible seating is integrated

15  throughout the stadium.  It is placed along every accessible

16  route of egress.  It is horizontally distributed around the

17  stadium.  It is vertically distributed on every level of the

18  stadium, the 100 level, 200 level, the suite level, and the

19  300 level, and available in a wide variety of price ranges

20  with the general public.

21       The essence of plaintiffs' case and the evidence that we

22  will show is it is a time warp.  Plaintiffs are asking this

23  court to effectively go back in time and create new law in

24  accordance with their perspective of what the law should be,

25  and then to enjoin or declare that the Mariners need to

1    comply.

2        They're asking for regulatory and structural engineering

3    requirements, and this sort of scenario presents a host of

4    equitable and due process affirmatives, and the court should

5    decline the invitation.

6        Thank you.

7            THE COURT:  Okay.

8            MR. CONNOR:  Plaintiffs call Malcom Rogel.

9    MALCOM ROGEL,                    HAVING BEEN FIRST DULY SWORN,
                                      TESTIFIED AS FOLLOWS:
10

11           THE CLERK:  Please state your name for the record,

12   and spell your last name for the record.

13           THE WITNESS:  My name is Malcom Rogel, R-o-g-e-l.

14                        DIRECT EXAMINATION

15   BY MR. CONNOR:

16   Q    You and I have met before, correct?

17   A    Yes.

18   Q    All right.

19   A    Good to see you again.

20   Q    Good to see you again.

21       I took your deposition sometime in May of this year,

22   correct?

23   A    That sounds accurate.

24   Q    Okay.

25       And you came for that deposition, and you were

1   identified as somebody who was going to talk on behalf of the

2   Mariners with respect to certain topics, correct?

3   A   Yes.

4   Q   Okay.  Getting that out of the way.

5        Before I get into some of those topics that we talked

6   about there, I'd like to have you explain, for Judge

7   Rothstein, what your position is with the Mariners and what

8   your history has been with the Mariners, if you would.

9   A   I'd love to.

10        I am moving into my 21st season at the Seattle

11   Mariners.  I oversee ticketing operations, parking

12   operations, and the liaison for our food and beverage

13   concessionaire and our spring training facility.

14   Q   Mr. Rogel, I understand you've had that position for a

15   relatively brief period of time, correct?

16   A   I've had -- yeah.  I was promoted to vice president last

17   December, which added the food and beverage piece.

18   Q   And prior to that, you had done what?

19   A   When I first started, I was in ticket operations from the

20   start, and have been in that for the entire 20 years.

21   Q   Okay.

22        And that was one of the topics that you were presented

23   to me to talk about in the deposition, correct?

24   A   Of course.

25   Q   All right.

1          Mr. Rogel, you are the first witness here, so I'm going

2     to ask your assistance in helping orient the court towards

3     the Mariners facilities and stadium and some of the issues

4     that we're talking about, so we'll try to do that, and if our

5     audiovisual things work here well, by looking through some

6     pictures, if we could.

7          MR. CONNOR:  Derik, can I have you pull up

8     Exhibit 238?

9     Q    (By Mr. Connor)  Do you have that on your screen?

10    A    Yes, I do.

11    Q    I'll represent to you that this is a -- something that I

12    found on the Mariners website.  Are you familiar with this --

13    this type of diagram on the Mariners website?

14    A    I am.  That's the virtual venue.

15    Q    Okay.

16         And it's --

17         MR. CONNOR:  Derik, could you show some of the other

18    pictures from that virtual venue?

19    Q    (By Mr. Connor)  And this next picture is also -- these

20    pictures are also from the virtual venue?

21    A    Yes, they are.

22    Q    Okay.

23         Mr. Rogel, what I thought I'd do is just -- so that --

24    because we're not having a view of the stadium in person, I

25    thought I'd use this as a helpful example to explain to the

 1    court where things are located.

 2           MR. CONNOR:  So, Derik, can you go back to that first

 3    picture that we were looking at?

 4    Q   (By Mr. Connor)  So, Mr. Rogel, could you explain to the

 5    court the various tiers on the stadium and where they're

 6    located?  And you can do so on this picture.  I understand

 7    that if you touch the screen here, it will show up for us.

 8    A   Oh, my goodness.

 9           So there are numerous tiers throughout the building,

10    as was described in the opening statements.  There's the main

11    level, which I'm hitting here.  This is the main level.

12        You can't really see it that well, but underneath, right

13    in here, you have two other levels; you have the suite level

14    and the club level.

15        And then up here, this is the view level.  Those are the

16    main levels.

17        Here, you have your bleachers.

18        Anything else you'd --

19    Q   Maybe to the next picture might show it a little better as

20    well.

21    A   That's better there.

22    Q   Okay.

23    A   So you can see -- this is going to identify your club

24    level, called the Terrace Club.  And then you can almost see

25    it, but right there is the suite level.

1    Q    Okay.

2         And is the suite level at a different level than the

3    200 level?

4    A    Yes.

5    Q    Okay.  And is it located above or below that?

6    A    Above.

7    Q    All right.

8         So the seats -- can you point out where the seats would

9    be that would be considered the 100-level seats?

10   A    Yes.  These are 100-level seats.

11   Q    And those wrap around the stadium, correct?

12   A    That's right, the entire concourse main level.

13   Q    And are there seats in the outfield at the 100 level?

14   A    That's true, yes.

15   Q    Okay.

16   A    You can kind of catch a little piece of it right about

17   there, and if you go around from the third-base view, you can

18   actually see them out in the lower outfield, which is in

19   right field.

20   Q    Okay.

21   A    You can see some right there.

22   Q    Mr. Rogel, I think we can get another picture up that

23   might help us look at the outfield.

24        MR. CONNOR:  Derik, can you go to the next one,

25   please?

 1                THE COURT:  Is there a way to take the marks off once
 2      you don't need them, because you're switching.
 3                MR. CONNOR:  I don't know that.
 4                THE COURT:  That makes sense on your exhibit.
 5                THE CLERK:  Your Honor, I just cleared them.
 6      A    Okay.  So these are 100 level, main level that are in the
 7      outfield.
 8      Q    (By Mr. Connor)  Okay.  Mr. Rogel, on this view, what is
 9      to the left of that set of seats that you've got the dot on
10      right now?
11      A    To the left from -- if you're sitting in the seat and
12      looking at the field?
13      Q    No.  Well, good question.  I meant, actually, to the left
14      on this diagram.  There's an "S."
15      A    Okay.
16      Q    Do you see that "S"?
17      A    So that "S" that is -- that is your drive lane.  You can
18      get vehicles in and out.  It's a big tunnel.
19                THE COURT:  A what?
20                THE WITNESS:  It's a tunnel, where you can get
21      vehicles out on the field.
22                Is that specifically what you're looking for?
23      Q    (By Mr. Connor)  Yeah.  If we can kind of progress around
24      so the court can understand what --
25      A    These are also the same kind of seats as the previous ones

1    we showed.  This is lower outfield seating.  This is The 'Pen

2    area, which is a group standing area.  These are the bullpens

3    that the pitchers warm up in.  This is Edgar's Cantina cafe.

4    I can go all around, if you'd like.

5    Q   You know, I think, just for clarify of the record, I'd

6    like to do that, if we could --

7    A   Okay.

8    Q   -- and then when we talk about things later on, it might

9    help us.  Okay?

10   A   Okay.  How granular do you want to get?

11   Q   I guess what I'd be interested in is, could you -- could

12   you tell us what the main features of the 100 level are, as

13   you've been doing, and then I'm going to go back and ask you

14   about whether -- which of these features have seating.  Okay?

15   A   Yeah.  So do you want to keep spinning around a little

16   bit, maybe view from center field?

17   Q   Yes.

18       You had indicated, for example, the last dot that was

19   placed on the left, that's what's called Edgar's Cantina; is

20   that correct?

21   A   Yes.

22   Q   And can you explain to the court what that is?

23   A   It's a restaurant, slash, bar.

24   Q   Okay.  And is there -- are there ticketed seats in the

25   Edgar's Cantina?

1    A    There are not.

2    Q    Okay.

3         Let's go back.  You talked about the area, the bullpen.

4    I gather that's adjacent to Edgar's Cantina?

5    A    Yep.

6    Q    Are there fixed, ticketed seats there?

7    A    There are not.

8    Q    All right.

9         You mentioned that there was an area, with the third

10   dot from the left on it.  Can you tell the court again what

11   that is?

12   A    The third dot from the left is The 'Pen.  Again, it's

13   standing room only, no fixed seats.

14   Q    Okay.

15        So spectators go out there, but you don't sell tickets

16   for fixed seats out there, correct?

17   A    Right.

18   Q    And I take it that -- going, again, in reverse order from

19   how you came, there's, obviously, seats in the next -- where

20   the next red dot is next to the "S," correct?

21   A    Yes.

22   Q    Okay.

23        And there are not seats where the "S" is because that's

24   an access place, correct?

25   A    Correct.

```
 1   Q    And then do the seats wrap all the way around, then?

 2   A    Yeah.  See how the map shows here?  It shows you there's

 3   a, you know, complete -- all the way around to the left-field

 4   side, there's consecutive sets of seats in different

 5   sections, with aisles in the middle.

 6   Q    Okay.

 7        And why don't we go to a view that will help us look at

 8   what's on the next level.

 9        MR. CONNOR:  I think, Derik, maybe the main-level

10   view.  Do you have that?

11        THE COURT:  Are you going to give numbers to any of

12   these so that we can find them again, counsel?  The first one

13   was 238, I believe.

14        MR. CONNOR:  Your Honor, these are all part of 238.

15        THE COURT:  Good.  Are they A, B, C?

16        MR. CONNOR:  We did not distinguish them that way.

17        THE COURT:  Okay.  It's just --

18        MR. CONNOR:  Okay.  What I'll -- Mr. Rogel, let's

19   figure out a way to --

20        MR. CAMPOS:  It's page 4.

21        MR. CONNOR:  Which one were we looking at before,

22   Derik?

23        MR. CAMPOS:  That is page 3.

24        MR. CONNOR:  So we can look at page 3, apparently,

25   Plaintiffs' Exhibit 238, page 3.  Derik, let's switch to
```

1   page 4.

2   Q   (By Mr. Connor)  So this is what's called on this website

3   the main level, Mr. Rogel.  Does that --

4   A   I think you, actually -- yeah, you have highlighted in

5   yellow there the main level.

6          THE COURT:  You've highlighted what?

7          THE WITNESS:  It looks as though they've highlighted

8   this in yellow.  The yellow outline is showing you the main

9   level.

10          THE COURT:  The main level?

11          THE WITNESS:  Yeah, main level, 100 level, same

12   thing.

13          THE COURT:  And what would you call the other level?

14   The level under the yellow, you're calling that what?

15          THE WITNESS:  I don't necessarily see a level under

16   that.  So the main level is one that, basically, adjoins the

17   playing surface.  And then it looks as though they have --

18   you know, they're showing you the Terrace Club level, which

19   are the seats above that.

20          THE COURT:  So the main -- can you put the dots back

21   on so we can talk about it?

22          THE CLERK:  Your Honor, I can't.

23          THE WITNESS:  I'll add a dot.  So, Your Honor, this

24   is the main level; this is the club level.

25          THE COURT:  Okay.

1   Q   (By Mr. Connor)  And, Mr. Rogel, the main level is the

2   same thing as the 100 level, correct?

3   A   Correct.

4   Q   All right.

5       And this next level above it that's behind the yellow

6   lines is what's called the club level?

7   A   Correct.

8   Q   Okay.

9       What other levels are there?  And I'll ask Mr. Campos

10  to pull up the pictures that depicts them.

11  A   Yeah.  So like we mentioned earlier, there's the view

12  level, which is the very big level on the top -- that's it --

13  and then --

14          MR. CONNOR:  And just for the record, Your Honor,

15  that would be page 6 of Plaintiffs' Exhibit 238.

16          THE COURT:  Wait.  Is the view level different than

17  the bleachers?

18          THE WITNESS:  It is different than the bleachers,

19  yeah.

20          THE COURT:  So which is the view level?

21          THE WITNESS:  The view level is this level.

22          THE COURT:  Okay.

23  Q   (By Mr. Connor)  That is the highest level in that area of

24  the stadium; is that correct?

25  A   Yes.

1  Q   Okay.

2       The view level the same as -- okay.  I'm sorry.

3       Is there a 200 level that's different from the club

4  level?

5  A   Well, the bleachers can be accessed from the club level.

6  We don't call the bleachers "club level."  We call them

7  "bleachers."  But they can be accessed through a sky bridge

8  right there from the club level.

9           THE COURT:  Now, wait a minute.  This couldn't be as

10  complicated as you're making it, or as I -- okay.

11      So the level that's closest to the playing field --

12          THE WITNESS:  Yes.

13          THE COURT:  -- that's the 100 level --

14          THE WITNESS:  Yep.

15          THE COURT:  Or the main level?

16          THE WITNESS:  That's right.

17          THE COURT:  Two names?

18          THE WITNESS:  That's right, two names; same thing.

19          THE COURT:  And then above that where there are now

20  four red dots, that is the club level, or is that the 200

21  level?

22          THE WITNESS:  The one where there's five dots is the

23  view level.  This, in between the two, is the club level.

24          THE COURT:  Okay.  So the view level has five dots?

25          THE WITNESS:  That's right.

 1          THE COURT:  And that's the highest?

 2          THE WITNESS:  That's right.

 3          THE COURT:  So where are the bleachers?

 4          THE WITNESS:  Out here.  It's hard for you to see,

 5   but I've put a dot right here.

 6          THE COURT:  That's not the same as the view level?

 7          THE WITNESS:  That's not the same as the view level,

 8   no.

 9          THE COURT:  And what is the difference between the

10   bleachers and the view level?  Is it the height, is it the

11   location, vis-à-vis --

12          THE WITNESS:  I would say it's the location, because

13   they're in the outfield, primarily.  Most of the view is on

14   the infield or in foul territory.

15          THE COURT:  I see.  So they're the same height?

16          THE WITNESS:  No.  The view level is higher than the

17   bleachers are, in most cases, yes.  The center-field and

18   left-field bleachers are more at about the club level height

19   of the building.

20      So if you think of the building, there's the three

21   heights.  There's the main 100; there's the club that has the

22   Terrace Club and the bleachers, but the bleachers are in the

23   outfield; and then view is the 300 level, the highest level.

24          THE COURT:  Okay.  And the bleachers are somewhere in

25   between the height of the --

 1              THE WITNESS:  Yeah.

 2              THE COURT:  -- view level and the club level?

 3              THE WITNESS:  And the club level, uh-huh, you're

 4     right.

 5              THE COURT:  Okay.

 6              MR. CONNOR:  Your Honor, maybe to help on the

 7     bleachers, Derik, can you do the diagram -- that, I think,

 8     would be page 3 -- that shows the perspective from home

 9     plate?

10     Q   (By Mr. Connor)  So those bleachers are out in the

11     outfield, correct?

12     A   Yeah.  So, Your Honor, these are the bleacher locations.

13     You can see they're a little different in size and shape, but

14     they're all at about the same level, height wise, as the

15     Terrace Club level.

16              THE COURT:  Okay.  So the 300 level is higher?

17              THE WITNESS:  Yes.

18              THE COURT:  I see that.  Okay.

19              MR. CONNOR:  Mr. Campos, will you put up Exhibit

20     P-233?

21     Q   (By Mr. Connor)  And, Mr. Rogel, this is an actual picture

22     of the stadium, as opposed to the diagram that we've been

23     looking at.

24          Can you point out, on this picture -- and we'll erase

25     the dots again.  Can you use this picture to again describe

1   for the court what the levels are?

2   A   Yes.  I'll be brief.

3         This is the view; this is the suite; this is the club,

4   or Terrace Club; this is the main level, that's as you stack

5   vertically; these are your bleachers, and that's it.

6   Q   And, again, just to reiterate, the club level is what you

7   consider the 200 level?

8   A   That's right.

9   Q   All right.  And that's the one immediately above the 100

10  or main level?

11  A   Correct.

12  Q   Okay.

13        In this picture, Mr. Rogel, on the lower level, there

14  is a shadow towards the rear of it.  Do you see that?

15  A   On the right or left-hand side?

16  Q   I'm looking on the left-hand side by your -- by your

17  lowest dot.

18  A   Okay.

19  Q   Okay.

20        The seats actually extend, on the lower level, back

21  behind the club-level seats, correct?

22  A   They stack vertically below the club level.  They don't

23  necessarily go much further back than the back of the club,

24  if that's what you're getting at.

25        You can kind of see here.  The Terrace Club, you have --

1    this is the front edge of the Terrace Club, and then the

2    main-level seats can go all the way to about here on the main

3    level.

4              THE COURT:  About how many rows would you say are

5    under that overhang?  It's an overhang, right?

6              THE WITNESS:  It's an overhang, yes.

7       So there's 43 total rows on the main level, and within

8    those rows, certain areas that overhang goes out further than

9    other areas.  So, for example, behind home plate, it's very

10   little overhang.  And this is the area I've kind of marked

11   here by my finger.  And then it kicks out a little bit and

12   goes all the way down each of the lines at this distance.  It

13   shows that on his previous one, too.

14             THE COURT:  So, roughly, how many?

15             THE WITNESS:  So, roughly, about eight to ten rows,

16   kind of in the area he's describing, is what we call a

17   "shaded area."

18             THE COURT:  Okay.

19             THE WITNESS:  Yep.

20             THE COURT:  But some places have ten, some have

21   eight, some have --

22             THE WITNESS:  Yeah.  And it's -- you know, the shade,

23   we have a lot of guests that ask about getting in shaded

24   areas, et cetera.  That moves, obviously.  But if your

25   question is where does the overhang land, regardless of

1    shade, that's about eight to ten rows before, and then right

2    behind the plate, it's only about four to five rows.

3            THE COURT:  Okay.

4            MR. CONNOR:  Derik, can you put up Exhibit 234?  Can

5    you possibly zoom in a bit by home plate?  I just want to

6    discuss with Mr. Rogel.  He was explaining that in some cases

7    there's not as much overhang, and I think this picture would

8    help demonstrate why that is, and so I'm interested in that

9    area.

10           Okay.  I guess that won't help us.

11   Q   (By Mr. Connor)  Mr. Rogel, I put a dot on an area.  What

12   is that that we're seeing in this picture not very clearly?

13   A   That's the press box.

14   Q   Okay.  And is that where there's less of an overhang?

15   A   Correct.

16   Q   And elsewhere, is the overhang the eight to ten rows that

17   you were describing?

18   A   That's right.

19           MR. CONNOR:  And, Mr. Campos, can you put up P-232?

20   Q   (By Mr. Connor)  Mr. Rogel, this is a picture -- and I

21   don't know that I need precision -- but this would be a view

22   of the field from the 100 level, correct?

23   A   Correct.

24   Q   Okay.  And, presumably, from near the rear of the 100

25   level?

 1   A    I'm not certain about where it's taken from, but it looks

 2   like it's definitely in the back third of the section, for

 3   sure.

 4   Q    Okay.

 5        So what you see as an overhang -- the dark portion of

 6   the photo above is the level of seats above the 100 level,

 7   correct, that's the club-level seats?

 8   A    Correct.

 9   Q    Or, perhaps, that's the press box.  Do you know?

10   A    It could be.  That looks like Section 128 on this picture,

11   so that's right near where it goes from the press box, and

12   then juts out a little bit.

13   Q    Okay.

14        So that would be an example of how the overhang would

15   appear from the back of the 100-level seats?

16   A    Yeah.  And I don't know if it's -- I mean, it's hard to

17   tell from this photo, but I can't tell if that photo is from

18   the concourse or if they're standing up or -- I guess I'm not

19   sure.

20   Q    Okay.

21   A    I don't know that I'd characterize it that that's from a

22   seat, per se.

23   Q    Okay.  Okay.  All right.  I can't ask you to do that.

24   A    Yeah.

25   Q    But the shadows that we see in the crowd are caused by the

1   overhang, correct?

2   A   Shadows are caused by the overhang, and in some cases it

3   can even be the 300-level overhang that will project a

4   shadow, depending on the time of day.

5   Q   Okay.

6           THE COURT:  Well, you said they're roughly eight to

7   ten rows.  In this picture, the shadow is practically down to

8   the --

9           THE WITNESS:  Yeah, exactly.  The shadow can cover

10  the entire main level at certain points of the day.

11          THE COURT:  Well, some of the shadow at some time is

12  caused by the way the sun is.

13          THE WITNESS:  That's right.  Yeah, and I guess, you

14  know, I'm just speaking to the -- where the end of that

15  overhang lands, regardless of shadows.  There's no shadow in

16  play.

17          THE COURT:  Okay.  So this picture may not be showing

18  that -- may also be showing it?

19          THE WITNESS:  That's right.  That could be even be

20  the 300 level, and it looks like the sun is coming from --

21          THE COURT:  Behind.

22          THE WITNESS:  -- this side, yeah.

23          THE COURT:  Okay.

24  Q   (By Mr. Connor)  Mr. Rogel, I'm going to ask you if you

25  could look at what's marked as Plaintiffs' Exhibit 191?

1            Mr. Rogel, do you recognize this exhibit?

2    A    I do, yes.

3    Q    And can you explain to us what this is?

4    A    This is the Mariners seating map.  This details, kind of,

5    our section names throughout the building.  It also, Your

6    Honor, kind of details the levels.  Again, here, you can see

7    the main level starts with 1s, and the Terrace Club, they

8    start with 2s, and then the 300 level starts with 3s.

9        I can talk all day about this map, if you need to, but is

10   there anything specific you want to know?

11           THE COURT:  Those are suites, the ones that say "S"?

12           THE WITNESS:  Yeah, yeah.

13   Q    (By Mr. Connor)  Why don't we go through it in a little

14   more detail, if we could?

15   A    Okay.

16   Q    I'm correct, am I not, that all of the blue seating on the

17   map here -- there's a couple of shades -- are there more than

18   one shade of blue seating?

19   A    There is.

20   Q    Okay.  How many are there?

21   A    There's -- in this particular map, it doesn't have the

22   year on it.  It looks like "2019 opening day" over here, so

23   that looks like for this last season, but for this one,

24   there's three different shades of blue.

25   Q    And, Mr. Rogel, what do the different shades of blue

 1   indicate or represent?

 2   A   Those represent a price category, or what we call a "price

 3   level."

 4   Q   Okay.  And I'm going to talk with you in, sort of, detail

 5   about that, but for right now --

 6   A   Yep.

 7   Q   -- the different shades represent different price levels,

 8   correct?

 9   A   Different shades represent different price levels, yes.

10   Q   Okay.

11       So in the -- there are numbers on this map, and let's,

12   for example, look at the number 142 in the first blue area on

13   the left.  Do you see that?

14   A   Yep.

15   Q   Can you explain to the court what the numbers are?

16   A   Those are the section names.

17   Q   Okay.

18       So these are the different sections throughout the

19   stadium, correct?

20   A   Correct.

21   Q   Okay.

22       And so just -- I think this is clear, but, for example,

23   the sections that would be immediately behind home plate

24   would be numbered what?

25   A   Immediately behind home plate are Sections 35, 33, 27, and

1    25.

2    Q    Okay.  But those, on this diagram, are in darker gray,

3    correct?

4    A    That's right.

5    Q    And, Mr. Rogel, there are blue shades for Sections 142

6    through 151.  There's also blue shades on the other side of

7    the stadium, which, I guess, are Sections 118 through 110,

8    correct?

9    A    Correct.

10   Q    Now, those would appear to be the same colors.  Are those

11   tickets priced the same as the ones on the other side of the

12   field with the same shade?

13   A    That's right.

14   Q    All right.

15        And then there are tickets with green shades on them,

16   and can you tell me how many different shades of green there

17   are?

18   A    Well, we have, even if you count the bleachers and the

19   view level that are also shades of green --

20   Q    Let's just focus right now, if we could, on the green

21   shades, other than the bleachers and the --

22   A    So, for example, right next to that section is 141, and we

23   have three shades of green.

24   Q    Okay.

25        And I note that there are cross-hatching in some of the

 1    sections; for example, 135 through 124 appear to have some

 2    cross-hatching in them?

 3    A    Yeah, 125 to 135, and then at the lower seats, 139 to 136

 4    and 124 to 121.

 5    Q    And what does the cross-hatching represent?

 6    A    That's protection from -- the net that we had installed.

 7    Q    Doesn't have anything to do with pricing?

 8    A    It doesn't.

 9    Q    All right.

10         So in those seats, from 141 through 119, there are

11    three price levels depicted on this, correct?

12    A    No.  Say that one more time.

13    Q    I'm sorry.

14         From Section 141 through Section 119, there would

15    appear to be three price levels depicted in those sections.

16    A    No.  The gray down at the bottom are also price levels.

17    Right there, there's a gray, and then there's even a line

18    right at the very front, which is the front row, and that's a

19    different price level.

20         So if you're looking at total number of price levels in

21    Section 141, there are five price levels.

22              THE COURT:  Can you show me which?

23              THE WITNESS:  Yeah.  So right here in 141, one, two,

24    three, four, five.

25              THE COURT:  And then those same five -- the five

1  different price levels within 141?

2          THE WITNESS:  That's right.  Within one section,

3  there are five price levels.

4          THE COURT:  And the same would be in 140?

5          THE WITNESS:  Yep.

6          THE COURT:  But 139 would be different?

7          THE WITNESS:  No.  It's the same as well in 139, but

8  142 would be different.  There are four different price

9  levels there.

10          THE COURT:  Does the width of the -- there are three

11  shades of green, right?  There's a dark green.  Let's take

12  140.  Okay?

13          THE WITNESS:  Okay.

14          THE COURT:  There's a dark green, there's a medium

15  green, and there's a light green.  They each have a different

16  price for tickets in those areas, right?

17          THE WITNESS:  They each can have a different price.

18          THE COURT:  What do you mean, they "can"?

19          THE WITNESS:  Well, this shows us, the ticketing and

20  staff, all of the different areas that we could have a

21  different price for a ticket.

22      So in 140, you could, if you want to, have all the tickets

23  the same price, or you could bifurcate down, and it gets

24  granular as this.  You could get to five different price

25  levels, if you wanted to.  This is like the infrastructure of

1    the ticket --

2              THE COURT:  But it does not happen all the time?

3              THE WITNESS:  It does not happen all the time, no.

4              THE COURT:  So looking at this chart isn't going to

5    tell us, at any particular game, what the price is on the

6    tickets?

7              THE WITNESS:  That's correct.

8              THE COURT:  Okay.

9    Q    (By Mr. Connor)  Mr. Rogel, I'm going -- I intended to

10   talk to you about pricing a little later --

11   A    That's fine.

12   Q    -- in my examination of you, but since Judge Rothstein has

13   asked a question about this, I'll address it for now.

14        It is true that, at least on a number of the games,

15   there are, in fact, different prices for each of those

16   different-shaded sections, correct?

17   A    I'd say yes, a majority of our games, there is different

18   prices within a section.

19   Q    Okay.  That would comport with these different shades on

20   this diagram, correct?

21   A    Yes.

22   Q    So most of your games, for example, in Section 142, there

23   would be five different price points in that section,

24   correct?

25   A    There can be, yes.

```
 1    Q    Well, I meant to ask you a question, which was, for most

 2    of the games, there would be five different price points in

 3    that section, correct?

 4    A    Honestly, it can change so much that it may not be most.

 5    It might be under most at certain times and certain seasons,

 6    et cetera.

 7         The back two blues, if we're not selling well, we're going

 8    to price the back two blues the same and let them sell

 9    through from that middle price, on back.

10         THE COURT:  And how did you get five?  I see three

11    different-color blues.  You said five.

12         MR. CONNOR:  I'm sorry, Your Honor.  I think there

13    are four -- there are three colored blues, and then there's a

14    brown area that I understand --

15         THE COURT:  Forget about the brown area.  We're

16    trying to get straight what happens with the three different

17    blues.

18         MR. CONNOR:  Okay.

19         THE COURT:  You start to complicate it.  I assume

20    those yellow, or whatever you call it, brown, are different.

21    But what you're telling us is that you don't really have a

22    fixed differentiation by color?

23         THE WITNESS:  We have -- those are blocks of seats.

24    Those blocks of seats can be priced differently from each

25    other.
```

 1        Right now, we don't have the ability to change the price

 2   by row, so we put them into a block of seats, and we can

 3   change that price by row.  But it does not mean that the

 4   prices will be different between those blocks.  It just means

 5   we have the ability to do so if we want.

 6             MR. CONNOR:  Your Honor, I may have confused things

 7   by talking about the shades.

 8   Q   (By Mr. Connor)  But in Section 142, there are four

 9   shades, correct, three of which are blue, and there's a brown

10   in front?

11   A   That's right.

12   Q   And those can all be priced differently, correct?

13   A   That's right.

14   Q   And I just want to clarify again and look at some seating

15   manifest.  But, at a minimum, they're often priced

16   differently, correct?

17   A   At a minimum, they are often priced differently.  Well

18   said.  Thank you.

19   Q   Mr. Rogel, on this map, there are icons that have

20   wheelchairs on them.

21        Derik, if you can zoom in on one of those.  Let's go

22   back to 142, and zoom in on the area of 142.

23        And I made Derik do that.  I realized, after, the

24   legend reflects -- the accessible seating in the stadium at

25   this time is denoted by the wheelchair icons, correct?

1   A   Yes.

2   Q   For example, there's a wheelchair icon in 142, correct?

3   A   Correct.

4   Q   Does this map accurately reflect the location of

5   accessible seating in T-Mobile stadium?

6   A   Probably, yes.  I mean, it doesn't do it to the seat

7   level, but it does show, within that section, where the ADA

8   seats are, yes.

9   Q   And it shows which section has ADA seats, correct?

10  A   Correct.

11  Q   All right.

12          We'll talk specifically about it, but, obviously, there

13  were some modifications made in the Diamond Club and Premier

14  seating section areas, correct?

15  A   Correct.

16  Q   And I don't know if those are reflected on this map, in

17  terms of there being accessible seating there.

18  A   It's not reflected on this map.

19  Q   Okay.

20          So Judge Rothstein understands where the Diamond Club

21  is, could you tell her where the Diamond Club is?

22  A   Of course.  Those are Sections 25, 27, 33, and 35, behind

23  the plate.

24          THE COURT:  You can touch and show me.

25          THE WITNESS:  Of course.

1          THE COURT:  And those are?

2          THE WITNESS:  Those are 35, 33, 27, and 25.

3          THE COURT:  Okay.

4    Q  (By Mr. Connor)  And you used the term "Diamond Club."

5    What does the Diamond Club mean?  What does that term mean?

6    A   It's a classification of seating category.

7    Q   Okay.

8          And there's also a dining facility that, I understand,

9    is also referred to as the "Diamond Club"; is that correct?

10   A   Yeah.  The ticket includes your food and drink and, kind

11   of, admittance into a dinner, you know, a buffet, et cetera.

12   Q   And where is that?  Where do you get your buffet if I buy

13   a Diamond Club ticket?

14   A   That would be back under your seats.  There's -- if you

15   can zoom in on the Diamond Club, there are little walkways

16   that lead back into the space that has all the food and

17   drinks.

18   Q   Okay.

19         And there is now accessible seating in the Diamond

20   Club, correct?

21   A   There is accessible seating in the Diamond Club, yes.

22         THE COURT:  What kind of seating?

23         MR. CONNOR:  Accessible seating.

24         THE COURT:  But there --

25         THE WITNESS:  There's no icon there.  There's no

 1  wheelchair icon.

 2           THE COURT:  But there is accessible seating?

 3           THE WITNESS:  Yes.

 4  Q   (By Mr. Connor)  That accessible seating was installed

 5  this off-season, correct?

 6  A   Additional accessible seating was installed this

 7  off-season, yes.

 8  Q   Okay.  And just to be particular, in the Diamond Club

 9  area, correct?

10  A   Yes, in the Diamond Club area.

11  Q   And, Mr. Rogel, I understand there's also seats that are

12  referred to as Premier Club seats, or Premier seats?

13  A   Yes.

14  Q   Can you explain to us what those are and where they are?

15  A   So the Premier seats, which are identified, kind of, in

16  this gray area, these seats that are above the visitors' and

17  the Mariners' dugouts that are these gray seats --

18  Q   Okay --

19  A   -- those are the Premier seats.  We have about 1,100 of

20  those seats, maybe a thousand-ish.

21  Q   Are there any accessible seats in the Premier area that

22  you just pointed to?

23  A   So can you zoom in on this, please?  Wonderful.

24           So the accessible seats for the Premier seat holders

25  are right here.

1    Q    And I want to make sure the court understands.  I think I

2    understand.  That's the area you described the Diamond Club

3    seating as being in, correct?

4    A    Yeah.  There's a whole row right here that is utilized for

5    both Diamond Club and Premier ADA.

6    Q    Okay.  And I think I understand the difference between the

7    Premier seating and the Diamond Club seating as, if you buy a

8    Diamond Club seat, you get the food and beverage services as

9    well as the seat, correct?

10   A    That's correct, yes.

11   Q    That's one of the differences, correct?

12   A    Yes.

13        THE COURT:  Show me where the Diamond Club is again

14   on this one.

15        THE WITNESS:  So these are -- the Diamond Club is,

16   actually, those gray sections, 25, 27, 33, and 35.

17        THE COURT:  Then where is the Premier?

18        THE WITNESS:  The Premier is the gray down the line,

19   so the further you get away from home plate.

20        THE COURT:  Okay.  So where is the accessible seating

21   in the Premier sections?

22        THE WITNESS:  So there is a whole row of seats that

23   goes right along here, the very front, and I have shown by

24   these dots, and that has both the Diamond Club accessible and

25   Premier seating accessible seats.

1          THE COURT:  But those are the Diamond Club seats,

2    right?

3          THE WITNESS:  This vomitory right here allows for our

4    ADA guests to come down to the field level, and then go into

5    the Premier ADA area.  So there's a whole row, and then the

6    first few seats closest to the visitors' dugout are Premier

7    ADA, and then the seats next to them would be Diamond Club.

8    There's red rope or something that's separating the two.  The

9    Diamond Club ADA guests can go back in and have the food and

10   beverage that's included with their ticket.  The Premier

11   seats would have the same experience that the other seating

12   in the Premier seats has, which is they go back, get their

13   food at the concession stands.

14         THE COURT:  Okay.  So you're saying 35 and 33 are not

15   Diamond Club, they are Premier?

16         THE WITNESS:  They are Diamond Club.  This map is

17   kind of confusing to understanding what it looks like.

18         THE COURT:  I think that's an understatement.

19      Okay.  You told me 35, 33, 27, and 25 are Diamond Club.

20         THE WITNESS:  That's right.

21         THE COURT:  You told me the red dots alongside, to

22   the left and to the right of the Diamond Club, are Premier.

23         THE WITNESS:  That's right.

24         THE COURT:  And now you're telling me that the front

25   row of the Diamond Club, wheelchair accessible, you're

1    calling Premier?

2           THE WITNESS:  There's a mix of the front row of

3    Section 35 and 33 that are Premier ADA and Diamond Club ADA.

4           THE COURT:  Okay.

5           THE WITNESS:  There's another exhibit that is out

6    there that can curtail this.

7           THE COURT:  It's just in those two, 35 and 33?

8           THE WITNESS:  Yes, that's it.

9           THE COURT:  Okay.

10      So are there any wheelchair-accessible seats in the gray

11   areas of 136, 137, 138?

12          THE WITNESS:  There's not above the dugouts, no.

13   The accessible seats for those seats are down at the front

14   row of 35.

15          THE COURT:  Okay.

16   Q   (By Mr. Connor)  Mr. Rogel, because it took me a long time

17   to understand this, and I think I finally do.  Let me see if

18   I can say this succinctly?

19          My understanding is -- and correct me if I'm wrong --

20   that what the Mariners have done is they chose to designate

21   some of the seats in what would otherwise be the Diamond

22   Club, Premier seats, and they've priced them accordingly,

23   correct?

24   A   That's well said.

25   Q   Okay.  So all of the seats in the Diamond Club, save those

1    accessible seats that have been designated Premier seats, are

2    Diamond Club seats, correct?

3    A    Yes.

4    Q    Okay.

5         And with regard to those Premier Club accessible seats,

6    what distinguishes them is not, actually, their location, but

7    the amenities in terms of food and beverage?

8    A    That's right.

9    Q    All right.

10        And how many accessible seats are there in this

11   Diamond/Premier Club?

12   A    There's 16 total.

13   Q    I didn't help you, but when we talk about accessible

14   seats, what are we talking about?

15   A    Well, there's 16 total accessible and companion seats, so

16   there's eight.

17   Q    Eight of each, correct?

18        And are there fixed seats in that 16-seat area?

19   A    There is as of 2019, but in 2020, I think those are going

20   to be folding chairs, but there are some that are bolted in

21   in 2019.  So those would be the companion seats.

22   Q    Okay.  All right.

23        Aside from these seats, Premier and Diamond Club

24   seats --

25   A    Yep.

1   Q    -- are there any seats in the lower level of T-Mobile

2   stadium, any accessible seats that are closer to the field

3   than the seats in the back rows of that level?

4   A    Well, I mean, out in Section 109 and 108, the field starts

5   at Row 23.  So the ADA seats are in Row 41.  They are closer

6   to the field than the seats right behind the plate, where the

7   ADA is at 41, and it goes down to Row 1.  So, yes, there are

8   seats that are closer to the field than right here.

9   Q    Okay.  Thank you.  Let's walk through that --

10  A    Okay.

11  Q    -- because I think I understand what you're saying there.

12  I want to make sure --

13          THE COURT:  No, I understand.  They're shorter

14  sections --

15          THE WITNESS:  That's right.

16          THE COURT:  -- so even though it's the back row --

17          THE WITNESS:  Yep, they're closer --

18          THE COURT:  -- it's closer to the playing surface.

19  You don't have to belabor it.  I've got that part.

20  Q    (By Mr. Connor)  So when we look at -- let's start, if we

21  could, with Row -- Section 149.  Do you know how many rows of

22  seats there are in that section?

23  A    It's either 43 or 41, but it looks like 41.

24  Q    Okay.

25          And the accessible seats in that section would be in

1    Row 41; is that correct?

2    A    In 149, yes.

3    Q    Okay.

4         And do you know -- for example, let's pick 141.  Do you

5    know how many rows of seats there are there?

6    A    141 has 41 rows.

7    Q    Okay.

8         And the accessible seats are in the 41st row in that

9    section, correct?

10   A    Correct.

11   Q    Okay.

12        And if we went around through everything up to, it

13   would appear, Section 112, you'd have approximately that many

14   rows of seats in those sections, correct?

15   A    The sections behind the plate, 132 and 131 and 129 and

16   133, and I think 134 as well, they have 43 rows.

17   Q    Forty-three?  All right.

18        Let me ask it this way:  Other than the seats in the

19   Diamond Club/Premier area that we just discussed, what's the

20   closest accessible seating to the field on the 100 level?

21   A    To the playing surface, the shortest distance would be out

22   in Section 105, 106, 107, to the playing surface.  To her

23   point, it's the shorter section.

24   Q    Okay.

25        How about any of the seats that would be in the

 1   infield?  What's the closest row that you can get accessible

 2   seating that's not in the Premier or Diamond Club?

 3   A   Row 41.

 4   Q   Okay.

 5       I started to ask you what was in the Diamond Club area

 6   prior to the renovation that was done this winter.  Were

 7   there accessible seats there?

 8   A   Prior to what was done?  Yes.

 9   Q   How many accessible seats were there?

10   A   There were two accessible and two companion.

11   Q   Okay.  And where were they located?

12   A   That same spot right at the front of Section 33.

13   Q   Okay.

14       So is it fair to say that prior to this year, after

15   this lawsuit was filed, the only accessible seats closer to

16   the field in the 41st row, at least on the infield line,

17   there were only two accessible seats, correct?

18   A   Correct.

19   Q   Mr. Rogel, let's talk about where the accessible seating

20   is elsewhere in the stadium, if we could.

21   A   Okay.

22   Q   And, actually, I may have an exhibit that may help us.

23       But could you tell Judge Rothstein, on this map, where

24   else the accessible seating is located?

25   A   Yes.  Your Honor, anywhere you see those icons,

```
 1    essentially, that's where --

 2            THE COURT:  The what?

 3            THE WITNESS:  The ADA icons -- that --

 4            THE COURT:  Well --

 5            THE WITNESS:  -- outside is --

 6            THE COURT:  You could help me by --

 7            THE WITNESS:  Of course.

 8            THE COURT:  -- identifying.  They are not immediately

 9    apparent.

10            THE WITNESS:  No problem.

11       So right there, this dot, is near one of the icons.  That

12    shows you that Section 239 has ADA seats with it.

13            THE COURT:  Okay.

14            THE WITNESS:  And then if we look in the 300 level,

15    Section 340, there's an icon there that shows where the

16    accessible seats are for that section.

17            THE COURT:  Okay.  So it's all along --

18            THE WITNESS:  Yeah.  On the 300 level, you could see

19    those big, white spaces, that's where they would be.

20            THE COURT:  Got it.

21    Q   (By Mr. Connor)  So let's look at the 200 level, if we

22    could?

23    A   Sure.

24    Q   So do all of these sections in the 200 level have

25    accessible seating?
```

1    A    No.

2    Q    Can you identify which sections do?

3    A    Sure.  This one.

4    Q    Which is what number?

5    A    215, 224, 226, 227, 237, 239, 246, 247.

6    Q    Okay.

7         With respect to the accessible seating in those

8    sections, which are on the second level, those accessible

9    seats are all located in the rear row of those sections,

10   correct?

11   A    Correct.

12   Q    All right.

13        So the court knows, how many rows are there, and if

14   they vary, let us know the variance in those sections?

15   A    They do vary.  They go 1 to 13.  The wheelchair seats are

16   located at Row 11.

17   Q    That sounds as if there are seats behind the wheelchair

18   seats.

19   A    In sections where there are wheelchair seats, they're on a

20   platform, so there are no seats behind them, but in an

21   adjoining section right next to them, it can go as high as

22   Row 13.

23   Q    Okay.  Okay.  Thank you.

24        Let's talk about the platforms, what you mean by that.

25   What are you referring to?

A    An ADA platform is where it allows our guests to pull in

and get into their space at grade with the concourse, at that

level, so that's a platform, a build-out.

Q    And is it -- is it cement or metal, or what is it?

A    It's concrete.

Q    On concrete.  All right.

     And elsewhere, whether or not there were platforms, how

do the wheelchairs users access their seats?

A    They all have platforms to get where their seating is.

So, for example, on the main level, it's all at concourse,

it's all at grade.  They can pull right out to their seats

into their space, no problem.  But it's at the concourse

grade.  It's not raised or lowered platform.  It's just at

grade.

Q    But at the 200 level, a couple of the platforms are

raised, correct?

A    There's one aluminum platform, I think it's 226, that was

built specifically for a season ticket holder that we --

          THE COURT:  Built specifically for what?

          THE WITNESS:  For a season ticket holder that had

some requirements that I'm not too aware of.  But they had

built a special platform for that buyer.

          THE COURT:  When you say "raised," does it go up and

down?

          THE WITNESS:  No.  It's just a little higher.  So you

1   go even up off the concrete a little bit more.

2           THE COURT:  I thought they needed to be level.  No?

3           THE WITNESS:  In that spot, they wanted it to be a

4   little different, so they built him a special design.

5   Q   (By Mr. Connor)  And the effect of that platform was it

6   gave the people using that platform a better view in terms of

7   an angle down at the field, correct?

8   A   I'm not sure what the purpose was.  I haven't been part of

9   that discussion.

10  Q   Well, have you visited the platform?  Have you been on

11  that platform?

12  A   Yeah, yeah, I know where the platform is.

13  Q   Does that elevation give you a better view of the field

14  than if you weren't on the platform?

15  A   I can't comment.  I don't know if it's a better -- I don't

16  know why they put it in.

17  Q   I understand that.  You weren't there or were involved in

18  the decision.

19          I'm just asking you a fact as to whether, if you're

20  standing on a platform, if you have a better view down at the

21  field than if you're not?

22  A   I'm not sure.  I don't know how I would quantify that, a

23  better view or not.  You're higher so maybe there's more

24  overhang in play.  If you're up higher or if you're lower,

25  I'm not sure how I would define that.

1    Q    More overhang in play, would you suspect there would be

2    more of a view below available?

3    A    I -- I wouldn't venture to comment on that.  I don't know.

4    Q    Okay.

5         Are there any other areas in which the accessible

6    seating is raised?

7    A    Not -- not that I'm aware of, no.

8    Q    Okay.

9         And let's talk, then, about the accessible seating on

10   the third level.  You indicated that's these white areas?

11   A    Yes.

12   Q    And those do not appear to be at the very back of the

13   stadium, correct?

14   A    Not at the very back of the sections.

15   Q    Okay.  All right.

16        THE COURT:  Are you going on to a new subject now,

17   counsel?

18        MR. CONNOR:  I think I am.

19        THE COURT:  Okay.  This may be a good time to take

20   our morning break.  We will be in recess for 15 minutes,

21   counsel.

22        MR. CONNOR:  Thank you, Your Honor.

23        THE COURT:  You may step down.

24             (Court in recess 11:28 to 11:42 a.m.)

25   Q    (By Mr. Connor)  Mr. Rogel, before we leave, actually,

 1    here, can you pull up Exhibit 191 again?

 2              MR. CONNOR:  Your Honor, I apologize.  Before I go on

 3    to that, I have not been moving for the admission of exhibits

 4    as we go along.  I can't remember if you want me to do that,

 5    or whether you want me to do it at the end of the day.

 6              THE COURT:  No, please don't.  As I understand it,

 7    the agreement we all came to was, really, there is no

 8    objection to any of the exhibits -- at least I haven't seen

 9    any -- but we weren't going to admit the exhibits wholesale

10    because you had so many more, both sides.

11        As you use them, at the end of the day, I want you to go

12    to Rhonda and have the list that you've used, to which there

13    are no objections, of course, and then she will admit them.

14    I just don't want you to admit things you haven't used.

15    That's all.  Otherwise, you could go down a list -- if you're

16    sure you're going to use them, you can go down the list and

17    give her the list.  But I'm afraid, if you do it that way,

18    you'll scoop up exhibits that you may never use.

19              MR. CONNOR:  Okay.

20              THE COURT:  So at the end of the day, whatever you've

21    used, or if any of you used them on cross-examination, just

22    make sure that before you leave, go to Rhonda and make sure

23    that she has a full list, and she'll admit them.

24              MR. CONNOR:  Your Honor, in fairness to defendants, I

25    think, virtually, all of our exhibits were objected to in one

1   shape or form, so I don't know --

2           THE COURT:  What?

3           MR. CONNOR:  Most of the exhibits we'd proposed had

4   been objected to by the defendants.

5           THE COURT:  I haven't heard an objection yet.

6           MR. WILLEY:  No, Your Honor.  I think Mr. Connor is

7   referencing our pretrial discussions, statements, and we had

8   asserted various objections.  Whether those will all be

9   maintained is a different story.

10          THE COURT:  Yes.  I have not heard an objection yet.

11          MR. CONNOR:  Okay.  If they're not made in real time,

12  I'll assume there's not an objection.

13          THE COURT:  We've passed certain things.  All right?

14          MR. CONNOR:  Okay.

15          THE COURT:  We've moved on.

16          MR. CONNOR:  Thank you, Your Honor.

17  Q   (By Mr. Connor)  Mr. Rogel, I wanted to ask you --

18          MR. CONNOR:  If we could focus in, Derik, on the

19  Diamond Club area.

20  Q   (By Mr. Connor)  Mr. Rogel, you indicated there's another

21  exhibit that may show this with more particularity, and I

22  apologize, I just don't have it at ready access.  But you

23  indicated that the accessible seating that's been installed

24  in the Diamond Club area this year is accessible from what

25  access point?

1   A    This vomitory right here.

2   Q    And Judge Rothstein may not know what a vomitory is.  I

3   didn't before I started this case.

4         What is a vomitory?

5   A    A vomitory allows access to patrons to different parts of

6   the building.

7              THE COURT:  A what?

8              THE WITNESS:  A vomitory is what it's called.  It's

9   an aisleway.  That leads back.  It's a technical term.

10             THE COURT:  A technical term?

11             MR. CONNOR:  Mr. Campos explained it well.

12  Apparently, it comes from the idea that people would leave

13  the stadium as if they were being expelled.

14             THE COURT:  I think I got it.

15             MR. CONNOR:  Okay.

16  Q    (By Mr. Connor)  So, in any event, it is a tunnel of

17  sorts; is that right?

18  A    That's right.

19  Q    And in this tunnel that you've drawn the line on, this

20  vomitory, what is the pathway in there?  It's a ramp,

21  correct?

22  A    It's an aisleway or a walkway or a hallway.  I don't know

23  that I'd call it a ramp, per se.

24  Q    That's fair.  I just wanted to -- it's not stairs,

25  correct?

1   A    It's not stairs.  It's flat.

2   Q    Okay.

3        And that would allow somebody, if the front row were to

4   be configured to access any portion of Section -- in the

5   front row of Section 33, 35, 27, and 25, correct?

6   A    Correct.

7   Q    Presently, only the 16 seats are accessible, correct?

8   A    Correct.

9   Q    Or sold to accessible patrons --

10  A    Correct.

11  Q    -- patrons needing access?

12  A    Yeah, there's 16 seats there.

13  Q    Can you tell me how many seats there are in total in the

14  front row of those four sections?

15  A    I couldn't accurately tell you exactly how many, no.

16  There's probably -- I think there's four to six in 25, and

17  there might be eight to ten in Section 27.

18  Q    And how many in 33, do you know?

19  A    Well, the ADA goes all the way around to here, and there's

20  a couple here.  Maybe another four.

21  Q    Okay.

22  A    There's another exhibit, also, that shows exactly every

23  seat.

24  Q    Okay.  Is that the construction diagrams?

25  A    It would be -- no, it's not the construction diagram.  I

```
 1    think it's the TicketMaster seating map.
 2            THE COURT:  Why don't we go on?  Let's not take time
 3    on that.  I get the picture.
 4            MR. CONNOR:  Okay.
 5    Q   (By Mr. Connor)  Mr. Rogel, let's go back to pricing and
 6    talk about that more in detail, if we could.
 7    A   Okay.
 8    Q   And to do that, I'd like to look at -- first of all, have
 9    you look at Plaintiffs' Exhibit 171, and that's a multipage
10    document, so I'll have Mr. Campos pull up the first page of
11    that.  But, Mr. Rogel, the notebook in front of you, I
12    believe, should have the entire document, so if you could
13    look in that notebook and see if you can find Exhibit 171.
14    A   I found it.
15    Q   Okay.  And do you recognize that document?
16    A   I do.
17    Q   And as I indicated, it's a number of pages, correct?
18    A   It looks -- yeah, there are a number of pages.
19    Q   And the first page is what's displayed on the screen,
20    correct?
21    A   Correct.
22    Q   And the remaining pages --
23            MR. CONNOR:  Derik, could you display the next one?
24    Q   (By Mr. Connor)  The remaining pages is something akin to
25    this, correct?
```

1    A    Correct.

2    Q    Okay.

3         What is this document that we're looking at?

4    A    This is a seating manifest.  The first page is the summary

5    page of the seating manifest.  The subsequent pages are pages

6    that detail every single seat in the building.

7    Q    And let's look at the summary page, if we could --

8    A    Of course.

9    Q    -- to begin with.

10        MR. CONNOR:  Derik, can you go back to that first

11   page?

12   Q    (By Mr. Connor)  Can we see, from this document, the price

13   codes that are used by the Mariners?

14   A    We can see the price codes, yes.

15   Q    Okay.  And those are -- where would we see those?

16   A    So the price codes are the top level.  Right up here you

17   can see.  Right below my red line, those are the price

18   levels, and here as well.  So the 1A, the 2B, et cetera.

19        THE COURT:  The what?

20        THE WITNESS:  Look right below my red line.

21        THE COURT:  I see.

22        THE WITNESS:  That is what we call "parent price

23   level," which is the infrastructure of the ticket system.

24   This is all those different colors.  So, for example,

25   remember back in those blues?  That's going to be F, G, H,

1    and I, right there.  Those -- all those different colors we

2    saw on that shade map have one of these price levels

3    associated with it.

4              THE COURT:  And where is the price?

5              THE WITNESS:  This is just --

6              THE COURT:  Those are the numbers?

7              THE WITNESS:  Yeah.  Those are just the letters that

8    tell the operations team which one of those colors, what they

9    are.  So it's the colors turned into a letter format.  So

10   this just details the number of seats within each of those

11   price levels.  So down below --

12             THE COURT:  Okay.  So the numbers at the bottom --

13             THE WITNESS:  That's right.

14             THE COURT:  -- are the number of seats at that price

15   level?

16             THE WITNESS:  That's right.

17        And then the access on the other side, if you don't mind

18   me explaining more, Mr. Connor.

19             MR. CONNOR:  No, I appreciate it.

20             THE WITNESS:  These are the classes that these seats

21   start in within a manifest.

22        Like I said, this is an infrastructure summary of the

23   seating manifest.

24   Q    (By Mr. Connor)  Mr. Rogel, there's a row labeled, at the

25   top.  I guess it's the 1A?

1    A    Yep.

2    Q    Can you tell us what that is referring to?

3    A    So that's Row 1A of the Diamond Club area.

4    Q    And that is a unique pricing category itself, correct?

5    A    It can be, yes.

6    Q    Okay.

7         What does the next -- well, let's clarify how this

8    chart works.

9    A    Yep.

10   Q    If we look down below 1A, it reflects -- there's some

11   numbers, correct?  There's 32, there's 20, correct?

12   A    That's right.

13   Q    Temporary?

14        What are those numbers?

15   A    So 32, those are the actual physical seats that are in the

16   Diamond class that are in Row 1A.  Diamond ADA is what we

17   have as a backup rebuild of those same seats in Diamond that

18   is simply a manifesting design.  It's not actual, physical

19   seats for Diamond ADA.  We have them in a special class.  If

20   we need to move seats between Diamond and Diamond ADA, we can

21   do that.  Those are the only seats in this actual chart that

22   aren't actual, physical seats.  It's like a double build.

23   Q    So the grand total below 1A, does that reflect how many

24   seats there are in the Diamond Club?

25   A    The grand total reflects how many total seats we could

1   have if we converted those 20 to Diamond ADA, but the actual

2   seats is more like 34, which is 32 plus the two temporary.

3   Q   Just to be clear, the reason for that difference is

4   because the actual seats include the ADA seats?

5   A   Yes.

6   Q   So can you tell from this -- can you answer my earlier

7   question, which is, how many additional seats are there,

8   besides the ADA seats, in the Diamond Club?

9   A   How many additional seats, besides the ADA seats, in the

10  Diamond Club?

11  Q   Yes.

12  A   There's 408, 410, somewhere in there.

13  Q   I'm sorry.  I misspoke.  In the front row of the Diamond

14  Club.

15  A   Oh, in the front row of the Diamond Club, there's

16  another -- I think we're up to, like, 16 or 18.

17  Q   Well, let me ask you this:  Is 1A the pricing category for

18  the front row of the Diamond Club?

19  A   Yes.

20  Q   All right.  Does it includes seats anywhere other than the

21  front row of the Diamond Club?

22  A   No.

23  Q   So I'm still, I guess, a little bit confused.

24      The grand total is 54 --

25  A   That's right.

1   Q    -- at the bottom of that?  And I understand that you say

2   that's overstating it, because there are accessible seats,

3   correct?

4   A    It's overstating it because the Diamond ADA is a build of

5   the Diamond.  It's the same build as the Diamond.  So those

6   are the same seats.  It's just in a different class that we

7   have them held in.  It's very into minutia on the ticketing

8   side.  It doesn't have anything to do with the actual,

9   physical seats.

10  Q    Okay.  Okay.  But it does have to do with pricing,

11  correct?  The Diamond Club front-row seats are priced

12  differently than other seats in the Diamond Club?

13  A    Well said.  Yes.

14  Q    All right.  So let's move on to 2B, if we can.

15  A    Yep.

16  Q    What does 2B reflect?

17  A    2B is the second level of pricing within the Diamond Club,

18  and it's Rows 2, 3, and 4.

19  Q    And is the grand total stated down below there the actual

20  grand total of seats?

21  A    Yes.

22  Q    In those rows in the Diamond Club?

23  A    Correct.

24  Q    And there are no ADA seats in those rows?

25  A    That's correct.

1  Q    So there's 132 seats in those rows in the Diamond Club?

2  A    Correct.

3  Q    And then I won't go through too many more examples, but

4  just to clarify.

5        Is there a pricing category different to pricing

6  category than 2B?

7  A    Say that one more time.

8  Q    Yeah.

9        I'm wondering if -- I see there's pricing category 1A,

10  there's pricing category 2B, there's pricing category 3E.

11  Are there any other pricing categories?

12  A    In the Diamond Club?

13  Q    Yes.

14  A    No, just those three.

15  Q    Okay.

16        What does 3E refer to?

17  A    Rows 5, 6, 7, and 8 of the Diamond Club.

18  Q    I understand that the grand total down there would

19  accurately reflect the number of seats in that --

20  A    Yes.

21  Q    And then these other pricing codes, as you look across the

22  top, those are different, separate pricing codes for, as you

23  explained, different sections of --

24  A    Yes, the different colors, yes.

25  Q    Okay.  All right.

1          Mr. Rogel, during your deposition, you explained to me,

2     sort of, the dynamic nature of pricing --

3     A    Yes.

4     Q    -- correct?

5          And I know that portions of your deposition is

6     designated as confidential, so I want to let Mr. Willey know

7     I'm going to ask questions that might begin to pertain to

8     that, but I don't mean to disclose anything that is of

9     tremendous concern.

10    A    Proprietary?

11    Q    Right, right.

12         In general terms, it's true that the organization

13    changes the prices of some of the tickets throughout the

14    season; is that fair to say?

15    A    That's fair to say.

16    Q    Okay.

17         And I understand that you do that, in part, in response

18    to demand that season?

19    A    Yeah.  It's a supply-and-demand decision-making process.

20    Q    Okay.

21         And so the price of a ticket that's sold in April may

22    differ from the price of a ticket for the same seat that's

23    sold in September; is that fair to say?

24    A    That's correct.

25    Q    And you indicated earlier that, with respect to these

1    different colors that are the price codes, that, on occasion,

2    the pricing for different colors might actually be the same,

3    correct?

4    A    That's right.

5    Q    Okay.

6         MR. CONNOR:  Derik, can you pull up this exhibit

7    again, 191?

8    Q    (By Mr. Connor)  Mr. Rogel, I think we talked about the

9    blue sections, and you indicated that it might be that the

10   lighter shades of blue closer to the field might, in fact, on

11   occasion, be priced the same as those with the darker shade

12   in the back of that section, correct?

13   A    Correct.

14   Q    Is it ever the case that the price of the tickets at the

15   back is priced more than the price of the tickets in front of

16   them?

17   A    No.

18   Q    All right.

19   A    All of the ADA seats live within these price levels.  So

20   they're not called out in any way.  They're priced the same

21   as whatever price level they live in.  So an ADA seat and a

22   seat adjoining, they're all, as far as I'm concerned, in the

23   same price level, so they're aren't broken out.

24   Q    Okay.  I hadn't meant to ask that, so I'll go back to my

25   question just to make sure I'm understanding things

1    correctly.

2    A    Of course.

3    Q    It would not be the case that the price of tickets in the

4    dark row would ever be more than -- dark hue would ever be

5    more than the tickets in front?

6    A    Correct.

7    Q    Okay.

8         Now, in the blue sections, there are ADA-accessible

9    seats in the dark-shaded blue code, correct?

10   A    That's right.

11   Q    And what would that code translate to in terms of a letter

12   on the exhibit we were looking at just before?

13   A    I think that's either H or I.

14   Q    Okay.

15        And what you've indicated is the ADA patrons -- the

16   patrons needing wheelchair-accessible seating have an option

17   to go into that price code on the first level, correct?

18   A    Among others, yes.

19   Q    Okay.  What others do they have the option to go into on

20   the first level?

21   A    The dark green, which is price level E --

22   Q    Okay.

23   A    -- and then the dark purple, which is K.

24   Q    Okay.

25        And they also have the option of going into the Diamond

```
 1   Club price codes, correct?

 2   A    They do, yep.

 3   Q    Do patrons needing the accessible seating have the option

 4   to go into the blue shade that's not the darkest blue, the

 5   next darkest blue?

 6   A    What's the question?

 7   Q    Not a good one.

 8        Let's look at 142 again, if we can.

 9   A    Okay.

10   Q    I think you said that you thought the ADA seating was in a

11   price code that you said was I or L or something?

12   A    Sure.

13   Q    Do you by chance know what the price code is --

14             THE COURT:  What did you just say?

15   Q    (By Mr. Connor)  I couldn't remember -- Mr. Rogel, you

16   said that the ADA seating is in price code -- the darkest

17   shaded area there has a letter associated with it of -- I

18   think you said "I"; is that correct?

19   A    It is "I."

20   Q    Okay.

21   A    This chart helps me here.  So it's "I."

22   Q    The shaded area next to it, the next darkest shade of blue

23   in the 142 section and the others adjacent to it, what price

24   code is that?

25   A    That's H.
```

1    Q    Okay.

2         How about the next lighter shade of blue, what price

3    code is that?

4    A    G.

5    Q    Okay.

6         Accessible patrons [sic] don't have an option to choose

7    seating in those price codes, correct?

8    A    In the prices?  No.

9    Q    And the same would be true with respect to the green price

10   codes, correct?  That the accessible -- patrons needing

11   accessible seating have the option to purchase tickets in the

12   dark green price code, correct?

13   A    Correct.

14   Q    And just for the record, what price code would that be?

15   A    That is E.

16   Q    Okay.

17        What would be the next darker green price code?

18   A    D.

19   Q    Okay.  And adjacent to that, what would that be?

20   A    C.

21   Q    Okay.

22        Now, wheelchair patrons don't have the option to

23   purchase seats in those price codes, correct?

24   A    They do not.

25   Q    Mr. Rogel, let's look at --

```
 1              MR. CONNOR:  Derik, you pull up Defense Exhibit 18?
 2    Q   (By Mr. Connor)  Mr. Rogel, can you tell the court what
 3    Exhibit 18 is?
 4    A   Yeah, of course.
 5        This is details of the seating locations, and then the
 6    pricing by date for those seats.
 7    Q   Okay.
 8            And let's go through the first page and pick an
 9    example, if we could.
10            So the very top line that contains numbers, it says,
11    "2018 Baseball, Section 8, Row 1, Seat 1," and it says, "Seat
12    21," and then it says, "6."  Can you explain what those
13    numbers mean in those first four columns?
14    A   Yeah.  So the first --
15    Q   I misspoke.  The first four columns containing the numbers
16    that I just read.  So the third, fourth, fifth, and sixth
17    column, can you explain what those numbers mean, the 8, 1, 1,
18    and 6?
19    A   The third column is "Sections."  That's the name of the
20    section.  If you remember, previously in our map, all the
21    sections had numbers on them.
22    Q   Okay.
23    A   That associates to those numbers.
24            The next column is "Row."  "Row" details which row,
25    within in that section, this seat exists, or this block of
```

1    seats exists.

2    Q    Okay.

3    A    The next is "Seat 2."  This details the first seat in that

4    row.  That can be 1, it could be 2, it could be 3, it could

5    be a 5.  It's whatever the first seat number is in that row.

6    Q    Okay.

7    A    The seat is the last seat in that row.  So in this case,

8    it's Seat 1 to 6, and there are six total seats, and the

9    price code is what we discussed earlier, again, with those

10   colors.  That's price code A for the All-Star Club.

11   Q    What is the All-Star Club?  I don't think we've talked

12   about that.

13   A    Similar to the Diamond Club, just on the suite level.

14   Q    Okay.

15        Could you flip through this exhibit and find for me

16   pricing for Diamond Club seating?

17   A    Can I flip through this exhibit and find pricing for

18   Diamond Club?

19   Q    I don't know if it's easier to do it on the hard copy and

20   then let us know the page, or if you can actually scroll

21   through this.

22   A    The Diamond Club is included in this file that you have

23   displayed as far as with regards to this document.  The

24   Diamond Club, as you recall, the section names are 25, 27, 33

25   that you have shown here.

1   Q   Okay.  On that first page?

2   A   That's right.

3   Q   All right.

4        So let's pick one of the Diamond Club seats.  Let's

5   look at the one two-thirds of the way down, the first

6   instance in which Section 25 appears.  Do you see that?

7   A   I do.

8   Q   Okay.  And the row next to that says "A"?

9   A   Yes.

10  Q   Okay.  And then Seats 1 through 3?

11  A   1 through 6.

12  Q   Oh, I'm sorry.  I'm a row up.  All right.

13       And so on our map, what seats would that be pertaining

14  to?

15  A   Do you want to go to the map?

16  Q   Yeah, why don't we.  I'm sorry.

17       MR. CONNOR:  Derik, can you go back?

18       THE WITNESS:  Can you zoom into the Diamond Club?

19  A   This is Section 25, just above my red dot.  I think it

20  said Row 1.  These are Row 1s right in there, and Seats 1 to

21  6 would be from there to there.

22  Q   Does this Exhibit 18 -- sorry -- 19, does it reflect

23  accessible seating in the Diamond Club?

24       THE COURT:  What?

25  Q   (By Mr. Connor)  Does it reflect the pricing code for the

1   accessible seating in the Diamond Club?

2   A   Can you go back to the exhibit?   25A and parent price code

3   1A would be the Diamond Club ADA.

4   Q   You pointed to that.   I'm sorry.

5   A   So Row A for the fixed seats is in price code 1A.   If you

6   want to find -- maybe if you go down a page.   Can I scroll?

7       So here's our ADA seats in the Diamond Club.

8   Q   The highlighted line?

9   A   That's right.

10  Q   All right.   So that's -- this reflects -- I didn't ask you

11  already, but there's columns to the right.   It says, "Game

12  Dates"?

13  A   Yes.

14  Q   Okay.   And there's dollar values in those columns,

15  correct?

16  A   Correct.

17  Q   Okay.

18      Those -- the 600 and 500 and 600, do those reflect the

19  price of the ADA seats in the Diamond Club on those game

20  days?

21  A   Yes.

22  Q   So, at least for the games on April 14th, July 5th, and

23  September 9th, the price would have been $600, $500, and $600

24  for those seats?

25  A   Correct.

 1            THE COURT:  What's the number of this exhibit?

 2            MR. CONNOR:  That, Your Honor, is 19.

 3            THE COURT:  This is Defense Exhibit --

 4            MR. WILLEY:  Defendants' 18.

 5            MR. CONNOR:  Sorry.

 6            THE COURT:  That's okay.

 7            MR. CONNOR:  Derik, can we look at 19 as well?

 8   Q   (By Mr. Connor)  So, Mr. Rogel, my understanding is that

 9   this exhibit is, again, a manifest, and what it does is it

10   includes different game day dates; is that correct?

11   A   Correct.

12   Q   Okay.  So could we look at what the price of the Diamond

13   Club accessible seats would be for the game days reflected

14   here?

15            MR. CONNOR:  And, Derik, I think we need to turn to

16   the next page.

17            THE COURT:  Is this still 18?

18            MR. CONNOR:  No, Your Honor, this is now 19.  They're

19   similar documents containing prices for different game days,

20   is my understanding.

21            THE COURT:  Okay.

22   Q   (By Mr. Connor)  Mr. Rogel, on the second page of Defense

23   Exhibit 19, there's a highlighted line.

24   A   Correct.

25   Q   And that, again, would be the pricing for the accessible

1   seating in the Diamond Club, correct?

2   A    Correct.

3   Q    And for the particular game days reflected on the

4   right-hand side, correct?

5   A    Correct.

6   Q    So on those game days, March 31st, April 2nd, April 13th,

7   the prices would have been $600, $450, and $600, correct?

8   A    Correct.

9   Q    Okay.

10       Do you remember when I took your deposition, I asked

11  you about the pricing for the accessible seating in the

12  Diamond Club?

13  A    I remember the deposition, but I don't remember the line

14  of questioning --

15  Q    Okay.

16  A    -- specifically.

17  Q    I can pull it up.  I'll suggest, and you can tell me if

18  this sounds wrong to you, that -- I asked you what the price

19  ranges would be for single-game tickets for the accessible

20  seating in the Diamond Club, and you said it would be $450 to

21  $600, correct?

22  A    Sounds right.

23  Q    Okay.

24       And I asked you if it was ever lower, and do you

25  remember what you told me?

1    A    No.

2    Q    Okay.

3             THE COURT:  Well, why don't you ask him now?  Maybe

4    it's the same answer.

5             MR. CONNOR:  All right.  That's fine.

6    Q    (By Mr. Connor)  Would the prices for those Diamond Club

7    accessible seats ever be lower than the $450 that we looked

8    at on these prices?

9    A    On a single-game basis, I think $450 was our lowest.

10   Q    Okay.

11            You submitted a declaration in this litigation.  Do you

12   remember that?

13   A    I do.

14   Q    And my understanding of your declaration was, you were

15   communicating to the court that there was Diamond Club

16   seating available at a lower price -- accessible seating

17   available on a $75 price per game?

18            THE COURT:  How much?  $75?

19            MR. CONNOR:  Yes.

20   A    That's incorrect.

21   Q    (By Mr. Connor)  Thank you for clarifying that.

22            So throughout the 2019 season -- let me just

23   clarify -- could a person wanting accessible seating or

24   companion seating had paid anything less than $450 for a seat

25   in the Diamond Club?

```
 1   A    If they'd bought it on a seasonal basis, yes.

 2   Q    And let's talk about what seasonal pricing would be.  What

 3   would that be for tickets in that level?

 4   A    There's a lot of different options between different types

 5   of plans.  I couldn't give you an exact quote on what the

 6   price is, but between $200 to $300.

 7   Q    Okay.

 8        And what that means is the best price somebody wanting

 9   accessible seating in the front row could get would have been

10   approximately $200 for a seat, correct?

11   A    For a front-row seat in the Diamond Club, depending on how

12   much they invest, yeah.

13   Q    Okay.

14        MR. CONNOR:  And, Derik, if you could go back to our

15   map.

16        THE COURT:  Let me understand that.  That $200 to

17   $300 is with a season ticket?

18        THE WITNESS:  Yeah, like if you buy all 81 games.

19        THE COURT:  Not if you go in and buy an individual

20   game ticket?

21        THE WITNESS:  Right.

22   Q    (By Mr. Connor)  And just to complete the record,

23   Mr. Rogel, you and I talked about how there are complete

24   season-ticket packages and there are lesser packages,

25   correct?  I assume that the season ticket would be $200, then
```

1    the smaller packages would not be less than that, correct?

2    A    Correct.

3    Q    All right.

4         So looking at our map on Plaintiffs' Exhibit 191, it is

5    fair to say that if anybody who needed accessible seating

6    wanted to purchase a seat in T-Mobile Park this season, and

7    they wanted to have a seat anywhere closer than the

8    accessible seating at the back of the first tier, they would

9    have had to pay, at a minimum, $200 for a seat, correct?

10   A    No, that's not -- in what year did you say?

11   Q    This year, this last season.

12   A    No.  There's those Premier ADA seats that are available.

13   Q    Oh, okay.  Thank you.  We didn't talk about those.  Let's

14   talk about the pricing for those as well.

15   A    And I'd like to clarify one point, if I may, Your Honor.

16        When you said the $75 Diamond Club ticket, that

17   exhibit, as part of that statement, the Sections 135, not 35.

18   And so that's referring to the Premier ADA seating.  It's

19   $75.

20   Q    Thank you for clarifying that.  Let's walk through that,

21   then.  I apologize.  I didn't appreciate the distinction.

22   Let's talk about the price codes for the Premier seating --

23   A    Okay.

24   Q    -- the accessible Premier Club seating, all right?  And

25   maybe we can go back and look at that.  Let's look at the

```
 1   summary page on 171.
 2        Mr. Rogel, it might be on your screen.
 3   A   Yeah, and what's the question?
 4   Q   The question is, on this summary page, does it reflect the
 5   price code for the Premier seating?
 6   A   It is in there.  I'd have to look deeper.  It's either in
 7   B or F.  I don't recall off the top of my head.
 8   Q   Let's look at the manifest.
 9        THE COURT:  Maybe we can shortcut this a little.  Do
10   you have a memory of what it would cost to get a Premier
11   seat?
12        THE WITNESS:  Yeah.  That $75 is accurate.
13        THE COURT:  $75 for a Premier seat?
14        THE WITNESS:  Yeah, that's the price point.  I think
15   it's in my deposition, and we may have a defendant document
16   that shows those prices.
17        THE COURT:  Okay.
18   Q   (By Mr. Connor)  Mr. Rogel, can we look at the manifest
19   and look at the prices for these different game dates that
20   are reflected in the manifest on 18 and 19 for Premier?
21   A   Do you have that?
22        THE COURT:  Is it on the left-hand side?  Can you
23   pull that up?
24        MR. CONNOR:  No.  I'm sorry.  Derik, could you pull
25   up Defense Exhibit 18?
```

```
 1   Q   (By Mr. Connor)  Could you look through that, Mr. Rogel,
 2   and see if you could identify for me where the Premier seats
 3   are?
 4   A   So if you can find, in this exhibit, Section 135 -- you'd
 5   have to keep scrolling.
 6            MR. CONNOR:  Can you do that, Derik?  I have it as
 7   Bates stamp 000425.
 8            THE COURT:  But he has here, 135.
 9            MR. CONNOR:  Okay.  Yeah, let's look at this.
10       Derik, which is it that you have up now?
11            THE COURT:  He has D-18.
12   Q   (By Mr. Connor)  Mr. Rogel, does that reflect the seating
13   for -- the accessible seating for the Premier Club?
14   A   That does not.  That's Row 41A.  So those are the seats
15   that are at the back of the section.
16   Q   Okay.
17   A   And that --
18   Q   I'm sorry.  Which section did you say we should be looking
19   at?
20   A   It should be Section 135, Row 1A.
21            THE COURT:  Are you questioning the accuracy of the
22   $75?
23            MR. CONNOR:  I just want to verify what it is over
24   the six different games that are displayed here.
25            THE COURT:  Well, can you get us to --
```

1    A    Well, I mean, if -- yeah, you can do that by the price

2    codes.  You can see that they're all different throughout.

3    But I don't see it here.  I don't see that seat location

4    here.

5    Q    (By Mr. Connor)  So, Mr. Rogel, let me ask it this way:

6    Are the ADA seats priced as price code E in the Premier Club?

7    A    They're supposed to be price code E.

8    Q    Okay.  So they would be the same as the seats that I

9    tapped here, correct?

10   A    Yeah.

11   Q    So it would be this $70, $65, and $104 for the games?

12   A    Yeah, correct.

13   Q    How many Premier ADA accessible seats are there again?

14   A    There are 12 in total; six and six.

15   Q    And how many Diamond Club seats are there?

16   A    There are four; two and two.

17   Q    Okay.

18          MR. CONNOR:  Derik, can we go back to the summary

19   chart on 171?

20   Q    (By Mr. Connor)  Mr. Rogel, I don't know if these two

21   exhibits are displayed side by side for you.

22   A    They are.

23   Q    All right.

24          If I wanted to know how many seats there were in the

25   100 level between the foul poles -- so, in other words,

1    seating from here to here -- how many seats were below the

2    dark price codes at the rear, could you tell me that, or

3    could you figure that out from looking at the summary chart?

4    A    We could determine that looking at the summary chart.

5    Q    Okay.  I'd like to do that, if we could.  Can you -- and

6    I'll suggest to you that I -- it would seem to me that what

7    you've got on this summary chart is you've got grand totals

8    for different price codes, correct?

9    A    Correct.

10   Q    Okay.

11        And so if we add it up, the number of seats for the

12   different price codes below the dark one at the back, we

13   could figure out how many seats were in that lower area,

14   correct?

15   A    I'm calculating now.

16   Q    Okay.

17   A    And you want to include all seats except the darkest blue;

18   is that correct?

19   Q    Except the darkest hue, so the dark blue and the dark

20   green.

21   A    Okay.

22   Q    And, Mr. Rogel, let me explain what I'm trying to figure

23   out.

24        If I wanted to figure out how many price codes -- how

25   many seats there were in price codes in which there is not

 1    accessible seating in the main level of the stadium -- I'm

 2    trying to figure out how many that would be.

 3            THE COURT:  Are you just trying to get the number of

 4    seats?

 5            MR. CONNOR:  Yes, Your Honor.  And just to make

 6    sure -- I'm trying to get the number of seats in price codes

 7    other than that dark price code, so the number of seats below

 8    the rows of the dark price code at the rear.

 9            THE WITNESS:  I'm almost finished.

10    A   On the main level between the foul poles, which are the

11    two red dots indicated on the map, not including price level

12    I, which is the darkest blue, or price level E, which is the

13    darkest green, there are 10,894 seats.

14    Q   (By Mr. Connor)  And I'll ask you -- did you have a

15    calculator while you were doing that?

16    A   I did.  I did it in my head.

17    Q   Can I have you use your calculator one more time?

18    A   Yes.

19    Q   Can I have you tell me the percentage, of that total

20    number of seats, eight seats would be?

21            THE COURT:  What percentage of what?

22    Q   (By Mr. Connor)  What percentage of the total number of

23    seats below the rear price code would eight seats be?  So one

24    percent --

25            THE COURT:  Eight?

 1          MR. CONNOR:  Eight seats.  The reason I'm asking

 2   that, Your Honor, is because there are eight accessible seats

 3   below that price code.

 4   A    The answer to that calculation is .0007.

 5   Q    (By Mr. Connor)  Okay.  So in other words, people in

 6   wheelchairs would have -- they have an option to purchase

 7   seating, in the first tier between the foul poles, below the

 8   price for the accessible seating in the rear, only the

 9   percentage that you described just now, correct?

10   A    Correct.

11   Q    And could you repeat that percentage?

12   A    .0007, three zeros.

13          MR. WILLEY:  Is that a percentage or a decimal?

14          THE WITNESS:  Decimal.

15          MR. WILLEY:  Okay.

16   Q    (By Mr. Connor)  So in terms of percentage, can you tell

17   us?

18   A    Is it 7/100ths?  I'm not sure.  7/1000?

19          THE COURT:  Why did you pick eight?  Where did you

20   get the figure eight?

21          MR. CONNOR:  Good question, Your Honor.

22   Q    (By Mr. Connor)  I understand there are eight accessible

23   seats in the front row of the stadium, correct?

24          THE COURT:  I thought there were 12.

25   A    There's 12 for the Premier ADA and four for Diamond Club,

1    16 total.

2    Q    (By Mr. Connor)  Sixteen total, but in terms of accessible

3    seats as opposed to companion seats, there are only eight

4    accessible seats, right?

5    A    Right.

6    Q    That's why I asked.

7              THE COURT:  Of that 12, four are companion seats?

8              THE WITNESS:  Of the 16, half are companion and half

9    are wheelchair accessible, so eight total.

10             MR. CONNOR:  Mr. Rogel, I'm going to step aside and

11   ask Mr. Reynoldson if there's anything further he'd like me

12   to ask.

13             THE WITNESS:  Okay.

14             MR. CONNOR:  That's all I have.  Thank you, Your

15   Honor.  Thank you, Mr. Rogel.

16             THE WITNESS:  Yeah, thank you.

17             THE COURT:  Are you going to cross-examine?

18             MR. WILLEY:  I am, Your Honor.  I'm trying to figure

19   out if we have a lunch-period break.

20             THE COURT:  I was going to break at one o'clock.

21             MR. WILLEY:  We're going to break at one o'clock?

22   That's fine.

23       Just for planning purposes, we'll break at 1:00 until?

24             THE COURT:  Probably 2:00, 2:30.  If we can all make

25   it by 2:00, I'd prefer 2:00.

 1                 MR. WILLEY:  Okay.  Thank you.

 2                 THE COURT:  Would it help if we broke now, or would

 3     you like to continue?

 4                 MR. WILLEY:  I can certainly start now.  If people

 5     would like to eat, I'm okay with that, too.

 6                              CROSS-EXAMINATION

 7     BY MR. WILLEY:

 8     Q   Mr. Rogel, I want to circle back a little bit and do some

 9     orientation of ourselves here.

10     A   Of course.

11     Q   Do you recognize this picture?

12     A   I do.

13     Q   Where is it take it from, roughly?

14     A   Roughly, that looks like the Lookout Landing, which is a

15     platform space just above Section 349.

16     Q   So we're down the left-field line above Section 349?

17     A   That's right.

18     Q   And we're looking at the field and the stands.

19             So if we look at the lower level here, this is the bowl

20     we've been talking about?

21     A   Yes.

22     Q   The lower level around the infield?

23     A   Yep.

24     Q   And in order to access that lower level, where are the

25     points of entry?

```
 1   A    There is one point of entry at the -- what we call the

 2   umpire tunnel, or the vomitory that leads into that space.

 3            THE COURT:  Can you show us?

 4            THE WITNESS:  Yeah, of course.  Right here.

 5   A    So that's one point of entry, and then the other point of

 6   entry is right next to it, through the Diamond Club, into the

 7   Diamond Club ADA area.

 8   Q    (By Mr. Willey)  So there are two vomitories or tunnels

 9   right behind home plate there that enable access to that

10   front space; is that correct?

11   A    That's correct.

12   Q    And when one uses those access points, where do you come

13   into when you're on the field side?  What space are you in?

14   A    When you access the Diamond Club tunnel, you come into the

15   field space of the Diamond Club seating.  When you access the

16   Premier seat, you come up the third-base side of those same

17   Diamond Club seats.

18   Q    And both those sections are -- they're adjacent?

19   A    Yes.

20   Q    And they're both in the Section 33, 35 area on the other

21   map we looked at?

22   A    That's right.

23   Q    Okay.

24        If you come in in one of those vomitories, can you

25   physically, in a wheelchair, get around the stadium
```

1   first-base side?

2   A    No, you cannot.

3   Q    And why is that?

4   A    The physical structure of the building prevents you from

5   doing so.

6   Q    And if you would come in one of those access points behind

7   home plate here that enables wheelchair access, could you

8   turn and go down the left-field line?

9   A    You cannot.

10  Q    Why is that?

11  A    Again, the structure of the building doesn't allow a

12  walkway down there.

13  Q    Got it.

14       If you were trying to access the 100 level, this bowl

15  around the infield, where else can you access it, other than

16  those two points that are the tunnels or vomitories, if

17  you're in a wheelchair?

18  A    I don't know that there is another access point for a

19  wheelchair.

20  Q    If you want to get to a seat that's in that section, is

21  there any way to come from the concourse, down into the bowl?

22              THE COURT:  Into the what?

23              MR. WILLEY:  The bowl itself.

24  Q    (By Mr. Willey)  If you're coming in from the concourse --

25  A    Right.

1   Q    -- where is the concourse in this section?

2   A    The concourse is this little line here.

3   Q    And what's on the concourse?

4   A    We have restrooms; we have all of our food and beverage

5   offerings, which are fantastic; we have all the safety and

6   security amenities that we provide at T-Mobile Park; we have

7   guest services, et cetera.

8   Q    And if you are coming from the concourse to the 100 level

9   and you want to go to an accessible seat, where are the

10  accessible seats on the 100 level, excluding the Diamond Club

11  and Premier?

12  A    They're right on the concourse level.

13  Q    Got it.

14       So they're in the access spot from the concourse to the

15  seat?

16  A    That's right.

17  Q    Do you have to go over a ramp or down a step?

18  A    No, it's at grade.

19  Q    So the access for a wheelchair user on the 100 level is

20  via the concourse?

21  A    That's right.

22  Q    Or via one of those two tunnels 135, 35 section?

23  A    Correct.

24  Q    Got it.

25       If you've looking at the 200 level, can you show us

```
 1   where that is on this map?

 2   A   That would be the section between these two dots and then

 3   corresponding third-base side.

 4   Q   And that section there which you're showing is above the

 5   first base or left-field line?

 6   A   That's right.

 7   Q   Right?  That section is narrower in the number of seats as

 8   compared to the 100 level, right?

 9   A   Correct.

10   Q   And if you were trying to get access, is there a vomitory

11   in the 200 level?

12   A   There is not.

13   Q   Is there a tunnel in the 200 level that enables a

14   wheelchair user to access the front row or the middle row?

15   A   There's not.

16   Q   When you're on the 200 level and you're attempting to

17   access that seat there that is accessibly available, how do

18   you get access to it?

19   A   Similar to the main concourse level, where you would go at

20   grade out to your seat.

21   Q   Off the concourse?

22   A   Off the concourse.

23   Q   And what does the concourse on the 200 level have?

24   A   So the concourse on the 200 left has carpeted floor, it

25   has, kind of, premier and unique food offerings that are
```

1  different than throughout the building; it has restrooms,

2  access to security and safety.

3  Q   And those facilities are adjacent to the accessible

4  seating at grade in the 200 level?

5  A   Correct.

6          THE COURT:  And they are in the last rows?

7          THE WITNESS:  There are 13 rows in some sections of

8  the Terrace Club.  They're in Row 11.

9  Q   (By Mr. Willey)  If we look at the 300 level, where is the

10  300 level in this picture?

11  A   The 300 level wraps all they way around here.

12  Q   And when you're in the 300 level, can you show us where

13  the -- well, let me ask you this:  Are there vomitories on

14  the 300 level?

15  A   There are.

16  Q   Where are they?

17  A   You can kind of make them out.  These little black dots

18  here and here and here.

19  Q   What's the, kind of, structural function of the vomitories

20  there?

21  A   The vomitories lead back to the back side of the seating

22  and the main concourse that provides services for that level.

23  Q   Is the concourse on the 300 level at mid level?

24  A   It's, actually, lower than mid.  So the ADA seats in the

25  300 level are Row 5, and there are 25 total rows in the 300

 1    level.

 2    Q    So the vomitories in the 300 level enable access from a

 3    concourse to accessible seats in the 300 level?

 4    A    That's correct, yeah, very similar, exactly, as the club

 5    and main.

 6    Q    Which is to say they're coming in at grade?

 7    A    That's right.

 8    Q    And because of the vomitory structures in the 300 level,

 9    the accessible seats in the 300 level are in Row 5?

10    A    That's right.

11            THE COURT:  And how many were there?  Twenty-five?

12            THE WITNESS:  Twenty-five rows.

13    Q    (By Mr. Willey)  So in the 300 level, you have 25 rows,

14    and the accessible seats are in the fifth row?

15    A    That's right.

16    Q    Okay.

17          Are there any accessible seats in the back row of the

18    300 section?

19    A    There are not.

20    Q    Why not?

21    A    We don't have access, in or out, to those seats.

22    Q    Right.  You've only got access to the vomitory?

23    A    That's right.

24    Q    Okay.

25          Do you recognize this document, Mr. Rogel?

1   A   I do.

2   Q   What is it?

3   A   Similar to the document we saw earlier.  It's a seating

4   and section breakdown of T-Mobile Park.  It also identifies

5   the locations of wheelchair seats that we have throughout the

6   park.

7   Q   So this document doesn't contain all the colors from the

8   other map, but it shows us where accessible seats are located

9   by section; is that correct?

10          THE COURT:  What document is this?

11          MR. WILLEY:  This document is Defendants' 5, Your

12   Honor.

13   Q   (By Mr. Willey)  The wheelchair-accessible locations are

14   illustrated here?

15   A   Yes.

16   Q   What are they illustrated with?

17   A   A wheelchair icon, red in color.

18   Q   So if we look at the red icons that surround the stadium

19   here on the 100 level, those are all the locations on the 100

20   level where there is accessible seating; is that right?

21   A   That's right.

22   Q   So is it 150 down the field line?

23   A   Yep.

24   Q   All the way around to 102 in right center?

25   A   That's right.

1    Q    And if we wanted to find seats in the bleacher level,

2    where are those?

3    A    Near Section 180 in our left-field bleachers, and at the

4    top row of Sections 190 through 195.

5    Q    Sort of center field there?

6    A    That's right.

7    Q    Got it.

8         And we have seating also on 200 level, and those are

9    shown going from the left field; is that right?

10   A    Yes.

11   Q    Is it 247?

12   A    Yep.

13   Q    So 247, 246, 239, 237?

14            THE COURT:  Wait.  Where are you?

15   A    247.

16   Q    (By Mr. Willey)  And then we go to 246, and then 239, 237,

17   all the way around the field.  Those are all 200-level seats;

18   is that right?

19   A    That's right.

20   Q    And then if we wanted to go to the 300 level, we'd do the

21   same thing but starting at 347 on the upper right -- or the

22   upper left?  Excuse me.

23   A    Correct.

24   Q    If I go here, here, here, these are all -- and these are

25   the ones that are in Row 5; is that right?

Malcom Rogel - Cross by Mr. Willey                    October 15, 2019

1    A    That's right.

2    Q    What are the ones that are listed in right field, below

3    the Hit it Here Cafe.   Are those 100-level seats?

4    A    Those are.

5    Q    So these ones here?

6    A    Yep.

7    Q    So looking at this map, if we wanted to understand where,

8    in T-Mobile Park, the locations are for accessible seats,

9    it's everywhere there is a red icon?

10   A    That's right.

11   Q    And do these seats have different views of the field?

12   A    Yes.

13   Q    So, for example, if I'm sitting in, you know, Section

14   150 -- right? -- down by the foul pole --

15   A    Yes.

16   Q    -- that is a different view of the field entirely than if

17   I'm in the fifth row of Section 313, right?

18   A    That's right, yeah.

19   Q    So one can pick different perspectives and angles to the

20   field, distances to the field?

21   A    That's right.

22   Q    This is Plaintiffs' Exhibit 191, a map.

23        When Mr. Connor was asking you questions, you were

24   explaining that the colors here, each one of those represents

25   a different pricing code; is that correct?

1   A    That's correct.

2   Q    And these are ways in which you and your team, when you go

3   to sell tickets, are structuring how you might sell the

4   inventory in the different price ranges, right?

5   A    That's right.

6   Q    How many different pricing slices or sections did the

7   Mariners have in 2019?

8   A    I think it was 28.

9   Q    So 28 different price buckets.

10       When you started working for the Mariners, was that

11  1999?

12  A    That was.

13  Q    How many pricing buckets did the Mariners have at that

14  time?

15  A    Eight.

16  Q    So what's happened between then and now that caused the

17  team selling tickets to go from eight different discrete

18  buckets to 22?

19  A    It's really just a shift in just general ticket practice;

20  to help the teams get to where price and demand meet.  So if

21  we can offer a lot of different pricing options, then maybe

22  certain fans will be able to sit in different areas.  By only

23  having six or eight different price levels, it doesn't

24  provide a lot of choices for the teams to direct their

25  pricing.

1       The structural infrastructure changes that have happened

2   since 1999 is primarily because of technology.  So the

3   ability by the ticket companies to be able to provide

4   different price levels and pricing options is so much

5   different now than it was when I started 20 years ago.

6       The ability to buy these tickets online and be able to

7   market different types of seats, maybe some King's Court in

8   one area and things like that, we're able to bifurcate all

9   these different sections into different price levels and

10  optimize, kind of, our seating plan and our seating pricing.

11  Q   When we look at this map that is Plaintiffs' Exhibit 191,

12  and I want to look at, say -- let's use Section 141.

13  A   Yep.

14  Q   In 141, it looks like there's five different price codes

15  in that section last season; is that right?

16  A   That's right.

17  Q   And that's because we're looking at the different colors,

18  from the dark green in the back down to the yellow-gold in

19  the front?

20  A   That's right.

21  Q   In 1999, how many different price codes would there have

22  been in that section?

23  A   There would have been one.

24  Q   One?  So it used to be one price code, and now it's five?

25  A   That's right.

1   Q   Is this analogous to the way that airlines price seating?

2   A   Yeah, it's very similar.  I mean, if you get an aisle

3   seat, you might pay more; if you get a window seat, you might

4   pay more; if you get a seat towards the front of the plane,

5   you might pay more.

6       Really, it's the lifecycle of ticketing that I've seen

7   over the last 20 years compared to where we may be in the

8   next 20 years is really -- it has changed dramatically.

9       In fact, you know, while we have 28 prices, a number of

10  teams have far, far more prices -- price options than we do.

11  Q   You've got 28 --

12  A   Yes.

13  Q   -- here in 2019?

14  A   That's right.

15  Q   Tell me an example of a team that has a different and

16  larger number.

17  A   The Portland Trail Blazers, I think they have 35.  The San

18  Diego Padres, last year, had 172 price levels.

19  Q   So if we're talking about the Padres, a Major League

20  Baseball team, in their stadium --

21  A   Yeah.

22  Q   -- and if we were looking at a map like this in their

23  stadium, it would have 191 different colors on it?

24  A   They had 172 last year.  This year they're at 305 price

25  levels.

1   Q    So there are a multitude of different price levels at the

2   Padres stadium this past year, something on the verge of

3   eight x from us?

4   A    Yes.

5   Q    And next year they're going to be up in the 300 level

6   because pricing technology and practice is changing over

7   time?

8   A    Yes.

9   Q    So the seats in Section 141 are the same seats that were

10  there in 1999, right?

11  A    That's right.

12  Q    And those seats used to be all priced at one price, and

13  now they're priced at five prices here?

14  A    That's right.

15  Q    If we looked at the seats that are in the accessible

16  seating section of 141, those seats, in 1999, were they

17  priced lower and higher or the same as seats further up?

18  A    They were priced the same.

19  Q    And today are they priced the same or less or more?

20  A    They're the lowest price.  In fact, when we went to this

21  model, one of the -- one of the most often-heard feedback

22  that I got from our guests was that they were paying such a

23  low rate compared to the other seats in that section, and

24  that was --

25              THE COURT:  Which seats?

```
 1              THE WITNESS:  So the seats in the back of the row.
 2   When we were just one price, let's say it was $50 for the
 3   entire section.  In 2012, when we rescaled the building --
 4   that's where you change the price levels -- that $50 ticket,
 5   I think, was $36.  So it dropped significantly.  The very
 6   front row would be $80, but the back row would be $36, and
 7   the year before, they had paid $50.
 8   Q   (By Mr. Willey)  So let me make sure I understand.  Let's
 9   use Section 141 as an example?
10   A   Okay.
11   Q   So in 1999 or 2010 --
12   A   Yep.
13   Q   -- all the seats in 141 had the same price?
14   A   That's right.
15   Q   So if I wanted to sit at Row 11 or Row 2, I paid the same
16   price as the front row, and I'd also pay the same price as
17   the last row?
18   A   Yes.
19   Q   So if I had an accessible seat, I'd pay the same price as
20   someone at Row 11?
21   A   That's right.
22   Q   And when you shifted to the new pricing, Row 11 now has a
23   different price?
24   A   That's right.  It can.
25   Q   It can.  And does it generally have a different price?
```

1    A    Generally, yeah.

2    Q    And the seats that are accessible in Section 41, those

3    have the lower price?

4    A    That's right.

5    Q    Can you tell us a little bit about how tickets are sold,

6    sort of the lifecycle of sales from the beginning of the

7    season, the preseason tickets, through mid-season,

8    single-game sales?  Can you give us a quick summary of that

9    so the court understands?

10   A    Absolutely.  Can I go back to one thing real quick?

11   Q    Absolutely.

12   A    Just so you understand, because ticketing is getting

13   crazier and crazier.

14        The secondary market, which sells tickets after someone

15   has already brought them -- StubHub, SeatGeek, et cetera --

16   they price their seats down to the seat level.  So the

17   secondary market could have 47,000 different prices for our

18   tickets.  And so I tell you that because I'm trying to

19   understand what the future looks like for ticketing, et

20   cetera, et cetera, and the trend I'm seeing is a number of

21   tickets being priced at whatever the clearance price will be

22   for that ticket, whatever someone is willing to pay for that

23   specific seat.

24        I just want to make sure you understood where I'm coming

25   from, since I've seen this forever.  That's where I'm seeing

 1   this kind of going.

 2   Q   Is it fair to say that you're seeing, in the ticket

 3   pricing, processing industry, a much greater nuance?

 4   A   Yes, it's extreme, and it's getting much more granular.

 5   Q   And when you talk about the secondary market, about how

 6   it's more granular, like on StubHub or SeatGeek --

 7   A   That's right.

 8   Q   -- those secondary entities that are not affiliated with

 9   the Mariners; is that right?  The secondary markets and their

10   pricing determinations, those are not Mariner determinations,

11   right?

12   A   That's right.

13   Q   But are they reflective of what you see in ticket pricing

14   granularity, generally?

15   A   Not generally.  I mean, other buildings do not get that

16   granular yet.

17   Q   Fair enough.  They're at --

18   A   They're at the extreme.  I just want to make

19   sure everybody understood --

20   Q   On the cutting edge?

21   A   Yep.

22   Q   Okay.

23       Let's go back to the question I had about the

24   ticket-selling process.

25   A   Sure.

1   Q   So when the Mariners sell tickets now for the 2020 season,

2   when does that start?

3   A   We are set to go out in November with new sales.  So right

4   now we're doing renewals.  So season tickets are being

5   processed and set up now, and then group tickets and

6   single-game tickets will subsequently go out.

7   Q   So if you are a current season ticket holder, you are

8   likely engaging with the team about whether or not you want

9   to renew?

10  A   That's right.

11  Q   And for new season ticket sales, those will start sometime

12  in November, you think?

13  A   That's right.

14  Q   Okay.

15       When tickets go out for season ticket sales in

16  November, is the ticket pricing aligned along with the

17  various codes?

18  A   That's right.

19  Q   If I buy a season ticket in November, and I buy a season

20  ticket, someone else buys a season ticket in the same

21  section, analogous seat, in December, is the price the same?

22  A   Yes.

23  Q   When you put tickets out for availability for season

24  ticket sales, are accessible ADA seats included among them?

25  A   Yes.

1    Q    How do you do that?

2    A    Well, because they are in the same price level, we're just

3    putting a price code out there, a price level that includes

4    those seats, so those seats would be out there for the same

5    as any seat around them.

6    Q    I come to you as a new ticket buyer in late November, and

7    I want to buy an accessible seat for season tickets, do I

8    have the option to buy such a seat in different price codes?

9    A    Yes.

10   Q    And do I have an option to buy that accessible seat in

11   different locations around the stadium?

12   A    Yes.

13   Q    Consistent with the red dot on the maps we looked at?

14   A    Of course.

15   Q    You also talked about -- well, let me ask you this:  If I

16   want to buy a ticket, and I need a seat, an accessible seat,

17   I want a season ticket and I come to you in March, so now

18   March 2020, generally, would you expect the same range of

19   options for seats?

20   A    No.

21   Q    Why?

22   A    Because we've sold through so much of our inventory at

23   that time that the pool of available seats to buy has been

24   reduced.

25   Q    Fair enough.

1          So if I want to see the best options, the widest ranges

2     of options, I shop early, and as I get closer to the season,

3     inventory has been sold?

4     A    Yes.

5     Q    What are group sales?

6     A    Maybe Judge Rothstein is going to take her crew to a

7     Mariner game, and she's going to take 40 people.  They'll

8     call the Mariners and buy a group of tickets for them to

9     enjoy.

10    Q    And are those tickets sold in advance of a season in the

11    same way season tickets are?

12    A    They are sold in advance of the season, yes.

13    Q    Are they sold at a later point, or do they generally go on

14    sale at a different point than the season tickets?

15    A    That's right.  So their sale cycle is different than the

16    season ticket sale cycle, and they last throughout the entire

17    season.

18    Q    So season tickets will go on sale the earliest?

19    A    That's right.

20    Q    Then group sales?

21    A    Then group and single game.

22    Q    And if you are buying a group sale bucket of tickets in

23    February, that price is consistent with the price code for

24    that section; is that right?

25    A    The price always -- the seat always lives within that

 1   price level, but it's not necessarily the same price.

 2   Q    It might change?

 3   A    That's right.

 4   Q    When you put tickets out for group sales, are ADA

 5   accessible seats included in those group sale options?

 6   A    Yes.

 7   Q    Does the ticket sale cycle and process for less-than-full

 8   season packages, 20-game packages, half-season packages, is

 9   it consistent with the season ticket sales process?

10   A    Say that again.

11   Q    Poor question.

12   A    Yep.

13   Q    When you're talking about season ticket packages that are

14   not for every game, like a 20-game package or a half season,

15   is that process, the sales process, the inventory

16   availability, the selling, consistent with full season?

17   A    It is.

18   Q    If I wanted to buy a 20-game package with an accessible

19   seat, is the availability different in November than in

20   April?

21   A    Yes.

22   Q    What would be different that you would expect?

23   A    We sell through a lot of that inventory.

24   Q    So the inventory is less in April?

25   A    Yes.

1   Q    In fact, if I wanted a 20-game package in a particular

2   section with an accessible seat in April, it might not be

3   available?

4   A    Correct.

5   Q    Let's look at Defense Exhibit 21, please.  This is Defense

6   Exhibit 21.  Do you recognize the information on this

7   exhibit?

8   A    I do, yes.

9   Q    And when you were talking with Mr. Connor a few minutes

10  ago, you were talking about your declaration; is that right?

11  A    That's right.

12  Q    And this is information that you had put forth in your

13  declaration; it's just now on the table?

14  A    That's right.

15  Q    What does this information show?

16  A    This details section and then a seat, and then the price

17  of that seat.  The seat, any row that ends with an A like

18  that, 17A, that's a wheelchair seat.

19  Q    So these are seats that were assessed for potential

20  purchase via -- for single-game sales; is that right?

21  A    That's right.

22  Q    These are not season tickets?

23  A    No.

24  Q    By which are these purchased?

25  A    The Internet.

1    Q    TicketMaster, via Internet?

2    A    Yes.

3    Q    So these seats were for a game in September of 2019; is

4    that right.

5    A    Yes.

6    Q    And each one of the seats listed here is an accessible

7    seat?

8    A    That's right.

9    Q    So they range from price, at the top, from $17, to the

10   bottom, at $75?

11   A    That's right.

12   Q    And each one of the sections we have 100s and 300s and

13   200s, right?

14   A    That's right.

15   Q    The seat at the bottom here that is Section 135, 1A for

16   $75, that's a seat that's in the Diamond Club/Premier

17   section, correct?

18   A    That's correct.

19   Q    But its code is connected to the Premier seat, not the

20   Diamond Club?

21   A    Correct.

22   Q    Got it.

23        And this is what you were talking about when you spoke

24   to Mr. Connor about it being the 135 section versus 35?

25   A    Yeah.  In the actual declaration, the image shows "35,"

 1   but it should be "135," as shown here.

 2   Q   Got it.

 3       So there's a typo that's being corrected here?

 4   A   That's correct.

 5   Q   And this seat that's 135, 1A, for $75, for the Reds on

 6   September 10th, where is that located?

 7   A   Right behind the plate, near that vomitory leading out.

 8   Q   Okay.  And it's front row?

 9   A   That's right.

10   Q   Got it.

11       MR. WILLEY:  We're at a good stopping point.  I'm

12   going to be switching topics.

13       THE COURT:  How much more do you have?

14       MR. WILLEY:  About 20 minutes.

15       THE COURT:  Great.  Then we can start with our second

16   witness for the day, unless you have --

17       MR. CONNOR:  I'll have some recross [sic], but not

18   much.

19       THE COURT:  Not much, or much?

20       MR. CONNOR:  I'll try to keep it limited.

21       THE COURT:  Go through it, because we don't want to

22   repeat.

23       Okay.  I'll see you all back here -- can you make it in an

24   hour, counsel?  Can you get that done?  See you back here at

25   2:00.

1                          (Court in recess.)

2            THE COURT:  Whenever you're ready, counsel.

3    Q   (By Mr. Willey)  Mr. Rogel, if you could, please, tell the

4    court what flex seating is.

5    A   With regards to our ADA seats, flex seating is where we've

6    set a number of spaces.  Instead of a fixed seat bolted into

7    the ground for the companion, we've actually made our ADA

8    areas with spaces, and within that and what that allows is

9    that a guest can come up and either fit their wheelchair into

10   that space, or they can use a folding chair for that space.

11          The reason and the benefit that we see is that a number of

12   our guests might have two or three wheelchairs, and in our

13   previous design, you couldn't actually seat them together.

14   So in this new design, we could have three, four, five, six

15   wheelchairs next to each other, and they can all enjoy the

16   game together.

17          I think we did that in 2016.  It was a big improvement.

18   We were really happy about that.  In fact, I walked around --

19   you know, I work every game, and I walk around and talk to

20   some of our guests in those locations, and they loved it.

21   They were really excited about it.

22          Anyway, I just wanted to clarify what that was.

23            THE COURT:  I'm afraid I didn't understand.

24          You're talking about having a space for a wheelchair and

25   also a folding chair that somebody could move from wheelchair

1    to the folding chair?

2           THE WITNESS:  Yeah.  So you can either have a folding

3    chair and sit there, or remove the folding chair and pull

4    another wheelchair in.

5        So in other buildings, what they'll have is they'll have

6    fixed, bolted-down seat, and a space right next to it.  At

7    T-Mobile Park, we have space, space, space, space, and that

8    just allows a lot more flexible choice in how you want to sit

9    in those ADA seats.

10   Q   (By Mr. Willey)  Let's see if we can get more detail on

11   that?

12          Say we have a section of seats that are ADA and

13   companion seats, and we have eight seats.  In the old world,

14   in the pre-flex-seat world, how would that be set up with

15   fixed seats in the ground and wheelchair-accessible spaces?

16   A   Yeah.  So, for example, the very first seat might be a

17   wheelchair space, and then the next two would be bolted-in

18   seats, and then the seat next to that would be a wheelchair

19   space, and then another wheelchair space, and then a

20   bolted-in seat.  So it wasn't very customizable and just not

21   super convenient for our fan base.

22   Q   In that scenario you described just previously, you, in

23   that section, would have a number of limited

24   wheelchair-accessible spaces because there were also

25   bolted-into companion spaces?

```
 1              THE COURT:  I think I got it.
 2   Q   (By Mr. Willey)  Those have all been removed?
 3   A   That's right.
 4              THE COURT:  And they're all folding chairs instead
 5   of bolted chairs, so it's flexible.
 6              THE WITNESS:  That's right.
 7              THE COURT:  They can be removed.
 8              THE WITNESS:  Yes.
 9   Q   (By Mr. Willey)  And accessible seating at T-Mobile Park
10   is all flex seating now; is that correct?
11   A   Yeah.  The Diamond Club is the last one we have to do, and
12   that will be in this next season.
13   Q   So in 2020, all accessible seating in the stadium is
14   flexible?
15   A   Yep.
16   Q   Okay.
17              MR. WILLEY:  I'd like to look at Defendants' 6,
18   please.  If you can enlarge to the top screen, please, Rondi.
19   Q   (By Mr. Willey)  So this is an exhibit, Mr. Rogel, that
20   was previously filed with the court with your declaration.
21        Can you tell us -- explain what the top screen we're
22   looking at shows?
23              THE COURT:  The what shows?
24              MR. WILLEY:  I'm sorry, Your Honor?
25              THE COURT:  You asked that question too fast.  What
```

1    did you say?

2          MR. WILLEY:  I'm asking Mr. Rogel to explain to us

3    what the top screen here shows.  The exhibit has two screens

4    on it, and I'm asking him to explain the top screen.  These

5    are the different views one sees in TicketMaster, and I'm

6    asking him to explain what the top is.

7          THE COURT:  What number is that?

8          MR. WILLEY:  This is Defendants' 6, Your Honor.

9    A   So this screen actually details what we call the

10   interactive seat map, and this is from the purchase page

11   within TicketMaster.  So this is how a fan will interact with

12   our ticketing system to purchase a ticket.

13       All those individual dots are actual, physical seats that

14   are located down in the building, and then you can select

15   which seat you'd like, and choose to buy it or not, or shop

16   around.

17   Q   (By Mr. Willey)  And for the screen that's being shown

18   here, what is the seat that's being contemplated for

19   purchase?

20   A   That one would be the Premier ADA seat, the 135, Row 1A.

21   Q   And that's the one that's down right on the field level,

22   next to home plate?

23   A   Yeah, right around there, and that's the $75 ticket we

24   were referencing earlier.

25          MR. WILLEY:  Rondi, if you could shift that so we now

1    look at the bottom screen, and enlarge that just slightly.

2    Q    (By Mr. Willey)   What is this screen, Mr. Rogel?

3    A    So within TicketMaster ticket system, if you select a seat

4    that is designed to be an accessible seat, the purchaser is

5    alerted to the fact that they've chosen that seat, and then

6    they must agree to the terms and understanding of when you

7    make that purchase, you're declaring that you need that kind

8    of seat for some reason.  This is set up to help against

9    fraud or prevent people from buying those seats that wouldn't

10   otherwise need them.

11   Q    And this is something that the purchaser has to

12   affirmatively opt into?

13   A    Yeah.  This is -- it's not default checked.  It's

14   something that you'd have to actively check.

15   Q    So by clicking the box on the bottom left, you are

16   representing that you or a member of your party has a

17   disability that requires accessible features provided by the

18   seating?

19   A    That's correct.

20   Q    In 2020, do you anticipate that there will be additional

21   ADA accessible seats at T-Mobile Park?

22             THE COURT:  I'm sorry.  Can you repeat that?

23             MR. WILLEY:  Yeah.

24   Q    (By Mr. Willey)  In the 2020 forthcoming season, do you

25   anticipate that there will be additional ADA accessible seats

1    at T-Mobile Park?

2    A    We will have that increase, yes.

3    Q    And where is the net increase coming from?

4    A    Well, this -- we have a project on the Terrace Club that

5    is creating some new seating options for our guests.  We have

6    these loge boxes, which is like a couch setup.  And then we

7    have these four-top tables, where you can sit in a group of

8    four.  Within each of those, there will be associated ADA

9    seats.  And beyond that, because we're making this change,

10   we're able to expand the existing ADA seats that are

11   associated to the Terrace Club seats, the general seating.

12   That is a net increase as well.

13   Q    I want to show you what's been marked as Defendants' 20.

14   This is an article from the *Ballpark Digest* magazine, from a

15   couple of weeks ago.

16        Does this include the Terrace Club project you're

17   talking about?

18   A    Yeah, it's included in this article.

19        MR. WILLEY:  Can you slide down, Rondi, to the

20   picture of the seats?

21   Q    (By Mr. Willey)  If we're looking here at the bottom

22   picture, what is that depicting?

23   A    So those are the loge boxes in the Terrace Club.

24   Q    And what's occurring in terms of -- we're moving certain

25   seats within the Terrace Club?

```
 1   A    Yeah.  We're, essentially, taking out the back six to
 2   eight rows, depending on if it's loge box or a four-top
 3   table, and converting these into a more group-type seating
 4   area.
 5   Q    And does the loge -- these bench seats, does it include
 6   accessible seating?
 7   A    It does.
 8             THE COURT:  How does it include accessibility
 9   seating?
10             THE WITNESS:  So it doesn't really show here, but if
11   you look at the gentleman wearing the Mariner logo white
12   T-shirt, there's space right there that they'd be able to
13   come off grade and pull right into that loge box.
14             THE COURT:  There's no bench there?
15             THE WITNESS:  There's no bench, you're right, and
16   there's no folding seat that would get pulled out.
17             THE COURT:  So how many seats are you planning to
18   allow for?
19             THE WITNESS:  As far as the number of ADA --
20             THE COURT:  As far as this remodeling, yes.
21             THE WITNESS:  -- or the total seats for the project?
22             THE COURT:  ADA seats.
23             THE WITNESS:  I think it's two in the loge box and
24   four on the four-top tables, but I'm not certain.  I don't
25   have it in front of me.
```

 1              THE COURT:  So six?

 2              THE WITNESS:  Yeah, I think so.  Don't quote me.  But

 3     it's somewhere around there.  I don't have it in front of me.

 4              MR. WILLEY:  Rondi, if you could slide down to the

 5     next page.

 6     Q   (By Mr. Willey)  What is being shown in the top picture

 7     here?

 8     A   So in the top picture, this is the four-top table, and all

 9     four of these are, actually, ADA accessible.  We could have a

10     set of four.  It kind of goes back to that flex ADA design

11     that we have.

12     Q   So the loge seating, bench seating, and then there's the

13     four-top table seating?

14     A   That's right.

15              THE COURT:  Is this part of 20?

16              MR. WILLEY:  Yes.

17     Q   (By Mr. Willey)  And the four-top table seating shows four

18     chairs there?  It looks like they're on casters?

19     A   That's right.

20     Q   And all of those seats are ADA accessible?

21     A   Yes.

22     Q   Okay.  Are there --

23              THE COURT:  Let me ask you something.

24              THE WITNESS:  Yes?

25              THE COURT:  So am I correct in assuming that this

 1  Terrace-level seating is on the same level as the concourse

 2  that provides access?

 3          THE WITNESS:  Yeah.  The four-top and the loge seats

 4  are at the very top of those sections so that you can come

 5  right in off the concourse, yes.

 6          THE COURT:  Okay.

 7  Q   (By Mr. Willey)  This is accessing off the 200-level

 8  concourse?

 9  A   That's right, yes.

10  Q   Are there ADA accessible seats that will be provided as

11  part of this rehab project, remodeling project that are not

12  in the loge boxes or on the four-top?

13  A   Yes.  Yeah, two of the sections will have the standard ADA

14  seats in the back, right at the top of the level there on the

15  concourse.

16          THE COURT:  Which concourse?

17          THE WITNESS:  The Terrace Club level.  So the

18  existing ADA seats that we have on the 200 level, it will be

19  that same thing, just a few more of them.

20          THE COURT:  How many more?

21          THE WITNESS:  I think two more increase.

22          THE COURT:  So there are already ADA seats at this

23  level?

24          THE WITNESS:  Yes.

25          THE COURT:  How many are there?

```
 1           THE WITNESS:  There's 15 in these sections that are
 2    being impacted, and then we go to 17.
 3    Q   (By Mr. Willey)  When you refer to 15, you're referring to
 4    these specific sections, not the entirety of the 200 level?
 5    A   Correct.  That's part of this project, yes.
 6    Q   So within these sections that are being affected by this
 7    work, there is a net increase in the ADA accessible seating;
 8    is that right?
 9    A   That's right.
10    Q   And the nature and variety of that seating will now be
11    three different options, as depicted here?
12    A   That's right.  Yeah, a net increase of two ADA, I'd like
13    to call it, and then the increase of the four-top tables and
14    the loge box ADA.
15    Q   And these different seats have different price points as
16    well, correct?  They're not all the same?
17    A   That's right.
18    Q   Do you have any knowledge as to how the sight lines for
19    the spectators here will change, if at all?
20    A   I don't have any knowledge of that, no.  Sorry.
21    Q   Okay.
22           You were talking about the sections, where are the
23    sections that are being impacted by the work being described
24    here in Exhibit 20?
25    A   They are on the first-base side.  You can kind of see how
```

1    it relates to the field there.  Section 219 through 227,

2    right in there.

3    Q   So from, roughly, the home baseline extending toward first

4    base?

5    A   That's right.

6    Q   Got it.

7        Is this kind of project something that is contemplated

8    to be expanded in any way?

9    A   Based on performance.  Like, we think these will be very

10   popular.  They've already received a lot of inquiries from

11   different ticket buyers that might be interested in these.

12   If they sell through really well, then we can probably expand

13   that over to the third-base side as well.

14       MR. WILLEY:  Those are all my questions, Mr. Rogel.

15   Thank you.

16       THE WITNESS:  Okay.

17                    REDIRECT EXAMINATION

18   BY MR. CONNOR:

19   Q   Mr. Rogel, I want to understand what was just on the

20   screen in terms of this project.

21   A   Okay.

22   Q   The net effect of that is going to be two additional ADA

23   seats?

24   A   For the standard ADA.  And so what I'm determining -- the

25   standard is seats that are associated to the fixed,

1   single-games seats in the rest of the Terrace Club.

2   Q    So when you're deciding whether you're complying with the

3   ADA, you're counting standard ADA seats, correct?

4   A    Yeah.  So the standard ones I'm talking about are going to

5   the fixed seats that currently exist.  On top of that, there

6   are new ADA seats that are added for both the loge and the

7   four-top tables.

8   Q    The total number, though, of standard ADA seats that is

9   going to be created by this is a net of plus two?

10  A    That's right.

11  Q    Okay.  So there will be two more seats --

12       MR. CONNOR:  Derik, can we put up Defendants'

13  Exhibit 5, please?

14  Q    (By Mr. Connor)  So these seats will be going in, I think

15  you said, the sections between 219...?

16  A    Yeah.  I think it's, actually, 220 to 227.

17  Q    220 to 227.  All right.

18  A    Yeah.

19  Q    So all of those sections will be adding a net of two ADA

20  seats; is that right?

21  A    A net standard, two ADA.  There are additional ADA that

22  are for those other seat offerings.

23  Q    Well, let's be a little precise here.

24  A    Of course.

25  Q    What's your distinction between by standard and

1   nonstandard ADA seating?

2   A    So what I would consider standard are the fixed seats that

3   are currently existing within the Terrace Club, the regular

4   seats that are there now, we're bringing in two new

5   offerings, one is a loge box, one is a four-top table.

6        My point is that the seats that are expanding plus two,

7   those represent the ADA seats that we are associating to the

8   fixed seats that are down between Rows 1 and 6.

9             THE COURT:  Is the difference that the two -- what

10  you're both calling standard, are bolted, fixed?

11            THE WITNESS:  They're associated to the fixed seats.

12  So the fixed seats that are down Row 1, 2, 3, they're there

13  today, they were there ten years ago.  Those existing seats

14  have ADA seats that go with them.

15            THE COURT:  Right.

16            THE WITNESS:  That amount of ADA seats is plus two.

17  Now, beyond that we're also introducing two new --

18            THE COURT:  I got that.  The loge and the table.

19            THE WITNESS:  Right.  So my point is, there is those

20  flex spaces, and those associate to those fixed seats in the

21  first couple of rows, and then there's new seating that has a

22  totally different experience.

23  Q    (By Mr. Connor)  I thought, when you were originally

24  testifying, you had said you didn't know whether those

25  additional seats counted as accessible seats.

 1   A   They do count as -- they are accessible seats.  The loge

 2   and the four-top tables have accessible seats.  I don't know

 3   exactly the number.

 4   Q   So you can't tell --

 5   A   I have my phone.  I could probably look it up.

 6   Q   Okay.  I don't know if I want take the judge's time.

 7        But you can't tell her right now how many net seats are

 8   being added --

 9            THE COURT:  I thought you said six.

10            THE WITNESS:  I think it's about six.  It may be

11   more.

12   Q   (By Mr. Connor)  Okay.  And, again, those will all be at

13   the rear of the 200 level?

14   A   Correct.

15   Q   Any plans for additional ADA seats anywhere else?

16   A   If we do expand to the first-base side, based on our

17   understanding of what's happening on the -- or expand to the

18   third-base side, based on what's happening on the third base,

19   we could see expansion.  I could see that.

20   Q   Okay.  But there is no current plans to do that?

21   A   No current plans, no.

22   Q   And are there plans that will reduce the current ADA

23   seating elsewhere in the stadium?

24   A   No, not currently.

25   Q   Okay.  Are there any that have been discussed in terms of

1   reducing ADA seating?

2   A   No.

3   Q   Okay.

4        MR. CONNOR:  Derik, can you put up Exhibit 6, and

5   focus in on the top exhibit?

6   Q   (By Mr. Connor)  Mr. Rogel, you indicated that this is a

7   screenshot of the TicketMaster site, correct?

8   A   Yes.

9   Q   And what has been pulled up is, there's a seat that can be

10  purchased in Section 135, which is a Premier seat, correct?

11  A   Yes.

12  Q   That's accessible, correct?

13  A   Yes.

14  Q   And if we look at this diagram, it's that dot there, isn't

15  it?

16  A   That's right.

17  Q   Okay.

18       Are there any other seats available in the Diamond Club

19  or accessible seating available?

20  A   For that particular game, no.

21  Q   Okay.

22       When was this accessed, do you recall?

23  A   I don't know.  It says, "Filed June 10."  I don't know

24  what that means.  Maybe that's it.

25  Q   Okay.

1           So as of June 10th, if somebody wanted to buy -- there

2    was only one accessible seat available in Premier/Diamond

3    Club for the September 10th game, correct?

4    A    That's correct.

5    Q    Let's look at the bottom part of that exhibit, and focus

6    in on that.

7           Mr. Rogel, Mr. Willey asked you about this screen, and

8    as I understand it, it's a screen that, in order to purchase

9    that seat that we were just looking at, a buyer would have to

10   touch the screen and say "I agree," correct?

11   A    Yes.

12   Q    Okay.

13          And part of what that screen says is that the purchaser

14   agrees that they need -- have a right to accessible seating,

15   correct?

16   A    Correct.

17   Q    Okay.

18          It also says that TicketMaster may investigate

19   potential misuse of accessible seating where there is good

20   cause to believe such seating has been purchased

21   fraudulently.

22          Has TicketMaster or the Mariners ever actually

23   investigated the seats that are being sold as accessible

24   seats are being used by people entitled to them?

25   A    I can't speak to what TicketMaster does or does not do,

1    but I can speak to the Mariners -- or me specifically.

2        I've never investigated whether someone needs a wheelchair

3    seat or not.  In fact, I make sure I don't ask if they are in

4    need of any kind of a wheelchair seat if they're seated in

5    that space.  I'm not sure what the disability may be that had

6    them check this button to purchase that ticket.

7    Q    Okay.

8        But the point is, you don't actually do anything to

9    verify that these seats have been sold?

10   A    I don't investigate.

11   Q    To your knowledge, does anybody with the Mariners

12   organization do that?

13   A    Not to my knowledge.

14   Q    All right.

15       And my understanding from the testimony of Mr. Gooby --

16   and tell me if you think this is correct, and we'll have

17   Mr. Gooby here himself -- but the people -- the ushers at the

18   Mariners stadium are instructed not to ask people about their

19   entitlement to such seating.

20   A    You can clarify with him, but I think that sounds

21   accurate.

22   Q    Have you seen people that aren't using wheelchairs seated

23   in the wheelchair-accessible areas?

24   A    Yes, absolutely.

25   Q    Have you seen them seated there not accompanied by a

Malcom Rogel - Redirect by Mr. Connor                                October 15, 2019          137

1    wheelchair user?

2    A    Yes.

3    Q    And have you done anything when you've seen that?

4    A    No.  No.  I mean, it could be a heart condition.  It could

5    be a number of things.  I'm not going to investigate on that.

6              MR. CONNOR:  Derik, can you pull up Plaintiffs'

7    Exhibit 234?

8    Q    (By Mr. Connor)  Mr. Rogel, you had spoken with Mr. Willey

9    about this exhibit, and you discussed with him where the

10   access points were, correct?

11   A    We did not discuss access points.  We just -- oh, I see

12   what you're saying.  Like the vomitories?

13   Q    Yes, yes, right.

14   A    Yes.

15   Q    And you said, basically, there were two vomitories that

16   provide access to the field level --

17   A    Yes.

18   Q    -- the front-row seats, right?

19   A    Right.

20   Q    And are there vomitories up on the third level?

21   A    Yes.

22   Q    Okay.

23        Now, the reason there is only access to the front-row

24   seats through those two vomitories that you described is

25   because that's how the stadium was built, correct?

1    A    Correct.

2    Q    Okay.  And, conceivably, the stadium could have been built

3    differently such that there would have been other vomitories

4    providing access closer to the field, correct?

5    A    I'm no expert in that field.  I'd leave that to the

6    engineers.

7    Q    Okay.

8         You and Mr. Willey talked at length about the trend

9    that you see in pricing, and how there is a whole bunch of

10   different price codes, and we looked at that colored chart

11   that I won't bother to pull up again.

12        But the reason you're able to have all those different

13   price points is precisely because supply and demand says that

14   customers distinguish between seats in certain rows and seats

15   not very far back from them, right?

16   A    The reason we can do it is because of the ticket system.

17   The reason --

18   Q    I misspoke.

19   A    Yeah.

20   Q    Let me strike that question and ask another.

21        I thought that you told Mr. Willey that you -- the move

22   was heading in this direction of further and further

23   differentiating the pricing because it allowed you to meet

24   consumer demand, correct?

25   A    Yes.

1   Q   And the reason you can do these distinctions is because

2   consumers are now seeing a difference between sitting in Row

3   5 and sitting in Row 17, right?

4   A   I'd say the consumers have seen that difference for years,

5   yes.

6   Q   Okay.

7        Well, previously, though, you said at one point in time

8   all the seats in the lower tier are priced the same, correct?

9   A   Yes.

10  Q   But it's become apparent to the Mariners and other

11  organizations that spectators actually care about minor

12  differences, or more minor differences, between the seating

13  locations, right?

14  A   Yes.

15  Q   And that's what's allowed you to do this differential

16  pricing?

17  A   All of that is what's motivated it, yes.

18  Q   What's allowed you to do it is the computerization --

19  A   Yeah --

20  Q   And the motivation is that consumers make those

21  distinctions, correct?

22  A   Correct.

23          MR. CONNOR:  All right.  That's all I have.

24          THE WITNESS:  That's correct.  I appreciate it.

25          THE COURT:  Anything, counsel?

```
 1              MR. WILLEY:  No, Your Honor.

 2              THE COURT:  You'll be glad to hear you may step down.

 3              THE WITNESS:  Thank you, Your Honor.

 4              THE COURT:  That means you may stay or go as you

 5     wish.  Most people choose to leave us, I'm afraid.

 6              MR. CONNOR:  Your Honor, at this time, we'd like to

 7     call Trevor Gooby.

 8              THE COURT:  Please step forward and be sworn.

 9     TREVOR GOOBY,                    HAVING BEEN FIRST DULY SWORN,
                                        TESTIFIED AS FOLLOWS:
10

11              THE CLERK:  Please state your full name for the

12     record, and spell your last name.

13              THE WITNESS:  My name is Trevor Gooby, G-o-o-b-y.

14                         DIRECT EXAMINATION

15     BY MR. CONNOR:

16     Q   Good afternoon, Mr. Gooby.

17     A   Good afternoon.

18     Q   You and I met before?

19     A   Yes.

20     Q   I took your deposition?

21     A   Yes.

22     Q   And you were presented to me as a representative of the

23     Mariners to discussed certain topics.  Do you remember that?

24     A   Yes.

25     Q   Okay.
```

1           And among the topics that I think you and I discussed

2     were past renovations to the T-Mobile -- what's now T-Mobile

3     stadium and future renovations, correct?

4     A    Correct.

5     Q    Okay.  I'm going to ask you a few questions about that and

6     a few other questions, and I won't have you on the stand too

7     long today.

8           Before I get to these, could I have you explain to

9     Judge Rothstein what your position is with the Mariners?

10    A    Yes.  I'm senior vice president of ballpark operations.  I

11    oversee the day-to-day operations of ballpark.  That includes

12    maintenance, construction, housekeeping, security, event

13    operations, et cetera.

14    Q    And how long have you had that position?

15    A    I started in the fall of 2016.

16    Q    And prior to that, what was your immediate employment

17    background?

18    A    Prior to that, I worked for another baseball team, the

19    Pittsburgh Pirates.  I was there from 2005 through 2016.

20    Q    Mr. Gooby, as I recall, you described, among your --

21              THE COURT:  Counsel, slow down, please.

22              MR. CONNOR:  Sorry, Your Honor.  Yes.

23    Q    (By Mr. Connor)  Among the responsibilities in your

24    present position with the Mariners is to oversee guest

25    experience, correct?

1   A    Yes, that's included in the event operations part of it,

2   yes, guest experience.

3   Q    Okay.  And what does that mean?

4   A    So that means we handle any compliment, complaint,

5   suggestion from any fan that comes into the ballpark, to make

6   sure that all of our fans have a great experience at the

7   ballpark.

8   Q    Okay.

9        When I took your deposition, it was in May of this

10  year, correct?

11  A    Yes.

12  Q    All right.

13       I asked you whether you had ever gone around the

14  stadium with a person in a wheelchair.  Do you remember my

15  asking you that?

16  A    Yes.

17  Q    And you told me at that time you had not done so, correct?

18  A    No, I have not done that.

19  Q    Okay.

20       Is that part of the guest experience for somebody in a

21  wheelchair?

22  A    My responsibility of that?

23  Q    Would that be part of your responsibility to see how the

24  guest experiences are for people using wheelchairs?

25  A    No, that would not be my direct responsibility, no.

1  Q   Whose direct responsibility would it be?

2  A   I have an assistant director of guest experience.  Her

3  name is Melissa Leung.  Part of my job is to receive the

4  complaints or compliments after the fact, and deal with the

5  situation.

6  Q   Okay.  You never proactively tried to see what the guest

7  experience was for people in wheelchairs?

8  A   We do proactively on all guest experience, but for this

9  specific example, as you said, have I gone around with

10  someone in a wheelchair, I have not done that, no.

11  Q   Mr. Gooby, one of the first things we discussed in the

12  deposition was renovations that have been done prior to the

13  deposition, major renovations to T-Mobile stadium.  Do you

14  remember that?

15  A   Yes, we did.

16  Q   And you told me -- I think we discussed four major --

17  sorry.  Let me take a step back.

18      Could you explain to Judge Rothstein how you had gone

19  about figuring out what had been done in terms of renovations

20  prior to the time that you were there?

21  A   Sure.

22      So I spoke to members of my team that had been with

23  the organization for previous years, and talked to them about

24  projects we had done.

25  Q   And I thought you indicated you reviewed files as well?

1    A    We have some files of projects that we've done in the most

2    recent years, correct.

3    Q    Okay.

4         Among things that you told me that had been done since

5    2001, major projects you identified, there were revisions to

6    Edgar's Cantina, correct?

7    A    Yes.   That's part of our 'Pen renovation.

8    Q    And can you describe, very briefly, for Judge Rothstein

9    what that was?

10   A    Sure.

11        That's a section that's located in our outfield area.

12   It's a space behind the outfield wall that is a

13   fan-engagement area, where fans purchase a ticket for

14   anywhere in the ballpark and can go to that section.   It's

15   close to the field.   It has different food options.   It's

16   close proximity to the bullpens.   That's why it's called The

17   'Pen.   And then, like you mentioned, Edgar's Cantina has a

18   restaurant, slash, bar in that area.

19   Q    You also told me that this stadium had gotten a new

20   lighting system, correct?

21   A    Correct.

22        MR. WILLEY:   Your Honor, I'm going to object, just to

23   raise the issue of what the relevance is to the two remaining

24   issues in the case.

25        THE COURT:   What is the relevance?

1          MR. CONNOR:  Well, Your Honor, we've seen in

2     declarations of Mr. Gooby and the summary judgment motions,

3     and I anticipate we're going to hear testimony to the fact

4     that the Mariners -- well, they're telling you what they're

5     going to do prospectively, and I think, in that regard, I'm

6     entitled to talk about -- and they put up what their plans

7     are.  I want to do some history of what they have and haven't

8     done.

9          THE COURT:  Well, I thought that one of the benefits

10    we were gleaning from the fact that you-all had resolved some

11    issues was that we're going to focus on the two remaining

12    issues.  Tell me what the relevance is.

13         MR. CONNOR:  Well, Your Honor, to the extent that

14    Mr. Rogel just was on the stand and asked about the future

15    things that were going to be done by the Mariners, I would

16    like to establish what the Mariners track record is with

17    respect to doing things.

18         THE COURT:  Are you doubting they're going to do what

19    they've told me they're going to do?  Because if that's the

20    case, we can cure that easily.  We don't have to go through a

21    track record.

22         MR. CONNOR:  Okay.  All right.  Then I won't do that.

23         THE COURT:  We can take care of that in a much more

24    direct fashion.

25         MR. CONNOR:  Okay.  Good.  That's what I'm hoping.

Q    (By Mr. Connor)  All right.  Mr. Gooby, we will narrow our

questions?

          We'll put up the map, 191.

          Mr. Gooby, I've discussed with Mr. Rogel, at length, a

lot of the seating issues that you and I also talked about in

your deposition.  There was a point that we got into, and I

wanted to follow up on.

          We had a discussion about the fact that fans are held

in the tunnel, in the area, as I understood it, down towards

the field, while a play is going on.  Is that correct?

A    I'm not exactly sure what tunnel you're talking about.

Q    Well, let me ask you this:  Are there tunnels down near

the Diamond and Premier Club seating?

A    We have vomitories that go from our service tunnel, which

runs from foul pole to foul pole, underneath the stadium, and

the vomitories go on to the field, correct.

Q    Are there TV monitors in those vomitories?

A    I believe so, yes.

Q    Okay.  And what is the reason for those TV monitors?

A    Those TV monitors would be for people to watch the game.

Q    And I understand people are actually held in those

vomitories while a play is going on?

A    We don't allow fans in any sections in the ballpark to

access the aisles while a play is going.  So that's the same

policy --

1    Q    Anywhere in the stadium you do that?

2    A    Correct.

3    Q    Okay.

4         And the reason is that you don't want the fans' views

5    to be obscured while a play is going on, correct?

6    A    There's a safety reason.  It's a suggestion that we make

7    to our fans.  The ushers are at the tops of the aisles or

8    sections, and they suggest to fans to not walk up and down

9    the aisles or access the vomitories during the time that the

10   ball is in play.

11   Q    And the reason for that, in part, Mr. Gooby, is because

12   you don't want the other fans' views to be obscured, correct?

13   A    That would be one of the reasons, or safety.

14   Q    Okay.

15        Mr. Gooby, the stadium is leased by defendant entities

16   in this lawsuit from a Pubic Facilities District, correct?

17   A    That's correct.

18   Q    And there is a lease agreement with that entity, correct?

19   A    That is correct.

20   Q    Okay.

21        And I believe you told me that pursuant to that lease

22   agreement, all structural changes that are to be made to the

23   facility have to be approved by the Public Facilities

24   District; is that correct?

25   A    We just recently signed a new lease with the PFD, but

1  prior to that, we informed the PFD of projects that we were

2  doing inside the stadium, similar to what a tenant would

3  explain to a landlord.

4  Q   Okay.

5      Is there anything different about the lease that you

6  signed recently?

7  A   The new lease that we have, we present to the PFD a

8  handful of times a year on different projects that we're

9  looking at, and they have approval of those projects.

10  Q   Okay.

11     So in order to do -- what types of projects have to be

12  presented to the PFD?

13  A   So any infrastructure projects that we're working on

14  inside the ballpark, as well as any upgrades, need to be

15  presented to the PFD.

16  Q   Okay.

17     And I won't belabor the discussion, but there were

18  renovations done to the Diamond Club area to provide

19  accessible seating last year, correct?

20  A   That is correct.

21  Q   Okay.

22     Were those the types of changes that were submitted to

23  the PFD for approval?

24  A   So was that part of the previous lease, but we did inform

25  the PFD of that project.

Trevor Gooby - Direct by Mr. Connor                    October 15, 2019

1   Q    Okay.  And they approved that project?

2   A    They were aware of that project, yes.

3   Q    So were those the types of projects that you would need,

4   under the current lease, to get approval from the PFD to do?

5   A    Yes, moving forward, all projects need to be approved by

6   the PFD.

7   Q    Okay.

8        Mr. Gooby, D-20 is on the screen in front of you.  Have

9   you seen this?

10  A    Yes.

11  Q    Okay.

12       That's an announcement of upgrades that the Mariners

13  plan to do to T-Mobile Park, correct?

14  A    I believe this is an article that someone wrote about the

15  upgrades that we're doing.

16  Q    Okay.

17       Did the Mariners release a press release that included

18  this information?

19  A    Yes.

20  Q    Okay.

21       And that press release indicated what the Mariners

22  intend to do over the course of ten years, correct?

23  A    The press release that we spoke of that we released this

24  year was about a one-year plan that we had that would have

25  included infrastructure projects as well as four upgrade

 1  projects.

 2  Q   Mr. Gooby, I did make a copy of it --

 3           MR. CONNOR:  Derik, can you scroll down to the end of

 4  this article?

 5  Q   (By Mr. Connor)  Mr. Gooby, is it correct that the

 6  Mariners ten-year plan submitted to the PFD for the Mariners

 7  indicates they intend to spend approximately $280 million

 8  over the next ten years?

 9  A   Yes.  We are required to submit a one- and ten-year plan

10  to the PFD, knowing that that ten-year plan is flexible,

11  depending on how the structure is over that period of time.

12           MR. CONNOR:  Okay.  That's all I have.

13                        CROSS-EXAMINATION

14  BY MR. WILLEY:

15  Q   Mr. Gooby, you were talking to Mr. Connor about the

16  long-term planning process.  Is there something called a

17  long-term capital-needs assessment?

18  A   Yes, there is.

19  Q   What is that?

20  A   In 2015-2016, the PFD and the Mariners co-funded a study

21  to look at the ballpark and to see all the different projects

22  that we would need to do over 25 years to keep the ballpark

23  relevant, as well as keeping it upgraded so that it is a

24  hundred-year-old ballpark.  That is the goal of our ownership

25  and that PFD, that the ballpark is a hundred-year-old

1    ballpark.

2    Q    So to that end, there is a capital-needs planning process?

3    A    Yes.  Every year in January, we sit down with our

4    consultants, and look at the ballpark.  We have a very -- we

5    have the guide that we sit down with and we look at it, and

6    it is listed every year of all the projects that we are

7    planning to do.  And then in January, we sit down and we look

8    out to see if those projects are actually necessary or not.

9    For example, if the HVAC system, for some reason, is still

10   working, and we thought it was planned to be replaced in

11   2021, we wouldn't replace that, and we would push it to the

12   next year.

13        In May, we are then required to submit to the PFD a plan

14   for a one-year and ten-year plan.  This includes upgrade

15   projects as well, and ideas that we want to make sure that

16   the ballpark is relevant compared to other ballparks around

17   the country.

18        The PFD then has a chance to look at that project -- or

19   look at those one- and ten-year plans and give us comments

20   and suggestions.  It also allows us to go to the City and try

21   to permit these projects to make sure that we can actually

22   get them done in the construction window that we have.

23        And then in September, we then submit a final approval to

24   the PFD of the projects.  Between May and September, we do

25   have opportunity to update those projects, get better

1    pricing, and, again, look at systems to make sure that they

2    are still in need of repair.

3    Q    We talked a little bit with Mr. Rogel about some of the

4    fan upgrade work being done in the 200 level during the

5    pending off-season.

6         Can you give us some examples of some of the capital

7    projects that are being done in addition to those fan upgrade

8    pieces?

9    A    Sure.  Some of the big projects that we're looking at this

10   year is, we have a retractable roof that needs ongoing

11   maintenance.  We're spending about $2 million on repairing

12   some of the axle wheels on that project.  We're also looking

13   at updating or installing a new sound system throughout the

14   ballpark.  We're also replacing our point-of-sale system for

15   concessions.  We're also looking at projects throughout the

16   building of our concrete, any repairs that we have with the

17   concrete cracking and things like that.  We have money set

18   aside for our expansion joints.  We have about $20 million of

19   infrastructure needs that will be done this off-season, and

20   about $10 million worth of upgrade projects.

21   Q    Thank you.

22        You're familiar with the project that occurred to

23   expand the number of accessible seats in the Diamond

24   Club/Premier seating section?

25   A    Yes, I am.

1    Q    And how are you familiar with it?

2    A    I was responsible for that project.

3    Q    In order to add the additional seats in that area, how is

4    that accomplished?

5    A    Sure.

6         So we wanted to add additional accessible seats in that

7    area, and how we did that was, we basically created new real

8    estate in that area.  We moved the backstop wall forward onto

9    the field after getting approval from Major League Baseball

10   that we could do that, and we actually covered over a camera

11   well with concrete.

12        We had a camera well that we noticed was not being used as

13   often as we thought, and we worked with our broadcasting

14   partners to make sure that we could use that.  Once they gave

15   us approval of that, we shifted that location into our

16   dugout, and we covered the camera well, and we were able to

17   increase our accessible seating in those areas.

18   Q    So you physically created new space to put seats in?

19   A    We did.  We moved the wall, the backstop wall towards the

20   field about a foot and a half.  And, again, we took space

21   that wasn't being used for a previous service, and we were

22   able to add concrete to that area and create a new section.

23             MR. WILLEY:  If you could pull up Defendants' Exhibit

24   16, please, Rondi?

25   Q    (By Mr. Willey)  What does this depict, Mr. Gooby?

1   A   This is one of the vomitories that we have from the

2   Diamond Club into that new section.

3   Q   So what we're looking at, then, is a door by which one can

4   access the Diamond Club?

5   A   That is correct.

6   Q   Where there's food and beverage and seats?

7   A   Yes.  In this new accessible area, we have two seating

8   products.  We have ADA seats for our Diamond Club, and we

9   have ADA seats for our Premier seats.

10  Q   And this is the vomitory by which one would access the

11  area where those seats are?

12  A   Correct.

13          THE COURT:  What number is this?

14          MR. WILLEY:  This is Defendants' Exhibit 16, Your

15  Honor.  It includes several pictures all within the same

16  physical area.

17  A   This vomitory would be used for our -- the first picture

18  that you showed would be used for our Diamond Club.

19  Q   (By Mr. Willey)  That's one of the vomitories?

20  A   Correct.

21  Q   And the next picture, which is also Defendants' 16, it's a

22  collection of four pictures, this is the other vomitory?

23  A   Correct.  We call this the umpires' tunnel, because it's

24  located right next to the umpires' locker rooms.  So the

25  umpires use this to access the field.  And then we also have

 1  our Premier seat ADA ticket holders access their seats with

 2  this tunnel.

 3  Q   Is there any way to access the field level, other than the

 4  vomitory that's in this picture here and in the prior screen?

 5  A   No.

 6  Q   What does this picture show, Mr. Gooby?

 7  A   So this shows -- the photos in the foreground here are the

 8  Diamond Club seats, and then in the background are the ADA

 9  seats for Premier.

10  Q   So if we're looking at the foreground, we're in those

11  seats that are Diamond Club associated with access via the

12  vomitory with the "Diamond Club" on the door; is that

13  correct?

14  A   Correct.

15  Q   And then the Premier seats, which are also in the front

16  row here, are those the ones that are on the other side of

17  that red rope?

18  A   That is correct.

19          THE COURT:  Say again?  Where are the Premier seats?

20          THE WITNESS:  On the topside of the red rope.

21  There's two stanchions.  If you can see -- I can point here.

22  That's where our ADA seats start for the Premier.

23  Q   (By Mr. Willey)  So just so we're clear for the record,

24  you've made a little mark there, and there's what appears to

25  be a red velvet rope, right?

1   A    Yes.

2   Q    And the seats that are on the other side of that red

3   velvet rope, those are accessible seats associated with

4   Premier seating?

5   A    That is correct.

6   Q    And then the ones that are on this near side of the velvet

7   rope are the ones that are in the Diamond Club?

8   A    That is correct.

9   Q    Okay.

10          THE COURT:  So where is the accessible seating?  You

11   can touch the screen, and it will show up.

12          THE WITNESS:  So this front row here, those are all

13   accessible seats.  Those chairs could get relocated or taken

14   out.  Those also show the accompanying seats that are fixed

15   right now, and then the spaces in between are ADA chairs.

16          THE COURT:  What about this section?

17          THE WITNESS:  This section here?

18          THE COURT:  No, just beyond that.

19          THE WITNESS:  That's our Diamond Club ADA section.

20          THE COURT:  So that space is where wheelchairs can

21   go?

22          THE WITNESS:  So our Diamond Club ADA is in here, and

23   then if I clear the screen, the Premier seats are in here.

24          THE COURT:  That's what I thought.  Okay.  Thank you.

25   Q    (By Mr. Willey)  And what you 're showing is both the flex

1    space, and there are some fixed seats here; is that right?

2    A    That's correct.

3    Q    And those are the fixed seats that can be removed?

4    A    They can be removed.

5    Q    Where is the new real estate that got created when you

6    removed that camera well?

7    A    Sure.  If you could clear the screen again.

8         So you can see the concrete here.  That was the camera

9    well there.  And then this backstop wall was moved towards

10   the field approximately a foot and a half.

11   Q    What is on the other side of the Premier seating that

12   you've just drawn a box around?

13   A    North of it would be the vomitory.

14   Q    Right here?

15   A    That's the visiting dugout.  So as part of this project,

16   even though the camera well that we'd covered over wasn't

17   being used very often, there still are occasions that maybe

18   it does need access for a camera well, so we installed a new

19   camera well inside the dugout, after getting approval from

20   Major League Baseball.  So we were able to do that.

21   Q    And the vomitory, that's coming up through here; is that

22   right?

23   A    So the line you just drew, that's the vomitory for the

24   Diamond Club, correct.

25   Q    Got it.

1          And if one wants to get into this section that's here,

2     there's no accessible route to that, correct?

3     A    No.

4     Q    I'd like to talk to you a little bit about some of the

5     ways in which information is transmitted at games.

6          Mr. Connor had asked you about video monitors in the

7     tunnels here.  Do you recall that?

8     A    Yes.

9     Q    Can you tell us where other locations are throughout the

10    stadium that have video monitors?

11    A    Sure.

12         We have monitors throughout the ballpark on all levels,

13    the 100 level, the suite level, and the Club level, or the

14    200 level.  Those monitors are in the seating bowl.  And then

15    we have -- on those levels as well, we have monitors in the

16    concourses near the concession stands.  And then on the 300

17    level, we have monitors that are in the concourse.

18    Q    So if one is on the concourse in the 100 level, and

19    they're in the concession area, are there monitors in that

20    space?

21    A    Yes, there are monitors throughout.

22    Q    And they're also throughout the concession level on the

23    concourse?

24    A    Yes, there's monitors.

25    Q    And you mentioned that there are monitors in the seating

1   bowl as well?

2   A   Yes.   On the 100 level, 200 level, and suite level,

3   they're in the seating bowl.

4   Q   If I am sitting in the accessible seating in the 100

5   level, are there video monitors up above me?

6   A   Yes.

7   Q   And what do those monitors show?

8   A   So before the game, the monitors will show Mariner

9   activities, such as events that are coming up at the stadium,

10  marketing material, things like that.

11      During the game, we show our Roots Sports, which is our

12  broadcast partner, they show the actual game footage, minus

13  the TV commercials.  When the TV goes to commercial, we will

14  show, again, marketing material for the Mariners, such as the

15  boat races that we do.  It's an in-game activity for our

16  fans.  We'll show that.  We'll show upcoming events.  We'll

17  show fun type of things for our fans.

18  Q   And when you talk about Root Sports feed, that's what you

19  would see if you turned on your TV and watched the game?

20  A   That is correct.  It's the same feed that our fans at home

21  would see.

22  Q   And so if I'm walking on the concourse level, the 100, or

23  the same on the 200, I'm seeing -- I can see that in addition

24  to whatever I can see on the field?

25  A   That's correct.

1  Q   And if I'm sitting in the accessible seating on the 100

2  level or the 200 level, in addition to what I'm seeing on the

3  field, I also have the live game feed on the monitors?

4  A   That is correct.

5  Q   Are there scoreboards in the stadium that provide

6  information?

7  A   We do have other boards throughout the ballpark.  We call

8  them "ribbon boards."  They are on the fascias or the front

9  of some of the 200-level sections.  And those boards will

10 show information such as play-by-play information, they'll

11 show closed-captioning, they'll show statistics, they'll show

12 advertising, they'll show in-game entertainment, things to

13 get the crowd excited, a variety of things that our in-game

14 entertainment group puts together.

15 Q   And those are located along the left field, like, above

16 the bullpen?

17 A   We have -- that board is in left field.  It's called our

18 out-of-town scoreboard, and that's directly in the outfield,

19 in left field.  And then we have these ribbon boards, if you

20 will, that are located in front of our Hit it Here Cafe,

21 which is center field to right field, and then they run the

22 infield bowl.  The infield boards run from foul pole to foul

23 pole.

24 Q   So if I'm sitting on the first-base side, I'd see the

25 ribbon board that's on the left-hand, and vice versa?

1    A    Correct.

2    Q    Okay.  Let's look at Defendants' 9, please.

3         There's a PA system as well, right?

4    A    Yes.  We have a public address system that we -- our PA

5    announcer gives the batter, the normal baseball

6    announcements, as well as in-between-inning announcements and

7    activities.

8    Q    DX-9, what is this document, Mr. Gooby?  Do you recognize

9    it?

10   A    Yeah.  This is a document that's on our website.  It's

11   information for our guests with disabilities.  These are

12   different services that we offer to our fans.

13              THE COURT:  What is that number, counsel?

14              MR. WILLEY:  Your Honor, this is Defense Exhibit 9.

15   Q    (By Mr. Willey)  And this lists a variety of resources

16   that are available for guests with disabilities?

17   A    That's correct.

18   Q    What is assisted-listening devices here?

19   A    So fans that are hard of hearing, we have these devices in

20   our guest experience areas, where they can sign them out, and

21   we allow them to have those for the game.  It lets them hear

22   the PA announcer.

23   Q    And what is the captioning that's located near the bullpen

24   during batting practice?

25   A    Sure.

 1      So the captioning is, again, whatever the PA announcer is

 2  saying.  That would be on the ribbon boards.

 3  Q    And what is the purpose of it?

 4  A    Again, so fans who can't hear can see what's going on.

 5          MR. WILLEY:  Rondi, if you could show us Defendants'

 6  Exhibit 11?

 7  Q    (By Mr. Willey)  This is Defendants' Exhibit 11.

 8  Mr. Gooby, can you explain what this is?

 9  A    Sure.

10          So this is an app that Major League Baseball and the

11  Mariners have.  This is our ballpark app.  This allows our

12  fans to have information at the touch of their fingers.  You

13  download this app on your cell phone, and this gives you all

14  the access that's on our website, as well as a way to access

15  your tickets, as well as being able to communicate to our

16  guest service department, if there is any issues that you

17  have inside the ballpark.

18  Q    And let's look at -- is there any cost to this, by the

19  way?

20  A    It's free for any fan.

21          MR. WILLEY:  Rondi, if you could shift to

22  Defendants' 12, please.

23  Q    (By Mr. Willey)  And what is this exhibit depicting,

24  Mr. Gooby?

25  A    So this is another app that Major League Baseball has.

1   It's connected through the Mariners website.  This is a way

2   for fans to watch Mariner games on their mobile devices.

3   Q   So this is an alternative to getting a cable feed?

4   A   Correct.  This is for, again, fans that want to watch the

5   Mariners on their mobile devices.

6   Q   And is this available to watch on a mobile device if

7   you're at the game?

8   A   I'm not a hundred percent how this app works.  I know it's

9   a subscription-base that you have to purchase, and I believe

10  it is based on the broadcast rights of where the team is.

11  Q   Understood.

12      Mr. Connor had asked you questions about your role as

13  the manager of guest services.  Do you recall that?

14  A   Yes.

15  Q   And as I understand it, that's a role and function that

16  you're the manager of, and Melissa Leung is the personal

17  interface; is that correct?

18  A   That is correct.

19  Q   In your capacity as the manager of guest services, are you

20  aware of any complaints about accessible seating sight lines,

21  other than this lawsuit?

22  A   No.

23  Q   Are you aware of any complaints regarding ADA-accessible

24  seating locations in the ballpark, other than this lawsuit?

25  A   No.

```
 1              MR. WILLEY:  That's all I have.  Thank you.

 2              THE WITNESS:  Thank you.

 3                        REDIRECT EXAMINATION

 4   BY MR. CONNOR:

 5   Q   Mr. Gooby, just a few follow-ups.

 6          There's a major scoreboard in the outfield, correct?

 7   That was one of the construction projects you and I talked

 8   about?

 9   A   Yes, our main scoreboard is in the outfield.

10   Q   Okay.  And do you know how much that cost?

11   A   I don't.  That was installed before I was here.

12   Q   Okay.

13          When you were preparing to testify for me as a 30(b)(6)

14   witness, did you investigate how much that cost?

15   A   I'm sorry.  Can you repeat the question?

16   Q   Yes.

17          When you were preparing to testify for me as designated

18   representative regarding renovations, did you look into what

19   the cost of that scoreboard was?

20              THE COURT:  The cost of which project?

21              MR. CONNOR:  He was designated to talk to me about

22   renovations in the stadium.

23              THE COURT:  Which project are you asking about?

24              MR. CONNOR:  The scoreboard project, Your Honor.

25              THE COURT:  The scoreboard.
```

1           MR. CONNOR:  Yes.  I'm sorry.

2    A   I have a general knowledge.  I don't know the exact

3    amount.

4    Q   (By Mr. Connor)  Can you give me a rough estimate?

5    A   It's somewhere between $10- and $15 million.

6    Q   Okay.

7           Why did the Mariners spend that kind of money on that

8    project, do you suppose?

9    A   That's a fan-amenity upgrade.

10   Q   Okay.

11          And with respect to that scoreboard, is the information

12   that's shown on that scoreboard the same as what's shown on

13   the monitors that you were discussing with Mr. Willey?

14   A   No.  It's different information.

15   Q   Okay.  Is it the same information that's shown on the

16   ribbon --

17   A   It's similar information.

18   Q   Does it differ at all?

19   A   Yes.  The scoreboard has a static photo of the player, but

20   statistics and things like that are located on multiple

21   boards throughout the ballpark.

22   Q   Do you know -- you told Mr. Willey --

23          THE COURT:  Wait a minute.  Is it the same, or it

24   isn't the same?

25          THE WITNESS:  It's not the exact duplication of what

1    the scoreboard is, but similar information is located on the

2    boards throughout.

3    Q    (By Mr. Connor)  But the Mariners opted to spend $10- to

4    $15 million to have the big scoreboard because that enhanced

5    the fan experience, correct?

6    A    I believe that's why they decided that, yes.

7    Q    Okay.

8         And you said to Mr. Willey, I think, that with regard

9    to the ribbon scoreboards or -- what was the term you used?

10   A    We call them either ribbon boards or fascia boards.

11   Q    Those are, at least in part, on the face of the -- above

12   the 100-level seats, correct?

13   A    They're above 100, as well as in the outfield.

14   Q    Okay.

15        On the ones that are above 100, Mr. Willey asked if you

16   could see those; for example, I think he said if you were on

17   first base, if you could see the left-field ones.  Do you

18   remember that question?

19   A    Yes.

20   Q    Okay.

21        Do you know if you can see those ribbon boards from the

22   accessible seating at the 100 level?

23   A    I haven't sat in the ADA seats there, but my assumption

24   would be you can see them.

25   Q    Okay.  But you don't know that?

1    A    I don't.

2    Q    Okay.

3         You were discussing with Mr. Willey the additional

4    seating that was added in the Diamond Club, and I had just a

5    few questions about that.

6    A    Okay.

7    Q    I think you said that the Mariners wanted to create

8    additional seating in that area, correct?

9    A    Yes.

10   Q    Okay.

11        And was the first time that they wanted to create that

12   additional seating in 2019?

13   A    Since I've been with the Mariners, that was the -- when we

14   looked at building that section, that was the first we spoke

15   about that.

16   Q    Okay.

17        To your knowledge, was there anything that precluded

18   them from adding that seating at any time in the past, before

19   this?

20   A    I mean, the area that we created was an active camera

21   well, and so that area has been used for 20-plus years as a

22   camera well.

23   Q    Do you know how it was decided to add the 16 seats in that

24   area, how that number was decided?

25   A    How that number?

1    Q    Yes.

2    A    No, not how the number was.  I know how we built the

3    project and what we could fit in that space.

4    Q    Do you know why you didn't add more seats in that area?

5    A    We had very limited real estate in that area, as well as

6    the Diamond Club space is completely sold out.

7    Q    Okay.

8         So to your knowledge, would there be a physical

9    impediment to having added more seats in that area?

10   A    There's literally no more real estate that you could take.

11   Q    Well, there are non-disabled patrons sitting in -- some of

12   those seats that had been sold out, correct?

13            THE COURT:  I'm sorry.  I didn't understand that

14   question.

15   Q    (By Mr. Connor)  There are seats in the front row of the

16   Diamond Club that are occupied by non-disabled patrons,

17   correct?

18   A    There are definitely seats in the Diamond Club that are

19   sold out, in the front row, yes.

20   Q    Okay.

21        And those seats could have been converted to accessible

22   seats, correct?

23   A    I don't believe so, as they were -- those seats are sold.

24   Q    Okay.

25        But as far as you know, the only impediment to having

1   converted those seats to accessible seats was the fact that

2   they'd been sold already to non-wheelchair-using patrons,

3   correct?

4   A    Yeah.  We wanted to make sure we had ample amount of ADA

5   seats in that area for our Premier seats, as well as Diamond

6   Club, and the number of seats that we have there meet that

7   requirement.

8          THE COURT:  I'm going to ask a variety of questions.

9          You have these flex seats, seats that can go either

10  way?

11         THE WITNESS:  Yes.

12         THE COURT:  You can move them out.  If you move them

13  out, they become ADA seats; otherwise, they're regular seats?

14         THE WITNESS:  No.  Those seats are sold as ADA seats.

15         THE COURT:  My next question is going to be, was

16  there any impediment to making more of those seats flex

17  seats?

18         THE WITNESS:  Again, other than the seats that we are

19  talking about are already previously sold to people in those

20  front rows.  So you'd have to relocate those fans that --

21  some of those people have had those seats for 20-plus years.

22         THE COURT:  I see.  Okay.

23  Q    (By Mr. Connor)  And so the reason those seats were

24  unavailable is was they'd not been previously made available

25  to people needing wheelchair access.

1    A    Correct.

2           THE COURT:  What?

3           MR. CONNOR:  I won't belabor the point, Your Honor.

4    That's all I have.

5           THE COURT:  You put in some new seats, right?

6           THE WITNESS:  We did.

7           THE COURT:  Those weren't sold to anybody?

8           THE WITNESS:  No.  Those seats, when they were

9    installed, those were brand-new seats, and those were sold to

10   ADA customers that needed seats.

11          THE COURT:  All of them?

12          THE WITNESS:  They're sold.  Again, I'm not in the

13   sales department, but Malcom and others sell those on a

14   game-by-game basis to ADA customers.

15          THE COURT:  Okay.

16   Q    (By Mr. Connor)  To address that point:  The only way that

17   you know that they're ADA customers is because they've

18   clicked on a box on the TicketMaster screen saying they're

19   entitled to those seats, correct?

20   A    Again, I don't sell the tickets.  I know when a fan has a

21   ticket, our hosts allow them to those sections as long as

22   they have a ticket for that section.

23   Q    Okay.

24          And let me ask you:  Have you seen people sitting in

25   those areas, the companion seats or the flex-seat area, who

1  were not in a wheelchair?

2  A   So we train all our staff that, regardless of who has an

3  ADA seat, to not question what the disability is.

4  Q   Okay.

5       And my question was, have you yourself seen people in

6  that area who are not using wheelchairs?

7  A   Wheelchairs, yes, I've seen people without wheelchairs.

8  But, again, I don't know what disability they may or may not

9  have to need those seats.

10      MR. CONNOR:  Okay.  Thank you.

11      THE COURT:  Anything?

12      MR. WILLEY:  No.

13      THE COURT:  That means you are excused.  You may stay

14  or leave, as you wish.

15      THE WITNESS:  Thank you.

16      MR. CONNOR:  Your Honor, at this time, I'd like to

17  call Mr. Jim Terry.

18      Your Honor, I apologize.  I noticed, towards the end of

19  Mr. Gooby's testimony, Mr. Terry came into the courtroom.  I

20  apologize.  I know there was an exclusion order.

21      THE COURT:  Okay.

22  JAMES TERRY,                      HAVING BEEN FIRST DULY SWORN,
                                   TESTIFIED AS FOLLOWS:
23

24      THE CLERK:  Please state your name, and spell your

25  last name for the record.

```
 1              THE WITNESS:   James Leslie Evan Terry; last name

 2     T-e-r-r-y.

 3                         DIRECT EXAMINATION

 4     BY MR. CONNOR:

 5     Q    Mr. Terry, can you tell the court if you are presently

 6     employed?

 7     A    I am.

 8     Q    And can you tell the court by whom you're employed?

 9     A    Evan Terry Associates, LLC.

10     Q    And what is that entity?

11     A    We're an architectural and consulting firm.

12     Q    And how many people are associated with that firm at this

13     point?

14     A    I think we have 20-something employees; 23, 25, somewhere

15     in that range.

16     Q    And what is your position with that firm?

17     A    I'm the chief executive officer, and I lead our access

18     compliance group.

19     Q    Okay.

20          And for how long have you been with that organization?

21     A    I started there in the summer of '71 as a high school

22     student; came back and worked a couple of summers before

23     coming back -- maybe several summers -- before coming back

24     from college and starting full time in 1978.

25     Q    And, Mr. Terry, I didn't ask you, but what's your
```

1  educational background?

2  A   I have a bachelor's of science in architecture from

3  University of Southern California, and a master of

4  architecture from University of Michigan.

5  Q   Do you have any experience with the design of public

6  assembly areas?

7  A   Yes.

8  Q   Okay.

9      And can you tell the court some of the things you've

10 done in that regard?

11 A   Primarily, just because I've been doing ADA work since

12 1990, it's been consulting on those kinds of facilities,

13 including plan reviews, looking at existing facilities to

14 help clients understand what they need to do with them,

15 looking at -- I've done expert witness on assembly facilities

16 work with the Department of Justice, those kind of things,

17 trying to assess what needs to be done.

18 Q   When you say "assess what needs to be done," you're

19 assessing what needs to be done with respect to ADA

20 compliance?

21 A   With ADA compliance, and very often also with state or

22 local requirements that are stricter than the ADA but all as

23 related to accessibility.

24 Q   Okay.

25      Can you give some examples of public facilities on

1    which you've worked with regard to ADA-compliance issues?

2    A    I've probably worked on 50 to 75 large assembly

3    facilities; probably 30 or so of those that are large

4    stadiums and arenas.  Yankee Stadium is one of the earlier

5    ones that we did; the MCI Arena; worked on Madison Square

6    Garden.  Both Madison Square Garden and Yankee Stadium were

7    for the U.S. Attorney in Southern District of New York.  I

8    worked on the MCI Arena.  I was the expert for PDA in their

9    lawsuit.  I've worked on the Broncos stadium in Denver as the

10   plan review expert for the design team on that; worked for a

11   while on the design reviews of the 49er stadium in San

12   Francisco -- south of San Francisco; and worked on lots and

13   lots of others.

14   Q    Okay.

15        Mr. Terry, have you ever been an expert witness with

16   respect to ADA issues?

17   A    Yes, I have.

18   Q    Okay.

19        Can you tell the court some of the instances in which

20   you've done that?

21   A    It depends on how you define "expert witness" because most

22   of the time when we're working on a project with a client,

23   it's because of a lawsuit.  We come in as an expert to help

24   them resolve it.  Or we are working sometimes because of a

25   lawsuit.  If it's related to a lawsuit, I've worked on, I

1    think, maybe 15 or 20 cases, where I either gave testimony at

2    trial or in deposition.  Some of those that have included

3    large assembly facilities; of course, Yankee Stadium; the MCI

4    Arena went all the way through trial; Coors Field in Denver

5    went all the way through trial; the Rose Garden Arena in

6    Portland, the Independent Living project there went all the

7    way through depositions but not to trial.  So different --

8    different ways.  I was a fact witness in the 49ers stadium

9    when they were sued.

10   Q   Okay.

11       And, Mr. Terry, I told you before you came in today

12   that the lawsuit pending before Judge Rothstein has been

13   narrowed.  We've eliminating several of the issues about

14   which you had investigated for us.  So I'm going to ask with

15   respect to the two remaining issues in this case.

16       Have you ever acted as an expert witness with respect

17   to sight lines, and, in particular, over standing spectators?

18   A   Yes.  Almost all of the projects that we've worked on,

19   including large assembly areas, have involved sight lines.

20   Q   Okay.

21       Have you ever acted as an expert witness with respect

22   to dispersal requirements under the ADA?

23   A   Yes.  Again, almost all of them include dispersal

24   considerations.

25   Q   All right.  Mr. Terry, I'd ask you to look at Exhibit 1.

1         Mr. Terry, do you recognize what's been marked as

2   Exhibit 1?

3   A   I do.

4   Q   And can you tell the court what that is?

5   A   It's the first page of my resumé.

6   Q   Okay.

7         And, Mr. Tery, there's a notebook in front of you --

8   A   Yes.

9   Q   -- that has hard copies, and these exhibits that have

10  multiple pages, those are there.  The remainder of that

11  exhibit is also your resumé, correct?

12  A   Yes, it is.

13  Q   Okay.  And is that an accurate statement of what's

14  reflected on there?

15  A   It was as of May 2019.

16  Q   Okay.  Thank you.

17        Mr. Terry, in the context in which you were not acting

18  as an expert witness but otherwise assisting with the design

19  and implementation of public arenas, what was your

20  responsibility, or what would you do in terms of trying to

21  ascertain whether the facility or make sure it did comply

22  with ADA requirements?

23  A   Two general roles.  The first one would be plan reviews

24  for the design team or for the owner, to help them understand

25  what they've missed in the drawings or what interpretations

1   that they've made or information that was just wrong, and so

2   to try to catch that before it was built, and give them the

3   opportunity to fix it.  That's generally what we do in plan

4   reviews.

5        When the project has already been built and we're working,

6   typically, for the owner at that point, to figure out what

7   needs to be done, we'll go out, look at the existing

8   conditions, we'll assess those for compliance with the

9   applicable standards, and then we will help them figure out

10  how to fix those kinds of things, and if something is

11  technically infeasible, we'll help go through that analysis.

12  Q   Okay.

13       And I didn't ask you this, but has your work been for

14  both owners and for individuals, such as the plaintiffs in

15  this lawsuit?

16  A   Yes.  Our work has been for design teams, for facility

17  owners, for plaintiff organizations, for the Department of

18  Justice.  In large assembly areas, those have been our

19  primary clients.

20  Q   Okay.  Thank you.

21  A   We've also worked for contractors.

22  Q   Okay.

23       Mr. Terry, you were asked by the plaintiffs in this

24  lawsuit to investigate certain matters and render opinions

25  with respect to them, correct?

1   A    Yes.

2   Q    Okay.  As I said, since, we've narrowed the case down to

3   two issues.

4        You were asked to investigate whether the Mariners

5   T-Mobile stadium provides sight lines over standing

6   spectators for wheelchair users that are comparable to those

7   non-wheelchair users, correct?

8   A    Correct.

9   Q    And you were asked to investigate whether the T-Mobile

10  stadium, as configured and as the tickets are priced,

11  complies with ADA requirements with respect to that, correct?

12  A    Yes.

13  Q    Let's talk, first, about the

14  sight-lines-for-standing-spectators issue.

15  A    Okay.

16  Q    Mr. Terry, let me -- before we get into this.

17       As an architect or as somebody assisting in your

18  professional capacity with plan reviews and the types of

19  things you were describing that constitute your job, how do

20  you go about figuring out what ADA requirements there are for

21  a facility?

22  A    Well, as a designer, the first thing that you do is to

23  figure out which standards are applicable at the time that

24  you're starting the design or at the time that you expect to

25  go for permitting, and you pull up the building codes that

1   relate to that, you pull up the ADA-accessibility standards.

2   If there are any stricter state or local standards, you pull

3   those -- copies of those.  You start reviewing those as

4   you're going through the project, both before you start

5   design and then as you're designing, to make sure that you

6   meet all the provisions of those.

7   Q   Okay.

8       And with respect to the issues of sight lines that need

9   to be provided to wheelchair users in public facilities, what

10  would you go to if you were involved in the design of a

11  stadium in 1996?

12  A   In '96, I would have looked at the 1991 ADA standards, I

13  would have looked at the 1991 ADA regulations and would have

14  looked at technical assistance materials that are out.  I

15  mean, you asked me if I were designing a stadium.  There

16  weren't many people designing this size stadiums back then.

17  So I would have looked at the information that was floating

18  around within that industry, which would have technical

19  assistance materials, letters from the Department of Justice

20  to people, and things like that.

21  Q   Okay.

22      So in 1996, would an architect or somebody involved in

23  reviewing plans for a design have expected that there would

24  be a requirement in order to comply with the ADA that sight

25  lines would be provided for wheelchair users over standing

1   speculators?

2   A    They would know that that was the position of the

3   Department of Justice, and that was -- the language in the

4   ADA standards indicated that.  By '96, it was very clear, in

5   the technical assistance materials, that it was required.

6   Q    And, Mr. Terry, I'm going to do my best not to have you

7   give strictly legal opinions.  These are, obviously,

8   interwoven facts, and the court's been alerted to a number of

9   these things.  But let's walk through, just briefly, what had

10  been promulgated by the Department of Justice by means of

11  regulation or otherwise by 1996 with regards to sight lines

12  over standing spectators, if we could.

13  A    Okay.

14  Q    You mentioned that there were ADA regulations, correct, in

15  1993?

16  A    Yes.  Those came out in 1991.

17  Q    1991.  And by whom were those promulgated?

18  A    The regulations, by the Department of Justice, they were

19  the enforceable requirements at that time.

20  Q    And did those regulations -- what did those specify with

21  respect to sight lines?

22  A    Under the section of the regulations that is called the

23  ADA standards, sometimes called ADAAG, under that section, it

24  was identical in '91, ADAAG, the guidelines, by the Access

25  Board and the ADA standards were identical in 1991.  And so

those gave -- the standards gave information about what
needed to be done, but also the regulations said that
facilities had to be designed so that they would be readily
accessible to and useable by people with disabilities, and
then they pointed you to the standards as well.  So it was
kind of an overarching responsibility, and then the standards
gave you more detail on that.

Q   What did the initial standards say with regards to sight
lines; do you remember?

A   That you needed to provide comparable lines of sight and
choices of admission prices for people with disabilities that
were provided to other members of the general public.

Q   And those were the 1991 regulations?

A   Yes.

Q   All right.

     They did not specifically mention that a wheelchair
user had to have a line of sight over a standing spectator,
correct?

A   No, that was not discussed at all.

Q   Okay.

     Do you know, did that come to be discussed at some
point in time in the regulations or the directives from the
Department of Justice?

A   Absolutely.

Q   Okay.

1          And when was the notion that comparable sight lines

2     required sight lines over standing spectators first

3     articulated in any regulation or publication by the

4     Department?

5     A    The first time I saw it in any official publications was

6     in 1993.  Justice started writing letters to the architects

7     who were designing stadiums.  There were about four

8     architectural firms that were designing a lot of stadiums and

9     arenas around the country, and knowing that that was the

10    case, Justice started -- the year after the standards went

11    into effect -- actually, the year that the standards went

12    into effect, they started writing letters to these design

13    firms, and saying you need to provide sight lines over

14    standing spectators.  That kind of information was also

15    available in the news memo.  AI Memo published something

16    about it being the number one requirement -- the number one

17    concern.  So there were a lot of things that started

18    happening in '93.

19         In '93, the Department of Justice published a Technical

20    Assistance Manual that reiterated the language of the '91

21    standards that said you had to provide sight lines and

22    choice-of-admission prices that were comparable to those

23    provided for members of the general public.

24    Q    Did the Department of Justice then, at some point,

25    specifically indicate that sight lines had to be provided

1    over standing spectators?

2    A    Yes.  In 1994, they issued -- oh, that was actually

3    included in earlier letters that they wrote, but in '94 --

4         MR. WILLEY:  Your Honor, I'm going to object to this

5    witness testifying about letters that are not in the public

6    record and not in this record and he is not the recipient of.

7    That's classic hearsay.

8         MR. CONNOR:  Your Honor, if I could?  Defendants'

9    expert witness, Mr. Endelman, has testified that the

10   Mariners -- and an argument made in opening statement was

11   that the Mariners didn't and shouldn't have known that they

12   were supposed to provide sight lines over standing

13   spectators.

14      Expert witnesses are entitled to testify based on hearsay.

15   It's the type of thing they rely on in their profession and

16   their normal work.

17      Mr. Terry -- I will qualify this further, but Mr. Terry

18   was engaged in such communications with the Department of

19   Justice, and I think it's perfectly within the scope of his

20   expert testimony.

21        THE COURT:  Well, it doesn't go directly to 1994.

22        MR. CONNOR:  Okay.

23        THE COURT:  We avoid the letters thing, because I

24   think he's about to talk about when they were regs.  Why

25   don't we just concentrate on that?

```
 1            MR. CONNOR:  All right, Your Honor.

 2            THE COURT:  He's about to tell us it was before 1996

 3  anyway.

 4            MR. CONNOR:  All right.

 5  Q   (By Mr. Connor)  Did the Department of Justice publish a

 6  technical advisory manual --

 7  A   Yes.

 8  Q   -- in 1994?

 9  A   Yes.

10  Q   In 1994.

11  A   The '93 Technical Assistance Manual was supplemented in

12  '94 by the Department of Justice, and in that they mention

13  specifically that sight line over standing spectators was

14  required by the section of the Technical Assistance Manual.

15  They inserted that into the Technical Assistance Manual.

16  Q   For the court, can you explain what a Technical Assistance

17  Manual means in your line of work?

18  A   It's the Department of Justice's further explanation of

19  what they intended when they adopted the standards and the

20  regulations.  So it gives more examples of how you might

21  comply with what they wrote in the standards.  So lots of

22  examples of ways to do things that would meet the

23  obligations.

24  Q   Okay.

25            And acting as an architect in 1994 -- let me figure out
```

 1  how to ask this -- would you have advised a client that they

 2  were going to need to provide sight lines over standing

 3  spectators in view of the 1994 TAM supplement?

 4  A   Yes.

 5  Q   All right.

 6      The TAM supplement did not specifically say how that

 7  was to be accomplished, correct -- how you were to provide

 8  sight lines over standing spectators, correct?

 9  A   No -- it didn't give diagrams, and it didn't give all the

10  various ways that you could do it.

11  Q   Okay.

12      And, Mr. Terry, as an architect, do you encounter

13  situations where there are -- or some standard that you're

14  supposed to achieve to accomplish something without being

15  told specifically how to do it?

16  A   Yes.

17  Q   Okay.

18      And what's the architect's responsibility in that

19  context?

20  A   Basically, to figure it out; to look at the circumstances

21  of your project, of what you're being asked to design, to

22  look at the restrictions on that design, including building

23  codes and accessibility requirements and all the other kinds

24  of things, ordinances that come up, and to research those,

25  and figure out how to interpret those in a way that meets the

 1   requirements that you've been handed.

 2        THE COURT:  Counsel, is this a good place to take our

 3   15-minute recess?

 4        MR. CONNOR:  Yes.

 5        THE COURT:  Probably as good as any.

 6        MR. CONNOR:  As good as any.

 7        THE COURT:  But we need a break.  Let's take our

 8   recess for 15 minutes.

 9                    (Court in recess.)

10        THE COURT:  Whenever you're ready.

11        MR. CONNOR:  Thank you, Your Honor.

12     Derik, could you pull up Defendants' Exhibit 2, please?

13        THE COURT:  What's the number?

14        MR. CONNOR:  It's Defendants' Exhibit 2.

15        THE COURT:  Defendants' Exhibit 2?

16        MR. CONNOR:  Yes.

17   Q   (By Mr. Connor)  Do you recognize what's marked as Defense

18   Exhibit 2?

19   A   I do.

20   Q   Can you tell the court what that is?

21   A   It's the *Accessible Stadiums* document the Department of

22   Justice put out in 1996.

23   Q   All right.

24        And was this a document you were referring to that

25   provided drawings?

1    A    Yes.

2    Q    Okay.

3         And could you turn to page 2 of this document?

4    A    Yes.

5    Q    This page indicates that wheelchair-seating locations must

6    provide sight lines comparable to those provided to other

7    spectators, and it goes on -- and I won't read it -- but it

8    goes on to say that -- well, I guess I will go on to read it.

9         "In stadiums where spectators can be expected to stand

10   during a show or event, all or substantially all of the

11   wheelchair-seating locations must provide a line of sight

12   over standing spectators."

13        And that had already been stated in the 1994 TAM,

14   correct?

15   A    Yes.

16   Q    Supplement.

17        This added the following explanation, correct, of what

18   was meant?

19   A    Yes.

20   Q    That, "A comparable line of sight, as illustrated in the

21   figure below, allows a person using a wheelchair to see the

22   playing surface between the heads and over the shoulders of

23   the persons standing in the row immediately in front and over

24   the heads of the persons standing two rows in front"?

25   A    That's correct.

1  Q   Mr. Terry, if an architect was told that a stadium had to

2  comply with this requirement, how would you go about

3  designing the stadium to do so?

4  A   Pretty much the same that you'd design a stadium for

5  seated spectators.  You look at what are you trying to see on

6  the field.  So are you trying to see every single piece of

7  it?  Are you trying to see certain areas of the field?  And

8  all spectators -- all stadiums are designed to do that.  So

9  you look at what height separation do you need, depending on

10  the distance to the field, depending on what's in front of

11  you, and you lay those out.  You lay out the configuration of

12  the tiers and the seating to allow you to do that.

13      This just says you need to elevate the wheelchairs.  If

14  they're behind standing spectators, you need to elevate them

15  enough to get their heads and their eyes in the same kind of

16  parabolic line that allows them to have the same kind of

17  sight lines that other people have but when people stand.

18  Q   Okay.

19      In opening statements, it was noted that this document

20  does not provide any specifications in terms of the heights

21  that are supposed to be assumed with respect to either the

22  standing spectators or the seated wheelchair patrons; is that

23  correct?

24  A   That's correct.

25  Q   Okay.

1          In the absence of that type of specification, what is

2     an architect supposed to do when they receive a performance

3     obligation like this?

4     A    Do the research and find the materials that they want to

5     use to design for it.  So they would look in places like

6     architectural graphic standards or in Dreyfuss's book, *Human*

7     *Scale*, or, later, *Measure of Man*, or those kinds of books

8     that have human anthropometric dimensions, and work from

9     those.

10    Q    Okay.  Because even if you weren't doing this to comply

11    with ADA, you have to make some assumptions about the heights

12    of people involved in any stadium seating situation, correct?

13    A    Correct.

14    Q    All right.

15         You mentioned some of the resources that an architect

16    would have looked at to try to comply with this.  Let's walk

17    through those a little more slowly.

18         Can you repeat, for the judge, what those were, and

19    talk about them individually?

20    A    The first really wide-scale survey anthropometrics was by

21    Dreyfuss, published -- I think the book was first published

22    in 1960.  They continued to do updates as they continued

23    their research in terms of how big people were.

24         They wrote a page that was in the *Architectural Graphics*

25    *Standards* 8th edition -- actually, in the 7th edition, did a

1   page that showed the size of wheelchair users and the size of

2   standing spectators, because architects need to know human

3   dimensions to do a lot of design work.

4   Q   And is "anthropometric" another word for human dimensions?

5   A   Yes.

6   Q   Okay.

7        And among human dimensions that would have been used on

8   that page that we're talking about for the wheelchair users

9   would have been what?

10  A   For wheelchair users, everything from the height of the

11  seat, the height of their eyes, the height of to the top of

12  their head, reach information, widths, all kinds of things.

13  Q   Okay.

14       And would it allow -- would it have specified what an

15  assumed eye level should be?

16  A   What it did is give you the eye-level heights of various

17  people.  So they tested fifth percentile females, 95th

18  percentile median mean.  They tested a lot of people, and

19  then compiled all of those into results that told you kind of

20  where those ranges were.  They did that for males and for

21  females.

22  Q   Okay.

23       And where was that information found?

24  A   In their research books, but also it was found in other

25  research books that are more commonly used by architects,

1    like *Architectural Graphic Standards*, where they actually

2    wrote the page for graphic standards.  It's a compilation of

3    edited standards.

4    Q    Okay.

5         And that guide that you're talking about, that's

6    something that architects, at the time, would have been aware

7    of and been using in their practices?

8    A    Yes.  *Graphic Standards* is kind of the bible for

9    architects, dimensionally.

10   Q    All right.

11        And what anthropometric standards were articulated in

12   that guide at that time?

13   A    The key one here would have been the eye height of

14   wheelchair users and the eye heights of average standing

15   people.  When you're designing a stadium or any large

16   assembly facility, you need to look at -- you look at

17   average-height people, and that's kind of the minimum design.

18   Some designers will design for taller standing spectators,

19   but that would be the minimum, to go for the average-height

20   spectator.

21   Q    Okay.

22        And were those standards ever ultimately used, to your

23   knowledge, in any sort of settlement?

24   A    Yes.  They were used -- the Department of Justice referred

25   to those in the -- with the Atlanta Committee and the Olympic

1    games, where the facilities designed for the Olympics in '96

2    were using the numbers that came from *Architectural Graphic*

3    *Standards*, originally from Dreyfuss.  They used those in the

4    settlement with the Olympics committee.  We were their expert

5    on the aquatics center at the Olympics in '96, and so we were

6    very involved in that process.

7         Then they also used it in their settlement agreement with

8    Ellerbe Becket, where they sued Ellerbe Becket for not

9    providing sight line over standing spectators, and we were

10   the expert in that case as well.

11             THE COURT:  Let me ask you a question.

12             THE WITNESS:  Yes.

13             THE COURT:  In the course of doing this, getting

14   measurements, putting them together, is a relevant factor to

15   you, once you figure the height, say, of a platform?

16             THE WITNESS:  Yes.

17             THE COURT:  The steepness of the ramp or how a person

18   would get on to that platform in a wheelchair?

19             THE WITNESS:  Yes.  That's a separate issue from the

20   sight-line issues, but, yes, you have to be able to get to

21   those positions, or they're not much help.

22             THE COURT:  Have you done that work on this project?

23             THE WITNESS:  On this project?  We did not look at

24   ramp slopes on this project.

25             THE COURT:  I was afraid you were going to say that.

1    Okay.  Thank you.

2    Q   (By Mr. Connor)  Mr. Terry, going back to the fact that

3    there was not anthropometric information included in the 1994

4    TAM supplement or in this *Accessible Stadiums* document, would

5    it have been appropriate for an architect simply to say they

6    didn't have to comply with what was being directed here or

7    identified here?

8    A   No.  The standards say what they say.  The technical

9    assistance says what it says.  But they gave architects some

10   flexibility in terms of what dimensions they choose to do

11   that.  The idea was readily accessible to and usable by

12   people with disabilities.

13       Now, there were some architects -- for example, HOK --

14   that used taller people, so they had better sight lines in

15   their facilities than some other designers had at the time.

16   But they needed to use something that was, you know, a

17   reasonable assumption about what those dimensions would be.

18   Q   Okay.

19       Mr. Terry, have you -- let's talk about what you did do

20   in this case, to this point, at least, and that is, what did

21   you do to ascertain whether T-Mobile stadium provided sight

22   lines over standing spectators to wheelchair patrons?

23   A   I looked around the stadium at where wheelchair users were

24   seated, tried to select a representative sample of those so

25   that we'd get a full variety of the types of places that

1    wheelchair users were sitting.  Then we measured the -- we

2    measured what those sight lines would be by taking a pair of

3    carpenter's rules, which are vertical, six-foot sticks with

4    dimensions on them.

5        We then put those on one row in front of the wheelchair

6    user so that we could go over the shoulders of them, between

7    the heads, and then two rows ahead so that we could measure

8    the height of the top of the people standing two rows ahead.

9    Then I moved back and put a camera at the location of the

10   wheelchair user's eye point.  So that would be 30 inches back

11   from whatever would block their wheelchair from moving any

12   further forward, 30 inches back and 47.45, I think, inches

13   high, which would be the height of a wheelchair user.  That

14   was the average height of a wheelchair user, according to the

15   Dreyfuss research, *Graphic Standards*.  I put a camera at that

16   point, and we, with the two carpenter's rules between me, my

17   camera, and the field, photographed where that would be.  We

18   had Post-it notes put on the vertical rules to show where the

19   shoulder height would be one row forward and where the head

20   height would be, according to the *Graphic Standards* numbers,

21   the same ones used in *Ellerbe Becket* and the Olympics by

22   Justice.  We put rules there and said this will show,

23   according to those anthropometrics, what a wheelchair user

24   could see.

25   Q    Okay.

1          And so you used the anthropometric Dreyfuss data both

2    for the presumed eye location of the wheelchair user and for

3    the presumed height and shoulder height of a standing

4    spectator who is not disabled?

5    A    That's correct.

6    Q    Okay.

7          Mr. Terry, can I ask you to look, initially, at

8    Plaintiffs' Exhibit 3?

9    A    If I could interrupt?  There's one more thing that's

10   important.

11        The idea that wheelchair users get comparable sight lines

12   to other spectators, the members of the general public, and

13   so we then we stepped forward one row and did the same thing

14   for a standing spectator so that we could compare what the

15   wheelchair user saw to what the standing spectator would see.

16        So, for example, the back, top level of the stadium, you

17   may not have the same sight lines for a standing spectator

18   there because sometimes it gets compromised towards the back.

19   So what we were looking for was comparability, not just what

20   you could see.

21   Q    Okay.

22        And -- well, let me ask you this:  Where did you do

23   this type of observation measurement within T-Mobile stadium?

24   A    We did it in ten locations, and those were in my report.

25   There's a drawing that we showed where each of those were.

1   So they were scattered around the facility in places that

2   looked like it was a representative sample.

3   Q    Okay.

4           MR. CONNOR:  Derik, can you pull up Plaintiffs'

5   Exhibit 14?

6   Q    (By Mr. Connor)  Mr. Terry, is this the exhibit you were

7   describing?

8   A    It is.

9   Q    And this was an attachment to your report, correct?

10  A    Yes.

11  Q    All right.

12          Can you explain to Judge Rothstein what's reflected on

13  this exhibit?

14  A    Yes.

15          What I showed was that we -- these are the spaces

16  where I went to look at what the sight lines were.  The first

17  place I went was Section 308; looked at the sight lines

18  there.  I did not document that because I didn't know how

19  much time I was going to have.  And so the sight lines from

20  there, in terms of being able to see the infield, were pretty

21  good.  So I did not measure those, but that shows up as a

22  dot.

23          The other red dots --

24  Q    Let me slow you down.

25          You can touch the screen, and it will leave a mark

1   where you're talking about.  So could you show, first of all,

2   the 308 section and where you --

3   A   308 is here.

4   Q   Okay.

5        And as I understand what you said, you got up there,

6   you observed, and it did not appear to you that it would be a

7   problem from those sight lines up there; is that a fair way

8   to say it?

9   A   I'm saying what would be blocked would be the outfield and

10  not the infield --

11  Q   Okay.

12  A   -- and so it didn't look like that was worth spending a

13  lot of time there.

14        THE COURT:  Are we looking at wheelchair sight lines

15  in 308?

16        THE WITNESS:  Yes.  I just -- I stopped there and

17  said would the sight lines here be something to measure, and

18  I didn't measure those because they looked like they were

19  reasonably good, to the infield.

20  Q   (By Mr. Connor)  Okay.  And it appears there's another red

21  dot on the 300 level, correct?

22  A   Yes, 330.

23  Q   Yes.

24        And did you do the same thing there?

25  A   We did, except in this location, we took the measurements.

1   So those -- I have images of those where we did analysis to

2   show the comparability of those.

3       Now, aside from Section 124, I believe it is, which is in

4   this location right here, aside from that one, I only had one

5   comparable wheelchair and standing spectator up there.

6       And so all the other red dots, I have one set of the

7   wheelchair user, step forward and take what a person one row

8   in front of them could see.

9       In 124, I decided it would be helpful to see, if I stepped

10  forward down the aisle, to see what other people further

11  ahead of them could see in the field as well.  So I actually

12  have four comparables for that section.

13  Q   Okay.  All right.

14      And the red dots represent the other locations at which

15  you did the measurements technique that you just described?

16  A   That's correct.

17  Q   Okay.

18      Mr. Terry, now why don't we look at Plaintiffs'

19  Exhibit 3?  This is an attachment to your report that you did

20  for us, correct?

21  A   Yes.

22  Q   Okay.

23      Could you describe for the court what these two

24  pictures reflect?

25  A   Yes.

1   Q   Let's talk -- well, there are markings on these pictures?

2   A   Yes.

3   Q   Let's just talk, first, about where they're taken from, if

4   you could.

5   A   Okay.

6       The first is taken -- if you look under the bottom,

7   Section 124, this is Row 41A, which is a wheelchair position,

8   Seat No. 1, and so that says where this photograph was taken.

9       Again, using the method I talked about, I had my

10  assistant, standing one row ahead, holding a vertical

11  carpenter's rule in a place where a person would stand, and

12  then two rows ahead in his right hand is the place where a

13  person two rows ahead would be standing.

14  Q   Okay.

15      And these photographs, the one on the left was taken

16  from what distance above the ground?

17  A   It was taken from wheelchair-user height at 47.45 inches

18  above the floor.

19  Q   Okay.

20      And what height is the photographs on the right-hand

21  side taken from?

22  A   In those photographs, he stepped forward one row, and I

23  stepped forward one row and stood in the seat in the row --

24  Row 40, right in front of the wheelchair platform.  That's

25  reflected -- oops.  Excuse me.  Sorry.  This is the

1   comparable spectator, one of the other ones that I did.  This

2   one is Row 33, Section 125, Seat 8.

3        So this particular comparable view was taken from a

4   distance forward of that.  I believe I had another one that

5   was one row in front of that.  I'm not sure now.

6        So this was taken up there to show what somebody in that

7   lower bowl would be seeing, again using the same method but

8   from a standing spectator's eye height and seating location.

9   Q   Okay.  And, Mr. Terry -- I'm sorry -- why don't we move on

10  to Plaintiffs' Exhibit 4.

11  A   Yes.

12  Q   In these two pictures, were these taken with the same

13  methodology you described?

14  A   Yes, they were the same methodology.  So in this location,

15  I may not have taken a shot from Row 40.  I just -- I can't

16  recall.  It looks like I did Row 25, Row 11, and Row 33 as

17  the comparables for this one.

18            THE COURT:  Now, my understanding is that blue

19  section on each of these --

20            THE WITNESS:  Yes.

21            THE COURT:  -- is the part of the infield that they

22  can't see?

23            THE WITNESS:  Yes.  If it's in blue, it shows what

24  they can see.

25            THE COURT:  What they can see?

 1           THE WITNESS:  What they can see.

 2      So the dark blue, the royal blue, is everything that's in

 3  dirt on the field and everything between the dirt lines.  So

 4  this is the area around the batter, the catcher, and the

 5  umpire, it's all the baselines and areas beyond the baselines

 6  where it's dirt.

 7      What we're trying to show in the photograph is both the

 8  portions of the field that you can see, and the things that

 9  are blocked.  So that would be what's below it.  So it

10  shows -- it's just a way to differentiate those pieces.

11           THE COURT:  The blue is what they can see, and the

12  green is what they can't see?

13           THE WITNESS:  That's correct.

14      Now, these are comparable sights.  This exhibit is what

15  general public members see.  And you can see that the members

16  of the general public can see all the dirt and everything

17  beyond that.  If you go back --

18           THE COURT:  This is what the public can see?

19           THE WITNESS:  Yes.  These are -- this is midsection

20  seating in Rows 25 and 11.  Remember wheelchair users are in

21  41.  So the first exhibit that we looked at, Exhibit 4, is

22  it?  No, Exhibit 3.  Can we go back to that one?

23           MR. CONNOR:  Yes.

24           THE WITNESS:  And it's also interesting.  As you look

25  at this, you get what you would expect, which is the

1   comparable seats can always see all of the infield dirt.

2       So the lines that showed in the two that we just looked

3   at, as well as the comparable spectator in B1 -- yes -- and

4   the comparable spectator in B1 can see all of the royal blue.

5   The wheelchair user, however, in this view, misses sections

6   of the infield, right there, where you can see the dirt

7   that's showing where the batter is, home plate you can't see,

8   because those are blocked by the heads of the people two rows

9   ahead.

10  Q   (By Mr. Connor)  Mr. Terry, can we -- because I think that

11  was kind of the exception in terms of your methodology, where

12  you took pictures down the row --

13  A   Yes.

14  Q   -- why don't we do the ones where you took the wheelchair

15  user and then from the perspective of the person one row in

16  front.  I think that was Attachment B4, which is Exhibit 6.

17  A   B3 does it, and B4 does it.  Well, all of the rest --

18  Q   Let's look at Exhibit 6.

19      So, Mr. Terry, first of all, where was the picture on

20  the left taken?

21          THE COURT:  Which one?

22          MR. CONNOR:  Exhibit 6, Your Honor.

23  A   It's listed as Attachment B4 on the screen, and it's --

24  B6?

25      So this was taken in Section 135, Row 41A, which is an

1    accessible seat, or supposed to be.

2    Q   (By Mr. Connor)  Okay.

3    A    Seat No. 1.  On the right is Row 40, one row ahead, same

4    section number, also Seat No. 1.  So I just stepped forward

5    for the photograph on the right.

6        As you step forward, you can see that the comparable sight

7    line for a standing spectator, an ambulatory, standing

8    spectator -- remember, the general public is that can see all

9    of the royal blue, and the wheelchair, shown on the left,

10   misses all of home plate.  And at that point you have to

11   guess how tall the batter and the catcher would be, but it

12   looks like you probably could not see them and you could not

13   see third base.  As to whether you could see shortstop or not

14   would be where they lined up.

15   Q   Mr. Terry, let me take this one step at a time, if I can,

16   on this.

17       So the picture on the left-hand side, the wheelchair-user

18   view, was taken using the anthropometric eye measurements you

19   talked about earlier in terms of the presumed height,

20   presumed distance back from the front of the row, correct?

21   A   I don't know that I would use the word "presumed," but,

22   yes, that's -- the concept is that those are the dimensions

23   that are given in the settlement agreement the Justices had

24   performed both in *Ellerbe Becket* and in the Olympic stadium

25   before this stadium was built.

1   Q   Based on the Dreyfuss standard, which is the architect

2   guide that you mentioned?

3   A   Yes.

4   Q   So on the left-hand side, then, there's two lines going

5   across both of these pictures.  There's one that says

6   "shoulder," correct?

7   A   Yes.

8   Q   Okay.  And then there's another one that says "head,"

9   correct?

10  A   Yes.

11  Q   Could you point it out, just to make sure the judge sees?

12  A   So this bottom line, right here, is the shoulder line.

13  The top line is the head line.  So that's the head, and this

14  is the shoulders down below.

15  Q   Okay.

16  A   And this is made by extending the line of where a row of

17  heads or a row of shoulders would be, based on the lineup of

18  the seats below that and drawing the vanishing points in on

19  CAD to make sure that they were accurate.

20  Q   Okay.  To make sure I understand that and the judge

21  understands that, Mr. Terry, the line, in essence, would

22  reflect the presumed shoulder height of a standing spectator

23  in the row immediately in front of the wheelchair user?

24  A   That's correct.

25  Q   Okay.

1          And the head line would reflect the presumed height

2    based on these anthropometric measurements at which the head

3    of someone standing two rows in front of a wheelchair user;

4    is that correct?

5    A    That's correct.

6    Q    Okay.

7          The picture on the right, which is -- was, as you

8    described, taken just simply one row in front, correct?

9    A    Correct.

10   Q    And what this reflects is a picture taken, presuming the

11   person is able to stand, correct?

12   A    Yes.

13   Q    As opposed to a wheelchair user?

14   A    That's correct.

15   Q    And then it reflects what would be obscured by a presumed

16   shoulder height of somebody one row in front of them, in what

17   would be obscured by a head of a person's presumed height two

18   rows ahead?

19   A    Or a row of heads.

20   Q    Okay.

21         So in this picture, then, just to be clear, what would

22   not be able to be seen above the heads of the users two rows

23   in front, from the wheelchair user's perspective, would be

24   the photographic part that is not colored below, correct?

25   A    Yes.

1    Q    Okay.

2         And that would mean that they would not be seeing that

3    portion of the field that appears in the photograph without

4    the color overlay?

5    A    That's correct.

6    Q    And that would include home plate?

7    A    Yes.

8    Q    And the third baseline?

9    A    Correct.

10   Q    A standing spectator would be able to see -- on the

11   right-hand picture, would be able to see home plate and the

12   third baseline, correct?

13   A    Yes, plus the dirt on this side of the baseline.

14   Q    Let's look at a couple other --

15            THE COURT:  Wait.  That last question confused me.

16       The left-hand picture --

17            THE WITNESS:  Yes.

18            THE COURT:  -- tells us what the seated wheelchair

19   person can see and can't see, right?

20            THE WITNESS:  Yes.

21            THE COURT:  And he or she can only see what's in the

22   blue, that narrow strip?

23            THE WITNESS:  That's correct.

24            THE COURT:  Okay.  Is the right-hand picture also a

25   seated wheelchair person?

1              THE WITNESS:  No.  The right-hand picture is a

2    standing spectator one row ahead of the wheelchair user.  So

3    this is the comparable position.  Because the sight lines

4    just have to be comparable to what everyone else gets.

5         So if you look at these two, you can see what another

6    member of the general public who is standing one row ahead,

7    what they can see compared to what the wheelchair user can

8    see from their elevated platform that's not quite elevated

9    enough.

10   Q   (By Mr. Connor)  Mr. Terry, I want to make sure I

11   understand?

12            There are three colors that appear on this picture, the

13   light blue, the dark blue, and the green, correct?

14   A   Yes.

15   Q   Are those -- is that what can be seen by the wheelchair

16   user?

17   A   Those are things that can be seen by anybody.  On the

18   right-hand, the standing spectators; on the left, wheelchair.

19            THE COURT:  Wait a minute.  What can be seen by

20   anybody?  I thought this was the point of view of the

21   wheelchair.

22            THE WITNESS:  The one on the left is what the

23   wheelchair can see, yes.

24            THE COURT:  The wheelchair cannot see anything other

25   than the blue?

 1              THE WITNESS:  That's right.  And the green -- in this
 2     area, with the red dot on the right, that is the portion of
 3     the area between the dirt and the dugout that the wheelchair
 4     can see.  And to the right, the comparable person can see
 5     more of that, essentially, foul-ball territory that the
 6     standing spectators can see.  Excuse me.
 7          So the wheelchair user can see this tiny bit of green on
 8     the left, and the standing spectator can see the larger green
 9     on the right.  That is in foul-ball territory off of the
10     first baseline.
11              THE COURT:  I thought you said what the wheelchair
12     person could see is the blue and only the blue.  Now you're
13     saying it can see the green also?
14              THE WITNESS:  They can see anything above that
15     horizontal line that says "head," this line here.  So
16     anything above that line is above the heads of people two
17     rows ahead.  So they can see the portion of the infield that
18     is shown in blue, they can see the portion of the foul
19     territory near first baseline that's shown in green, and they
20     can see the portion of the outfield that's shown in light
21     blue.
22              THE COURT:  Okay.
23     Q   (By Mr. Connor)  And, Mr. Terry, the reason you colored
24     those areas differently was just to assess what portions of
25     the infield and outfield and side field can be determined?

1           THE COURT:  What did you just say?

2    Q   (By Mr. Connor)  Mr. Terry, on the bottom of this, you

3    have these colors associated with the side, infield, and the

4    outfield, right?

5    A   Yes.

6    Q   So the colors -- just to make clear, anything that's

7    actually colored in is something that could be seen by even a

8    wheelchair user or the non-wheelchair user in these pictures,

9    right?

10   A   Yes.  We've used the same technique on both images.

11   Q   Okay.

12       And so what could not be seen by the wheelchair user in

13   the left picture is the portion of the photo that's below

14   that line that's not colored, right?

15   A   That's right.  It's all of -- this stuff cannot be seen by

16   the wheelchair user, everything down here.

17   Q   Okay.

18       And, similarly, what's obscured for the

19   non-wheelchair-using patron is everything below this line?

20   This line, correct?

21   A   Yes.

22   Q   Okay.

23       And so in terms of comparability, what you want to

24   assess is what can be seen by each, correct?

25   A   Yes.

1  Q  Okay.

2      And the wheelchair user cannot see home plate or third

3  base, correct?

4  A  That's correct.

5  Q  Okay.

6      And the non-wheelchair user can, correct?

7  A  Yes.

8  Q  Okay.  Let's go on and look at Exhibit 8.

9      Mr. Terry, did you use the same methodology for these

10 photographs?

11 A  I did.

12 Q  Okay.

13     And where were these taken?

14 A  These were taken from Section 214, Row 11A, Seat No. 9,

15 and one row forward, Seat No. 16.  Again, because it was a

16 diagonal, I had to shift it over to be able to see the

17 comparable view.

18 Q  Okay.

19     So in this photograph, then, Mr. Terry, what could be

20 seen over the head of a standing spectator two rows in front

21 by wheelchair users is what's colored in that left-hand

22 picture, correct?

23 A  That's correct.

24 Q  Okay.

25     And what could not be seen is, apparently, the area by

1    first base, correct?

2    A    Yes.

3    Q    The non-wheelchair user could see the entirety of the

4    playing field, correct?

5    A    All of the infield.

6    Q    Okay.

7         Let's go on and look at another one, B7, which is

8    Exhibit 9.

9         Can you -- same methodology here?

10   A    Same methodology.

11   Q    Okay.  And these were taken in Section 224?

12   A    224, 11A, Seat 7, and one row forward, Seat 12.

13   Q    Okay.

14        Mr. Terry, where did you observe accessible seating

15   throughout the stadium?

16   A    Distributed all over the stadium.  There are lots of

17   accessible seats.

18   Q    Okay.  On the lower level, where are they located?

19   A    They're in the back, except for the one or more seats that

20   are in the Diamond Club area there.  Everything is in the

21   back of the 100 level and the back of the 200 level.

22   Q    Okay.

23   A    It's only the 300 level where they're in the middle.

24   Q    Okay.

25        Mr. Terry, the picture here, the wheelchair user could

1    not see home plate; is that correct?

2    A    That's correct, home plate or any of the dirt around it.

3    Q    And apparently cannot see first base?

4    A    That's correct, and maybe not even the second baseman,

5    where they're standing.

6    Q    That's because the shift is on, correct?

7    A    I'm sorry?

8    Q    I'm sorry.  It's too late for a joke.

9         The one on the right, the non-wheelchair user can see

10   the entirety of the infield, correct?

11   A    Yes.

12   Q    Okay.  Let's look at Exhibit 10, if we could.

13        Similar methodology here?

14   A    Yes.

15   Q    In this instance, it would appear that the wheelchair user

16   can see as much as -- or almost as much, if not more, as the

17   non-wheelchair user, correct?

18   A    They can see a little more than the non-wheelchair users

19   can one row in front.

20   Q    Okay.  Let's move on to --

21            THE COURT:  Why is that?

22            THE WITNESS:  When we got there to look at that --

23   and one of the reasons I selected 227 is because 227 had an

24   aluminum platform that had been built up enough to give them

25   those sight lines.

1      So at some point in the past, they had raised that section

2   for wheelchairs -- there were, I think, two sections in the

3   stadium that had these raised platforms where you could

4   actually get comparable sight lines.  All the other places

5   looked like the original concrete or concrete that gave the

6   wheelchair users some elevation, but not enough to be

7   comparable.

8   Q   (By Mr. Connor)  So the consequence of that elevation,

9   apparently, was in this situation to give comparable sight

10  lines, correct?

11  A   Right.  The modification achieved comparable sight lines.

12  Q   Okay.

13        Then we'll look at Exhibit 12, if we could.

14        Similar methodology in this one, correct?

15  A   Yes.

16  Q   Okay.

17        In this case, at least a portion of the field is

18  obscured for the non- -- for the wheelchair user, correct?

19  A   Yes.

20  Q   Okay.

21        A lesser portion of the field is obscured for the

22  non-wheelchair user, correct?

23  A   A lesser portion of the field, but none of the infield is

24  obscured for the non-wheelchair user.

25  Q   Okay.

```
 1              THE COURT:  None is...?

 2              THE WITNESS:  None of the comparable user -- the

 3    comparable user can see all of the infield.  The wheelchair

 4    user misses third base and part of those lines approaching

 5    and leaving third base.

 6              THE COURT:  This was not built up?

 7              THE WITNESS:  This was not built up.  Like I said,

 8    there were two sections in the stadium, I think they're 227

 9    and somewhere very close to that one that had the raised

10    platforms, but nothing else in the stadium, that I saw, had

11    those.

12    Q   (By Mr. Connor)  Mr. Terry, let's look at Exhibit 13, if

13    we could.

14              And, here, this was taken on the 300 level; is that

15    correct?

16    A   Yes, Section 330.

17    Q   All right.  And same methodology?

18    A   Exactly.

19    Q   Okay.

20              The wheelchair user cannot see home plate when there're

21    standing spectators?

22    A   That is correct, or probably anybody standing near home

23    plate.

24    Q   Okay.

25              And the non-wheelchair can see the entirety of the
```

1    infield, correct, and the outfield?

2    A   Yes.

3    Q   Mr. Terry, you did not take measurements of all of the

4    accessible-seating locations, correct?

5    A   No.

6    Q   From all of them?

7    A   No.

8    Q   So the sample that you took was what was reflected on the

9    first exhibit that we looked at in terms of locations?

10   A   Yes.

11   Q   And that appeared to you to be comparable to or an

12   appropriate sample?

13   A   I tried to get a representative sample in, you know, the

14   time that I was there.

15   Q   Okay.

16       And, Mr. Terry, let's look at Exhibit 15, briefly, if

17   we could.  Can you tell the court what this is?

18   A   If you looked at the prior exhibits, below the images

19   there were numbers where we calculated what percentage of the

20   infield, the sidelines, and the outfield, the whole field,

21   what percentage of those were visible to the wheelchair users

22   and what percentage of those were visible for the comparable

23   views.

24       So this chart -- this spreadsheet just gives you an

25   explanation or a summary of what we found there.

1      The red numbers indicate the percentages that were visible

2   to the wheelchair users that were less than what was visible

3   to the comparable users.

4      So you would compare -- for example, taking 129, because

5   it has the -- in that view, it has only one comparable.  So

6   the wheelchair user could not see any of the grass on their

7   side of the dirt, along that baseline, where the standing

8   spectator one row forward could see 91 percent of that.

9   Ninety-one percent of that would be visible over the

10  sidewall, in front of the front wall or the dugout.

11     The infield, they could only see 65 percent of the

12  infield, where the comparable person could see 100 percent.

13  The outfield, they could see 99, and the other person could

14  see 100, and then 62 percent versus 97 percent for the other

15  spectator of the entire field that was in the image.

16     So this chart just gives you a way to see -- and then you

17  can see, down on Section 227, the blue letters.  Those

18  indicate that the wheelchair actually had better visibility

19  of the field, a higher percentage of the field than the

20  comparable did.

21  Q   Okay.  And that was where the raised platform was?

22  A   Yes.

23     So the red lines indicate where there was not

24  comparability, the red numbers; the blue numbers indicate

25  where there was comparability or better comparability.

1   Q   Okay.

2   A   And the standards look for at least comparability in

3   the -- under '91.

4   Q   Mr. Terry, let's now look, if we could, at Exhibit 16.

5   A   Okay.

6   Q   There are two pictures on this exhibit.  Can you explain

7   to the court what they reflect?

8   A   In this case, looking at the scoreboard, we outlined the

9   edges of the scoreboard on both the wheelchair view and on

10  the comparable view and said what percentage of that

11  scoreboard is actually visible to the wheelchair user.

12      Although you can see the edges of that, part of it is

13  blocked by a speaker, so you only got a score of 93 percent,

14  as you can see here, where you had 100 percent from the other

15  with no speakers blocking that.

16  Q   And what altitude and locations were these pictures taken?

17  A   Again, it's the same wheelchair user's eye point from the

18  center of the wheelchair user's face.

19  Q   But here, effectively, the wheelchair user has almost a

20  complete view of the scoreboard, correct --

21  A   That's correct.

22  Q   -- other than that?

23      Let's look at Exhibit 17.  Same methodology here?

24  A   Same kind of methodology.

25  Q   And here --

1   A    This is the overhang line right here.

2   Q    Okay.

3   A    And so I'm not drawing it through.  In order to determine

4   what percentage of that was blocked, we extended the

5   scoreboard up, and looked and did the calculations based on

6   the information we had there.

7        Here is the impact for the comparable user one row

8   forward, where the overhang is here, and it runs above the

9   scoreboard.  So a person sitting Row 1 to 40 can see the

10  entire scoreboard.  It's only when you get to 41, the

11  wheelchair row, that you have a percent blocked.

12  Q    And, Mr. Terry, this is visually confusing.  You can't

13  actually see the scoreboard -- the top of the scoreboard from

14  the wheelchair-user view on the left, correct?

15  A    That's right.  Those are --

16  Q    What portion of that can you not see?

17  A    Everything above the pink line --

18  Q    Okay.

19  A    -- is not visible to you.  We extended that in order to

20  run --

21  Q    I see.

22  A    -- the calculation.

23  Q    I see.

24       THE COURT:  The person in Row 40 can't see the whole

25  scoreboard, either, can they?

1              THE WITNESS:  Row 40 can see everything.  So the

2    entire orange -- the orange outlines where the scoreboard

3    edges are.  The pink line, in both cases, shows where the

4    overhang is.  And so the portion of this scoreboard that is

5    above the pink line is invisible or is blocked for the

6    wheelchair user.  The portions below the pink line,

7    wheelchair user can see.  Every bit of the scoreboard is

8    below the comparable users -- the overhang for the comparable

9    user.

10   Q   (By Mr. Connor)  Mr. Terry, let's look at a couple more

11   pictures like that.  Let's look at Exhibit 18.

12          Similar methodology here?

13   A   Exactly the same methodology.

14          One thing we didn't really talk about is the percent

15   of that scoreboard that is visible is shown here, and that's

16   taken by doing the math on the -- of what's below the pink

17   line within the orange line of the scoreboard edge and what's

18   above the overhang within the orange.

19   Q   Okay.

20          Exhibit 19 is the same type of thing?

21   A   Yes, it is.

22   Q   Exhibit 20 is the same type of thing?

23   A   It is.

24   Q   And the percentages reflected there show and compare the

25   amount of scoreboard that can be seen?

1          THE COURT:  Am I correct, Mr. Terry, that if the

2    platform in which the wheelchair user was sitting was raised

3    so that he or she could see the infield and the outfield

4    more --

5          THE WITNESS:  Yes.

6          THE COURT:  -- they could see less of the scoreboard?

7          THE WITNESS:  That's correct.

8          THE COURT:  Are you making recommendations here, or

9    are you just reporting the facts as you see them?

10          THE WITNESS:  I haven't made any recommendations.

11          THE COURT:  Okay.

12          THE WITNESS:  I don't know if I will be or not,

13    but --

14          THE COURT:  I don't know, either.

15          THE WITNESS:  -- I haven't yet.

16          THE COURT:  All right.

17    Q   (By Mr. Connor)  Mr. Terry, if you moved the wheelchair

18    user forward, would they have more of a view under an

19    overhang?

20    A   Yes.

21          THE COURT:  I assume if you moved them forward,

22    that's the way you would have measured it in the first place,

23    right?

24          THE WITNESS:  We were not attempting to find out how

25    to solve these problems at this point.  We didn't have enough

1   time to try to solve --

2           THE COURT:  Are you saying that if we moved the

3   wheelchair user forward, they could see more of the

4   scoreboard?

5           MR. CONNOR:  I wanted to --

6           THE WITNESS:  Yes.

7           MR. CONNOR:  -- clarify that.  Yes, I think that's

8   correct, Your Honor.

9           THE COURT:  Well, I don't understand why the picture

10  wasn't taken with a wheelchair user forward.

11          MR. CONNOR:  The wheelchair could not, presently, as

12  the stadium is configured, move forward.  A possible

13  mechanical fix, as I understand it -- and I don't want to get

14  into this in detail -- but would be to move the wheelchair

15  platforms forward.

16          THE WITNESS:  Extend the platforms.

17          MR. CONNOR:  Extend the platforms.

18          THE COURT:  I'm not talking about moving the

19  platform.

20      Did you mean to say that if the wheelchair user moved

21  forward from the position these pictures were taken in, he

22  could see more of the scoreboard?

23          MR. CONNOR:  Well, the answer would be no, because

24  they can't move forward.  They can't move forward as it's

25  currently configured.  If they could move forward --

 1          MR. WILLEY:  Mr. Terry should testify, not

 2   Mr. Connor.

 3          THE COURT:  Yes.

 4      You're not saying that he could have moved forward and

 5   seen more of the scoreboard in these pictures?

 6          THE WITNESS:  A wheelchair user, at this point, is

 7   prevented from moving forward by the guard that keeps them

 8   from dropping onto the row in front of them.

 9          THE COURT:  Okay.  That's the answer I needed.  Thank

10   you.

11   Q   (By Mr. Connor)  Mr. Terry, Exhibit 21, was that the same

12   type of thing?

13   A   Yes, it's the same technique.

14   Q   Okay.  Thank you.

15          Mr. Terry, could you look at Exhibit 26?

16   A   Yes.

17   Q   Can you tell Judge Rothstein what this exhibit reflects?

18   A   This is a composite drawing that we pulled off of

19   TicketMaster, showing, in blue, the seats -- the little, blue

20   dots that you probably can't see in this -- the blue zones

21   are areas where tickets were available on the day that we did

22   this particular analysis, and in dark red, the lines that are

23   around the various locations, these lines are the places

24   where there are banks of wheelchair users.

25      On this particular day, there was one seat for a

1    wheelchair user in the Diamond Club that was available, and

2    that's where that one seat is right now.

3        So all of these dark red lines on the drawing indicate

4    where wheelchair users are able to buy tickets when they're

5    available.

6    Q   On that particular day?

7    A   On that particular day.

8            Now, this blue does not show which tickets had been

9    sold out.  The red lines just show where the wheelchair users

10   would be able to go.  The red line covers up the indication

11   of whether somebody already bought the ticket or not.

12   Q   Okay.  What's the difference between that exhibit and

13   Exhibit 27?

14   A   Exhibit 26 is one that we prepared, my office did, and

15   Exhibit 27 is somebody else's drawing.

16   Q   Oh.  Okay.

17   A   It seems to indicate the same kind of things, but it looks

18   like it was -- it looks like it was from a different game or

19   a different day, looking at the seats that are open.

20   Q   Okay.  If you don't know what it is, I won't ask you

21   further.

22           Mr. Terry, the pictures that we've just looked at, the

23   exhibits that you've prepared and the calculations that you

24   made were based on the Dreyfuss standards, the anthropometric

25   standards, correct?

1    A    Yes.

2    Q    All right.

3         Are those a reasonable -- the assumptions embedded in

4    those anthropometric standards, are those reasonable in view

5    of more current information about actual body heights and

6    shapes of wheelchair users?

7    A    In my opinion, no, they are not.

8    Q    Okay.  And why is that?

9    A    The Dreyfuss study, when I was on the editorial board for

10   *Graphic Standards* to look at the changes caused by the ADA,

11   and I called their office to find out how they came up with

12   these numbers, because they didn't match with the numbers

13   that I was seeing from actual people with disabilities.

14        They said they took able-bodied people and sat them in

15   hospital wheelchairs and measured them.  And people with

16   disabilities are disproportionately shorter, for the most

17   part.  Many of the disabilities that cause people to use

18   wheelchairs makes them not the same height or size sitting in

19   a chair that real wheelchairs users are.

20        So the Access Board commissioned a study to look into the

21   heights of people -- real people that used wheelchairs.  That

22   was done by Ed Steinfield at SUNI Buffalo.  That was released

23   in December of 2010, that information was, and I believe

24   that's the current research that should be used to determine

25   what sight lines for wheelchair users should be used.

 1   Q    Okay.  I'm going to ask you about Exhibit 130 and 131.

 2   Let's start with 130.

 3              MR. WILLEY:  Your Honor, we object to 130 and 131.

 4              THE COURT:  And...?

 5              MR. WILLEY:  Those are hearsay.

 6              THE COURT:  What is it?

 7              MR. WILLEY:  It's an email exchange between Mr. Terry

 8   and someone else.  He's attempting to put somebody else's

 9   email in as an exhibit.

10              MR. CONNOR:  Your Honor, unless I've misunderstood

11   the law for a long time, experts are entitled to rely on

12   hearsay, if it's something that they would normally rely upon

13   in the execution of their responsibility.

14              THE COURT:  I'm sorry?

15              MR. CONNOR:  I trailed.  I apologize.

16      My -- experts are entitled to rely on hearsay, and I'm not

17   going to quote the rule verbatim.  They're entitled to rely

18   on hearsay if people in their field would be expected to do

19   so under similar circumstances.

20              MR. WILLEY:  Your Honor, this is information

21   Mr. Terry just now testified was from 2010, and he thinks

22   that's the data that should have been used in 1996.  I'm not

23   quite certain how that's relevant.

24              THE COURT:  What is the relevance of this?

25              MR. WILLEY:  Moreover, Mr. Terry's own study did not

1    use the data he now wishes to talk about.

2         MR. CONNOR:  Your Honor, the relevance of this is, I

3    believe that we're going to request that the court enter a

4    declaratory order.  And in view of the fact that this is more

5    reliable and accurate data in terms of what should be

6    presumed about anthropometrics of wheelchair users, we're

7    going to suggest that the court should use this data.  So

8    that's the relevance of it.

9         THE COURT:  This data was not included in his report?

10        MR. CONNOR:  This is an exhibit to his report.

11        MR. WILLEY:  He did not use this anthropometric data

12   in his report.

13        THE COURT:  I'm going to sustain the objection.

14        MR. CONNOR:  Your Honor, can I explain how it was and

15   was not used?

16        THE COURT:  Sure.

17        MR. CONNOR:  Okay.  What I wanted to establish, and I

18   asked Mr. Terry --

19        THE COURT:  Talk slower, counsel.

20        MR. CONNOR:  I asked him to prepare the exhibits

21   we've gone through using the conservative data that was used

22   in the *Ellerbe Becket* case and the Dreyfuss data.

23        THE COURT:  Right.

24        MR. CONNOR:  I wanted to demonstrate that even using

25   that conservative data, the views of wheelchair uses are not

1  comparable to those of non-wheelchair users.

2     What I think, in requesting relief, would be appropriate

3  to do is to fashion relief based on the actual heights of

4  wheelchair users, and so that's why I want Mr. Terry to

5  testify to the what the -- what the accepted data is today.

6          THE COURT:  Okay.  Well, this -- yes, counsel, did

7  you want to respond?

8          MR. WILLEY:  I was just going to say, Your Honor,

9  that, in opening, I mentioned that the plaintiffs were

10 seeking to have you legislate stadium design retrospectively.

11 Using 2010 data for a stadium designed in 1996 is exactly

12 that point.

13         THE COURT:  You want me to fashion relief for this

14 situation based on something that happened in 2010?  Is that

15 what you're asking me to do?

16         MR. CONNOR:  Your Honor, I believe that would be

17 appropriate.  This stadium never complied with the 1991

18 requirements, which means that it's appropriate to apply the

19 2010 standards, potentially.

20         THE COURT:  Well, this is as good as a time as any to

21 discuss something I'd like counsel to think about and talk to

22 me about tomorrow, and it really is taking you away from this

23 objection.

24    The more I hear in this case, the more I think this is

25 really a two-part case.  One is a case in which I make a

1   ruling about either of the two, and if I make a ruling about

2   either of the two, that there is a problem, and that there is

3   a failure to comply.

4        Then there's the second part of the case, which is what we

5   do about it.

6        Right now I will tell the plaintiffs that I haven't

7   heard -- this is the first suggestion I've heard -- I

8   haven't -- no, this isn't even a suggestion.  I haven't heard

9   any suggestion from plaintiffs about what they would want me

10  to do.  I mean, it was lacking from any of the briefs, it was

11  lacking from anything I've heard.

12       I mean, I just raised the issue that, I don't know, I

13  assume what plaintiff is going to ask is that I -- if I find

14  that there isn't something comparable between a seated

15  wheelchair user and a standing person, that since we already

16  have one instance where it worked, that you can ask me to

17  order raising the platform.  But we've already established

18  that if I order the platform raised, and they raised the

19  platform, they're not going to be able to see the scoreboard,

20  at least worse than they see the scoreboard now.

21       So I don't even know what plaintiff is suggesting we do

22  about these things.  Do you want the platform raised?

23  Because if you do, then why are you arguing to me about the

24  scoreboard?  I mean, I don't know what you expect me to do.

25  There are things that can be done about the scoreboard, but

1   nobody has made any suggestion to me as to what any of the

2   solutions are.

3       Now you're coming up with the fact that one of my

4   solutions, were I to rule that there's a lack of

5   comparability, that one of my solutions should be a 2010

6   study applying it now.

7       You know, this is the first suggestion I've heard, and it

8   is -- I'm not even sure it would be appropriate, let alone to

9   admit this thing.

10      I'm just pointing out to counsel that I'm hearing what I

11  think is a two-part case, and I haven't heard any real

12  suggestion -- until now -- now this is the first I've heard

13  of something you're going to want me to do in the future in

14  applying a 2010 standard.

15      Counsel has a point.  How could they have complied with

16  the 210 standard that wasn't there?  Now, the fact that they

17  may not have complied with the 1991 standard, that's a

18  different situation.  Failure to comply is failure to comply

19  with what was there.

20      I think what you're asking me to do is, of course, not

21  find out they didn't comply with the 210, because they

22  didn't, it wasn't even around.  But to apply a 210 standard,

23  ordering them -- let's say I did find a failure to comply,

24  but now I should be ordering them -- I don't know.  I mean,

25  this is a legal issue that nobody has briefed for me.

1    I mean, what's the propriety of applying -- on one hand, I

2    can see what you're saying.  If they're going to do it now,

3    do it in conformity with the existing rules and regs now.  On

4    the other hand, there's something about that that seems very

5    strange to do to people who built in accordance with

6    something that they should have known about, or didn't build

7    in conformance, if that's what I find.  But to superimpose on

8    them the standards now, I don't know.

9        Counsel, do you want to respond?

10        MR. WILLEY:  Number one, we raised this issue in a

11    motion in limine because Mr. Terry did not opine, in his

12    report on remediation of any sort, what a fix might look like

13    if you were to find in plaintiffs' favor.

14        THE COURT:  Wait.  I think you should take the

15    position at the -- we'll be able to hear you better if you go

16    to the lectern and talk to us, and you can take turns going

17    back and forth.

18        MR. WILLEY:  Absolutely, Your Honor.

19    Mr. Terry's expert report did not opine on remediation,

20    which is to say he did not propose, offer any kind of fix.

21    In fact, he expressly disclaimed his ability to do so in his

22    report.  As a result, we moved in limine to prevent him from

23    now testifying about some sort of remediation that he's never

24    previously opined about.

25        And the upshot, and Your Honor is absolutely right to be

1  keen on this, is, plaintiffs have failed to come up with and

2  to offer and to have any evidence of what would be a fix if

3  there were to be liability, and that's failure of the

4  plaintiffs' case, Your Honor, and it's one that should weigh

5  heavily in your decision here.

6        I don't think it means that when they failed to make their

7  case over the course of 18 months, they somehow get a do-over

8  at trial.

9            MR. CONNOR:  Your Honor, I'd like to say two things.

10  One, I meant to presage this when we had our pretrial

11  conference, and I said what we anticipated doing was proving

12  the Mariners and the defendants had not complied with their

13  obligations under the ADA.  Right?  And I told you that I

14  thought that what we'd be doing at the end of this case is

15  asking you to issue declaratory relief and telling them to

16  remediate that.  All right?

17        What I also said was that we weren't necessarily going to

18  tell them the mechanisms by which they had to remediate it.

19  We were going to ask you to tell them what standards they had

20  to meet.  Okay?  So that does not necessarily entail a

21  discussion of what they do.  It just tells them they have to

22  do this.

23        With respect to the issue of whether these current

24  anthropometric data should be used or not, that goes to

25  whether if they hadn't complied in 1991, what are they

1  supposed to do in 2010?  And we can put that in the proposed

2  findings of fact and the like.

3      I'm not asking for remediation testimony from Mr. Terry

4  right now.  This exhibit that I was asking him about was

5  attached to a report that was provided to the Mariners in

6  March.

7      All I'm asking, which we disclosed and he disclosed -- I'm

8  asking him to put in the record so when you make your

9  decision about declaratory relief -- I'm asking him to

10  explain whether the data that underlies the *Ellerbe Becket*

11  anthropometric measurements should or should not be used.

12      And as Mr. Willey stated in opening argument, the

13  Department of Justice has adopted millions of measurements

14  for the standards, except for the *Ellerbe Becket* case, which

15  was a consent order in one case.

16          THE COURT:  But you're using that case?

17          MR. CONNOR:  I use that case to show that even under

18  that -- what we think is an inappropriate anthropometric

19  measurement, they failed to comply.  So I'm using the case to

20  show the breach.  And then the question is, if they've

21  breached, then they've breached their obligation, what

22  standard should be used -- should they be directed to

23  remediate to?

24      And, Your Honor, I guess the other thing I'll say, because

25  I don't want this to go unsaid for 24 hours, the obligation

1    to show remediation is not part of our case.  We do not have

2    that obligation.  We have the obligation to show that they

3    don't comply with the requirements of the ADA.  Okay?  And

4    once we've done that, they are supposed to do so.

5        And they have defenses, based on, you know, whether they

6    can do it or not.  But that is a misstatement of our prima

7    facie obligations in this case.

8            MR. WILLEY:  Two things, Your Honor.  Number one, the

9    Department of Justice has never used the anthropometric data

10   that Mr. Terry is seeking to get in.

11       Number two, Mr. Connor told you that what he wants to do

12   at the end of this case is to have you enter, quote,

13   declaratory relief, end quote, requiring us to simply comply

14   with the ADA.  That sounds, to me, very much like a, quote,

15   obey the law injunction, and the court is well attuned to how

16   those are received.

17           THE COURT:  I'll tell you what.  I only have to make

18   one ruling now.  All right?  And we can go on tomorrow with

19   what we need to go on with.  I'm going to exclude the 2010

20   information.

21           MR. CONNOR:  Okay.

22           THE COURT:  We will proceed relying on the Dreyfuss,

23   which, I think, is the basis of all these pictures.  I just

24   looked at a -- I started at 14, and I'm up to 30.  I've just

25   looked at about 15 exhibits that were based on the Dreyfuss

1   measurements.

2           MR. CONNOR:  Okay.

3           MR. WILLEY:  Your Honor, would it be easier to refer

4   to the *Ellerbe Becket* numbers?  Because that's where they

5   come from.  In his report, Mr. Terry said he's used the

6   numbers from *Ellerbe Becket*, based on Dreyfuss.

7           THE COURT:  Whatever they were, I'm using the ones

8   that he used when he made all those pictures.  I'm not going

9   to start now with a totally different set of standards.

10      So the only ruling I need to make today is I'm sustaining

11  the objection.

12          MR. CONNOR:  Okay, Your Honor.

13          THE COURT:  Tomorrow morning, I guess you're going to

14  be back here, Mr. Terry.  I had hopes that we would somehow

15  finish with you.  I could see those were very, very

16  unrealistic, because we haven't gotten through direct, let

17  alone cross.  But that's all right.  We have time tomorrow.

18      Am I correct, counsel, that after Mr. Terry, the only

19  witnesses I have are the four plaintiffs?  I'm asking

20  defendant that because there was a "maybe" in there, and I

21  don't know if you've reached a decision about that.

22      You've got one expert, right?

23          MR. WILLEY:  Yes.

24          THE COURT:  And a maybe?

25          MR. WILLEY:  As of today, our plan would be to put on

1    our expert following the plaintiffs.

2            THE COURT:  Okay.  The one expert?

3            MR. WILLEY:  Yes.

4            THE COURT:  And then we have the four plaintiffs?

5    Okay.  So we are making progress, and, I think, actually,

6    good timing.

7         So, thank you, counsel.  I'll see you back here at ten

8    o'clock tomorrow morning, and we'll proceed from there.

9               (Proceedings adjourned at 5:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


Dated this 21st day of October 2019.


/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter