UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

CLARK LANDIS, ROBERT BARKER,      )
GRADY THOMPSON, and KAYLA BROWN, ) CASE NO. C18-01512-BJR
                                  )
            Plaintiffs,           ) SEATTLE, WASHINGTON
                                  )
v.                                ) October 16, 2019
                                  ) 10:00 a.m.
WASHINGTON STATE MAJOR LEAGUE     )
BASEBALL STADIUM PUBLIC           ) BENCH TRIAL, Day 2 of 4
FACILITIES DISTRICT, BASEBALL     )
OF SEATTLE, INC., a Washington    )
corporation, MARINERS             )
BASEBALL, LLC, a Washington       )
limited liability company, and    )
THE BASEBALLCLUB OF SEATTLE,      )
LLLP, a Washington limited        )
liability partnership,            )
                                  )
            Defendants.           )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

  For the Plaintiffs:      CONRAD A. REYNOLDSON
                           MICHAEL TERASAKI
                           Washington Civil & Disability Advocate
                           4115 Roosevelt Way NE, Suite B
                           Seattle, WA 98105

                           STEPHEN P. CONNOR
                           DERIK R. CAMPOS
                           Connor & Sargent, PLLS
                           1000 Second Avenue, Suite 3670
                           Seattle, WA 98104

  For the Defendants:      STEPHEN C. WILLEY
                           SARAH GOHMANN BIGELOW
                           Savitt Bruce & Willey LLP
                           1425 Fourth Avenue, Suite 800
                           Seattle, WA 98101-2271

## EXAMINATION INDEX

EXAMINATION OF                                          PAGE

 JAMES TERRY        DIRECT EXAMINATION (continued)     3
                    BY MR. CONNOR

                    CROSS-EXAMINATION                  41
                    BY MR. WILLEY

                    REDIRECT EXAMINATION              110
                    BY MR. CONNOR

                    RECROSS-EXAMINATION               118
                    BY MR. WILLEY

 CLARK LANDIS       DIRECT EXAMINATION                130
                    BY MR. TERASAKI

                    CROSS-EXAMINATION                 135
                    BY MS. GOHMANN BIGELOW

## EXHIBIT INDEX

EXHIBITS ADMITTED                                      PAGE

 ADMITTED OF THE RECORD

REPORTED BY:      NANCY L. BAUER
                  FEDERAL OFFICIAL COURT REPORTER
                  700 STEWART STREET, SUITE 17205
                  SEATTLE, WA 98101
                  (206) 370-8506

```
 1                          PROCEEDINGS

 2     ────────────────────────────────────────────────

 3              THE COURT:  Good morning, all.

 4              MR. WILLEY:  Good morning, Your Honor.

 5              THE COURT:  Have we lost a witness?  Mr. Terry?

 6              MR. CONNOR:  Your Honor, I had anticipated we'd

 7     discuss with you what you'd asked us to think about last

 8     night in terms of how the trial will proceed.  If you'd like

 9     to just begin with Mr. Terry, I'll put him up there.

10              THE COURT:  Do you need to discuss that now, or what

11     are you thinking?

12              MR. CONNOR:  No, I was trying to respond to what the

13     court had requested last night.

14              THE COURT:  No.  Let's go ahead with Mr. Terry.

15              MR. CONNOR:  Okay.  Thank you, Your Honor.

16              THE COURT:  Good morning.

17              THE WITNESS:  Good morning.

18     JAMES TERRY,                     HAVING BEEN PREVIOUSLY SWORN,
                                        TESTIFIED AS FOLLOWS:
19

20                      DIRECT EXAMINATION (continued)

21     BY MR. CONNOR:

22     Q   Mr. Terry, I don't want to burden the court and repeat

23     things we discussed yesterday, but I had noted last night

24     that there was something that I wanted to make sure we

25     clarified for the court, and that was regarding exhibits
```

1   which included -- I believe they began on Exhibit 16,

2   Plaintiffs' Exhibit 16, and proceeded through Exhibit 25.

3            I wanted to talk to you about something that I don't

4   know if it was clear yesterday, and that was where the

5   cameras were located in those varies pictures.  And these are

6   the pictures that pertained to the scoreboard.  Okay?  So

7   let's just go through them quickly, if we could.

8            Could you look at Exhibit 16, which is up?

9   A   I have it.

10  Q   Okay.

11           Mr. Terry, on this picture, was what the location of

12  the camera with regard to the comparable spectator view?

13  A   It was Section 129, Row 40, Seat 18, and it was located at

14  the height of a standing, average-size human.

15  Q   Okay.  Could you look at the next exhibit, which is 17?

16           Can you tell us where the height of the comparable

17  spectator view is taken on that exhibit?

18  A   It's in Section 135, Row 40, one row forward of the

19  wheelchair position that it's compared to, and it's in

20  Seat 1, at the height of a standing spectator.

21  Q   Mr. Terry, on the caption above, it says "comparable

22  spectator view seated."

23  A   Excuse me.  Yes, this is a seated view.

24  Q   Okay.

25           So with respect to -- these two pictures were taken

1    using different assumptions as to what the comparable

2    spectator is doing, correct?

3    A    That's correct.

4    Q    Okay.

5         So one reflects what a spectator who is a comparable

6    spectator would see standing, and the other is what they'd

7    see seated?

8    A    Let me --

9    Q    At the different locations that you've identified.

10   A    If -- if the -- yeah, if it said "seated," it was seated.

11   Q    Okay.

12   A    The assumption was that most of the time, during a game,

13   people will be seated, that they're likely to stand the whole

14   game.  So when they're seated, can they see it?  Wheelchair

15   users are seated most of the game -- all of the game, and so

16   can they see it when they're seated as well.

17   Q    Okay.

18        So these exhibits -- and we can look at 18, maybe,

19   next.  The comparable view on Exhibit 18, in this case, was

20   taken when the spectator was standing, correct?

21   A    That's correct.

22   Q    And the next one, Exhibit 19, is taken when the spectator

23   is seated, correct?

24   A    That's correct.

25   Q    Okay.

1          And then just to complete our examination of these,

2    Exhibit 20, in that case it was a comparable view of the

3    spectator standing in the seat identified?

4    A    Yes.

5    Q    Okay.

6          And then in Exhibit 21, it was the view of the

7    scoreboard of the spectators.  Is that standing or seated, do

8    you know?

9    A    I don't recall on that one.

10         THE COURT:  The trouble is, it doesn't say on the

11   exhibit.

12         THE WITNESS:  I know.  I don't recall --

13         THE COURT:  The court's going to be looking at these

14   exhibits without you guys around --

15         THE WITNESS:  I'm sorry?

16         THE COURT:  -- and it's important that I --

17         MR. CONNOR:  Right.

18         THE COURT:  -- see what you're trying to show me.

19         MR. CONNOR:  Right.

20   Q    (By Mr. Connor)  Mr. Terry, are you able to look at

21   anything in your notes or anything in your report that will

22   let you know whether that was taken in the seated position or

23   standing?

24   A    You know, I don't -- I don't think I do.

25   Q    Okay.

1          THE COURT:  So the purpose of this set of exhibits

2     has to do with the scoreboard --

3          MR. CONNOR:  Correct, Your Honor.

4          THE COURT:  -- not with the view of the field?

5          MR. CONNOR:  Correct, Your Honor.

6          THE COURT:  Because it looks like the view of the

7     field is essentially the same from both seats.  Am I right?

8          THE WITNESS:  The -- because we don't have the

9     standing spectators --

10          THE COURT:  Well -- yeah, we're not dealing with that

11     question right now.

12          THE WITNESS:  Right.

13          THE COURT:  We're dealing only with the scoreboard

14     question.

15          MR. CONNOR:  Correct.

16          THE WITNESS:  That's from about the same location.

17          MR. CONNOR:  Right.

18     Q   (By Mr. Connor)  So, Mr. Terry, just to make clear, these

19     pictures we've just been going through don't attempt to show

20     the impact of spectators standing in front of either the

21     wheelchair patron or a standing spectator, correct?

22     A   That's correct.

23     Q   Okay.  I wanted to clarify that.

24          MR. CONNOR:  Your Honor, I don't want to ask

25     Mr. Terry questions beyond those which you'd like me to ask,

 1  so I'll preface these questions with that acknowledgment.

 2     In reviewing the ruling on the motion in limine, you had

 3  indicated that Mr. Terry would be allowed to testify about

 4  general solutions to sight-line problems that he's aware of

 5  in other stadiums.  So I wanted to let you know I was

 6  continuing to ask him about that, and proceed if that's

 7  acceptable.

 8          THE COURT:  Okay.

 9          MR. WILLEY:  Your Honor, I will reiterate my

10  objection, because it's not clear to me how any particular

11  piece of engineering or improvement at another stadium, if

12  Mr. Terry has not actually looked at whether it's feasible

13  here at all -- in other words, what's the relevance of what

14  we're talking about?

15     He's not opined about any remediation here, and he said he

16  has no basis to do so.  And so what he's really doing is sort

17  of telling you what's out there in the world and asking you

18  to somehow draw the relevance, and I think that's

19  inappropriate, Your Honor.

20          THE COURT:  So your purpose right now is to ask him

21  what?

22          MR. CONNOR:  Your questions of Mr. Terry yesterday

23  suggested you had some concern about whether there was

24  anything that likely could be done to correct these problems.

25  I want to suggest that, while Mr. Terry did not because he

1    was not allotted time sufficient to do so in the examination

2    of the stadium because, it's not our burden, he did not try

3    to come up with specific remediation suggestions.

4        But to the extent that the court is concerned whether

5    there are likely solutions to these concerns, I was going to

6    ask him whether he's encountered similar problems such as

7    this in other facilities and whether they've been able to

8    come up with solutions.  And that, I felt, was specifically

9    within the ambit of what you'd allowed me to do in the motion

10   in limine order.

11            THE COURT:  Do you want to respond?

12            MR. WILLEY:  I'd just like to mention two things,

13   Your Honor.

14       Number one, we are, again, not -- not talking about

15   anything that Mr. Terry has assessed with respect to this

16   stadium.  And so I don't know how anything that has occurred

17   at a stadium in Arizona or New York or Madrid, built at a

18   different time by a different construction company, a

19   different business and a different stadium, has anything to

20   do with this.

21       And it strikes me that what they're trying to do, Your

22   Honor, is to back-door remediation testimony via, "Well,

23   other people have done this."

24       Secondly, with respect to timing, Mr. Terry inspected the

25   T-Mobile stadium on February 5th, 2019, and at no point after

1    that were we ever asked for additional inspection time.  So

2    the concept that "I didn't have time to do it" is unavailing.

3              MR. CONNOR:  I will pull up the emails between myself

4    and Mr. Willey --

5              THE COURT:  Wait, wait.  You're going too fast.

6              MR. CONNOR:  Okay.  There's a multitude of emails

7    between myself and Mr. Willey regarding the time that would

8    be allotted to Mr. Terry to review that stadium.  He made it

9    categorically clear that he was not going to be allowed there

10   for more than seven hours, and that was all the time he had.

11       Your Honor, having said that, I will not have Mr. Terry

12   testify to this if the court doesn't have some concern about

13   whether something is likely able to be done.

14       I intend to present to you, by way of clarification

15   because it came up yesterday -- I did a little supplemental

16   brief on whether we have a burden of proving any remediation

17   efforts in our case-in-chief, and the answer is we absolutely

18   do not.  And I have that brief right now.  I'm happy to give

19   it to you.

20       I don't think I have to do that in my case.  Because the

21   court, it seemed, has some general concerns about whether

22   this likely could be done, that was my purpose in asking

23   Mr. Terry whether he's encountered problems such as this

24   where they were able to remediate it.

25              THE COURT:  Yeah.

 1              MR. WILLEY:  I have one question, Your Honor.

 2        The issue in here is the phrase that Mr. Connor used:

 3   "Likely to be effective."  Right?  That phrase indicates

 4   feasibility connection, linkage to this stadium, and that is

 5   completely absent here in his testimony.

 6              THE COURT:  I appreciate what you're doing, and I

 7   appreciate the fact that my concerns at the end of the day

 8   yesterday may have precipitated your wanting to do this.

 9        I just don't see how it would be appropriate to have him

10   testify about things in other stadiums.  We would be

11   opening -- well, opening the door to cross-examination we

12   already know, which the question is going to be, "Have you

13   looked at this stadium to see if any of these things work?"

14   I already know the answer to that.  So I'm going to say no.

15   Let's not get into it.  Okay?

16              MR. CONNOR:  Okay.  Your Honor --

17              THE COURT:  But I do appreciate your brief.

18              MR. CONNOR:  Okay.  And I can hand it to Your Honor.

19              THE COURT:  I sort of have a better sense of when I'm

20   going to want that brief.

21              MR. CONNOR:  Okay.  Okay.  All right, Your Honor.

22   Q   (By Mr. Connor)  All right, Mr. Terry, we won't talk about

23   that.

24              Why don't we --

25              MR. CONNOR:  Your Honor, one last detail.  Again, I

1   don't want to complicate things.

2       I had attempted to ask Mr. Terry about information he had

3   about more current anthropometric data yesterday, and you had

4   ruled that you didn't want that in.

5       I hope I've made a sufficient offer of proof that

6   Mr. Terry would be able to testify that there's more recent

7   data that was likely more accurate in terms of the height of

8   wheelchair users.

9           THE COURT:  More recent data?

10          MR. CONNOR:  There's data available presently that

11  suggests that the anthropometic measurements used in the

12  *Ellerbe Becket* --

13          THE COURT:  Oh, I remember that.

14          MR. CONNOR:  So with regard to that.

15          THE COURT:  Okay.

16          MR. CONNOR:  Thank you.

17  Q   (By Mr. Connor)  Mr. Terry, does the ADA, when they're

18  implementing regulations or directives from the Department of

19  Justice, impose any requirements with respect to the design

20  of facilities in terms of the dispersal of accessible

21  seating?

22  A   Yes.

23  Q   Okay.

24          And can you tell us what is required under the ADA with

25  respect to that?

1   A    Under the 1991 standards, at 4.33.3, it said that you had

2   to provide wheelchair users the comparable sight lines and

3   dispersal, choice of ticket prices.  They didn't really talk

4   about exactly how to do that because there were so many

5   different types of large assembly areas, and small assembly

6   areas, that were covered by it, but choice of admission

7   prices and viewing angles was a mandate, comparable.

8   Q    And was there any other clarification with respect to what

9   was meant by the idea of comparable sight lines?

10  A    Yes.

11  Q    Let me ask specifically.

12       Did the ADAAG manual address what was meant by

13  comparable sight lines?

14  A    Yes, they did.

15  Q    Okay.  And what did it indicate?

16  A    It indicated that comparable sight lines meant dispersal

17  at varying distances from the playing field, in this case, at

18  multiple levels at -- yeah, I'd have to look at exactly what

19  the language said to see which all the pieces were that the

20  manual picked up.

21  Q    Okay.

22  A    There was also other clarification in other documents that

23  were produced.

24  Q    Okay.

25       So distance from performance areas was one of the

1   factors in assessing dispersal?

2   A   Yes.

3   Q   All right.

4        Mr. Terry, were you asked to assess whether the

5   accessible seating in T-Mobile Park is dispersed in such a

6   manner as to provide wheelchair patrons with comparable lines

7   of sight?

8   A   I was.

9   Q   Okay.

10       And what did you do to asses -- well, let me ask you

11  first off:  What was your conclusion with respect to that?

12  A   That the stadium has pretty good dispersal, horizontally,

13  around the field.  There are positions where wheelchair users

14  can go at various viewing angles, from, you know, the

15  outfield, from the infield, from first base, third base,

16  behind the catcher.  There are places you can go horizontally

17  at the various levels.  There were a few places where I

18  couldn't tell.  But the horizontal separation was good.  So

19  the viewing angles horizontally were good.

20       Viewing angles vertically were dispersed to all levels,

21  although they were in back of all the levels, except for the

22  300 and the one seat that we could find available in the

23  Diamond Club area between the dugouts.

24  Q   So did you find that the accessible seating was dispersed

25  so as to provide comparable viewing angles to accessible

1  patrons, vertically?

2  A   The way the standard was written was that you had to

3  provide a choice of admission prices and viewing angles and

4  that's comparable to that provided for the general public.

5      There were -- there are choices of admission prices, but

6  it's not comparable.  So the dispersal among the ticket

7  prices was one that was a problem.

8      Also, the distances, there are options, but they're not

9  comparable because the numbers are so small forward of the

10  41st row, between the foul poles.

11  Q   Okay.

12      Mr. Terry, you brought up a second issue, and I believe

13  these are intertwined, which is the ticket pricing and the

14  physical dispersal.  Let's talk just on the physical

15  dispersal aspect of this right now.

16  A   Okay.

17  Q   Okay.

18      And you said -- I think what Mr. Rogel testified to

19  yesterday, which was that there are effectively no accessible

20  seats below the 41st row, except with respect to the ones in

21  the Diamond Club, correct?

22  A   Yes.

23  Q   Okay.  Let me change and ask you another question.

24      Does the ADA or its implementing regulations set forth

25  a presumed percentage of accessible seats that are supposed

1   to be provided in a facility -- in a public facility?

2   A   Yes.

3   Q   Okay.  Could you tell me what that percentage is and where

4   it derives from?

5   A   In a stadium over 5,000 seats, which this is, you look at

6   the seats that are supposed to be counted; you look at

7   Section 221, the scoping standard from the current ADA; you

8   look at 4.1.3(19) --

9           THE COURT:  Wait a minute.  These are current ADA

10  standards?

11          THE WITNESS:  The -- well, the --

12          THE COURT:  Passed when?

13          THE WITNESS:  The 1991 standards were the 4.1.3(19).

14  That's where their list was.  It said one percent.  That was

15  easy to figure.

16     The 2010 standards said -- they gave you a chart that was

17  36 for the first 5,000 seats, plus one for each 200 or a

18  portion thereof over 5,000.

19          THE COURT:  You're talking about the 2010 standards

20  now?

21          MR. CONNOR:  Yes.  Your Honor, and in this context,

22  I'm sure the defendants would want to agree to it with us,

23  because the requirements have actually gone down in the 2010

24  standards, and we acknowledge that those are the applicable

25  requirements with respect to numbers.

```
 1              THE COURT:  I was wondering why there wasn't an
 2    objection.
 3              THE WITNESS:  He wants that number.
 4              MR. CONNOR:  If Mr. Willey would like to say they
 5    have to have one percent, that would be fine.
 6              MR. WILLEY:  I'll discuss this on cross, Your Honor.
 7              THE COURT:  You'll what?
 8              MR. WILLEY:  I will discuss this on cross.
 9              THE COURT:  Okay.
10       All right.  So we're talking about the percentage in the
11    2010 standards.  Okay.
12              THE WITNESS:  And that percentage in this stadium
13    amounts to about a half -- .00526 ratio, so it's a little
14    more than a half of a percent.
15    Q   (By Mr. Connor)  Okay.
16          And, previously, it had been one percent?
17    A   Yes.
18    Q   Okay.
19          So at the time the stadium was constructed, there was
20    supposed to be one percent accessible seats?
21    A   That's correct.  One percent wheelchairs, plus one percent
22    companions.
23    Q   Okay.  Thank you for clarifying.
24              THE COURT:  One percent wheelchair and one percent
25    what?
```

1              THE WITNESS:  Companions.  So a wheelchair user

2    doesn't have to go to the game by themselves, there has to be

3    a space set aside for each wheelchair space -- a seat.

4    Q   (By Mr. Connor)  Thank you for mentioning that.

5         Mr. Terry, under the 2010 standard, the half percent

6    applies to the wheelchair users?

7    A   Yes.

8    Q   And is there also an additional half-percent requirement

9    for accessible seating?

10   A   That's correct.

11   Q   Okay.

12        So the total accessible seating, under the 2010

13   standard, is one percent?

14   A   One percent if you include the companion, yes.

15   Q   If you include the companion.  Okay.  All right.

16        Mr. Terry, did you make an effort to determine how many

17   seats there were in the main level?

18         MR. CONNOR:  Derik, maybe we can pull up Exhibit 171,

19   I think it is.  No, 191, the map.

20   A   Yes, I did.

21   Q   (By Mr. Connor)  Okay.

22        And when I'm asking you that, I'm talking about the

23   seats from foul pole to foul pole.  Did you assess that?

24   A   Yes, we did.

25   Q   All right.

1          And how many seats did you determine were in that area?

2    A    A little over 20,000, maybe 21,000, something like that.

3    I don't recall the exact number.

4    Q    Okay.

5              THE COURT:  Wait a minute.  Which seats are these?

6              THE WITNESS:  It's the 100 Level, between the foul

7    poles.

8              THE COURT:  Are you talking about all seats?

9              THE WITNESS:  All seats between the back -- the

10   wheelchair users on the back and the front wall on the field,

11   around behind the dugouts and home plate, all the way out to

12   the foul poles.  So it would be in here.

13        I can't remember if Section 151 was included in that

14   number, or if it stopped at 150.  Same way, I think, 110 was

15   included in that.  So it went all the way around this area

16   right here.  And, again, I can't remember where it was there

17   and where we took that number right there.  I'd have to look

18   at my notes.

19   Q    (By Mr. Connor)  Mr. Terry, there are colored shading on

20   this map.  Do you see that?

21   A    Yes.

22   Q    And I will represent to you that Mr. Rogel testified

23   yesterday that that relates to different price points for

24   those seats.

25   A    Yes.

1    Q    Was that your understanding?

2    A    That's my understanding as well.

3    Q    And how did you come to have that understanding?

4    A    Two different ways:  One, we looked at the -- what we

5    could find on the Major League Baseball TicketMaster site for

6    the stadium.  Then we looked at a chart like this one that

7    was available on the Internet, and then we looked at the

8    seating manifest that was provided by the defendants that

9    showed the price zone or price --

10             THE COURT:  Okay.  You've moved now from the

11   percentage to the different prices, right?

12             THE WITNESS:  Yes.

13             THE COURT:  I thought you were going to tell us

14   whether they met the percentage requirement.  Did they?  I

15   mean, you're moving --

16             MR. CONNOR:  Your Honor, it's very confusing, and I

17   understand why you're asking what you're asking.  Let me --

18   I'll step back and ask it just in terms of percentages.

19   Okay?

20             THE COURT:  Well, you were talking about percentages.

21             MR. CONNOR:  I know.

22             THE COURT:  I thought we were going to get an opinion

23   from him about whether there was a percentage that met the

24   2010 standards.  You're now talking about ticket prices.

25             MR. WILLEY:  Your Honor, I want to be clear that Mr.

1    Terry has not opined an opinion with respect to the

2    percentage of ADA seating in the stadium.  He has not

3    rendered that opinion, and he cannot do so today.

4            THE COURT:  Oh, okay.  Well, then, now I know why

5    he's not giving me an opinion.

6            MR. CONNOR:  I disagree with Mr. Willey's

7    characterization.

8        In his report, Mr. Terry indicated that there's not

9    sufficient seating in terms of vertical dispersal because of

10   the numbers.

11           THE COURT:  No, no.  I'm just asking a very simple

12   question.

13           MR. CONNOR:  Okay.

14           THE COURT:  I know he doesn't like the vertical

15   seating arrangements.  We've been there.  They're all in the

16   back, except for the third level and the little ones in the

17   front.

18       I thought we were dealing with something that seemed to me

19   very simple.  I was going to get a clear answer.

20       Under the 2010 standards, which everyone seems to be

21   thinking so far, one percent, including companion seating,

22   one percent?

23           MR. CONNOR:  Correct.

24           THE COURT:  Do they meet the one percent?  Somebody

25   should be able to add up the numbers.

1          MR. CONNOR:  I think Mr. Rogel told you they didn't.

2     In front of the pricing --

3          THE COURT:  I'm not talking pricing.  I'm talking

4     whether --

5          MR. CONNOR:  Your Honor, because --

6          THE COURT:  Never mind.  I think I can do it myself.

7          MR. CONNOR:  Okay.

8          THE COURT:  All I have to do is count the number of

9     seats that are there with companion seats.  And I'm sure

10    it's -- I don't want to say it's a simple mathematical

11    calculation, but we can figure out whether it's one percent

12    or not.  I just thought maybe he had done it.

13         MR. WILLEY:  Your Honor, maybe it would help if I

14    told you there was no claim in the case with respect to the

15    percentage of the ADA seating in the stadium.

16      The claim in the case has to do with distribution of that

17    seating or pricing of that seating.  That's what the issue

18    is.

19         THE COURT:  That's all you had to tell me, that we

20    don't have to deal with it.

21         MR. CONNOR:  Your Honor, the distribution is related

22    to the percentage of seats that you're supposed to have,

23    right?  And so we don't disagree at this point that there are

24    sufficient seats in total in this stadium to fulfill the one

25    percent.  Right?

1              THE COURT:  That's what I needed to hear.

2              MR. CONNOR:  We don't disagree with that.  And this

3    is what I was trying to develop with Mr. Terry.

4         You do not satisfy the law with respect to dispersal, as

5    far as the ADA is required, if you stick all of those seats

6    at the back of the stadium.  All right?

7              THE COURT:  I understand your position, counsel.

8              MR. CONNOR:  Okay.  All right.  And --

9              THE COURT:  I just needed to know that the percentage

10   was introduced.  But that really isn't an issue.  Okay?

11             MR. CONNOR:  No, but I just want to make sure Your

12   Honor understands.

13        We think the percentage is relevant to assessing whether

14   there's been adequate distribution, precisely for the reason

15   I just described, which is you can meet the percentage --

16             THE COURT:  I got that message.

17             MR. CONNOR:  Okay.  Great.  Perfect.

18   Q    (By Mr. Connor)  Mr. Terry, I'm going to ask you something

19   that's simple, and I don't want to -- the judge probably

20   understands this.

21        Are the lines of sight at the rear of the first level of

22   the stadium comparable to lines of sight in the seating

23   sections in front of it?  And by that, just, again -- that

24   was poorly word -- but do you understand that the accessible

25   seating on the 100 level is located, at least in part, at the

1    rear rows of the various sections that you've circled?

2    A    Yes.

3    Q    Okay?

4    A    So the viewing angles from the back do not provide

5    comparable choices to the viewing angles at other portions of

6    the 100 viewing level.

7    Q    In your opinion, do the viewing levels -- and I don't mean

8    to belabor a simple point, but do the viewing angles from the

9    rear of the 141 section, for example, are those comparable to

10   the viewing angles of somebody in the middle rows of the 141

11   section?

12   A    No, they're not.

13   Q    All right.

14        Let's -- let's go back.

15        The distribution requirement that we're just talking

16   about, you indicated there was supposed to be comparable

17   choice of sight lines, correct?

18   A    Yes.

19   Q    Okay.

20        And you also mentioned that the ADA required a

21   comparable choice of ticket prices, correct?

22   A    Yes.

23   Q    All right.

24        Do you have an understanding and did you evaluate

25   whether -- do you have an understanding of the pricing

1    practices of the Mariners with respect to these areas on this

2    map?

3    A    Yes.

4    Q    And what do you understand that to be?

5    A    Generally speaking, the seats that are closer to the

6    field, the closer to the center are the higher priced, and as

7    you get away from that point, you get lower-priced tickets,

8    and those reflect demand, where people want to sit and what

9    they're willing to pay to sit there.

10   Q    In you review of the manifest, did you have an

11   understanding as to whether there is a difference in prices

12   in the different shaded areas on this map?

13   A    Did I have an understanding of that?

14   Q    Yes.

15   A    In what way?

16   Q    Well, do you understand -- well, let me ask you this:

17   Let's pick 42.  There's different shades of blue on that?

18   A    Yes.

19   Q    Do you understand whether those tickets are typically

20   priced the same or different than each other in the different

21   shades?

22   A    The back is the lower price and the front is the higher

23   price, and there are zones in between that reflect zones of

24   price changes.

25   Q    Okay.

```
 1          Do -- and, again, this is sort of obvious, but do

 2   wheelchair users have the option of purchasing tickets, for

 3   example, in Section 142, in the middle pricing zones?

 4   A    No.

 5   Q    All right.

 6          Under the ADA, should they be allowed to do so?

 7   A    Yes, at that price.

 8   Q    Okay.

 9          Mr. Terry, they can't purchase tickets in those areas

10   because there's not accessible seating there presently,

11   correct?

12   A    That's correct.

13   Q    All right.

14          Does the ADA or the implementing regulations say what's

15   supposed to be done in those cases?

16   A    Yes.  The regulations say that if the seats -- that

17   wheelchair seats have to be provided in a choice of prices,

18   and it's a full choice of prices, because it has to be

19   comparable; that those seats have to be provided either in

20   that zone, in that ticket price area, or they need to be

21   provided in a better location at that price.

22       So if the design of the stadium or barriers in an existing

23   stadium, it's not readily achievable to remove those, then

24   the wheelchair positions have to be in as good a place or

25   better location than what the price would be.
```

1   Q   Okay.

2        And what you're reciting now stems from which

3   regulation?

4   A   It started with the 1991 standards, where it said choice

5   of ticket prices, admission prices, and lines of sight that

6   are comparable to those provided to members of the general

7   public.

8        As the years went on, the Department of Justice went

9   through and said in case you misunderstood that, here's how

10  you implement that.  And so in the technical assistance

11  materials and the 2010 regulations that went into effect

12  2011, I believe, when those regulations came out, that said

13  that the readily achievable barrier removal had to be done

14  and then that seats had to be provided as described so the

15  people who used wheelchairs would have choices of admission

16  prices, as required in 1991, that was comparable for other

17  people.

18  Q   Okay.

19        Mr. Terry, is there a difference with respect to how

20  facility owners are supposed to deal with modifications to

21  practices, policies, and procedures, as opposed to structural

22  changes?

23  A   The policies, practices, and procedures are found in the

24  regulations, not the standards portion of the regulations but

25  in the basic regulations.  They are -- they're, essentially,

1    what they were before.  There were some modifications,

2    particularly a lot more clarity added in the 2010 regulations

3    for ticketing, but they're just interpreting what they had

4    said before.

5    Q   Okay.

6    A   And that went into effect -- policies, practice, and

7    procedures went into effect when the regulations became

8    effective after 2010.

9    Q   Okay.

10        What I'm wondering is, is there any grandfathering in

11   in terms of what you're expected to do with respect to

12   policies, practices, and procedures?

13   A   No.  There's no safe harbor, there's no grandfathering.

14   That's just what's required to be done.

15   Q   So if the DOJ said change your practice in the year 2019,

16   does the stadium have to do that, irrespective of when it was

17   constructed?

18   A   Yes.

19        THE COURT:  Can you repeat that question?

20        MR. CONNOR:  Yeah.

21   Q   (By Mr. Connor)  With respect to policies, practices, and

22   procedures, as opposed to structural changes to a facility,

23   if the DOJ promulgates regulations this year that says

24   facilities are supposed to do this with respect to policies,

25   practices, and procedures, like pricing, for example, can a

1  stadium say, "We don't have to change our pricing because we

2  were built in 1993"?

3  A   No.  The policies, practices, and procedures go into

4  effect as of the effective date of that regulation, so that

5  has already passed.

6        MR. WILLEY:  Your Honor, I would respectfully submit

7  that Mr. Terry is opining legal opinions at this juncture.

8        THE COURT:  I can't hear you.

9        MR. WILLEY:  He's opining legal opinions at this

10  juncture.

11        THE COURT:  Well, he's already testified.  It can

12  stand.  He is getting into --

13        MR. CONNOR:  It's a very close line.  I appreciate

14  that, so I'll discontinue further questioning.

15        THE COURT:  That will stand.

16        MR. CONNOR:  Thank you, Your Honor.

17  Q   (By Mr. Connor)  Mr. Terry, I didn't ask you this, but --

18  and I apologize for backtracking a little bit -- but with

19  regard to vertical distribution in this stadium, did you

20  examine what seating there is in front of the back row of the

21  first level?

22  A   Yes.

23  Q   Okay.

24        And the judge heard testimony about this yesterday, so

25  I don't want to belabor it.  But there have been seats added

1   in the front row of the stadium in what's been identified as

2   the Diamond Club and the Premier Club.  Do you understand

3   that?

4   A   I do understand that, yes.

5   Q   Do you understand where that seating is located,

6   physically, in the facility?

7   A   I do.

8   Q   Okay.

9       And have you -- did you make any effort to determine

10  whether additional seating could be added -- well, let me ask

11  it this way so I don't have objections about remediation.

12      Is there existing egress to additional spaces behind

13  home plate, at which there is not presently accessible

14  seating?

15      I'll strike that question.  I think that was not

16  typical verbiage.

17      Let me ask it this way:  Have the Mariners added all

18  the seats that could be added for accessible seating, without

19  structural changes to the facility, at all points of egress?

20      MR. WILLEY:  I'm going to object to this question;

21  lack of foundation, and because it was something he's not

22  previously opined on.

23      THE COURT:  Overruled.

24  A   That area was under construction when I was there in

25  February, and so there was concrete ripped out.  I haven't

 1    looked back to see if any of that concrete was structural,

 2    but in looking at the construction that was going on at the

 3    time, it did not appear to be.  It appeared to be on grade,

 4    so there wouldn't be structural changes that would prevent

 5    from going any further, from what I could see while I was

 6    there on site.

 7    Q   (By Mr. Connor)  Okay.  Meaning you could rip out the

 8    fixed seating and make additional spaces in that area?

 9    A   Do the same thing that they did during February.

10    Q   Okay.

11         MR. CONNOR:  Your Honor, I don't mean to go further

12    than you want me to go, but I'm going to ask Mr. Terry a

13    question, and you can tell me if it's too far.

14    Q   (By Mr. Connor)  Mr. Terry, can vomitories be built to

15    provide additional means of egress in facilities?

16    A   Yes.

17    Q   Okay.

18         Are there existing vomitories in T-Mobile Park?

19    A   Are there existing vomitories?

20    Q   Yes.

21    A   There are vomitories throughout the stadium.

22    Q   Okay.  Is there -- that's all I'll ask.

23         Mr. Terry, let's talk a little bit more about pricing.

24         Did you attempt to determine -- we've already talked,

25    to some extent, about the fact that, obviously, wheelchair

1   patrons don't currently have the option to purchase tickets

2   in the price zones where there's not accessible seating,

3   correct?

4   A    Correct.

5   Q    Did you make any effort to determine whether tickets were

6   available to wheelchair patrons for seats that had been

7   identified as being accessible seating?

8   A    Yes.

9   Q    Okay.  And what did you do in that regard?

10  A    I looked, at several different times over the last year or

11  so, on the Mariners' TicketMaster site to see what tickets

12  were available for wheelchair users; clicked on the little

13  bar which shows you which accessible seats were available,

14  and looked at where they were in the stadium; and at one

15  point, went and looked at every single game remaining in the

16  season and attempted to find out where they were available.

17  Q    Okay.  And what did you see when you did that?

18  A    The wheelchair seating positions that were constructed in

19  February, behind home plate, I didn't find, at any point,

20  more than one of those wheelchair positions that was actually

21  available for sale.  And the price of that one changed over

22  time.  It was at a higher price earlier in the season, and

23  later in the season, it switched to, I believe, a $75 price,

24  and the other seats were not available down there.

25       In other places in the stadium, it appeared that

1    wheelchair seats generally sold out in the sections closer to

2    behind home plate on the 41st row.  And going around at a

3    similar kind of distribution, the seats in front of them were

4    going out -- the wheelchair seats sold out faster than the

5    sections in front of them sold out.

6    Q    Okay.  Well, let me ask you about that.

7         Did you look at what was available, in terms of

8    non-accessible or the seats that weren't accessible seats?

9    A    Yes.  When the TicketMaster zoomed-in drawing shows you

10   what's available for wheelchairs, it also shows what's

11   available for the general public.

12   Q    Okay.  And what did you see with respect to that?

13   A    Just what I said:  That the seats for the general public

14   did not sell out as fast as the wheelchair positions close to

15   them sold out, near the center of the field, near the -- in

16   the zones, you know, directly behind home plate -- those

17   sections behind home plate.

18   Q    Okay.

19        And what is the practical implication of that for

20   somebody who is a wheelchair user in terms of their choice in

21   purchasing tickets?

22   A    That the seats are not practically available to them as

23   they are for people who can walk down the steps and sit in a

24   standard seat.

25   Q    Mr. Terry, I'm fumbling and looking for -- you prepared an

1    exhibit to your report?

2    A    Yes.

3    Q    Could you assist me and tell me what exhibit that was?

4    A    Let's see.  Which binder are we in?  The white binder or

5    the --

6    Q    The white binder.

7    A    The white binder.  Okay.

8    Q    Let's look first at Exhibit 26, which we looked at,

9    briefly, before.  Do you recognize that exhibit?

10   A    I do.

11           THE COURT:  Which exhibit are we --

12           MR. CONNOR:  Twenty-six, Your Honor, Plaintiffs'

13   Exhibit 26.

14   Q    (By Mr. Connor)  I think we discussed this yesterday, and

15   so I don't want to spend a lot of time on it, but what is

16   this exhibit?

17   A    The white seats are seats -- the white spaces within the

18   sections are the places that have been sold, and the blue

19   places are those that have not been.

20       In this exhibit, the dark red bars cover the wheelchair

21   positions so that you can't tell whether they've been sold or

22   not, and that was so this exhibit could explain where the

23   wheelchair seats are located in the field more graphically.

24   Q    Okay.  And can I also have you look at Exhibit 162?

25   A    Yes.

1    Q    Mr. Terry, can you explain what this exhibit represents?

2    A    These are season-ticket prices and their availability as

3    of April the 28th.

4    Q    And so looking at this, there's reference to different

5    plans.  Do you see that?

6    A    Yes.

7    Q    Okay.

8         And what does that signify or what does that pertain

9    to?

10   A    As of the date this was taken, there were five plans for

11   season tickets that were available to people in the various

12   sections where we'd done the sight-line studies.  So these

13   sections that are listed on the left are not all of the

14   sections; they're sections where we did the sight-line

15   studies.  And this shows the prices of the season tickets,

16   with the associated row numbers, and whether or not there

17   were season tickets available in those sections at that time,

18   on that date, for wheelchair users.

19   Q    And where did this information come from?

20   A    It came from the Mariners' website.

21   Q    Okay.

22        And so, for example, let's look at the Section 124.

23   There's a reference to a Plan A, which, apparently, pertains

24   to people purchasing 20 tickets at a time?

25   A    That's correct.

1    Q    Okay.

2         And it appears there was a price for those of $918 for

3    non-accessible seating, correct?

4    A    That's right.

5    Q    Okay.

6         Were those tickets -- was that plan available to

7    wheelchair-accessible patrons?

8    A    Section 124 did not have any wheelchair spaces available

9    for season tickets, the 20-plan price, on that day.

10   Q    Okay.

11        And I assume it's the same with respect to the other

12   information you've shown me here?

13   A    Yes.  Where it says "WC not available," but there is a

14   price on standard seating, it means standard seating had

15   season tickets available in that section, but wheelchair

16   users did not have season tickets available in that plan in

17   that section.

18   Q    Okay.

19        There's some lines on this exhibit that are highlighted

20   pink in color that says "not offered."  What do those

21   reflect?

22   A    It's my understanding that that plan was not offered in

23   that section.  So that -- for example, in the 308, it looks

24   like there were no season tickets available in Section 308

25   for anybody.  They just weren't offered.

1    Q    But with respect to others, there was an availability for

2    patrons not needing accessibility when there was not for --

3    A    That's correct.

4    Q    At least in the sections, correct?

5    A    Yes.

6         Now, with the exception that in Section 247, where it

7    said the standard seats were not available, so it appears

8    that all of the standard seat season tickets for 20-game plan

9    in Section 227, that all of those were all gone.  Both the

10   wheelchair-user spaces were gone and the standard seats were

11   gone.

12   Q    Okay.

13   A    So if it says "standard not available," it means that had

14   sold out.  It appeared to have been offered, but it appeared

15   to have been sold out.

16   Q    Okay.

17        And, Mr. Terry, I'm sorry, I didn't have you explain --

18   I don't want to go over it too much, but back on Exhibit 26.

19        On this map, you'd indicated that the red -- dark red

20   reflected seats that were available on that day?

21   A    The dark red was an attempt to use this composite drawing

22   of the stadium and show where all potential wheelchair seats

23   were placed in the stadium.  So the red shows where they

24   could be, where they were either available or they were sold.

25   So every wheelchair position that TicketMaster knew about for

1   wheelchair users was in dark red.  So this is not showing

2   availability.  This is showing what exists.

3   Q    Oh, I'm sorry.  I misunderstood.  All right.

4        Does this reflect anything with regard to the

5   availability of wheelchair seating?

6   A    Not for wheelchair seating.

7   Q    Can I ask you -- okay.

8        There appears to be a seat available towards the home

9   plate, an available accessible seat.  Are there more -- there

10  are more than that; is that correct?

11  A    The drawings that we were given, post my site visit, when

12  they tore up the concrete, we could see the concrete and the

13  dirt where they were building, those areas down there, but we

14  didn't have any kind of drawings, anything.

15       After my site visit, I was given a drawing that showed

16  what was supposed to be constructed there, and then I saw

17  some photographs that had been provided by the defendant that

18  showed additional wheelchair seats behind home plate, in that

19  area, and it totaled eight wheelchair positions down in that

20  location.

21       Those eight seats, in all of the games that I looked at --

22  and I looked at dozens of games to try to find out how many

23  of those were actually available for wheelchair users to

24  purchase through TicketMaster, and I never saw a game where

25  more than one of those was actually available.  So I don't

1   know if there are wheelchair seats there, or if they had been

2   in-filled by other seats or what had happened.  They just

3   weren't available.  They may have been sold to wheelchair

4   users, they may have been sold to other people, I don't know

5   what was going on.  But I couldn't find one seat there.  So

6   this drawing shows that one wheelchair position, because we

7   know it was available at some point --

8   Q   Okay.  All right.

9   A   -- TicketMaster had evidence of it.

10          The red lines also represent -- they cover up the

11  companion seats as well.  So it's not just the wheelchair

12  users.  These are the zones where wheelchairs and their

13  companions can sit.

14  Q   Okay.

15          And would the one seat that was available on the dozens

16  of days that you mentioned, would that allow a wheelchair

17  user to purchase a seat and have a companion available?

18  A   It appeared to.  I didn't go through the process because

19  I'm not eligible to buy one, but it appeared that they were

20  available for some games.

21  Q   Let me clarify my question.

22          Was there both, to your understanding, an accessible

23  seat and a companion seat available on those days, or just

24  one seat?

25  A   I believe it was both.

1        MR. CONNOR:  Mr. Terry, I think that's all I have for

2   you.  Let me check with my co-counsel to see if there's

3   anything he wants me to follow up on.

4        THE WITNESS:  Okay.

5        MR. CONNOR:  Your Honor, that's all I have.  Sorry.

6   Let me check with my other co-counsel.

7   Q   (By Mr. Connor)  Mr. Terry, could you look at Exhibit 2?

8        MR. WILLEY:  Your Honor, we object to Exhibit 2.

9   It's Mr. Terry's report.  He is welcome to testify on the

10  stand, but his report is hearsay, and it's a classic example

11  and excluded generally.

12       THE COURT:  I haven't seen it, so I can't tell.

13  Q   (By Mr. Connor)  Mr. Terry, can you tell the court what

14  Exhibit 2 is?

15       THE COURT:  It's not up yet.

16  A   It's my expert report from the --

17       MR. WILLEY:  It's his expert report, Your Honor.

18  Courts consistently exclude expert reports.  They allow the

19  expert to testify.

20       THE COURT:  Do you have a question you want to ask

21  him?

22       MR. CONNOR:  No, Your Honor.  Some courts allow the

23  reports to be admitted.

24     All right.  No further questions, Mr. Terry.  Thank you.

25       THE COURT:  Whenever you're ready, counsel.

```
1                      CROSS-EXAMINATION

2    BY MR. WILLEY:

3    Q   Good morning, Mr. Terry.

4    A   Good morning.  You've visited T-Mobile stadium once; is

5    that correct?

6    A   That's correct.

7    Q   That was February 5th, 2019?

8    A   That's correct.

9    Q   You've never been to a baseball game there?

10   A   I have not.

11   Q   Okay.

12           THE COURT:  You've never been what?

13           MR. WILLEY:  To a baseball game at T-Mobile.

14           THE COURT:  Oh.

15   A   They weren't playing in February.

16   Q   (By Mr. Willey)  Understood.  And you haven't otherwise

17   been there; not this season, not last season, not ever?

18   A   That's correct, not personally.

19   Q   You had talked to the court about views of a scoreboard

20   when Mr. Connor was asking you questions?

21   A   Yes.

22   Q   Can you tell us, with some clarity, as to what regulation

23   you were referencing when you assert that there is a

24   view-to-scoreboard requirement?

25   A   The requirement in 4.33.3 of the 1991 ADA standards
```

1   requires comparable viewing angles, and the regulations under

2   Title III for effective communication say that you have to

3   communicate effectively with people with disabilities.  You

4   provide auxiliary aids and services, if necessary, but you

5   must communicate effectively with people with disabilities as

6   well.  So there's a reg obligation and there's the comparable

7   viewing angles.

8   Q   I just wanted to be clear.

9       You're telling the court that it's 4.33.3 of the '91

10  standard, right?

11  A   Yes.

12  Q   And you're also telling the court that it's effective

13  communication regs under Title III?

14  A   Yes.  That's -- as an architect, that's what I would be

15  designing for if I was looking at that.

16  Q   Fair enough.

17      And the effective communication regs under Title III

18  are intended to address people with hearing and sight

19  impairments; is that correct?

20  A   I don't believe it says that anywhere in the regulations.

21  That's an assumption that most people make.

22  Q   You don't believe it says that anywhere in the regs?

23  A   I don't believe so.

24  Q   Are examples given in the regs?

25  A   There are examples given.

1    Q    And all those examples involve people with hearing or

2    sight impairments, correct?

3    A    That's correct.

4    Q    Okay.  Thank you.

5         4.33.3 of the '91 standards refers to comparable line

6    of sight, I believe; is that correct?

7    A    Comparable viewing angles.

8    Q    Okay.

9         MR. WILLEY:  Rondi, do you want to pull up 4.33.3?

10        THE COURT:  I didn't hear your last question.  Was

11   there a question?

12        MR. WILLEY:  Yes.  I asked Rondi if she would pull up

13   Section 4.33.3.

14        THE COURT:  Try to talk slower, counsel.  I think it

15   would be helpful to me and to the court reporter.

16        MR. WILLEY:  I understand, and I appreciate your

17   guidance, Your Honor.

18   Q    (By Mr. Willey)  Mr. Terry, on the screen in front of you

19   is Section 4.33.3.  This is the language you were referring

20   to, right, lines of sight comparable?

21   A    The highlighted area is, yes.

22   Q    Okay.

23        And that language was then clarified further by the --

24   ultimately, the *Accessible Stadiums* document, correct?

25   A    It was.

1              MR. WILLEY:  Can we pull up DX-2, please?  And if we

2     could go to the second page there.

3     Q    (By Mr. Willey)  If we're looking at the second bullet

4     point on this page here, Mr. Terry, this refers to where the

5     DOJ defines what comparable line of sight means, right?

6     A    No.

7     Q    Well, it says -- let's just read the language.  I don't

8     want to debate it with you.  It says, "A comparable line of

9     sight, as illustrated in the figure below, allows a person

10    using a wheelchair to see the playing surface between the

11    heads and over the shoulders of the persons standing in the

12    row immediately in front of them and over the heads of the

13    persons standing two rows in front."  Is that correct?

14    A    That's what it says.

15    Q    Right.

16         And the reference here, "comparable line of sight," is

17    to the playing surface, right?

18    A    That is what this reference refers to.

19    Q    Okay.

20         Is this a regulatory reference that requires a

21    particular line of sight to a particular scoreboard?

22    A    A regulatory reference?  It is a much broader requirement

23    than a scoreboard.

24    Q    I understand.  I'm asking you what the reference is so we

25    can look at it and talk to the court about it.

1   A    I don't know of a regulatory reference from the Department

2   of Justice that specifies scoreboards.

3   Q    Okay.  So if you were to say that the -- as I believe

4   you've testified that the Mariners are not complying with

5   some ADA issue or regulation, what is it?

6   A    Sorry?

7   Q    With respect to scoreboards.

8   A    I'm sorry?

9   Q    Are you opining that the Mariners do not comply with the

10  ADA with respect to the line of sight to the scoreboard?

11  A    I am.

12  Q    Okay.

13       What is the regulatory basis upon which that opinion

14  rests?

15  A    Viewing angles that are comparable to those provided to

16  members of the general public.

17  Q    Which is to say Section 4.33.3 of the '91 standards and

18  *Accessible Stadiums*?

19  A    *Accessible Stadiums* addresses the particular issue of

20  lines of sight over standing spectators.  This does not

21  address other viewing angles that are required for players --

22  for spectators to be able to see what's happening in the

23  game.

24  Q    I understand there is no regulatory reference on this

25  subject, is what you're saying?

1    A    I'm sorry?

2    Q    There is no regulatory reference on this subject.

3    A    I'm not saying that.

4    Q    Is there?

5    A    Are you saying that specifically mentions scoreboards?  If

6    that is your question, then I do not know of a place where

7    the regulatory references specifically mention scoreboards.

8    Q    Okay.

9         Is there more than one scoreboard at T-Mobile Park?

10   A    That's a definitional question.  There are lots of places

11   where information is provided.  There's different information

12   provided in different places.  So, for instance, the banners

13   that attach to the front of the various levels have got

14   certain types of information.  There's other types of

15   information that's available on this large scoreboard that's

16   shown in the photographs we've looked at.

17        MR. WILLEY:  Rondi, if you could pull up

18   Defendants' 5, please.

19   Q    (By Mr. Willey)  Mr. Terry, this is a map of the stadium

20   listing the sections and listing the accessible seating

21   locations.  You've seen this before, yes?

22   A    It's the layout of the facility.

23        Where are the scoreboard locations you're talking

24   about?

25   Q    So I'm going to ask you.  Where is the scoreboard that

1   you've been talking about located on this map?  If you could

2   show the court.

3   A   I don't recall where everything is located on this map.

4   There are some things in the back, near the outfield; don't

5   remember exactly where they are.  I can pull up my

6   photographs and do that, which would be really easy for me to

7   do.

8   Q   I'm just wondering if you know where the other scoreboards

9   are.

10  A   You know, I don't have a photographic memory of this.  And

11  if it's a memory test, I'm not going to be able to tell you

12  where every scoreboard is in the stadium.  I can look at my

13  photographs and tell you, but I don't have that kind of

14  memory.

15  Q   Okay.  Let's do this.

16          MR. WILLEY:  Could you clear that for me, please?

17  Q   (By Mr. Willey)  So the scoreboard you're talking about is

18  here, right?

19          THE COURT:  The big scoreboard, you're talking about?

20          MR. WILLEY:  Yeah.

21          THE COURT:  The main scoreboard?

22          MR. WILLEY:  This is the center field scoreboard,

23  Your Honor.

24  Q   (By Mr. Willey)  Is that where it's located, Mr. Terry?

25          THE COURT:  You know where that is, don't you?

1   A    If you're asking me to testify under oath, I'd like to be

2   able to verify that this is the one that we're talking about.

3   Q    (By Mr. Willey)  I'm not trying --

4   A    Yes, I believe so.  I believe so.

5   Q    Okay.

6        Do you know if there is another scoreboard above The

7   'Pen area?

8           THE COURT:  He's already indicated to you that he

9   doesn't know where the other scoreboards are.  Are you sure

10  you want to take the time to go through every one of them

11  with this witness?  I assume you're going to have your own

12  witness.

13          MR. WILLEY:  I'm just wondering if he knows where

14  these other places are, and if he doesn't, that's okay.

15          THE COURT:  He's told you he doesn't.  He'd have to

16  look at his pictures and figure it out.

17  Q    (By Mr. Willey)  Are you aware of how many scoreboards

18  there are?

19  A    Define "scoreboards" so I know what you're talking about?

20  Q    Sure.

21       I'm defining scoreboards to mean visual displays that

22  are transmitting information about the game.

23  A    Okay.  Would that include, for example, a picture of the

24  player and their statistics when they come to bat?

25  Q    I think it would.

1   A   Would it only include that?

2   Q   No.  I said information about the game, so balls and

3   strikes, who's pitching, what the pitcher's pitch speed is,

4   what the game score is, all of that information communicated

5   about the game.

6   A   There are lots of places that, in looking -- and, again,

7   it was dark on the day that I went there.  But looking at the

8   photographs that Brenda Cummings took, and looking at things

9   online and looking at what I saw was in the field, there is

10  information displayed in many, many places around the

11  stadium.  It is not all the same information so that people

12  with disabilities don't get to see all of the information;

13  they get to see part of it looking at those other

14  scoreboards.

15  Q   Do you know what information is transmitted onto the

16  various scoreboards?

17  A   I do not know what is transmitted on to those, because the

18  photographs that I've looked at show those photographs in an

19  instant, and most of those boards have varying information

20  that shows up on them.

21      When I speak of "scoreboard," I'm talk about the big

22  jumbotron-looking, colored scoreboard that is in the area

23  that you've shown here.  I'm not complaining about other

24  scoreboards that are out there.  I'm not saying anything

25  about those.

1   Q   Fair enough.

2       And you don't actually know what's being transmitted on

3   those scoreboards around the stadium, do you?

4   A   Not throughout a game.  I don't know what information

5   might be presented on each of those boards.  Some of them are

6   too small to show the kind of information that can only show

7   up on that big board.

8   Q   You're also aware that, for the accessible seats on the

9   100 level and 200 level, there are video monitors above the

10  seats?

11  A   Yes.

12  Q   Are you aware of what the video monitors transmit during

13  the game?

14  A   From the photographs that I saw, it appeared to be the

15  action of the game.  They did not appear to be duplicating

16  information that was on that scoreboard.

17      Also, there were not many of those.  They were fairly

18  small.  They were dispersed.  And so the ability to see -- if

19  you tried to display the information on the giant scoreboard,

20  on those it would be very difficult to see that because they

21  were so small and so far away for many wheelchair users.

22  Q   Just so we're clear for the court, you've not actually sat

23  and seen what any of those video monitors show.  You don't

24  know what the feed is?

25  A   Not personally.  I've seen the photographs that Brenda

1    Cummings, my associate, took of those.

2    Q    Do you know if, for example, the hydro race shown on the

3    big scoreboard also appears on the video monitors?

4    A    I don't know what goes across all those monitors all the

5    time.

6    Q    Okay.  Thank you.

7         Do you know if other seating sections in the stadium

8    have obstructed-access view to the center field scoreboard?

9    A    Yes.

10   Q    Lots of seats do, right?

11   A    There are other seats that have some obstruction.  So, for

12   example, if you're sitting in the -- say, for example,

13   Section 214, the overhang of the bottom of the 300 level

14   blocks a portion of that corner, and that shows up in my

15   photograph, that there's a slight portion of that blocked.

16   Q    And the people who sit in this section -- right? --

17   they're not going to see that scoreboard?

18   A    I don't know.  Can they not turn around and look up at it?

19   Q    I guess they could turn and look straight up, yeah.

20        What about the people sitting here?

21   A    I don't know what their viewpoint of that is.  Those are

22   very cheap tickets.  They're not always available for sale.

23   Sometimes those sections are closed for games.  Certain

24   games, there were no seats available on TicketMaster.

25   Q    Those people there have an inability to see that

1   scoreboard, right?

2   A    I don't know that.

3   Q    You don't know that?  You can't render any opinion on

4   that?

5   A    That's correct.

6   Q    Okay.  Thank you.

7          And so when you were looking at the views of the

8   scoreboard, you were not, at the same time, ever assessing

9   views to other scoreboards or information communication

10  devices around the stadium, were you?

11  A    I was not asked to look at those other ones.

12  Q    Fair enough.  You just didn't do it?

13  A    No, I didn't do it.

14         MR. WILLEY:  Okay.  Rondi, if we could look at

15  Plaintiffs' 16, please.

16         THE COURT:  Which number is this?

17         MR. WILLEY:  I'm looking for Plaintiffs' 16, please.

18  Q    (By Mr. Willey)  This is one of the picture comparisons

19  you did; is that correct, Mr. Terry?

20  A    Yes.

21  Q    And this is showing a comparison between a wheelchair user

22  in Section 129, Row 41, Seat 16, I believe --

23  A    Yes.

24  Q    -- compared to a comparable spectator view in Section 129,

25  Row 40, Seat 18; is that right?

1    A    That's correct.

2    Q    And you're positing here that the percentage of the

3    scoreboard visible to the wheelchair user is 93 percent and

4    to the comparable spectator view is 100 percent?

5    A    Yes.

6    Q    Okay.  Is that comparable?

7              THE COURT:  Is that what?

8              MR. WILLEY:  Comparable.

9    A    I wouldn't argue about that one as being noncomparable.

10   Q    (By Mr. Willey)  So you'd say that's comparable?

11   A    I would.

12   Q    Okay.

13       So Exhibit 16 shows a comparable line of sight for the

14   scoreboard here?

15   A    Yes.  The obstruction is just a tiny speaker overhead, and

16   it blocks a very small portion of the scoreboard.  And it

17   looked as if you could move your head from side to side and

18   you might be able to see around that speaker.

19   Q    What I was establishing was that in this picture here,

20   which is Exhibit 16, your opinion is that's comparable?

21   A    I'm not saying it's not.  I'm fine with it.

22   Q    Okay.

23             MR. WILLEY:  Could we look at Exhibit 21?  If you

24   could enlarge that slightly, Rondi, please?

25   Q    (By Mr. Willey)  You had talked with -- about this exhibit

 1  with Mr. Connor this morning?

 2  A    Yes.

 3  Q    When we're looking at the comparable spectator view here,

 4  you are describing that location as Seat -- it looks like

 5  "approximate 16."  What does that mean?

 6  A    I don't -- I don't remember exactly where I took that one

 7  because I didn't have a photograph that showed where that was

 8  placed.  I didn't photograph the seat number before I took

 9  that photograph, or immediately after it, but it is about in

10  Seat No. 16.

11  Q    So we're not certain where that photograph is taken,

12  right?

13  A    I'm no more certain than it's about Seat No. 16.  It could

14  be Seat 14, it could be Seat 18, it could be 17 or something.

15  Q    You didn't document where it was?

16  A    I did not document exactly where it was.  I know it was in

17  Row 10, and I know in was front of the wheelchair user.

18  Q    So in this one, you're saying the center field scoreboard

19  is 78 percent visible to the wheelchair user and 87 percent

20  visible to the comparable spectator sitting in about Seat 16.

21  Is that comparable?

22  A    It's a little more of a problem.  It's comparable in the

23  corner.  The majority of that, down in the corner where it's

24  blocked by the 300-level section, that's comparable, so that

25  would certainly not be an issue.

1      The upper right-hand corner might be.  I just tried to

2  document all the places where we had done this, and I tried

3  to document exactly what we saw.

4  Q   Well, I'm just asking you if it's comparable or not.

5  A   I wouldn't argue about that one.  I don't think we'd be

6  here if it was just for that one.

7  Q   Well, what I'm trying to understand is, sir, where is the

8  point that you are drawing the line as to what's comparable

9  versus not, for purposes of this particular exercise.

10 A   I think at the point where it feels like it's relegated to

11 something that's substandard for the people who are using it.

12      Now, as an architect, I'm responsible for understanding

13 the way my users react to the spaces that they're in.  And so

14 my opinion is looking at it as to how is that perceived by

15 the users.  Is that something that really creates a problem

16 for them?  And I try to make a judgment call based on that.

17      If you're asking for a bright line, I don't know of a way

18 to draw a bright line, other than when viewed in its entirety

19 or when looking at this from the view of does it feel like

20 discrimination or not, like I said, I wouldn't be arguing

21 about this one if this was the only case.

22 Q   No, I appreciate it, and I appreciate the role that you

23 take in terms of trying to accomplish what you're doing in

24 architecture.

25      What I'm trying to understand, though, is, as an expert

1  giving an opinion to this court, are you telling the court

2  that what we do is we kind of see what it feels like?

3          THE COURT:  See what?

4          MR. WILLEY:  What it feels like.

5  A    Isn't that the way discrimination works?  It's -- it's do

6  you have opportunities that are comparable; that you have the

7  overall feeling of it that is, is this something -- some

8  things are bright lines.  Some things are bright lines.  In

9  terms of this one, are you communicating effectively, is the

10 information that is up in that corner of the scoreboard

11 available at all times available on another band somewhere?

12 You'd have to look at a lot of different things to worry

13 about it.

14     But just looking at this picture, as I said, this is not

15 something that would cause me to say, oh, no, this is a

16 horrible design.

17 Q    (By Mr. Willey)  I understand.  And I guess why I'm asking

18 the question is, if you're seeking to prosecute a claim

19 against my client, I'm trying to understand how it is we

20 should have known to do something at the time, in designing a

21 stadium in 1996, to avoid having somebody tell us, in 2019,

22 that something feels not quite right.

23          And I understand and appreciate individual persons'

24 feelings.  I'm just trying to understand the standards we're

25 applying.

1   A    Well, this scoreboard, if I understand it right, was not

2   actually installed on opening day.  Was this added later?

3   Q    I believe it was.

4   A    Okay.

5   Q    I believe there was a prior board there.

6   A    Yeah.  So what I would have expected the designers or the

7   purchaser of this thing to do is to say is this information

8   going to be available to anybody in the place that we want to

9   put it?  It is it going to be available to everybody, or will

10  there be a discriminatory effect, whether intentional or not

11  intentional?  And if there would be discriminatory effect

12  that would prevent people with disabilities from having the

13  same kind of statistical information that baseball spectators

14  love to see, then I'd provide that same information in some

15  other way that they could have access to that, rather than

16  just being -- not knowing that the information was being

17  given to everybody else or knowing that it was being given,

18  but they couldn't see what it was.

19  Q    Fair enough.

20       And in order to do that, in a coherent way, what one

21  would need to do would be to look at the viewing from many

22  different seats and, at the same time, to recognize and

23  assess what's being shown on other means of communication and

24  other scoreboards in order to determine if there is that

25  information provided, right?  That's what you need to do?

1    A    That is the obligation.

2    Q    And you didn't do that?

3    A    I'm sorry?

4    Q    You didn't do that here?

5              THE COURT:  Counsel, you made your point.

6              MR. WILLEY:  Okay.  Thank you.

7    Q    (By Mr. Willey)  Mr. Terry, you had talked with Mr. Connor

8    about pricing of seats and also distribution of seats,

9    correct?

10   A    Yes.

11   Q    When we're talking about those things, those are not the

12   same thing, right?

13   A    They're intertwined.  The prices typically reflect the

14   kinds of choices of admission prices of 4.33 that are

15   comparable.  Those fall into what are the dispersal and the

16   sight lines -- the dispersal and parts of the sight lines.

17   Q    Again, so we're very clear, so the applicable regulatory

18   authority for seating distribution and whatever pricing

19   you're talking about, that would be for purposes of this

20   stadium, as constructed when it was, Section 4.33.3, the TAM,

21   the TAM supplement, and *Accessible Stadiums*, correct?

22   A    I'm not following you.  Why are we limiting it to that,

23   and why are we limiting it to the time that it was

24   constructed?

25   Q    Well, because the time it's constructed is when there

1  would have been information and regulations available to the

2  architects that they could have applied.  It would be a

3  challenge for them to anticipate what might occur in the

4  future.

5       So let's just talk about what was available at the

6  time.  And if I'm missing something, please tell us.

7  A   Okay.

8  Q   So we have Section 4.33.3 of the '91 standards, we have

9  the TAM, we have the TAM supplement, and we have the

10 *Accessible Stadiums* document.  Is there something else that

11 you're relying upon with respect to what the obligation was

12 at the time?  Please tell me.

13 A   I think those are sufficient.

14 Q   Okay.

15      When I deposed you, you had -- we had talked a little

16 bit about your opinion with respect to accessible seating

17 distribution.  Do you remember, vaguely, we talked about that

18 subject?

19 A   We did.

20 Q   Okay.

21      And what you told me at the time was that your

22 opinions, for purposes of this case, were premised on a,

23 quote, a hybrid kind of analysis, end quote, that mixed the

24 '91 and the 2010 standards; is that right?

25 A   That's correct.

1   Q    So when you're rendering an opinion about what the seating

2   distribution should be at T-Mobile Park, you're seeking to

3   impose the 2010 standards retrospectively?

4   A    What I'm doing is exactly what you wanted to do with the

5   count.

6        The '91 standards required one percent of all seating in

7   the stadium to be wheelchair users, plus one percent for

8   companions; however, the 2010 standards gave you an

9   opportunity to reduce that number, which you have done, and,

10  therefore, there is a hybrid analysis there.  Where the 2010

11  standards are less restrictive, you're allowed to use the

12  2010 standards.  Where the '91 standards had a particular

13  requirement that was not met, then the obligation is to

14  correct it in accordance with the 2010 standard.

15       So in looking at it, if an element that met -- if an

16  element met the '91 standards, then it does not have to be

17  modified.  If it did not meet the '91 standards, then I'm

18  going to look at it and say, all right, now the 2010

19  standards apply, and how would the 2010 standards have

20  applied to this.

21       So there is this mixture -- because of the safe harbor,

22  because of the reduction in access, there is a mixture in how

23  you look at particular questions related to the design of the

24  stadium.

25  Q    Well, let me take this in just little pieces.  Okay?

```
 1          You're not opining about remediation, are you?
 2              THE COURT:  You're not what?
 3    Q   (By Mr. Willey)  You're not opining about remediation, are
 4    you?
 5    A   I'm only opining about whether the condition that was
 6    there met the '91 standards, and if it did not, what
 7    standards applied to it.  So does this element -- what is the
 8    applicable rule that applies to this element?
 9          So I'm not talking about how you fix it.  I'm talking
10    about what standard applies to that.
11    Q   Right.  And let's just take one step at a time.
12          If you were going to determine what the obligation of
13    T-Mobile Park was when the stadium was built, you would look
14    at the '91 standards, right?
15    A   Plus the other documents we've talked about.
16    Q   Plus the other documents, right?
17          And if you determined, hypothetically, that it did not
18    comply with those -- right? -- then you would assert the 2010
19    standards should apply, right?
20    A   Yes.
21    Q   Okay.  If --
22    A   Element by element.
23    Q   But making the first determination, you must apply the '91
24    standards only, right?
25    A   That's correct.
```

1    Q    And you didn't do that; you actually did that assessment

2    with a hybrid analysis?

3    A    No.  I called it a hybrid analysis in my deposition

4    because I was trying to explain the fact that it's not an

5    either/or.  If it failed '91, did it pass 2010?  So it failed

6    the number of seats required under '91, but it passed the

7    number of seats required in the stadium under 2010.  So I

8    gave you the benefit of the doubt because that's what

9    applied.  In the same way if it passed '91 -- if an element

10   passed '91, then it didn't have to -- if an element passed

11   '91, it didn't have to comply with 2010, so I ignored it.

12   Q    I think the number of seats is not at issue here.

13   A    It's the concept.

14   Q    It's not a claim in the case, and I don't want to confuse

15   the issue.

16   A    I'm just trying to explain that that's the way it works,

17   and using an example that we already understand.

18   Q    You would agree with me that one cannot determine

19   liability based on the 2010 standard?

20   A    I'm sorry?

21   Q    Would you agree with me that one cannot determine

22   liability based upon the 2010 standard in this case?

23   A    No.  It's more complicated than that.

24             MR. CONNOR:  I think that's an ambiguous question.  I

25   don't know what Mr. Willey means by "determine liability in

1    this case."

2              MR. WILLEY:  It doesn't strike me as an evidentiary

3    objection.

4              THE COURT:  Wait.  Stop.

5         The witness has already said that he judged the adequacy

6    of whichever we're talking about now, distribution pricing,

7    whatever, by 1991 standards.  Am I right?

8              THE WITNESS:  That's correct.

9              THE COURT:  And that would be the end of it if it

10   complied with the 1991 standard?

11             THE WITNESS:  That's correct.  That's correct.

12             THE COURT:  If, in your opinion, it did not comply

13   with the 1991 standards, you would then look, I guess, for

14   purposes of saying what should be done to the 2010 standards?

15             THE WITNESS:  I would be looking to see not what

16   should be done but what is -- what is it required to be now.

17        So, for example, let's say it didn't pass in '91, but they

18   came in and remediated it to meet 2010 in January, I show up

19   in February, this meets 2010, I don't care whether it met '91

20   or not.  Right now it's compliant.

21        So I used '91 as the first threshold.  If it failed that,

22   then I looked at 2010.  If it failed that, it's noncompliant.

23   If it met either one, that element would be compliant.

24   Q    (By Mr. Willey)  And you're basing this upon those four

25   documents that we've referenced?

1    A    Well, obviously, when I moved to the 2010 standards, I had

2    to look at the 2010 standards that applied when it failed

3    those.

4    Q    With respect to your adjudication about 1991 compliance,

5    you're looking at the Section 4.33.3, the TAM, the TAM

6    supplement, and *Accessible Stadiums*, right?

7    A    That's correct.

8    Q    That's the sole substance of it?

9    A    I'm sorry?

10   Q    That's all you're --

11            THE COURT:  Yes, counsel, he's answered that three

12   times.

13            MR. WILLEY:  He's, actually, opined on other things

14   with Mr. Connor, and I want to make sure we're clear on that.

15            THE COURT:  I think he had said to you that in

16   judging -- whether there is compliance with the 1991

17   standards, he's looked at those three things:  The TAM, the

18   TAM supplement, and the cite that you talked about, 4.33.3.

19   Q    (By Mr. Willey)  You agreed, right -- I think I heard you

20   say this -- the horizontal distribution in T-Mobile Park is

21   good?  It's compliant?

22   A    Horizontal distribution I wouldn't argue about, yeah.

23   Q    And I think you also testified previously that the 200 and

24   300 levels at T-Mobile Park meet the standards of vertical

25   dispersal?

1  A   What I testified about was that the 200 levels, even

2  though it's in the back and it would not have met the 2010

3  standards for location, that the -- or would likely not have,

4  I didn't look at it that way -- but it didn't bother me.

5  Because the section was so short, I wouldn't have argued that

6  the 200 level would be a problem for that.

7  Q   Right.  So the 200 level you don't think is noncompliant,

8  right?

9  A   I'm not claiming that it is.

10 Q   Okay.

11      And the same thing with 300 level, you have no problem

12 with it?

13 A   For vertical dispersal, that's correct.

14 Q   And for horizontal?  I think you testified --

15 A   Yes, that's correct.

16 Q   Okay.

17      Is there anything in the DOJ regs or guidance, in

18 effect in 1991 and 1996 when the stadium was built, that

19 refer to an assessment of vertical distribution section by

20 section or level by level?

21 A   I don't believe that was there because it was a standard

22 that was written for lots of different types of facilities,

23 and they were expecting the designers and the owners to

24 achieve something that provided comparable lines of sight,

25 viewing angles, and choice of admission prices.

1    Q    I understand.

2    A    So they weren't so specific to get into those.

3    Q    And so one doesn't know whether you should be looking at

4    vertical distribution throughout the stadium as a whole, or

5    looking at it section by section, right?

6    A    I'm sorry?

7    Q    There's no guidance from the DOJ as to whether or not

8    vertical distribution should be assessed by the stadium as a

9    whole, in an integrated sense, or whether you would piecemeal

10   it section by section or level by level.  That's not in the

11   regs anywhere, is it?

12   A    I think in designing a stadium like this, when you look at

13   the standard and it says "choice of admission prices and

14   viewing angles that are comparable as has been provided to

15   members of the general public," as a designer of the stadium,

16   you know that those things, when combined, that the choice of

17   ticket prices on the upper levels, in the back of the upper

18   level, may be different than down closer.  So when you look

19   at that language together, that kind of performance language,

20   that you say, all right, how do we need to give people

21   comparable opportunities, a comparable experience, comparable

22   opportunities, choices in the stadium, and you make those

23   judgment calls based on what you know about what you're

24   designing.

25   Q    Okay.

```
 1              And to answer my question, there is no information in
 2     the DOJ regs about assessing vertical distribution via the
 3     stadium as a whole versus section by section or level by
 4     level, is there?
 5     A   I don't recall that being in the DOJ regulations that came
 6     out in '91.  I know that it came out in other places.  I
 7     can't recall specific documents that mention that, from the
 8     list that you gave.
 9     Q   And you can't identify for us any other DOJ document that
10     was contemporaneous that mentioned that?
11     A   Not that you'll let me talk about.
12     Q   Which is to say there's nothing published?
13     A   No, I didn't say that.
14     Q   Did you testify in the --
15              THE COURT:  Wait, wait.  Stop.
16     A   I didn't say that.
17     Q   (By Mr. Willey)  Did you testify in the *Independent Living*
18     case about the Rose Garden in Portland?
19     A   I did.
20     Q   And the judge found that comparable sight lines meant
21     something different, didn't he?
22     A   The judge in that case said that the sight line over
23     standing spectators, he did not see that in the Department of
24     Justice rules, and so he did not require them to add those.
25     They did add raised platforms in that stadium almost
```

 1   immediately after the case.  They enhanced the sight lines

 2   for wheelchair users, but the judge did not enforce that in

 3   his opinion.

 4   Q   And he understood -- I think his order, after you

 5   testified, was that the lines of sight had to do with

 6   different perspectives around the field, right?  First base,

 7   home, center field?

 8   A   You know, I don't recall exactly how he defined what was

 9   what in there.

10   Q   With respect to the pricing -- let's talk about ticket

11   availability first.

12       You had looked at ticket availability; is that right?

13   A   Yes.

14   Q   And I believe that your opinion about ticket availability

15   for single-game tickets, as opposed to season tickets or

16   packages, was based upon your review of TicketMaster on

17   April 16, 2019, for a single game on May 28th, 2019; is that

18   correct?

19   A   That was one of the -- one of the bases for it.

20   Q   You did not have an expert opinion about single-game

21   ticket availability for any game, other than May 28th, 2019,

22   right?

23   A   No, that's not true.

24   Q   Could you identify the games for which you had an opinion

25   about ticket availability, other than the one?

1          THE COURT:  While you look for that, I think it's

2    probably a good time to take our morning recess, so we will

3    be in recess for 15 minutes.  You can resume when we come

4    back.

5          MR. WILLEY:  Thank you.

6          THE WITNESS:  Can I continue to look?

7          THE COURT:  You may.

8                    (Court in recess.)

9          THE COURT:  Were you able to find what you were

10   looking for?

11         THE WITNESS:  I was.

12         THE COURT:  Then, counsel, let's go.

13   Q   (By Mr. Willey)  Mr. Terry, did the Mariners meet the 1991

14   standard for the percentage of accessible seats when the

15   stadium opened in 1999?

16   A   I don't know.

17   Q   Did the Mariners' pricing for ADA-accessible seats and the

18   distribution of such pricing meet the ADA standard in 1991

19   when the stadium opened in 1999?

20   A   I don't have any information about that.

21   Q   Mr. Terry, there are a number of accessible seats in the

22   outfield bleacher area, in Sections 190, 191, 192, et cetera.

23   You can look at the DX-5.  Here.

24   A   Excuse me.  Those -- there are wheelchair symbols on this

25   drawing, but they were not on drawings we had received

1    before.  There was no indication of seats in that location.

2    Q   So you don't have an opinion as to whether or not those

3    seats have comparable view lines?

4    A   I didn't know there were seats.  This is the only drawing,

5    that I can remember seeing, that shows that there were

6    wheelchair seats there.

7    Q   I'm not trying to ask you to go somewhere that you don't

8    know about.  If you don't know or have an opinion, that's

9    fine.

10             THE COURT:  He told you he didn't know there were

11   seats there, so he can't give an opinion on --

12   Q   (By Mr. Willey)  How about here?

13             THE COURT:  Ask him another question.

14             MR. WILLEY:  Yeah.  I showed him another section, the

15   section that extends forward here beneath the Hit it Here

16   Cafe, and I wanted to know if Mr. Terry had an opinion with

17   respect to the comparability of those seats.

18   A   Excuse me.  I was looking at the wrong section when you

19   put that up.

20       The first section, I did know about wheelchair seats

21   behind there.  I did not do an analysis of those.

22   Q   (By Mr. Willey)  Okay.  Fair enough.

23             Is that true also for this section here?

24   A   What are those section numbers?

25   Q   105 through 110.

1  A    I did not do sight-line analysis from there.  From the

2  ones that are in this area in the outfield, I did not do

3  sight-line analysis of that due to time restrictions.

4  Q    And these are shorter sections in the bowl?

5  A    Sorry?

6  Q    Shorter, narrower sections, fewer rows of seats than the

7  bowl, generally?

8  A    Yes, front to back, there's less distance.

9  Q    Got it.

10  A    Now, the mark that was down on the bottom of the screen

11  here, is that mark -- were you asking me something there?

12  Q    No.  That's my hand bumping into it inadvertently.

13  A    Okay.  No problem.  I just don't want to miss anything I'm

14  supposed to...

15         MR. WILLEY:  If we could look at Defendants'

16  Exhibit 161, please, Rondi?

17      Excuse me.  Plaintiffs' Exhibit 161.

18  Q    (By Mr. Willey)  This is a chart you prepared, Mr. Terry;

19  is that correct?

20  A    Yes.

21  Q    And this is a chart that is depicting some analysis you

22  did with respect to your review of tickets available on

23  TicketMaster as of April 16, 2019, for the game dated

24  May 28th, 2019, right?

25  A    That's correct.

1    Q    All right.

2         So your analysis here is predicated on a single game?

3    A    Partly.

4    Q    Right.

5         And when I asked you in your deposition if there was

6    any other game that you could identify that was part of this

7    analysis, you could not, right?

8    A    What you asked me in my deposition was whether I knew the

9    ticket availability for specific games, and you quoted

10   particular dates and wanted to know if I knew those -- what

11   was the availability in those games.  The way I recall the

12   deposition, and I couldn't tell you, on any particular game,

13   what that -- what that information was.

14        I did tell you, in my report -- I realized that I did give

15   you some specific dates in my report that I couldn't recall

16   during my deposition.

17   Q    But you don't have an analysis with respect to ticket

18   availability, apart from this chart here that's Exhibit 161,

19   plaintiffs', right?

20   A    Detailed analysis of ticket availability, apart from this

21   chart?  This chart really doesn't show ticket availability.

22   This chart is what we used to count the number of tickets.

23   Because there was a difference between the seating manifest

24   that we'd been given, numbers that we'd been quoted, and what

25   was actually showing up on TicketMaster.  And so in this

1   chart, what we tried to do was to reconcile the differences.

2      Now I understand that ticket availability differs;

3   somebody breaks a seat, that one is no longer available;

4   there's a seat that's held for trouble.  There are all kinds

5   of things that change those numbers.  But we were trying to

6   find out did you meet the minimum number, and we had to count

7   the stadium, and so we did that.  That's what this chart was

8   for.  This was not about availability.

9   Q   And you had testified earlier today about whether or not,

10  when a ticket buyer would go on TicketMaster to seek an

11  accessible seat, and there may not have been one, that they

12  were not -- I think you used the phrase "not practically

13  available"?

14  A   Yes.

15  Q   And when they're not practically available, that's because

16  someone else bought the ticket, right?

17  A   It's hard to know.

18  Q   Well, but that's the most plausible outcome, right?  If I

19  go to TicketMaster and I want to buy a seat and the seat is

20  not available, the most likely scenario is because someone

21  else bought it, right?

22  A   That's the most common reason for it.

23      Sometimes front-row seats are held out for -- you

24  know, high-end seats are held out for, you know, celebrities

25  that want to come to a game.  So it's hard to say that

1    they've actually been bought, but that is the most common

2    reason for it.

3    Q    Right.

4         MR. WILLEY:   Rondi, let's look at Exhibit 162.   This

5    is Plaintiffs' Exhibit 162.

6         THE COURT:   Plaintiffs'?

7    Q    (By Mr. Willey)   You had looked at this chart with

8    Mr. Connor, and I believe you were looking at the

9    availability of season-ticket packages and group packages,

10   or, rather, different pieces of season-ticket packages as of

11   April 28th, 2019; is that right?

12   A    That's correct.

13   Q    So if you had run this search on January 1 of 2019, you

14   would have had different results, right?

15   A    I would expect it to.

16   Q    Right.

17        And if you'd run it on November 30th of 2018, when the

18   tickets were initially on sale, you would have had different

19   results?

20   A    That's true.

21   Q    So this doesn't tell us whether or not there were

22   wheelchair seats in season-ticket packages, does it?

23   A    It tells us something about that.   It does not tell us

24   everything that we would need to know to do a thorough

25   analysis, but that would also require computer programs.

1    Q    Sure.

2          And we'd want to look at more than one date and more

3    than one section, right?

4    A    I would want to look at further-back information than that

5    to be able to get a good idea of it, but this is -- all we

6    had access to was what we knew at the time.

7    Q    Sure.

8          And one date in April, and looking at certain sections,

9    right?

10   A    That's correct.

11   Q    So just looking at this chart, it is -- on the left-hand

12   column, we have Sections 124, 125, 129, right?

13   A    Yes.

14   Q    And you didn't know and check if there was something

15   available in 128?

16   A    That's correct.  These are the seats that we did the

17   sight-line analysis, just to give us a limited section;

18   otherwise, we would have ended up with something -- a

19   spreadsheet the size of the one we just looked at.

20   Q    I understand entirely.

21          Even as of the date of this particular inquiry --

22   A    Yes.

23   Q    -- the information depicted on this exhibit is not

24   representative of the stadium as a whole; it only depicts

25   those sections?

1   A    That's correct.

2   Q    Okay.

3        And so if we wanted to know about what

4   wheelchair-accessible seats were available as of April 28th

5   in season-ticket packages, this doesn't tell us, except for

6   with respect to the sections listed?

7   A    No.  This is a sample -- what I tried to get was a

8   representative sample of places where we could see what the

9   sight lines were.

10  Q    Have you ever designed a stadium?

11  A    Sorry?

12  Q    Have you ever designed a stadium as an architect?

13  A    Designed a stadium?

14  Q    Yeah.

15  A    I'd have to think back.  I've been doing this for 30

16  years, or 29.

17       I have worked on the design of some stadiums as a

18  draftsman for schools, but I have not actually been a

19  designer on a team -- one of the four teams that was

20  designing stadiums this size.  Now, I've served as a

21  consultant on the design of a lot of stadiums, at least half

22  a dozen stadiums and arenas that are this size.

23  Q    Do you know who the architect was for T-Mobile Park?

24  A    I believe it was NBBJ.

25  Q    They designed other stadiums?

1    A    Yes.  They were one of the big four designing stadiums in

2    the '90s, stadiums and arenas.

3    Q    And do you have any knowledge as to what NBBJ did in terms

4    of designing this stadium with respect to ADA compliance?

5    A    Any knowledge?

6    Q    Yeah.

7    A    I can see the results of a lot of things that they did.

8    Q    With respect to what they were doing at the time when

9    designing.

10   A    What their design practices were?

11   Q    Yeah.

12   A    I don't know what their design practices were at the time.

13   I mean, there are thousands of practices that they would have

14   in designing a stadium like this, and I don't know.

15   Q    Fair enough.  I just wanted to know if you had any

16   familiarity, and I'm hearing you say you did not, and that's

17   fine.

18         So if we could talk about your sight-line analysis.

19   A    Yes.

20   Q    And I want to make sure I understand what it is you were

21   doing exactly.

22         MR. WILLEY:  If you could pull up Plaintiffs' 3,

23   please, Rondi.

24         THE WITNESS:  Which one?

25         MR. WILLEY:  It's on the screen in front of you, and

1   it's Plaintiffs' Exhibit 3.

2         THE WITNESS:  Three.

3   Q   (By Mr. Willey)  Do you have it there?

4   A   I do.

5   Q   So when you were doing this analysis, as I understand it,

6   you were having yourself in a wheelchair seating location

7   with a camera; is that right?

8   A   In the left-hand photograph, yes.

9   Q   Right.

10        And then you're having your assistant stand in front of

11  you, holding up rulers or extended yardsticks?

12  A   That's correct.

13  Q   And then you're taking these pictures.  And when you're

14  doing this analysis and trying to show or visualize, in some

15  way, what a spectator might see, are you populating this with

16  the heads of spectators?  In other words, when I'm in a

17  stadium and I'm sitting in a seat, my view is their heads and

18  shoulders in front of me in various angles.  Are you doing

19  that here?

20  A   The line shown on the top -- the upper line shown here

21  that has "head," that is the heads of people.  It represents

22  the head of an average-height spectator standing two rows in

23  front of the wheelchair user.  The line below that, that says

24  "shoulder," represents the shoulders of people, ignoring the

25  heads, recognizing that they may be there -- they will be

1    there, hopefully -- but recognizing that that's the line of

2    the shoulder.  So it's assuming that you're looking over the

3    shoulders and between the heads of the people one row in

4    front.

5    Q   This is not being populated, though, with human,

6    mannequin, or like figures to show how spectators actually

7    sit, is it?  In other words, there are no spectators here.

8    You're simply drawing a line, right?

9    A   Yes.

10   Q   And the same is true up here.  In other words, you're

11   drawing this line, and then you're saying there is no vision

12   here at all.  That's what you're saying, right?

13   A   I'm saying that anything below that row of heads on the

14   second row, forward, is to be assumed to be blocked, and

15   that's because that's what the technical assistance said to

16   assume.  It said you're looking over the heads of the

17   people -- over the shoulders of the people one row forward,

18   ignoring the heads, knowing they're going to be there, but

19   over the heads of people two rows in front.

20   Q   But if we had heads here -- right? -- you would see more

21   of the field, wouldn't you?  In other words, you've put up

22   just a wall, and, in fact, real life is there are heads in

23   there, right?

24   A   I could have shown a drawing here -- and I've seen another

25   person actually put some little cutouts of people in front.

1    I could have shown that here, but that's noise in that it

2    doesn't tell you what the documents told you to calculate

3    based on.

4        So what I looked at was, I tried to show you how the

5    standards told you to do that analysis, not the noise of all

6    of the various places that people could have been standing.

7    There's a little -- these are a little out of scale, and they

8    ignore the people whose heads are between the ones that

9    you're looking at there.  So it's -- what I tried to do was

10   just pare it down to what the standard said to look for.

11   Q    I understand, but there's no reg that tells you to do what

12   you've done here, though?

13   A    There's no reg that tells you how to illustrate it.

14   Q    Right.  So you chose to do it by putting up a wall, and

15   could have also chosen to do it by doing heads, right?

16   A    I chose to do it in a way that represented what the

17   technical assistance was interpreted to require, and to

18   filter out the noise of all the other kinds of things.

19   Q    When you say "the technical assistance required," you're

20   referring to what?

21   A    Over the shoulders of people one row in front and over the

22   heads of people two rows in front, if that is what the other

23   people in this area were able to see.  So, again, in this

24   particular location, it's over the shoulders -- the people in

25   the rows in front, that's the kind of sight lines they were

1    given.  So for the wheelchair user, I tried to do a

2    comparable analysis of that.

3    Q    Right.

4         And just so we're clear, if we're looking at the

5    percentage of the field that one is viewing -- right? -- if

6    you had done the work with different heads, like I'm showing

7    here, you would have had a greater percentage of field view,

8    right?

9    A    I'm sorry?

10   Q    Do you not understand my question?

11   A    I don't, because -- I would have had a greater view of the

12   field?  I mean, it depends -- if you're talking about a

13   re-imagining of a real crowd of people who are not all the

14   same height, then, yes, you would have different views,

15   depending on whether you're sitting behind a bunch of kids or

16   a bunch of Texans with their hats on or -- I mean, you would

17   get that kind of noise in front of you, and that's expected.

18   But the stadium designers, what is expected by the standards,

19   is that you are designing for average-height people.  So your

20   obligation is to give comparability in the design of this so

21   that when it's populated by the various types of people that

22   would be there, you've still have comparability.  Anybody

23   sitting in any of these seats could have Texans with hats on

24   in front of them.

25   Q    I'm not asking about Texans.  I'm actually just getting at

1   the differentiation between, for example, average-height

2   people with actual heads versus a wall in the analysis.

3   That's all.

4        Let me ask you this:  When you're talking about the

5   regs that require this, you're consistently going back to the

6   Accessible Stadium document.  That's the reference we're

7   talking about, right?

8   A    The Accessible Stadium document and the Title III

9   Technical Assistance Manual supplement in terms of the types

10  of things that they were talking about, that you had to have

11  sight line over standing spectators.

12  Q    The 1994 TAM supplement and the 1996 *Accessible Stadiums*,

13  right?

14  A    Yes, that's what we're talking about.

15  Q    Okay.

16       And the 1994 TAM supplement indicated that one of the

17  ways to comply would be to put people at the back of the

18  viewing section with some elevation, right?

19  A    Yes.

20  Q    And that's what NBBJ did here?

21  A    Almost.

22  Q    Well, they did it.  I mean, you're telling me 20 years

23  later you disagree, but that's what they did, right?

24  A    They elevated the platform, but they didn't elevate it

25  enough to provide comparability.

1   Q   In your view?

2   A   I don't see that it's really so much of an opinion.  It's

3   a question of what do the numbers show.  It's a fact, and

4   it's an opinion about those facts.

5           MR. WILLEY:  Rondi, if we could look at that same

6   exhibit again, and then follow that with Exhibit 4.  These

7   are Plaintiffs' Exhibit 3 and 4.

8   Q   (By Mr. Willey)  So this is Plaintiffs' Exhibit 3, minus

9   my red marks.

10          In this document, we have the wheelchair-user view, and

11  you're showing that -- that over the shoulder, a hundred

12  percent view of the field, and over the head, there's a 53

13  percent view of the field; is that right?

14  A   Are we on Attachment B1?

15  Q   Attachment B1.

16  A   And tell me where you're reading.

17  Q   I'm reading your numbers here.  So --

18  A   These numbers right here?

19  Q   Yes.

20  A   Okay.  All right.

21  Q   So this is showing that, in this picture, the

22  wheelchair-user view has a hundred percent view of the field

23  over shoulders, right?

24  A   Yes.

25  Q   And this picture, you're calculating that when you put the

1  wall up here, you have 53 percent view of the field, right,

2  the entire field?

3  A    Fifty-three percent of the entire field, yes.

4  Q    And if we do the comparison on the right side -- right? --

5  over the shoulder we have a hundred percent here, and over

6  the head, we have 73 percent of the entire field, right?

7  A    That's correct.

8  Q    Is that comparable?

9         THE COURT:  Is that what?

10  Q    (By Mr. Willey)  Comparable, in your view.

11  A    Because I can't see the home plate, and I can't see the

12  slide going into home plate, it's not comparable, in my view.

13  Q    Got it.

14       So is it home-plate based?

15  A    It is based on watching a baseball game.  And a lot of

16  stuff happens at home plate, so that's comparability, as far

17  as I'm concerned.  It's important to be able to see the

18  action, particularly that action.

19  Q    What if the action is in the infield?

20  A    Then I can see that.

21  Q    Okay.

22       What I'm trying to understand is, is the 53 versus 73

23  percent comparable?

24  A    If you look at the calculation of the infield, not the

25  entire field, most of the action typically occurs in the

1    infield.  The infield is a hundred percent over the heads for

2    all standing spectators, all members of the general public

3    can see all of the infield and all the places that I looked

4    at.  It's only wheelchair users who have significant portions

5    or important portions of the infield blocked.

6    Q    Well, let me just ask you, then, about the infield here.

7         Eighty-three versus a hundred percent, is that

8    comparable?

9    A    Depends on which percent it is that you're missing.

10   Q    Well, it sounds to me what you need to be doing, in your

11   view, is you do some sort of seat-by-seat analysis all the

12   way around, right?

13   A    Which is what the designers would have done --

14   Q    I'm only trying to understand your position.

15   A    Yes, my position is that you do comparable for wheelchair

16   users what you do for everybody else in that area.

17   Q    So in your view, what would be comparable here in these

18   seats is different than what would be comparable in a

19   different section?

20   A    Absolutely.

21   Q    Got it.

22        So you would have a different, sort of, comparability

23   analysis all the way around?

24   A    Because the comparability is what other people in that

25   area get to see.  So if you're paying for the nosebleed

1  sections, and you have a different set of viewing angles up

2  there in those $20 seats, then that's the kind of viewing

3  angle that you're required to provide for wheelchair users.

4      If you've got the multi-hundred-dollar view from the

5  Diamond Club, then you need to give everybody the same kind

6  of view for, kind of, where they are.  Give people the

7  options.

8  Q   I understand.  I guess what I'm trying to understand,

9  then, is, you would say that your analysis of comparability

10 is not really based upon this percentage analysis; it's,

11 rather, based upon looking at the specifics of each seat all

12 around the stadium?

13 A   It is looking at the seats that are in that area,

14 comparability for other seats in the area.  So the photograph

15 on the right is taken from a seat just ahead of the one row

16 ahead of the wheelchair user, and this shows what they can

17 see.

18 Q   Okay.  Well, let's go to Exhibit 190 -- excuse me --

19 Plaintiffs' 4.

20      Okay.  So this is now a comparison of two seats in the

21 section next to it?

22 A   Yes.

23 Q   Right, that are not wheelchair seats?

24 A   That's correct.

25 Q   Okay.

1          And in this picture, the person in the

2    general-admission seat on the left has a 42 percent view of

3    the field?

4    A   Of the entire field, yes.

5    Q   Right?

6          And the other general accessible person on the right

7    has a 65 percent view of the entire field?

8          So each of these non-wheelchair users has an impaired

9    view of the field as well, right?

10   A   That's correct.

11   Q   And so would you say, then, that this section here is

12   comparable -- the wheelchair-accessible seating in Exhibit 3

13   that we just looked at is comparable to what's been shown

14   here?

15   A   Exhibit 3 that we just looked at?

16   Q   Yeah.  Does the wheelchair, in your view, have a

17   comparable sight?  Because we've got a 53 percent view of the

18   field there; here, you've got somebody with 42 percent in a

19   general-admission seat.

20   A   I would not say that you base comparability on the entire

21   field.  You base comparability on a whole series of things

22   that a spectator, who is there to watch the game, is

23   interested in.  Most spectators are interested in seeing the

24   places where the action occurs.  So if I'm limiting -- if I'm

25   looking at where I would consider comparability important, I

1  would be looking first at the infield, and then I'd be

2  looking at, well, what else is blocked or what else is

3  obscured, and what kind of trade-offs are in -- in looking at

4  that.

5      It was interesting in this -- in doing this review, that

6  all of those standing spectators could see all of the

7  infield.  I would expect a designer to make sure that that

8  could happen.  But then recognizing that, you know, the

9  location of the dugout if you're down close, the location of

10 other kind of things will block certain parts of your view.

11     So I'm looking at all those numbers to decide what I

12 believe would be comparable.  But the key indicator here is

13 that the infield, where those views are most critical to most

14 baseball fans, you don't have comparability.

15 Q   And so I just want to make sure I understand.

16     Your view is that most baseball fans want to see the

17 infield and not the outfield?

18 A   No, they want to see the outfield.  They want to find out

19 if that fly ball got caught or not.

20 Q   And so, really, you're telling us, though, that we should

21 not be looking at the entire field comparisons?

22 A   I didn't say that.  What I said was, you look at all of

23 these things together, not just one of them independently.

24 Q   Well, let me ask you this:  Do you believe that the person

25 sitting in Section 125, Row 11, Seat 8, has a comparable view

1    as the person sitting in Section 124, 41A, Seat 1?

2    A    Again, it's one of those gray areas.  You've got to look

3    at it and say, is this okay?

4         Now, a person sitting in Row 8 or Row 11, if I remember

5    correctly, is paying a different price than somebody sitting

6    in Row 25, they have a different set of viewing angles.

7    They're closer to the players, they can see other types of

8    things.  So comparing those two is not the same as comparing

9    a wheelchair user and a person one row in front.  Their

10   viewing angles are much closer together than these.

11        So the comparability between trying to compare two general

12   seats that are way apart from each other is a different set

13   of ticket choices that people get to make when they go to

14   games.

15        So, I mean, if we're trying to do a numerical analysis and

16   say is 42 comparable to 65, well, let's look at everything

17   together and see if it's a reasonable assumption -- I mean, a

18   reasonable thing to do.

19        The higher up you get, the more of the field you see,

20   generally, if you're not blocked, because you've got a

21   bird's-eye view looking down rather than an obscured view

22   looking over walls and looking over people that are standing

23   in front of you or sitting in front of you.

24   Q    Mr. Terry, your Exhibit 4 that's on the screen here, this

25   shows us that people in non-accessible seats,

1    general-admission seats in Section 125, in Rows 11 and Row

2    25, have impaired views of the field, right?

3    A    Yes.

4    Q    Got it.

5         And they have impaired views of the field that is, in

6    percent terms, similar to the person sitting in Section 124

7    or 41A?

8    A    No, that's not my testimony.

9    Q    I'm not asking you if that's your testimony.  I'm asking

10   you what the exhibit shows.

11   A    The exhibit shows that the view of the entire field -- I'd

12   have to go back to the one that we just looked at to see what

13   the number there was.

14        When you look at the entire field view for a wheelchair

15   user, the person who is sitting higher up -- again, the way

16   to get a hundred percent view of the field is to fly a drone

17   over the center of the field.  The higher you get, the more

18   percentage of the field you'll generally get, unless it's

19   blocked by something.  So the higher you move up, the more of

20   the entire field you'll see.

21        So, yes, that's why Row No. 11 has more of the entire

22   field blocked than Row No. 25 does, because it's higher up.

23   Q    Row 11 is closer to the field than Row 25.

24   A    Excuse me.

25        So the percent visible from Row 25 is 65 percent.  The

1    entire field from Row 11 is 42 percent.

2    Q    And the entire field from Row 41A is 53 percent?

3    A    That's correct.

4    Q    Got it.

5         So in this case, the person sitting in Row 11 has a

6    lesser view than the person sitting in Row 41?

7    A    Of the entire field, they have a lower percentage than the

8    person sitting in the wheelchair position, because a

9    wheelchair user is higher up and gets a better angle down on

10   the field than the Row 11 seat does for the entire field.

11   Q    Right.

12        And there are, then, seats in the bowl of the Section

13   100 level, right?  Some of the number of seats in that bowl

14   have lesser impaired views than the people sitting in Row 41,

15   right?

16   A    Only if you're looking exclusively at the entire field.

17   Q    Well, if we're looking at the entire field, then you would

18   agree with me, right?

19   A    Yes, that there are -- that there are people who have

20   worse views, than the people sitting in the back of 124, of

21   the entire field.

22   Q    Right.

23        And the same would be true if we looked at Section 135,

24   and we compared somebody, say, in Row 11 versus Row 41?

25   A    If you're looking only at the entire field, you would

1    generally have -- the higher you get up, the more of the

2    entire field you can see just because of the obstruction of

3    the people blocking the close edge of the field from you.

4    Q    Right.

5         And so in this case, what we're seeing here in this

6    exhibit is that if you're closer to the field, you actually

7    have less a view of the entire field?

8    A    Of the entire field.

9    Q    Right.

10        And so we can draw a band through the Section 100 level

11   of seats that have higher and, therefore, better views of the

12   entire field versus the seats that don't, presumably, right?

13   A    I'm sorry?

14   Q    Presumably, there is a band you can draw through the 100

15   level, where, above that band, the seats have better views,

16   and below that band, seats have more impaired views, just

17   like here, Row 11 has a lesser view than Row 41?

18   A    That's an oversimplification of what's actually happening.

19   So I wouldn't characterize it that way.  It's a misleading

20   oversimplification.  That's what I wouldn't want to do.

21   Q    But I'm saying if you were to go and look at Row 11

22   everywhere you did this analysis, you would likely see Row 11

23   to be impaired differently than Row 41, right?

24   A    The view from each seat in the stadium is going to be

25   slightly different, and the type of view changes occur based

1    on a lot of different factors, mostly related to how many

2    people are sitting in front of you, where you're sitting in

3    relation to that, how low you are.  And as you move closer to

4    the field, you get a closer, more personal view of what's

5    happening, but you get less a perspective of what's happening

6    on the entire field.

7        So that's why people had to have choices of viewing

8    angles, so that they can pick the type of view they want to

9    have in the stadium so that everybody gets to pick things

10   that they like to see.

11   Q   I just want to be clear, then.

12       What you're saying is -- you're testifying that we

13   don't look at the entire field percentages; we should look at

14   something --

15   A   No, I didn't testify to that.  I said that's one of the

16   factors to look at.

17   Q   Okay.

18       And on that basis, then, you would say these seats have

19   comparability?

20   A   I'm sorry.  Can you restate --

21   Q   The seats that are shown in Exhibit 3 and Exhibit 4 are

22   all comparable based upon an entire field comparison?

23   A   I wouldn't say that they're comparable to each other;

24   they're --

25   Q   Are they not?

1    A    -- different.

2    Q    Okay.

3         Are they non-comparable, in violation of the ADA, in

4    your view?

5    A    I'm sorry?

6    Q    Do they not compare in a way that violates the ADA, the

7    1991 regs, in your view?

8    A    The seats in Row 11 and 25 are not covered by the ADA.

9    Q    Versus Row 41?

10   A    They're not covered by the ADA.

11   Q    Well, if you're saying Row 41 does not have a comparable

12   view, I'm showing you seats in Row 11 and Row 25, and I'm

13   asking if those have comparable views, in your view.

14   A    The ADA says that wheelchair users need to have comparable

15   viewing angles to what's provided for other members of the

16   general public.  And so the viewing angles -- there are a lot

17   of different portions of the definition of viewing angles.

18   And so in terms of closeness to the field, these are better

19   than the wheelchair users.  So you get closer-up views of the

20   players, closer-up views of the action.

21        The seats in the back, you don't have that kind of option.

22   You don't have that opportunity.  The seats in the back, you

23   compare to the other people sitting in the area right next to

24   them.

25        Now, I looked at these seats because I wanted to find out,

1    are there -- the closer you get to the field, are other

2    people losing sight of, particularly the infield, are people

3    losing sight of that.  And what I found was that as you got

4    closer to the field, you didn't lose sight of the infield.

5    You lost sight of, primarily, the sidelines.

6        So if you look at Row 11, the side is 20 percent visible,

7    where, only 14 rows back, the side is 38 percent visible, and

8    that's --

9            THE COURT:  Wait a minute.  Were you saying that

10   sitting in Row 11 or standing in Row 11, and people stand up

11   in front of you, you have a better view of the infield than

12   somebody sitting in Row 25 with people standing in front of

13   them?  Is that what you're saying?

14           THE WITNESS:  No.  In Row 25 and Row 11, you can see

15   all of the blue area that indicates the infield in both

16   images.  So both of them have a full view of all of the dirt

17   that makes up the infield.

18       So 111 and 25, it was designed to give both of them a full

19   view of the infield when people are there, standing up.

20           THE COURT:  So then you would say they were

21   comparable?

22           THE WITNESS:  These two are comparable to each other

23   in their view of the infield.  In terms of the sight-line

24   view of what you can see over the standing spectators,

25   they're comparable.  But these are non-wheelchair users.

 1  Q   (By Mr. Willey)  Right.  And I'm comparing them to the

 2  wheelchair user in Exhibit 3.

 3  A   And when you go back to that wheelchair user, they could

 4  not see all of the infield because their elevation had not

 5  either been pushed far enough forward to -- they would have

 6  lost Row 40, pushed forward enough to be able to have the

 7  sight of the people in front of them, or been raised higher

 8  to be able to see over the people in front of them.

 9  Q   I think we understand that you're trying to say, that we

10  look at different pieces for every seat; is that right?

11  A   I'm sorry.

12  Q   We look at different pieces for every seat, I think is

13  what you're saying.

14  A   No.

15  Q   No?

16      If we could talk about Exhibit B8, please -- excuse

17  me -- it's Plaintiffs' 10, Attachment B8.

18      Do you recall looking at this, Mr. Terry?

19  A   I do.

20  Q   And there were two sections, I think, in the Terrace Club

21  that has platforms; is that correct?

22  A   That's correct.

23  Q   Did you look at the platforms?

24  A   I'm sorry?

25  Q   Did you look at the platforms when you were at the

1    stadium?

2    A    227 was one of the raised platforms.  I did look at it.  I

3    looked at platform -- I believe it was in 224, but I'm not

4    sure about that -- the other raised platform, and it was very

5    similar.

6    Q    And those platforms both had extended ramps to go up to

7    them, right?

8    A    They did.

9    Q    Those ramps went along a walkway?

10   A    They went between the glass for the cafe in there,

11   whatever it was, a bar, and they went along between that and

12   the back row of seats.

13   Q    Do you know if those ramps are ADA compliant?

14           THE COURT:  Were what?

15           MR. WILLEY:  If those ramps --

16           THE COURT:  Were ADA compliant?

17           MR. WILLEY:  Yes.

18   Q    (By Mr. Willey)  Did you test them?

19   A    The judge asked me yesterday if I had looked at all the

20   ramps in the stadium, or, at least -- I believe it was all

21   the ramps in the stadium, and I had not looked at all of the

22   ramps, but I did look at those ramps.  They were close, but

23   they were not fully compliant.

24   Q    And were the platforms themselves compliant?

25           THE COURT:  What platforms?

1    A    There was enough room --

2              THE COURT:  What platforms?

3              MR. WILLEY:  The platforms in Section 227 that this

4    exhibit is based upon.

5    A    The platforms were a little unusual.  They were -- if I

6    remember correctly, there was sufficient width for them to

7    have two wheelchairs and two companions in there.  One of

8    them, for some reason, had a fixed companion seat.  I

9    probably would have put it in a different location.  But I

10   don't remember opining about any problems with those ramps or

11   these platforms.

12   Q    (By Mr. Willey)  Are you aware that the Mariners installed

13   those platforms for two season-ticket holders that requested

14   them?

15   A    I heard that yesterday.

16   Q    And are you also aware that the Mariners are taking those

17   out because those ramps are not compliant and the stand of

18   the platform itself are not compliant with ADA?

19             MR. CONNOR:  There's no evidence about that, and the

20   record doesn't support that.

21             MR. WILLEY:  I'm asking if he knows.

22   A    I don't have information about that sufficient to be able

23   to give you any kind of opinion.

24   Q    (By Mr. Willey)  And the new Terrace Club, you were here

25   when that was testified about, the Terrace Club seating?

1   A    The Terrace Club seating?  Is that plans for new seating

2   that is supposed to be coming in?

3   Q    Yes.  Were you here for that testimony?

4   A    I heard something about a Terrace Club when I was here

5   yesterday.  I was reviewing notes and wasn't really paying a

6   lot attention to what was going on.  I didn't see where that

7   was going.

8        Is this the Terrace Club, the area where that renovation

9   is expected to be happening?

10  Q    I'm not going to testify, but I was asking if you knew

11  that.

12  A    No, I don't know that.

13  Q    I want to talk to you a little bit about the pricing.

14       If we could look at the -- I think it's Plaintiffs'

15  191.

16       So this is the map that shows the different seats in

17  the stadium and seating locations, as well as different

18  colors that designate current pricing or tiers or buckets,

19  right?

20  A    Okay.

21  Q    You're familiar with this?

22  A    I've seen lots of drawings like this taken at different

23  times.

24  Q    Are you familiar with this one, which has been used here

25  as an exhibit and, I believe, was shown to you previously?

1   A    I saw this exhibit.

2   Q    Yeah.  Okay.

3        So there was testimony that each color here designates

4   a current differentiation of price zone or bucket, right?

5   A    Okay.

6   Q    Are you aware of that?

7   A    What testimony?  I didn't hear that testimony.  I don't

8   know what the specifics were, so I'm sorry.

9   Q    Okay.

10       Well, I think it's been established that this map,

11  which was produced by the Mariners, shows, in the color here,

12  the differentiated price zones for 2019, right?

13  A    Okay.  All right.

14  Q    And these are different price zones or differentiation or

15  tiers that existed in 1999; do you know that?

16  A    I would expect that.

17  Q    So in 1999, Section 142 had one price?

18       THE COURT:  It had what?

19       MR. WILLEY:  One price.

20  A    I'll take your word for it.

21  Q    (By Mr. Willey)  Are you aware?  There was testimony

22  yesterday about that.

23  A    Okay.

24  Q    And today there is five price zones in that section.

25  A    Okay.

1    Q    Well, there was also testimony yesterday that the teams,

2    generally, are moving to more granular and finely

3    differentiated priced tiering, right?

4    A    That's true.

5    Q    And Mr. Rogel testified, for example, the San Diego Padres

6    had something like 122 price zones last year, and will have

7    something in excess of 300 for the forthcoming season.

8    A    I'm not surprised.

9    Q    Which means there is a lot of different pricing in the

10   stadium, right?

11   A    Yes.

12   Q    Is there a requirement that there be accessible seating in

13   every single price location?

14   A    Yes.

15   Q    Got it.

16        So your position would be, when the Padres move from

17   170 price points to 300 price points, they have to

18   structurally change the stadium to put new seats in those

19   price points?

20   A    If it's readily achievable.  They are required to do that

21   by the regulations.

22   Q    And what regulation would that be?

23   A    The Title III regulations.

24   Q    Which one?

25   A    I believe it's 36.302(f), maybe 36.4- -- I don't have a

1    memory for the section numbers.

2    Q    It's all right.  I just want to make sure I understand.

3         You're saying that if a team alters the pricing in a

4    section, it must also physically change every seat to make

5    sure that there is accessible seating in every single pricing

6    zone?

7    A    No, I'm not saying that.

8    Q    Okay.  Then what are you saying?

9    A    What I'm saying is that the regulations say that you have

10   to provide accessible seats in all of the price points, but

11   you never have to exceed -- and they're supposed to be done

12   in a ratio, they're supposed to be done either at that price

13   point in that zone where that price point is offered, or in a

14   seat that provides substantially equivalent or better viewing

15   angles and amenities.  So it's -- you don't have to do it --

16   so if you have 500 price points in the stadium, you don't

17   have to increase the number of wheelchair seats; you just

18   have to give people opportunities that allow them, if they

19   can only afford a $75 ticket for the game but there isn't

20   anything forward of the $55 ticket, you need to give them

21   something that allows them to get a better view than a $55

22   ticket.  That's the way the regulations are written.  If you

23   give people choices that are comparable, substantially

24   equivalent or better, and that's what the ticket pricing

25   requirements are.

1    Q   So I want to change the pricing in the stadium, and I want

2    to move to 100 different price zones.

3    A   Yes.

4    Q   And do I have to provide accessible seating in each one of

5    those price zones, or do I have to provide a cross of the

6    representative sample of the price zones?

7    A   You have to do whatever is readily achievable to do in the

8    stadium to be able to accomplish that.  So give people -- you

9    have to do whatever you can that meets the readily achievable

10   obligation.  You have to make those physical changes to the

11   stadium to allow you to do what the price choice requirement

12   obligates you to do.

13   Q   And you would say this is a readily achievable analysis?

14   A   If you're spending $300 million over the next few years,

15   or however many years it is, it sounds like there's money

16   available to do it.

17   Q   I'm actually just asking you the standard you're opining

18   on, sir.

19   A   I have not done a financial analysis --

20   Q   No, no, no.  I'm actually not asking about the analysis.

21   The standard, you say it's readily achievable.  That's the

22   standard?

23           MR. CONNOR:  Your Honor --

24   A   Okay.  The regulations --

25           MR. CONNOR:  Your Honor, can I object?  I'd like

 1   Mr. Willey to clarify what he's asking the standard is for

 2   what -- if he can be more precise.

 3            MR. WILLEY:  I'm actually trying to follow up on

 4   Mr. Terry's testimony.

 5            THE COURT:  I don't understand the objection.

 6            MR. CONNOR:  Your Honor --

 7            THE COURT:  Are you confused?

 8            MR. CONNOR:  I'm confused.

 9            THE COURT:  Me, too.  Just rephrase, and try to be

10   more specific.

11   Q   (By Mr. Willey)  The Mariners have something like 22

12   different price points today.

13   A   Okay.

14   Q   Right?  In 1999, they had something like four.

15   A   Okay.

16   Q   And going forward in the future, there's the possibility

17   they'll have more price zones.  So what I'm trying to

18   understand is, if you increase the number of prices --

19   right? -- price differentiation, are you telling me that

20   means you have to put accessible seats in each one of those

21   price zones, or do you have to have a representative sampling

22   of them?

23   A   No.  Comparability requires -- if you read the regulations

24   from -- the 2010 regulations that apply to ticket sales

25   prices, those regulations require you to make wheelchair

1   seats available in all price -- in all of the price points

2   that are offered in the stadium.  And if, because of the

3   design of the stadium or barriers in the stadium that limit

4   that, you're not able to do that, then you have to provide

5   those wheelchair positions in a substantially equivalent or

6   better location than what is required -- than what would have

7   been required in a zone that you can't get to because there's

8   not a ramp to get there; for example, in some of the areas

9   that is shown in here.  So you would have to move those

10  wheelchair positions, that related to that, forward into a

11  better location.

12  Q   And so I want to make sure I'm clear here.

13        If the Mariners had complied with pricing seat

14  availability distribution in 1999, when it opened -- right?

15   -- because there were many fewer ticket variations -- just

16  assume that, right?

17  A   If every section had the same price point from Row 41 to

18  Row 1 --

19  Q   Yeah.

20  A   -- if all of those were the same price, then they would

21  have met the price dispersal requirement at that point.  As

22  soon as they changed those price points, then they ran the

23  risk of being out of compliance.

24  Q   Are you telling me -- I just want to make sure it's clear.

25        So when the team, over the course of years, changes the

1  price of tickets, then they have to go and restructure the

2  seating to meet each ticket price bucket; is that what you're

3  saying?

4  A    That depends on the design of the stadium and on what kind

5  of alterations they've done since they built it; to provide

6  the opportunity to make those ticket price changes; to take

7  advantage of the increased demand for the close-up ones with

8  the higher prices; to give the opportunities for wheelchair

9  users to have the same kind of choices that everybody else

10  has on price points.

11  Q    Let me just make sure I understand.

12        If I'm looking at this map here, Section 142, 143, 145,

13  it's that blue along the 100 level, third-base side; do you

14  see it?

15  A    Yes, I do.

16  Q    So if those seats were the same today as they were in 1999

17  but the pricing is different, are you telling me that the

18  Mariners are obligated to somehow put accessible seating in

19  every one of those price zones now?

20  A    Let me make sure I understand what you're asking.

21        Are you asking if the lighter blue that's right

22  between the section number and the field, that kind of

23  mid-blue color, if you change that ticket price there, you're

24  asking me if they have to put wheelchair users in that box;

25  is that what you're asking?

1    Q    Yes.

2    A    The answer is no.

3    Q    Do they have to offer a ticket at that price?

4    A    They do, they definitely have to offer them at that price,

5    and it cannot be in a worse place than that location.  It's

6    got to be in that location or a better place for that price

7    point.

8    Q    And this is a function of the 2010 regs, or the 1991

9    standard?

10   A    I would say it's in both of them.  Choices -- choice of

11   prices that are comparable.

12   Q    So you're saying the 1991 standard, if we met it when we

13   opened in 1999, but we changed the pricing of the seats,

14   you're saying the 1991 standard --

15   A    Still governed.

16   Q    And we have to keep re-upping and changing the seating and

17   the allocations?

18   A    Because that's a policy.  You didn't have to raise those

19   prices.  You've made that, as a policy or procedure, a

20   practice decision that's covered by the regulations.  That's

21   not a construction regulation.  It has construction

22   implications, but you chose to do that as a policy.  You

23   didn't have to change the prices in there.  You could have

24   left them all -- you could have raised the price of everybody

25   equally, rather than splitting them out and getting more

1    money off the people up front and less money from the people

2    at the back.  But that's not what you chose to do.

3         That policy decision is discriminatory, according both to

4    the 1991 standards and the regulations and the 2010

5    regulations.  The 2010 regulations just kind of explain that

6    in more detail.

7    Q   Is there a particular regulation you would point to that

8    was applicable when this stadium was designed and when it was

9    opened in 1999 that you're talking about now?

10   A   It said comparable admission -- choice of admission prices

11   as those available for members of the general public.

12   Q   So you're going back to Section 4.3.33?

13   A   Yes.  That's where it was at the time.

14   Q   Okay.

15            MR. WILLEY:  Your Honor, I think I may be concluded.

16   I just want to check on something here.

17            THE COURT:  Sure.

18   Q   (By Mr. Willey)  Mr. Terry, you were a consultant for the

19   49ers?

20   A   I did a plan review on the schematic design drawings and

21   the design development drawings for the architect on the

22   49ers' stadium.

23   Q   And they were subsequently sued for ADA violations of that

24   stadium.

25   A   They were.

1           THE COURT:  Speak slower.

2   Q   (By Mr. Willey)  I'm just clarifying, Mr. Terry.  You were

3   a consultant for the 49ers for plan-review purposes for ADA

4   compliance?

5   A   For the first two phases.  We did not do plan reviews on

6   the second -- on the construction -- well, we did plan

7   reviews on the construction documents, but they would not

8   agree.  They wanted to make us liable for everything wrong

9   with the stadium under the ADA, and we knew there were things

10  wrong, so we would not take their liability and did not

11  finish the project out.

12  Q   But you consulted and you were are a fact witness in that

13  lawsuit?

14  A   I was a fact witness in that lawsuit.

15  Q   And you had consulted to the stadium for plan review, and

16  then when built, there was alleged ADA violations, right?

17  A   Yes.

18  Q   And that was a difficult process, right?

19  A   A difficult process?  In what way?

20  Q   To ensure, as you went through your plan review, that all

21  the ADA issues were complied with.

22  A   I don't believe there was ever any pretext that all of the

23  ADA issues would be fixed as a result of our plan review.

24  Our job was to identify the things that they were designing

25  into the drawings that were violations of both the ADA and

1   the California accessibility requirements.  We did that.  We

2   performed our job.  There was never any question about that.

3   They just wanted us to give liability for all of their

4   construction problems and their obligation to do things that

5   they didn't do.  They wanted to give us that obligation.  I

6   wouldn't sign that contract.

7            MR. WILLEY:  Thank you for testifying.

8                    REDIRECT EXAMINATION

9   BY MR. CONNOR:

10  Q   Mr. Terry, I want to start by talking about the 2010

11  regulations regarding prices.  Okay?

12  A   Okay.

13  Q   I think you told Mr. Willey you didn't remember the

14  precise language of that regulation, and I'd like you to look

15  at Plaintiffs' Exhibit No. 235.

16           MR. WILLEY:  Your Honor, we'll object to this

17  exhibit.

18           MR. CONNOR:  I'm not moving for its admission.  I'm

19  asking if this would allow him to refresh his recollection as

20  to what the specifics are of the regulation that he was asked

21  about by Mr. Willey.

22           THE COURT:  Which exhibit?

23           MR. CONNOR:  Exhibit 235, Your Honor.

24           MR. WILLEY:  Your Honor, this is a supplemental

25  report that Mr. Terry produced on September 28th, 2019.  We

 1   would have moved in limine to exclude it, but it was

 2   submitted to us after we filed our motion.

 3              THE COURT:  As I understand it, he's not moving to

 4   admit anything.  He just wants him to read the regulation

 5   because --

 6              MR. CONNOR:  Correct.

 7              THE COURT: -- he wants to get the right language.

 8   There's a paragraph there he's going to read.  He can read

 9   it.

10   Q   (By Mr. Connor)  Mr. Terry, I think you told Mr. Willey

11   you thought it was regulation 36.302(f), correct?

12   A   Yes.

13   Q   Could you -- and I don't know if the court would like him

14   to read it.

15              THE COURT:  We'll both read it together, to

16   ourselves.

17              MR. CONNOR:  Okay.

18              THE COURT:  I think he just wanted you to read that

19   paragraph.

20              THE WITNESS:  Yes.

21   Q   (By Mr. Connor)  Is that the paragraph that you're

22   addressing, in part, in terms of the pricing regulations?

23   A   That paragraph, plus the ticket-sales document that the

24   Department of Justice put out.  But that's the basis for what

25   I'm referring to.

1   Q   Okay.  And let's talk about the other document you

2   referred to, the ticket-sales document put out by the

3   Department of Justice.

4        Can you tell the court what that was and when it was

5   issued?

6   A   After the standards came out but before they went into

7   effect -- I believe it was before they went into effect,

8   Justice came out with further explanation for how you would

9   apply those regulations when you were selling tickets.

10       So the ticket-sales regulations are written in legal

11  language.  The ticket-sales regulations are written in more

12  legal language.  The ticket-sales book or document that was

13  published by Justice in 2011 was an attempt to make that

14  clearer, more easily usable by somebody who was actually

15  doing work in the field than in having to go back and read

16  the regulations.  So it is more examples of things like that.

17  Q   Did that document address what was to be done in terms of

18  pricing and the location being better or comparable?

19  A   Yes, it does.

20  Q   Okay.

21       And can you tell us what it said in that regard?

22  A   What it said was that you can't set the accessible ticket

23  pricing higher in an attempt to spread the comparable -- the

24  ticket prices across all of the choices.  In an attempt to do

25  that, you couldn't put wheelchair users that were paying the

1    higher price in a zone that had a lower price.  So you

2    couldn't take somebody that was buying the $125 ticket and

3    put them in the $55 ticket zone, or the $75 zone, put them in

4    the $55.  You had to put them in a place that was at a nearby

5    or similar accessible location.

6        So the two pieces of that are, you've got to make the

7    tickets available at all prices, and it can't be worse than

8    the other people who are paying that price.  It's got to be

9    that good or better.

10   Q   Okay.

11   A   In a similar location, meaning if it's an outfield seat,

12   you can't put them -- or if it's an infield seat, you can't

13   put them in the outfield.  You've got to do something that's

14   a similar kind of experience.

15   Q   Okay.

16       Mr. Terry, I also wanted to ask you:  When Mr. Willey

17   was questioning you about what was promulgated by the

18   Department of Justice with respect to comparable lines of

19   sight at the time the stadium was constructed or designed,

20   had the Department of Justice promulgated the ADAAG manual?

21   A   The ADAAG was from the Access Board, and that came out in

22   1998.

23   Q   Okay.

24   A   The technical assistance behind it was pretty consistent

25   leading up to that.  If you called their hotline, you'd get

1   the answers they were putting in that book.  That book took a

2   while to write.

3   Q   Okay.  And did -- had that -- I'll skip that for now.

4        Mr. Terry, I want to ask you about these pictures --

5   and I'll try to make it brief -- that we looked at.  Let's

6   look, if we could, at, for example, Plaintiffs' Exhibit 11.

7        Putting aside the percentages of the view here, this

8   picture depicts what can be seen of the field by the

9   seated -- the wheelchair user over standing spectators and

10  the non-wheelchair user, correct?

11  A   Yes.

12  Q   What's not covered in some sort of coloration is what can

13  be seen, correct?

14  A   Yes.

15  Q   I misspoke.

16       What is colored is what can be seen -- I'm confused.

17  A   Is that not what you said?

18  Q   I think I said the opposite.  Just to make sure.

19           THE COURT:  I thought it was what you said.

20           THE WITNESS:  Okay.  We'll take it.

21  Q   (By Mr. Connor)  And so simply put, irrespective of the

22  percentages, the wheelchair user, if you make assumption

23  about the standing spectators, could not see home plate or

24  third base in this view, correct?

25  A   That's correct.

1   Q   All right.

2        I also want to ask you about the percentages.  Let's go

3   back and look at -- let's look at -- let's look at Exhibit 4,

4   if we could.  I want to go through this, because I think we

5   may have confused the judge.

6        This exhibit would suggest that these two -- and these

7   are both non-accessible seats, correct?

8   A   These are general-public seats.

9   Q   So they would suggest that, of the entire field, the

10  person sitting in the seat identified on the left could only

11  see 42 percent of the entire field, correct?

12  A   This is somebody standing in that location.  So this is a

13  standing image.

14  Q   Correct.  But -- oh, I'm sorry.

15  A   If you're sitting, you actually have less -- you can see

16  more of the field.

17  Q   Okay.

18       But, here, what I want to clarify is, although our

19  exhibit says 42 percent, somebody standing in that position

20  could literally see the entirety of the field that's colored

21  in, correct?

22  A   Yes.

23  Q   Okay.

24       There's something to do with the artifact of the -- the

25  percentages that has to do with, sort of, the tilt, correct?

1    A    The tilt?  You mean how high above the field you are?

2    Q    Right.

3    A    Yes.

4    Q    So does it seem likely that somebody sitting in this or

5    standing in that seat could see a play that's occurring in

6    the infield?

7    A    Yes.

8    Q    And could see a play occurring in the outfield, correct?

9    A    In the outfield beyond the infield, yes.

10   Q    Okay.

11        So because the angle is tilted in terms of the

12   percentage of the screen this is taking up, only 42 percent

13   of the field can be seen from that perspective, but, in

14   reality, somebody in that position could see everything

15   occurring above the line, correct?

16   A    Yes.

17        The percentages are calculated on the screen on the

18   image.  It's not a square footage of field that you can see.

19   It's the percentage of the view that would be available to

20   you if there was nothing blocking it.  So it's that -- it's

21   the percentage of what you see here, not the percentage of

22   the whole field.

23   Q    Okay.

24        And so a person in this position, even though on the

25   screen they're seeing this percentage, from the picture, it

1   indicates that they can see everything occurring on the

2   field, correct?

3   A    You couldn't see what was -- like a foul ball, you could

4   see -- if it's a pop fly that's infield, in bounds, you could

5   see it, but if it's pop fly that lands close to you in that

6   area that's blocked by the diagonal lines, you couldn't see

7   that part of the field.

8   Q    Okay.  But you could see everything occurring above what's

9   colored in, correct?

10  A    Everything within the foul lines, you can see from this

11  location.

12  Q    Okay.  Above the line that's here?

13  A    Yes.

14  Q    Okay.  Mr. Willey was making a point that I want to

15  discuss with you.

16       He talked about the fact that, in reality, there

17  wouldn't be a wall; there would be a number of heads instead

18  of a wall, correct?

19  A    That's correct.

20  Q    So to the extent we were looking at this in terms of

21  percentages, Mr. Willey was correct that it wouldn't be that

22  entire percentage blocked out at any given moment, correct?

23  A    Right.  This attempts to show what is required by the

24  standards.  It does not attempt to show what might happen at

25  any given instance during a game.

 1  Q   All right.  Let me ask this a different way.

 2      Does this show the potential for what would be obscured

 3  at any point in time?

 4  A   Yes.

 5  Q   Okay.

 6      So maybe some points wouldn't be obscured, but this

 7  shows where, potentially, they could be obscured, correct?

 8  A   That's correct, according to the way the standards are

 9  written and interpreted using Dreyfuss numbers and all those

10  kinds of details.

11      MR. CONNOR:  Okay.  I think that's all I have.  Thank

12  you.

13                      RECROSS-EXAMINATION

14  BY MR. WILLEY:

15  Q   For the sections that you looked at, Mr. Terry, you did

16  the sight-line analysis.  Do you know, for those seats, how

17  many games in 2019 there was a spectator in front of them?

18  A   I'm sorry?

19  Q   Do you know, in 2019, how many times there was a spectator

20  in any of these seats in front of the sections that you're

21  looking at here?

22  A   I do not.

23  Q   If you were sitting in front of Row 41A in Section 100,

24  and you're five-foot-four, do you have similarly barred and

25  blocked space?

1    A    Five-foot-four to top of head versus five-foot-seven to

2    the top of head, it would be pretty close, assuming you're

3    looking over an average-height person.

4    Q    So that person there has an impaired view in a similar

5    fashion to somebody who's on a platform up above them?

6    A    That's right.  But it's not based on their disability,

7    it's based on their height.

8    Q    You're familiar with the flex seating at T-Mobile Park?

9    A    Is that where you put 33-inch wheelchairs and 33-inch

10   companions?

11   Q    It's where the fixed seating is removed to create the

12   option of varying patterns of wheelchairs versus companion

13   seats.

14   A    I know they're doing that.

15   Q    So, I think, with one exception, all of the accessible

16   seating in the park is that way.

17             THE COURT:  All the way?

18   Q    (By Mr. Willey)  All the accessible seating in T-Mobile

19   Park is that flex seating, which is to say no fixed seats,

20   spaces that you could put either a wheelchair or a companion

21   chair in, depending on the configuration.  Do you understand

22   that?

23   A    That's what it looked like when I was there.

24   Q    And if you were to be in the wheelchair space for the

25   purposes of your analysis here, and you were to move two

1    inches to the left, does that change these numbers?

2    A    No.

3    Q    Not at all?

4    A    Not at all.

5    Q    And even if you have the human heads, not the wall here?

6    A    I'm sorry?

7    Q    If you were to do your analysis using human heads instead

8    of a wall drawn across the picture, if I move to the left or

9    to the right, you're telling me that doesn't change the

10   analysis?

11   A    No, it does not change the analysis because the analysis

12   is based on the assumption that people could be standing

13   anywhere on that row in front of you, and you have to be able

14   to see over their heads two rows in front of you.  You have

15   to be able to see over the heads at that point.  And the

16   assumptions are not based on -- either for the designer who

17   is designing all the seats in the stadium, or for the person

18   who's designing the wheelchair seats, those are based on

19   assumption that people are moving all over the place.

20   Q    Is your analysis based upon there being staggered seating

21   as the rows go down?  In other words, are you assessing this

22   to be that the person in the row in front is centered on the

23   wheelchair user's seat, or to the side, staggered?

24   A    I took my measurements behind the numbered seating

25   location from what would have been the center of the eye

1  point of the wheelchair user if they were parked in the space

2  that was designated for them.

3      As to whether you actually had staggered seating in front

4  of them or not, that's a concept, particularly in a baseball

5  stadium, where, if you're trying to get in between two heads

6  in front of you, then you could see what's between those two

7  heads and over the heads of the people in front of that, but

8  you're also trying to see play on a wide field.  So there,

9  actually, might be multiple heads that are between you on

10 both rows and whatever the action is there.

11     So rather than basing the analysis on where heads might be

12 in front of you, other than the height, I've followed what

13 the practice of stadium designers has been for millennia,

14 which is to assume that people are about the same height and

15 that you want the ability to see over the heads, in this

16 particular type of stadium, one row, two rows ahead, and

17 between the heads on that row.  And where you're placed

18 horizontally is -- does it affect that calculation?

19 Q   Do you know if the seating at Safeco -- excuse me --

20 T-Mobile Park is staggered?

21 A   It varies.

22 Q   And so you didn't incorporate a staggered-seating analysis

23 for the purpose of your report; is that correct?

24 A   I used the standards -- I used the method that the

25 standards require, which is -- now, the technical

1   assistance -- I believe it was the ADAAG manual that talked

2   about between the heads two rows in front and -- or over the

3   heads two rows in front, between the heads one row in front,

4   and over the shoulders one row in front.  That was written

5   based on staggered seating, and so I considered that.  And

6   that's very helpful if you have a single speaker, whose in

7   front of you and the seats are staggered, you can actually

8   move in there and see that speaker probably the whole event.

9   But in a baseball game, because the play is happening very

10  quickly across a wide portion in front of you, there are

11  multiple heads at various locations.  And so the way you

12  apply the design requirements is by assuming that people can

13  be anywhere in that plane, anywhere in both planes, both the

14  one row ahead of you and the two row ahead of you, assume

15  they can be anywhere there and say above this point or below

16  this point, it can be obstructed.

17      And the goal of the design and the comparability analysis

18  that I did treated the wheelchair users exactly the same way

19  that I treated the people who were not wheelchair users but

20  members of the general public.

21  Q   And so you did not use a staggered-view analysis.  You put

22  the wall in instead to incorporate the idea that somebody

23  could move back and forth in front of you?

24  A   Aside from the way I just described it, I've never heard

25  of anybody coming up with a staggered-view analysis in a

1    stadium.

2         You can't stagger all the seats in a stadium like this and

3    get as many tickets as the stadium designers put in those

4    facilities.

5         So I followed the standard practice in this kind of design

6    venue.

7              MR. WILLEY:  Those are all my questions, Mr. Terry.

8    Thank you.

9              MR. CONNOR:  Nothing further, Your Honor.

10             THE COURT:  Well, you may step down, Mr. Terry.

11             THE WITNESS:  Thank you.

12             THE COURT:  That means you may stay or leave, as you

13   wish.  I will tell you, as I said the other day, most people

14   leave, especially after being on the stand as long as you

15   have been.

16        The timing couldn't be better.  We are now at our lunch

17   break, and today I think we're going to take a little longer

18   lunch break.  So instead of seeing you back here at 2:00,

19   I'll see you back here at 2:30.  Okay.

20        Now, what are we going to do?  Are we going to your

21   witness, or are we going to continue plaintiffs' case?

22             MR. CONNOR:  Your Honor, my understanding is we're

23   going to our witnesses.  I believe that what we are going to

24   do is just present one of our clients.

25             THE COURT:  Just one?

```
 1              MR. CONNOR:  Yes.

 2              THE COURT:  Not all four?

 3              MR. CONNOR:  I spoke with Mr. Willey yesterday, and

 4    there is a scheduling issue, which is Mr. Endelman,

 5    Mr. Willey's expert, won't be here until tomorrow.  So it may

 6    be that we'll have a brief afternoon.

 7              THE COURT:  Oh.

 8              MR. WILLEY:  And there's -- Mr. Connor and I have

 9    been working together, but we were faced with the challenge

10    of who was testifying today and how many plaintiffs would be

11    testifying and so on.  And I think that's been in flux and

12    it's being clarified now.

13        Mr. Endelman, we had asked him to be available Thursday

14    and Friday, and so we'll have him here first thing in the

15    morning.

16              THE COURT:  But you will finish with him tomorrow,

17    right?

18              MR. WILLEY:  Yes.

19              THE COURT:  And you will have time for closing

20    arguments tomorrow, right?

21              MR. CONNOR:  Okay.  Yes.

22              THE COURT:  I mean, you can continue, but I'm going

23    to be on a plane on Friday, so if you do, you'll be talking

24    to an empty court.  I'm being serious.  I think you should

25    aim to continue.
```

```
 1        I know it's inconvenient to start earlier, but if you
 2   think you need more time, then you ought to think about
 3   whether we should start earlier, because we really need to
 4   finish with him tomorrow, and we don't want to feel rushed
 5   about it.
 6        We can always go later with closings, but we've got to
 7   bear in mind that we have a court reporter who is human.
 8   She's not a machine.  She's got to have some reasonable
 9   limits.
10        So what do you think?  Do you think we can finish with him
11   tomorrow?
12             MR. WILLEY:  I believe we can, Your Honor.  I don't
13   believe it will be an issue.  You should be on your flight.
14             THE COURT:  Okay.
15             MR. CONNOR:  Your Honor, I have no idea how long
16   he'll take.  My concern about cross-examination is, I don't
17   want -- because Mr. Endelman, there were not arrangements for
18   him to be here earlier, I don't want to be precluded from
19   having Mr. Terry testify briefly in rebuttal, if need be.
20             THE COURT:  Right.
21             MR. CONNOR:  And I still don't think that would take
22   much time.  I may not use him, but I want to make sure I'm
23   not prejudiced because Mr. Endelman is not done.
24             THE COURT:  You won't be.  We'll get everybody on who
25   needs to be on.
```

1    I was really half jesting.  If I have to stay, I'll stay.

2  But I think we should be able to finish the witnesses today,

3  and, if necessary, we can always do closings by video, unless

4  you're going to be showing lots of exhibits during closing.

5    Think about that.  Think about what you anticipate your

6  closings will look like.

7    When you do that, counsel, I think you're going to make a

8  very interesting discovery, which is kind of novel because of

9  the way you've proceeded with your exhibits.

10    Those red lines that you've been putting in and your

11  little red dots and things, they're not there anymore.  I

12  mean, it's a little different than it usually is because

13  you've used them, but it's not like drawing a red Magic

14  Marker across them.  The marks are gone.  Well, some of them

15  you didn't.  You can use them if you want.

16    Okay.  I'd like you to give some thought during the lunch

17  hour to the idea of starting -- I realize that we have tried

18  to make an accommodation and start at 10:00, but I'm a little

19  worried.  I think it's very important that you have an

20  opportunity to put your witness back on, if you want, and I

21  don't want us to be caught short.

22    I'm perfectly willing to start the day at 8:30, and if we

23  end early, that would be nice.  Okay?  But I'd like you to

24  think about that.

25    I realize that may be a hardship, but I think -- I just

```
1   want you to consider that, because we really do -- we may

2   have a long day ahead of us.

3       Anyway, let's all go to lunch, and I'll see you back at

4   2:30.

5                       (Court in recess.)

6           THE COURT:  Are you ready to call your next witness?

7           MR. CONNOR:  I am, Your Honor.

8       I was wondering if you'd like -- Mr. Willey and I talked

9   about the schedule.  I don't know if you want to talk about

10  that now.

11          THE COURT:  Sure.  We can do that.

12      Are you sure you haven't found your guy, huh?  He's not

13  here, huh?

14          MR. CONNOR:  Mr. Endelman is not here.

15          MR. WILLEY:  I wish he were.

16          MR. CONNOR:  Your Honor, with respect to that, what

17  Mr. Willey and I discussed was, we would both be amenable to

18  doing closing arguments next week by video, or something like

19  that.

20          THE COURT:  Oh.  Okay.

21          MR. CONNOR:  And I think that if we did that, we both

22  expect that we would be done with testimony tomorrow.

23          THE COURT:  I just want you to know, counsel, before

24  you commit yourself to too much, I really was kidding.  If it

25  was necessary for me change my flight, I'd be -- not happy,
```

1    but I would do it.

2          MR. CONNOR:  No, and I'm certain you would.  I just

3    think -- for all the benefits, I think we'll be able to be

4    done tomorrow.

5        But related to that, I do need to request that we start at

6    ten o'clock tomorrow, both because of Mr. Reynoldson's

7    condition and because of our plaintiffs' and clients'

8    conditions.  Having said that, I still think we'll be done

9    within the normal course tomorrow.

10          THE COURT:  Okay.  I just don't want you to feel

11    rushed.  That's all.

12          MR. CONNOR:  Yes, I appreciate that.

13          THE COURT:  If you want to bring your witness back

14    again, I want you to have time to do that.

15        But if we don't have the closing arguments of necessity,

16    that gives us easily an hour and a half --

17          MR. CONNOR:  Right, right.

18          THE COURT:  -- with a break in between, probably two

19    hours.

20          MR. CONNOR:  So that's what we would suggest, and I

21    think it would work out well.

22        The only other thing I wanted to bring up before we call

23    our next witness is, Mr. Willey and I have discussed the need

24    to have all of our clients appear and give, potentially,

25    duplicate testimony.

1    Mr. Willey has agreed that he will stipulate -- and I'll

2    let him say what he's willing to stipulate to -- but I think

3    it will allow us to only present one of our plaintiffs as a

4    witness, and that's what we intend to do.

5          THE COURT:  That's fine.

6          MR. WILLEY:  And the issue that Mr. Connor had raised

7    and which I was agreeable to was that we would stipulate to

8    the fact that we will not challenge the standing of the

9    plaintiffs.

10         THE COURT:  You're narrowing issues.

11    As long as we're talking scheduling, I should give you an

12    idea of how I think we would proceed after closings.  I would

13    probably be asking each side to prepare findings and

14    conclusions, and accompanying the findings and conclusions, I

15    want briefing.  Because I can probably put together a list of

16    questions that will give you some guidance.  But there have

17    been specific questions raised -- and I'm sure the next day

18    is only going to intensify them -- that I feel the court

19    could use some guidance on.  There are questions that have

20    come up in the course of the trial, some of them legal

21    questions that the parties really haven't -- let's put it

22    this way:  If they have been briefed, it wasn't sufficiently

23    focused in the manner that the testimony has focused it for

24    the court.

25    So I'm just preparing you; that the case isn't going to be

1   over after your closing arguments.

2      Okay.  Is that it?

3              MR. CONNOR:  All right.

4              THE COURT:  Thank you for working out that business

5   about the stipulation on the standing.  That will really move

6   things along.  So we just have one witness left today?

7              MR. CONNOR:  Yes, Your Honor,

8              MR. TERAKIS:  Your Honor, we'd like to call

9   Mr. Clark Landis.

10  CLARK LANDIS,                    HAVING BEEN FIRST DULY SWORN,
                                     TESTIFIED AS FOLLOWS:
11

12             THE CLERK:  Please state your full name for the

13  record, and spell your last name.

14             THE WITNESS:  Clark Landis, L-a-n-d-i-s.

15                          DIRECT EXAMINATION

16  BY MR. TERASAKI:

17  Q   Good afternoon, Mr. Landis.

18      Can you tell us what city you live in?

19  A   Seattle.

20  Q   And what is your occupation?

21  A   I'm an assistive technology professional, working with

22  folks with disabilities, seating/mobility specialist.

23  Q   Is there any training or certification you have for that?

24  A   A couple of certifications as an assistive technology

25  professional and then one as a seating/mobility specialist.

1   Q    I see you're in a wheelchair today.  How long have you

2   been using a wheelchair?

3   A    Thirty-nine years.

4   Q    And are you a fan of the Mariners?

5   A    Yeah.

6   Q    How long have you been a fan of the Mariners?

7   A    Well, I went to opening season in '77, so I kept going.

8   Q    How many games do you, generally, attend per season?

9   A    Usually anywhere from five to seven.

10  Q    And are you planning on attending any games next year?

11  A    Yes.

12  Q    So when you go to T-Mobile Park, do you watch the games

13  from your wheelchair?

14  A    I do.

15  Q    And what was the last game you attended?

16  A    Oh, gosh.  I'm not sure of the exact game, but I believe

17  it was Texas, in September, but I'm not sure of the date.

18  Q    And where did you sit?

19  A    The 200 level, 226.

20  Q    And how often do you sit in that seat?

21  A    Five games a year, at least.

22  Q    Have you ever sat on the 100 level of the stadium?

23  A    I have.  It's been probably 20 years since I've sat on

24  that level.

25  Q    And is there any reason you don't sit there any longer?

1  A    The group of folks who I get my tickets with decided the

2  very first season of T-Mobile -- or Safeco at the time --

3  that we didn't like those seats because the overhang was so

4  impeding to what we could see, so we moved up to the second

5  level.

6  Q    So if you recall when you were sitting on the 100 level,

7  do you recall any spectators in front of you, standing?

8  A    Yes.

9  Q    And how did that affect your view of the playing field?

10 A    Really couldn't see much of the action at all, as far as,

11 like, home plate or them running to first base.  I sat on the

12 first-base side.

13 Q    Do you recall if you had a view of the scoreboard from

14 your seat on the 100 level?

15 A    It's been so long, but if I remember right, I had to kind

16 of duck down to try to see above or below or however around

17 the edge of the second level coming down.

18 Q    Was that frustrating to you?

19 A    Yeah.

20 Q    Do you think looking up the information on the scoreboard

21 in a phone app is a reasonable alternative to get that

22 information?

23 A    No.

24 Q    And why not?

25 A    Well, I think it distracts me from the game, the people

1    I'm with, if I have to continually be checking stuff on my

2    phone.  You know, when you're watching a game, you're looking

3    out at the field.  You know, you want to be able to just look

4    up and kind of get a big picture of what's going on, and that

5    would be the main scoreboard.

6    Q    So you said you now sit on the 200 level, correct?

7    A    Yes.

8    Q    How is your view from your seat at the 200 level?

9    A    So I happen to sit in one of the seats that has a raised

10   platform, and it's a good view of the field, I can lose track

11   of fly balls some, and then in order to see the scoreboard,

12   again, I need to lean down because we lost that view of the

13   scoreboard by being raised up so we could see over the top of

14   people.

15   Q    Where else in the stadium have you sat?  Just those two

16   locations, or other locations?

17   A    I've sat in the Hit it Here Cafe; I've sat up on the 300

18   level.

19   Q    Do you think it's important to get a view of the game from

20   different areas of the stadium?

21   A    Yes.

22   Q    Are there any areas you would like to sit in that you

23   haven't had the opportunity to?

24   A    Well, if I really had my druthers, I'd like to be about

25   six or eight rows up from the dugouts, but that's not an

1    option.

2    Q    And why haven't you been able to sit there?

3    A    There's no disabled seats available.

4          MR. TERASAKI:  Derik, can you put up Plaintiffs'

5    Exhibit 6?

6    Q    (By Mr. Terasaki)  Mr. Landis, do you recognize this

7    exhibit we've put up here?

8    A    I do.

9    Q    And where do you recognize this from?

10   A    From yesterday and today.

11   Q    Do you understand what this, kind of -- sorry about the

12   circle around that -- this pink line right here represents?

13   A    Yes.

14   Q    And what does that represent?

15   A    The heads of the people two rows in front of the

16   wheelchair seat.

17         MS. GOHMANN BIGELOW:  Your Honor, I'm going to object

18   about whether or not the witness has any personal knowledge

19   or ability to offer an opinion on this exhibit.

20         THE COURT:  I don't know where it's going yet.  All

21   he said is he knows what the line means.  Let's go from

22   there.

23   Q    (By Mr. Terasaki)  From your recollection on the 100 level

24   and your seats at the back of the 100 level, does this match

25   what the view was like when people were standing in front of

1   you?

2   A    I have to say it's been a long time.  I just know that my

3   view was obstructed.

4          MR. TERASAKI:  Derik, can you put up Exhibit 10,

5   please?

6   Q    (By Mr. Terasaki)  So you said you sat in Section 226,

7   correct?

8   A    Correct.

9   Q    From your recollection of the seats you often sit at in

10  226, does this picture fairly accurately represent what your

11  view is from that seat?

12  A    Yes.

13         MR. TERASAKI:  I have no more questions.

14         THE COURT:  I have one.  Do you have questions for

15  this witness?

16         MS. GOHMANN BIGELOW:  Yes, I do.

17         THE COURT:  Why don't you go ahead.

18         MS. GOHMANN BIGELOW:  Sure.

19                       CROSS-EXAMINATION

20  BY MS. GOHMANN BIGELOW:

21  Q    Good afternoon, Mr. Landis.

22  A    Hello.

23  Q    I believe we met when I took your deposition back in May.

24  A    Right.

25  Q    So, Mr. Landis, I believe you testified, just a few

1    minutes ago, that you recall sitting on the 100 level; is

2    that correct?

3    A    Yes.

4    Q    And at your deposition, do you remember telling me that

5    you have sat on the 100 level one time, and that was back in

6    either 1999 or 2000?

7    A    Yes; in the Diamond Club seats.

8    Q    Have you ever sat in the 100 level in the ADA seats that

9    are directly off the 100 level concourse?

10   A    Yes.

11   Q    Okay.

12        When did you sit in those seats?

13   A    It would have been back in '99 or 2000, shortly after the

14   ballpark opened.

15   Q    Okay.

16        And you don't remember which section you sat in when

17   you were in these ADA seats on the 100 level, correct?

18   A    I don't remember which section.  I know I was on the

19   first-base side.

20   Q    Okay.

21        And this would have been before the stadium switched to

22   a flex seating plan; is that right?

23   A    I'm assuming so.

24   Q    Okay.

25        And by that, I just mean that, at the time you sat in

1    these seats, companion seats were bolted down, as opposed to

2    the folding chairs?

3    A    Yes.

4    Q    Okay.

5         Do you recall testifying at your deposition that when

6    people in the row in front of you stood, you could see parts

7    of the field?

8    A    I don't recall that, but I'm sure that I said that because

9    you can see parts of it.

10   Q    Okay.

11        And do you also remember testifying that you could see

12   parts of the field over the heads of the people standing in

13   the row in front of you?

14   A    Probably, but I would have been moving around, trying to

15   get a view.

16   Q    Okay.

17        And do you remember testifying that you could see over

18   the heads of the persons standing two rows in front of you?

19   A    I don't recall, no.

20   Q    And you can't recall how tall the person standing in front

21   of you was, correct?

22   A    No.

23   Q    Or how tall the person was standing two rows in front of

24   you, correct?

25   A    No.

1    Q    When you attended this game in 1999 or 2000, that was

2    before the HD scoreboard was installed; is that right?

3    A    I'm sure it must have been.

4    Q    Okay.

5         When you attended that game in 1999 or 2000, do you

6    remember if you were able to see any video monitors from your

7    seat?

8    A    I am not sure.  Again, it's been a long time.  If they

9    were there, I might have been able to see something, but I

10   don't recall if they were there.

11   Q    Okay.

12        Do you remember testifying that you were able to see --

13   that you are able to see video monitors from your seat in

14   Section 226?

15   A    Yes.

16   Q    Okay.

17        And on those monitors, you're able to see game

18   highlights, correct?

19   A    Yes.

20   Q    And you're also able to see content from the HD

21   scoreboard, like the hydro races and the ball-in-the-hat

22   trick, right?

23   A    Yes.

24   Q    And it also shows information about players and

25   statistics, correct?

1   A    Periodically.

2   Q    Okay.

3           MS. GOHMANN BIGELOW:  If I could have just one

4   moment?

5           THE COURT:  Sure.

6           MS. GOHMANN BIGELOW:  Thank you, Mr. Landis.  I'm

7   finished.

8           THE COURT:  I have a question.

9       The seats that you have now, you said they were raised

10  platform?

11          THE WITNESS:  Yes.

12          THE COURT:  From that raised platform, can you see

13  when people are standing?  How good is your view?

14          THE WITNESS:  I can see right over the top of them.

15          THE COURT:  You can?

16          THE WITNESS:  Yeah.

17          THE COURT:  And let me ask you, because -- getting

18  into the raised platform, is there a ramp?

19          THE WITNESS:  There is.

20          THE COURT:  Pretty easy to negotiate, hard to

21  negotiate?

22          THE WITNESS:  You know, it's steep.  It's not

23  something that I want to carry a beverage up or something on

24  my lap.  I usually will give that to someone who is with me.

25          THE COURT:  But it does get you to a level where you

1   can see --

2           THE WITNESS:  Yes.

3           THE COURT:  -- over the heads of the people in front

4   of you?

5           THE WITNESS:  Yes.

6           THE COURT:  I'm not sure I've got a correct picture.

7   Can you see the big board from there?

8           THE WITNESS:  I have to lean down.

9           THE COURT:  Because of the overhang?

10          THE WITNESS:  Yes.

11          THE COURT:  Thank you very much.  I don't know if

12  I've sparked any additional questions.

13     Okay.  Thank you very much, Mr. Landis.

14          MR. CONNOR:  Your Honor, as indicated, that's all we

15  have for the day.

16          THE COURT:  Okay.

17     So your request was that we start at the usual time, which

18  is 10:00 tomorrow?

19          MR. CONNOR:  Yes, Your Honor.

20          THE COURT:  And you both agree that if we run out of

21  time, we can do closings, maybe next week, by video?

22          MR. WILLEY:  I think we're agreed that we will have

23  enough time tomorrow to get the witnesses in.  I don't know

24  that we have enough time for closings, but, regardless,

25  Mr. Connor and I agreed that we would do closings subject to

```
 1   your schedule, Your Honor.

 2           THE COURT:  You only have one witness, right?

 3           MR. WILLEY:  I don't think we're going to have an

 4   issue.

 5           THE COURT:  Okay.  Well, counsel, have a nice

 6   afternoon.

 7           MR. CONNOR:  Thank you, Your Honor.

 8           THE COURT:  See you tomorrow morning.  We'll start at

 9   10:00.

10               (Proceedings adjourned at 2:55 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

C E R T I F I C A T E


I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


Dated this 21st day of October 2019.


/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter