UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

CLARK LANDIS, ROBERT BARKER,      )
GRADY THOMPSON, and KAYLA BROWN,  ) CASE NO. C18-01512-BJR
                                  )
              Plaintiffs,         ) SEATTLE, WASHINGTON
                                  )
v.                                ) October 17, 2019
                                  ) 10:00 a.m.
WASHINGTON STATE MAJOR LEAGUE     )
BASEBALL STADIUM PUBLIC           ) BENCH TRIAL, Day 3 of 4
FACILITIES DISTRICT, BASEBALL     )
OF SEATTLE, INC., a Washington    )
corporation, MARINERS             )
BASEBALL, LLC, a Washington       )
limited liability company, and    )
THE BASEBALLCLUB OF SEATTLE,      )
LLLP, a Washington limited        )
liability partnership,            )
                                  )
              Defendants.         )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

  For the Plaintiffs:      CONRAD A. REYNOLDSON
                           MICHAEL TERASAKI
                           Washington Civil & Disability Advocate
                           4115 Roosevelt Way NE, Suite B
                           Seattle, WA 98105

                           STEPHEN P. CONNOR
                           DERIK R. CAMPOS
                           Connor & Sargent, PLLS
                           1000 Second Avenue, Suite 3670
                           Seattle, WA 98104

  For the Defendants:      STEPHEN C. WILLEY
                           SARAH GOHMANN BIGELOW
                           Savitt Bruce & Willey LLP
                           1425 Fourth Avenue, Suite 800
                           Seattle, WA 98101-2271

EXAMINATION INDEX

EXAMINATION OF                                              PAGE

 WILLIAM ENDELMAN    DIRECT EXAMINATION                      3
                     BY MR. WILLEY

                     CROSS-EXAMINATION                      38
                     BY MR. CONNOR

                     REDIRECT EXAMINATION                   76
                     BY MR. WILLEY

                     RECROSS-EXAMINATION                    79
                     BY MR. CONNOR

 JAMES TERRY         REBUTTAL DIRECT EXAMINATION            81
                     BY MR. CONNOR

                     REBUTTAL CROSS-EXAMINATION             83
                     BY MR. WILLEY

REPORTED BY:    NANCY L. BAUER
                FEDERAL OFFICIAL COURT REPORTER
                700 STEWART STREET, SUITE 17205
                SEATTLE, WA 98101
                (206) 370-8506

 1          THE COURT:  Good morning, all.  We will, at least,

 2   learn a little bit about the witness and get as much done in

 3   the ten minutes we have before we go through our earthquake

 4   drill.

 5       Are we ready to proceed, counsel?

 6          MR. WILLEY:  We are.  Thank you for scheduling the

 7   high jinx this morning.

 8       The defendants call Mr. Endelman.

 9          THE COURT:  Please step forward to be sworn by the

10   clerk.

11   WILLIAM E. ENDELMAN,           HAVING BEEN FIRST DULY SWORN,
                                    TESTIFIED AS FOLLOWS:
12

13          THE CLERK:  State your full name, and spell your last

14   name for the record, please.

15          THE WITNESS:  William Endelman, William E. Endelman,

16   in completion.  And, I'm sorry.  What did you ask besides

17   that?

18          THE CLERK:  Please spell your last name.

19          THE WITNESS:  E-n-d-e-l-m-a-n.

20                       DIRECT EXAMINATION

21   BY MR. WILLEY:

22   Q   Good morning, Mr. Endelman.

23   A   Good morning.

24   Q   Before we get started, I'd like to just talk a little bit

25   about your background.

1          If you could tell us, did you go to college?

2    A    Absolutely.  University of Pennsylvania.

3    Q    University of Pennsylvania?  Did you study anything

4    particular there?

5    A    I studied architecture there, and as an undergraduate

6    there, with a BA in architecture, and then I was in the

7    Honors Program, which somewhat matriculated me into the

8    graduate school of architecture during my senior year.  So my

9    first year of graduate work was as a senior, and stayed

10   there, all total, seven and a half years, and then ended up

11   with a Master's in architecture.

12   Q    Did you do any other graduate work or other advanced

13   education after that?

14   A    The only other educational -- other than, obviously,

15   seminars and continuing education, the only other things

16   would be a noncredit course at University of Washington

17   called the Management Program.  About 1990, I did that.

18   Q    Are you a licensed architect?

19   A    I'm a licensed architect in both Washington and

20   California.

21   Q    Are you currently employed, Mr. Endelman?

22   A    I am retired from Endelman & Associates, the firm that I

23   founded 24 years ago.  I'm technically a part-time employee

24   at the moment, which enables me to do things like I'm doing

25   today, and some miscellaneous consulting.

1    Q    What is Endelman & Associates?

2    A    Endelman & Associates is an architecture firm.  It's a

3    12-person firm now.  It started out with just me and my home

4    office.  And we do no traditional architectural services; no

5    design, no construction documents.  We specialize in

6    accessibility consulting, which includes ADA compliance, Fair

7    Housing Act compliance, uniformed federal accessibility

8    compliance, accessibility building code compliance, all the

9    applicable standards for any building type.

10        And our primary work is proactive work.  We review plans

11   at various stages of design to help the architects ensure

12   that their plans comply.  If they're not designed right on

13   paper, they're certainly not going to get built right in the

14   field.  And then most of our clients hire us to go out into

15   the field at certain key points during construction, to make

16   sure it is, in fact, being built per the plans.

17        And, of course, we do some miscellaneous consulting, and

18   occasionally some expert witness work, such as this.

19   Q    If you could look at Exhibit 24, please.

20   A    I'm sorry.  I'm having a little bit of trouble hearing

21   you, Steve.

22   Q    Certainly.

23        If you could look at Exhibit 24, and we'll pull it up

24   on the screen.

25        Are you familiar with this document, Mr. Endelman?

1    A    I am.  It is from my CV.

2    Q    And is it accurate?

3    A    Yes, it is.

4    Q    At the bottom of the first page and on to the second page

5    is a listing of cases.  What are those, just generally?

6    A    They are, I believe -- let me just take a quick look.

7    These all happen to be Fair Housing Act cases, either for the

8    plaintiff -- the representative plaintiff, which is the

9    Department of Justice, or the last one there, it was for the

10   defendant, on behalf of the owner of a property.

11   Q    Have you consulted on behalf of the Department of Justice?

12   A    Yes.

13   Q    And have you also consulted on behalf of parties that were

14   subject to actions by the Department of Justice?

15   A    Yes.

16   Q    If we look at this page here, Exhibit 24, and we'll go to

17   the second page, these are all cases in which you were

18   retained as an expert witness or consultant?

19   A    That is correct.

20   Q    Are you familiar with the Americans with Disabilities Act?

21   A    I am.

22   Q    Are you familiar with the implementing regulations?

23   A    I'm sorry.  The what?

24   Q    The implementing regulations, the 1991 standards.

25   A    Yes, I am.

1  Q   And are you familiar with DOJ guidance subsequent to the

2  original 1991 standards?

3  A   Yes, I am.

4  Q   Do you know who the architects were for T-Mobile Park?

5          THE COURT:  Counsel, let me make a suggestion.  If

6  you would speak more slowly and articulate very carefully,

7  and we won't have to ask you to repeat.  Okay?

8          MR. WILLEY:  Thank you, Your Honor.

9  Q   (By Mr. Willey)  Do you know, Mr. Endelman, who the

10  architects were for T-Mobile Park?

11  A   Yes.  NBBJ.  And NBBJ is a large, old-line Seattle firm

12  that does work nationally and internationally, including this

13  building, and is probably in the third generation of

14  ownership, I suspect.

15  Q   Mr. Endelman, if one were designing a stadium in 1996,

16  what would be the relevant regulations or other DOJ guidance

17  for purposes of determining sight-line requirements for

18  accessible seating, what would you look at?

19  A   Well, the starting point is the 1991 ADA standards, in

20  particular, Section 4.33.3.  And I see you've popped it up on

21  the screen there.  And it is -- and that's followed up by a

22  couple of guidance documents that the Department of Justice

23  issued.

24      In 1993, there was a TAM, or a technical advisory manual,

25  and in 1994, they did a supplement to that TAM, and then they

1    issued an undated document in 1996 called *Accessible*

2    *Stadiums*, and those are the three guidance documents that

3    were issued by the Department of Justice, which stand the

4    same till today, except for the updated 2010 ADA standards.

5            MR. WILLEY:  Rondi, if you could go to Defense

6    Exhibit 2, please.

7    Q   (By Mr. Willey)  On your screen, and also listed as

8    Defense Exhibit 2 in the book in front of you, Mr. Endelman,

9    is a document labeled "*Accessible Stadiums*."  Is that the

10   document you were referring to?

11   A   Yes, it is.

12   Q   And if we could go to the second page of that document.

13           Are you familiar with the drawing here on the second

14   page, and the text above it?

15   A   Yes, I am.  This is where, essentially, the Department of

16   Justice has defined lines of sight in that diagram, and that

17   constitutes what would be comparable sight lines to the

18   general public.

19   Q   And if you were looking at this -- and it says in the last

20   sentence there of the second paragraph, "A comparable line of

21   sight, as illustrated in the figure below, allows a person

22   using a wheelchair to see the playing surface between the

23   heads and over the shoulders of the persons standing in the

24   row immediately in front and over the heads of the persons

25   standing two rows in front."

1    A    That's correct.

2    Q    And is that what this diagram depicts that?

3    A    And that's what the diagram depicts.  And, in fact, this

4    is the first time the Department of Justice has actually

5    defined that fact.  In the '91 ADA standards, they don't even

6    talk about seeing over standing spectators.

7    Q    In 4.33.3, there's no mention of it?

8    A    There's no mention of that.

9    Q    Does the *Accessible Stadiums* document contain any

10   information regarding how the scope or perspective of the

11   playing surface would be for the wheelchair user in this

12   picture?

13   A    No, there is no detail whatsoever on that perspective.

14           MR. CONNOR:  Your Honor, I recommend that we should

15   look at the document itself in terms of what it says.  The

16   document speaks for itself.  So if Mr. Endelman can read what

17   it said in that regard, I'd appreciate it.

18           THE WITNESS:  I'm not understanding what you're

19   trying to say.

20           THE COURT:  The question and answer can stand.  Let's

21   just go.  You can raise this on cross-examination, if you

22   wish, counsel.

23   Q    (By Mr. Willey)  Is there any guidance provided in the

24   *Accessible Stadiums* document or otherwise by the DOJ that

25   shows this diagram, or something like it, in a

1  general-public, non-accessible seat?  In other words, is

2  there a comparative diagram that is out there?

3  A   Well, the comparative diagram is the one that's up on our

4  screens here that is referenced in the paragraph on lines of

5  sight.  That's the only place that occurs.

6  Q   In the 23 years since *Accessible Stadiums* in 1996, has the

7  Department of Justice provided any other guidance beyond this

8  document as to what comparable lines of sight, how they are

9  to be calculated?

10  A   There are no DOJ-published documents that I'm aware of.

11  Q   And we have an additional 2010 standard, but there's no

12  new drawing or other perspective; is that right?

13  A   That's correct.

14  Q   Are you familiar with an *Ellerbe Becket* consent order?

15  A   Yes, I am.

16        MR. WILLEY:  If you could pull that up, Rondi.  I

17  believe it's DX-3, Defense Exhibit 3, the second page of

18  this, please.

19  A   If you can enlarge that, please.  I have macular

20  degeneration.

21        MR. WILLEY:  No worries.  We're blowing this up.

22        THE COURT:  Is this big enough?

23        THE WITNESS:  Yes, that's great.

24  Q   (By Mr. Willey)  Do you recall what the *Ellerbe Becket*

25  consent order required?

1   A    Well, essentially, it was a complaint about a stadium of

2   the same vintage as this stadium that we're under discussion

3   here.  And I think one of the most significant things in here

4   is, the Department of Justice did not require -- or the

5   agreement did not require any alterations to the stadium in

6   question.  It's a forward-looking document that says here's

7   what you need to do going forward designing stadiums.

8   Q    What did the Department of Justice say you needed to do

9   going forward?

10  A    It said to comply with the *Accessible Stadiums* document

11  and provide the sight lines and range of prices available to

12  the general public that was in that document.

13  Q    If you look at the last two sentences of the paragraph 5,

14  the first -- the penultimate sentence says, "For purposes of

15  this order, Ellerbe shall calculate sight lines for

16  wheelchair seating locations as described in the Department

17  of Justice publication entitled *Accessible Stadiums*."

18  A    Correct, that's exactly what it says.

19  Q    Did the Department of Justice provide Ellerbe Becket any

20  information regarding anthropometric dimensions to use in

21  doing so?

22  A    Yes.  For the first time in this document, there is some

23  anthropometric dimensions given for what is the average

24  height of a seated wheelchair user, what's the assumed height

25  of the general public in the seats in front, and things of

1    that sort.

2              MR. WILLEY:  If we could go to the last page of the

3    order, please, Rondi.  I'm looking for the part that's

4    Exhibit B.  There it is.

5    Q   (By Mr. Willey)  This is Exhibit B to the order of -- the

6    consent order.  Are these the anthropometric dimensions

7    you're referring to?

8    A   Yes, they are.

9              And, by the way, these dimensions do not occur in any

10   of the DOJ documents before this.  They do not occur even in

11   the 2010 ADA standards.  So if you're designing a stadium

12   today, again, we're working with the same information.

13   Q   The only place the DOJ has articulated anthropometric

14   dimensions is in this consent order?

15   A   That's correct.

16             And I think it's important to realize that architects

17   are not attorneys.  You know, they don't cruise Lexis Nexus

18   trying to find every possible court case that could involve

19   their design, and it's not, I think, realistic to expect that

20   architects do that.

21         Architects do -- you know, when they do kind of a project,

22   they do what's called a code check, which includes ADA and

23   Fair Housing Act, and look for all the documents that are

24   applicable to what they're designing.  And these are the ones

25   we've discussed here for the applicable documents.

 1              MR. WILLEY:  Your Honor, I'm shifting into another

 2    topic, and I'm wondering, in light of our forthcoming

 3    activities, if this might be a good place to stop, briefly.

 4              THE COURT:  Yes.  You do understand why we're taking

 5    a break here?

 6              THE WITNESS:  Yes.

 7              THE COURT:  Yes.  My understanding is that we only

 8    need to take a break for about five minutes.  Rhonda will let

 9    you know when it's really over.

10        You may step down.

11        The court will be in recess for a short while.

12                           (Court in recess.)

13              THE COURT:  You may resume the stand.

14    Q   (By Mr. Willey)  Mr. Endelman, do you have an opinion

15    regarding sight lines at T-Mobile Park?

16    A   Yes, I do.

17    Q   Could you tell the court and us what that is?

18    A   My opinion is that the sight lines comport with the

19    diagram and the description in the *Accessible Stadiums*

20    documents and that, as built, the stadium complies.

21              MR. WILLEY:  Could we look, please, Rondi, at DX-1,

22    Defense Exhibit 1?

23    Q   (By Mr. Willey)  Mr. Endelman, are you familiar with this

24    diagram, or these two diagrams?

25    A   Yes, I am.  They were created by my firm.

1   Q   Could you please explain to the court what these diagrams

2   show?

3   A   What we did is we took the diagram -- the intent of the

4   diagram in that *Accessible Stadiums* document and,

5   essentially, took the NBBJ drawings of the stadium that show

6   what the actual layouts of the seats were and the actual

7   dimensions; measured, in these particular sections, the

8   actual heights and spacing of the rows and the height of the

9   platform, and, essentially, made the diagram that was in that

10  document represent what's there in reality.

11      And so there's two diagrams here that represent two

12  different sections.  And what the diagrams show is that the

13  sight lines of a seated wheelchair user on the platform

14  behind other seats comports with the requirement that you be

15  able to see over the shoulders and between the heads of

16  people in the row immediately in front, and over the heads of

17  people in the second row in front of the accessible seating.

18  Q   This top document or top diagram is Section 112, and then

19  the one below it is Section 224.  Do you know why those

20  sections were picked?

21  A   I do not.  I just know that those were the sections that

22  were in the complaint that we analyzed.

23  Q   They were in the complaint?

24  A   Yes.

25  Q   Got it.

1          THE COURT:  These sections are specifically referred

2     to in the complaint?

3          MR. WILLEY:  They are referred to and cited in the

4     complaint, Your Honor.

5     Q   (By Mr. Willey)  Did Mr. Sanderson go out and do field

6     measurements at T-Mobile Park?

7     A   Yes, he did.

8     Q   And can you explain in more detail how this diagram gets

9     created?

10    A   Yes.  I mean, basically, with CAD software and

11    contemporary software, you're able to scan a diagram, stretch

12    it, dimension it, change it very easily.  So we, basically,

13    took the Department of Justice diagram and, you know,

14    superimposed it, if you will, on the actual layouts of the

15    seating in the section.

16         THE COURT:  And the heights, I suppose you're going

17    to ask, since this is your --

18         MR. WILLEY:  My next question, Your Honor.

19         THE COURT:  Go ahead.

20    Q   (By Mr. Willey)  What were the anthropometric dimensions

21    that you used for this analysis that's Section 112 and

22    Section 224?

23    A   We used the anthropometric dimensions that were in the

24    *Ellerbe Becket* case, the only place that has any

25    anthropometric dimensions, and so that's what was used in

1   these diagrams.

2   Q   This Section 112 sight-line study does not indicate how

3   much of the playing surface the viewer can see.  Why is that?

4   A   Again, there's no requirement in the *Accessible Stadiums*

5   document that tells you how much of the playing surface

6   you're supposed to be able to see.

7   Q   There's no information anywhere about that?

8   A   There's no information anywhere about that.

9   Q   And according to the analysis that you've done in Section

10  112 and Section 224, does that wheelchair user have a line of

11  sight to the playing surface?

12  A   Correct, it does.  It looks down over the bowl of the

13  stadium.

14          MR. WILLEY:  Rondi, if you could pull up Defendants'

15  Exhibit 22, please.

16  Q   (By Mr. Willey)  Mr. Endelman, here is a picture of

17  Section 116 at T-Mobile Park.  Have you ever seen this

18  section?

19  A   Yes, I have.

20  Q   Can you tell me what the picture is depicting?

21  A   Well, what you're looking at is the flexible seating on

22  the platform where accessible seating and companion seating

23  is provided.  And there's a railing both for safety, and it's

24  a drink rail, if you will.  And it overlooks, as you can see,

25  the entire bowl of seating in front of it, and the playing

 1   field.

 2   Q    What are those seats that are in the picture there?

 3   A    They are flexible seating.  You know, there's an option,

 4   really, of providing fixed seating for able-bodied people and

 5   spaces of a particular size so a wheelchair can be

 6   accommodated adjacent to a standard seat.

 7        This is actually much more flexible.  It doesn't say one

 8   person who is a wheelchair user sits next to one person who

 9   is in a seat.  This can be -- all these seats can be moved to

10   any layout you want to accommodate a group of customers that

11   include somebody who is disabled and in a wheelchair.

12            THE COURT:  You used the word "fixed seating."  These

13   chairs are not fixed to the floor?

14            THE WITNESS:  No, they're not.  It's, actually,

15   superior to having them fixed because it gives flexibility.

16   Q    (By Mr. Willey)  So under this flex model, this picture

17   shows three seats, and the idea is that you could have a

18   wheelchair in any one of those spaces or all three of them;

19   is that right?

20   A    Yes.  I mean, as they're sitting here right at the moment,

21   obviously the spaces between these chairs are not sufficient

22   to have a wheelchair between them, but they can be moved to

23   accommodate that.

24   Q    Got it.

25   A    And the overall dimension of the platform is specific for

1    a certain number of seats and wheelchair seats.

2    Q    Understood.

3            MR. WILLEY:   Rondi, could you flip to the next

4    picture in Exhibit 22?

5    Q    (By Mr. Willey)   So, here, we're looking at the same

6    section, different perspective.   What does this show,

7    Mr. Endelman?

8    A    Well, this gives you a good view to show the height of the

9    platform and step that shows the dimension of how much higher

10   it is than the stepped-seating below.   So it's clearly a

11   higher platform, significantly higher.

12   Q    And are you referring to -- and I'm going to draw on this

13   picture with my finger.   Are you referring to that piece

14   there?

15   A    Correct.

16   Q    And is that platform that's raised, is it one that

17   requires a ramp to get up to, or is it on level with the

18   concourse?

19   A    This is on a direct-accessible route from the concourse,

20   and it's also the required means of egress that all

21   accessible seating has to have.

22   Q    Got it.

23            MR. WILLEY:   Rondi, if we could look at the next

24   picture, please.

25   Q    (By Mr. Willey)   Now we have another view of 116

1    accessible seating from just below.  What is this showing

2    here?

3    A    I think it's just another view of the same thing.  It

4    really is showing how much higher that platform really is,

5    and the stepped seating and the normal rake of the bowl

6    below.

7    Q    When you were looking at the stadium, is the platform that

8    you see in this picture here, is that consistent with the

9    platforms on the 100-level accessible seating?

10   A    Yes, it is.

11            MR. WILLEY:  Rondi, if we could go to the next

12   picture.

13   Q    (By Mr. Willey)  And then we're looking at the other end

14   here, and this is just a different view of the same thing; is

15   that correct?

16            MR. CONNOR:  Your Honor, I apologize, but we received

17   these pictures, for the first time, a day or two ago.  I've

18   never seen them.  Mr. Endelman's report pertains to two

19   sections, 112 and 224.  I have not had an opportunity to look

20   at these exhibits, cross-examine him about them, or talk to

21   him about his assertions that these are the same platforms as

22   elsewhere.

23       So this is now completely new testimony, completely beyond

24   the scope of his expert report, and to the extent they're

25   making complaints about the pictures that were provided by

1   us, months in advance, ones that we got two days ago should

2   not be the subject of interrogation of this witness.

3          MR. WILLEY:  Your Honor, these are simply pictures of

4   the sections that he looked at in the stadium.  He's not

5   testifying about anything other than that those are what he

6   saw.

7      And these are not any different than the pictures that we

8   talked about with the plaintiffs.

9          THE COURT:  Not different than what pictures?

10         MR. WILLEY:  There have been pictures provided by the

11  plaintiffs, at various times, long, long, long after

12  discovery, all the way up to just before trial, and the court

13  has said that there is no issue with those.

14     These are simply illustrating, visually, so that the court

15  can see what we're talking about.

16         MR. CONNOR:  Your Honor --

17         MR. WILLEY:  I don't think there's any question about

18  the authenticity or the accuracy of these pictures, and

19  there's no prejudice whatsoever.

20         MR. CONNOR:  Your Honor, I misspoke.  We received

21  these pictures an hour ago.  All right?

22     And Mr. Endelman gave me no testimony during his

23  deposition, there's nothing in his report about the level of

24  these platforms and how they're accessible and where they're

25  ramped and what height they are.

1        Mr. Endelman himself has never visited the stadium.  He

2    did --

3            THE WITNESS:  That's not correct.

4            MR. CONNOR:  Oh.  Well, at the time of your

5    deposition, when I was interrogating you, you had not visited

6    the stadium.

7            THE WITNESS:  That would be correct.

8            MR. CONNOR:  So --

9            MR. WILLEY:  Mr. Endelman's report depicts and shows

10   these exact platforms, Your Honor --

11           MR. CONNOR:  No --

12           MR. WILLEY:  Those are, actually, measured in his

13   report.  He talks about accessible egress in his report.  All

14   we're doing is visually showing what it is we're talking

15   about, I don't think there's any question --

16           THE COURT:  Mr. Willey, are you seriously telling me

17   that these pictures were never provided to the other side?

18           MR. WILLEY:  I am telling you those pictures were

19   only taken recently, Your Honor, because we realized there

20   was no pictures showing the court what the thing looked like.

21   Plaintiffs have never shown the court what it looked like.

22      I don't think there's any question about the accuracy or

23   validity or authentication of these pictures.

24      And if plaintiffs have a complaint about what we're

25   showing, I'm happy to ask questions of Mr. Endelman about it,

1   or anybody else.  These are merely depictions of the seats as

2   they exist.

3        And I don't think Mr. Endelman's testimony is expert

4   testimony here --

5            THE COURT:  Did you not know that this witness would

6   be testifying about this?  I mean, with or without the

7   pictures.

8            MR. CONNOR:  I didn't know anything.  What I knew was

9   that Mr. Endelman's testimony pertained to Sections 112 and

10  224.  That's all I knew about.  That's what his report was

11  about.

12       And when I asked him a list of questions about whether he

13  knew anything about the sight lines from any other sections,

14  he told me no.

15       So until Mr. Willey started asking, today, about pictures

16  of these sections that I have not interrogated him about, I

17  don't personally know --

18           THE COURT:  Are 112 and 124 substantially different

19  than --

20           MR. CONNOR:  I don't know that.  That's my

21  difficulty, Your Honor.  I'm sitting here not certain of

22  that.

23           MR. WILLEY:  Your Honor, just to correct, if I could.

24  It's 112 and 116.

25           THE COURT:  Oh, 112 and 116?

1              MR. WILLEY:  Yeah.

2              THE COURT:  116 is what we're talking about.

3              MR. WILLEY:  116 is what was measured, the sight

4    line.  Mr. Endelman is not testifying to the sight line in

5    this picture.  He's using this pictures to show the court

6    what the sections in the 100 level look like.

7        And he can testify to what they look like.  He's not

8    offering expert opinion insofar as he said, "I went out

9    there, and the 100-level accessible seating, all is on a

10   platform like this."  This is two sections away.  The other

11   pictures, by the way, are 224.

12             THE COURT:  Are what?

13             MR. WILLEY:  224, which is in the diagram.

14             THE COURT:  Mr. Connor, I'm not sure that his

15   testimony is, actually, all that different.  I'd be happy to

16   take a look at his report, if that's what you'd like the

17   court to do.

18       But I am troubled that you haven't actually seen these

19   pictures before.  So what I propose we do is that we continue

20   with his testimony, because that will give you a good idea of

21   where it's going and what he's going to say.  And then we'll

22   take a break for as long as you need.  If you feel the need

23   to depose the witness additionally before you proceed with

24   cross, or if you feel the need to have some time to talk to

25   Mr. Terry about what you're seeing, we'll make that happen.

1    Okay?

2        I mean, I'm disturbed.  I realize -- I think, in

3    actuality, you're not seeing anything that should be a total

4    surprise, because this is what he talked about.  It's 116.

5    It's the same section.  Anybody who's out there would have

6    seen the platform, the chairs in front of it, the flex

7    chairs, whatever.  I don't think there's anything new in

8    this.  But you haven't seen it, and that troubles me.  And I

9    want to give you an opportunity to sort of regroup with the

10   testimony and with the pictures in mind, and take as long as

11   you need to regroup about it.  Do you see what I'm saying?

12           MR. CONNOR:  I do, Your Honor, and I appreciate that.

13       I have complete confidence in the facts of our case.  I'm

14   just sitting here this morning, knowing that what I prepared

15   for pertained to the report I'd been given and at deposition,

16   and now we're moving beyond what is in either of those.  So I

17   appreciate your offering the opportunity to consider this.

18           THE COURT:  Okay.

19           MR. CONNOR:  Thank you.

20           THE COURT:  I think what we should do is proceed, but

21   after you've had a chance to hear the testimony, before you

22   begin your cross-examination, somewhere in there we're going

23   to have lunch --

24           MR. CONNOR:  Okay.

25           THE COURT:  -- so you will have a chance to consider

1    how much time you need, what you need.  I'm going to give you

2    enough time to regroup, with the pictures in mind.

3        But as I say, I really -- I don't feel uncomfortable with

4    proceeding, because I think these pictures are really doing

5    no more than illustrating his deposition and report

6    testimony.

7            MR. CONNOR:  And needless to say, Your Honor, it's a

8    bit frustrating when you produce pictures, months in advance,

9    for Mr. Willey, for him to complain about the surprise that

10   he had, and then for me to be getting these one hour ahead of

11   court today.  I didn't even think we had them.  Mr. Campos

12   had to tell me we have them.

13           THE COURT:  I hear your frustration, and I understand

14   where you're coming from, and I think you're justified in the

15   fact that these shouldn't have been sprung on you an hour

16   before the testimony.

17       I'm just saying that when the court considers the help

18   that these illustrations give versus the fact that they

19   should have been given earlier, but, in fact, were not --

20   they can't be considered a total surprise.  This is just

21   exactly what the whole case is about.  I mean, everybody but

22   this court has been out there and looked at this section.  We

23   all know -- it's helpful to the court to see these pictures,

24   and it can't be that much of a surprise or something new.

25       But you haven't seen them before, and I'm trying to work a

1   fair accommodation so that you can work them into your

2   cross-examination and discuss them with your expert.  But I

3   don't think it's the kind of surprise that would cause me to

4   exclude these exhibits.

5           MR. CONNOR:  Okay.

6           THE COURT:  So let's proceed.

7           MR. WILLEY:  And, Your Honor, I'm very confident that

8   Mr. Terry would opine that these are the same things he

9   looked at.  Mr. Terry was at the stadium, he was looking at

10  Section 100, pieces of this, and I think he would have

11  complete agreement these are what was there.

12          THE COURT:  Clearly, they're accurate pictures of

13  what's there.  It's just that the way trials proceed --

14  Mr. Willey, I don't have to lecture you about discovery,

15  do I?

16          MR. WILLEY:  No.

17          THE COURT:  But the way trials proceed, if a witness

18  is going to use exhibits on the stand, we presume that those

19  exhibits have been shown to the other side, at some point.

20          MR. WILLEY:  Fair enough, Your Honor.

21      And we simply realized, in going through the pictures,

22  that there was no picture showing the court what this looked

23  liked.  That's all.

24          THE COURT:  You're talking too fast.

25          MR. WILLEY:  There's no picture in the record showing

1  what any of this stuff actually looked like, and we just

2  thought it would be useful illustration.  I understand --

3          THE COURT:  Believe me, the court appreciates these

4  pictures.  They're exactly what the court needs to see about

5  what this really looks like.  I need to see that, and I find

6  them very helpful.  I just think, in the interest of attorney

7  relationships, it would have been appropriate to show them to

8  opposing counsel, at least last night.  Well, of course, the

9  witness didn't get here until today.

10         MR. WILLEY:  I understand, Your Honor.

11         THE COURT:  But we're going ahead here, so let's go.

12         MR. WILLEY:  Could we look at Exhibit 23, please,

13 Rondi?

14 Q  (By Mr. Willey)  Here, we have Section 224, Mr. Endelman.

15 Have you viewed this section?

16 A  Yes, I have.

17 Q  What is this picture depicting?

18 A  Again, it's simply showing the accessible platform where

19 the accessible seating is, and a view of the field.

20 Q  Got it.

21         MR. WILLEY:  Rondi, if you'd go to the next picture,

22 and then the next one after that.

23 Q  (By Mr. Willey)  What is this picture depicting, Section

24 224, again, Mr. Endelman?

25 A  Again, it's just a three-dimensional version of the

1   diagram we had in our report.

2   Q   So if I'm looking at Exhibit 1, and I'm looking at the

3   second -- Defendants' Exhibit 1, and I'm looking at the

4   second sight-line study, Section 224, this is showing, in a

5   picture form, that same section?

6   A   Correct.

7   Q   And then what is this piece here?

8   A   That is the added platform height that was built into the

9   structure to accommodate the sight lines.

10  Q   And that's the platform that's shown in your Section 224

11  sight-line study in Defendants' Exhibit 1?

12  A   Yes.

13          THE COURT:  When you say "added platform height" --

14          THE WITNESS:  Let me clarify, Your Honor.

15      Without putting these platforms, a stadium just step,

16  step, step, step, step, and this thing is a giant step, if

17  you will, and so that's what that platform represents.

18          THE COURT:  I see.  Well, actually, it's the

19  equivalent of --

20          THE WITNESS:  Multiple steps.

21          THE COURT:  -- of three steps, probably, three and a

22  half, four, five.  I see what you're saying.

23      You didn't mean added after the building --

24          THE WITNESS:  No.  Sorry for the confusion, Your

25  Honor.

```
 1              THE COURT:  Okay.
 2   Q   (By Mr. Willey)  And is the accessible seating here at 224
 3   at grade with the concourse?
 4   A   Yes, it is.
 5   Q   When you were talking with the judge just a moment ago,
 6   you used a phrase "step, step, step" for a stadium.  You're
 7   referring to these steps here, right?
 8   A   Correct.  Each row of seats goes down a couple of steps.
 9   Q   Got it.
10        And then you have this section here, which is the
11   platform for the ADA seats?
12   A   Correct.
13   Q   If you had been engaged by NBBJ in 1996 to do plan review
14   with respect to sight lines, what would you have done?
15   A   Essentially, the same review using the same Department of
16   Justice diagram.  The only difference is, we would use the
17   as-designed height of the platform and spacing, as opposed to
18   what's built in the field.  So there may be some tolerance
19   differences between the drawing and construction.
20   Q   Because when you're doing a plan review, the building
21   doesn't exist yet?
22   A   Exactly.
23              THE COURT:  When you're doing what?
24              MR. WILLEY:  When you're doing a plan review, the
25   building doesn't exist yet, so you're basing it upon the
```

1    design, not the as-built.

2            THE WITNESS:   Exactly.   We're looking at what's on

3    paper.

4    Q   (By Mr. Willey)   What would you have told NBBJ regarding

5    comparable lines of sight?

6    A   I would have said based upon the limited information

7    available from the Department of Justice, it's my opinion

8    that this complies.

9    Q   What if you had done a field survey in late 1998 or early

10   1999, just before the stadium opened; what would you have

11   done then to assess compliance with the comparable line of

12   sight?

13   A   Essentially, the same thing we did in response to this

14   complaint that generated those diagrams.

15   Q   You would have then looked at the stadium as built, not in

16   the plan?

17   A   Correct, and we're taking the same measurements in the

18   field that we just took.

19   Q   And what would you have told NBBJ regarding compliance or

20   not with the ADA standards in effect?

21   A   I would have told them that the stadium complied.

22   Q   And that would have been based upon your use of the same

23   process you used to do the studies of Section 112 and 224 in

24   this case?

25   A   That's correct.

```
 1              THE COURT:  So when you would have told them that it
 2    had complied, you were basing it on what?  Tell me again.
 3              THE WITNESS:  I would have -- they would have had
 4    drawings that had dimensions of the platform heights and the
 5    spacing of the seating rows, et cetera, et cetera, and those
 6    are the dimensions that I'd be reviewing, and I would have
 7    said it complied with the diagram in the Accessible Stadiums
 8    document.
 9    Q    (By Mr. Willey)  And then when you did a field survey when
10    the building had been constructed, would you have been
11    looking at the plans, or at the building itself?
12    A    We'd be using the real dimensions in the field as
13    constructed.
14    Q    And your analytic process would have been the same; is
15    that correct?
16    A    Essentially, yes.
17    Q    Based upon the Accessible Stadiums document and the
18    diagram presented there?
19    A    Yes, correct.
20    Q    When you were consulting clients regarding ADA compliance,
21    what sort of perspective do you take in terms of that
22    consulting?  What kind of information or objective or
23    perspective are you trying to provide them?
24    A    Well, our firm doesn't take any advocacy position
25    whatsoever.  We simply do our very level best to have
```

1    objective and neutral opinions on the documents that are

2    available, and that's what we hold as the standard in our

3    reviews.

4    Q    You have seen Mr. Terry's report; is that correct?

5    A    Yes.

6    Q    Mr. Terry has a different perspective in his opinions; is

7    that correct?

8    A    I believe so.

9    Q    In your view, is Mr. Terry's opinion analysis consistent

10   with the *Accessible Stadiums* document?

11   A    I think the extensive diagrams that he did really

12   represent going beyond what the diagram in the *Accessible*

13   *Stadiums* document shows.  I think it's really more what he

14   would like the standard to define, and the standard doesn't

15   give a lot of definition.

16   Q    Mr. Endelman, do you have an opinion regarding the

17   distribution of accessible seating at T-Mobile Park?

18   A    Yes.  I believe the distribution at T-Mobile Park has a

19   distribution around the stadium and at the different levels

20   of seating -- the 100 level, the 200 level, the 300 level --

21   and there's a wide range of prices, from inexpensive seats to

22   very expensive seats, that are able to be chosen.

23        MR. WILLEY:  Rondi, can you show us DX-5, Defendants'

24   Exhibit 5.

25   Q    (By Mr. Willey)  Mr. Endelman, when you were talking about

1    the distribution of accessible seats at T-Mobile Park, does

2    this document show what you were talking about?

3    A    Yes, it does.

4    Q    What do you see in this document?

5    A    What I see is numerous accessible seats surrounding the

6    playing field; at the rear of Level 1; there's accessible

7    seating at the rear of Level 2; and in the center of Level 3,

8    which is where the direct access to the concourse is; in

9    addition to additional seats in the 100 section at the front

10   row, where the Diamond Club is; and accessible seats in the

11   bleacher section of the park as well -- what's called the

12   bleachers out in the outfield.

13   Q    Got it.

14        When you are looking at distribution, are you looking

15   at the stadium as a whole, or are you doing a

16   section-by-section analysis?

17   A    As a whole.  As a whole.

18   Q    Is the accessible seating at T-Mobile Park situated such

19   that it provides access to parking and to the public areas

20   and concessions?

21   A    Yes.  All seating, as provided, is connected by an

22   accessible route to the accessible parking, to the concourse

23   where all the food concessions and restrooms and other

24   amenities are provided.  So, yes.  And that also serves as

25   the required accessible means of egress from the stadium for

1   accessible seating.

2   Q   Have you done any detailed analysis of pricing of tickets

3   at T-Mobile Park?

4   A   No, we have not.  That was beyond our scope of work.

5   Q   Okay.

6        Have you seen the platforms that exist for two sections

7   in Section 200?

8   A   Yes, I have.

9   Q   Could you tell us about what those are?

10  A   What I understand is, there are two platforms that were

11  added at the request of a particular customer, a good

12  customer of the Mariners, and those platforms were,

13  essentially, superimposed on the structure.  They're not

14  really the original structure of the stadium.  And they have

15  long, it appears, non-compliant ramps leading up to those

16  platforms.

17          THE COURT:  Let me understand this.

18      Were they superimposed on an already-existing platform, or

19  were they superimposed on level ground?

20          THE WITNESS:  They were superimposed upon the stepped

21  stadium seating.  They were built up from the concrete

22  structure of the stadium, if you will.

23          THE COURT:  So there was no wheelchair-accessible

24  platform there before?

25          THE WITNESS:  I don't believe so.

```
 1              THE COURT:  Okay.  I see.  There were steps there.

 2              THE WITNESS:  Yes.

 3              THE COURT:  Stepped seating.

 4              THE WITNESS:  Right.  Think of it almost like the

 5   deck of your house that is just above whatever is below, and

 6   whatever is below was existing seating.

 7   Q   (By Mr. Willey)  Did you measure the ramps?

 8   A   I did not.

 9   Q   You were looking at them to see, based upon your

10   experience, whether they appeared compliant?

11   A   Yes.

12   Q   And were they long?

13   A   They were quite long.

14   Q   And in your view of what would make it non-compliant, was

15   it because of the rise?

16              MR. CONNOR:  Your Honor, I'm sorry, but Mr. Endelman

17   has not taken the measurements necessary to ascertain whether

18   these comply.  I don't think he should be saying what he

19   thinks based on appearances.

20              THE COURT:  I think he's --

21              MR. CONNOR:  I don't think it's relevant, in any

22   event, but I don't think he's got the qualifications or

23   should be testifying that he has any expert opinion about

24   whether they're compliant or not.

25              THE COURT:  Let's see exactly how he reached the
```

1   conclusion.  Okay?

2   Q   (By Mr. Willey)  I think I asked you whether you had

3   measured them, and the answer?

4   A   I did not measure them.  I have been doing measurements

5   for 25 years on this stuff, and you get to have a pretty good

6   eyeball for things that appear to be non-compliant.  Do I

7   know for a hundred percent sure?  No.

8       There's also a maximum run of ramp you're allowed to have

9   before you need a level landing, and I didn't see any

10  intermediate landings on those ramps.

11          THE COURT:  Is your opinion about noncompliance due

12  to the length, or due to the pitch, if "pitch" is the right

13  word?

14          THE WITNESS:  I suspect that, but I don't know that.

15  So I'm not testifying they're definitely non-compliant.  I'm

16  just saying --

17          THE COURT:  You're not testifying that they're

18  non-compliant?

19          THE WITNESS:  Not with definiteness, no.

20  Q   (By Mr. Willey)  Do you have any knowledge of whether

21  those platforms will exist next year?

22  A   My understanding is they're actually being removed because

23  the stadium is providing an amenity that's going to have

24  tables and chairs in that area, including accessible tables

25  and chairs.

```
 1          THE COURT:  Is this an accessible area that's going
 2   to have the tables and chairs?
 3          MR. WILLEY:  Your Honor, it's the area that was
 4   testified to by Mr. Rogel.  It will have accessible seating
 5   in both the loge areas, the four-top seats, and additional
 6   regular Terrace Club accessible seating, all three different
 7   places.
 8          THE COURT:  Continue.
 9          MR. WILLEY:  Mr. Endelman, I don't think I have any
10   further questions for you.  Let me just consult with my
11   colleague.
12      Thank you, Mr. Endelman.
13          THE COURT:  Sorry.  Are you finished?
14          MR. WILLEY:  I am done.
15          THE COURT:  Well, what is your wish, Mr. Connor?
16          MR. CONNOR:  Your Honor, what I would like to do, if
17   it's okay, I'd like to start, while some things are fresh in
18   my mind, then I'd like to make sure I have a break before I
19   complete Mr. Endelman's testimony, if that's all right.
20          THE COURT:  Why don't you start --
21          MR. CONNOR:  Okay.
22          THE COURT:  -- see how long you go, and when you need
23   a break, let me know, and we'll see how we can work this out.
24   Okay?
25          MR. CONNOR:  Thank you, Your Honor.
```

                          CROSS-EXAMINATION

BY MR. CONNOR:

Q    Hello, Mr. Endelman.  You and I met before in your

deposition, correct?

A    How are you, Mr. Connor?

Q    Good.  Nice to see you.

      Mr. Endelman, I wanted to start by talking a little bit

about your experience with respect to sight lines in public

facilities and stadiums.  All right?

      I asked you, in your deposition, whether you had ever

done an analysis of whether sight lines were appropriate and

in compliance with ADA requirements in stadiums such as this.

Do you remember that?

A    Yes.

Q    And you told me that you had not, correct?

A    That's correct.

Q    And, in fact, you've never done that until you were asked

to do that in this case, correct?

A    That's correct.

Q    Okay.

      So you had no experience or expertise prior to being

retained in this case with respect to doing sight lines in

stadiums, correct?

A    We've not done an analysis such as this because we've

never had a client who's asked us to do that scope of work.

1    Q    So the answer is no, you don't have any experience doing

2    this?

3    A    I have experience in knowing how to use codes and do

4    things.  So, to me -- it's routine for us to have new

5    building types, new jurisdictions, new technical standards

6    and building codes, and so there's nothing magical about

7    that.

8    Q    But the short answer is, prior to being retained in this

9    case, you'd never done analysis of sight lines in a stadium,

10   correct?

11   A    That is correct.

12   Q    All right.

13        You told me -- and I was a little unclear when I was

14   reviewing your deposition transcript -- that your firm, at

15   least, had been involved in something regarding a basketball

16   arena at the University of Las Vegas, I believe?

17   A    That's correct.  That was a very, very limited consulting,

18   really being on a couple of conference calls just to answer

19   questions for an existing stadium remodel.

20   Q    Okay.

21        And you described that facility as being a very

22   substandard facility, correct?

23   A    I couldn't hear you.  I'm sorry, sir?

24   Q    You described that facility as being a very substandard

25   facility, correct?

1    A    Yes.  If memory serves, this facility was probably built

2    in the 1970s.

3    Q    And one of the deficiencies you noted in that building is

4    that it didn't have sight lines above standing people,

5    correct?

6    A    It didn't have adequate accessible seating, it didn't have

7    sight lines.  It had a myriad of problems.

8    Q    Okay.

9         One of those myriad of problems you mentioned was not

10   having sight lines over standing spectators, correct?

11            THE COURT:  Not having what?

12            MR. CONNOR:  I'm sorry.

13            THE COURT:  Two things:  First of all, lift the

14   microphone up.  Second, slow down, and also articulate.  Both

15   of you seem to have -- it's fair, because you both have the

16   same problem, but it doesn't help all of us.  Okay.  Slow

17   down, articulate.  Okay?

18            MR. CONNOR:  My high school debate coach called me

19   "Mumbles" for a reason.  I apologize.

20   Q    (By Mr. Connor)  Let's move on.  Let's, if we could, start

21   by looking at -- well, let's talk about sight lines over

22   standing spectators.

23       You acknowledge, do you not, that in 1994, the TAM

24   supplement published by the Department of Justice indicated

25   that stadiums were supposed to have sight lines over standing

1  spectators, correct?

2  A   Yes, the 1994 TAM document says you need sight lines over

3  standing spectators, correct.

4         THE COURT:  Over what?

5         THE WITNESS:  Standing spectators, with no

6  specification beyond that.

7  Q   (By Mr. Connor)  So you were not involved in designing

8  stadiums at that time, correct?

9  A   No.

10 Q   All right.

11       And Mr. Willey asked you what you would have done, so

12 I'll do the same thing.

13       Would you have felt free, at that point in time, if you

14 had known the Department of Justice said that you had to

15 provide sight lines over standing spectators, would you have

16 told your client to ignore that?

17 A   No, of course not.

18 Q   So you would have directed your client that they should do

19 something to provide sight lines over standing spectators,

20 correct?

21 A   I would have directed my client to make sure they comply

22 with the '91 standards, the '93 TAM, the '94 TAM, and the

23 *Accessible Stadiums* documents.

24 Q   Okay.

25       And so the answer to my question is, you would have

1  told your clients that they had an obligation to provide

2  sight lines over standing spectators for wheelchair users,

3  correct?

4  A   I would have, yes.

5  Q   So you don't dispute that the Mariners had an obligation

6  to do that, correct?

7  A   Correct.

8  Q   Right.

9       If I understand your testimony, you are saying that

10  that obligation was satisfied by the Mariners because your

11  diagrams look like the diagrams in the *Accessible Stadiums*

12  document, correct?

13  A   The only technical requirement that the Department of

14  Justice has provided is that diagram --

15  Q   Okay.

16  A   -- and the description of seeing over the shoulders and

17  between heads in the first row, and over heads in the second

18  row.  There is no more detail provided.

19  Q   Okay.

20       But it says it's supposed to provide sight lines,

21  correct?

22  A   It says you're supposed to have a view of the stadium --

23  of the playing field.

24  Q   Of the playing field.  All right.

25       Does it specify how much of the playing field?

1   A   It does not.

2   Q   Okay.

3       So what would you advise your client if you were

4   telling them how much of the playing field a spectator should

5   be able to see to comply with the obligation with regard to

6   sight lines over standing spectators?

7   A   All I would say is make sure that each of the accessible

8   seats has a view of the playing field.

9   Q   Okay.

10      And would it have been acceptable, in your opinion, if

11  the stadium had been designed such that wheelchair users had

12  a view of the turf near the outfield wall?

13  A   Yes.

14  Q   That would have satisfied you?

15  A   Technically, that's all that's required.

16  Q   Okay.  Let's step back.

17      Do you know what the requirements of the ADA are?

18  A   Yes.

19  Q   Okay.  And what are they?

20  A   Essentially, to provide a comparable access to the goods

21  and services being provided to the general public.

22  Q   Okay.

23      So against that backdrop, would you have advised your

24  client that if somebody sitting in a wheelchair could only

25  see the turf at the outfield portion of the field, whereas

1    the general public could see far more of the field, that they

2    were in compliance with the requirements of the law?

3    A    Probably I wouldn't know that detail, how much every seat

4    in the stadium sees versus the accessible seating.

5    Q    Well, wouldn't you think that that would be something that

6    you should try to figure out when you're telling a client

7    whether they're complying with the law?

8    A    I always tell my clients that the law and these

9    regulations is what is required.  You, as an owner, could

10   always choose to go further than that.

11   Q    Okay.

12        So just so Judge Rothstein understands what your

13   professional opinion is and what you're saying under oath, is

14   that you believe that a stadium owner would have complied

15   with the ADA, at the time that this facility was built, if

16   they had provided sight lines for wheelchair users that only

17   allowed them to see over standing spectators the turf at the

18   outfield wall?

19   A    Yes, I would.  And the context for that is, unlike

20   football, baseball is a sport where there's very little time

21   spent -- probably a percent or so of the entire playing time

22   of the event, people are standing.  So we're still arguing

23   over a fraction of the time an event is occurring.

24   Q    What's the point, then, of DOJ requirements providing for

25   sight lines over standing spectators?  Is it in recognition

1  that that's an important part of the game, potentially?

2  A   I think it is.  I think it is.  And I think, as I said, in

3  other sports, it's a much more serious issue because, like

4  football, people stand an awful lot of the time.

5  Q   Have you ever done any studies to see how much of the time

6  somebody stands at a football game versus a baseball games?

7  A   Just my experience watching games.

8  Q   Okay.  You're not offering a professional opinion on that?

9  A   No.

10  Q   Mr. Endelman, if we could look at your exhibits.  I want

11  to talk to you about how you went about doing this again.  I

12  think I understand.

13      Mr. Endelman, when you and I talked at your deposition

14  and in your report, you indicated that an associate of yours

15  had visited the Mariners' stadium, correct?

16  A   That's correct, Bart Sanderson, who is our technical

17  director and senior associate.

18  Q   Okay.  And he had done what at the stadium?

19  A   He had done what?  I'm sorry, sir?

20  Q   What had Mr. Sanderson done in his travels to the stadium

21  with respect to sight lines?

22  A   He used the standards we discussed.

23  Q   Okay.

24      The standard -- are those standards any different than

25  the standards discussed in Mr. Terry's report, in terms of

1  the measurements and the anthropometric assumptions?

2  A    I don't think Mr. Terry and I disagree on the applicable

3  standards.

4  Q    Okay.

5  A    I think that his report does a lot of illustration of

6  things that, in my opinion, go beyond what the standards say.

7  Q    Well, that's what I want to try to understand.

8        You agree with Mr. Terry's assumptions about

9  anthropometric measurements, correct?

10 A    I don't agree that those are available in the documents

11 provided by the DOJ.

12 Q    Okay.

13       But that's what your diagrams are based on, the same

14 anthropometric assumptions, correct?

15 A    We used them because there was nothing else we could use,

16 and it was available from the *Ellerbe Becket* decision, which

17 was released when the construction of the stadium was

18 probably halfway completed.

19 Q    Okay.

20       Do you know if that type of information was available

21 before the *Ellerbe Becket* decision?

22 A    It may have been available in other studies in the

23 universe.  And, again, I think there's a limit to how much an

24 architect needs to do legal research and research of, you

25 know, anthropometric studies, in order to do their

1  profession.

2  Q   In order to design a stadium -- and let's put aside the

3  issue of accessible seating -- an architect has to make some

4  anthropometric assumptions when they're trying to establish

5  sight lines, correct?

6  A   Yes.

7  Q   So it's incumbent on an architect, when designing a

8  stadium, to ascertain what are appropriate anthropometric

9  measurements, correct?

10 A   I don't know what data they use.  They might not use the

11 data that's in the *Ellerbe Becket* report at all.

12 Q   I understand that.  I'm just trying to ask a more generic

13 question -- all right? -- and that is, an architect who is

14 designing a stadium would, of course, want to consider the

15 sight lines that the spectators have of the field, correct?

16 A   Yes.

17 Q   Okay.

18         And in order to make sure that the spectators in the

19 stadium had lines of sight to the playing field, that they

20 paid for so that they can see the game, they would have to

21 make some assumptions about the anthropometric measurements

22 as to the average spectators, correct?

23 A   I believe so.

24 Q   Okay.  And so NBBJ must have done that, correct?

25 A   I have no idea exactly what NBBJ has done.

1    Q    Do you think that NBBJ designed this stadium without

2    looking at anthropometric data?

3    A    I assume so.  I've had no discussion with anybody at NBBJ,

4    so I don't know any details.

5    Q    So it would have been within the expected burden of a

6    company designing this stadium to have sought out information

7    about anthropometric assumptions that should be made in

8    designing it, correct?

9    A    I would say it's their duty to make a stadium that

10   spectators can see the field.

11   Q    Okay.  And the way you would go about doing that,

12   designing it, would be to use anthropometric assumptions,

13   correct?

14   A    I'm assuming so.  I'm not a stadium designer.

15   Q    Okay.  So you don't know what stadium designers do, then?

16   A    I'm not a stadium designer.

17   Q    Okay.  So the answer is you don't know what stadium

18   designers do.

19   A    I do not.

20   Q    Okay.

21        So you don't know whether stadium designers would have

22   had access to anthropometric information at the time that the

23   stadium was built?

24   A    I do not know what anthropometric information they use.

25   Q    Okay.

```
 1            And do you know what anthropometric information was

 2    available at that time?

 3    A    I know one set of data, which is the stuff that is in the

 4    Ellerbe Becket report.

 5    Q    Okay.

 6            And that data had been available, other than in the

 7    Ellerbe Becket report, because it had been published in a

 8    number of locations, correct?

 9    A    I don't know that.

10    Q    Okay.

11            Would you dispute it if Mr. Terry said that had been

12    part of the architectural guidebook for years?

13    A    I'm not familiar with that.

14    Q    Okay.

15            Your diagrams depict a -- I'm not going to use the

16    right term -- but there's, sort of, a side view of the

17    spectators, correct?

18    A    Correct.

19    Q    Okay.

20            Did you make any effort to ascertain the view, from the

21    locations depicted here, down to the field, what you could

22    see?

23    A    It's our belief if the sight line shown in that diagram

24    clears the shoulders and heads as is required, and that the

25    sight line is headed on a downward slope, you would see the
```

```
 1    field.  Obviously, if it was pointing up in the air, you

 2    wouldn't see the field.  So if there's a downward slope to

 3    it, I believe you'd see the field.

 4    Q   Mr. Endelman, my question was:  Had you made any effort to

 5    depict what portion of the field could be seen from these

 6    locations for a wheelchair user?

 7    A   I didn't.

 8    Q   Okay.

 9        You did review Mr. Terry's analysis of that, correct?

10    A   I did.

11    Q   And you saw the exhibits to his expert witness report,

12    correct?

13    A   I did.

14    Q   You told me that, using the assumptions that he used,

15    which were based on Ellerbe Becket information -- correct? --

16    that you didn't have a disagreement with what was depicted,

17    correct?

18    A   I didn't have a disagreement with what?

19    Q   That those accurately depicted what would be viewed, based

20    on the assumptions.

21    A   Well, actually, I said I had some questions about some

22    methodology things, but on reflection, when I look at his

23    diagrams, I think he puts, if you will, a giant screen of

24    what he says you can't see, and I don't think he really shows

25    what goes between -- over the shoulders and between people's
```

 1    heads.  I'm not sure if it's really accurate.

 2    Q    Okay.

 3         With that qualification, you understand and don't

 4    disagree with what he did, correct?

 5    A    I understand what he did.

 6    Q    Okay.  And I'm just asking you.

 7         What he did is in keeping with what he described, which

 8    was using the *Ellerbe Becket* data, correct?

 9    A    I believe that's what he said in his report.

10    Q    Okay.  And you don't have any reason to dispute that?

11    A    No.

12    Q    Okay.

13         When I deposed you, I asked you -- and I understand the

14    qualification you're making now, that it's not a wall,

15    necessarily, that's depicted, but I asked if the view for the

16    wheelchair users were the same or comparable to the

17    non-disabled spectators, and you told me you agreed they were

18    not, correct?

19             THE COURT:  Wait.  Say that again.

20             MR. CONNOR:  I'd like to reword it, because this is

21    important.  I can get Mr. Endelman's deposition out, but I

22    don't think he'll disagree with me.

23    Q    (By Mr. Connor)  You agreed with me that, looking at

24    Mr. Terry's exhibits and assuming his assumption that there

25    was the wall, as you described it, that the views for the

1   wheelchair users were not comparable to the views of the

2   non-disabled spectators one row in front of them, correct?

3   A    I said that, but I misspoke about what I was trying to

4   say.  What I was trying to say, yes, it is clear that two

5   side-by-side photographs look different, but, in my opinion,

6   both of them meet the requirements of the *Accessible Stadiums*

7   document.

8   Q    Okay.  So just, again, to step back.

9        Your basis for saying that is that you've got pictures

10  that show the sideways view, and they have lines that look

11  like the lines in the diagram for the *Accessible Stadiums*

12  publication, correct?

13  A    What I was trying to say is that both versions have a view

14  of the field.

15  Q    But you can't tell me how much of a view of the field is

16  seen, right?

17  A    No.

18  Q    You didn't even try to analyze that, did you?

19  A    No, because there's no detail in how much a view of the

20  field you need to have.

21  Q    Okay.  So just to make sure the judge is clear.

22        You did not try to analyze how much of a view of the

23  field wheelchair users had over standing spectators, did you?

24  A    It met the diagram --

25  Q    Please answer my question.

1    A    I'm going to say the same answer again and again because

2    that's what my opinion is.

3        If you ask me the question five times, I'll give you the

4    same answer.

5            THE COURT:  Let him finish his answer, and then you

6    can ask him another question.

7            MR. CONNOR:  Okay.

8            THE COURT:  You can't both talk at the same time --

9            MR. CONNOR:  I'm sorry.

10           THE COURT:  -- because our court reporter can't take

11   it down when you both talk at the same time.

12           Okay.  Do you want to ask your question again?

13   Q    (By Mr. Connor)  Mr. Endelman, you did not do an analysis

14   of how much of the field could be seen by a wheelchair user

15   over standing spectators in front of them, did you?

16   A    We did no quantification of that at all.

17   Q    Okay.

18        And putting aside quantification in terms of

19   percentages, you didn't even do an analysis of what parts of

20   the field could be seen by a wheelchair user, correct?

21   A    We did not.

22   Q    All right.

23        You have no reason to disbelieve Mr. Terry's analysis

24   that, at least at times, portions of the infield would be

25   obscured for wheelchair users that would not be obscured for

1    standing spectators, correct?

2    A    Some of his photos depict that, apparently.

3    Q    Mr. Endelman, your report, and I think your testimony

4    today, expressed some frustration that the Department of

5    Justice did not and has not promulgated anthropometric data,

6    correct?

7    A    They have not.

8    Q    I may be repeating something discussed, to some extent,

9    but an architect had an obligation to fill that gap, right?

10   A    I'm not sure what you mean "by fill that gap."

11   Q    Well, absent anthropometric data, an architect had an

12   obligation to try to figure out how to satisfy the

13   requirement the Department of Justice was specifying, which

14   was to see the playing field, correct?

15   A    The architect needs to provide a view of the field, yes.

16   Q    Okay.

17        And in order to do that, that they would have had to

18   have found anthropometric information to design a stadium

19   appropriately, correct?

20   A    It seems that way to me, but, again, I don't know the

21   details of how a stadium designer goes about designing the

22   shape of the bowl of a stadium and accessible seating.

23   Q    Mr. Endelman, you and I talked a bit about the scoreboard

24   during your deposition.  Do you remember that?

25   A    I do.

1    Q   Okay.

2        And do you believe that the views of the wheelchair

3    users are comparable to the views of non-wheelchair users

4    with respect to the scoreboard?

5    A   I think there are adequate locations and scoreboards and

6    monitors and displays that enable people to keep track of

7    scores and other information about the game.

8    Q   Okay.

9        Do you know how much the Mariners spent on that main

10   scoreboard that they have?

11   A   I don't know how much narrative they put in there for

12   that.

13   Q   Would it surprise you if their witness testified that it

14   was somewhere between $10- and $15 million?

15   A   I'm sorry.  I don't understand.  You said -- you asked

16   me --

17   Q   I asked you -- first of all, I asked you -- and,

18   understandably, you don't -- if you knew how much the

19   Mariners spent on that scoreboard.

20   A   I misunderstood your question completely.  I thought you

21   were asking how much data was displayed on the screen.

22   Q   I was probably mumbling.  I meant to ask you if you know

23   how much they spend on that.

24   A   I have no idea.

25   Q   Okay.

 1          Would it surprise you if you heard that a witness

 2   testified between $10- and $15 million?

 3   A    I don't know the price of that equipment.

 4   Q    You agreed with me in your deposition that a scoreboard is

 5   something that falls within the ambit of what's meant by

 6   "goods and services" within the meaning of the ADA, correct?

 7   A    Correct.

 8   Q    Okay.

 9          And so the ADA requires, generally, that wheelchair

10   users are provided the same goods and services that

11   non-wheelchair users are provided, correct?

12   A    They don't use the word "same."  It's "equivalent

13   services."

14          MR. CONNOR:  Your Honor, if I could take a break now?

15   I don't think I'll have too much more time, but I have a

16   break in the subject of my questioning, and it will allow me

17   to talk to Mr. Terry about the pictures that have been

18   produced.

19          THE COURT:  Okay.  About how long would you like?

20   And are you thinking that we should -- you would need enough

21   so that we would just go right into the lunch hour, or do you

22   want to come back?  Usually we go at one o'clock for the

23   lunch hour, but we can go at 12:00 if you think your break is

24   going to take that long.  Otherwise, we can come back and

25   finish.

 1          MR. CONNOR:  Your Honor, all I need right now is a

 2    15-minute break, I think, and I suspect that I will be able

 3    to finish the questioning within a half an hour of that

 4    break.

 5          THE COURT:  Perfect.  We'll take our morning

 6    15-minute recess now, and if you need more time, we can add

 7    on to that.

 8          MR. CONNOR:  Okay.

 9          THE COURT:  But then we will resume and try to finish

10    with the witness.

11       You may step down.  The court will be in recess.

12                    (Court in recess.)

13          THE COURT:  Whenever you're ready, counsel.

14          MR. CONNOR:  Thank you, Your Honor.

15    Q   (By Mr. Connor)  Mr. Endelman, Mr. Willey asked you about

16    the *Ellerbe Becket* consent decree.  Do you recollect that?

17    A   Yes.

18    Q   Okay.

19          I appreciate you're not a lawyer, but since he asked

20    you about it, I'll ask you a few further questions.

21          Do you know whether any of the stadiums or stadium

22    owners are actually party to that lawsuit?

23    A   I don't know that.

24    Q   Okay.

25          Ellerbe Becket was just the design firm, correct?

1   A   Correct.

2   Q   Okay.

3          So you don't know what, if anything, the Department of

4   Justice required with respect to the stadiums that had been

5   constructed?

6   A   I don't know about the second stadium constructed -- I'm

7   not sure what you're saying.

8   Q   The *Ellerbe Becket* consent order just pertained to the

9   directive to the design firm, correct?

10  A   Correct.

11         MR. CONNOR:  Derik, can we pull up the pictures we

12  got this morning?  I'd like to see the ones with the concrete

13  platform.  Which number is that?

14         MR. TERASAKI:  This is D-23.

15  Q   (By Mr. Connor)  Mr. Endelman, what's up on the screen in

16  front of you is the picture that's Exhibit D-23, and you

17  talked with Mr. Willey about that a little bit.

18      Because I think we've used slightly confusing verbiage

19  throughout this case, and it's certainly not your fault, but

20  this concrete here, is that what you described as a platform?

21  A   Yes.  It's a structural.  It's a structural platform.

22  Q   Okay.

23         But there are nonstructural platforms in a couple of

24  the sections that you discussed with Mr. Willey, correct?

25  A   Correct.

1    Q    Okay.

2         So I wanted to ask you about this:  Could you tell

3    me -- as far as you know, was this how the stadium was

4    constructed, or is this something that was added?

5    A    No, this was how it was constructed.

6    Q    Could I ask you what the effect of having constructed that

7    platform out further, like that, would have been in terms of

8    sight lines for wheelchair viewers?

9    A    I think that it would cause a problem in the seats in the

10   row in front of the platform in terms of the spacing for

11   non-accessible seating.

12   Q    Okay.  I was ask- -- I was concerned about wheelchair

13   users, actually.

14        So I'm wondering, do you know what the effect of moving

15   that platform out further would have been for the views of

16   wheelchair users?

17   A    It's all -- the view of the wheelchair users is all

18   governed where the heads of the people are in front.  So if

19   you move the platform out further, the chairs in front move

20   out further, and the standing spectators would move out

21   further with it.  It all would move together, I think.

22   Q    Well -- and that's a fair comment.

23        But let's assume you didn't move these -- you just

24   eliminated that row of seats.  Okay?  Wouldn't the effect of

25   that be to give a better view for wheelchair users?

1   A   Well, certainly, because the first row, then, would be

2   really the second row in front, which is lower than this;

3   that's true, eliminate the entire row of seats.

4   Q   Right.

5        And, in fact -- so it could have been constructed in

6   that manner, as far as you know, and then provided better

7   views for the wheelchair users, correct?

8   A   Well, there's other criteria for designing a stadium,

9   which is providing the amount of seats and other things that

10  the client wants in the stadium.  So if you go and eliminate

11  many hundreds of seats, that's a separate programmatic

12  problem.

13  Q   What it is is it's a financial problem for the ownership,

14  correct?

15  A   I'm saying --

16       MR. WILLEY:  This witness has no knowledge or

17  foundation.  He's testified he wasn't the stadium architect,

18  and he wasn't involved in this stadium.

19       THE COURT:  Do you think it might be general

20  knowledge that if you took a row of seats away, it would cost

21  something?

22       MR. WILLEY:  I'm wondering why it's a question for

23  this witness, then.

24       MR. CONNOR:  Mr. Endelman explained that you might

25  not be able to do that, and I was trying to understand why

1   you couldn't do that, and I thought what he was saying was

2   because you would be eliminating a row of seats, and that

3   would be a problem with the owner.

4          MR. WILLEY:  Mr. Endelman has not testified and has

5   no opinion with respect to remediation.

6          THE COURT:  I don't even understand what the question

7   is.

8          MR. CONNOR:  Your Honor, I would just -- I would like

9   to establish that there was nothing that precluded -- and

10  this is not remediation.  This is whether the owners of this

11  stadium fulfilled their obligations when they built it, and

12  I'd like to establish --

13         THE COURT:  He's already testified that, in his

14  opinion, they fulfilled their obligation because they met the

15  requirements of the *Accessible Stadiums* manual picture,

16  design, whatever it is.

17         MR. CONNOR:  And what I would like to explore

18  slightly further with him is, because if he's in error about

19  that because his analysis of what was required is not

20  correct, I wanted to ascertain whether the stadium could have

21  been built such that the views of the wheelchair users would

22  have been better than they are.

23         THE COURT:  Well, go ahead and ask.

24         MR. CONNOR:  That's what I asked.  I asked

25  Mr. Endelman -- and that's what I meant to ask, if I didn't.

1    Q    (By Mr. Connor)   Mr. Endelman, as far as you know, there

2    was nothing that precluded this platform from having been

3    extended out, other than a lack of desire to move the seats

4    in front, correct?

5    A    I think that's correct.

6    Q    Okay.

7         And as you said, that would have improved the view for

8    wheelchair users over standing spectators, correct?

9    A    Correct.

10   Q    Okay.

11        Mr. Endelman, let's talk about where the accessible

12   seating is located in the stadium.   I wanted to talk to you,

13   first of all --

14        MR. CONNOR:   Derik, can we look at 191?

15   Q    (By Mr. Connor)   You had testified, when Mr. Willey was

16   asking you questions, that you thought that the Mariners had

17   satisfied the obligations of the ADA and the DOJ with respect

18   to the dispersal of accessible seating, correct?

19   A    Correct.

20   Q    And I heard you say that you felt that they had done so,

21   in part, because they put seating near places of egress,

22   correct?

23   A    I went further than just egress.   I'm saying that there's

24   adequate dispersal around the stadium as a whole, both in

25   terms of horizontal and vertical dispersion.

1    Q    Okay.

2         Do you know how many seats are located in this lower

3    bowl of the stadium?

4    A    Accessible seats?

5    Q    No.  Seats in total.

6    A    No, I don't.

7    Q    Okay.

8         So you didn't make an effort to ascertain how many

9    seats there were in the lower tier of the stadium?

10   A    No.

11   Q    Okay.

12        Would it surprise you if I told you that a witness

13   testified that it was approximately 20,000 or more?

14             THE COURT:  Assume that he's giving you the

15   correct --

16   Q    (By Mr. Connor)  Yeah, assuming that there are, at least,

17   20,000 seats in that lower section of the stadium, can you

18   tell me how many are located in front of the back row?

19             THE COURT:  In front of the --

20             MR. CONNOR:  In front of the back row of the first

21   tier.

22   Q    (By Mr. Connor)  Other than the seats at the back row, how

23   many accessible seats do you understand there are in that

24   lower bowl of the stadium?

25   A    I believe there's 16.

 1   Q    Okay.

 2        And are those accessible seats, or are they accessible

 3   and companion seats?

 4   A    They're accessible seats.

 5        I'm sorry.  Can you clarify your question, please?

 6   Q    Yes.

 7        There's a distinction between accessible seats and

 8   companion seats, correct?

 9   A    Correct.

10   Q    Okay.

11        How many accessible seats do you understand are located

12   in T-Mobile stadium below the back row of the first level?

13   A    Below the back row of the first level?

14        THE COURT:  Do you mean the ones in the first row?

15        MR. CONNOR:  Correct.

16        THE COURT:  Why don't you just say the ones in the

17   front row.

18   A    I believe there are 16.

19   Q    (By Mr. Connor)  Sixteen accessible and 16 companion, or

20   16 accessible and companion, total?

21   A    I think it's the combination of the two.

22   Q    Okay.  All right.

23        What percentage of 20,000 would eight seats be, do you

24   know?

25        MR. WILLEY:  Excuse me, Your Honor.  I believe

1    there's a misstatement in the record with regard to the

2    number of seats in the lower bowl.  I think Mr. Connor is

3    testifying to an erroneous number.

4              THE COURT:  Do you know the correct number?

5              MR. WILLEY:  I believe it's more in the order of 10-

6    or 11,000, Your Honor.

7              THE COURT:  All right.  Somebody, before the end of

8    this case, find that out.  This is not something we need to

9    argue about.

10             MR. CONNOR:  Okay.  All right.

11             THE COURT:  You just have to be sure you're

12   including -- you're all talking about the same bowl and the

13   same amount of seating.

14      The fact of the matter is, I can -- you can then tell me,

15   in closing, what eight seats comprise of --

16             MR. CONNOR:  Okay.  Okay.

17             THE COURT:  -- whether it should be eight or

18   sixteen --

19             MR. CONNOR:  Okay.

20             THE COURT:  -- is another question.

21             MR. CONNOR:  Okay.

22             THE COURT:  -- but what percentage, and you don't

23   have to ask this witness, because he shouldn't have to figure

24   it out on the stand.

25      We're talking about eight seats out of X.  X is either

1    20,000 or 15,000 or 10,000.

2    Q    (By Mr. Connor)  Mr. Endelman, do you know whether there

3    is access to the seats in the front row behind the home

4    plate?

5    A    Yes, there are two areas where you can get to the front

6    row, from the Diamond Club amenity space, and the other two

7    have steps.

8    Q    Okay.

9    A    But I would like to clarify something in your previous

10   question.

11        You're excluding, from the counts of the seats in the 100

12   section of the stadium, the myriad of seats in the last row

13   of the 100 section of the stadium.  So there's way more than

14   16 seats, or whatever the exact number is, in the first row.

15   Q    Yeah.  And if I said that, I didn't mean to say that.  I

16   meant to ask you how many seats there were in front of the

17   seats at the back of the first tier.

18        Do you know whether all of the space that is accessible

19   from the existing vomitories down at the front there has been

20   used for accessible seating, that could be?

21   A    I believe so.  It goes from dugout to dugout.

22   Q    Your understanding is there are accessible seats all the

23   way from dugout to dugout?

24   A    Yes.

25   Q    So you think that there are only 16 seats between the

1   dugouts?

2   A    In the first row.

3   Q    Okay.  Are you certain of that?

4   A    I'm not a hundred percent sure of the exact number 16, but

5   all the accessible seats are in the first row from dugout to

6   dugout.

7   Q    Okay.

8        If a Mariners representative testified differently here

9   in the courtroom, you wouldn't disagree with that?

10  A    I wouldn't dispute that.

11  Q    Okay.

12       The ADA regulations promulgated by the Department of

13  Justice in 4.33.3, which is cited in your report, required

14  that people with physical disabilities are supposed to be

15  given a choice of admission prices in lines of sight

16  comparable to those of members of the general public,

17  correct?

18  A    Correct.

19  Q    Do you think that the line of sight of somebody sitting at

20  the back row of the stadium on the first tier -- and let's

21  just pick a section.  Sorry.  Could you clear this for me?

22       Do you think the line of sight of somebody sitting

23  here, and we'll pick Section 133, would be the same as

24  somebody sitting in the fifth row in that same section?

25  A    I think when you're comparing lines of sight, you can't go

1  seat-by-seat in the stadium, or you'd have to have accessible

2  seating in every single row of the stadium, if you were going

3  on a microscopic, granular scale.

4      I think the intent is that there are, clearly, tiers of

5  seating, and I think there's a wide range of price points --

6  a very wide range of price points for those things, so I

7  think it complies.

8  Q   Okay.  I just want to focus on the comparability of the

9  lines of sight.  Okay?  And if you could answer my question.

10         Do you think that the line of sight for somebody

11  sitting in the back row of Section 133 in the stadium would

12  be the same as the line of sight of somebody sitting in the

13  fifth row of that section?

14  A   That is not what is defined by the Department of Justice.

15  The Department of Justice says if you meet that diagram, you

16  provided a view to the playing field --

17  Q   Mr. Endelman --

18  A   -- and those seats provided a view to the playing field.

19  Q   Mr. Endelman, could you answer my question?

20  A   I can't answer it with the terms you're using.  It's not

21  comparable in the definition that the DOJ has provided.

22  Q   Mr. Endelman, do you -- well, let me ask it this way:  If

23  you had a choice of sitting in the fifth row on the first

24  level or the 41st row on the first level, in the same

25  section, do you have an idea which seat you might pick?

1    A    I might take the 41st, to be honest with you.  And I'm not

2    saying that to be contrary.  I think there's advantages to

3    being higher up and getting a better view of the overall

4    action on the field than being closer to the field.  That's

5    my personal opinion.  And that's what makes horse racing.

6    People like different seats.

7    Q    Okay.  You're aware that the Mariners have made finer and

8    finer pricing distinctions in terms of the location of seats

9    as the years have gone on, correct?

10   A    On a broad level.  I have no other details about pricing.

11   Q    Okay.

12        You would agree that, generally speaking -- well, do

13   you understand that the seats priced closer to the front of

14   the stadium are priced at a higher price than the seats

15   further back?

16   A    I understand that.

17   Q    Okay.

18        And the reason for that is, despite maybe your personal

19   preference, most members of the public -- supply and demand

20   suggest -- prefer to be closer to the stadium [sic] than

21   further back, correct?

22   A    Correct.

23   Q    You acknowledge that people using wheelchairs do not have

24   an option to sit on the first level, other than at the rear

25   of the stadium in those eight seats in front, correct?

1    A    Sitting in the rear of the first level is not in the rear

2    of the stadium.  It's probably in about the front -- 40

3    percent of the stadium.

4    Q    Let's talk about that.

5         From the standpoint of ADA requirements, in terms of

6    vertical dispersal, do you believe that if there was a

7    stadium or a facility that was built that was 41 rows high,

8    that it would be acceptable to place all of the disabled

9    seating at the top row of that stadium?

10   A    Yes.  The technical assistance manual, it says that the

11   seating can be provided in the front row, or it can be

12   provided in the rear row, with sufficient elevation to

13   provide sight lines to the field.  It says that.  It says

14   they can be clustered.

15   Q    They can be clustered, and that's because there is a

16   concern in the regulations about making sure that wheelchair

17   users are integrated in the facility, correct?  That they're

18   not ghettoized in some portion of the facility, right?

19   A    Correct.

20   Q    Okay.

21   A    It's my opinion, as I said before, that there's adequate

22   vertical and horizontal dispersion here.

23   Q    Okay.  And I'm just trying to explore that.  That's why

24   I'm asking you that.

25        If you had a client who had a stadium that was only 40

1   rows high, would you think it would be acceptable to locate

2   all of the accessible seating at the rear of that stadium?

3   Would that satisfy the vertical-dispersal obligations under

4   the ADA?

5   A    Under the ADA, it probably does.  Under the building code,

6   it might not, the current building code.

7   Q    You said something about how the vertical dispersal, you

8   can put the wheelchair locations at the back of a level or at

9   the front level, correct?

10  A    Correct.

11  Q    So do you think there's an obligation on the part of the

12  Mariners to put wheelchair seating at the front?

13  A    I don't think there's an obligation.  There's an

14  obligation where you provide an accessible route, that you

15  can provide wheelchair seating there.  If there's not an

16  accessible route, you don't have to provide the seats there.

17  Q    Well, let's talk about that.

18       In your opinion, would it have been permissible for the

19  Mariners to have designed a stadium that provided no

20  accessible routes, meaning wheelchair-accessible routes to

21  the front of the stadium, and then only located seating at

22  the back of the stadium?  Would that have satisfied the

23  requirements of equal access for people with disabilities?

24  A    If there were no accessible routes to the front of the

25  stadium, I think it probably would comply.

1   Q   But at the time the stadium was designed, would it have

2   been acceptable for a stadium to have been designed such that

3   there were no accessible routes to the front of the stadium?

4   A   I don't know that they have to do that.

5         Again, I don't think that people designing stadiums

6   put obstacles intentionally, from providing accessible

7   seating.  They do the best they can with a very complex

8   arrangement of trying to design a stadium.

9         THE COURT:  What's the relevance of the question

10  you're asking?

11        MR. CONNOR:  Your Honor, I'm sorry if the context

12  isn't clear.

13     Our belief is this stadium was not designed to provide

14  adequate vertical dispersal.  Okay?  And since it wasn't, and

15  they had an obligation to because it was not an existing

16  stadium, it was a new facility, the stadium is in violation

17  of the ADA.  So that's what I'm asking.  This stadium could

18  have been designed such that there was more access toward the

19  front, and it wasn't, and we believe that violated the

20  vertical-dispersal requirements.

21     What they did was -- they had limited access -- they put

22  in this year, and after the suit was filed, a token couple of

23  seats in the front, but otherwise put the wheelchairs at the

24  back of the first level.

25        THE COURT:  I think I'm getting a preview of your

1   closing argument, counsel, and I appreciate that.

2       I don't know that it's either necessary or germane for the

3   court to give a ruling on whether the stadium, as a whole,

4   conforms to the ADA.  Is that what you're asking the court to

5   do?

6           MR. CONNOR:  With respect to these issues that we're

7   talking about, yes.

8           THE COURT:  With respect to the issues you're talking

9   about?

10          MR. CONNOR:  Right.

11          THE COURT:  But I don't see that we need to go into

12  the whole design of the stadium.  If you think it's valuable

13  and you're going to argue from it, then go ahead and ask.

14          MR. CONNOR:  Okay.  Thank you.  And I won't belabor

15  it.

16  Q   (By Mr. Connor)  Mr. Endelman, let me ask you this:  Are

17  you familiar with the DOJ standard "structural

18  impracticability"?

19  A   What structural impracticability means?

20  Q   Yes.

21  A   Yes.

22  Q   And how does the Department of Justice define structural

23  impracticability?

24  A   Let me see if I can get a good version of that.

25          Something that is not technically feasible because of

1   structural constraints.

2   Q   Is that what it says?

3           MR. WILLEY:  Your Honor, I believe we're moving into

4   the realm of remedy issues.  Structural impracticability has

5   nothing to do with liability determination.  It's a

6   remediation issue.  It's a defense issue.  In other words,

7   it's a defense to a proposed remediation.  It has nothing to

8   do with the liability issues presented to you.

9           THE COURT:  Well, he's got a witness on the stand who

10  may be able to talk about it --

11          MR. WILLEY:  But this witness hasn't opined upon that

12  issue, Your Honor.

13          MR. CONNOR:  I asked him if he knew what that was and

14  what the standard was for structural impracticability.

15          THE COURT:  He's given you his version.  Go ahead.

16  Q   (By Mr. Connor)  So putting aside how the stadium might

17  have been built differently, Mr. Endelman, it was built such

18  that there is accessible egress down to that front area of

19  the stadium by the home plate area, correct?

20  A   Correct.

21  Q   Okay.

22          And as far as you're concerned, do the Mariners have an

23  obligation to put as much seating down there, to satisfy the

24  vertical-distribution obligations, as they can?

25          THE COURT:  Counsel, repeat your question, and try to

1   say it more clearly, please.

2           MR. CONNOR:  Okay.

3   Q   (By Mr. Connor)  Mr. Endelman, could you -- I'll read.

4   4.33.3 says that wheelchair users or people with disabilities

5   are supposed to be provided lines of sight comparable to

6   those for members of the general public, correct?

7   A   Yes.

8   Q   Okay.

9        And it says that -- and I think this is what you were

10  mentioning when you were talking with Mr. Willey and with me

11  just a minute ago -- that accessible viewing positions may be

12  clustered for areas having more than a five percent grade,

13  correct?

14  A   That's referring to a bleacher exception.

15  Q   A what exception?

16  A   A bleacher exception.

17  Q   Oh, okay.  So that exception doesn't apply to a stadium

18  like this, the types of seats in this stadium?

19  A   It's an interesting question, because bleachers have -- it

20  doesn't have a defined meaning under the standards.  There's

21  no definition of "bleacher" in the ADA standards.  There's

22  bleachers that you and I know from having been in high school

23  and college, and, generally, what we know as bleachers.  So

24  that's the way I've taken that to mean.

25          MR. CONNOR:  Mr. Endelman, I think that's all I have.

1   Let me talk to my co-counsel for a second.

2        That is all I have, Mr. Endelman.  Thank you.

3                        REDIRECT EXAMINATION

4   BY MR. WILLEY:

5   Q    Just a couple of questions for you, Mr. Endelman.

6        Mr. Connor asked you a hypothetical about whether or

7   not a particular view of the field or a particular percentage

8   of a view of the field complied with the ADA.  Do you recall

9   that?

10  A    Yes.

11  Q    Do you have an understanding as to whether or not the DOJ

12  has any requirement that mandates a particular percentage

13  view of the field?

14  A    There's absolutely no such requirement specified.

15  Q    Mr. Connor had asked you, I think, a question about the

16  TAM supplement from 1994.  Do you recall that?

17  A    Yes.

18        MR. WILLEY:  Rondi, can you pull that up on the

19  screen?

20  Q    (By Mr. Willey)  Here, this document is a 1993 reg, ADA

21  standard with the 1994 TAM -- excuse me.  It's the 1993 TAM

22  with the 1994 TAM supplement shown in yellow.  Do you see

23  that yellow is what got added in in 1994?

24  A    Yes.

25  Q    Do you see there it says, "In assembly areas where

1  spectators can be expected to stand during the event or show

2  being viewed, the wheelchair locations must provide lines of

3  sight over spectators who stand, period."  Do you see that?

4  A    Yes.

5  Q    And then language was then modified in the 1996 *Accessible*

6  *Stadiums* document, right?

7  A    Correct.

8  Q    Okay.

9       When the TAM was published in '94, it offered examples

10 of how you might accomplish this, right?

11 A    Correct.

12 Q    And that is in the next sentence.  "This can be

13 accomplished in many ways, including placing wheelchair

14 locations at the front of a seating section or by providing

15 sufficient additional elevation for wheelchair locations

16 placed at the rear of seating sections to allow those

17 spectators to see over the spectators who stand in front of

18 them."  Do you see that?

19 A    Correct.

20 Q    And do you have an understanding of whether or not either

21 one of those things was done at the stadium?

22 A    Yes.

23 Q    What is your opinion?

24 A    I believe it complies, because that's exactly how the

25 stadium was constructed, with platforms at the rear of

1   seating sections, and the front-row seats in the stadium,

2   whether they were originally there or added later, have an

3   accessible route, and they're in the front of the section,

4   comporting with this.  If you note, it says "in the front or

5   in the rear."  It doesn't say "and in the rear."

6   Q    You had testified with Mr. Connor that the accessible

7   seats that are in the front row are between the dugouts; is

8   that correct?

9   A    Yes.

10  Q    Do you know if every seat in the front row is accessible,

11  or some portion of them is?

12  A    I believe all the seats in the front row now are

13  accessible seats.  I mean, accessible seats and companion

14  seats.

15  Q    Do you know how many seats are in the front row between

16  the dugouts?

17  A    I don't know the number.

18  Q    Have you seen those?

19  A    Yes.

20  Q    Have you ever testified in court before?

21  A    I've not been in court until this day.  I've been deposed,

22  obviously, a number of times in some of those other cases.

23  This is the first time in court.

24  Q    When you were full-time employed, what portion of your

25  practice was compliance, proactive efforts with clients, and

```
 1   what portion was doing expert witness work?

 2   A   Oh, probably less than one percent.

 3           THE COURT:  Less than one percent of what?

 4           THE WITNESS:  Doing testimony as an expert witness.

 5   Q   (By Mr. Willey)  And the remainder was the compliance

 6   work, plan review, field surveys, et cetera?

 7   A   Correct.

 8           MR. WILLEY:  I think those are all my questions.

 9   Just let me check something.

10           THE COURT:  Anything, Mr. Connor?

11           MR. CONNOR:  One second, if I could, Your Honor.

12                        RECROSS-EXAMINATION

13   BY MR. CONNOR:

14   Q   I thought you told me that you didn't know whether all the

15   seats in the front row between the dugouts were accessible

16   seats.  Isn't that what you told me?

17   A   I guess by "accessible seats," I meant the actual

18   wheelchair user's space, you know, as opposed to wheelchair

19   seats and companion seats.

20           THE COURT:  Counsel, we can ascertain that, can't we,

21   as a matter of fact?

22           MR. CONNOR:  Well, I want to make sure the record

23   isn't compromised or something.

24           THE COURT:  Nothing is compromised.  There's got to

25   be an answer to how many seats in the front row are
```

```
 1   wheelchair accessible, how many are companion, and how many

 2   of them are something else.

 3            MR. CONNOR:  I have nothing further, Your Honor.

 4            THE COURT:  Anything further, Mr. Willey?

 5            MR. WILLEY:  Nothing.

 6            THE COURT:  You may step down.

 7            MR. CONNOR:  Your Honor, at this time, I believe

 8   solely for the purpose of talking about how many accessible

 9   seats there are in the front row, I'd like to put Mr. Terry

10   back on the stand.

11            THE COURT:  Is that the only reason you're putting

12   him on?

13            MR. CONNOR:  I think so.

14            MR. WILLEY:  Your Honor, we can stipulate to that

15   number.

16            THE COURT:  I really don't think you need to put

17   Mr. Terry on for that.  Can't you stipulate?

18            MR. CONNOR:  My concern is Mr. Willey just had -- the

19   witness testified that all the space is taken by accessible

20   seating.

21            THE COURT:  He also testified that he wasn't sure.

22   Believe me, the case isn't going to turn on --

23            MR. CONNOR:  Okay.

24            THE COURT:  Does somebody know?  Does anybody know?

25            MR. WILLEY:  We'll provide a number, and we'll
```

 1   stipulate to it.  I don't think there's any confusion

 2   factually.

 3           MR. CONNOR:  Your Honor, I would like to call

 4   Mr. Terry for one other question.

 5           THE COURT:  Sure.  I remind you you are still under

 6   oath, Mr. Terry, having been sworn earlier.  You may resume

 7   the stand.

 8   JAMES TERRY,                     HAVING BEEN PREVIOUSLY SWORN,
                                      TESTIFIED AS FOLLOWS:
 9

10                     DIRECT EXAMINATION

11   BY MR. CONNOR:

12   Q   Mr. Terry, you're familiar with the *Accessible Stadiums*

13   guide, correct?

14   A   Yes.

15   Q   And that's Exhibit D-2, the picture here.

16   A   Yes.

17   Q   Okay.

18       Does this picture, in your mind, depict something

19   different than what's depicted by the measurements taken by

20   Mr. Endelman --

21   A   Definitely.

22   Q   -- with respect to lines of sight?

23       How do they differ?

24   A   First of all, if you -- can I make another comment that's

25   kind of off of that?

1           This figure doesn't define it.  It illustrates the

2     requirement.  But the key thing that it illustrates is that

3     the sight line from the wheelchair user, as it goes towards

4     the field, when you compare it to the sight line for the

5     member of the general public, these lines actually -- and can

6     you remove that now?  Those lines -- you can see in this

7     figure -- can you zoom in on it?  It makes it a little bit

8     easier to see.  Those lines actually converge.

9         The wheelchair user can see at least as much,

10    substantially equivalent to or greater than a portion

11    of the field.

12        So what it's showing by these lines not being parallel and

13    by the wheelchairs user's line of sight not being further

14    out, this indicates that the wheelchair user can see at least

15    as much or more -- in this diagram -- can see more of the

16    field than the standing spectators can or can the seated

17    spectators, and that illustrates that the requirement to

18    provide comparable lines of sight is being met in this

19    illustration.

20    Q    Okay.

21          Can we look at Mr. Endelman's illustrations.  What do

22    the lines there reflect?

23    A    Can we zoom in on one of those?

24    Q    I think so.

25    A    You'll notice that, in this case, the wheelchair users

1    line of sight -- I'm trying to follow that carefully -- and

2    the line of sight -- and I'm going to draw it right above it,

3    just like I did the one above -- and the line of sight of the

4    member of the general public actually diverge.  So what that

5    is showing is exactly what my photographs showed with the CAD

6    drawings and the colored portions of the field.

7         What my drawings show is exactly what these drawings show;

8    that the wheelchair user cannot see as low on the field

9    because of the way the lines are going.  They're diverging.

10   So the wheelchair user can see part of the field; they just

11   can't see a comparable part of the field.

12        And 4.33.3 and all of the technical documents that we've

13   quoted that were in effect at the time the stadium was

14   designed, all of them require comparable lines of sight, not

15   just lines of sight that see the field.

16   Q    Okay.

17        And, Mr. Terry, obviously these diagrams do not

18   actually depict what is seen from those locations, correct?

19   A    That's correct.

20        MR. CONNOR:  All right.  I think that's all I have.

21   Thank you.

22        MR. WILLEY:  Can I go back to the exact same ones?

23                      CROSS-EXAMINATION

24   BY MR. WILLEY:

25   Q    Mr. Terry, when you're looking at the *Accessible Stadiums*

1    document, is that what's seen on the left side of the screen

2    here?

3    A    Yes.

4    Q    Do you know what percentage of the field the wheelchair

5    user can see in this diagram?

6    A    The percentage is not shown in the figure, and it's not

7    specified in any part of the DOJ technical assistance

8    materials, because -- I have to tell the whole truth --

9    because the portion of the field that can be seen by members

10   of the general public at different portions of the stadium

11   are different.

12        So if you're in the top row, you, as a member of the

13   general public, you can't see all of the field like somebody

14   sitting on the first row or the tenth row or any other

15   portion.  There are slight differences in what you can see.

16   What's comparable is what is required.

17   Q    Understood.

18        And do you know, in looking at this ADA document that's

19   in the *Accessible Stadiums*, the person sitting in the row

20   immediately in front of the wheelchair user, do you know what

21   portion of the field that person can see?

22   A    I do not.

23   Q    How about the person two rows in front?

24   A    It's not shown in the drawing.  This is a drawing to

25   illustrate the concept.

1    Q    I understand.

2         There's no specification, anywhere in here, about that,

3    is there?

4    A    Not for percentages of field.

5    Q    When you look at the drawing that Mr. Endelman did, does

6    it tell you what percentage of the field the person in the

7    wheelchair can see?

8    A    No.

9    Q    How about the person in front of them?

10   A    No.

11   Q    You had talked with Mr. Connor about the way in which the

12   sight lines were converging or not converging?

13   A    Yes.

14   Q    Do you know where the playing surface is, vis-à-vis the

15   persons depicted in *Accessible Stadiums*?

16   A    No.

17   Q    That would matter, wouldn't it, in terms of where the

18   sight line was going?

19   A    If we were in a stadium as compared to a flat-floored

20   auditorium with a raised stage, it does make a difference

21   that you be able to see a comparable portion.  The

22   assumption, because the sight lines are drawn from one side

23   to the other and they're looking down, the assumption is that

24   you're raised above the field, and so the obligation, then,

25   is comparability for being raised above the field.

1   Q   Do you remember when we were talking yesterday and we

2   looked at one of your exhibits, and it showed that the person

3   sitting in Row 11 had a lesser view than the person sitting

4   in Row 41?

5   A   A lesser view of what?

6   Q   Of the field, lesser percentage of the field.

7   A   Of the total field?

8   Q   Yes.

9   A   Yes.

10  Q   And that may be because the person sitting here in

11  Mr. Endelman's diagram, that person sitting may have a lesser

12  view than the person in the wheelchair, right?

13  A   Of the field?

14  Q   Yeah, of the total field.

15  A   Possibly a minuscule difference.

16  Q   But it's possible, right?

17  A   Yes.

18  Q   Just like the exhibit we looked at yesterday with you?

19  A   Yes.

20          THE COURT:  Just like what?

21  Q   (By Mr. Willey)  The exhibit we looked at yesterday with

22  you, where the person sitting in Row 11 had a lesser view of

23  the whole field than the person in Row 41.

24  A   The closer you get to the field, because of the reduced

25  portion of the field, you're seeing -- you're looking at it

 1   more horizontally, the lower percentage of the whole field

 2   that you get.  It does not -- in the design of the Mariners'

 3   stadium, it does not affect -- because they designed it

 4   correctly, it does not affect the percentage of the infield

 5   that you can see.

 6   Q   What portion of your testimony is expert witness work?

 7           THE COURT:  Is what?

 8           MR. WILLEY:  Expert witness work, or expert

 9   consulting.

10   A   I've been doing this for about 25 years.  It's -- in terms

11   of cases that go to deposition or trial, it's probably been

12   less than two percent.

13           MR. WILLEY:  Thank you.  That's all I have.

14           THE COURT:  Any other questions?

15           MR. CONNOR:  No, Your Honor.

16           THE COURT:  You may step down, probably for the last

17   time, Mr. Terry.

18       Well, counsel, you turned out to be excellent predictors,

19   and we have now, as I understand it, finished the testimonial

20   portion of the case, which means that you can, in fact, give

21   me your closing arguments this afternoon, right?

22       Do you want to take a lunch hour now, and take a long

23   lunch hour so you can prepare, or what?

24           MR. WILLEY:  Your Honor, Mr. Connor and I had both, I

25   think, understood that we would be, no matter what was

1   occurring, doing our closings subsequently.  And, certainly,

2   if you would like, we could do them, but it would be a

3   challenge to do so, and it would be helpful, I think, for the

4   court, if we had additional time.

5          MR. CONNOR:  Your Honor, I agree with Mr. Willey.  I

6   anticipated we'd be doing them next week, and I was going to

7   work on them with my co-counsel.

8          THE COURT:  Well, okay.  Let me -- all right.  That's

9   fine.  I mean, I always think closing arguments are more

10  effective when counsel have had a chance to work on them and

11  refine them.

12     I'm going to want briefing from counsel on certain issues

13  that I'm sure you're going to be dealing with in your closing

14  arguments.

15     I want to think about the timing.  I can tell you right

16  now I'd like you to prepare findings and conclusions, and

17  there will be issues you need to brief that were raised, I

18  think, during the course of trial.  So I'm just trying to

19  think of the timing.  Do I want closing arguments first, and

20  then we can get to the briefing after.  Because, otherwise,

21  closing argument will be delayed too long, because it's going

22  to take you a while to do the briefing, and I'd like to have

23  closing argument as close to the testimony I've heard as

24  possible, which I think would mean Monday, right?

25         MR. CONNOR:  That would be fine with me.

 1          THE COURT:  I'll be traveling tomorrow and can't do

 2   it, but by Monday, hopefully you'll find something else to do

 3   and not spend three whole days on your closing arguments.

 4   But I would like to have closing arguments sometime on

 5   Monday.  Rhonda and I will talk with you about setting up a

 6   time, taking into account the time difference.

 7          MR. WILLEY:  Your Honor, I'm sorry.  I have an

 8   argument in the Supreme Court on Tuesday -- Washington

 9   Supreme Court.  It would be something of an impediment if I

10   was trying to prepare for that and the closing on Monday.

11       I'm wondering if we could talk about Wednesday or Thursday

12   of next week, if that works for the court's schedule.  If it

13   doesn't, I'll move things around, but I raise that as...

14          THE COURT:  Why don't we talk about Wednesday.  Okay?

15   I don't want to get in the way of that.

16          MR. CONNOR:  I have a mediation on Wednesday that has

17   to occur on that day because my client is pregnant and is

18   going to be delivering shortly thereafter, so I don't believe

19   I can reschedule that mediation.

20          THE COURT:  Mediation on Wednesday?

21          MR. CONNOR:  Yes.

22          THE COURT:  And you have a Supreme Court argument on

23   Tuesday?  Why don't you just come back this afternoon?

24   You're making this impossible.  I suggest you get together

25   right now and talk about it, and get me a date.  Would you be

1    available on Thursday?

2             MR. CONNOR:  I would be available on Thursday.

3             THE COURT:  Are you available on Thursday?

4             MR. WILLEY:  Yes.

5             THE COURT:  All right.  We'll pick Thursday.  I don't

6    want to hear anybody else having any problems.

7        I would like to see Mr. Connor and Mr. Willey in chambers,

8    just the two of you, please.

9        Court will be adjourned.

10               (Proceedings adjourned at 12:22 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

       I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

       Dated this 22nd day of October 2019.


       /S/  Nancy L. Bauer

       Nancy L. Bauer, CCR, RPR
       Official Court Reporter