UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLARK LANDIS, ROBERT BARKER,     )
GRADY THOMPSON, and              )     CASE NO. 2:18-cv-01512-BJR
KAYLA BROWN,                     )
                                 )
            *Plaintiffs*,         )
                                 )
       v.                        )     FINDINGS OF FACT AND
                                 )     CONCLUSIONS OF LAW
WASHINGTON STATE MAJOR LEAGUE)
BASEBALL STADIUM PUBLIC          )
FACILITIES DISTRICT, BASEBALL OF )
SEATTLE, INC., a Washington      )
corporation, MARINERS BASEBALL,  )
LLC, a Washington limited liability )
company, and THE BASEBALL CLUB   )
OF SEATTLE, LLLP, a Washington limited )
liability limited partnership,   )
                                 )
            *Defendants.*          )
                                 )

I.   INTRODUCTION ...........................................................................................................4
II.  BACKGROUND ............................................................................................................5
  A.  Jurisdiction and Venue ..........................................................................................5
  B.  Procedural History .................................................................................................5
      1.  Complaint and Post-Complaint Remediations..............................................5
      2.  Motion for Summary Judgment ....................................................................5
      3.  Post-Summary Judgment Settlement ............................................................6
      4.  Trial ..............................................................................................................6
  C.  Statutory Background: The ADA and its Regulations ...........................................7
      1.  The ADA .......................................................................................................7
      2.  Subsequent Regulations and Guidelines.......................................................9
          a.  1991 ADAAG.......................................................................................9
          b.  1993 TAM ..........................................................................................10
          c.  1994 Supplement to the TAM .............................................................10
          d.  Accessible Stadiums ...........................................................................11
          e.  2010 ADAAG ......................................................................................11
          f.  Post-2010 ADAAG Guidelines ...........................................................13
      3.  1991 vs. 2010: When each applies ..............................................................13
      4.  Anthropometric Measurements ...................................................................14
      5.  Relevant Caselaw ........................................................................................15
  D.  Legal Standard .....................................................................................................15
  E.  Factual Background: T-Mobile Field and Accessible Seating .............................17
      1.  The Parties ...................................................................................................17
      2.  Design and Construction of T-Mobile Park................................................18
      3.  Scoreboard ...................................................................................................19
      4.  Wheel Chair Accessible Seating..................................................................20
      5.  Expansion Plans...........................................................................................22
      6.  Pricing..........................................................................................................23
III. Discussion...................................................................................................................24
  A.  Whether Wheelchair Users Have Adequate Sightlines over Spectators Standing Directly in Front of Them ...................................................................................................24
      1.  Plaintiffs' Claim..........................................................................................24
      2.  Defendants' Counter.....................................................................................28
      3.  The Court's Conclusion ...............................................................................29
  B.  Whether Accessible Seats are Properly Distributed Vertically in the 100 Level of the Park 32
      1.  Plaintiffs' Claim..........................................................................................32
      2.  Defendants' Counter.....................................................................................35
      3.  The Court's Conclusion ...............................................................................36
  C.  Whether Ticket Prices for Accessible Seats are Comparable to Nonaccessible Seating...40
      1.  Plaintiffs' Claim..........................................................................................40
      2.  Defendants' Counter.....................................................................................42
      3.  The Court's Conclusion ...............................................................................43

    D.   Whether Wheelchair Users have Sufficient Sightlines to the Main Scoreboard Located in
Centerfield ...........................................................................................................................47
        1.   Plaintiffs' Claim...................................................................................................47
        2.   Defendants' Counter............................................................................................48
        3.   The Court's Conclusion.......................................................................................50
IV.    Conclusion ............................................................................................................................52
APPENDIX A.............................................................................................................................53
APPENDIX B.............................................................................................................................54

# I. INTRODUCTION

This matter came before the Court for a bench trial. Plaintiffs are lifelong baseball fans who, because of mobility disabilities, use wheelchairs. Defendants are the collective owners and operators of T-Mobile Park, home of Major League Baseball's Seattle Mariners (collectively, "Defendants"). The current action involves Plaintiffs' attempt to procure better wheelchair seating through enforcement of (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and its subsequent regulations and guidelines and (2) the Washington Law Against Discrimination, WASH. REV. CODE § 49.60.010 *et seq.* ("WLAD").

Plaintiffs' Complaint originally included a list of elements of the stadium they claimed were not compliant with the ADA and WLAD. The Court previously granted in part and denied in part Plaintiffs' Motion for Summary Judgment on some of these claims. *See* Dkt. No. 32. Additionally, the parties settled several of the other claims. *See* Dkt. No. 72. Thus, by the time of trial only four issues remained unresolved: (1) whether wheelchair users have adequate sightlines over spectators standing directly in front of them ("sightlines"); (2) whether accessible seats are properly distributed vertically in the 100 Level of the Park ("distribution"); (3) whether ticket prices for accessible seats are comparable to nonaccessible seating ("pricing"); and (4) whether wheelchair users have sufficient sightlines to the main Scoreboard located in centerfield ("communications").

Having considered the evidence produced at trial together with post-trial briefing and the submissions of the parties, the Court finds that T-Mobile Park is ADA compliant as to all four of the remaining issues. In accordance with Federal Rule of Civil Procedure 52(a), the Court now makes the following findings of fact and conclusions of law.

## II.    BACKGROUND

### A. Jurisdiction and Venue

Plaintiffs bring causes of action under Titles II and III of the ADA and thus jurisdiction is proper under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. Additionally, the Court has supplemental jurisdiction over Plaintiffs' WLAD claims pursuant to 28 U.S.C. § 1367. Dkt. No. 1 at ¶¶ 2.1–2.2; Dkt. No. 43 at 2.

Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) as all of the events giving rise to Plaintiffs' claims occurred in King County, Washington. Dkt. No. 1 at ¶ 2.3.

Jurisdiction and venue have not been at issue or contested in this matter.

### B. Procedural History

#### 1. Complaint and Post-Complaint Remediations

Plaintiffs filed the current action on October 15, 2018, alleging violations of (1) Title II of the ADA, (2) Title III of the ADA, and (3) WLAD. Dkt. No. 1 at ¶¶ 5.1–5.34. The Complaint based these violations on a list of claimed noncompliant elements of the Park. *See* Dkt. No. 1 at ¶ 5.21.

After the filing of the Complaint, the parties engaged in negotiations, according to which Defendants conducted some remedial measures, including installing more accessible seats. *See infra* at 22.

#### 2. Motion for Summary Judgment

On May 20, 2019, Plaintiffs filed a Motion for Summary Judgment, Dkt. No. 19, which the Court granted in part and denied in part on August 19, 2019, Dkt. No. 32. The motion sought judgment on a number of elements, but not all those listed in the Complaint, which the Court

summarized in its Opinion as: (1) Seating Dimensions, (2) Edgar's Cantina Elevator/Lift, (3) Bullpen and Dugout Access, (4) Gaps, Cracks, and Expansion Joints, (5) Eating and Drinking Surfaces, (6) Concession Counters, (7) Concession Lines, (8) Distribution, and (9) Sightlines. *See* Dkt. No. 32 at 5–7.

The Court granted summary judgment as to seating dimensions, Edgar's Cantina elevator and lift, and bullpen and dugout access as they were uncontested by Defendants. Dkt. No. 32 at 16. As for the other claims, the Court found that given a number of disputes of fact existed, summary judgment was inappropriate. *See id.* at 30–31.

### 3. Post-Summary Judgment Settlement

After summary judgment, the parties continued their negotiations. On the eve of trial, Plaintiffs and Defendants informed the Court that they had settled on all but the four issues previously mentioned. The parties then formalized the settlement in a motion which the Court granted on October 31, 2019. Dkt. No. 72.

### 4. Trial

Thus, only four issues were tried to the Court. These included (1) sightlines, (2) distribution, (3) pricing, and (4) communications. Trial commenced on October 15, 2019 and continued until October 17, 2019. Closing arguments were held on October 24, 2019.

Trial included testimony from the following five witnesses:

- Malcom Rogel, Senior Vice President of Ticket and Event Services for the Seattle Mariners. Dkt. No. 59 at 22–140.

- Trevor Gooby, Senior Vice President of Ballpark Operations for the Seattle Mariners. Dkt. No. 59 at 140–171.

- James L. E. Terry, CEO of Evan Terry Associates, LLC, and expert witness for Plaintiffs. Dkt. No. 59 at 172–224; Dkt. No. 60 at 3–123; Dkt. No. 61 at 81–87.

6

- Clark Landis, Plaintiff. Dkt. No. 60 at 130–140.

- William E. Endelman, former founder and principal of Endelman & Associates PLLC, and expert witness for Defendants. Dkt. No. 61 at 3–79.[1]

After trial, the Court ordered the parties to submit proposed findings of facts and conclusions of law as well as post-trial briefs. Dkt. No. 58.[2]

Two elements of trial are worth noting for their absence. First, Plaintiffs presented no evidence of damages, which they originally asserted under Title II of the ADA and WLAD. *See* Dkt. No. 1 at ¶¶ 5.14, 5.16, 5.33, 6.4. Second, the trial included no mention of WLAD at all. As such, the Court considers the WLAD claims abandoned.

**C. Statutory Background: The ADA and its Regulations**

In an effort to elucidate the often confusing and contradictory standards which govern this matter, the Court here explicates the applicable ADA law, regulations, and guidelines that controls its decision. The Court notes that seemingly the only consistency in the applicable law is that it and its regulations are incredibly convoluted. This Court, therefore, joins many of its sister courts in bemoaning the lack of clarity regarding the issues at hand.

*1. The ADA*

The ADA was enacted in 1990 and was intended "to provide clear, strong, consistent,

---

[1] Trial transcripts are referred to throughout this Findings of Fact and Conclusions of law as Dkt. No. 59 (Day 1), Dkt. No. 60 (Day 2), and Dkt. No. 61 (Day 3).

[2] This briefing is as follows:

   Dkt. No. 73- Defendants' Proposed Findings of Fact and Conclusions of Law
   Dkt. No. 74- Defendants' Trial Brief
   Dkt. No. 75- Plaintiffs' Proposed Findings of Fact and Conclusions of Law
   Dkt. No. 76- Plaintiffs' Trial Brief

enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C.§ 12101(b)(2). It is divided into several Titles, two of which are relevant here.

Title II addresses public entities and prohibits such entities from discriminating against qualified individuals with a disability by excluding such individuals from participation in or denial of "benefits of the services, programs, or activities." 42 U.S.C. § 12132.

Title III addresses "public accommodations and services operated by private entities" and provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.

The parties focus mainly on Title III, and its subsequent regulations and guidelines. Dkt. No. 32 at 10. Title III requires stadiums, such as T-Mobile Park, to be "design[ed] and construct[ed]" so as to be "readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12183(a)(1). The only exception to Title III's requirements is where "an entity can demonstrate that it is structurally impracticable to meet the requirements." *Id.*

The ADA charges the Department of Justice ("DOJ") with promulgating regulations and guidelines for effectuating the statute's prohibitions against discrimination. 42 U.S.C. § 12134(a); *id.* at § 12186(b). The process includes an "unusual twist," however. *Miller v. California Speedway Corp.*, 536 F.3d 1020, 1024 (9th Cir. 2008). In promulgating and implementing its regulations, the DOJ is to "be consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board," also known as "the Access Board." 42 U.S.C. 12186(c); *see also id.* at § 12134(c). The Access Board is "an independent

8

federal agency comprised of twenty-five persons—thirteen presidentially-appointed individuals and representatives from twelve federal agencies, including the DOJ." *Miller*, 536 F.3d at 1024 (citing 29 U.S.C. § 792(a)(1)); *see also* Dkt. No. 32 at 11 n.10. The Board's purpose is to establish "minimum guidelines and requirements for the standards issued" under Title III, 29 U.S.C. § 792(b)(3)(B), as well as "develop advisory information for, and provide appropriate technical assistance to, individuals or entities with rights or duties under" Title III, *Miller*, 536 F.3d at 1024–25; Dkt. No. 32 at 11 n.10.

   2. *Subsequent Regulations and Guidelines*

      a. *1991 ADAAG*

   Six months after the enactment of the ADA, the Access Board published its first proposed ADA Accessibility Guidelines ("ADAAG"), which were finalized in July 1991. *Miller*, 536 F.3d at 1025. The very same day the Access Board published its final ADAAG, the DOJ formally adopted it "'as the accessibility standard applicable under this rule,'" *i.e.*, Title III. *Id.* (quoting 56 Fed. Reg. at 35,585). Thus, "[t]he DOJ incorporated the ADAAG . . . verbatim" into what was then Appendix A. *Miller*, 536 F.3d at 1026 (citing 28 C.F.R. 36.406 & App. A). Today, the 1991 ADAAG (or "1991 Standards," as they are sometimes called) is located at Appendix D. *See* 28 C.F.R. Pt. 36, App. D; *see also* Access Board, *ADA Standards for Accessible Design* (1994), https://www.ada.gov/1991standards/adastd94-archive.pdf ("1991 ADAAG").

   Several elements of the 1991 ADAAG are important for the case before the Court, and worth quoting in whole.

   First, the 1991 ADAAG sets out the required number of accessible seats a stadium must offer. Section 4.1.3(19) provides a chart and dictates that for assembly areas over 500, "6, plus 1

9

additional space for each total seating capacity increase of 100" wheelchair locations are required. *1991 ADAAG* at § 4.1.3(19).

Second, and central to this matter, Section 4.33.3 of the 1991 ADAAG address placement of wheelchair locations, and provides in whole:

> Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public. They shall adjoin an accessible route that also serves as a means of egress in case of emergency. At least one companion fixed seat shall be provided next to each wheelchair seating area. When the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location. Readily removable seats may be installed in wheelchair spaces when the spaces are not required to accommodate wheelchair users.

> EXCEPTION: Accessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent. Equivalent accessible viewing positions may be located on levels having accessible egress.

*1991 ADAAG* at § 4.33.3 ("Section 4.33.3").

   b.   *1993 TAM*

In 1993 under its authority to publish technical assistance, *see* 42 U.S.C. § 12206(a), (c)(2)(C), the DOJ published a Technical Assistance Manual. *See* Department of Justice, *ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities* (1993), https://www.ada.gov/taman3.html ("1993 TAM"). Such technical assistance manuals are meant to guide entities such as Defendants in some of the more technical elements of complying with the regulations.

   c.   *1994 Supplement to the TAM*

In 1994, the DOJ supplemented the 1993 TAM. *See Title III Technical Assistance Manual 1994 Supplement* (1994), https://www.ada.gov/taman3up.html ("1994 Supplement to the TAM").

10

Most relevant to this matter, the 1994 Supplement to the TAM provides:

> In addition to requiring companion seating and dispersion of wheelchair locations, ADAAG requires that wheelchair locations provide people with disabilities lines of sight comparable to those for members of the general public. Thus, in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight over spectators who stand. This can be accomplished in many ways, including placing wheelchair locations at the front of a seating section, or by providing sufficient additional elevation for wheelchair locations placed at the rear of seating sections to allow those spectators to see over the spectators who stand in front of them.

*1994 Supplement to the TAM* at III-7.5180.

### d. Accessible Stadiums

In addition to the ADAAG and the TAMs, the DOJ also publishes more informal guidelines regarding its interpretations of the ADA, the ADAAG, and its own regulations. For example, in 1996 it published *Accessible Stadiums* in order to "highlight[] key accessibility requirements of the ADA that apply to" stadiums built after the ADA's effective date. Department of Justice, *Accessible Stadiums* (1996), https://www.ada.gov/stadium.pdf ("Accessible Stadiums"). In its most pertinent part, *Accessible Stadiums* provides:

> Wheelchair seating locations must provide lines of sight comparable to those provided to other spectators. In stadiums where spectators can be expected to stand during the show or event (for example, football, baseball, basketball games, or rock concerts), all or substantially all of the wheelchair seating locations must provide a line of sight over standing spectators. A comparable line of sight, as illustrated in the figure below, allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front.

*Accessible Stadiums* at 2.

### e. 2010 ADAAG

In 2004, the Access Board completed a comprehensive update of the 1991 ADAAG, which the DOJ adopted in 2010. *See* 28 C.F.R. Pt. 36, App. B; *see also* Access Board, *2010*

11

*ADA Standards for Accessible Design* (2010),

www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf ("2010 ADAAG").

The 2010 ADAAG provides an update and elaboration on many of the elements disputed by the parties in this matter. For example, the 2010 ADAAG provided a new formula for calculating the required number of wheelchair spaces a stadium must provide. *2010 ADAAG* at § 221.2.1.1 (for assembly areas with over 5001 seats, requiring "36, plus 1 for each 200, or fraction thereof, over 5000").

The 2010 ADAAG also has an explicit requirement for integration of accessible seating. *2010 ADAAG* at § 221.2.2 ("Wheelchair spaces shall be an integral part of the seating plan" meaning that "wheelchair spaces must be placed within the footprint of the seating area" and that "[w]heelchair spaces cannot be segregated from seating areas."). This requirement was formerly part of Section 4.33.3 in the 1991 ADAAG, but the 2010 ADAAG drew out, separated, and elaborated on many of the requirements that were contained within Section 4.33.3.

The 2010 ADAAG also attempted to clarify the lines of sight and distribution requirements. Section 221.2.3, for example, states:

> In providing lines of sight, wheelchair spaces shall be dispersed. Wheelchair spaces shall provide spectators with choices of seating locations and viewing angles that are substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators. When the number of wheelchair spaces required by 221.2.1 has been met, further dispersion shall not be required.

*2010 ADAAG* at § 221.2.3.

Finally, the 2010 ADAAG includes specific provisions for horizontal distribution of accessible seats, *2010 ADAAG* at § 221.2.3.1 ("[h]orizontal dispersion of wheelchair spaces is the placement of spaces in an assembly facility seating area from side-to-side or, in the case of an

arena or stadium, around the field of play or performance area"), and vertical distribution, *id.* at §

221.2.3.2 ("[w]hen wheelchair spaces are dispersed vertically in an assembly facility they are

placed at different locations within the seating area from front-to-back so that the distance from

the screen, stage, playing field, area of sports activity, or other focal point is varied among

wheelchair spaces").[3]

### f. Post-2010 ADAAG Guidelines

The DOJ also published helpful guidelines clarifying when the 2010 ADAAG, rather than

the 1991 ADAAG, applies, *see* Department of Justice, *ADA Requirements: Effective

Date/Compliance Date* (2011), https://www.ada.gov/revised_effective_dates-2010.htm

("Effective Date"), which Plaintiffs attached as Exhibit B to their Trial Brief, Dkt. No. 76-2.

Additionally, the DOJ published clarifications on the 2010 ADAAG's ticket pricing requirements,

*see* Department of Justice, *Ticket Sales* (2011), https://www.ada.gov/ticketing_2010.htm ("Ticket

Sales"), which Plaintiffs attached as Exhibit C to their Trial Brief, Dkt. No. 76-3.

### 3. 1991 vs. 2010: When each applies

An important question in this litigation is when the 1991 ADAAG's requirements apply,

versus when the 2010 ADAAG's requirements prevail. The Court finds that under the relevant

regulations, the 1991 ADAAG applies to construction built prior to September 2010, 28 C.F.R. §

36.406(a)(1), while the 2010 ADAAG applies to construction after March 2012, *id.* at §

---

[3] Similar to Section 4.33.3, the 2010 ADAAG's vertical dispersion requirement includes an exception, which states that wheel chairs spaces are not required "in rows other than at points of entry to bleacher seating." *2010 ADAAG* at § 221.2.3.2 ("Points of entry to bleacher seating may include, but are not limited to, cross aisles, concourses, vomitories, and entrance ramps and stairs. Vertical, center, or side aisles adjoining bleacher seating that are stepped or tiered are not considered entry points.").

36.406(a)(3).[4]  But, if a stadium such as T-Mobile Park—that was supposed to be constructed according to the 1991 ADAAG—fails to meet that original standard, it must now "be made accessible in accordance with the 2010 Standards." *Id.* at § 36.405(a)(5)(ii).[5]

In summary, when first constructed, T-Mobile Park needed to comply with the 1991 ADAAG.  If no alterations have been made, the 1991 ADAAG still applies.  If alterations were made after March 2010, those alterations needed to comply with the 2010 ADAAG.  Finally, if Defendants failed to construct the Park according to the 1991 ADAAG, they must now bring the stadium into compliance with the 2010 ADAAG.

*4. Anthropometric Measurements*

An important element that is not discussed in the relevant regulations or guidelines is the anthropometric measurements, *i.e.*, measurements of size and proportion of the human body, that are to be used when constructing the stadium.  *See* Dkt. No. 73 at 9–10.  In other words, when measuring the sightlines or viewing angles of patrons who use wheelchairs or the spectators standing in front of them, what measurements should an architect use to represent the height of the wheelchair users and other spectators?

The relevant regulations and guidelines are silent on the matter, but a settlement by the DOJ sheds some light on what anthropometric values should be used.  In 1998, the DOJ settled a

_____

[4] Stadiums built between October 2010 and February 2012 could choose between the 1991 and 2010 Standards. 36.406(a)(1).

[5] Additionally, stadiums that would have been controlled by the 1991 ADAAG that conduct alterations after March 2012, must make those alterations in compliance with the 2010 ADAAG.  *Id.* at § 36.406(a)(3).  "Alterations" include "remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions."  *Id.* at § 36.402(b)(1).  Neither side in this case make claims regarding qualifying alterations.

14

case with a Consent Order against Ellerbe Becket, a major architectural, engineering, interior design and construction firm involved in the design and construction of several stadiums. *See United States v. Ellerbe Becket, Inc.*, D. Minn., No. 4-96-995, (March 24, 1998 Consent Order), https://www.ada.gov/ellerbe.htm; *see also* Defs.' Ex. 3.

In Exhibit B of that Consent Order, the DOJ for the first time endorsed specific anthropometric measurements to be used prospectively in designing stadiums. While those measurements were produced towards the end of construction of T-Mobile Park, both Plaintiffs' and Defendants' testifying experts utilized them when conducting their measurements within the Park. *See* Dkt. No. 73 at 9–10; Dkt. No. 75 at 10–11; Dkt. No. 59 at 193:18–195:5; Dkt. No. 61 at 15:20–16:1.

    *5. Relevant Caselaw*

The caselaw addressing some of the issues in this matter is storied for its level of confusion and contradiction. For example, the question of whether, under the 1991 ADAAG, stadiums are required to provide sightlines from accessible seats over standing spectators, has been much examined and gained renewed exposure thanks to a recent Supreme Court opinion. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2410 (2019). Unfortunately, the Supreme Court did not address the issue, instead it merely used sightlines as an example of a "real uncertaint[y] about a regulation's meaning." *Id.* at 2410. This Court agrees with that sentiment.

**D. Legal Standard**

Plaintiffs have consistently argued that their only burden at trial is to show that the T-Mobile Park does not comply with the ADA. *See, e.g.*, Dkt. No. 44 at 3–5; Dkt. No. 76 at 1–4. Regarding proposed remedies, Plaintiffs consistently claim that they are not required to provide

15

solutions to alleged noncompliance. *See* Dkt. No. 76 at 3. Instead, they claim strict compliance is necessary and where the stadium has failed to meet the applicable ADA standard, the Park must be brought into compliance regardless of the cost or architectural feasibility. *Id.*

The only defense to strict compliance for stadiums is "structurally impracticable." 42 U.S.C. § 12183(a)(1). Structural impracticability, in turn, occurs "only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features." 28 C.F.R. 35.151(a)(2)(i); *id.* at 36.401(c)(1).

While strict compliance is the rule, it is Plaintiffs' burden to show T-Mobile Park is not in strict compliance in the first place. *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1048 (9th Cir. 2008). To establish a violation of Title II of the ADA, Plaintiffs must prove (1) they are qualified individuals with a disability, (2) that they were "excluded from participation in or denied the benefits of a public entity's services, programs or activities, or [were] otherwise discriminated against by the public entity," and (3) the "exclusion, denial of benefits, or discrimination was by reason of [their] disability." *Grant v. Alperovich*, 993 F. Supp. 2d 1356, 1364 (W.D. Wash. 2014) (citing *Weinreich v. L.A. Cnty. Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997)).

To establish a violation of Title III of the ADA, Plaintiffs must prove (1) they have a disability, (2) that T-Mobile Park is a place of public accommodation, and (3) that they were "denied public accommodations by Defendants because of [their] disability." *Grant*, 993 F. Supp. 2d at 1364 (citing *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir.2007)).

Element (1) of Title II and elements (1) and (2) of Title III are not at issue in this case. *See* Dkt. No. 43 at 6–7. Thus, the only elements in dispute are whether Plaintiffs have been discriminated against.

16

Discrimination under Title III includes "a failure to design and construct facilities . . . that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements . . .." 42 U.S.C. 12183(a)(1). "Readily accessible," in turn, is achieved where the stadium complies with the relevant ADAAG. *Kohler v. Bed Bath & Beyond of California, LLC*, 778 F.3d 827, 830 (9th Cir. 2015).

### E. Factual Background: T-Mobile Field and Accessible Seating

Having reviewed the parties' Pretrial Statement's stipulated facts, Dkt. No. 43, the testimony presented at trial, and the parties' post-trial submissions, the Courts finds as follows.

*1. The Parties*

Plaintiffs Clark Landis, Robert Barker, Grady Thompson, and Kayla Brown are all baseball fans, who the parties have stipulated qualify as individuals with a disability under Title II of the ADA and disabled under Title III of the ADA. Dkt. No. 43 at 7; *see also* Dkt. No. 32 at 2.

Defendants comprise four separate legal entities, which own or operate T-Mobile Park in some capacity. *See* Dkt. No. 32 at 3

Washington State Major League Baseball Stadium Public Facilities District ("PFD") is a municipal corporation, created by the State of Washington, which owns T-Mobile Park. Dkt. No. 43 at 6. The parties stipulate that PFD is a public entity subject to Title II of the ADA. *Id.*

PFD, in turn, leases the Park to the other Defendants, Baseball of Seattle, Inc., Mariners Baseball, LLC, and The Baseball Club of Seattle, LLLP (collectively "the Mariners"). Dkt. No. 43 at 6. The Mariners are private entities regulated under Title III of the ADA. *See* Dkt. No. 32 at 10.

17

*2. Design and Construction of T-Mobile Park*

Designing and planning for a new baseball stadium in Seattle began in 1996. Dkt. No. 43 at 7; *see also* Dkt. No. 32 at 3. Construction began on March 8, 1997. Dkt. No. 32 at 3; Dkt. No. 43 at 7. It took twenty-seven months to construct the stadium, with the first game taking place on July 15, 1999. Dkt. No. 43 at 7.

T-Mobile Park is located at 1250 First Avenue South near downtown Seattle. The building itself is composed of four tiers of seating that are "vertically-stacked" one atop the other. *Id.*; *see also* Dkt. No. 32 at 3–5; Dkt. No. 59 at 25:4–26:10. Closest to the field is the 100 Level (also known as the "Main Level") and then proceeding upwards is the 200 Level (also known as the "Club Level"), the Suite Level, and the 300 Level (also known as the "View Level"). Dkt. No. 43 at 7; Dkt. No. 59 at 33:9–35:4. The Park also includes two "bleacher" sections, which are located behind left and centerfield. Dkt. No. 59 at 32:16–35:17. Each level is then divided horizontally into sections. Dkt. No. 43 at 7.

Plaintiffs' Exhibit 191 shows a map of the Park, which is appended hereto as Appendix A. *See* Pls.' Ex. 191. As the map displays, the 100 Level sections extend around the lower bowl of the stadium, from Section 102 in centerfield to Section 151 in left field. Proceeding up, the 200 Level includes Sections 211 to 249; the Suite Level includes suits s1 to s69; the 300 Level includes Sections 306 to 347; and, finally, the bleachers include Sections 180 to 187 and 190 to 195. *See* App. A.

Additionally, right behind Home Plate are Sections 25, 27, 33, and 35, which constitute the Diamond Club. *See* App. A; Dkt. No. 59 at 49:19–50:17. The Diamond Clubs is a "premium seating location" that includes additional perks like access to a food bar and some of the best views

18

in the stadium. Dkt. No. 43 at 7; *see also* Dkt. No. 59 at 50:7–11.

The stadium's seats are reached by way of a concourse located at the back of each section. Dkt. No. 43 at 7. The concourses also contain food, beverage, and merchandise concessions. Dkt. No. 59 at 99:3–7. In the 100, 200, and Suite Levels, patrons access their seats by walking down concrete steps from the concourse, as the seats are pitched on a slope to provide a better view of the field. In the 300 Level, access to the seating from the concourse is through a passage, which emerges in the middle of each section. Dkt. No. 43 at 7; *see also* Dkt. No. 59 at 101:23–102:7.

Patrons reach the Diamond Club through four passages that provide access to these front row seats. Dkt. No. 43 at 7. These four tunnels provide the only access directly to the seats closest to the field, as all of the other front row seats in the 100 Level are accessed by descending from the 100 Level concourse via concrete steps. Dkt. No. 32 at 4. The concourses and Diamond Club tunnels are depicted on the map in Appendix A as grey gaps between the sections. *See* App. A.

Finally, appended here as Appendix B is a table provided by the parties detailing the actual number of seats in the stadium, broken down into various categories, for example the number of seats in the 100 Level or the number of seats in the front row next to the field. *See* App. B.

*3. Scoreboard*

T-Mobile Park has a large, state-of-the-art Scoreboard behind the seats in the outfield. *See* Pls.' Ex. 234. The Scoreboard displays game statistics, replays, and a variety of other information during games. *See* Dkt. 59 at 165:10–166:2.

In addition to the main Scoreboard, many smaller scoreboards and displays are located throughout the Park, and provide similar, often identical, information as displayed on the main Scoreboard. *See* Dkt. No. 59 at 158:9–163:10. These displays and modes of communication

include video monitors located throughout the ballpark on all levels including near accessible seating in the 100 Level, which play live feeds of the game. *Id.* at 158:4–160:4. The Park also includes "ribbon boards," which are "fascias on the front of some of the 200-level sections" that "show information such as play-by-play information, . . . closed-captioning, . . . statistics, . . . advertising, . . . in-game entertainment, . . .[and] things to get the crowd excited[.]" *Id.* at 160:7–14. In addition to the main Scoreboard and ribbon boards, the Park also has an "out-of-town" scoreboard, located "directly in the outfield, in left field," which shows scores from around the league. *Id.* at 160:17–23.

    *4. Wheel Chair Accessible Seating*

    Accessible seating is located on all of the four levels of the Park. Dkt. No. 43 at 7. In Appendix A, accessible seating is denoted by the icon located at the bottom right of the diagram. *See* Dkt. No. 59 at 105:7–10. As the diagram displays, accessible seating is located horizontally throughout the stadium, including in nearly every section in the 100 Level, most sections in the 300 Level, some sections in the 200 Level, and in the All-Star Club in the Suite Level. *See* Dkt. No. 32 at 4. Although not depicted in Appendix A, accessible seating is also provided in Sections 33 and 35. Dkt. No. 59 at 49:11–18.[6]

---

[6] The accessible seating in Sections 33 and 35 has been alternatively referred to as "Diamond Club" or "Premier" seating. To the best of the Court's comprehension, both the Diamond Club and the Premier accessible seating are located in Sections 33 and 35, *i.e.*, essentially right next to each other, but the difference is the amenities provided with the purchase of each. Accessible seating coded as "Diamond Club ADA" comes with the amenities of the Diamond Club, and "Premier ADA" seating does not. Accordingly, Diamond Club ADA seats are priced at the same level as non-ADA Dimond Club seats, and Premier ADA seats are priced at the same level as nearby front row non-Diamond Club non-ADA seats. Dkt. No. 59 at 51:11–55:8, 88:12–19, 88:12–91:17, 118:15–119:8; 154:7–156:24. In Sections 33 and 35, twelve of the accessible seats are coded as Premier (six wheelchair and six companion) and four as Diamond Club (two wheelchair and two companion). *Id.* at 94:25–95:9.

20

In the 100 and 200 Levels, accessible seating is primarily located in the last row of each section, adjacent to the concourse. Dkt. No. 32 at 4. The seating is located on concrete platforms that sit at grade with the concourse, allowing wheelchair users to navigate to their seats directly from the concourse. *See* Dkt. No. 59 at 61:1–14. In the 300 Level, wheelchair users access their seats located in the middle (or slightly forward of the middle) of the section through the access tunnel used by all other patrons. Dkt. No. 32 at 4; Dkt. No. 59 at 101:23–102:10. In Sections 33 and 35, wheelchair users access their accessible seats through two of the four access tunnels as only two of the tunnels allow for wheelchair access. Dkt. No. 32 at 4. The other two tunnels include stairs, preventing wheelchair access to the front of Sections 25 and 27. *See* Dkt. No. 61 at 66:2–7.

In addition to wheelchair accessible seats, the Park also includes companion seating. Under the regulations, each wheelchair accessible seat must be accompanied by a "companion" seat so that wheelchair users can sit next to, or near, friends, family, or caregivers. *See 1991 ADAAG* at § 4.33.3; *2010 ADAAG* at § 221.3. Throughout this Findings of Fact and Conclusions of Law, the Court refers to "accessible seats (or seating)" as including both wheelchair and companion seating and refers to each individually where appropriate.

The table provided by the parties and appended as Appendix B also includes the number of accessible seats located throughout the Park. This includes specific categories, such as the total number of accessible seats located in the last row of the 100 Level. *See* App. B. It also includes a breakdown of how many of those accessible seats are wheelchair accessible, and how many are companion seating. *Id.*

Sections 33 and 35 are the only sections with front row accessible seats and have been a

21

major point of contention throughout litigation. These Sections are also where the most change in accessible seating has occurred since T-Mobile Park's construction. Originally, only four accessible seats were located here, representing the only front row accessible seats in the Park. Following the 2018 offseason, and the initiation of this suit, Defendants installed fourteen additional accessible seats, bringing the total to eight wheelchair seats and eight companion seats. *See* App. B; *see also* Dkt. No. 59 at 55:9–21, 58:10, 153:3–22.

Another element of change to accessible seating in T-Mobile Park is the Defendants' implementation of "flex seating." *See* Dkt. No. 73 at 7; Dkt. No. 59 at 120:3–122:15. Previously, companion seats, like nonaccessible seats, were fixed to the ground directly next to wheelchair spaces. Dkt. No. 73 at 7. Defendants, however, have implemented a program of replacing such fixed companion seats with folding chairs. As Defendants explain, doing so allows "guests greater flexibility in seating configurations," for example permitting "six wheelchairs [to] be seated side by side since fixed seats no longer get in the way." *Id.* Thus, Defendants still allocate the required number of wheelchair and companion seats to accessible rows, but the order of wheelchair and companion seats may be varied according to patrons' seating preferences. During the 2019 season, all accessible seating in the stadium was flex except the seats in Sections 33 and 35 but, by the 2020 season, all accessible seating including Sections 33 and 35 will be flex. *Id.*; *see also* Dkt. No. 59 at 122:9–15.

5. *Expansion Plans*

Defendants also informed the Court of plans to add additional accessible seating in the offseason. *See* Dkt. No. 73 at 8; Defs.' Ex. 20; Dkt. No. 59 at 124:24–133:24. Specifically, Defendants will be updating Sections 200 to 227, along the first base line, to include more and

22

varied seating options. This includes removing the last six to eight rows of standard seating and replacing them with three alternative seating options: (1) "Loge" boxes, which are "sofa-style seating," (2) four-top table seating, and (3) standard accessible seating. Dkt. No. 73 at 8. Defendants claim that the renovations will provide "a net increase in the number of ADA spaces available on the 200 Level" and will "offer ADA guests access to three different types of tickets at different price points." *Id.*

   *6. Pricing*

   Defendants utilize a dynamic pricing scheme in which ticket prices vary over time based on supply and demand. *See* Dkt. No. 59 at 74:25–75:24. To price the tickets for seats in the Park, Defendants have split the stadium into separate "price levels." *Id.* at 41:25–42:3, 105:22–106:5. Seats within the same level are priced the same. *Id.* at 43:10–14. Defendants can then fluctuate the price of each price level according to their dynamic pricing scheme. *See id.* at 105:22–112:21.

   Within the map appended as Appendix A, Defendants' price levels are depicted each as a distinct color, including shades of, for example, blue and green. *See* App. A; *see also* Dkt. No. 59 at 45:14–46:7, 106:6–8. In 2019, Defendants had 28 different price levels, which are sometimes combined depending on supply and demand. Dkt. No. 59 at 45:17–47:9, 106:6–9.

   As far as actual sales, Defendants offer tickets in three categories: season tickets, group tickets, and individual tickets. *Id.* at 113:1–6. Season tickets are sold first, starting in the November preceding the coming season. *Id.* at 113:1–13. Those wishing to purchase season tickets may choose from locations around the Park. *Id.* at 114:6–12. The price of season ticket packages is set and do not vary. *Id.* at 113:19–22. Accessible seats are available for season ticket purchase. *Id.* at 113:23–114:5.

23

Next, group tickets go on sale after season tickets and are sold throughout the season. *Id.* at 115:5–21. The price of group sales, unlike season tickets, varies depending on when they are purchased. *Id.* at 115:22–116:2. Accessible seats are also available in group ticket offerings. *Id.* at 116:4–6.

Finally, Defendants sell single game tickets. Again, accessible seats are available for single-game purchase. *See, e.g.*, Defs.' Ex. 21 (illustrating sample ticket availability for accessible seating for the September 10, 2019 game against the Cincinnati Reds). The price of both accessible and nonaccessible seating for single game purchase varies according to Defendants' dynamic pricing scheme. Dkt. No. 59 at 75:1–24; Dkt. No. 61 at 32:16–22. Defendants' Exhibit 21, for example, shows prices ranging from $17 to $75. Defs.' Ex. 21; *see also* Dkt. No. 59 at 115:5–118:21. Defendants have also provided seating price manifests for three games in 2018, *see* Defs.' Ex. 18, and three games in 2019, Defs.' Ex. 19.

## III.    DISCUSSION

### A. Whether Wheelchair Users Have Adequate Sightlines over Spectators Standing Directly in Front of Them

*1. Plaintiffs' Claim*

Plaintiffs claim that T-Mobile Park violates the ADA because the sightlines from accessible seats to the field are not comparable to the sightlines from nonaccessible seats. Specifically, Plaintiffs claim that they are unable to see some of the game's most thrilling moments when the spectators seated right in front of them stand in excitement because the Park's accessible seating has not been properly designed to provide a view of the field over standing spectators. *See* Dkt. No. 76 at 4–5.

According to Plaintiffs, Section 4.33.3 of the 1991 ADAAG requires that wheelchair users

24

be provided with seating options that allow them to see at all times during a game. For elaboration on the exact applicable standard, however, Plaintiffs point primarily to the 1994 Supplement to the TAM, which Plaintiffs claim requires the Park to provide wheelchair users with lines of sights *over the heads* of spectators standing seated directly in front of their accessible seats. *See, e.g.,* Dkt. No. 75 at 19–20.

Plaintiffs rely on the report and testimony of their expert witness, James Terry for this proposition. At trial, Mr. Terry testified that, in his opinion, the sightlines from wheelchair accessible seats at T-Mobile Park are not comparable to the sightlines from nonaccessible seats. Dkt. No. 60 at 24:7–12. Mr. Terry based his opinion on observations and measurements he made during an approximately eight-hour tour of T-Mobile Park. Dkt. No. 75 at 9.

Specifically, during that tour Mr. Terry took numerous measurements and pictures from multiple locations in the Park. *Id.* These measurements and pictures were "intended to demonstrate how the sightlines of wheelchair users sitting in accessible seats in T-Mobile Park compare with those of fans sitting in non-accessible standard seats in close proximity to the accessible seats." *Id.*

Mr. Terry described his methodology during Day 1 of the trial. *See* Dkt. No. 59 at 193:18–194:24, 199:3–206:13; *see also* Dkt. No. 75 at 9–11. He began by selecting several accessible seating locations from around the Park with the goal of getting "a full variety of the types of places that wheelchair users were sitting." Dkt. No. 59 at 193:23–194:1.

In locations he selected, Mr. Terry and his assistant used a carpenter's ruler to measure the average eye height of a wheelchair user in an accessible seat (for practical ease, call this "Seat A"). He then used a carpenter's ruler to measure the height of both the shoulders and head of a standing

25

spectator seated directly in front of the accessible seat just measured ("Seat B"). To take these measurements, Mr. Terry used the anthropometric measurements provided by the DOJ in its settlement with Ellerbe Becket. Dkt. No. 75 at 9–10; Dkt. No. 59 at 193:18–194:24. Having taken these measurements, Mr. Terry took a photograph from the eye height of the wheelchair user in Seat A, marking where the shoulders and head of the standing spectator in Seat B would fall in the photograph. Thus, he gained an approximate vantage of what a wheelchair user in Seat A would see when the standing spectator is Seat B rose in excitement.

Mr. Terry then repeated the process, going one row forward from Seat B ("Seat C"). Dkt. No. 59 at 195:9–20. Seat C is also a nonaccessible seat. He measured the shoulder and head height of a standing spectator in Seat C and took a photograph from the eye height of the standing spectator in Seat B marking where the shoulders and head of the standing spectator in Seat C would fall in the photograph. Thus, he garnered an approximate vantage of what a standing spectator would see from a nonaccessible seat in front of an accessible seat over a standing spectator in the nonaccessible seat in front of that spectator.

By performing these measurements and taking these pictures, Mr. Terry was left with approximations of the vantages of an accessible seat and the nonaccessible seat immediately in front of it, including a standing spectators' shoulder and head height immediately in front of each seat. Mr. Terry took these photographs, and digitally marked them to denote where the standing spectators' heads and shoulders would fall. *See, e.g.*, *id* at 202:18–206:13. Then, using the assumption garnered from the 1994 Supplement to the TAM that sightlines were to be *over the head* of the spectator standing, he calculated the percentage of the field that could be seen from both Seat A and Seat B over the line marking the standing spectator's head in front of both. *See*

26

*id.* at 184:24–185:4, 202:18–206:13. He then compared what each could see in the illustrations, which were introduced as Plaintiffs' Exhibits 3 through 13. Dkt. No. 75 at 10; *see also* Pls.' Ex. 3–13.

The illustrations show that, in the locations measured, a wheelchair user would consistently see less of the field then their counterpart accessible seat. The locations from which Mr. Terry took his measurements are marked in Plaintiffs' Exhibit 14. *See* Dkt. No. 59 at 195:21–198:16; *see also* Pls.' Ex. 14.

According to Plaintiffs, these illustrations prove that a patron seated in an accessible wheelchair seat could not see the field over the head of a spectator standing directly in front of them where counterpart nonaccessible seats can. Thus, using Mr. Terry's illustrations and testimony as evidence, Plaintiffs claim that T-Mobile Park does not provide the sightlines required by Section 4.33.3 of the 1991 ADAAG. Again, in making this argument, Plaintiffs rely on the 1994 Supplement to the TAM's interpretation of Section 4.33.3, in which the DOJ interpreted the 1991 ADAAG as requiring that "in assembly areas where spectators can be expected to stand during the event or show being viewed, the wheelchair locations must provide lines of sight *over spectators who stand*." *1994 Supplement to the TAM* at III-7.5180 (emphasis added).

Plaintiffs also point to *Miller*, in which the Ninth Circuit deferred to the DOJ's interpretation (the 1994 Supplement to the TAM) of its own regulation (the ADAAG) and held that the 1994 Supplement's requirement that "wheelchair locations must provide lines of sight over spectators who stand," was not "'plainly erroneous [n]or inconsistent with the regulation.'" *Miller*, 536 F.3d at 1029 (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)); Dkt. No. 76 at 2.

27

Thus, Plaintiffs urge the Court to find that T-Mobile Park's sightlines do not comply with the ADA and order Defendants "to take all necessary measures to provide wheelchair users in all accessible seating" with adequate sightlines. Dkt. No. 75 at 30.

*2. Defendants' Counter*

Defendants respond that the sightlines at T-Mobile Park do comply with the ADA's requirements. *See* Dkt. No. 74 at 2–6.

In support of this conclusion, Defendants rely on the *Accessible Stadiums* guideline from 1996, which dictates that sightlines are comparable where they allow "a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front." Dkt. No. 74 at 3 (quoting *Accessible Stadiums* at 2). Defendants claim that their accessible seats meet this standard. Defendants' base their assertion on the report and testimony of their own expert witness, William Endelman.

Contrary to Mr. Terry, Mr. Endelman testified that, in his opinion, the sightlines at T-Mobile Park complied with the ADA. Dkt. No. 61 at 13:14–20. Mr. Endelman based this opinion on a different process of evaluation than that of Mr. Terry. *See id.* at 13:23–16:13.

Mr. Endelman, and his architecture firm, began with the diagram provided in the *Accessible Stadiums* guideline depicting "Comparable Line of Sight for Wheelchair Seating Location." *See Accessible Stadiums* at 2. Mr. Endelman then took measurements from the stadium in two of the sections listed in the Complaint and superimposed the diagram on top of the actual measurements as they exist in the Park. Like Mr. Terry, to establish the anthropometric measurements Mr. Endelman used the Ellerbe Becket dimensions. Dkt. No. 61 at 15:20–16:1.

28

Mr. Endelman then compared the two dimensions and concluded that, based on the match between the diagram and the Park's actual dimensions, wheelchair users are "able to see over the shoulders and between the heads of people in the row immediately in front, and over the heads of people in the second row in front of the accessible seating" and thus comply with the DOJ's guideline as established in *Accessible Stadiums*. *Id.* at 14:11–17. Mr. Endelman's comparison was admitted into evidence as Defendants' Exhibit 1. *See* Defs.' Ex. 1.

Based on this evidence, Defendants claim they have complied with the ADA's sightline requirements. *See* Dkt. No. 74 at 6.

### 3. The Court's Conclusion

As T-Mobile Field was constructed prior to the application of the 2010 ADAAG, and there have been no alterations since then, the Court finds that the appropriate standard to apply to the Park's sightlines is the 1991 ADAAG. Specifically, the sightlines must comply with Section 4.33.3's dictates, as well as the regulations and guidelines that existed at the time the Park was being constructed, including the 1993 TAM, 1994 Supplement to the TAM, and the *Accessible Stadiums* guideline.

As stated above, the parties differ as to which are the applicable regulations and guidelines. Plaintiffs rely on the 1994 Supplement to the TAM, which dictates sightlines *over* standing spectators. They point to *Miller*, 536 F.3d 1020, as support for this position. Defendants rely on the *Accessible Stadiums* guideline, which dictates a sightline "between the heads and over the shoulders" of spectators standing immediately in front of the accessible seat.

The Court finds that since T-Mobile Park was being constructed contemporaneously with the *Accessible Stadiums* guideline, the Court finds that the applicable standard is: "[a] comparable

line of sight . . . allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front." *Accessible Stadiums* at 2.

*Miller* supports this conclusion. While Plaintiffs rely on *Miller* for the proposition that it set the applicable standards for "over the heads" of standing spectators, *Miller* actually dictates deference by courts to the DOJ's interpretation of its own regulations and guidelines. *See, e.g.*, *Miller*, 536 F.3d at 1028 ("here we are dealing with the leeway we must grant an agency in the interpretation of its own regulations"). The Ninth Circuit noted that "we have previously held that the TAM itself is entitled to substantial deference," and that such deference was again warranted. *Id.* at 1028–1030. Since the 1994 Supplement to the TAM's interpretation of Section 4.33.3 as requiring "sightlines over spectators who stand" was "neither plainly erroneous nor inconsistent with the regulation," it was "entitled to substantial deference." *Id.* at 1029–1030 (internal quotations removed).

Thus, *Miller* was about deference, not standard setting, and since *Accessible Stadiums* is the DOJ's most contemporaneous interpretation of Section 4.33.3, the standard set forth therein should be afforded deference. The Court, therefore, finds that *Accessible Stadiums*' interpretation of Section 4.33.3 as requiring sightlines "between the heads and over the shoulders" of standing spectators is the correct standard to apply and the court further finds that the standard is neither plainly erroneous nor inconsistent with the regulation. *See Miller*, 536 F.3d at 1029.

Further, as in *Miller* where the Ninth Circuit determined that the DOJ did not have to go through notice and comment to adopt the 1994 Supplement to the TAM's view because it constituted an interpretative rule, so too with *Accessible Stadiums*. *Id.* at 1032. As the Ninth

Circuit stated, "[t]he Attorney General is not estopped from changing a view she believes to have been grounded upon a mistaken legal interpretation. Where the agency's interpretation of its regulation is at least as plausible as competing ones, there is little, if any reason not to defer to its construction." *Id.* at 1032–33 (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (cleaned up)). It held that the 1994 Supplement to the TAM was an interpretive rule, and that interpretive rules do not require notice and comment. *Id.* at 1032–33 (citing 5 U.S.C. § 553(b)(3)(A); *Erringer v. Thompson*, 371 F.3d 625, 630 (9th Cir. 2004)). Like the 1994 Supplement to the TAM, *Accessible Stadiums* is an interpretive rule. *See id.* at 1030.[7] Thus, the DOJ was free to adopt its interpretation in 1996, even if its dictates contradict those of the 1994 Supplement to the TAM.

Therefore, this Court concludes that to comply with the 1991 ADAAG, and Section 4.33.3 therein, sightlines at T-Mobile Park must provide wheelchair users views of "the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front." *Accessible Stadiums* at 2. Viewing the evidence submitted at trial, the Park accomplishes this task.

The Court finds that, as Mr. Endelman testified, the accessible seats that exist roughly comport with the diagram provided by the *Accessible Stadiums* guideline.

---

[7] "An interpretive rule is one 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.' *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) (quotation marks and citation omitted). '[I]nterpretive rules merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule,' whereas legislative rules 'create rights, impose obligations, or effect a change in existing law pursuant to authority delegated by Congress.' *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003)."

Furhter, Mr. Terry's illustrations support the conclusion that the sightlines are comparable when considering the *Accessible Stadiums*' standard. Mr. Terry's illustrations include two lines, one representing where the head of a standing spectator would fall and another representing where their shoulders would fall. Mr. Terry testified that when he based his opinion on what could be seen over the line representing the standing spectator's head, the percentage of the field that could be seen was not comparable between accessible and nonaccessible seats.

But, when the Court reviews the illustrations considering what can be seen over the line representing the standing spectator's shoulders, *i.e.*, "over the shoulders and between the heads," more of the field is visible from the accessible seat, making the views comparable. For example, when considering the shoulder line in Mr. Terry's illustrations, several of the locations have 100% visibility of the field. *See* Pls.' Exs. 3, 4, 5, 6, 7, 10, 12. For the others, the percentage of field viewable is close to 100%. *See* Pls.' Exs. 8, 9, 11. Thus, the Court concludes that when taking into account what percentage of the field that can be seen utilizing the standard set by the *Accessible Stadiums* guideline, the sightlines are comparable.

Thus, after determining the applicable standard, and reviewing the evidence presented at trial, the Court concludes that the sightlines from accessible seats are comparable to the sightlines from nonaccessible seats and, therefore, T-Mobile Park complies with Section 4.33.3 of the 1991 ADAAG in this regard.

**B. Whether Accessible Seats are Properly Distributed Vertically in the 100 Level of the Park**

*1. Plaintiffs' Claim*

Plaintiffs claim that accessible seating is not properly distributed throughout T-Mobile Park. They point out that while there is accessible seating at all levels, the seating is predominately

located in the last rows of the 100 and 200 Levels.

It is first important to note what is not at issue in this claim. Plaintiffs are not claiming that there is an insufficient total number of accessible seats in T-Mobile Park to satisfy the ADA. Dkt. No. 76 at 5. Nor are Plaintiffs claiming that there is insufficient horizontal distribution around the playing field in the Park. Dkt. No. 75 at 23. Plaintiffs are also not claiming that there are insufficient total numbers of accessible seats within each of T-Mobile Park's vertical levels, *i.e.*, the 100, 200, 300, and Suite Levels. Dkt. No. 76 at 5. Finally, Plaintiffs do not claim insufficient vertical distribution at the 200 or 300 Levels. *See* Dkt. No. 75 at 12; Dkt. No. 76 at 5–6.

Instead, Plaintiffs' claim a lack of accessible seats "'dispersed throughout' the 100 Level to provide wheelchair users with comparable choices as required." Dkt. No. 76 at 5–6. Plaintiffs contend the Section 4.33.3 of the 1991 ADAAG requires vertical distribution within the 100 Level. *See* Dkt. No. 76 at 6. Additionally, Plaintiffs point to the DOJ's guideline in *Accessible Stadiums*, which states that "[w]heel chair seating must be dispersed throughout all seating areas and provide a choice of admission prices and views comparable to those for the general public." *Accessible Stadiums* at 1; Dkt. No. 75 at 22.

Plaintiffs recognize that wheelchair accessible seating cannot be located mid-tier. They contend, therefore, that "[w]here accessible seating cannot be located in mid-tier, it should be dispersed between front and back rows equally so as to provide wheelchair users, on average, with options comparable to those available to the general public." Dkt. No. 76 at 6. T-Mobile Park does not comply with this requirement, according to Plaintiffs, because "[n]early all accessible seating in the 100 [L]evel is located at the rear most rows" and only "a measly 8 of 180 accessible seats on the 100 level of T-Mobile Park are accessible seats located closer to the field than the last

33

row." Dkt. No. 76 at 6; *see also* Dkt. No. 75 at 13, 23–26.

This arrangement, according to Plaintiffs, is "tantamount to [] discriminatory tokenism." Dkt. No. 76 at 6 (internal quotations removed). Based on the lack of proportionate front row seating, Plaintiffs ask the Court to order Defendants to add 52 wheelchair seats and 52 companion seats, "in addition to the seats now located in" Sections 33 and 35, to the sections in the 100 Level between the foul poles "below the middle rows of seats." Dkt. No. 76 at 8.

Plaintiffs arrive at this number by calculating 1%[8] of the total number of seats in the 100 Level (20,630), which amounts to 206, and then proportionally distributing half (104 or 52 accessible seats and 52 companion seats) to the back of the 100 Level (where accessible seating is currently located) and half to the front. Dkt. No. 76 at 8.[9]

Plaintiffs recognize that "[a]s presently constructed a fully compliant number of additional accessible seating could not be located between the back and front rows of the 100 Level at T-Mobile." Dkt. No. 76 at 6 n.8. Therefore, to achieve the addition of the number of accessible seats they request in the front rows of the Park, Plaintiffs suggest that Defendants may build additional tunnels, similar to the access points to Sections 33 and 35. Dkt. No. 76 at 6 n.8, 9; Dkt. No. 60 at 31:14–16.

---

[8] The parties also express this requirement as .5%. 1% is for wheelchair seats and companion seats combined, .5% is for just wheelchair seats.

[9] Plaintiffs claim that the 1% requirement is mandated by the 2010 ADAAG. *See* Dkt. No. 75 at 31 (citing Section 221.2 of the 2010 ADAAG); *see also* Dkt. No. 76 at 6. The Court assumes that 1% is an approximation as Section 221.2 of the 2010 ADAAG actually requires stadiums with over 5001 seats to have, at minimum, "36, plus 1 for each 200, or fraction thereof, over 5000," which when calculated is not 1%. *2010 ADAAG* at § 221.2.1.1.

*2. Defendants' Counter*

Defendants counter that accessible seating is properly dispersed vertically throughout T-Mobile Park. They dispute Plaintiffs' distribution claim on both a legal and factual basis.

Legally, Defendants claim "[t]here is no authority holding that each discrete section or level within a stadium must include a specific proportionate number of accessible seats." Dkt. No. 74 at 9. As they state, Section 4.33.3 applies and merely requires "comparability." *Id.* at 6. Further, this comparability according to Defendants is tempered by practical considerations, for example Section 4.33.3's exception which permits clustering. *See 1991 ADAAG* at § 4.33.3 ("[a]ccessible viewing positions may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent").[10] Thus, Defendants claim, T-Mobile Park complies with Section 4.33.3's vertical distribution requirement so long as there is a vertical distribution considering the stadium as a whole.

Defendants contend that T-Mobile Park is, in fact, vertically distributed when the Park is considered as a whole. Dkt. No. 74 at 8. As they point out, "T-Mobile Park offers accessible seating within each of its four tiers or levels" and "ADA-accessible seating has been placed along every accessible path of egress within the Stadium." *Id.* Further, they claim that even "[i]f the Court were inclined to adopt Plaintiffs' view" that distribution within each section is required, "any allocation of accessible seats within the 100 Level would have to account for the substantial

---

[10] Defendants full list of practical considerations include that "(a) accessible seating must 'adjoin an accessible route that also serves as a means of egress in case of emergency,' (b) accessible seating 'must be dispersed throughout all seating areas and provide a choice of admission prices,' (c) accessible seating 'may be clustered' in 'areas' having sight lines that require slopes of greater than 5 percent,' and (d) equivalent accessible viewing positions may be located on levels having accessible egress." Dkt. No. 74 at 6–7.

35

number of existing accessible seats." *Id.* at 9 n.17.[11]

### 3. The Court's Conclusion

As with sightlines, the Court finds that the 1991 ADAAG, and specifically Section 4.33.3, applies as T-Mobile Park was built prior to the implementation of the 2010 ADAAG and neither party has alleged alterations to the Park that would cause the 2010 ADAAG to apply.

In calculating the total required number of accessible seats, and the proportional distribution of those seats, the Court will utilize Section 221.1 of the 2010 ADAAG's calculations, and, more specifically, the 1% approximation utilized by the parties. The Court utilizes the more recent calculations set forth in Section 221.1 of the 2010 ADAAG because even were T-Mobile Park not to comply with the 1991 ADAAG's requirement, the 2010 ADAAG's requirement would now apply, *see supra* at 13–14; *see also* Dkt. No. 60 at 60:1–24. Thus, while in order to comply with the ADA's requirements accessible seating in T-Mobile Park must be distributed according to Section 4.33.3's mandate, the Court will utilize the current 2010 standards as a yardstick for the proper proportional representation that should be present in the stadium between accessible and

---

[11] As support for this assertion, Defendants provide their own within-100 Level seat calculations also using the 1% (or .5%) standard used by Plaintiffs ostensible from Section 221.2 of the 2010 ADAAG. *But see supra* at 34 n.9 (the Court calling into question this calculation). As Defendants state:

> [T]here are 18,573 seats on the 100 Level between the foul poles, of which one-half percent is 92. There are 172 accessible seats (plus 173 companion seats) located at the rear of the 100 level, in addition to the 8 accessible seats (and 8 companion seats) located in the Diamond Club area; *i.e.*, more than double the one-half percent. Similarly, there are 433 seats in the front row of the 100 Level, of which one-half percent is 2. As noted, there are already 8 accessible seats in the front row of the 100 Level; i.e., four times the one-half percent. Thus, if the Court were to determine the need for more accessible seats in the 100 Level, it would have to recognize that the existing number of accessible seats—both in the 100 Level as a whole and in the front row alone—exceed any requirement.

Dkt. No. 74 at 9 n.17.

nonaccessible seats.

Section 4.33.3 requires a vertical distribution that is "integral" to the stadiums seating plan in a manner comparable to the general public. *See 1991 ADAAG* at § 4.33.3. Specifically, Section 4.33.3's command is that "[w]heelchair areas shall be an *integral* part of any fixed seating plan and shall be provided so as to provide people with physical disabilities *a choice of . . . lines of sight comparable* to those for members of the general public." *Id.* (emphasis added). Thus, the requirement is for (1) integration within the seating plan (*i.e.* no placing all accessible seating in one location) and (2) comparable lines of sight (which here is also interpreted as horizontal and vertical distribution) that provide a choice of seating locations. *See also id.* ("[w]hen the seating capacity exceeds 300, wheelchair spaces shall be provided in more than one location").

The Court notes, however, that Section 4.33.3 qualifies the distribution requirement. First, Section 4.33.3 states that accessible seats "shall adjoin an accessible route that also serves as a means of egress in case of emergency." *Id.* Next, it provides an exception wherein accessible seating "may be clustered for bleachers, balconies, and other areas having sight lines that require slopes of greater than 5 percent." *Id.*[12]

Notably, Section 4.33.3 makes no pronouncement on the proportionality of distribution for

---

[12] While Plaintiffs also point to Accessible Stadiums, it provides little additional guidance. It merely repeats Section 4.33.3's integration and distribution requirements without elaborating on them much further. *See Accessible Stadiums* at 1 ("Accessible seating must be an integral part of the seating plan so that people using wheelchairs are not isolated from other spectators or their friends or family. . . . Wheelchair seating locations must be provided in all areas including sky boxes and specialty areas. . . . Whenever more than 300 seats are provided, wheelchair seating locations must be provided in more than one location. This is known as dispersed seating. Wheelchair seating locations must be dispersed throughout all seating areas and provide a choice of admission prices and views comparable to those for the general public.").

either the stadium as a whole or within each vertical section. The sparse case law on the subject supports a limited view of the distribution requirement. Most courts that have opined on the subject have merely held that there is a vertical distribution requirement. *See, e.g., Paralyzed Veterans of Am. v. Ellerbe Becket Architects & Eng'rs*, P.C., 950 F. Supp. 393, 404 (D.D.C. 1996) ("[d]ispersal requires a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators"); *Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 708, 709 (D. Or. 1997) ("DOJ interprets Standard 4.33.3 to require both vertical and horizontal dispersal, *i.e.*, in large arenas and stadiums such as the Rose Garden the wheelchair locations must be distributed in a manner that approximates the overall distribution of seats in the facility"); *see also Berry v. City of Lowell*, No. 01-10694, 2003 WL 22050772, at *2 (D. Mass. May 30, 2003); *Colorado Cross-Disability Coal. v. Colorado Rockies Baseball Club, Ltd.*, 336 F. Supp. 2d 1141, 1146 (D. Colo. 2004); *Cerda v. Chicago Cubs Baseball Club, LLC*, No. 17-9023, 2019 WL 4138943, at *8–9 (N.D. Ill. Aug. 30, 2019).

Those courts, however, have tempered the vertical distribution requirement by recognizing the practical limitations associated with accessible seating. *See, e.g., Paralyzed Veterans of Am.*, 950 F. Supp. at 404 ("[b]ecause wheelchair patrons make up only a small percentage of all spectators, there need not be wheelchair seating in every section of the arena, but there must be spaces scattered throughout a sufficiently representative number of sections in the seating bowl to provide comparable choices"); *Indep. Living Res.*, 982 F. Supp. at 709 ("[w]hile absolute homogeneity is usually neither feasible nor required—since wheelchair users cannot navigate stairways or the narrow passage leading to a seat in the middle of a row—neither may the arena operator relegate most wheelchair users to the dark corners of the arena"); *Cerda*, 2019 WL

38

4138943, at *9 ("the 2010 Standards do not say where Accessible Seats must be located and do not require the Cubs to place ADA seats in the front row").

Thus, while the Park is clearly permitted to cluster accessible seats at points where those seats may actually be accessed, *i.e.*, off a concourse or near a means of accessible ingress and egress such as a tunnel, it may not fulfill the vertical distribution requirement by placing all accessible seating in the back of a section. Afterall, "[w]here dispersion is feasible, it must be achieved." *Colorado Cross-Disability Coal.*, 336 F. Supp. 2d at 1146. Accessible seating must be integral to a stadium's seating plan in a manner comparable to that of the general public. *1991 ADAAG* at § 4.33.3. A stadium, therefore, could not fulfill Section 4.33.3's mandate by merely apportioning an equal amount of accessible seating within each of the stadium's vertical tiers but then relegating those seats entirely to the rear of each of the tiers. For instance, because ambulatory patrons have the option to access front row seating, stadiums, at the very least, must also provide accessible front row seating for wheelchair patrons. *See Colorado Cross-Disability Coal.*, 336 F. Supp. 2d at 1146 ("Locating the wheelchair accessible seats at the back of the Lower Level does not provides comparable lines of sights for wheelchair patrons. These seats are also not integrated.").

The question then is in what numbers, or what proportion, must a stadium distribute front row accessible seats? Section 4.33.3, unfortunately, does not say and the DOJ has provided no guidance. Plaintiffs' suggestion (50% of the required accessible seats to the front and 50% to the back), however, goes too far for the simple reason that 50% of the nonaccessible seats in the 100 Level available to the general public are not front row seats. *See* Dkt. No. 76 at 8–9. According to the seating numbers provided by the parties, there are 18,573 total seats in the 100 Level between

39

the foul poles and only 443 of those are in the front row. *See* App. B. Thus, only about 2.4% of the seats in the 100 Level are in the front row and Section 4.33.3 requires comparability to the offerings available to the general public.

Therefore, the Court will utilize the same proportionality. As mentioned previously, there are 18,573 total seats in the 100 Level between the foul poles. App. B. Assuming for purposes of this calculation that the 100 Level represented the entire stadium, T-Mobile Park would be required to provide 1% of that total in accessible seats. *See 2010 ADAAG* at § 221.2.1.1. Thus, 1% of 18,573 is 186. That means T-Mobile is required to have 186 wheelchair accessible seats in the 100 Level. Given that only 2.4% of the total nonaccessible seats in the 100 Level are front row seats, to maintain the same proportionality for wheelchair accessible seats, 2.4% of the 186 accessible seats should also be front row seats. 2.4% of 186 is approximately five seats. Thus, in order to maintain the proportionality of front row accessible seats to front row nonaccessible seats, T-Mobile Park must provide at least five front row accessible seats in the 100 Level. Defendants, however, now exceed this requirement as, after the initiation of this lawsuit, they provide sixteen accessible front row seats in the 100 Level (Sections 33 and 35 in the 100 Level offer two wheelchair Diamond Club, two companion Diamond Club, six wheelchair Premier, and six companion Premier).

Thus, the Court finds that Defendants' now fulfill the vertical distribution requirement mandated by Section 4.33.3 of the 1991 ADAAG.

**C. Whether Ticket Prices for Accessible Seats are Comparable to Nonaccessible Seating**

*1. Plaintiffs' Claim*

Plaintiffs claim that Defendants have violated the ADA because they have failed to provide

40

wheelchair users in the 100 Level with "a choice of admission prices . . . comparable to those for members of the general public." Dkt. No. 1 at ¶ 5.21(e).

Plaintiffs refer to two sources for the requirement to comparatively price accessible seats. In their Complaint, Plaintiffs cite Section 4.33.3 of the 1991 ADAAG as the genesis for this requirement. *See id.* at ¶ 4.8, 4.11 (citing Section 4.33.3 and then stating "Defendants are required to provide people with physical disabilities a choice of admission prices . . . comparable to those for members of the general public"); *see also* Dkt. No. 44 at 7 ("As with sightlines, the regulation governing wheelchair seating price distribution is § 4.33.3 of the 1991 ADAAG, which requires a choice of admission prices for wheelchair seating locations 'comparable' to the selection for standard seating locations.").

Plaintiffs' Trial Brief, however, traces the applicable regulation to the standards implemented in 2010, including Section 221.2.3 of the 2010 ADAAG, 28 C.F.R. § 36.302(f), and the DOJ's guidelines in *Ticket Sales*. *See* Dkt. No. 76 at 7, 9. The apparent change in requirements comes from DOJ guidance in the form of the *Effective Date* guideline, which was published in 2011 and attached as an exhibit to Plaintiffs' Trial Brief. *Id.* at 7 (citing *Effective Date* at 1). Also attached to Plaintiffs' Trial Brief is the DOJ's *Ticket Sales* guidance. *See* Dkt. No. 76-3. Plaintiffs claim that this DOJ guidance requires Defendants to provide equal or better accessible seating in proportion to seats that are not physically available at particular price points to Plaintiffs. *See* Dkt. No. 76 at 9.

As support for their claim, Plaintiffs contend that: (1) "[a] potential ticket purchaser who requires accessible seats would pay the same for a seat 16 rows further back than a member of the general public could potentially buy" and (2) a wheelchair user "would have no ability to purchase

41

a ticket anywhere within the first 15 rows of seats aside from the far more expensive seats directly behind home plate as part of either the 'Diamond Club' or the 'Premier Seats.'" *Id.* at 7.

The crux of Plaintiffs' argument then is that (1) since the 100 Level is divided into banded price levels increasing in price as the levels approach the field and (2) Plaintiffs only have access to the cheapest of these price levels since accessible seats are located at the back of the section off of the concourse (excluding the Section 33 and 35 seating), then (3) Defendants must make a proportional number of seats available from price levels they do not have access to in a similar or better location at the same price.[13]

Based on the foregoing, Plaintiffs ask the Court to order that "where accessible seats are not physically available at particular price points, accessible seats in equal or better locations must be made available on proportionate basis at the price points which are offered in the locations where accessible seats are not available." *Id.* at 9.

*2. Defendants' Counter*

Defendants' counter that there are sufficient price offerings to wheelchair users. They argue that Plaintiffs' pricing claim (along with its distribution claim) is no more than an attempt to obtain a "dramatically increased number of wheelchair accessible seats closer to the playing

---

[13] As their Proposed Findings of Fact and Conclusions of Law states, "[t]here are more than 45 separate seating sections on the 100 level and in all but one of those sections, Section 35, where front row accessible seating has recently been added, the only choice of accessible seating is in the cheapest price point of each section in the rearmost row." Dkt. No. 75 at 14. Further, the Section 35 seating "range[s] in cost between $75 and $600 [and] are the only accessible seats near the field." *Id.* at 15. Members of the general public, on the other hand, are able to purchase seats "right next to the field in the outfield section were as cheap as $35 in 2019." *Id.* (citing Defs.' Ex. 19 at 2–4 referencing seats in Sections 102 to 109 located in center and left field). And, finally, a "wheelchair using baseball fan who wanted to sit closer to the field than the very back row at T-Mobile Park was required to pay at minimum nearly two times as much as any other member of the general public would be required to pay to sit near the field." *Id.*

42

field [at] lower ticket prices." Dkt. No. 74 at 6.

Defendants base their conclusion that there are comparable pricing options available to wheelchairs users on testimony at trial that demonstrated that accessible seats are available in all three ticketing categories: season tickets, group tickets, and individual tickets. Dkt. No. 73 at 16 (citing Dkt. No. 59 at 113:23–114:14, 116:4–6; Defs.' Ex. 21). Further, Defendants assert, "ADA seats are offered at a range of price points and their prices vary depending on when they are purchased" according to Defendants' dynamic pricing scheme. *Id.* For example, Defendants highlight a game that took place on September 10, 2019 against the Cincinnati Reds in which accessible seating ticket prices ranged from $17 to $75. *Id.* (citing Defs.' Ex. 21; Dkt. No. 59 at 117:5–118:21). Finally, Defendants note that accessible seats are "always priced the same as the non-accessible seats within the same pricing level." *Id.* at 17 (citing Dkt. No. 59 at 76:18–23).

Thus, according to Defendants, wheelchair users have comparable pricing options to the general public and Defendants' pricing scheme does not violate the ADA.

*3. The Court's Conclusion*

It is unnecessary for the Court to resolve the parties' dispute between the applicable standard as both standards yield the same conclusion.

Defendants are correct in their assessment that the 1991 ADAAG, under Section 4.33.3, requires only comparability. As it states, "[w]heelchair areas shall be . . . provided so as to provide people with physical disabilities a choice of admission prices . . . *comparable* to those for members of the general public." *1991 ADAAG* at § 4.33.3 (emphasis added). Further it qualifies comparability with certain practical considerations such as "adjoin[ing] an accessible route that also serves as a means of egress" and "cluster[ing] [in] bleachers, balconies, and other areas having

43

sight lines that require slopes of greater than 5 percent." *Id.* As other Courts have stated, comparability in pricing requires "a choice of various seating areas, good and bad, expensive and inexpensive, which generally matches those of ambulatory spectators." *Paralyzed Veterans of Am.*, 950 F. Supp. at 404; *see also Colorado Cross-Disability Coal.*, 336 F. Supp. 2d at 1149; *Indep. Living Res.*, 982 F. Supp. at 709. Thus, in order to show a violation of the 1991 ADAAG in terms of pricing, Plaintiffs must show they do not have comparable options compared to the general public.

The 2010 standard (represented by the three separate sources pointed to by Plaintiffs), on the other hand, essentially sets forth the same requirement as the 1991 ADAAG, just with more particularity.

Plaintiffs refer to Section 221.2.3 of the 2010 ADAAG as a source for what is now required for ticket prices. Section 221.2.3, however, addresses sightlines and distribution, not pricing. *See 2010 ADAAG* at § 221.2.3 (emphasis added) ("[w]heelchair spaces shall provide spectators with choices of *seating locations* and *viewing angles* that are substantially equivalent to, or better than, the choices of seating locations and viewing angles available to all other spectators"). Thus, it says nothing about what is required in terms of ticket pricing.

Plaintiffs also point to 28 C.F.R. § 36.302(f) and *Ticket Sales* for the applicable standard to apply to pricing. 28 C.F.R. § 36.302(f) contains three separate requirements:

> [1] The price of tickets for accessible seating for a single event or series of events shall not be set higher than the price for other tickets in the same seating section for the same event or series of events. [2] Tickets for accessible seating must be made available at all price levels for every event or series of events. [3] If tickets for accessible seating at a particular price level cannot be provided because barrier removal in an existing facility is not readily achievable, then the percentage of tickets for accessible seating that should have been available at that price level but for the barriers (determined by the ratio of the total number of tickets at that price

44

level to the total number of tickets in the assembly area) shall be offered for purchase, at that price level, in a nearby or similar accessible location.

28 C.F.R. § 36.302(f)(3).

*Ticket Sales*, in turn, elaborates on this standard.[14]

What 28 C.F.R. § 36.302(f) and *Ticket Sales* therefore require is something akin to what Section 4.33.3 already required, that is that: (1) stadiums cannot make accessible seats more expensive than nearby nonaccessible seats; (2) that accessible seats must be available at every "price level" (from 28 C.F.R. § 36.302) or "price category" (from *Ticket Sales*); and (3) where there is an architectural barriers preventing wheelchair access to a particular price level, a proportional number of seats at that price level must be provided elsewhere. The third requirement, which Plaintiffs rely on heavily, is an elaboration on the second; where one cannot achieve the second requirement (provide all price levels) because of an architectural barrier, one must provide proportional access elsewhere.

Thus, whether under the 1991 or 2010 standard, Defendants must show that (1) they do not charge wheelchair users higher prices for their seats than nonaccessible seats within the same section and (2a) under the 1991 standard, wheelchair users have comparable price options to the general public or (2b) under the 2010 standard, wheelchair users have access to all price levels/categories available to the public.

Plaintiffs' argument, however, assumes that "price levels" or "categories" in the 2010

---

[14] Specifically, *Ticket Sales* states "[v]enues cannot charge higher prices for accessible seats than for non-accessible seats in the same seating section. [ . . . ] Venues must offer accessible seats in all price categories available to the public." *Ticket Sales* at 2. It then provides provides an example of 28 C.F.R. § 36.302(f)(3)'s third requirement.

45

standard means the same thing as what Defendants call "price levels," which they use to identify which seats will be priced similarly according to their dynamic pricing scheme. It does not. As other courts have already held, price level means a selection from inexpensive to expensive. In other words, Plaintiffs must have a choice to buy cheap seats, middle priced seats, and expensive seats, like the general public. Applying this standard, Defendants' pricing scheme complies with the ADA's requirements.

The Court finds that Defendants' testimony establishes that the price of an accessible seat will never be more than nearby nonaccessible seats because accessible seats always fall within the same price level as their neighboring (and thus comparable) accessible seats. Dkt. No. 59 at 76:18–23. Defendants have also shown that wheelchair users have access to the same sales categories of tickets as the general public, *i.e.*, season tickets, group tickets, and individual tickets. Further, the testimony and evidence made clear that wheelchair users have access to a range of ticket price levels, from inexpensive to expensive, including availability for as low at $17 and as high as $75, *see* Defs.' Ex. 21, or even as high as $500 or $600 for Diamond Club seats with the special amenities provided therein, *see* Defs.' Ex. 19 at 2. This range is a result of the fact that there is sufficient vertical and horizontal distribution in the Park to create price differentials among accessible seats comparable to the nonaccessible seats in the sections available to them.

Pursuant to the foregoing, the Court finds that the Defendants' pricing scheme does not violate the ADA.

46

### D. Whether Wheelchair Users have Sufficient Sightlines to the Main Scoreboard Located in Centerfield

*1. Plaintiffs' Claim*

T-Mobile Park has a main Scoreboard that dwarfs the Park's other scoreboards and that allegedly cost between $10 to $15 million dollars to construct. Dkt. No. 75 at 7. Plaintiffs claim, "[t]he view of the [S]coreboard is either completely or mostly obstructed when seated in the 100 Level accessible seats." Dkt. No. 1 at ¶ 4.23; *see also* Dkt. No. 75 at 6–7 (claiming that the accessible seats on the 200 Level also have obstructed views). Plaintiffs claim that this difference in visibility is the result of the overhang of the structures above the accessible seats (in the 100 Level, the 200 Level hangs over parts of the stands in the 100 Level and in the 200 Level, the 300 Level hangs over parts of the stands in the 200 Level). Dkt. No. 75 at 6–7. Based on this obstruction of the Scoreboard and that "[w]heelchair users are entitled to enjoy as much of [the] experience [provided by the Scoreboard] as can be provided," Plaintiffs claim that the Park violates the ADA. Dkt. No. 75 at 27.

In their complaint, Plaintiffs framed this claim as a "lack of effective communications" that violates Title II and Title III of the ADA, which mandate (in the case of Title III, for example) that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1); Dkt. No. 1 at ¶ 4.23–4.24; *see also* Dkt. No. 75 at 27.

But, most of Plaintiffs' language regarding their claim relates to the standard found in Section 4.33.3 of the 1991 ADAAG. Plaintiffs' claim is, in essence, that sightlines to the Scoreboard from accessible seats are not comparable to those from nonaccessible seats. *See, e.g.*, Dkt. No. 75 at 6; *see also* Dkt. No. 60 at 41:22–42:7 (Plaintiffs' expert witness, Mr. Terry,

testifying that he relied on Section 4.33.3 for the "view-to-scoreboard requirement").

Plaintiffs rely on several of Mr. Terry's illustrations to demonstrate the obstruction of the Scoreboard. Dkt. No. 75 at 27 (relying on Pls.' Exs. 16–21); *see also* Dkt. No. 60 at 52:17–55:21. These exhibits depict the difference in views from accessible seats and nearby comparable nonaccessible seats. For example, Plaintiffs' Exhibit 17 compares Seat 1, Row 41A, Section 135 (accessible) with Seat 1, Row 40, Section 135 (nonaccessible). Pls.' Ex. 17. According to Mr. Terry's illustration, from the viewpoint of the accessible seat in the 100 Level, the Scoreboard is partially blocked by the overhang of the 200 Level, whereas the Scoreboard is completely viewable from the nonaccessible seat. *Id.* Plaintiffs' Exhibits 16 to 21 purport to show the same from various other locations throughout the 100 and 200 Levels. *See* Pls.' Exs. 16–21. In short, Mr. Terry testified that obstruction of the Scoreboard was greater from accessible seats. *See* Dkt. No. 59 at 217:4–219:23; Dkt. No. 60 at 45:9–11.[15]

Based on the inability of wheelchair users to fully see the Scoreboard, Plaintiffs ask the Court to order the Defendants to "correct sightlines to the scoreboard" by "install[ing] more or larger video monitors" that will mirror the main Scoreboard but will be visible from all accessible seating in the 100 and 200 Levels. Dkt. No. 75 at 34; Dkt. No. 76 at 9.

*2. Defendants' Counter*

Defendants counter that Plaintiffs have failed to show a lack of effective communications

---

[15] Plaintiffs also rely on the testimony of Plaintiff Landis to establish the obstruction of views of the Scoreboard from accessible seats. *See* Dkt. No. 75 at 7. During trial, Mr. Landis testified that from the 100 Level he had to "kind of duck down to try to see above or below or however around the edge of the second level coming down" and that doing so was frustrating. Dkt. No. 60 at 132:13–19.

48

for two reasons: (1) that Plaintiffs cannot identify a regulatory requirement that mandates what they seek and (2) that Plaintiffs have failed to establish a factual lack of communications. *See* Dkt. No. 73 at 31–33; Dkt. No. 74 at 10.

First, Defendants claim that neither 28 C.F.R. § 36.303 nor Section 4.33.3 require "a line of sight from ADA seats to a particular scoreboard." Dkt. No. 75 at 10. Defendants contend that 28 C.F.R. § 36.303 applies only to individuals with communications difficulties and Section 4.33.3 only applies to sightlines to the playing field. *Id.*

In support of their contention that their communications are sufficient, Defendants primarily rely on the testimonies of Mr. Gooby and Mr. Terry. *See* Dkt. No. 73 at 13–15, 32–33, Dkt. No. 74 at 10. Mr. Gooby, for example, testified to the numerous modes of communication that exist throughout the Park in addition to the main Scoreboard, including video monitors, ribbon boards, the out-of-town board, a PA system, assisted-listening devices, close captioning, and a ballpark app available for free on patrons' phones. Dkt. No. 59 at 158:4–163:11. When asked about the similarities and differences between the information displayed on the main Scoreboard and the ancillary scoreboards and monitors, Mr. Gooby testified that while the information is in a different format, it is similar. Dkt. No. 59 at 165:10–166:2. Specifically, he stated that "[t]he [main S]coreboard has a static photo of the player, but statistics and things like that are located on multiple boards throughout the ballpark." *Id.* at 165:19–21.

Defendants also rely on the testimony of Mr. Terry, who during Day 2 of the trial, admitted that "[t]here are lots of places where information is provided" at T-Mobile Park and that "there is information displayed in many, many places around the stadium." Dkt. No. 73 at 15 (quoting Dkt. No. 60 at 46:8–11 and 49:6–11).

49

*3. The Court's Conclusion*

Both parties agree that the relevant regulations regarding communications are 28 C.F.R. § 36.303 and Section 4.33.3 of the 1991 ADAAG, in so far as T-Mobile Park is required to comply with each. They disagree, however, as to which is applicable to Plaintiffs' claims regarding a lack of communication in the Park.

The Court finds that 28 C.F.R. § 36.303 does not apply to Plaintiffs, nor does it provide for the relief they seek. 28 C.F.R. § 36.303 provides that:

> A public accommodation shall take those steps that may be necessary to ensure that *no individual with a disability* is excluded, denied services, segregated or otherwise treated differently than other individuals *because of the absence of auxiliary aids and services*, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, *i.e.*, significant difficulty or expense.

28 C.F.R. § 36.303(a) (emphasis added).

The TAM makes explicit that this provision "extends only to individuals with disabilities who have physical or mental impairments, such as vision, hearing, or speech impairments, that substantially limit the ability to communicate." *1993 TAM* at Section III-4.3100. Thus, the provision extends only to those with communications disabilities. *See Lockhart v. Coreas*, No. 10-644, 2011 WL 2516569, at *9 (E.D.N.Y. June 21, 2011) ("Plaintiff has not alleged a hearing or sight impairment and does not have standing to assert a claim of discrimination against those with disabilities other than his own."). Further, the remedy provided in 28 C.F.R. § 36.303 for those with qualifying disabilities is the provision of an "auxiliary aid or service." Here, Plaintiffs have not alleged that the other auxiliary forms of communications provided at the Park are not sufficient; merely that they are not exactly the same. *See Betancourt v. Ingram Park Mall, L.P.*,

50

735 F. Supp. 2d 587, 606–07 (W.D. Tex. 2010) ("Plaintiff has not alleged any auxiliary aid or service that she required but was not provided.").

As for Section 4.33.3 of the 1991 ADAAG, Defendants are correct that it does not appear to apply to scoreboards, as compared to the playing field. The *Accessible Stadiums* guideline, for example, explicitly says "[a] comparable line of sight . . . allows a person using a wheelchair to see *the playing surface* . . .." *Accessible Stadiums* at 2.

Even were the Court to find that Section 4.33.3 applied to the Scoreboard, Section 4.33.3 requires only a *comparable* sightline. *1991 ADAAG* at § 4.33.3. Plaintiffs have not demonstrated a lack of comparable experience. First, as Mr. Gooby testified, and Mr. Terry affirmed, there are numerous modes of Communication throughout the Park. Similar information to that of the main Scoreboard is provided on auxiliary scoreboards and monitors though perhaps in smaller versions. Section 4.33.3's use of the comparability standard does not require an identical view, nor does it mandate an uninhibited view to a specific mode of communication.

The comparability standard also means that the information received by accessible seats needs to be compared to the same in nonaccessible seats. As some of Mr. Terry's illustrations showed, many nonaccessible seats also do not have an uninhibited view to the main Scoreboard. *See* Pls.' Exs. 19 and 20. Further, there are entire sections of seating located immediately in front of the main Scoreboard. *See* Pls.' Ex. 14. These include Sections 102–105 and 190–195. Presumably everyone in these Sections cannot see the Scoreboard while watching the game. As such, Plaintiffs have not shown that the view they demand is required.

Pursuant to the foregoing conclusions, the Court finds that Plaintiffs have failed to show a lack of communications that would violate the ADA.

# IV. CONCLUSION

The Court is mindful that this decision leaves Plaintiffs, and those in circumstances similar to Plaintiffs, with significantly limited seating choices and that the lion's share of seats available to them at the Park are in less than ideal locations. The Court regrets this. Unfortunately, the limitations imposed by a stadium designed with tiered seating connected by stairs leads to this outcome and the dictates of the ADA do not require otherwise. Thus, the Court's decision is compelled by the stadium's design, existing ADA regulations and guidelines, and case law.

For the foregoing reasons, the Court rules as follows:

1. Defendants have met their obligations under the applicable provisions of the ADA to provide sufficient sightlines;

2. Defendants have met their obligations under the applicable provisions of the ADA to provide sufficient distribution of ADA-accessible seating;

3. Defendants have met their obligations under the applicable provisions of the ADA to provide comparable ticket pricing for ADA-accessible seating; and

4. Plaintiffs have not met their burden in showing that Defendants have not met their obligations under the applicable provisions of the ADA to effective communications with spectators with disabilities.

DATED this 3rd day of December, 2019.

Barbara J. Rothstein
BARBARA J. ROTHSTEIN
UNITED STATES DISTRICT JUDGE

**APPENDIX A**

Map of T-Mobile Park



*This image was admitted into evidence as Plaintiffs' Exhibit 191.

**APPENDIX B**

Table of Various Seating Numbers at T-Mobile Park

| Number | Value |
|---|---|
| Total seats in 100 level, including outfield (not including bleachers) | 20,630 |
| Total seats in front row of Diamond Club | 48 |
| Total seats on 100 level between foul poles | 18,573 |
| Total seats on the 100 level in the outfield area | 2,057 |
| Total seats in Diamond Club | 405 |
| Total seats in the front row of the 100 level | 443 |
| Total seats in the 200 level (Terrace Club level) | 4,585 |
| Total seats in front row on 100 level between the foul poles | 308 |
| Total wheelchair accessible seats on the 100 level located in the last row | 345 total wheelchair and companion, 172 wheelchair accessible |
| Total wheelchair accessible seats on the 100 level located closer than the last row (all in the front row) | 8 |
| Total wheelchair accessible seats in T-Mobile Park | 685 total wheelchair and companion, 342 wheelchair accessible |
| Total mid-section wheelchair accessible seats in T-Mobile Park | 189 total wheelchair and companion, 94 wheelchair accessible |
| Total wheelchair accessible seats in the rear row of their respective sections at T-Mobile Park | 475 total wheelchair and companion, 237 wheelchair accessible |

*The preceding chart represents the number of accessible and nonaccessible seats located in the referenced area. The chart was originally provided as Exhibit A to Plaintiffs' trial brief. Dkt. No. 76-1. The numbers have stipulated to by the parties. *Id.* at 1.

54