**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CLARK LANDIS; ROBERT BARKER; GRADY THOMPSON; KAYLA BROWN, *Plaintiffs-Appellants*, <br><br> v. <br><br> WASHINGTON STATE MAJOR LEAGUE BASEBALL STADIUM PUBLIC FACILITIES DISTRICT; BASEBALL OF SEATTLE, INC., a Washington corporation; MARINERS BASEBALL, LLC, a Washington limited liability company; THE BASEBALL CLUB OF SEATTLE, LLLP, a Washington limited liability limited partnership, *Defendants-Appellees.* | No. 19-36075 <br><br> D.C. No. 2:18-cv-01512-BJR <br><br><br> OPINION |

Appeal from the United States District Court
for the Western District of Washington
Barbara Jacobs Rothstein, District Judge, Presiding

Argued and Submitted December 10, 2020
Seattle, Washington

Filed September 1, 2021

Before:  M. Margaret McKeown, Danielle J. Forrest[*], and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Forrest;
Concurrence by Judge Bumatay

**SUMMARY**[**]

**Americans with Disabilities Act**

The panel vacated the district court's judgment, after a bench trial, in favor of defendants and remanded for further proceedings in an action under the Americans with Disabilities Act.

Plaintiffs alleged that spectators using wheelchairs at T-Mobile Park in Seattle had inadequate sightlines under the ADA, as implemented by the Department of Justice's 1996 *Accessible Stadiums* document.

The panel assumed without deciding that the district court did not err in applying the *Accessible Stadiums* guidance interpreting § 4.33.3 of the 1991 Accessibility Guidelines adopted by the DOJ.  The panel held, however, that the district court did not properly apply this standard because it analyzed only the requirement that a person using a wheelchair must be able to see the playing surface between the heads and over the shoulders of the persons standing in

---

[*] Formerly known as Danielle J. Hunsaker.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the row immediately in front.  The panel held that the district court erred by failing to analyze the additional requirement that a person using a wheelchair must be able to see the playing surface over the heads of the persons standing two rows in front.

The panel addressed additional issues in a concurrently filed memorandum disposition.

Concurring, Judge Bumatay wrote that the case should be remanded for different reasons.  Judge Bumatay wrote that the district court erred in summarily applying *Auer* deference to the *Accessible Stadiums* document as a binding interpretation of a disability regulation when *Accessible Stadiums* is a guidance issued by a section within the DOJ's Civil Rights Division that, by its own terms, "has no legally binding effect," and does "not establish legally enforceable responsibilities."  On remand, Judge Bumatay would ask the district court to perform the requisite analysis under *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), before deferring to the *Accessible Stadiums* guidance.

## COUNSEL

Conrad Reynoldson (argued) and Michael Terasaki, Washington Civil & Disability Advocate, Seattle, Washington; Christopher H. Knauf, Alexandra M. Robertson, and Anthony Pinggera, Disability Rights Legal Center, Los Angeles, California; for Plaintiffs-Appellants.

Stephen C. Willey (argued) and Sarah Gohmann Bigelow, Savitt Bruce & Willey LLP, Seattle, Washington, for Defendants-Appellees.

Stephen A. Hylas (argued) and John D. Maher, Munger
Tolles & Olson LLP, San Francisco, California, for Amicus
Curiae Disability Rights Organizations.

## OPINION

FORREST, Circuit Judge:

The question presented is whether spectators using
wheelchairs at T-Mobile Park in Seattle, Washington (the
Stadium) have adequate sightlines under the Americans with
Disabilities Act (ADA) as implemented by the Department
of Justice's (DOJ) 1996 *Accessible Stadiums* guidance
document.[1] Following a bench trial, the district court
concluded that the Stadium's sightlines are adequate, but it
failed to explain how the Stadium satisfies all the *Accessible
Stadiums* requirements. Therefore, we vacate and remand.

## BACKGROUND

### A. Wheelchair Accessibility Requirements for Sports Stadiums

Congress enacted the ADA to address discrimination
suffered by individuals with disabilities. The ADA prohibits
anything less than the full and equal enjoyment of places of
public accommodation by individuals with disabilities.
42 U.S.C. § 12182(a). Accordingly, sports stadiums—which
are places of public accommodation—must be "readily
accessible to and usable by individuals with disabilities." *Id.*

---

[1] Plaintiffs-Appellants also appeal the district court's rejection of
their claims that the Stadium has accessibility barriers related to ticket
pricing, dispersal of seats, and views of a particular scoreboard. We
address these issues in a concurrently filed memorandum disposition.

§ 12183(a)(1). The DOJ is responsible for implementing the ADA by promulgating regulations. *Id.* § 12134(a). The DOJ's regulations must comply with the minimum standards set by the Architectural and Transportation Barriers Compliance Board, *see id.* §§ 12186(c), 12134(c), commonly known as the "Access Board." *Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1024 (9th Cir. 2008).

The Access Board is an independent federal agency charged with "develop[ing] advisory information for, and provid[ing] appropriate technical assistance to, individuals or entities with rights or duties" under Titles II and III of the ADA and establishing "minimum guidelines and requirements for the standards issued" by Titles II and III of the ADA. 29 U.S.C. § 792(b)(2), (3)(B). The Access Board published its first "ADA Accessibility Guidelines" in 1991 (1991 Accessibility Guidelines). *Miller*, 536 F.3d at 1025. In relevant part, section 4.33.3 of the 1991 Accessibility Guidelines requires that "[w]heelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and lines of sight comparable to those for members of the general public." 28 C.F.R. Part 36, App. A § 4.33.3 (1991) (emphasis omitted).

The DOJ adopted the 1991 Accessibility Guidelines the same day they were published. *Miller*, 536 F.3d at 1026. The DOJ published technical assistance guidance in 1993 and 1994, *id.*, and in 1996, it published the guidance document at issue in this case. *See* Dep't of Just., *Accessible Stadiums* (1996), https://www.ada.gov/stadium.pdf (*Accessible Stadiums*). *Accessible Stadiums* "highlights key accessibility requirements of the ADA that apply to new stadiums," including sightline requirements for wheelchair seating. *Id.* at 1. Regarding sightlines, *Accessible Stadiums* interprets

section 4.33.3 of the 1991 Accessibility Guidelines as requiring that:

> Wheelchair seating locations must provide lines of sight comparable to those provided to other spectators. In stadiums where spectators can be expected to stand during the show or event (for example, football, baseball, basketball games, or rock concerts), all or substantially all of the wheelchair seating locations must provide a line of sight over standing spectators. A comparable line of sight, as illustrated in the figure below, allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front.

*Id.* at 2 (emphasis omitted). The *Accessible Stadiums* comparable-sightline figure is included below.



*Figure Showing Comparable Line of Sight for Wheelchair Seating Location*

## B. Plaintiffs' Claims

Plaintiff-Appellants Clark Landis, Robert Barker, Grady Thompson, and Kayla Brown (collectively, Plaintiffs) are baseball fans with qualifying disabilities under Title II and Title III of the ADA who use wheelchairs for mobility. Defendants-Appellees are four entities that own and operate the Stadium, home to the Seattle Mariners: (1) Washington State Major League Baseball Stadium Public Facilities District; (2) Baseball of Seattle, Inc. (3) Mariners Baseball, LLC; and (4) The Baseball Club of Seattle, LLLP (collectively, Owners and Operators). The Stadium was designed in 1996 and built between 1997 and 1999. It has four vertically stacked seating levels sloped toward the field. There is wheelchair accessible seating on each level.

Plaintiffs sued the Owners and Operators, alleging the Stadium fails to comply with multiple requirements of the ADA, 42 U.S.C. §§ 12131–12134 and 12181–12189, and the Washington Law Against Discrimination, Wash. Rev. Code § 49.60.010 *et seq.* Plaintiffs opted for a bench trial, and by the time trial began, only four issues remained, including whether spectators using wheelchairs have adequate sightlines over standing spectators.

The Owners and Operators relied on their expert William Endelman in asserting that the Stadium's sightlines were adequate. Endelman utilized the *Accessible Stadiums* guidance in reaching his opinion. Specifically, he compared two sections of the Stadium with the *Accessible Stadiums* figure provided above. Based on this comparison, Endelman concluded that spectators using wheelchairs are "able to see over the shoulders and between the heads of people in the row immediately in front, and over the heads of people in the second row in front of the accessible seating."

Plaintiffs' expert James Terry disagreed. Terry evaluated the sightlines of spectators in wheelchairs by estimating the shoulder height of a spectator standing one row forward of the wheelchair-accessible seating and the full height of a spectator standing two rows forward of wheelchair-accessible seating. Using this same process, Terry also estimated sightlines of spectators *not* using wheelchairs in comparable locations. Terry determined that the sightlines of spectators using wheelchairs were nearly always more obstructed than the sightlines of spectators not using wheelchairs. Specifically, Terry concluded that the heads of standing spectators two rows forward caused the most obstruction. In seating section 135, for example, when viewing the side of the field, spectators using wheelchairs could see 8% of the field while spectators not using wheelchairs could see 41% of the field; when viewing the infield, spectators using wheelchairs could see 31% of the field while spectators not using wheelchairs could see 100% of the field; when viewing the outfield, spectators using wheelchairs could see 66% of the field while spectators not using wheelchairs could see 86% of the field; and when viewing the field generally, spectators using wheelchairs could see 36% of the field while spectators not using wheelchairs could see 71% of the field.

After considering the testimony and evidence presented by the parties' competing experts, the district court rejected Plaintiffs' sightline claim and held that the Stadium complies with the ADA. Regarding the *Accessible Stadiums* standard, the district court concluded:

> [W]hen the Court reviews the illustrations considering what can be seen over the line representing the standing spectator's shoulders, *i.e.*, "over the shoulders and

> between the heads," more of the field is visible from the accessible seat, making the views comparable. For example, when considering the shoulder line in Mr. Terry's illustrations, several of the locations have 100% visibility of the field. For the others, the percentage of field viewable is close to 100%. Thus, the [c]ourt concludes that when taking into account what percentage of the field that can be seen utilizing the standard set by the *Accessible Stadiums* guideline, the sightlines are comparable.

Plaintiffs timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## STANDARD OF REVIEW

We review the district court's findings of fact for clear error. *OneBeacon Ins. Co. v. Haas Indus., Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011). This is deferential review; we reverse only if we are left with a "definite and firm conviction that a mistake has been committed." *United States v. Gainza*, 982 F.3d 762, 765 (9th Cir. 2020) (citation omitted). The district court's legal conclusions are reviewed de novo, *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004), as are mixed questions of fact and law, *OneBeacon Ins. Co.*, 634 F.3d at 1096.

## DISCUSSION

The first question we must answer is whether the *Accessible Stadiums* guidance interpreting section 4.33.3 of the 1991 Accessibility Guidelines governs this case. This question is easily resolved given how the parties litigated this case.

Case 2:18-cv-01512-BJR   Document 89   Filed 09/01/21   Page 10 of 27

10 LANDIS V. WASH. STATE MLB STADIUM PUB. FACILITIES DIST.

As a general rule, courts defer to an agency's interpretation of its own "genuinely ambiguous" regulation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–15 (2019); *see also Miller*, 536 F.3d at 1028. As with many rules, however, there are exceptions. *Kisor*, 139 S. Ct. at 2414 ("[W]e have noted various circumstances in which [*Auer*] deference is 'unwarranted.'"). We do not defer to the agency's interpretation unless it is "reasonable"—that is, the interpretation "must come within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415–16; *see also Miller*, 536 F.3d at 1028. Additionally, the agency's interpretation must be "made by the agency" and "must in some way implicate its substantive expertise." *Kisor*, 139 S. Ct. at 2416–17. Finally, the "agency's reading of a rule must reflect fair and considered judgment" to warrant deference. *Id.* at 2417 (internal quotation marks and citation omitted).

Here, the parties apparently agree that section 4.33.3 is genuinely ambiguous and that *Accessible Stadiums* is a reasonable interpretation of that guideline reflecting the DOJ's authoritative, expert, and fair and considered judgment. *See Kisor*, 139 S. Ct. at 2415–17. No party contested here or below the applicability of *Accessible Stadiums* or the district court's deference to it. *Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*, 403 F. Supp. 3d 907, 916 n.12 (W.D. Wash. 2019) ("Both parties agree that the *Accessible Stadiums* guidance applies to T-Mobile Field."). We see no reason to disturb the parties' presentation of the issues and sua sponte question the validity of *Accessible Stadiums*. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[A]s a general rule, our system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and

argument entitling them to relief." (cleaned up)). Thus, we assume without deciding that the district court did not err in applying the *Accessible Stadiums* standard to this case. We find this approach particularly appropriate where the regulation that *Accessible Stadiums* interprets was supplanted by the 2010 Accessibility Guidelines[2] for new construction and alterations, thus cabining *Accessible Stadiums'* applicability. *See* 28 C.F.R. § 36.406(a)(1); 28 C.F.R. Pt. 36, App. B (noting the DOJ issued *Accessible Stadiums* to provide official guidance on the comparable-sightlines requirement in the 1991 Accessibility Guidelines). We expressly acknowledge the possibility, however, that the validity of *Accessible Stadiums* may properly be raised in the future, and our decision today does not foreclose any such challenge.

Having concluded that the district court did not err in applying the *Accessible Stadiums* comparable-sightline standard to this case, the second question we must answer is whether the district court properly applied this standard. *Accessible Stadiums* directs that a person using a wheelchair has comparable sightlines over standing spectators only when two requirements are met. *Accessible Stadiums* at 2. First, a person using a wheelchair must be able to "see the playing surface between the heads and over the shoulders of

---

[2] The 2010 Accessibility Guidelines require that if standing spectators are afforded sightlines "over the heads of spectators standing in the first row in front of their seats," then spectators in wheelchair spaces must be afforded that same sightline. And if standing spectators are afforded sightlines "over the shoulders and between the heads of spectators standing in the first row in front of their seats," then spectators in wheelchair spaces must be afforded the same. Dep't of Just., *2010 ADA Standards for Accessible Design* (2010), https://www.ada.gov/regs2010/2010ADAStandards/2010ADAStandards.pdf; *see also* 28 C.F.R. § 35.104.

the persons standing in the row immediately in front." *Id.* Second, a person using a wheelchair must be able to see the playing surface "over the heads of the persons standing two rows in front." *Id.*

On appeal, Plaintiffs argue that the district court erred by analyzing only the first requirement. We agree. Although the district court recited both requirements, it failed to explain how the evidence satisfied the second requirement. Noting that Endelman testified that "the accessible seats that exist roughly comport with the diagram provided by the *Accessible Stadiums* guideline, the district court reasoned that Terry's diagrams also supported this conclusion. Specifically, the district court dismissed Terry's conclusion that the second requirement was not satisfied because spectators using wheelchairs did not have a comparable view *over* the heads of standing spectators, because "when [it] reviews [Terry's] illustrations considering what can be seen over the line representing the standing spectator's shoulders, *i.e.*, 'over the shoulders and between the heads,' more of the field is visible from the accessible seat, making the views comparable." The district court did not discuss whether spectators using wheelchairs could see *over the heads of the spectators standing two rows in front of them*. It seems the district court may have erroneously concluded that Terry's diagrams addressed only the spectator one row in front of the wheelchair accessible seating. However, Terry's exhibits and his testimony explaining the exhibits make clear that one line represents the head of a spectator *two rows* in front and the other line represents the shoulders of a spectator *one row* in front.

Because we are not satisfied that the district court analyzed the second *Accessible Stadiums* requirement, we vacate its decision concluding that the Stadium satisfies the

ADA by providing comparable sightlines to spectators using wheelchairs, and we remand for further proceedings so that a complete analysis of the *Accessible Stadiums* requirements can be performed. We express no opinion at this point as to the ultimate issue—whether the Stadium's sightlines for spectators using wheelchairs are sufficient to satisfy the ADA. To properly consider that question, a full analysis of the *Accessible Stadiums* requirements is needed.

## CONCLUSION

For the forgoing reasons, the district court's decision on Plaintiffs' comparable-sightlines claim is **VACATED AND REMANDED** for further proceedings consistent with this opinion.

---

BUMATAY, Circuit Judge, concurring:

I agree with my colleagues that we should return this case to the district court. But I believe we should do so for different reasons. In short, the district court erred in summarily deferring to a document called *Accessible Stadiums* as a binding interpretation of a disability regulation. But far from being authoritative, *Accessible Stadiums* is guidance issued by a section within the Department of Justice's Civil Rights Division that, by its own terms, "has no legally binding effect" and does "not establish legally enforceable responsibilities."[1] This fact and others would have surfaced had the district court performed the requisite analysis under *Kisor v. Wilkie*, 139

---

[1] Available at https://www.ada.gov/stadium.pdf [https://perma.cc/Q4BZ-7H95].

S. Ct. 2400 (2019).  No such analysis occurred, however.  On remand, I would thus ask the district court to follow the steps laid out in *Kisor* before deferring to this guidance on the scope of a disability regulation.

## I.

Understanding the doctrinal background is key to understanding today's discussion.  Since the Supreme Court's decision in *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945), federal courts have extended controlling weight to an agency's interpretation of its own ambiguous regulation unless that interpretation is "plainly erroneous or inconsistent with the regulation," *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (simplified).  This doctrine is often called *Auer* deference or *Seminole Rock* deference.  While a topic for another day, not everyone is a fan of *Auer* deference.  In fact, four sitting justices have called for *Auer* to be overruled.  *See Kisor*, 139 S. Ct. at 2425 (Gorsuch, J., concurring, joined by Thomas, J.); *see id.* at 2448 (Kavanaugh, J., concurring, joined by Alito, J.).

Before *Kisor*, our court had adopted the "plainly erroneous or inconsistent" formulation of *Auer* deference.  Under that regime, an agency's interpretation of an ambiguous regulation controls "so long as the interpretation sensibly conforms to the purpose and wording of the regulations." *Miller v. California Speedway Corp.*, 536 F.3d 1020, 1028 (9th Cir. 2008) (simplified).

In *Kisor*, however, the Court cast doubt on our implementation of *Auer* deference.  The Court "restate[d]" its approach and charged lower courts with following a more rigorous analysis before deferring to an agency interpretation.  *Kisor*, 139 S. Ct. at 2414.  It explained that lower courts may have misinterpreted its "mixed messages"

and thus improperly deferred to agency interpretations without "significant analysis of the underlying regulation." *Id.* Significantly, in the Court's view, our court's formulation in *Miller*—the "plainly erroneous or inconsistent" standard—has led to a "caricature of the doctrine," resulting in "reflexive" deference. *Id.* at 2415 (simplified). *Auer* deference, the Court said, isn't meant to be used that way. The doctrine doesn't apply "in all cases" and only provides a "general rule" of interpretation. *Id.* at 2414 (simplified).

While the limits of *Auer* aren't confined to a "rigid test," *id.*, *Kisor* provided several steps to consider before deferring.

*First*, the regulation must be "genuinely ambiguous." *Id.* at 2415. Deference is unnecessary if the meaning of the regulation is plain after exhausting the "traditional tools" of interpretation. *Id.* In making this determination, lower courts should consider the "text, structure, history, and purpose of a regulation[.]" *Id.*

*Second*, the agency's interpretation must be "reasonable." *Id.* Deference is not appropriate unless the interpretation "come[s] within the zone of ambiguity the court has identified after employing all its interpretive tools." *Id.* at 2415–16. Once again, "text, structure, history, and so forth" are the central considerations. *Id.* at 2416. These data points establish the "outer bounds of permissible interpretation." *Id.* "[L]et there be no mistake:" agencies "can fail" the reasonableness requirement. *Id.*

*Third*, the interpretation must be the agency's authoritative position. *Id.* Intuitively, this makes sense—the interpretation "must be one actually made by the agency." *Id.* Thus, we cannot defer to an "ad hoc statement

not reflecting the agency's views." *Id.* At the very least, the interpretation "must . . . emanate from those [agency] actors, using those vehicles, understood to make authoritative policy in the relevant context." *Id.* For example, we don't defer to interpretations from a mid-level official's speech, from informal memoranda recounting employee conversations, or from an agency that disclaimed the use of regulatory guides as authoritative. *Id.* at 2416–17 (collecting cases).

*Fourth*, the interpretation must implicate the agency's substantive expertise. *Id.* at 2417. Again, this is intuitive. Courts should only defer to an agency's interpretation that implicates its policy expertise. There's no need for deference when the interpretive question falls "more naturally into a judge's bailiwick" or when the agency has no "comparative expertise in resolving a regulatory ambiguity." *Id.*

*Finally*, *Kisor* offers a catchall: the interpretation must be a "fair and considered judgment" of the agency. *Id.* at 2417 (simplified). For example, no deference is due to mere convenient litigating positions, post hoc rationalizations, interpretations leading to unfair surprise, or readings in conflict with prior ones. *Id.* at 2417–18.

## II.

Turning to the law at issue: Section 4.33.3 of the 1991 Americans with Disabilities Act ("ADA") Accessibility Guidelines governs the placement of accessible seating at places of public accommodation, such as T-Mobile Park, home of the Seattle Mariners. In adjudicating this dispute, the district court deferred to *Accessible Stadiums* as the binding interpretation of § 4.33.3. The district court explained, "*Accessible Stadiums* is the DOJ's most

contemporaneous interpretation of Section 4.33.3" and that the agency's reading was "neither plainly erroneous nor inconsistent with the regulation."

That, however, was the sum total of the *Auer* analysis in this case.  After the district court held *Accessible Stadiums* binding, it found that T-Mobile Park complied with the guidance's sightlines requirement.  The district court *might* be right here.  T-Mobile Park might ultimately meet the ADA's accessibility requirements.  But the district court needed to follow the *Kisor* steps before reaching that conclusion.  As shown below, doing so would reveal some hard questions about reflexively deferring to *Accessible Stadiums*' interpretation of the law.  I would vacate the district court's judgment and remand for the court to reconsider deferring to *Accessible Stadiums* under *Kisor*.

## A.

First, we must determine whether the regulation at issue is "genuinely ambiguous."  *Kisor*, 139 S. Ct. at 2414. Section 4.33.3 was promulgated by the Department of Justice as a part of its 1991 ADA Accessibility Guidelines ("ADAAG").  It provides, in relevant part:

> **Placement of Wheelchair Locations.**
> Wheelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and

> lines of sight comparable to those for
> members of the general public.

28 C.F.R. Part 36, App. A, 4.33.3.[2]

*Accessible Stadiums* is a 1996 DOJ "informal guidance" document that purports to interpret disability law as related to new stadiums. *Accessible Stadiums* at 1, 5. While it doesn't expressly reference § 4.33.3, the document explains that a "comparable line of sight . . . allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front." *Id.* at 2. It then provides a graphic representation of its interpretation. *Id.* Accordingly, if binding, § 4.33.3 conditions ADA compliance on providing lines of sight over standing spectators—the factual dispute between the parties here.

Perhaps § 4.33.3's "choice of . . . lines of sight comparable" language is so ambiguous that looking to *Accessible Stadiums* is appropriate, but I'm not so sure. Courts are divided on this question. The regulation might mean, as then-Judge Alito explained, that stadiums must adhere to a dispersal requirement: patrons with wheelchairs must have a choice of viewing angles to the field of play. *See Caruso v. Blockbuster-Sony Music Ent. Ctr. at Waterfront*, 193 F.3d 730, 732 (3d Cir. 1999). On the other hand, it might require that accessible seating provide lines of sight over standing spectators. *See Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 585 (D.C. Cir. 1997),

---

[2]   Available at https://www.ada.gov/1991standards/adastd94-archive.pdf (as revised on July 1, 1994) [https://perma.cc/7VMF-BKFA].

*abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015).

Either way, the district court should have used all the interpretive tools available to determine whether an ambiguity exists in the first instance.

**B.**

Assuming the ambiguity of the text, next we consider if the agency's interpretation of the regulation was "reasonable." *Kisor*, 139 S. Ct. at 2415. In doing so, we look to the text, structure, and regulatory history. *Id.* Here, the regulatory history for § 4.33.3 strongly suggests that the law doesn't include any sightline-over-standing-patrons requirement and thus DOJ's contrary interpretation may not be reasonable.

At its inception, § 4.33.3 was not thought to address sightlines over standing spectators. It was first proposed by the Architectural and Transportation Barriers Compliance Board ("Access Board"), a federal agency composed of 13 Presidentially appointed members and the heads of 12 federal agencies, including DOJ. *See* 29 U.S.C. § 792(a). The Access Board is tasked with establishing and maintaining "minimum guidelines and requirements" for standards under the ADA. *Id.* § 792(b)(3)(B).

The Access Board's first proposed language for § 4.33.3 said: "[w]heelchair areas shall be an integral part of any fixed seating plan and shall be dispersed throughout the seating area. They shall . . . be located to provide lines of sight comparable to those for all viewing areas." ADAAG, 56 Fed. Reg. 2296, 2380 (Jan. 22, 1991). With this proposed rule, the Access Board sought comments on the issue of sightlines over standing spectators:

> Section 4.33.3 provides that seating locations for people who use wheelchairs shall be dispersed throughout the seating area and shall be located to provide lines of sight comparable to those for all viewing areas. This requirement appears to be adequate for theaters and concert halls, but may not suffice in sports arenas or race tracks where the audience frequently stands throughout a large portion of the game or event. . . . *The Board seeks comments on whether full lines of sight over standing spectators in sports arenas and other similar assembly areas should be required.*

*Id.* at 2314 (emphasis added).  By requesting comments on whether "lines of sight over standing spectators" should be required, the Access Board's interpretation of its own proposed regulation didn't include that mandate.

One month later, DOJ announced that it would adopt the guidelines proposed by the Access Board, along with "any amendments" made by the Access Board during the rulemaking process.  Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 7452, 7478 (Feb. 22, 1991).  To that end, DOJ asked that any comments on the proposed guidelines be directed to the Access Board.  *Id.*

The Access Board published its final proposed guidelines that summer.  *See* ADAAG, 56 Fed. Reg. 35408 (July 26, 1991).  It made clear that § 4.33.3 is a dispersal requirement, not a substantive sightline-over-standing-spectators rule.  The Board explained that "[i]ndividuals with disabilities and their organizations supported the

requirements in 4.33.3 for wheelchair seating spaces to be *dispersed* throughout the seating area." *Id.* at 35440 (emphasis added). In adopting the measure, the Board observed:

> The requirements in 4.33.3 for *dispersal* of wheelchair seating spaces have been modified. Wheelchair seating spaces must be an integral part of any fixed seating plan and be situated so as to provide wheelchair users a choice of admission prices and lines of sight comparable to those available to the rest of the public. A provision has been added for at least one companion fixed seat to be provided next to each wheelchair seating space.

*Id.* (emphasis added).

The Access Board expressly reserved for another day the issue of sightlines over standing spectators. It said:

> The [earlier proposed rulemaking notice] asked questions regarding row spacing and lines of sight over standing spectators in sports arenas and other similar assembly areas. Many of the persons who responded to the question stated that they have difficulty accessing mid-row seats in an assembly area. Many commenters also recommended that lines of sight should be provided over standing spectators.
>
> . . .

> The issue of lines of sight over standing spectators will be addressed in guidelines for recreational facilities.

*Id.* In other words, the Board was under the impression that § 4.33.3 created a dispersal requirement that did not reach the issue of sightlines over standing spectators. DOJ concurrently adopted the Board's proposed guidelines in full. It explained that all comments on the proposed rules had been addressed adequately by the Access Board. *See* 28 C.F.R. Part 36, App. B, at 632–33.

The next year, the Access Board again signaled that § 4.33.3 had no requirement for sightlines over standing spectators. Discussing that section's rulemaking history in a new notice, the Board explained that DOJ had previously "incorporated" the Board's guidelines and that the Board was now seeking information to use in deciding whether to amend certain provisions of the ADAAG. ADAAG for Buildings and Facilities; State and Local Government Facilities, 57 Fed. Reg. 60612, 60613 (Dec. 21, 1992). The Board recalled that during the initial rulemaking, "[a]n overwhelming majority of responses favored including a provision requiring lines of sight over standing spectators in sports arenas[.]" *Id.* at 60618. But, the Board explained, at the time it "felt it was essential to conduct further research" on the issue, and thus "intend[ed] to address the issue of lines of sight over standing spectators in the guidelines for recreational facilities which will be proposed at a future date." *Id.* To that end, the Board sought comments "on the design issues associated with providing integrated and dispersed accessible seating locations with a clear line of sight over standing spectators in arenas, stadiums or other sports facilities." *Id.*

Since the Access Board promulgated § 4.33.3 with the understanding that it did not reach sightlines over standing spectators, and DOJ directly adopted that rule, *Accessible Stadiums*' establishment of such a sightline requirement may be outside § 4.33.3's "zone of ambiguity." *Kisor*, 139 S. Ct. at 2415–16. Given that the Access Board expressly refused to read a sightline requirement into § 4.33.3 and asked for further research on the issue, the district court shouldn't have reflexively deferred to DOJ's contrary interpretation.[3]

## C.

Even if we get this far and determine that § 4.33.3 is ambiguous and that *Accessible Stadiums* reasonably interprets it, we still have further to go before deferring. We must next determine whether *Accessible Stadiums* was DOJ's "authoritative" or "official position." *Kisor*, 139 S. Ct. at 2416 (simplified). There's good reason to think *Accessible Stadiums* is not—it says as much. The document contains an explicit disclaimer:

> This guidance document is not intended to be
> a final agency action, has no legally binding

---

[3] I recognize that *Miller* found § 4.33.3 to be ambiguous enough to plausibly include a sightline-over-standing-spectators requirement. *See* 536 F.3d at 1032. But because *Kisor* changed the landscape so significantly, I doubt that *Miller* is still binding law. Indeed, *Miller* acknowledged that it understood "why a reasonable reader might conclude that as of July 1991, the DOJ's new ADA regulations did not address lines of sight over standing spectators," but then deferred to DOJ's contrary interpretation because it was "a reasonable, practical construction" of the regulation. *Id*. at 1030–31. None of this satisfies *Kisor*'s requirements. *Miller* didn't analyze whether DOJ's interpretation was within the "zone of ambiguity" or take any of the other analytical steps that *Kisor* mandates. In any case, *Miller* didn't address deference to the *Accessible Stadiums* guidance, so it's not binding here.

> effect, and may be rescinded or modified in
> the Department's complete discretion, in
> accordance with applicable laws. The
> Department's guidance documents, including
> this guidance, do not establish legally
> enforceable responsibilities beyond what is
> required by the terms of the applicable
> statutes, regulations, or binding judicial
> precedent.

*Accessible Stadiums* at 5.  DOJ thus did everything it could to refute the notion that the document is binding.  As *Kisor* noted, when an agency itself disclaims the authoritativeness of its guidance, that's a strong signal that it is not authoritative.  139 S. Ct. at 2417.  Here, perhaps the district court should have considered taking DOJ at its word.

### D.

Next, we examine the agency's substantive expertise in the subject area.  *Id.*  Here, I do not question DOJ's policy chops when it comes to accessibility issues for patrons using wheelchairs.

### E.

Before we defer, there's one last step.  We must ensure that the agency's interpretation is a "fair and considered judgment."  *Id.*  Several issues call that into doubt with *Accessible Stadiums*.

First is unfair surprise.  As *Miller* said, "a reasonable reader might conclude that as of July 1991, the DOJ's new ADA regulations did not address lines of sight over standing spectators."  536 F.3d at 1031.  If *Accessible Stadiums* purports to interpret § 4.33.3, it would surprise the public

and the Access Board to learn that the section did in fact require sightlines over standing spectators.

Relatedly, if the Access Board's interpretation of § 4.33.3 may be imputed to DOJ, we need not defer to conflicting agency positions.  As *Kisor* observed, courts should "only rarely" defer "to an agency construction conflicting with a prior one." 139 S. Ct. at 2418 (simplified). The Third Circuit held that the Access Board's commentary about the meaning of § 4.33.3 can be attributed to DOJ.  *See Caruso*, 193 F.3d at 736.  The Third Circuit gave several reasons for that conclusion:

> 1) the DOJ referred all comments to the Board; 2) the DOJ relied on the Board to make adequate changes based on those comments; 3) the Board specifically changed the language of 4.33.3 in response to comments and explained that change in its commentary; 4) the DOJ was a "member of the Board" and "participated actively . . . in preparation of both the proposed and final versions of the guidelines," 28 C.F.R. Part 36, App. B, at 632; and 5) the DOJ's commentary stated that the final guidelines promulgated by the Board adequately addressed all comments.

*Id.* at 736.  So if the Access Board's reading—that § 4.33.3 didn't include a standing-spectator rule—can be attributed to DOJ, then DOJ's later position in *Accessible Stadiums* creates a clear conflict.  In that case, *Accessible Stadiums* might not deserve deference.

## III.

Based on the above, I would remand with instructions for the district court to embark on the interpretive task that *Kisor* requires.  In my view, to resolve this case without deciding what § 4.33.3 means would be an abdication of the judicial responsibility to interpret the law.  And it's no answer that the parties agree that *Accessible Stadiums* is binding on them.  The parties have no obligations to ensure that the interpretation of public law is correct.  We do.  *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) (Marshall, C.J.) ("Those who apply the rule to particular cases, must of necessity expound and interpret that rule.").

It is therefore no small matter that the parties ask us to abstain from interpreting the law and reflexively accept the Executive's purported interpretation of § 4.33.3.  In matters of such importance, we need not follow the parties' lead.  As I've previously written:

> While it is true that we generally rely on the arguments advanced by the parties, we never abdicate our independent role in interpreting the law.  If the parties don't offer the correct reading of a particular statute [or regulation], we are not bound to blindly follow their lead.  Instead, as judges, our duty is to get the law right. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). As Justice Ginsburg aptly stated, "a court is not hidebound by the precise arguments of

> counsel." *United States v. Sineneng-Smith*,
> 140 S. Ct. 1575, 1581 (2020). . . . After all,
> judges are not like lemmings, following the
> parties off the jurisprudential cliff.

*Ctr. for Investigative Reporting v. DOJ*, 982 F.3d 668, 697
(9th Cir. 2020) (Bumatay, J., dissenting) (simplified).

So while this case is, on one level, about sightlines in sports stadiums, on a deeper level, it concerns fundamental questions about the separation of powers. I thus find it disconcerting that we have no independent review of the meaning of the law in this case. And with the majority's remand, that may never happen. Worse yet, district courts might mistakenly think that they should still defer to an agency's interpretation so long as that interpretation is minimally plausible. I do not think that courts should have so little a role in interpreting the law.