The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| CLARK LANDIS, ROBERT BARKER, GRADY THOMPSON, and KAYLA BROWN,<br><br>Plaintiffs,<br><br>v.<br><br>WASHINGTON STATE MAJOR LEAGUE BASEBALL STADIUM PUBLIC FACILITIES DISTRICT, BASEBALL OF SEATTLE, INC., a Washington corporation, MARINERS BASEBALL, LLC, a Washington limited liability company, and THE BASEBALL CLUB OF SEATTLE, LLLP, a Washington limited liability limited partnership,<br><br>Defendants. | NO.   2:18-cv-01512-BJR<br><br>**DEFENDANTS' OPENING BRIEF ON REMAND** |

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue, Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. PROCEDURAL HISTORY ........................................................................................... 2

III. THE STADIUM HAS COMPARABLE LINES OF SIGHT......................................... 3

    A. Applicable Law. ................................................................................................. 3

    B. History and Context............................................................................................ 4

    C. The Evidence at Trial. ........................................................................................ 5

        1. The flawed methodology of Plaintiffs' expert......................................... 5

        2. Plaintiffs' expert did not articulate a clear or consistent standard of "comparability." ...................................................................................... 9

        3. One cannot assess the Stadium as a whole by considering ten seats.... 10

        4. There is no evidence that any Plaintiff suffered sightline discrimination. ........................................................................................ 11

        5. The testimony of Defendants' expert. .................................................... 12

IV. CONCLUSION ............................................................................................................ 13

DEFENDANTS' OPENING BRIEF ON REMAND - i
(No. 2:18-cv-01512-BJR)

**SAVITT BRUCE & WILLEY** LLP
1425 Fourth Avenue, Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

## I.     INTRODUCTION

Defendants Washington State Major League Baseball Stadium Public Facilities District (the "PFD"); and Baseball of Seattle, Inc.; Mariners Baseball, LLC; and The Baseball Club of Seattle, LLLP (collectively, "the Mariners") submit this opening brief to address the single issue on remand—*i.e.*, whether the Court correctly determined that accessible seating at T-Mobile Park (the "Stadium") complies with Section 4.33.3 of the 1991 ADA Standards.

As the Court previously noted, "the only consistency in the applicable law is that it and its regulations are incredibly convoluted." ECF-77 at 7:14-15. The relevant law and regulations regarding sightlines for accessible seats are both convoluted and inconsistent, and the overarching challenge for the Court is a three-part question: (a) what is the pertinent legal authority, (b) how is it to be interpreted, and (c) what does this mean in practical application for a given sports venue in the context of a specific evidentiary record? This inquiry is additionally problematic given that much of currently available guidance (*e.g.*, the 2010 ADA Standards) cannot be retroactively applied to a facility, like the Stadium, that was designed and constructed over the time period 1996 – 1999.

The notion of comparability is at the heart of Section 4.33.3. This is an aptly equitable concept for a statute like the ADA, but it has never been clearly or adequately defined—and it has been interpreted and applied by different courts in different and inconsistent ways. This is unsurprising given the language of Section 4.33.3, which the United States Supreme Court has identified as a paradigmatic example of an ambiguous regulation.

Here, Plaintiffs' case is entirely founded on the trial testimony of their expert, James Terry, based on a framework of "comparability" that he created. The resulting analysis of "comparability" is insufficiently rigorous on its own terms, it is inconsistent and muddy in actual application, and it is disconnected from the underlying statute and regulatory guidance. Mr. Terry's testimony cannot be relied upon and it fails to sustain Plaintiff's burden of proof. Moreover, Plaintiffs themselves failed to present any evidence of discrimination. The sole

DEFENDANTS' OPENING BRIEF ON REMAND - 1
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Plaintiff who testified at trial explained that he regularly sits in Section 226 in a seat that has "a good view of the field."

The evidence demonstrates that the Stadium was designed and constructed in accordance with the requirements of the ADA in effect and known at the time. The issue of sightlines for accessible seats is a complex accessibility matter that has beneficially evolved over time. But Defendants cannot be liable under a theory of regulatory interpretation and a nebulous "comparability" analysis that did not exist when T-Mobile Park was designed and constructed.

## II.  PROCEDURAL HISTORY

Following a bench trial in October 2019, this Court held that "after determining the applicable standard, and reviewing the evidence presented at trial, . . . the sightlines from accessible seats are comparable to the sightlines from nonaccessible seats and, therefore, T-Mobile Park complies with Section 4.33.3 of the 1991 ADAAG in this regard." ECF-77 at 32:17-20. For the applicable standard, the Court relied on *Accessible Stadiums*, a guidance document issued by the Department of Justice in 1996. *Id.* at 29:24 – 30:3.

On appeal, the Ninth Circuit Court of Appeals ruled as follows:

> Because we are not satisfied that the district court analyzed the second *Accessible Stadiums* requirement, we vacate its decision concluding that the Stadium satisfies the ADA by providing comparable sightlines to spectators using wheelchairs, and we remand for further proceedings so that a complete analysis of the *Accessible Stadiums* requirements can be performed. We express no opinion at this point as to the ultimate issue—whether the Stadium's sightlines for spectators using wheel chairs are sufficient to satisfy the ADA. To properly consider the question, a full analysis of the *Accessible Stadiums* requirements is needed.

ECF-89 at 8-9.[1]

---

[1] In an unpublished Memorandum, the Ninth Circuit affirmed this Court on two other issues: (a) that wheelchair-accessible seating is sufficiently dispersed throughout the Stadium, and (b) that the Stadium's ticket pricing complies with the ADA. ECF-90 at 2-4. Additionally, the Ninth Circuit held that Plaintiffs' "cumulative-effects" argument—*i.e.*, that the Stadium violates the ADA's general non-discrimination provision, 42 U.S.C. § 12182(a)—had been waived because it was raised for the first time on appeal. *Id.* at 4.

DEFENDANTS' OPENING BRIEF ON REMAND - 2
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

### III.     THE STADIUM HAS COMPARABLE LINES OF SIGHT

Given the factual record, and under the applicable law, Plaintiffs have not met their burden of proof to show that the sightlines for accessible seating in T-Mobile Park fail to comply with the 1991 ADA Standards as embodied in *Accessible Stadiums*.

**A.     Applicable Law.**

Section 4.33.3 of the 1991 ADA Accessibility Guidelines ("ADAAG") requires that "[w]heelchair areas shall be an integral part of any fixed seating plan and shall be provided so as to provide people with physical disabilities a choice of admission prices and <u>lines of sight comparable to those for members of the general public</u>."[2]  Additionally, all accessible seating must "adjoin an accessible route that also serves as a means of egress in case of emergency." Section 4.33.3 makes no mention of standing spectators.

In 1993, the Department of Justice published a Technical Assistance Manual ("TAM"), which reiterated that accessible seating should be "dispersed throughout the seating area," should "provide[] <u>lines of sight</u> and choices of admission prices <u>comparable to those offered to the general public</u>," and "must adjoin an accessible route that serves a means of egress from the assembly area."[3]

In November 1994, the DOJ issued a TAM Supplement, which provides that "in assembly areas where spectators can be expected to stand during the event or show being viewed, the <u>wheelchair locations must provide lines of sight over spectators who stand</u>."[4]  The TAM Supplement did not provide any specifications for the standing-spectator requirement, but it did state that the new directive "can be accomplished in many ways," including clustering wheelchair locations at the front of a seating section or in the rear with "additional elevation."

In May 1996, the Department of Justice issued a document entitled *Accessible Stadiums*.[5]  *Accessible Stadiums* stated that "[a] <u>comparable line of sight</u>, as illustrated in the

---

[2] *See* https://www.ada.gov/1991standards/1991standards-archive.html (emphasis supplied).
[3] See https://www.ada.gov/taman3.html (at III-4.4600, III-7.5180; emphasis supplied).
[4] *See* https://www.ada.gov/taman3up.html (at III-7.5180; emphasis supplied).
[5] *See* https://archive.ada.gov/stadium.pdf (emphasis supplied).

DEFENDANTS' OPENING BRIEF ON REMAND - 3
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

figure below [*see* Appendix A], <u>allows a person using a wheelchair *to see the playing surface* between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front</u>." *Accessible Stadiums* is the first DOJ publication to provide any particular information or clarification as to the meaning of "comparable line of sight" with respect to standing spectators. *Accessible Stadiums* does not, however, provide anthropometric data, and it contains no information at all regarding a spectator's focal point on the playing surface, the horizontal range of view or perspective, or what portion or percentage of the playing surface is relevant. Additionally, *Accessible Stadiums* contains the following disclaimer:

> The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.
>
> This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations or binding legal precedence.[6]

**B.     History and Context.**

When T-Mobile Park was being designed and constructed, there was no clear statutory requirement or applicable regulation for a sightline requirement with respect to standing spectators. The two DOJ documents that address this issue—the TAM Supplement and the subsequent *Accessible Stadiums*—are limited in their guidance. Additionally, the only case law in this Circuit contemporaneous with the time period during which the Stadium was designed

---

[6] *Id.* at p.5. For this reason, among others, Judge Bumatay's concurring opinion in the Ninth Circuit's opinion held that the Court should undertake the requisite analysis under *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019) to determine whether *Accessible Stadiums* is a binding interpretation of a disability regulation subject to deference under *Auer v. Robbins*, 519 U.S. 452 (1997) and *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945). ECF-89 at 13-27. The majority opinion addressed this issue by "assum[ing] without deciding that the district court did not err in applying the Accessible Stadiums standard to this case." *Id.* at 11. The majority opinion also stated that "[w]e expressly acknowledge the possibility… that the validity of Accessible Stadiums may properly be raised in the future and our decision today does not foreclose any such challenge." *Id.* In *Kisor*, the United States Supreme Court specifically identified Section 4.33.3 as an illustrative example of there being "real uncertainties about a regulation's meaning. 139 S.Ct. at 2410.

DEFENDANTS' OPENING BRIEF ON REMAND - 4
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

and constructed found that Section 4.33.3 of the 1991 ADA Standards did not require sightlines over standing spectators.[7]

When T-Mobile Park was being designed and constructed, the primary guidance from the DOJ regarding "comparable" sightlines was *Accessible Stadiums*.[8]  Accordingly, in order to determine compliance with Section 4.33.3 and sightline requirements at the time, the relevant analysis would be a sightline review utilizing the text and figure from *Accessible Stadiums*.

C.  The Evidence at Trial.

   1.   The flawed methodology of Plaintiffs' expert.

At trial, Plaintiffs' expert James Terry acknowledged the limited scope of regulatory information and guidance.  10/15/19 Tr. at 180:14 – 181:19; 10/16/19  Tr. at 82:4-14.  Mr. Terry, however, attempted to fill this vacuum with an analytic model that is neither discussed nor mandated by any regulation or DOJ interpretation.  It is a methodology of Mr. Terry's own invention.  Moreover, despite a patina of scientific rigor, Mr. Terry's analysis and conclusions collapse upon inquiry.

Mr. Terry testified that "I tried to show you how the standards told you to do [the sightline] analysis."  10/16/19 Tr. at 80:4-5.  But there is no information regarding "how" to do

---

[7] *See Independent Living Resources v. Oregon Arena Corporation*, 982 F.Supp. 698, 758 (D. Ore. 1997) (granting defendant's motion for summary judgment: "Section 4.33.3 does not presently require that wheelchair users be given lines of sight over standing spectators.").  Eleven years later, the Ninth Circuit held that Section 4.33.3 requires sightlines over standing spectators, but the court did not address *Accessible Stadiums* nor did it provide any guidance as to how the apparent regulatory requirement it stated could be satisfied.  *Miller v. California Speedway Corp.*, 536 F.3d 1020 (9th Cir. 2008).  As this Court previously observed, "*Miller* was about deference, not standard setting."  ECF-77 at 30:15.  Additionally, in his concurrence, Judge Bumatay noted that "because *Kisor* changed the landscape so significantly, I doubt that *Miller* is still binding law. . . . In any case, *Miller* didn't address deference to the *Accessible Stadiums* guidance, so it's not binding here."  ECF-89 at 23, n.3

[8] Numerous courts have criticized the DOJ's cursory guidance.  For example, "the Justice Department has not established a clear record of exactly what its interpretation [of Section 4.33.3] requires.  With the exception of a single, general diagram in the 1996 'Accessible Stadiums' release, the Department has not defined or documented the technical specifications for compliance . . . . The application of the theoretical issues of sightlines to the design of an actual arena is a complex problem; this problem has been exacerbated by the lack of concrete, technical standards for architects to follow."  *Paralyzed Veterans of America v. Ellerbe Becket Architects and Engineers P.C., et al.,* 950 F.Supp. 393, 399-400 (D.D.C. 1996) ("*PVA II*") (also noting that the DOJ has not insisted on full compliance with enhanced sightlines, has never maintained an enforcement action against an arena or stadium under construction, and "even declined to enforce its standards against the MCI center in this litigation").

DEFENDANTS' OPENING BRIEF ON REMAND - 5
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

a sightline analysis other than the general reference to a "comparable line of sight" in *Accessible Stadiums* with a related diagram.

At trial, Mr. Terry explained his methodology as follows:

- He "looked around the stadium" and "tried to select a representative sample" accessible seats "so that we'd get a full variety of the types of places that wheelchair users were sitting."[9] He measured sightlines by "taking a pair of carpenter's rules, which are vertical, six-foot sticks with dimensions on them. We then put those on one row in front of the wheelchair so that we could go over the shoulders of them, and then two rows ahead so that we could measure the height of the top of the people standing two rows ahead.  Then I moved back and put a camera at the location of the wheelchair user's eye point. … We had Post-it notes put on the vertical rules to show where the shoulder height would be one row forward and where the head height should be . . . .We put rules there and said this will show … what a wheelchair user could see.  10/15/19 Tr. at 193:23 - 194:24.

- To create his pictorial representations, Mr. Terry imported his pictures into computer-aided design ("CAD") software, which "extend[ed] the line of where a row of heads or a row of shoulders would be" to depict "presumed" heights. *Id.* at 204:16 – 205:4.  The "line" generated by CAD is not consistent with the sightlines that would reflect actual human bodies, shoulders and heads.  In Mr. Terry's analysis the CAD-imposed line effectively creates the top of a visual wall and anything below is "assumed to be blocked."  10/16/19 Tr. At 78:5 – 79:14.[10]

---

[9] Mr. Terry also testified, however, that he did not measure accessible seating where he thought sight lines were "pretty good."  10/15/19 Tr. at 196:16 – 197:19 (discussing Section 308).

[10] Mr. Terry performed a similar analysis for a lawsuit regarding the Superdome in New Orleans, and the trial court described his methodology in greater detail.  *Bailey v. Bd. of Comm'rs of the La. Stadium & Exposition Dist.*, 484 F. Supp. 3d 346, 386-87 (E.D. La. 2020).

DEFENDANTS' OPENING BRIEF ON REMAND - 6
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

The output of Mr. Terry's work regarding sightlines was a series of exhibits he created using CAD software.  *See* PX 3 – 13 (sightlines to playing field) and PX 16 – 21 (sightlines to center-field scoreboard).[11]

There are inherent limitations and flaws in Mr. Terry's methodology, which materially undermine their reliability.  When questioned about his use of a CAD-generated visual "wall" to implement his analysis (as opposed to, *e.g.*, human body shapes or mannequins that would more accurately depict the actual experience of a spectator in a wheelchair), Mr. Terry acknowledged that he "could have shown that here" but chose not to—and if he had, "you would have had different views."  10/16/19 Tr. at 79:24 – 80:1, 81:4 – 81:14 (discussing PX-3). Mr. Terry testified that his approach was "pare[d]" down because he wanted to "filter out the noise of all the other kinds of things"—*i.e.*, the actual and realistic complexities of an analysis predicated on human forms or analogs.  *Id.* at 80:9-18.  And, yet, even with this simplified approach, Mr. Terry acknowledged that his work was "a little out of scale."  *Id.* at 80:7.

As a related point, Mr. Terry did not testify that he used a tri-pod or other tool to ensure camera stability, nor did he testify about steps taken to ensure consistency regarding placement and verticality of the carpenter's rules.  This matters because another court, in considering the very same type of sightline testimony from Mr. Terry, found that "the slightest error—a camera or ruler that is not perfectly straight—can dramatically alter the calculations of sightlines to a field that is hundreds of feet away."[12]  *Bailey v. Bd. of Comm'rs of the La. Stadium & Exposition Dist.*, 484 F. Supp. 3d 346, 389 (E.D. La. 2020).

---

[11] The scoreboard-related exhibits are not substantively at issue because the Court previously ruled against Plaintiffs' "sightline to scoreboard" claim.  ECF-77 at 50:1 – 51:25 ("Plaintiffs have failed to show a lack of communication that violates the ADA.").  These exhibits and Mr. Terry's related testimony are, however, relevant in that they reflect the same "comparability" analysis as the sightlines-to-playing-field exhibits and testimony.

[12] In this respect, the *Bailey* court noted the testimony of the expert opposing Mr. Terry:  "We're measuring very small distances, but we have to project this out across the field which is several hundred feet away.  So whatever minor errors that occur during measuring across a small triangle, get magnified when you go out the distance to the field….If you're holding a camera, even your heartbeat can move the camera during the shot.  You don't know precisely when you take it.  You also must constantly take a look at where that – where the tape measure is compared to where you're holding the camera.  Also, if you're looking down to take the camera – take the picture and looking at your lenses, you got this problem looking down to the tape measure through the camera lens, you can get a false reading that way."  484 F. Supp. 3d at 389, n.352.

DEFENDANTS' OPENING BRIEF ON REMAND - 7
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

In addition to the technical flaws noted above, Mr. Terry's analysis is weakened by his unexplained and inconsistent use of "comparison" seats. Thus, for example, PX-3 depicts a comparison between an accessible seat (Section 124, Row 41A, Seat 1) and a non-accessible seat in a different section, eight rows closer to the field, and a different seat number (Section 125, Row 33, Seat 8).[13] Such different locations—in different sections, at different elevations, and with differing horizontal placement—would necessarily have different views.

PX-4 depicts two *non*-accessible seats, both in Section 125. Mr. Terry testified that "these are comparable sights" and "[t]his exhibit is what the general public members can see." 10/15/19 Tr. at 201:14-15. Comparing the non-accessible seats in PX-4 with the accessible seat depicted in PX-3, Mr. Terry suggested that the non-accessible seats had better views because one could "see all of the infield dirt." *Id.* at 202:1. And yet, according to Mr. Terry's analysis, one of these seats (Row 25, Seat 8) has a better view of the entire field and the other seat (Row 33, Seat 8) has a worse view of the entire field, both as compared to the accessible seat depicted in PX-3.

In some instances, Mr. Terry chose comparison seats that were the same seat number one row forward. PX-6, PX-12, PX-13. In other instances, however, Mr. Terry chose to use "comparison" seats that were a different seat number (with a varying delta of one to five seats) without explanation as to this choice or its impact on any sight-line analysis. PX-5 (Seat 16 vs. Seat 18), PX-7 (Seat 6 vs. Seat 5), PX-9 (Seat 7 vs. Seat 12), PX-11 (Seat 7 vs. Seat 12).

And for one sightline comparison Mr. Terry did not document which comparison seat he actually used. PX-8 (listing comparison seat as "~16"); *see also* 10/16/19 Tr. at 54:3 -16 (testifying regarding the use of the same "~" symbol in PX-21: "I don't remember exactly where I took that one because I didn't have a photograph that showed where it was placed … I'm no more certain than it's about Seat No. 16. It could be Seat 14, it could be Seat 18, it could be 17 or something…. I did not document exactly where it was.").

---

[13] Regarding PX-3, Mr. Terry testified "this particular comparable view was taken from a distance forward of that. I believe I had another one that was one row in front of that [Row 40]. I'm not sure now… I may not have taken a shot from Row 40. I just – I can't recall." 10/15/19 Tr. at 200:3-16.

DEFENDANTS' OPENING BRIEF ON REMAND - 8
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington 98101-2272
(206) 749-0500

Mr. Terry's analysis cannot be relied upon because the underlying methodology is neither consistent nor demonstrably accurate.

### 2. Plaintiffs' expert did not articulate a clear or consistent standard of "comparability."

The sightline exhibits created by Mr. Terry visually suggest analytic rigor, *e.g.*, by their segmentation of the playing surface and related attributions of view with a specific percentage, as well as an aggregate view percentage. *See, e.g.*, PX-3. For the reasons noted above, however, the accuracy and related margin of error of Mr. Terry's measurements must be questioned. As a separate but related matter, the very nature of what is "comparable" and how to define it is called into doubt by Mr. Terry's testimony. On this front, Mr. Terry failed to identify an acceptable level of tolerance for "comparability." Rather, he suggested that comparability was fluid, and he ultimately proposed that it was an impressionistic determination for each individual.

*Accessible Stadiums* refers to lines of sight to "the playing surface." Mr. Terry's viewpoint and testimony on this issue was inconsistent. For example, he testified that "a lot of stuff happens at home plate, so that's comparability, as far as I'm concerned." 10/16/19 Tr. at 84:15-17 (testifying regarding PX-3). Mr. Terry also testified that "most of the action typically occurs in the infield" and "most baseball fans … want to see the outfield." *Id.* at 84:25 – 85.1, 88:16-18. But he also testified that "I would not say that you base comparability on the entire field." *Id.* at 87:20-21.

Beyond the geography of what is being compared, Mr. Terry was unable to explain any reasoned standard of comparability or tolerance for deviation. Thus, for example, Mr. Terry testified, with respect to a 7% delta in comparable views under his analysis, "I'm fine with it." 10/16/19 Tr. at 53:21. For comparative views with a 9% delta, he testified that "I wouldn't argue about that one." *Id.* at 55:5. And, when asked whether the infield views depicted in PX-3 were comparable, Mr. Terry testified that it "[d]epends on which percent it is that you're missing." *Id.* at 85:7-9.

DEFENDANTS' OPENING BRIEF ON REMAND - 9
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

Mr. Terry was also questioned regarding the comparability of the accessible seat depicted in PX-3 (shown as having a 53% view of the entire field) and the non-accessible seat in Row 11 that is depicted in PX-4 (shown as having a 42% view of the entire field). He testified that "it's one of those gray areas" and "[y]ou've got to look at it and say, is this okay?" 10/16/19 Tr. at 89:2-3; *see also id.* at 89:4 – 96:15.

In short, Mr. Terry was unable to draw any clear or quantitatively-principled line as to the parameters of comparability:

> Q. Well, what I'm trying to understand is, sir, where is the point that you are drawing the line as to what's comparable versus not, for purposes of this particular exercise.
>
> A. I think at the point where it feels like it's relegated to something that's substandard for the people who are using it….<u>If you're asking for a bright line, I don't know of a way to draw a bright line, other than when viewed in its entirety or when looking at this from the view of does it feel like discrimination or not</u>[.]"

*Id.* at 55:7-20 (emphasis supplied).

In Mr. Terry's view, one does a different analysis throughout a stadium, and the relevant comparative factors vary and are ultimately assessed an impressionistic way. As a result, Mr. Terry's opinion is inconsistent and unreliable.

### 3. One cannot assess the Stadium as a whole by considering ten seats.

Mr. Terry provided analysis and testimony regarding sightlines from ten (10) accessible seats in the Stadium. PX-3, PX-5 – PX-13. Mr. Terry testified that he did not take measurements for all of the accessible seats.[14] Rather, he testified that he "tried to get a representative sample in, you know, the time I was there." 10/15/19 Tr. at 215:3-14. But Mr. Terry failed to offer any explanation as to why the ten accessible seats he chose were representative. Mr. Terry's silence on this front is also problematic because he testified that he intentionally chose not to measure accessible seats where he thought the sightlines were "pretty good" and "it didn't look like it was worth spending a lot of time there." 10/15/19 Tr. at

---

[14] The Mariners use "flex" seating for accessible seats and do not differentiate between accessible seats and related companion seat. As of the date of trial, the Stadium had 685 total wheelchair and companion seats. ECF-76-1. See also 10/16/19 Tr. at 119:8-23.

DEFENDANTS' OPENING BRIEF ON REMAND - 10
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

196:16 – 197:19 (discussing Section 308). This admission indicates a selection bias in the first instance.

As a separate but related matter, Mr. Terry did not explain how or if he determined, as a matter of statistical analysis and validity, that a 1.46% sample size was adequate.[15] Mr. Terry's analysis shows that nine accessible seats out of a universe of 685 seats had sightlines to the playing surface that differed, and were lesser in varying degrees and in different ways, from a particular chosen "comparison" seat.[16] If one accepts Mr. Terry's analysis and related testimony at face value—and setting aside the methodological and comparative analysis problems noted above—then at most he opined that 1.31% of the accessible seats at the Stadium had sightlines to the field that were lesser than a selected "comparable" seats.[17] This is not a sufficient basis to extrapolate regarding whether accessible seats in the Stadium as a whole do or do not comply with the 1991 ADA standards.

As Mr. Terry acknowledged, any comparability analysis must be specific to given seats and the immediate surrounding area, and that analysis necessarily varies throughout the Stadium given the different horizontal and vertical placements of seats and related distance to the field—*i.e.*, the analysis for one section does not translate to another section. 10/16/19 Tr. at 85:17-25 ("comparability is what other people in that area get to see").

### 4. There is no evidence that any Plaintiff suffered sightline discrimination.

Only one Plaintiff, Clark Landis, testified at trial. Mr. Landis testified that he attends "at least" five Mariners games per year and that, for the past twenty years, he usually sits in Section 226.[18] 10/16/19 Tr. at 131:19-21. Mr. Landis testified that he sits "in one of the seats that has a raised platform, and it's a good view of the field"—and when people are standing in front of him, he "can see right over the top of them." *Id.* at 133:9-10, 139:12-14. Mr. Landis

---

[15] 10 seats out of a total of 685 wheelchair and companion seats.
[16] As noted above, the comparison depicted by PX-10 showed the accessible seat to have a superior view.
[17] 9 seats of out a total of 685 wheelchair and companion seats.
[18] Mr. Terry did not do an assessment of sightlines in Section 226.

DEFENDANTS' OPENING BRIEF ON REMAND - 11
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

was shown PX-10 (depicting seats in Section 227) and he agreed that the exhibit accurately represents the view from his seat in Section 226.[19]  *Id.* at 135:6-12.

Mr Landis also testified that he had previously sat on the 100 level but had not done so for "probably 20 years" and could not recall what section he had been in, although he remembered being able to see parts of the field when people in front of him stood up.  *Id.* at 131:22-23, 136:9-19. 137:5-15.  Mr. Landis further testified that he had sat in the Hit it Here Café and on the 300 level of the Stadium, but he offered no testimony regarding sightlines from these locations.  *Id.* at 133:17-18.

In sum, the only direct evidence of Plaintiffs' experience is Mr. Landis' testimony.  Mr. Landis acknowledged that he has not experienced impaired sightlines to the playing surface from his seat in Section 226 and he had no other specific testimony regarding any other section in the Stadium.  Plaintiffs have not presented any evidence of their having suffered sightline-related discrimination at the Stadium.

5. **The testimony of Defendants' expert.**

For his analysis, Defendants' expert William Endelman did not create a new methodology.  Rather, he testified that if he had been engaged by NBBJ (the architects of the Stadium) in 1996 to do a plan review with respect to sightlines, he would have used the "Department of Justice diagram" (the figure depicted in *Accessible Stadiums*) and the "as-designed height of the platforms and spacing.  10/17/19 Tr. at 29:13-19.  He would have advised that, "based upon the limited information available from the Department of Justice, …. this complies."  *Id.* at 30:6-8.  And if he had done a field survey after the Stadium was built, Mr. Endelman would have done the same analysis using *Accessible Stadiums* and advised that the Stadium complied with the 1991 ADA Standards.[20]  *Id.* at 30:9-21.  This is the same

---

[19] PX-10 depicts a view from an accessible seat and a non-accessible seat in Section 227.  According to Mr. Terry's analysis as reflected in PX-10, a wheelchair-user in the accessible seat has <u>better</u> views of the field than a spectator in the non-accessible seat in front of it. *See also* 10/15/19 Tr. at 212:12-20.

[20] *See also* 10/17/19 Tr. at 28:2-20 (referencing DX 1 and DX23 and discussing "added platform height that was built into the structure to accommodate the sight lines.").

DEFENDANTS' OPENING BRIEF ON REMAND - 12
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

analysis that Mr. Endelman performed in response to Plaintiffs' claims in this case.  *See* DX 1; 10/17/19 Tr. at 13:14 – 16:13.

## IV. CONCLUSION

Disability-related discrimination is a serious matter and courts have struggled with the issue of comparative sightlines and how to implement the goals of the ADA and promote accessibility and, at the same time, comport with fairness and due process.

But one cannot assert that a vague and generalized statement constitutes a viable "performance standard" and then retroactively claim liability for an alleged ADA violation based on (a) previously-undefined accessibility standards and (b) a flawed analytic framework and methodology.  This is particularly so where, as demonstrated by Mr. Terry's testimony and analysis, the goalposts do not have a consistent location and, at the end of the day, the goalposts themselves are not determinative because what drives the comparative analysis is whether something "feel[s] like discrimination or not."  This is not a reasonable interpretation of the applicable law and regulations and it is divorced from the language of Section 4.33.3 and *Accessible Stadiums*.

Given the factual record, and in light of the applicable law, the Court should enter judgment in favor of Defendants on Plaintiffs' sightline claim.  Plaintiffs have failed to meet the burden of proof on their claim.

DATED: February 13, 2023

SAVITT BRUCE & WILLEY LLP

By  /s/ Stephen C. Willey
    Stephen C. Willey, WSBA #24499
    Sarah Gohmann Bigelow, WSBA #43634
    1425 Fourth Avenue, Suite 800
    Seattle, WA  98101-2272
    Telephone: 206.749.0500
    Email: swilley@sbwllp.com
    Email: sgohmannbigelow@sbwllp.com

*Attorneys for Defendants*

DEFENDANTS' OPENING BRIEF ON REMAND - 13
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on February 13, 2023, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 13th day of February, 2023 at Seattle, Washington.

_____
Rondi A. Greer

CERTIFICATE OF SERVICE
(No. 2:18-cv-01512-BJR)

SAVITT BRUCE & WILLEY LLP
1425 Fourth Avenue Suite 800
Seattle, Washington  98101-2272
(206) 749-0500