UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLARK LANDIS, ROBERT BARKER,
GRADY THOMPSON, and KAYLA BROWN

Plaintiffs,

v.

WASHINGTON STATE MAJOR LEAGUE
BASEBALL STADIUM PUBLIC FACILITIES
DISTRICT; and BASEBALL OF SEATTLE,
INC., a duly licensed Washington corporation
d.b.a. Mariners Baseball, LLC, a duly licensed
Washington limited liability corporation d.b.a.
The Baseball Club of Seattle, LLLP, a duly
licensed Washington limited liability limited
partnership,

Defendants.

Case No. 2:18-cv-01512-BJR

**PLAINTIFF'S POST-REMAND
BRIEFING AS ORDERED
FEBRUARY 7, 2023,
DOCKET NO. 102**

**TABLE OF CONTENTS**

Page(s)

INTRODUCTION ....................................................................................1

STATEMENT OF THE CASE....................................................................2

STATEMENT OF FACTS ........................................................................4

I. The Parties ...........................................................................4

II. Wheelchair Accessible Seating at the Stadium...........................5

III. The DOJ's 1996 Accessible Stadiums Guidance........................6

IV. The Experts .........................................................................7

    A. Plaintiffs' Expert Exhibits and Testimony.......................7

    B. Defendants' Expert Exhibits and Testimony ...................9

V. Wheelchair Users on the 100 and 200 Levels of the Stadium Have Severely Obstructed Views Over the Heads of Spectators Standing Two Rows Forward, Whereas the Views of General Spectators Are Significantly Less Obstructed and Provide Unobstructed Sightlines to the Infield ...............................................................................10

POINTS AND AUTHORITIES ................................................................12

I. The DOJ's 1999 Accessibility Guidelines, and the Corresponding 1996 *Accessible Stadiums* Guidance, Govern This Case....................................12

II. On Remand, This Court Should Analyze the Second Requirement Under *Accessible Stadiums*: Whether Wheelchair Users Have Comparable Views Over the Heads of Persons Standing Two Rows in Front. .............14

III. Based on the Expert Evidence Presented at Trial, Defendants Have Not Met Their Obligations Under the ADA to Provide Comparable Sightlines.................................................................................15

    A. Plaintiffs' Expert Evidence Shows that the Stadium Does Not Provide Comparable Sightlines Over the Heads of Persons Standing Two Rows in Front .......................................................15

    B. Defendants' Expert Evidence Does Not Show that the Stadium

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

Provides Wheelchair Users with Comparable Sightlines Over the Heads of Persons Standing Two Rows in Front .............................16

CONCLUSION ........................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.,*
11 F.4th 1101 (9th Cir. 2021) .............................................................*Passim*

*Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.,*
403 F. Supp. 3d 907 (W.D. Wash. 2019)....................................................13

*Miller v. California Speedway Corp.,*
536 F.3d 1020, 1024 (9th Cir. 2008) ........................................................17

*Paralyzed Veterans of Am. v. D.C. Arena L.P.,*
117 F.3d 579 (D.C. Cir. 1997) ..................................................................16

*Perez v. Mortg. Bankers Ass'n,*
575 U.S. 92, 135 S. Ct. 1199, 191 L. Ed. 2d 186 (2015)...........................17

*United States v. AMC Ent.,*
2006 WL 224178, at *3 (C.D. Cal. Jan. 10, 2006) ...................................17

*United States v. AMC Ent.,*
549 F.3d 760 (9th Cir. 2008) ...................................................................17

## STATUTES & REGULATIONS

### Federal

42 U.S.C. § 12101 et seq.......................................................................1, 2, 3

42 U.S.C. § 12182(a). ...................................................................................12

42 U.S.C. § 12183(a) ...................................................................................12

28 C.F.R. Part 36, App. D § 4.33.3, ADA Accessibility Guidelines (1991) ..........3, 4, 12

### State

Washington Law Against Discrimination Revised Code of Washington
§§ 49.60.010-49.60.505 .........................................................................2

PLAINTIFF'S POST-REMAND
BRIEFING - iii
2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

## OTHER AUTHORITIES

U.S. Department of Justice, *Accessible Stadiums* guidance publication
(1996) ............................................................................................................*Passim*

U.S. Department of Justice's 1994 Technical Assistance Manual Supplement
§ III-7.5180 ...........................................................................................................13

PLAINTIFF'S POST-REMAND
BRIEFING - iv
2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

**INTRODUCTION**

The Ninth Circuit Court of Appeals, on appeal from this Court, considered whether

wheelchair users at T-Mobile Park (the "Stadium") have adequate sightlines under the

Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"). The Circuit Court held

that—pursuant to the Department of Justice's ("DOJ") 1996 *Accessible Stadiums* guidance

publication ("*Accessible Stadiums*")—wheelchair users must be able to see the playing surface

*over the heads of the persons standing two rows in front*. As this Court did not apply this

standard, the Circuit Court vacated the Court's prior decision on Plaintiffs' comparable sightlines

claim and remanded for further proceedings consistent with its opinion.

At trial, Plaintiffs presented unrebutted expert testimony establishing that wheelchair

users do *not* have comparable sightlines *over the heads* of spectators standing *two rows* in front.

Plaintiffs' expert James Terry evaluated ten sample locations around the Stadium where he

compared wheelchair user sightlines with non-wheelchair user sightlines. His evaluations

presented photographic views of the playing field above two separate lines: (i) the line

representing *the shoulders* of spectators standing *one row* forward, and (ii) the line representing

*the heads* of spectators standing *two rows* forward.

In nine out of ten cases, when comparing sightlines over the heads of spectators standing

two rows forward, Plaintiffs' evidence shows that the wheelchair user's view of the playing field

is significantly obstructed as compared to the non-wheelchair user's view. Notably, Plaintiffs'

evidence shows that the wheelchair user's view of the *infield*—where the vast majority of the

action takes place in baseball—was significantly obstructed, while the non-wheelchair user's

view of the infield was entirely unobstructed. This disparity flagrantly violates the second

requirement under the *Accessible Stadiums* guidance for comparable sightlines.

PLAINTIFF'S POST-REMAND
BRIEFING – Page 1

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

Defendants did not dispute Plaintiffs' evidence on this issue. Rather, Defendants' expert William Endelman testified that wheelchair users can see some piece of the playing surface over the heads of standing spectators, though they may see less of the field than non-wheelchair users. Defendants maintain that this alone should meet the standard for comparable sightlines under the ADA, but they are mistaken. Because wheelchair user sightlines at the Stadium are more obstructed than the non-wheelchair user sightlines, and thus not comparable, Defendants have not met their obligations to provide comparable sightlines under the ADA.

## STATEMENT OF THE CASE

Plaintiffs Clark Landis[1], Robert Barker, Grady Thompson and Kayla Brown ("Plaintiffs"), as lifelong baseball fans, brought this action against Defendants Washington State Major League Baseball Stadium Public Facilities District, Baseball of Seattle, Inc., Mariners Baseball, LLC, and The Baseball Club of Seattle, LLLP ("Defendants") alleging violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), its subsequently promulgated regulations and standards, and the Washington Law Against Discrimination Revised Code of Washington ("WLAD") §§ 49.60.010-49.60.505. *See* Dkt. No. 1. After engaging in negotiations and Summary Judgment proceedings, in October 2019, the parties tried the remaining issues in a bench trial before this Court.

The trial included testimony from the following five witnesses:

- Malcom Rogel, Senior Vice President of Ticket and Event Services for the Seattle Mariners. Dkt. No. 59 at 22-140.

- Trevor Gooby, Senior Vice President of Ballpark Operations for the Seattle Mariners. Dkt. No. 59 at 140-171.

---

[1] Plaintiff Clark Landis passed away in 2022. The comparable sightlines claim—asserted by Plaintiffs Robert Barker, Grady Thompson, and Kayla Brown—remains at issue.

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

- James L. E. Terry, CEO of Evan Terry Associates, LLC, and expert witness for Plaintiffs. Dkt. 59 at 172-224; Dkt. No. 60 at 3-123; Dkt. No. 61 at 81-87.

- Clark Landis, Plaintiff. Dkt. No. 60 at 130-140.

- William E. Endelman, former founder and principal of Endelman & Associates PLLC, and expert witness for Defendants. Dkt. No. 61 at 3-79. [2]

On December 3, 2019 the Findings of Fact and Conclusions of Law ("FFCL") were issued. Dkt. No. 77. The Court also issued its Final Judgment Dkt. No. 78. In relevant part, the Court held that "Defendants have met their obligations under the applicable provisions of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., to provide sufficient sightlines[.]" Dkt No. 78 at 1. [3]

On December 16, 2019, Plaintiffs timely filed a Notice of Appeal with the Ninth Circuit. Dkt. No. 79. On December 10, 2020, after substantial briefing by the parties and by numerous Disability Rights Organizations, the Ninth Circuit Court of Appeals heard oral argument, and on September 1, 2021, the Court of Appeals issued its opinion. *Landis v. Washington State Major League Baseball Stadium Pub. Facilities Dist.*, 11 F.4th 1101 (9th Cir. 2021); *see also* Dkt. No. 89.

The Ninth Circuit panel "assumed, without deciding, that the district court did not err in applying the *Accessible Stadiums* guidance interpreting § 4.33.3 of the 1991 Accessibility Guidelines adopted by the DOJ. The panel held, however, that the district court did not properly apply this standard because it analyzed only the requirement that a person using a wheelchair must be able to see the playing surface between the heads and over the shoulders of the persons

---

[2] Trial transcripts, for ease of reference, are referred to throughout this Brief as Dkt. No. 59 (Day 1), Dkt. No. 60 (Day 2), and Dkt. No. 61 (Day 3).

[3] This Court further held that Defendants have met their obligations to provide sufficient distribution of, and comparable ticket pricing for, ADA-accessible seating. *Id.* The Court also held that Plaintiffs failed to show Defendants have not met their obligations under the ADA to effective communications with spectators with disabilities. *Id.* at p. 2. These three dismissed claims (seating distribution, ticket pricing, and effective communications) are no longer at issue.

PLAINTIFF'S POST-REMAND
BRIEFING – Page 3

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

standing in the row immediately in front. The panel held that the District Court erred by not analyzing the additional requirement that a wheelchair user must be able to see the playing surface *over the heads* of the persons standing *two rows* in front." *Id* at 2-3 (emphasis added). Consequently, the Ninth Circuit vacated the District Court's Final Judgment and remanded for further proceedings consistent with the panel's opinion.

## STATEMENT OF FACTS

### I.      The Parties

At the time of trial, Plaintiffs Clark Landis, Robert Barker, Grady Thompson, and Kayla Brown were all baseball fans with qualifying disabilities under Title II and Title III of the ADA, and all used wheelchairs for mobility. *See* FFCL, Dkt. No. 77 at 17:12-14.

Defendants are comprised of four separate legal entities, which own or operate the Stadium where the Seattle Mariners baseball team plays. Washington State Major League Baseball Stadium Public Facilities District ("PFD") is a municipal corporation which owns the Stadium and was originally established by the State of Washington.  The parties stipulated that PFD is a public entity subject to Title II of the ADA.  The PFD leases the Stadium to the other Defendants, Baseball of Seattle, Inc., Mariners Baseball, LLC, and The Baseball Club of Seattle, LLLP (collectively "the Mariners").  The Mariners are private entities regulated under Title III of the ADA. *Id.* at 17:15-25.

Construction commenced on what is now T-Mobile Park on March 8, 1997. It was completed twenty-seven months later in July of 1999, and the first game was played in the Stadium on July 15, 1999. *Id.* at 18:1-5.

PLAINTIFF'S POST-REMAND
BRIEFING – Page 4

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

## II.    Wheelchair Accessible Seating at the Stadium

The Stadium is comprised of four "vertically-stacked seating sections. Closest to the field is the 100 Level (also known as the "Main Level") and then proceeding upwards is the 200 Level (also known as the "Club Level"), the Suite Level, and the 300 Level (also known as the "View Level"). The Stadium also includes two "bleacher" sections, which are located behind left and centerfield. Dkt. No. 59 at 32:16-35:17. Each level is then divided horizontally into sections. *Id.* at 18:6-14.

The 100 Level, also known as the main level, wraps around the Stadium and is the primary level for the entire concourse. *See* Rogel Testimony ("Rog. Test.") Dkt. No. 59 at 26:7-12. On the main level there are a total of 43 rows of seats, with certain areas that are under an overhang more than other areas. *Id.* at 37:4-13. Wheelchair accessible seats on the 100 Level are located in in the back row, numbered 41 or greater for different sections. *Id.* at 56:1-58:3. The *only* wheelchair accessible seats located anywhere other than the back row were in two substantially more expensive "premium seating" sections in the front row: the "Diamond Club" directly behind home plate and "Premier Seating." *See* FFCL, Dkt. No. 77 at 20, fn. 6. There are eight wheelchair accessible seats in these more expensive "premium seating" sections; all other accessible seats are 40 rows further back. *Id.*; *see also* Rog Test. Dkt. No. 59 at 55:10-56:8; 57:25-58:3; Ter. Test. Dkt. No. 59 at 211:18-21.

Immediately above the 100 Level is the 200 Level. Rog Test. Dkt. No. 59 at 36:6-11. The 200 Level contains sections that have between 11 and 13 rows of seats. *Id.* at 60:2-16. Like the 100 Level, sections with wheelchair accessible seating on the 200 Level is only available in the last row. *Id.* at 59:24-60:22; Ter. Test. Dkt. No. 59 at 211:18-21.

PLAINTIFF'S POST-REMAND
BRIEFING – Page 5

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

### III.  The DOJ's 1996 Accessible Stadiums Guidance

In its 1996 *Accessible Stadiums* guidance, the DOJ states that: "[a] comparable line of sight . . . allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front of them *and over the heads of persons standing two rows in front*." Appendix to Plaintiffs' Post-Remand Briefing ("Pls.' App."), Attachment A2 (*Accessible Stadiums* Publication) at 2 (emphasis added), Ex. DX2.[4] The following diagram, included in the DOJ's *Accessible Stadiums* guidance, illustrates this concept:



*Figure Showing Comparable Line of Sight for Wheelchair Seating Location*

/ / /

/ / /

/ / /

---

[4]  For the Court's convenience, Defendants' Trial Exhibits 1 and 2, and Plaintiffs' Exhibits 3 through 15, which address the issue of comparable sightlines, have been attached in the accompanying Appendix.

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

## IV. The Experts

### A. Plaintiffs' Expert Exhibits and Testimony

Plaintiffs' expert, Mr. James Terry, has broad expertise in ADA compliance at stadiums such as T-Mobile Park, including evaluating sightlines at such stadiums. Terry Testimony ("Ter. Test.") Dkt. No. 59 at 172:17-177:21. His extensive experience includes assisting both owner and patron interests in numerous large assembly arenas, including the original Yankee Stadium, Coors Field (Broncos Stadium), MCI Center Arena, and Madison Square Garden, among others. *Id.* Defendants do not dispute Mr. Terry's credentials.

Mr. Terry testified that he took measurements and pictures throughout the Stadium, demonstrating how the sightlines of wheelchair users sitting in accessible seats compare with those of fans sitting in non-accessible standard seats in close proximity. Ter. Test. Dkt. No. 59 at 193:19-196:2. He presented the sightline measurements and pictures as a sampling of the views of the playing field from ten accessible seating locations on the 100 and 200 levels, representing various locations where wheelchair seating is available. *Id.*; *see also* Pls.' App. Att. B12, Pls.' Ex. 14.

Mr. Terry took a representative sample of pictures from locations at which the eye of a a wheelchair user would be located assuming anthropometrics of wheelchair user height, wheelchair size, and location from the front of the edge of the seating platform at which the wheelchair would be located. Ter. Test. Dkt. No. 59 at 193:19-195:5; 199:1-18; 203:15-204:3.[5] He had an assistant place a first measuring stick *one row in front* with marks reflecting the

---

[5] Defendants do not dispute the anthropometric measurements used by Mr. Terry, which were derived from the Ellerbe Becket Settlement. Ter. Test. Dkt. No. 59 at 203:21-25. In fact, "both Plaintiffs' and Defendants' testifying experts utilized them when conducting their measurements within the Park." FFCL, Dkt. No. 77 at 15:5-11.

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

assumed height of the *shoulders* of an average standing spectator one row forward. *Id.* at 193:19-195:5; 199:1-18; 203:15-25; 204:4-205:20. He also had the assistant place a second measuring stick *two rows in front* with marks reflecting the assumed height of the *head* of an average standing spectator two rows in front. *Id.* The two measuring sticks appear in each exhibit. Pls.' App. Att. B1-B11, Pls. Ex. 3-13.

To check comparability of views, Mr. Terry then took pictures reflecting what a non-wheelchair user could see standing one row in front of the accessible seating from which the first picture was taken. Ter. Test. Dkt. No. 59 at 195:7-196:2, 205:6-14. As stated previously, he used two measuring sticks to mark the anthropometric measurements (derived from Ellerbe Becket) reflecting a "*Shoulder*" marker (held one row in front of the general spectator) and a "*Head*" marker (held two rows in front of the general spectator). Ter. Test. Dkt. No. 59 at 204:4-205:20; Pls.' App. Att. B1-B11, Pls. Ex. 3-13.

Each of Mr. Terry's photo exhibits (Pls.' App. Att. B3 through B11) offers a side-by-side comparison of two photos: The photo on the left represents a wheelchair user's view of the field, while the photo on the right represents the nearby general spectator's view of the field (standing one row in front of the accessible seating). Ter. Test. Dkt. No. 59 at 202:14-205:14.[6] Using Computer Aided Design and Drafting software (CADD), Mr. Terry created a "*Shoulder*" line and a "*Head*" line for each photo. *Id.* at 204:4-205:19. The "*Shoulder*" line extends the line of the shoulders of general spectators standing one row in front, while the "*Head*" line extends the line of the heads of general spectators standing two rows in front of the viewer. *Id.*

---

[6]     Attachments B1 and B2 both compare the wheelchair user's view from section 124, row 41A, with the views for general spectators standing in the adjacent section 125, including multiple views from front to back, in rows 33, 25, and 11. Ter. Test. Dkt. No. 59 at 198:17-200:17; Pls.' App. Att. B1, B2, D, Pls.' Ex. 3, 4, 15.

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

Mr. Terry's pictures include color overlays showing the portions of the field unobstructed by spectators standing in front of the subjects in each section of the Park that he surveyed. *Id.* at 205:20-206:5; Pls.' App. Att. B1-B11, Pls.' Ex. 3-13. The colored portions of the photos—Blue, Green, Light Blue—reflect the portions of the entire baseball field that can be seen *above* the "*Head*" line (including the Infield, Sides, and Outfield respectively). Ter. Test. Dkt. No. 59 at 207:10-18; 208:11-209:21; Pls.' App. Att. B1-B11, Pls.' Ex. 3-13. Anything above that "*Head*" line is above the heads of spectators *two rows forward. Id.* The uncolored portions of the photos appearing *below* the "*Head*" line would be *obscured* by the heads of those spectators standing two rows in front. *Id.*

Mr. Terry summarizes his sightline analyses in Plaintiffs' Exhibit 15 (*see generally* Pls.' App. Att. D, Pls.' Ex. 15), and he concludes with the expert opinion that, in nine out of ten cases examined, the wheelchair users' sightlines are not comparable to the general public (except in section 227, which had a raised platform). Ter. Test. Dkt. No. 59 at 215:15-217:3.

### B. Defendants' Expert Exhibits and Testimony

Defendants' expert, Mr. Endelman, acknowledged that he had no experience or expertise regarding sightlines in sizable public assembly areas or stadiums such as T-Mobile Park. Endelman Testimony ("End. Test.") Dkt. No. 61 at 38:6-39:11. His only prior experience with a sightline issue was being on a couple of conference calls to answer questions for an existing basketball arena remodel until he was asked to act as an expert in this case. *Id.* at 39:12-19. Endelman criticized the lack of detailed specifications defining how to comply with the DOJ's *Accessible Stadiums* guidance. *Id.* at 9:9-13; 16:2-8. Despite his limited experience and his limited understanding of the DOJ's sightline guidance, Mr. Endelman opined that the sightlines at T-Mobile Park comport with the *Accessible Stadiums* guidance. *Id.* at 13:17-20.

PLAINTIFF'S POST-REMAND
BRIEFING – Page 9

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

Mr. Endelman presented a schematic diagram reflecting the layout and dimension of two sections of the Stadium, with sightlines drawn in a format similar to the *Accessible Stadiums* diagram. End. Test. Dkt No. 61 at 13:21-14:17; Pls.' App. Att. A1, Def's Ex. DX1. Based on his diagram, he reasoned that wheelchair users were able to see over the shoulders of people standing one row in front and over the heads of people standing two rows in front. *Id.* Mr. Endelman acknowledged the purpose of the ADA was to provide persons with disabilities comparable access to the goods and services being provided to the general public. *Id* at 43:17-21. But still took the position that (in the absence of detailed legal specifications) that the ADA (and the *Accessible Stadiums* guidance interpreting it) would be satisfied so long as a wheelchair user could see the outfield warning track when spectators stand at the Stadium. End. Test. Dkt No. 61 at 13:17-20, 43:2-44:19.

**V.     Wheelchair Users on the 100 and 200 Levels of the Stadium Have Severely Obstructed Views Over the Heads of Spectators Standing Two Rows Forward, Whereas the Views of General Spectators Are Significantly Less Obstructed and Provide Unobstructed Sightlines to the Infield.**

Wheelchair users have severely obstructed views of the baseball field over the heads of spectators standing two rows in front of them, which detracts from exciting moments of play; non-wheelchair users have unobstructed views of the infield and consistently less obstructed views of the whole field. *See* Ter. Test. Dkt. No. 59 at 209:22-212:11; 215:15-217:3; Pls.' App. Att. B1-B11, C, D, Pls.' Ex. 3-15; Ter. Test. Dkt. No. 60 at 87:15-88:23.

The Ninth Circuit flagged one egregious example, identified by Plaintiffs' expert, of how wheelchair users in section 135 of the Stadium would see less of the playing field than spectators not using wheelchairs—"[W]hen viewing the infield, spectators using wheelchairs could see 31% of the field while spectators not using wheelchairs could see 100% of the field…and when

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

viewing the field generally, spectators using wheelchairs could see 36% of the field while spectators not using wheelchairs could see 71% of the field." *Landis*, 11 F.4th at 1104; *see also* Pls.' App. Att. B4, D, Pls.' Ex. 6, 15.  To be sure, wheelchair users in section 135 cannot see home plate or third base if spectators two rows in front of them stand, while a member of the general public who is not using a wheelchair can see those same areas of the field. Ter. Test. Dkt. No. 59 at 210:2-4. As explained, the view of the playing surface for wheelchair users is significantly blocked by the heads of persons standing two rows in front of them. *Id.* at 202:22-205:25.

By way of further examples:

- In section 129, wheelchair users could see only 65% of the infield, whereas spectators not using wheelchairs could see 100% of the infield. Wheelchair users could see 62% of the entire field, whereas spectators not using wheelchairs could see 97% of the entire field. Ter. Test. Dkt. No. 59 at 216:4-15.

- In section 224, wheelchair users could see only 40% of the infield, whereas spectators not using wheelchairs could see 100% of the infield. Wheelchair users could see 38% of the entire field, whereas spectators not using wheelchairs could see 69% of the entire field. In fact, a wheelchair user in section 224 can *only* see third base, while a member of the general public can see the entire infield. *Id.* at 211:7-212:11; 215:18-216:.

- In section 237, wheelchair users could see only 31% of the infield, whereas spectators not using wheelchairs could see 100% of the infield. Wheelchair users could see 36% of the entire field, whereas spectators not using wheelchairs could see 73% of the entire field. *Id. at* 215:18-216:3.

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

*See* Pls.' App. Att. B3, B7, B9, D, Pls.' Ex. 5, 9, 11, 15.

In just two sections of the Stadium (including section 227 in Mr. Terry's sample), the Defendants installed elevated platforms in order to provide wheelchair users with the necessary elevation over standing spectators. As a result, wheelchair user views of the infield were not obstructed by standing spectators, and their views of the remainder of the field were as good or better than the views of the general public. Ter. Test. Dkt. No. 59 at 212:12-213:11; Pls.' App. Att. B8, D, Pls.' Ex. 10, 15. In these exceptional cases, the extra several inches of lift was all that was necessary to provide a comparable view for patrons who use wheelchairs.[7]

## POINTS AND AUTHORITIES

**I.      The DOJ's 1991 Accessibility Guidelines, and the Corresponding 1996**
**         *Accessible Stadiums* Guidance, Govern This Case.**

Congress enacted the ADA to address discrimination suffered by individuals with disabilities, and as applied here, "the ADA prohibits anything less than the full and equal enjoyment" of sports arenas by individuals with disabilities. *See Landis*, 11 F.4th at 1102; *see also* 42 U.S.C. § 12182(a); § 12183(a)(1). To that end, the ADA—and the DOJ guidance interpreting it—require Defendants to provide wheelchair users with *comparable* sightlines.

Section 4.33.3 of the DOJ's ADA Accessibility Guidelines requires wheelchair accessible seats to have "lines of sight comparable to those for members of the general public." 28 C.F.R. Part 36, App. D § 4.33.3 (1991). The 1996 *Accessible Stadiums* guidance publication further

---

[7]    Defendant announced during trial that the two raised platforms in section 200 were being removed for a premium amenity area with tables and chairs.  Thus, Plaintiffs are not aware of any current back row wheelchair accessible seats on either the 100 or 200 Levels with views comparable to the general public. End. Test Dkt. No. 61 at 34:6-8; 36:20-37:7

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

interprets the comparable sightline requirement under section 4.33.3. According to the Ninth Circuit:

> *Accessible Stadiums* directs that a person using a wheelchair has comparable sightlines over standing spectators *only when two requirements are met*. First, a person using a wheelchair must be able to "see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front." *Second*, a person using a wheelchair must be able to see the playing surface "*over the heads of the persons standing two rows in front*."

*Landis*, 11 F.4th at 1106 (*citing Accessible Stadiums* at 2)(emphasis added); *see also* Pls.' App. Att. A2 at 2.

"Both parties agree that the *Accessible Stadiums* guidance applies to T-Mobile Field." *Landis v. Wash. State Major League Baseball Stadium Pub. Facilities Dist.*, 403 F. Supp. 3d 907, 916 n.12 (W.D. Wash. 2019). "No party contested the applicability of *Accessible Stadiums* or the district court's deference to it." *Landis*, 11 F.4th at 1105. Consequently, the *Accessible Stadiums* guidance governs the analysis of comparable sightlines in this case. *See id.* ("We see no reason to disturb the parties' presentation of the issues and sua sponte question the validity of *Accessible Stadiums*").[8]

/ / /

/ /

---

[8] The Court and parties recognize that sightlines also must comply with the 1994 Supplement to the Technical Assistance Manual ("TAM"), consistent with *Accessible Stadiums*. *See* FFCL, Dkt. No. 77 at 29:13-17. The TAM Supplement requires that: "[I]n assembly areas where spectators can be expected to stand during the event…wheelchair locations must provide lines of sight over spectators who stand." 1994 TAM Supplement § III-7.5180.

PLAINTIFF'S POST-REMAND
BRIEFING – Page 13

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

## II. On Remand, This Court Should Analyze the Second Requirement Under *Accessible Stadiums*: Whether Wheelchair Users Have Comparable Views Over the Heads of Persons Standing Two Rows in Front.

The Ninth Circuit observed that the district court analyzed the *first* requirement under *Accessible Stadiums*, but not the *second* requirement. "Although the district court recited both requirements, it failed to explain how the evidence satisfied the second requirement." *Landis*, 11 F.4th at 1106.[9]

The Circuit Court underscored how the evidence presented by Plaintiffs' expert Terry did not comport with the conclusion that a wheelchair user can see the playing surface *over the heads of persons standing two rows in front*: "Terry determined that the sightlines of spectators using wheelchairs were nearly always more obstructed than the sightlines of spectators not using wheelchairs. Specifically, Terry concluded that the heads of standing spectators two rows forward caused the most obstruction." *Id.* At 1104.

The Ninth Circuit reasoned:

> It seems the district court may have erroneously concluded that Terry's diagrams addressed only the spectator one row in front of the wheelchair accessible seating. However, *Terry's exhibits and his testimony explaining the exhibits make clear that one line represents the head of a spectator two rows in front* and the other line represents the shoulders of a spectator one row in front.

*Id.* at 1106 (emphasis added).

---

[9] Plaintiffs do not contend here that Defendants violate the *first* requirement under *Accessible Stadiums*, regarding sightlines between the heads and over the shoulders of the persons standing one row in front.

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

For these reasons, the Ninth Circuit vacated this Court's prior decision on Plaintiffs' comparable sightlines claim and remanded for reconsideration of Plaintiffs' claim consistent with the second requirement under *Accessible Stadiums*. *Id.* at 1107.

In light of the Ninth Circuit's ruling, on remand, the Court should determine whether wheelchair users at the Stadium have a comparable sightline of the playing field over the heads of persons standing two rows in front.

### III.    Based on the Expert Evidence Presented at Trial, Defendants Have Not Met Their Obligations Under the ADA to Provide Comparable Sightlines.

Plaintiffs and Defendants each presented expert exhibits and testimony concerning sightlines at the Stadium. Analyzing the second requirement under *Accessible Stadiums*, the unrebutted evidence shows that wheelchair user sightlines to the field of play are substantially obstructed and are not comparable to those of non-wheelchair users.

### A.    Plaintiffs' Expert Evidence Shows that the Stadium Does Not Provide Comparable Sightlines Over the Heads of Persons Standing Two Rows in Front.

Plaintiffs' exhibits and expert testimony "show that, in the locations measured, a wheelchair user would consistently see less of the field" than their counterpart non-wheelchair users. *See* FFCL, Dkt. No. 77 at 27:4-5; *see also* Pls.' App. Att. B1-B11, C, D, Pls.' Ex. 3-15. Except for the two 200 level sections where raised platforms were installed (and slated for removal), wheelchair users have significantly obstructed views of the *infield* over the heads of spectators standing two rows in front of them. Pls.' App. Att. D, Pls.' Ex. 15. Wheelchair users also see substantially less of the playing field *as a whole* than what can be seen by general

PLAINTIFF'S POST-REMAND
BRIEFING – Page 15

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

spectators. *Id.*

Plaintiffs' evidence further demonstrates that general spectators at the Stadium (i.e., the non-wheelchair users)—unlike disabled patrons—can see the entire infield over spectators standing two rows forward, including all of the bases and base lines. Pls.' App. Att. B1-B11, D, Pls.' Ex. 3-13, 15. At every location measured by Mr. Terry, the general spectator can see 100% of the infield over the heads of other spectators standing two rows in front of them, and consequently, a much higher percentage of the playing field when viewed as a whole. *Id.*

In sum, Plaintiffs' expert evidence shows that wheelchair users at the Stadium do not have comparable sightlines over the heads of spectators standing two rows in front.

### B. Defendants' Expert Evidence Does Not Show that the Stadium Provides Wheelchair Users with Comparable Sightlines Over the Heads of Persons Standing Two Rows in Front.

Defendants offer Mr. Endelman's testimony, and his schematic drawing (Pls.' App. Att. A1, Def.'s Ex. DX1), as their sole evidence regarding sightlines at the Stadium. Yet, neither Mr. Endelman's testimony nor his drawing provides any information or analysis about what portion of the field wheelchair users can and cannot see as compared to non-wheelchair users.

As set forth above, the ADA prohibits anything less than the full "and equal enjoyment" of sport stadiums by individuals with disabilities. *See Landis*, 11 F.4th at 1102. Necessarily, then, Defendants must provide wheelchair users with views of the playing field that are *no more obstructed than* those provided to the general public. *See Paralyzed Veterans of Am. v. D.C. Arena L.P.*, 117 F.3d 579, 583 (D.C. Cir. 1997) ("We thus think the phrase 'lines of sight comparable' is easily read as a view no more obstructed than would be available to non-

PLAINTIFF'S POST-REMAND
BRIEFING – Page 16

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

wheelchair users"), *abrogated on other grounds by Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 135 S. Ct. 1199, 191 L. Ed. 2d 186 (2015); *agreed with by Miller v. California Speedway Corp.*, 536 F.3d 1020, 1024 (9th Cir. 2008); *cf. United States v. AMC Ent.*, 2006 WL 224178, at *3 (C.D. Cal. Jan. 10, 2006).[10]

Moreover, the Ninth Circuit has already seen fit to implement the ADA requirement of "comparable" sightlines to require views over standing spectators, notwithstanding objections by stadium operators regarding a lack of clear DOJ guidance. *See Miller*, 536 F.3d at 1032. In *Miller*, the Ninth Circuit determined that the DOJ's 1994 interpretation of "lines of sight comparable to those for members of the general public" was reasonable. *See id.* at 1029. The Ninth Circuit explained that, when the crowd stands at a sporting event: "[M]ost spectators can also stand and, in doing so, *enable themselves to substantially see the event*. Therefore, in order to be given a comparable line of sight, wheelchair users *must also be able to see the event when the crowd is standing*." *Id.* at 1029 (emphasis added).

The vast majority of "action" in a baseball game occurs in the infield, which includes the pitching mound, bases, home plate, and running lanes. Every single play in baseball begins at the pitching mound. Every single pitch is thrown within the infield, and every hit begins at home plate. Every runner runs exclusively within the infield diamond. Defendants cannot demonstrate that they provide *comparable* sightlines at the Stadium because the general public has a clear view of the infield (100% unobstructed) over spectators standing two rows in front, but wheelchair users have significantly obstructed views of the infield. Thus, wheelchair users have

---

[10] After finding that AMC violated the comparable sightlines requirement of Section 4.33.3, and without regard to any standing spectator issue, the district court ordered AMC to provide wheelchair users with an unobstructed view to the top ninety percent (90%) of the movie screen, since "AMC currently provides most members of the general public with an unobstructed view to the top ninety percent (90%) of the screen." *See, United States v. AMC Ent.*, 2006 WL 224178, *modified by United States v. AMC Ent.*, 549 F.3d 760 (9th Cir. 2008) (Rruling applicable to theaters constructed in the Ninth Circuit after AMC received notice of the regulatory requirements).

PLAINTIFF'S POST-REMAND
BRIEFING – Page 17

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

far more obstructed views of the baseball game in play as compared to the views of the general public. In other words, during the most exciting moments of the game, when general spectators stand, wheelchair users cannot enjoy the game as fully and equally as everyone else.

Furthermore, Defendants must provide wheelchair users with views of the playing field, considered as a whole, that are no more obstructed than those provided to the general public. But once again, looking over the tops of the heads of spectators standing two rows forward, wheelchair users' views of the entire field (including the sides, infield, and outfield) are comparatively more obstructed than the views provided to non-disabled spectators. *See* Pls.' App. Att. D, Pls.' Ex. 15.

Of course, Defendants have argued that everyone can see at least some small piece of the playing surface over standing spectators, and if wheelchair users only had a view of the turf near the outfield wall that's all that's required. End. Test. Dkt. No. 61 at 13:17-20; 43:2-44:10. But this ignores the spirit and purpose of the ADA. Defendants have not said—*and indeed cannot say*— that wheelchair users see an equal or equivalent amount of the field of play as members of the general public (at least not over the heads of spectators standing two rows in front). Mr. Endelman made no effort whatsoever to ascertain what portions of the field could be seen by the general public as compared to what portions of the field could be seen by wheelchair users over standing spectators. *Id.* at 50:4-7, 52:15-20, 53:13-21.[11]

For the reasons above, Defendants' evidence does not show that wheelchair users have comparable sightlines over the heads of spectators standing two rows in front of them.

---

[11] Notwithstanding his views about ADA compliance, even Mr. Endelman acknowledged that, assuming a wall of spectators standing two rows forward, the wheelchair user's views would be obstructed compared to the views of non-disabled spectators. *Id.* at 51:23-52:7, 53:20-54:2.

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558

# CONCLUSION

Defendants have not met their obligations under the ADA to provide comparable sightlines to wheelchair users at the Stadium. Plaintiffs respectfully request that the Court enter Judgment in favor of Plaintiffs on this sole remaining issue of liability.

In light of the above, the Court should enter an order requiring Defendants to provide wheelchair users in accessible seats on the 100 and 200 levels of the Stadium with sightlines such that, when measured from an assumed eye height and location of a wheelchair user, they will have a comparable view of the entire field, including *all* of the infield, and be able to fully enjoy America's pastime.

DATED: February 13, 2023      Respectfully submitted,

WASHINGTON CIVIL & DISABILITY ADVOCATE

*/s/Conrad Reynoldson*
Conrad Reynoldson, WSBA #48187
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
Email: Conrad@wacda.com
Phone: (206) 428-3558

DISABILITY RIGHTS LEGAL CENTER

*/s/Christopher H. Knauf*
Christopher H. Knauf, CSB #185180
Disability Rights Legal Center
1001 Wilshire Blvd., Suite 100, PMB 3201
Los Angeles, CA 90017
Email: ck@drlcenter.org
Phone: (213) 736-1031 x8199

PLAINTIFF'S POST-REMAND
BRIEFING – Page 19

2:18-CV-01512-BJR

WASHINGTON CIVIL &
DISABILITY ADVOCATE
4115 Roosevelt Way NE, Suite B
Seattle, WA 98105
(206) 428-3558