The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CLARK LANDIS, *et al.*,

Plaintiffs,

v.

WASHINGTON STATE MAJOR LEAGUE BASEBALL STADIUM PUBLIC FACILITIES DISTRICT, *et al.*,

Defendants.

NO. 18-cv-1512

**ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND**

## I.  INTRODUCTION

This matter comes before the Court on remand from the Court of Appeals for the Ninth Circuit, which partially affirmed this Court's judgment, after a bench trial, in favor of Defendants. The appellate court vacated the Court's judgment on the sole issue of whether the Defendants' stadium's sightlines for spectators using wheelchairs are sufficient to satisfy the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* The panel affirmed the Court's decision on Plaintiffs' remaining claims related to ticket pricing, dispersal of seats, and views of a particular scoreboard. With regard to sightlines, the panel held that the Court failed to explain how the evidence satisfied both requirements of the Department of Justice's *Accessible Stadiums*

ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND

- 1

1    comparable-sightline guidance[1] and remanded this case for further proceedings so that the Court

2    could perform a complete analysis of the requirements. Having carefully reviewed the evidence

3    produced during the bench trial, the parties' opening and responsive briefs on remand, and the

4    relevant legal authorities, the Court finds that T-Mobile Park meets the *Accessible Stadiums*

5    comparable-sightline standard, and thus, its sightlines for spectators using wheelchairs are

6    sufficient to satisfy the ADA.

7        The reasoning for the Court's decision follows.

## II.   BACKGROUND[2]

9        Plaintiffs are baseball fans who use wheelchairs. Defendants are the collective owners and

10   operators of T-Mobile Park, home of Major League Baseball's Seattle Mariners. The Plaintiffs

11   initially asserted there were numerous elements at the stadium that were not compliant with the

12   ADA. By the time of trial, only four issues remained unsolved: (1) whether wheelchair spectators

13   have adequate sightlines over spectators standing in front of them ("sightlines"); (2) whether

14   accessible seats are properly distributed vertically in the 100 Level of the Park ("distribution"); (3)

15   whether ticket prices for accessible seats are comparable to nonaccessible seating ("pricing"); and

16   (4) whether wheelchair spectators have sufficient sightlines to the main Scoreboard located in

17   centerfield ("communications"). After a bench trial and post-trial briefing, the Court found that T-

18   Mobile Park is ADA compliant as to all four issues. *See* Findings, ECF No. 77. Plaintiffs timely

19   appealed. In a non-published memorandum disposition, the Ninth Circuit affirmed the Court's

---

[1] In addition to the 1991 ADA Accessibility Guidelines and the Technical Assistance Manuals, the Department of Justice ("DOJ") also published more informal guidelines, such as the Accessible Stadiums guidelines in order to "highlight[] key accessibility requirements of the ADA that apply to" stadiums built after the ADA's effective date. Department of Justice, Accessible Stadiums (1996), https://www.ada.gov/stadium.pdf ("*Accessible Stadiums*").

[2] Because the parties are quite familiar with the underlying facts and legal arguments, the court provides only a brief background to aid in understanding its opinion on this discreet issue of the case. For more detail, *see* Findings of Fact and Conclusions of Law, ECF No. 77.

ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND

- 2

decision as to distribution, pricing, and communications. Mem. Dispo., ECF No. 90. In a concurrently published opinion, the Ninth Circuit vacated the Court's decision regarding sightlines and remanded for further proceedings. Ninth Cir. Op., ECF No. 89.

The Ninth Circuit first considered whether the *Accessible Stadiums* guidance interpreting section 4.33.3 of the 1991 Accessibility Guidelines is the appropriate standard to apply in this case. *Id.* at 9-11. The panel majority assumed, without deciding, that the Court did not err in applying the *Accessible Stadiums* standard, and then considered if the standard had been properly applied. *Id.* at 11.[3] The panel determined that although the Court had recited both requirements provided in *Accessible Stadiums*, it was not satisfied that the Court had analyzed the second requirement and remanded the case back to this Court to perform a full analysis of the *Accessible Stadiums* requirements. *Id.* at 12-13.[4]

### III. ANALYSIS

In its most pertinent part, *Accessible Stadiums* provides:

> Wheelchair seating locations must provide lines of sight comparable to those provided to other spectators. In stadiums where spectators can be expected to stand during the show or event (for example, football, baseball, basketball games, or rock concerts), all or substantially all of the wheelchair seating locations must provide a line of sight over standing spectators. A comparable line of sight, as illustrated in the figure below, allows a person using a wheelchair to see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front and over the heads of the persons standing two rows in front.

---

[3] The majority saw "no reason to disturb the parties' presentation of the issues," agreeing that *Accessible Stadiums* is a reasonable interpretation of the "genuinely ambiguous" regulation. Ninth Cir. Op. at 10. In a concurring opinion, Judge Bumatay questioned deference to the DOJ's "informal guidance" document, suggesting that it would be more appropriate for the district court to perform the deference analysis described in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). Ninth Cir. Op. 13-27 (Bumatay, J., concurring).

[4] The majority also noted that "the regulation that *Accessible* Stadiums interprets was supplanted by the 2010 Accessibility Guidelines for new construction and alterations, thus cabining *Accessible Stadiums*' applicability. Ninth Cir. Op. 11 (citing 28 C.F.R. § 36.406(a)(1); 28 C.F.R. Pt. 36, App. B).

ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND

- 3

*Accessible Stadiums* at 2 (emphasis omitted).



Figure Showing Comparable Line of Sight for Wheelchair Seating Location

Accordingly, "*Accessible Stadiums* directs that a person using a wheelchair has comparable sightlines over standing spectators only when two requirements are met. First, a person using a wheelchair must be able to 'see the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front.' Second, a person using a wheelchair must be able to see the playing surface 'over the heads of the persons standing two rows in front.'" Ninth Cir. Op. 11-12 (quoting *Accessible Stadiums* at 2).  It is Plaintiffs' burden to show that Defendants discriminated against them by not complying with accessibility regulations at T-Mobile Park. *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1048 (9th Cir. 2008).

The relevant evidence submitted at trial included testimony from Plaintiffs' expert James Terry, Defendants' expert William Endelman, and Plaintiff Clark Landis. *See* Trial Trs., ECF Nos. 59-61.  Mr. Landis primarily testified about his view of the scoreboard.  He testified that although it had been "probably 20 years" since he sat in the 100 level of the stadium, his recollection was that when sitting on the first-base side, if spectators in front of him were standing, his view was impeded of home plate and players running to first base. Trial Tr. 131-32, Oct. 16, 2019, ECF No.

ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND

- 4

1  60; *see also id.* at 135 ("I have to say it's been a long time. I just know that my view was

2  obstructed."). He did not recall whether he could see over the heads of the persons standing two

3  rows in front of him. *Id.* at 137. Mr. Landis chose to move to the 200 level, where he has a "good

4  view of the field" although he still had issues seeing the scoreboard. *Id.* at 133. He testified that in

5  section 226, he can see when people are standing in front of him: "I can see right over the top of

6  them." *Id.* at 139. The Court does not find Mr. Landis's testimony particularly helpful, since he did

7  not provide any specific testimony related to the two individual requirements, but only generally

8  regarding having some obscured visibility in one section and a good view in another section.

9        The parties' experts each took different approaches to their analysis of the sightline

10  requirements, and they present competing opinions regarding whether the requirements were

11  satisfied. The Court must assess the weight to afford each expert's testimony and opinion.

12        Defendants' expert, Mr. Endelman, is a licensed architect, and his firm specializes in

13  accessibility consulting, which includes ADA compliance, primarily during the design phase of

14  buildings to ensure that architectural plans comply with regulations. Trial Tr. 4-5, Oct. 17, 2019,

15  ECF No. 61. He relied on the *Accessible Stadiums* text and illustrative figure as being the only

16  guidance available to T-Mobile Park when it was being designed and constructed. *Id.* at 7-10.[5] To

17  establish anthropometric measurements, Mr. Endelman used the dimensions provided by the DOJ

18  in its settlement with Ellerbe Becket.[6] *Id.* at 11-12. Mr. Endelman's firm used the actual

---

[5] "The only technical requirement that the Department of Justice has provided is that diagram and the description of seeing over the shoulders and between heads in the first row, and over heads in the second row. There is no more detail provided." Trial Tr. 42, Oct. 17, 2019.

[6] *United States v. Ellerbe Becket, Inc.*, D. Minn., No. 4-96-995, (March 24, 1998 Consent Order), https://www.ada.gov/ellerbe.htm). In Exhibit B of that Consent Order, the DOJ for the first time endorsed specific anthropometric measurements to be used prospectively in designing stadiums. While those measurements were produced towards the end of construction of T-Mobile Park, both Plaintiffs' and Defendants' testifying experts utilized them when conducting their measurements within the Park.

ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND

- 5

architectural drawings of the stadium showing the layouts of the seats and the actual measured dimensions in two sections of the stadium that Plaintiffs had referenced in their Complaint—Sections 112 and 224. *Id.* at 14. Using Computer Aided Design ("CAD") software, the *Accessible Stadiums*' illustrative figure was then superimposed on the actual layouts of the seating in those sections, using the anthropometric dimensions from the *Ellerbe Becket* case. *Id.* at 15. Based on a comparison of the two dimensions showing a match between the DOJ illustrative diagram and the stadium's actual dimensions,[7] Mr. Endelman opined that the wheelchair spectator has a line of sight to the playing surface as required by the *Accessible Stadiums* guidance. *Id.* at 16, 30-32. Specifically, referring to the diagrams admitted into evidence,[8] Mr. Endelman testified that "what the diagrams show is that the sight lines of a seated wheelchair user on the platform behind other seats comports with the requirement that you be able to see over the shoulders and between the heads of people in the row immediately in front, and over the heads of people in the second row in front of the accessible seating." *Id.* at 14. Mr. Endelman did not opine on the view of the field because there was no requirement specified by the DOJ in *Accessible Stadiums*. *Id.* at 16, 76.

Plaintiffs' expert, Mr. Terry, also has a background in architecture, and has extensive experience with ADA compliance at stadiums such as T-Mobile Park. Trial Tr. 172, Oct. 15, 2019, ECF No. 59. In addition to consulting on accessibility compliance, he has provided expert witness testimony in similar cases. *Id.* at 173-177; *see, e.g.*, *Bailey v. Bd. of Comm'rs of Louisiana Stadium & Exposition Dist.*, 484 F. Supp. 3d 346, 386 (E.D. La. 2020) (evaluating Mr. Terry's expert opinion

---

[7] Mr. Endelman testified that the same approach is taken when the firm analyzes compliance during the design phase except then they use the "as-designed" spacing as opposed to the "as-built" spacing. Trial Tr. 29-30, Oct. 17, 2019. Whether analyzing the T-Mobile Park "as-designed" or "as-built," Mr. Endelman's opinion is that the stadium complies with *Accessible Stadiums* guidance. *Id.*

[8] Defendants' Trial Exhibits 1, 23.

ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND

- 6

1  regarding sightlines in a football stadium).  Mr. Terry focused his analysis on comparing the views
2  of a wheelchair spectator to the views of a standing spectator. Trial Tr. 195, Oct. 15, 2019.

3       Mr. Terry selected a representative sample of ten wheelchair seats in the stadium and
4  measured what he projected the sight lines to be by taking a pair of carpenter's rulers, which are
5  six-foot sticks with dimensions, placing them in the row in front of the wheelchair spectator and
6  two rows in front of the wheelchair spectator, marking shoulder and head heights with Post-it notes,
7  and then taking a photograph of the field using a camera at the wheelchair spectator's deemed eye
8  point. *Id.* at 193-94.  He then stepped forward one row and took similar measurements and
9  photographs from the point of view of the standing spectator. *Id.* at 195.  Using CAD software to
10 extend the line where the row of heads or row of shoulders would be, and using the anthropometric
11 measurements from *Ellerbe Becket*, Mr. Terry compared the view of the field as shown in the
12 photographs. *Id.* at 194, 204, 234.  Mr. Terry opined that the wheelchair spectators do not see the
13 same percentages of the playing field as the counterpart nonaccessible seat.  *Id.* at 195-216
14 (describing Plaintiffs' Trial Exhibits 3-15).

15      The photographs depict two lines obstructing a spectator's view: the lower line represents
16 the shoulders of standing spectators one row in front of the camera eye, and a second higher line
17 that represents the heads of the spectators standing two rows in front of the camera eye. *Id.* at 203-
18 05. Mr. Terry testified that when selecting the sample seats for his analysis, he chose not to take
19 measurements at seats that appeared to have "pretty good" or "reasonably good" views. *Id.* at 196-
20 97. He also testified that some comparators were not directly in front of the wheelchair spectator
21 but were from a different standing spectator's view. *Id.* at 199-200, 202.  A spreadsheet summary
22 of the calculations shows that the wheelchair spectators' views of the playing field were not always
23 equivalent. *See* Pls.' App'x 133-45, ECF No. 105.  Mr. Terry opined that 100% equivalency was

ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND

- 7

not necessary to be considered comparable, but he could not define comparability as a standard. Trial Tr. 53-56, 84-88, Oct. 16, 2019; *see also id.* at 55:17-20 ("If you're asking for a bright line, I don't know of a way to draw a bright line, other than when viewed in its entirety or when looking at this from the view of does it feel like discrimination or not[]").  Mr. Terry's testimony and exhibits indicated that generally, the wheelchair spectators could see above the shoulders of the spectators standing one row in front, but frequently had a more restricted view of the field when looking over the heads of the spectators two rows in front. Pls.' App'x 133-45.  In Mr. Terry's opinion, his illustrations support a finding that the views were not comparable, and therefore, the sightlines do not comport with the ADA.

Part of the Court's assessment of the trial evidence and testimony includes judging credibility and evaluating the weight to afford each expert's testimony. The Court found Mr. Endelman's testimony credible and persuasive.  It was clear, precise, focused on the requirements, used actual architectural drawings and measurements from the stadium as-built, and demonstrated that the wheelchair spectator had sightlines over the shoulders of one row in front and over the heads of two rows in front. Mr. Terry's testimony was less precise and his conclusions more subjective.  At least one other court has evaluated Mr. Terry's methodology and found it wanting with regard to analyzing sightlines. *See Bailey*, 484 F. Supp. 3d at 388-89 (affording less weight to Mr. Terry's testimony and findings than to the competing expert using a similar methodology). Mr. Terry was not able to articulate a consistent standard to apply, leaning more towards what felt like discrimination. Although he provided detailed photographic drawings and percentages, the reliability of the photographs and data is questionable. When examined closely, the photographs cause significant concerns. Furthermore, they are based on inconsistent comparators, no allowances for margins of error considering the measuring methodology, and his decision to not take

ORDER FINDING IN FAVOR OF DEFENDANTS ON REMAND

- 8

measurements for seats where he deemed the view "reasonably good" serves to undermine his overall conclusion. Therefore, the Court affords less weight to Mr. Terry's findings that are contrary to Mr. Endelman's.

Based on the evidence presented at trial, the Court concludes that (1) a wheelchair spectator has comparable sightlines to other spectators when viewing the playing surface between the heads and over the shoulders of the persons standing in the row immediately in front of them; and (2) a wheelchair spectator has comparable sightlines to other spectators when viewing the playing surface over the heads of the persons standing two rows in front of them.  As such, the sightline from accessible wheelchair seats comports with the requirements set forth in the DOJ's *Accessible Stadiums* guideline.  The Court finds that the Plaintiffs have not met their burden to show that the Defendants discriminated against them by not complying with accessibility regulations at T-Mobile Park.

### IV.   CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendants on Plaintiffs' sightline claim.  Judgment shall be entered by separate Order.

DATED this 5th day of June 2023.

*Barbara J. Rothstein*
Barbara Jacobs Rothstein
U.S. District Court Judge